105.

106. Dr. Kraszewski's medical findings and her statements to the effect that she , are directly contradictory to statements given, and actions taken by every named Defendant in the case who came into contact with DILEONARDO and BIENZ at the hospital, all who claimed that neither exhibited any sign of

107. The Defendants intentionally failed to act in accordance with the official duties inherent to their office, failed to accurately report their observations and intentionally withheld or omitted damaging evidence against DILEONARDO and BIENZ in furtherance of the conspiratorial goal of shielding DILEONARDO and BIENZ from criminal and administrative sanctions and in furtherance of the false arrest and malicious prosecution of MOROUGHAN. When subsequently questioned about their observations during the investigation by Nassau and Suffolk County Internal Affairs Units, all named Defendants' lied in sworn statements as to their observations and actions concerning DILEONARDO and BIENZ to the benefit of DILEONARDO and BIENZ and the detriment of MOROUGHAN. All defendants did so to benefit themselves and their departments by conveying a benefit to their brethren officers.

C. NASSAU COUNTY IAB CONCLUSION OF DILEONARDO AND BIENZ' INTOXICATION

108

### Events at Huntington Hospital

A. RESPONSE BY NASSAU AND SUFFOLK POLICE:

13

### Response by Nassau Police

109. After Nassau County Police Department was notified of the shooting, the first Nassau officer to respond to Huntington Hospital was Sgt. MARINACE of the 3rd precinct after Nassau County Police Department was notified of the shooting. Sgt. MARINACE arrived at Huntington Hospital at 0211 hours (2:11 am), just thirteen minutes after DILEONARDO and BIENZ arrived at the emergency room.

110.

111. In this case, the DFR consisted of the following personnel:

   a. Edmond Horace, Inspector Information and Technology Unit;

   b. John Hunter, Deputy Chief Patrol;

   c. Daniel P. Flanagan, Commanding Officer Police Academy;

   d. John DeMartinis D/Sergeant Homicide Bureau.

112.

113. In the instant case, the first DFR responder was Inspector HORACE who arrived at Huntington Hospital at 0251 hours at which time he was briefed by Sgt. MARINACE and unidentified Suffolk County Detectives from the 2nd Precinct. Thereafter, Inspector HORACE spoke with DILEONARDO, BIENZ, Jillian Bienz, and Sophia Cornia.

114.

a)

b)

c)

14

d)

e)

f)

115.  Deputy Chief of Patrol HUNTER responded to the crime scene at 0439 and thereafter responded to Huntington Hospital (no time recorded) as part of his duties as a member of the DFR.

a)

b)

c)

d)

116.

15

117. Captain Daniel FLANAGAN responded to the crime scene arriving at approximately 0437 hours. However, there is no evidence that he interviewed any party or witness to this event either at the crime scene or at the hospital. Captain FLANAGAN also failed to accurately report the true factual account of the events in question.

118. On February 27, 2011, Deputy Chief HUNTER issued a memorandum to the Commissioner of Police, which in material part, intentionally contained false and misleading factual information. In summary the memorandum concluded the following: The investigation consisted of an on scene evaluation and a review of the investigation by the Suffolk County Police Department's Homicide Squad and Second Squad. All preliminary information was received from SCPD investigators. Interviews with police officers DILEONARDO and BIENZ had not yet been conducted. As a result of this preliminary investigation, it is the opinion of the Deadly Force Response Team that the actions of all officers involved, with regard to Use of Force issues were within Departmental guidelines pertaining to the Use of Deadly Physically Force as well as those of Article 35 of the Penal Law of New York State. All officers involved were found fit for duty.

119. The Nassau County Police Department Deadly Force Response Team, intentionally failed to act in accordance with their official duties inherent in their office, failed to accurately report their observations and intentionally withheld or omitted damaging evidence against DILEONARDO and BIENZ in furtherance of the conspiratorial goal of shielding DILEONARDO and BIENZ from criminal and administrative sanctions and in furtherance of the false arrest and malicious prosecution of MOROUGHAN

120. The Nassau County Police Department Deadly Force Response Team met with, and conspired with, members of the Suffolk County Police Department for the purpose of fabricating evidence against MOROUGHAN, including but not limited to: securing a false confession from MOROUGHAN in violation of his fifth amendment right to remain silent, 6th amendment right to counsel and due process right to a fair trial; and by withholding evidence concerning MOROUGHAN'S repeated complaints about being brutally shot and assaulted by DILEONARDO without justification, about the erratic operation of the motor vehicles being driven by DILEONARDO and BIENZ, about the intoxication of both DILEONARDO and BIENZ, about the erratic behavior of DILEONARDO, about MOROUGHAN'S repeated requests for counsel, about the true nature of MOROUGHAN'S medical condition, state of mind, and cognitive processes at the time he was questioned by LESER and TAVARES, misleading MOROUGHAN into believing he was signing a supporting deposition for the arrest of his assailants rather than a false confession outlining a justification defense tailored to the Conspiratorial goal of establishing a justified shooting, and intentionally delaying the interview of BIENZ and DILEONARDO to insure they were no longer intoxicated prior to their interviews by LESER and TAVARES, failure to perform any sobriety test geared to evidence signs of intoxication, failure to even request blood, urine, or breath samples from DILEONARDO and BIENZ, failure to secure a warrant for blood or urine to test for intoxicants, ignoring the repeated requests of medical personnel at the hospital to secure the blood of DILEONARDO and BIENZ due to their obvious intoxication, failure to subsequently investigate and question witnesses who would establish the intoxication of DILEONARDO and BIENZ, as well as

the true facts and circumstances surrounding the shooting which would establish the criminal and unjustified use of deadly physical force by DILEONARDO upon MOROUGHAN. All this was done with the intent by Defendants' to achieve their conspiratol goal of falsely arresting and maliciously prosecuting MOROUGHAN to avoid criminal and administrative sanctions against DILEONARDO and BIENZ.

### Response by Suffolk Police

121. DILEONARDO and BIENZ arrived at Huntington Hospital at approximately 2:00 AM. They remained at Huntington Hospital for approximately 8 hours, during which time no Suffolk County police officer allegedly interviewed either man. Defendants' falsely reported that no members of the SCPD spoke to DILEONARDO or BIENZ during the 8 hours they were at Huntington Hospital, despite the fact that neither of them were seriously injured and were available for questioning. DILEONARDO and BIENZ were brought to the SPCD 2nd precinct at approximately 10:00 a.m., where they were finally questioned by TAVARES and LESER. Questioning occurred while both DILEONADO and BIENZ were in the same room. Despite the seriousness of this case, no written statement was taken of BIENZ. DILEONARDO provided a one paragraph statement which purports to include a comprehensive account of events, these events include, but are not limited to, the initial road rage incident, the subsequent verbal altercation with MOROUGHAN, the location of the argument, the persons and vehicles present, their respective locations, DILEONARDO'S discharge of his firearm, DILEONARDO'S assault on MOROUGHAN perpetrated in furtherance of DILEONARDO'S alleged attempt to arrest MOROUGHAN, DILEONARDO'S loss of his service weapon, MOROUGHAN'S alleged attempt to fatally injure DILEONARDO with his Prius, and MOROUGHAN'S exit from the scene (MOROUGHAN drove from the scene of the incident directly to Huntington Hospital in order to obtain medical treatment for the two gunshot wounds and broken nose inflicted by DILEONARDO).

122. Suffolk Police Officers ROCCHIO and NIEVES were first to respond to the crime scene at 422 Oakwood Drive, Huntington, New York.

ROCCHIO intentionally failed to perform duties inherent in her office as she failed to interview any of the parties at the crime scene or to take their statements. Despite the intoxicated state of the DILEONARDO and BIENZ, ROCCHIO failed to conduct any field sobriety test, portable breath tests, and failed to seek a warrant for blood. ROCCHIO accompanied the parties to Huntington Hospital.

17

126. Detective GEISSINGER of the Second Squad initially responded to the crime scene GEISSINGER intentionally failed to take witness statements or to conduct interviews, claiming that the 2nd Squad did not handle police shooting. GEISSINGER then responded to Huntington Hospital, met and conspired with Nassau Defendants with the intent to falsely arrest MOROUGHAN in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions.

18

123. Officer NIEVES responded to the crime scene with ROCCHIO.

124. Officer FAYA responded to Huntington Hospital, met and conspired with other Defendants with the intent to falsely arrest MOROUGHAN in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions.

125. Sergeant SMITHERS responded to the crime scene, met and conspired with other Defendants with the intent to falsely arrest MOROUGHAN and to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions.

126. Detective GEISSINGER of the Second Squad initially responded to the crime scene. GEISSINGER intentionally failed to take witness statements or to conduct interviews, claiming that the 2nd Squad did not handle police shooting. GEISSINGER then responded to Huntington Hospital, met and conspired with Nassau Defendants with the intent to falsely arrest MOROUGHAN in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions.

18

27). Despite detecting the odor of alcohol, GEISSINGER failed to perform duties inherent to his office in that GEISSINGER failed to administer field sobriety tests, portable breath tests and further failed to seek a warrant for blood.

127. Detective FAVATTA of the Second Squad responded to Huntington Hospital, met and conspired with Defendants with the intent to falsely arrest MOROUGHAN in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions.

128. Thereafter, FAVATTA responded to Huntington Hospital, met and conspired with other Defendants with the intent to falsely arrest MOROUGHAN in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions.

FAVATTA further failed to perform a duty inherent in his office by failing to administer field sobriety tests, a portable breath test or seek a warrant for blood. FAVATTA's actions were intentionally taken in order to further the Defendant's conspiratorial goals.

129. Detective CICCOTTO, of the Suffolk County Homicide Squad, responded to Huntington Hospital, met and conspired with other Defendants in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions.

130. Detective TAVARES responded to Huntington Hospital, met and conspired with other Defendants with the intent to falsely arrest MOROUGHAN in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions. In his sworn

19

131.

132.

133.   The first and only interview of DILEONARDO was conducted by TAVARES, but not until 10:00 AM. Both Defendants BIENZ and LESER were present at this interview. TAVARES took a one (1) paragraph statement from DILOENARDO, which is directly contradicted by eyewitness accounts, that MOROUGHAN'S vehicle drove towards DILEONARDO who in turn, fired at MOROUGHAN in self defense. Since TAVARES had already procured a false confession from MOROUGHAN, TAVARES was able to provide DILEONARDO with the information needed to articulate an intentional false account of events which in turn provided DILEONARDO with a false basis to claim justification for the use of deadly physical force.

134.   Detective Sergeant LAMB responded to Huntington Hospital, met and conspired with other Defendants with the intent to falsely arrest MOROUGHAN and to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions. LAMB arrived at 4:00 AM and he intentionally had no interaction with DILEONARDO or BIENZ other than to briefly introduce himself, as he was aware of their intoxicated state.

furtherance of the conspiracy LAMB directed TAVARES and LESER to secure a false confession from MOROUGHAN.

135. Detective LESER responded to Huntington Hospital, met and conspired with other Defendants with the intent to falsely arrest MOROUGHAN in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions. While at the hospital, in furtherance of the conspiracy assisted TAVARES in securing a false confession from MOROUGHAN.
shortly after 3:00

136. Police Officer MEANEY responded to Huntington Hospital, met and conspired with other Defendants with the intent to falsely arrest MOROUGHAN in order to protect and shield DILEONARDO and BIENZ from possible criminal and/or departmental sanctions. MEANEY failed

137. At no time, despite clear medical evidence supporting the fact that DILEONARDO and BIENZ were intoxicated did any member of the SCPD attempt to administer field sobriety tests, a portable breath test or to secure a warrant for blood. This failure by the SCPD officers present was a collective and intentional failure to perform duties inherent in their offices in furtherance of their conspiratorial goal of insulating DILEONARDO and BIENZ from possible criminal and/or

21

departmental sanctions, while contemporaneously falsely arresting MOROUGHAN, the victim of the shooting.

### Nassau IAB Interview of Assistant District Attorney Risco Lewis

138.

### Eyewitness Account of Eric Klug

139. Eric Klug was an eyewitness to the shooting. Mr. Klug resided in a second floor apartment with a large picture window overlooking the incident which occurred directly in front of his house. His physical address was 422 Oakwood Drive, Huntington, New York. Mr. Klug called 911 that evening, provided his name, phone number and reported the shooting. Despite that fact no Suffolk police officer interviewed Klug or took his statement.

On July 18, 2011, Klug provided the following eyewitness account:

22

Klug's sworn eyewitness account corroborates the factual account of MOROUGHAN and his girlfriend Christine Mondo, specifically that at no point in time did MOROUGHAN ever drive his vehicle at or towards DILEONARDO. Mr. Klug's statement clearly contradicts the false statements and the accounts given by DILEONARDO, BIENZ, Sophia Cornia, and Jillian Bienz.

**Statement of Timothy Jochen**

140.

**Statement of Ruti Besaris**

141.

142. Despite the fact that the names and addresses of the witnesses who called 911 contemporaneously with the shooting were readily available, the Defendants herein acted in tandem and intentionally failed to interview the witnesses in order to avoid procuring information which would directly contradict the false account of the events given by DILEONARDO, BIENZ, Sophia Cornia and Jillian Bienz, and which would also have directly contradicted the false confession procured by TAVARES and LESER from MOROUGHAN. As a result of this overt failure to perform duties inherent in their office and in furtherance of their conspiratorial goals MOROUGHAN was falsely arrested and maliciously prosecuted.

143. Given the true and accurate details of the events surrounding the shooting, as reported by MOROUGHAN and Mr. Klug, the proposition that MOROUGHAN could have made a voluntary confession, as the Defendant's assert is completely implausible. MOROUGHAN'S recollection of the events, which is collaborated by Mr. Klug's statement, make it clear that at all times DILEONARDO

23

was the aggressor, and at no point in time did MOROUGHAN drive his vehicle toward or at DILEONARDO. These facts clearly demonstrate that the "confession" procured by TAVARES and LESER is false.

. It can be no mere coincidence that the false confession procured from MOROUGHAN would completely insulate DILEONARDO from liability. One of the goals of the conspiracy between and among the Defendants was to protect DILEONARDO and BIENZ from possible criminal and/or departmental sanctions, and the only way to accomplish that goal would have been to first speak with DILEONARDO, BIENZ and other Nassau Defendants so that TAVARES and LESER would already have a factually working knowledge of the events prior to interviewing MOROUGHAN in order to insure that MOROUGHAN'S false confession would serve its purpose; to exonerate DILEONARDO and BIENZ from liability by means of a justification defense.

144.   The Suffolk County Police Department met with, and conspired with, members of the Nassau County Police Department for the purpose of fabricating evidence against MOROUGHAN, including but not limited to: securing a false confession from MOROUGHAN in violation of his fifth amendment right to remain silent, 6th amendment right to counsel and due process right to a fair trial; and by withholding evidence concerning MOROUGHAN'S repeated complaints about being brutally shot and assaulted by DILEONARDO without justification, about the erratic operation of the motor vehicles being driven by DILEONARDO and BIENZ, about the intoxication of both DILEONARDO and BIENZ, about the erratic behavior of DILEONARDO, about MOROUGHAN'S repeated requests for counsel, about the true nature of MOROUGHAN'S medical condition, state of mind, and cognitive processes at the time he was questioned by LESER and TRAVERES, misleading MOROUGHAN into believing he was signing a supporting deposition for the arrest of his assailants rather than a false confession outlining a justification defense tailored to the conspiratorial goal of establishing a justified shooting, and intentionally delaying the interview of BIENZ and DILEONARDO to insure they were no longer intoxicated prior to their interviews by LESER and TAVARES, failure to perform any sobriety test geared to evidence signs of intoxication, failure to request the voluntary withdrawal of blood, failure to secure a warrant for blood to test for intoxicants, ignoring the repeated requests of medical personnel at the hospital to secure the blood of DILEONARDO and BIENZ due to their obvious intoxication, failure to subsequently investigate and question witnesses who would establish the intoxication of DILEONARDO and BIENZ, as well as the true facts and circumstances surrounding the shooting, which would establish the criminal and unjustified use of deadly physical force by DILEONARDO upon MOROUGHAN, disseminating false press reports designed to attack and undermine the character of MOROUGHAN. All this was done with the intent to achieve their Conspiratorial goal of falsely arresting and maliciously prosecuting MOROUGHAN to avoid criminal and administrative sanctions against DILEONARDO and BIENZ.

145.   Defendant police officers from Nassau and Suffolk Counties, two separate municipal entities engaged in a civil conspiracy with each other reaching an agreement between themselves, express and/or tacit, to achieve an unlawful end by inflicting an unconstitutional injury upon MOROUGHAN and carried out overt acts in furtherance of that goal causing damages to plaintiff.