```
                                                     208
1                    Thomas M. Moroughan

2    your car and break your driver's window?

3         A      Yes.

4         Q      And then it says -- hit you in

5    the face.

6                 Did he in fact hit you in the

7    face?

8         A      Yes.

9         Q      Did you tell that to the

10   detectives, that he smashed your window and

11   hit you in the face with his gun?

12        A      Possibly.  Probably.

13        Q      Did you say "probably"?

14        A      Yes, probably.

15        Q      "███████████████████████  ████

16   ██ ████████. "

17               Do you see that?

18        A      Yes.

19        Q      Did the guy in fact come over and

20   tell you to get out of the car and you

21   struggled?

22        A      He was trying to pull me out of

23   the car.

24        Q      When he was trying to pull you

25   out of the car, would you describe that as
```

209

Thomas M. Moroughan

1    struggling?

2    A       Yes.

3            MR. GRANDINETTE:  Did he ever

4        tell you to get out of the car.  That

5        was the question.^ check - i can't hear

6        him here

7            THE WITNESS:  No.

8    BY MR. MITCHELL:

9        Q       Then it says:  "███ █████████ █

10   ████████████████ █ ███ ██████ ████."

11           Did you tell the detectives that

12   the person said "he was a police officer and

13   that I was under arrest"?

14       A       No.

15       Q       Okay.

16           If I'm correct, earlier you

17   indicated in your earlier testimony today

18   that the person said nothing to you at that

19   time, am I right?

20       A       Correct.

21           MR. GRANDINETTE:  Nothing

22       regarding the fact that he was a police

23       officer and that he was under arrest,

24       correct?

210

Thomas M. Moroughan

1

2    BY MR. MITCHELL:

3         Q      Well, let me ask this way:

4              Not talking about the statement,

5    if I direct your attention now to when the

6    person broke your window and hit you in the

7    nose with a gun, at that point in time, did

8    the person say anything to you at all?

9         A      No.

10        Q      Okay.  And then there came a time

11   right after that that you started to back your

12   car up, correct?

13        A      Yes.

14        Q      Did the person say anything to

15   you at that point?

16        A      No.

17        Q      So if I'm correct, when I say he

18   said nothing to you at all, that would be a

19   correct statement, based on your testimony?

20        A      Yes.

21              MR. GRANDINETTE:  With respect --

22   I am sorry.  Withdrawn.

23              It's clear.

24              MR. MITCHELL:  Well, the

25        testimony said "██████."

211

1          Thomas M. Moroughan

2              MR. GRANDINETTE:  It's clear.

3              MR. MITCHELL:  It doesn't matter

4      what the subject matter of "███████" is.

5              MR. GRANDINETTE:  I stand

6      corrected.  It's clear.

7              My objection was over the time

8      frame, but you cleared it up.

9   BY MR. MITCHELL:

10         Q     Then it says: ████████ ████ ██

11   ████ ███."

12              Do you see that?

13         A     Yes.

14         Q     ███████ ████████████ ████ █

15   ██████████   ██████████ █████████████

16   ██ █ ████████████ █ ██████████████████."

17              Do you see that?

18         A     Yes.

19         Q     And when it says there in this

20   statement that it says "████████ ████ ██████ █

21   ██████ █ ████████████████," at that point in

22   time when -- when you actually drove

23   backwards, at that point in time did you

24   entertain the thought of whether he was a

25   police officer or not?

                                                                212
                              Thomas M. Moroughan

1
2        A     No.
3        Q     If I'm correct, you didn't -- the
4    thought of him being a police officer or not
5    didn't come up until later when you were
6    driving away and you heard something about the
7    word cop; is that a fair statement?
8        A     Yes.
9        Q     Then it says: "████████████████████
10   █████████ ▌ ████████████ ▌ ██████████ ███
11   ████." "
12             You would agree with me that when
13   you went backwards your door was open and you
14   did knock the guy down, correct?
15       A     Yes.
16       Q     "███████████████    ████████████
17   █████ ▌ ████ █████████████████████ ▌ █████ █████
18   █████████."
19             Actually, I think ███ █████████ ███
20   █████ █████████." I think that might be a
21   period.
22             MR. GRANDINETTE:  That is a
23          period, correct.
24   BY MR. MITCHELL:
25       Q     "███████ ▌ █████ ████████████████

213

Thomas M. Moroughan

1

2  ▮████████████████ ▮ ████████

3  ████████."

4           Do you see that?

5     A     Yes.

6     Q     And did you tell the detectives

7  that?

8     A     No.

9     Q     "████████ ▮ ████████

10 ████████████████████████ ▮

11 ████████████."

12          Do you see that?

13    A     Yes.

14    Q     In fact, you did drive to the

15 hospital?

16    A     Yes.

17    Q     And your girlfriend did call 911?

18    A     Yes.

19    Q     Then it says:  ▮ ████ ████████

20 ████████████ ████████████

21 ████████ ▮ ████████."

22          Do you see that?

23    A     Yes.

24    Q     Below that, is that your

25 signature?

214

Thomas M. Moroughan

1

2      A      Yes.

3      Q      Okay.  And if you just take a

4  look at page 2.

5              You see at the bottom of page

6  2 -- I realize a bit of it is cut off -- at

7  the bottom of page 2 is that your signature?

8      A      Yes.

9      Q      Okay.  And, Mr. Moroughan, when

10 you put your initials at the top of this

11 document on page 1 and when you wrote the word

12 "████" about a third of the way down and put

13 those initials, is it your contention that you

14 didn't read what it said before where you put

15 your initials?

16     A      No, I didn't read it.

17     Q      Where it says "████████  ████████"

18 and it has a couple of questions you actually

19 wrote the word "████" and the word "████" and

20 then your initials.

21             Do you see that?

22     A      Yes.

23     Q      You would agree with me that the

24 writing is your writing, correct?

25     A      Yes.

215

Thomas M. Moroughan

1

2      Q      And then again that's your

3   signature, am I right?

4      A      Yes.

5             MR. GRANDINETTE:  When you say

6        that's his signature --

7             MR. MITCHELL:  Where it says

8        "█████████   █████████."

9             MR. GRANDINETTE:  Okay.

10  BY MR. MITCHELL:

11     Q      You signed that, correct?

12     A      Yes.

13     Q      And on the spots where we went

14  over where you put the initials on page 2 --

15     A      Yes.

16     Q      -- is it your contention that you

17  didn't put your initials there for the purpose

18  of noting that a change had been made to the

19  document?

20             MR. GRANDINETTE:  I'm going to

21        object to the form.

22             But you can answer.

23     A      I really don't understand that

24  question.

25     Q      When you put your initials there,

216

Thomas M. Moroughan

1    were you aware that a change had been made to

2    the document?

3                In other words, where it says

4    "████████," when you put the initials were

5    you aware that the change had been made to say

6    "██████"?

7        A       Yes.

8        Q       Okay.

9                And you knew that because you

10   read it, right?

11       A       No, I never read it.

12       Q       But at the time when you

13   initialled it you were aware that the change

14   had been made from "█████" to "█████"; is that

15   correct?

16       A       I don't know what the change was

17   made or he just told me to initial here,

18   initial here, that he made some mistakes.

19       Q       I think you may have

20   misunderstood my question that I asked before.

21               When you put the initials there

22   to where the corrections were made, were you

23   aware what the corrections were?  In other

24   words, from "████████" to "████████"?

217

1                     Thomas M. Moroughan

2          A     No.

3          Q     Were you aware that it said "███

4     ████████████" to "███████████████"?

5          A     No.

6          Q     You would agree with me, however,

7     that those corrections were in fact consistent

8     with what actually occurred, right?

9                     MR. GRANDINETTE:  Objection;

10          asked and answered.

11          A     Yes.

12          Q     Your girlfriend's name is Kristie

13     Mondo, am I right?

14          A     Yes.

15          Q     And she spells it with a K?

16          A     Yes.

17          Q     Again, you see on page 1 where it

18     says:   "█████████████" -- and this is like

19     about halfway down through the body of the

20     document.

21                     "█████████████████████ ████

22     ████████  ████████  ████████████," "

23                     Do you see that?

24                     MR. GRANDINETTE:  You're on page

25          1?

218

1              Thomas M. Moroughan

2              MR. MITCHELL:  Page 1 about

3         halfway down.

4              MR. GRANDINETTE:  Okay.  It's a

5         little cut off.

6    BY MR. MITCHELL:

7         Q     You see it says "▮▮▮▮"?

8         A     Yes.

9         Q     You agreed with me it's spelled

10   with a K, correct?

11        A     Yes.

12        Q     And can you tell me,

13   Mr. Moroughan, about how long did the Suffolk

14   County homicide detectives speak to you?

15   About how long was that?

16             MR. GRANDINETTE:  Don't guess.

17        A     Around an hour.

18        Q     Do you know when it was when they

19   first started speaking to you?

20             MR. SCHROEDER:  You mean what

21        time?

22             MR. MITCHELL:  What time.

23        A     I don't remember the time.  It

24   was probably a couple of hours before I left.

25        Q     Take a look at Exhibit C.  You

219

Thomas M. Moroughan

1   see where it says the date about midway down

2   the page?

3   A       Yes.

4   Q       And it says February 27, '11?

5   A       Yes.

6   Q       Do you see it says:   "████████

7   █████"?

8   A       Yes.

9   Q       Does that help you remember

10  around what time it was that they were there?

11  It may not.

12  A       No.  I believe it was earlier.

13  Q       Okay.

14          And you said regardless of what

15  time they came in, you think they were there

16  about an hour, am I right?

17  A       Yes.

18  Q       Now, I asked you earlier that it

19  was your belief at the time that they were

20  speaking to you and taking a statement from

21  you because you were a victim, am I right?

22  A       Yes.

23  Q       And you recall having a

24  conversation with them about what happened, am

220

Thomas M. Moroughan

1    I right?

2

3         A        Yes.

4         Q        In other words, they asked you

5    questions and you answered the questions?

6         A        Yes.

7         Q        That was before you were asked to

8    put your signature and initials on this

9    written statement?

10        A        Yes.

11        Q        And the only persons in the room

12   at the time were the two detectives from

13   Suffolk County, am I right?

14        A        Yes.

15        Q        Did any medical personnel come

16   into that room during that period of time?

17        A        I don't believe so.

18        Q        And after the detectives left,

19   after the detectives left, did any medical

20   personnel come in the room between then and

21   when you left the hospital?

22        A        I don't believe so.

23        Q        Do you recall what time it was

24   that you left the hospital?

25        A        I believe it was around

221

1                    Thomas M. Moroughan

2     8 o'clock.

3                    MR. SCHROEDER:  Say that again,

4          I'm sorry?

5                    THE WITNESS:  I believe it was

6          around 8 o'clock.

7     BY MR. MITCHELL:

8          Q      From the time the detectives left

9     after speaking to the homicide detectives, to

10    the time you actually left the hospital, about

11    how much time went by?

12         A      I don't know.

13         Q      Was it like more than --

14         A      Maybe a half-hour.

15         Q      -- an hour, half-hour?

16         A      I'm not sure.

17         Q      When you left the hospital, what

18    were you dressed in?

19         A      Scrubs.

20         Q      Like, was that something the

21    hospital provided you?

22         A      Yes.

23         Q      And when you left the hospital

24    were you given any instructions by the medical

25    personnel?

222

Thomas M. Moroughan

1

2      A      Yes.

3      Q      What type of instructions did

4  they give you?

5      A      Pain medicine for pain as needed.

6  Antibiotic.  Told me to follow up in a couple

7  of days with Dr. Martin.

8              Don't remember much else.

9      Q      Okay.  When they gave you those

10 instructions you understood them?

11     A      Yes.

12     Q      Did you ask them questions about

13 who you should go see or where Dr. Martin's

14 office was?

15     A      No.  They handed me the paper.

16 The release paper.  Release form.

17     Q      When they were giving those

18 instructions, handing you that paper, did you

19 sign that piece of paper?

20     A      Yes.

21     Q      Did you read it before you signed

22 it?

23     A      Probably not, no.

24     Q      Did you know what it was about?

25     A      They told me it was my

223

Thomas M. Moroughan

1    discharge -- my discharge paperwork.

2         Q       When they told you it was your

3    discharge paperwork you understood what they

4    were telling you, correct?

5         A       I've been to the hospital before,

6    so yes.

7         Q       But that morning, regardless of

8    whether you have been to a hospital before or

9    not, you understood what they meant when they

10   said it was discharge paperwork, right?

11        A       Yes.

12        Q       And you have a recollection of

13   them telling you it was your discharge

14   paperwork, right?

15        A       Yes.

16        Q       You signed that document,

17   correct?

18        A       I believe so, yes.

19        Q       Now, when you left the hospital,

20   prior to actually leaving the location of the

21   hospital, did you have an opportunity to speak

22   to Ms. Lewis?

23        A       Yes.

24        Q       Okay.

224

Thomas M. Moroughan

1

2          Where was it that you spoke to
3     Ms. Lewis?
4          A     Outside by a marked car.
5          Q     Okay.
6               And when you were outside by the
7     marked car were you handcuffed?
8          A     No.
9          Q     And when you were outside by the
10    marked car and you spoke with Ms. Lewis, did
11    you smoke a cigarette?
12         A     Yes, I did.
13         Q     And when you were there smoking a
14    cigarette with Ms. Lewis did you have any
15    conversation with Ms. Lewis?
16         A     Yes.
17         Q     When you spoke with Ms. Lewis did
18    you mention to Ms. Lewis about the statement
19    that the detective had you sign, the homicide
20    detectives had you sign?
21         A     No.
22         Q     Did you say anything to her about
23    having signed that statement and not
24    understanding why the police were speaking to
25    you?

225

1           Thomas M. Moroughan

2               MR. GRANDINETTE:  Objection.  He

3       said he never mentioned the statement.

4       A       No.

5               MR. GRANDINETTE:  You can answer.

6   BY MR. MITCHELL:

7       Q       When you spoke with Ms. Lewis

8   while you were having a cigarette, did you say

9   anything to her about your conversation that

10  you had with the Suffolk County homicide

11  detectives, about the content of it?

12      A       No.

13      Q       When you were speaking to

14  Ms. Lewis did she say anything to you?

15      A       Anything at all?

16      Q       Yes.

17      A       Something like everything was

18  going to be okay.

19      Q       Anything else?

20      A       That's about it.

21      Q       Did she ask you whether you gave

22  any statements to the police?

23      A       No.

24      Q       Did she mention to you at all

25  whether she -- did she say anything to you

226

                    Thomas M. Moroughan

1

2    about you being placed under arrest?

3         A    No.

4         Q    Did she ever say anything to you

5    about -- that the police wanted to charge you?

6         A    No.

7         Q    And then were you taken from the

8    hospital eventually to the police precinct?

9         A    Yes.

10        Q    How did you get to the police

11   precinct?

12        A    Marked patrol unit.

13        Q    Were you in handcuffs when you

14   went in the patrol unit?

15        A    No.

16        Q    Was there anybody in the patrol

17   unit other than yourself and police officers?

18        A    No.

19        Q    How many police officers were in

20   the patrol unit?

21        A    I believe two.

22        Q    If you know, were they in

23   uniform?

24        A    Yes.

25        Q    Did they -- and where were you

227

```
 1                 Thomas M. Moroughan
 2    seated in the vehicle?
 3        A      In the back seat.
 4        Q      Again, were you handcuffed?
 5        A      No.
 6        Q      Now, I wanted to show you,
 7    Mr. Moroughan, after these events, if I'm
 8    correct, you wrote some notes about the things
 9    that happened on the morning -- I'll use that
10    phrase -- of February 27, 2011?
11        A      Yes.
12                        ---
13             (County of Suffolk Defendants'
14             Exhibit B, Time log, was marked for
15             identification)
16                        ---
17    BY MR. MITCHELL:
18        Q      I'm going to show you what's been
19    marked today as Suffolk Defendants' B.
20             Do you see that?
21        A      Yes.
22             MR. MITCHELL:  Everybody got a
23        copy?
24             MR. GRANDINETTE:  Yes.
25    BY MR. MITCHELL:
```

228

Thomas M. Moroughan

```
1
2        Q        Mr. Moroughan, take a look at
3    what has been marked as Suffolk County
4    Defendants' B.
5                 Do you see that?
6        A        Yes.
7        Q        That is a three-page document, am
8    I correct?
9        A        Yes.
10       Q        Yes?
11       A        Yes.
12       Q        And that document is a note that
13   you made?
14       A        Yes.
15       Q        That's your handwriting?
16       A        Yes.
17       Q        Can you tell me when it was that
18   you made that document?
19       A        Few days, maybe a week, after it
20   happened.
21       Q        Okay.  And if you look at page 1,
22   you'd agree with me that that is sort of a
23   chronological listing of things that occurred,
24   am I right?
25       A        Yes.
```

229

1                    Thomas M. Moroughan

2          Q      Starting with "1:25," it says

3     "around"?

4          A      Yes.

5          Q      It says "Get to the hospital"?

6          A      Yes.

7          Q      And then it has a list of things.

8     It goes -- I'm just going to read them for the

9     record.

10                It says:  "1:30, First cop gets

11    to hospital."  Right?

12         A      Right.

13         Q      Then it says:  "2:00, Risco

14    shows."

15                Am I right?

16         A      Yes.

17         Q      Okay.

18                "2:30, Nassau detectives come

19    in."

20                It says "DTS"; do you mean

21    detectives?

22         A      Yes.

23         Q      "2:40, Doctors tell detectives to

24    leave."  Correct?

25         A      Yes.

230

1          Thomas M. Moroughan

2          Q        "3:30, Doctors leave, detectives

3    come back"?

4          A        Yes.

5          Q        "4:00, Detectives leave"?

6          A        Yes.

7          Q        "7:00, Suffolk detectives come

8    in"?

9          A        Yes.

10         Q        Right?  That's your writing, am I

11   correct?

12         A        Yes.

13         Q        It is fair to say that when you

14   wrote this you believed that the Suffolk

15   detectives came in about 7 o'clock?

16         A        Roundabout.  There was no clock.

17   So it was basically me just trying to remember

18   time off my head.

19         Q        And the time that you remembered

20   for this document was 7 o'clock?

21         A        Yes.

22         Q        Then it says:  "8:00, go to

23   Precinct," correct?

24         A        Yes.

25         Q        Fair to say that when you wrote

231

Thomas M. Moroughan

1  this document it was your belief that it was

2

3  about an hour after the Suffolk detectives

4  came in that you left the hospital, correct?

5      A      Something around there, yes.

6      Q      Based on your document it would

7  actually be an hour, because it says 7 to 8?

8      A      Yes.

9      Q      You also have a number of

10  different -- the next two pages have a number

11  of different notes that you wrote, correct?

12      A      Yes.

13      Q      And these -- I know it speaks for

14  itself, but it actually has quotations of

15  conversations that you either had with people

16  or that people said to you?

17      A      Right.

18      Q      You'd agree with me,

19  Mr. Moroughan, that this document that's

20  marked as Suffolk Exhibit B lists things that

21  happened at the hospital between when you were

22  there from 1:25 to when you left at 8 o'clock,

23  correct?

24      A      Yes.

25      Q      And you'd agree with me that what

232
                    Thomas M. Moroughan
1
2    you have listed on here is consistent with
3    what you testified to here today about when
4    things occurred, right?
5          A      Yes.
6          Q      Fair to say that your memory when
7    you wrote this document about what happened
8    was relatively clear, right?
9          A      Yes.
10         Q      So the things that happened in
11   the hospital that you detailed here was a
12   result of a clear memory of what happened,
13   right?
14         A      Yes.
15         Q      And again, you have detailed for
16   me today talking about speaking to the Suffolk
17   detectives and the questions they asked you,
18   that that is something that you have a
19   recollection of as well, right?
20         A      Yes.
21         Q      In fact, your recollection was
22   not that they were taking a statement from you
23   as a criminal defendant, but rather that you
24   believed they were speaking to you as a
25   victim, correct?

233

Thomas M. Moroughan

1

2          A       Yes.

3          Q       And you have a recollection of

4     the things that they said to you that led you

5     to believe that they were speaking to you as a

6     victim, correct?

7          A       Yes.

8          Q       And you'd agree with me, at least

9     according to what's been marked as Exhibit B,

10    that there came a time around 8 o'clock that

11    you were permitted to leave the hospital, am I

12    right?

13         A       What do you mean?

14         Q       The medical professionals at the

15    hospital determined it was okay for you to

16    leave the hospital, right?

17         A       Yes.

18         Q       And you would agree with me that

19    that was within an hour of speaking to the

20    Suffolk detectives, correct?

21         A       I believe so.

22         Q       And at the time that you left the

23    hospital, you weren't of a medical condition

24    where you weren't cognizant, in other words,

25    aware of where you were, am I right?

234

```
1                    Thomas M. Moroughan
2       A          Correct.
3              MR. GRANDINETTE:  Of where he
4       was?
5       Q          Meaning you knew where you were,
6       right?  In the hospital?
7       A          I knew I was in the hospital.
8       Q          You knew that when the people
9       came to discharge you they read you things you
10      understood, right?
11             MR. GRANDINETTE:  Objection to
12             the form.
13      A          Yes.
14      Q          The medical personnel, right?
15      A          Yes.
16      Q          You didn't tell the medical
17      personnel, hey, I can't leave, my head is
18      foggy, right?  You didn't say anything like
19      that, right?
20      A          No.
21      Q          You didn't say I can't stand up,
22      I can't walk, correct?
23             MR. GRANDINETTE:  Objection to
24             the form.
25      A          No.
```

235
1                    Thomas M. Moroughan

2          Q        You knew where you were, right?

3          A        Yes.

4          Q        You knew who the hospital

5     personnel were, right?

6          A        (No response.)

7          Q        At that time when -- just before

8     you left, right?

9          A        The hospital personnel, yes.

10         Q        In other words, you don't think

11    the hospital personnel let you leave the

12    hospital before you were capable of doing so,

13    correct?

14                   MR. GRANDINETTE:  Objection to

15         form.

16         A        I don't know what was in their

17    minds.

18         Q        Okay.  But from your experience

19    when you left did you feel as though it was

20    appropriate for them to let you go?

21                   MR. GRANDINETTE:  Objection to

22         his analysis of their medical conclusion

23         that he is free to go.

24                   But, do you know --

25                   MR. MITCHELL:  I'll withdraw the

236
1                    Thomas M. Moroughan

2           question.

3      BY MR. MITCHELL:

4           Q       When they discharged you did you

5      say to the people in the hospital, I really

6      don't think you should let me go because my

7      mind is not clear, I don't know what is going

8      on?

9                   Did you say anything like that?

10                  MR. GRANDINETTE:  Objection.

11          A       No.

12          Q       Your mind was clear, wasn't it?

13                  MR. GRANDINETTE:  Objection.

14          A       No.

15          Q       When you left the hospital you

16     went out and had a cigarette, didn't you?

17          A       Yes.

18          Q       You had a conversation with

19     Ms. Lewis, correct?

20          A       Yes.

21          Q       You were able to speak to her;

22     she was able to speak to you?

23          A       Yes.

24          Q       You were able to comprehend what

25     she said to you?

237

1                     Thomas M. Moroughan

2          A       Yes.

3          Q       You were able to speak to her in

4    full sentences, am I right?

5          A       Yes.

6          Q       And again, you have a clear

7    memory of everything that occurred from the

8    time that you got to the hospital to the time

9    you left, am I right?

10                 MR. GRANDINETTE:  Objection.

11         A       No.

12         Q       Is it fair to say that you have a

13   memory well enough to detail the things to me

14   today that you did from the time you got to

15   the hospital to the time you left, right?

16                 MR. GRANDINETTE:  Objection.

17         A       No.

18                 MR. GRANDINETTE:  He said they

19        were estimates.

20   BY MR. MITCHELL:

21         Q       Now, Mr. Moroughan, I'm going to

22   ask you, since September -- pardon me -- since

23   February 27, 2011 have you had any contact

24   with members of the Suffolk County Police

25   Department in the Second Precinct?

238

1           Thomas M. Moroughan

2           A       Yes.

3           Q       Okay.  Do you occasionally run

4   into them down in Huntington Station while

5   you're driving a taxi cab?

6           A       Yes.

7           Q       Have you had conversations with

8   them about different things?

9           A       Yes.

10          Q       Has there ever been a time where

11  you've told them you don't want to speak to

12  them?

13          A       Since the incident?

14          Q       Yes.

15          A       No.

16          Q       Okay.  So you never had any

17  problems speaking to police -- have you ever

18  actually approached the police yourself to

19  speak to them?

20          A       No, I don't think so.

21          Q       Have they ever come to you to ask

22  you for information?

23          A       No.  I mean, there's a few that I

24  know --

25          Q       Right.

239

1          Thomas M. Moroughan

2          A       -- that I've spoken to.  But,

3    those are the ones I've known prior to that

4    incident.  So I never had any problem talking

5    to them.

6          Q       Is there any specific reason that

7    you spoke to them?

8          A       Seeing them at Dunkin Donuts.

9          Q       Was there ever any incident that

10   you actually spoke to them about, something

11   that may have occurred that you spoke to them

12   about?

13         A       You said members of the Second

14   Precinct?

15                 I mean, I've gotten pulled over

16   since then once.

17                 I had -- I had a guy who was

18   stealing out of my backyard, I had to call --

19   we had to call -- we had to call the police

20   and I was there for that.  But nothing --

21         Q       When the police came you spoke to

22   them about what happened with someone stealing

23   out of your backyard?

24         A       Yes.

25         Q       There was no problem; in other

240
1                    Thomas M. Moroughan

2       words, you were capable of speaking to them?

3       You didn't have any fear of them when you were

4       talking to them?

5              A      Some.

6              Q      As you were relating to them

7       about your -- someone stealing something out

8       of your backyard?

9              A      Yes.

10             Q      How about the police that you

11      encountered that you said you knew already?

12             A      No.

13             Q      You didn't have any fear of them,

14      am I right?

15             A      Not really.

16                    MR. SCHROEDER:  Getting close.

17                    MR. MITCHELL:  I'm almost done.

18             Almost.  The lawyer almost.

19             Q      Mr. Moroughan, if you'll take a

20      look at Exhibit C.

21             A      Yes.

22             Q      Have you come to learn that

23      Exhibit C is, as it says, that this is a

24      statement that has a waiver of rights on it?

25      Have you come to learn that?

```
                                                         241
1                    Thomas M. Moroughan
2          A       Yes.
3          Q       And, if you know -- you may
4    not -- do you know if this statement that is
5    marked as Exhibit C, do you know if this
6    statement was ever used in any criminal
7    proceeding against you?
8                  You may not know.
9          A       I don't understand the question.
10         Q       Did there ever come a time that
11   you actually saw the charges that were against
12   you; in other words, the police paperwork
13   about the charges that you were charged with?
14   Did you ever see that?
15         A       Yes.
16         Q       When you looked at that, was this
17   statement attached to it, if you know?
18         A       I don't believe so.
19         Q       Was the charges just based on a
20   statement from the person --
21                 MR. GRANDINETTE:  Objection.
22         Q       -- that you know as Officer
23   DiLeonardo?
24         A       I have no idea.
25                 MR. CLARKE:  Objection.
```

242

Thomas M. Moroughan

1

2   Q        Now, Mr. Moroughan, did there

3   come a time that -- I'll withdraw that.

4            If you know, after the criminal

5   charges against you were filed, did there come

6   a time that they were dismissed?

7   A        Yes.

8   Q        Were you present in court when

9   they were dismissed?

10  A        Yes.

11  Q        Did your lawyer say anything to

12  the Court while you were there?

13  A        Yes.

14  Q        Did your lawyer tell the Court

15  that you did not want to cooperate in any

16  further investigation of the -- of the events

17  of February 27th, 2011?

18           MR. GRANDINETTE:  Objection.

19  A        No.

20  Q        They didn't say that in front of

21  you?

22  A        Not that I can remember.

23  Q        At any time did you tell the

24  District Attorney's Office that you didn't

25  want to cooperate in an investigation of the

243

1              Thomas M. Moroughan

2    events of February 27, 2011?

3         A      No.

4         Q      Did -- in your presence, did your

5    attorney ever tell them that?

6         A      No.

7         Q      Have you ever come to learn that

8    your lawyers told the District Attorney's

9    Office that you didn't want to cooperate in

10   any further investigation?

11             MR. GRANDINETTE:  I'll object to

12        form.

13        A      Now, are we talking when my

14   charges were dismissed?

15        Q      Let's start with that.

16             When your charges were

17   dismissed --

18        A      Okay.

19        Q      -- in court, at that time did

20   your lawyer represent to the Court that you

21   did not want to, I'll use the word

22   participate, in any further investigation of

23   what happened on February 27, 2011?

24        A      No.

25             MR. GRANDINETTE:  Objection.

244

Thomas M. Moroughan

1   Q       Has your lawyer ever represented

2

3   to the District Attorney's Office since then

4   that you don't want to cooperate in any

5   further investigation?

6               MR. GRANDINETTE:  Same objection.

7               You can answer, if you can.

8   A       I believe William Petrillo did,

9   yes.

10   Q       So in other words, William

11   Petrillo told the District Attorney on your

12   behalf that you were not interested in

13   cooperating in any further investigation of

14   what occurred on February 27th, 2011?

15               MR. GRANDINETTE:  Objection.

16               Were you there when William

17       Petrillo spoke to the DA?

18               THE WITNESS:  No.

19               MR. CLARKE:  That is not the

20       question.

21   BY MR. MITCHELL:

22   Q       Have you ever seen a letter that

23   your lawyer wrote, that Mr. Petrillo wrote to

24   the District Attorney --

25   A       No.

245

1                    Thomas M. Moroughan

2          Q        -- indicating that you did not

3     want to cooperate with any further

4     investigation?

5          A        No.

6          Q        Okay.

7                    MR. GRANDINETTE:  I'll object to

8          the form.

9          Q        Mr. Moroughan, do you know a

10    person named Tony Mondo?

11         A        Yes.

12         Q        Is that Kristie's brother?

13         A        There's two Tony Mondos.

14         Q        Does she have a brother named

15    Tony Mondo?

16         A        Yes.

17         Q        Did there come a time that you

18    attended a wedding where Tony Mondo was the

19    groom?

20         A        Yes.

21         Q        Was that in September of 2011?

22         A        I believe so, yes.

23         Q        When you attended that wedding

24    were you seated at a table with persons there?

25         A        I believe so, yes.

246

Thomas M. Moroughan

1

2    Q        When you were seated at the table

3  did there come a time where there was a

4  conversation at the table about people having

5  tattoos?

6    A        I don't remember.

7    Q        Do you have a recollection -- or

8  actually, when you were at the table did a

9  person discuss tattoos and did you say that

10 you were going to have tattoos put on the

11 spots where your bullet holes were?

12   A        Not that I can recall, no.

13   Q        Do you recall the conversation

14 regarding the tattoos on the bullet holes

15 turning to why you had the bullet holes?

16   A        No.

17   Q        Do you recall stating that:  I

18 tried to -- excuse me.

19           Do you recall stating that you

20 had been shot by a police officer?

21   A        No.  I personally wouldn't have a

22 conversation at a wedding about this

23 situation.

24   Q        Okay.  Do you recall actually

25 showing people at the table the bullet holes?

247

1                    Thomas M. Moroughan

2          A        No.

3          Q        Do you recall saying to them:   I

4     tried to run them over and they shot me, what

5     do you expect?

6          A        No.

7          Q        Did there come a time when you

8     were at the table there -- did you ever come

9     to learn that there was a Suffolk County

10    police officer sitting at the table?

11         A        No.

12         Q        Did there come a time when that

13    Suffolk County police officer actually told

14    you that he was a Suffolk cop?

15         A        No.

16         Q        Do you know a person named

17    Michael Lamonica?

18         A        No.

19         Q        Do you know a person named

20    Anthony D-E-R-I-S-E?

21                  MR. GRANDINETTE:   D-E-E-R?

22         Q        D-E-R-I-S-E.

23         A        No.

24         Q        Do you know a person named James

25    S-I-L-E-O?

248

1                      Thomas M. Moroughan

2          A       No.

3          Q       Do you know a person named

4    Alejandro Trujillo, T-R-U-J-I-L-L-O?

5          A       No.

6          Q       Do you know that person at all?

7          A       No.

8          Q       Did you know any of the people

9    that were at the table when you were at the

10   wedding?

11         A       There was a girl Lauren, was the

12   only one that I knew at the table with us.

13         Q       You're saying you have no

14   recollection of having a conversation about

15   tattoos, am I right?

16         A       No.

17         Q       You didn't tell people that you

18   were going to get tattoos over the bullet

19   holes, correct?

20         A       Correct.

21         Q       Do you have tattoos over the

22   bullet holes?

23         A       Yes.

24         Q       You have one on your arm we saw

25   earlier.

```
                                                    249
1                   Thomas M. Moroughan
2               Do you have a tattoo over the
3     bullet hole in your chest?
4          A      Yes.
5          Q      But you have no recollection of a
6     conversation?
7          A      No.
8               MR. MITCHELL:  Thank you,
9          Mr. Moroughan.  Thank you, ladies and
10         gentlemen.
11              I'm done.
12              MR. GRANDINETTE:  Brian, can
13         you -- you mentioned one of those people
14         was -- I didn't get his name -- the
15         Suffolk County cop?
16              MR. MITCHELL:  I didn't mention
17         the cop's name.
18              MR. CLARKE:  It is 1:45.
19              MR. MITCHELL:  Off the record.
20                      ---
21         (Luncheon recess taken:  1:45 p.m.)
22
23
24
25
```

250

Thomas M. Moroughan

1    AFTERNOON   SESSION

2    (Time Noted:  ^ p.m.)

3         THOMAS M. MOROUGHAN, having been

4    previously duly sworn by a Notary

5    Public, was examined and testified

6    further as follows:

7         *              *              *

8         MR. SCHROEDER:  We had sort of

9    mentioned off the record that there's

10   generally a seven-hour time limit for an

11   EBT.  Given the number of parties,

12   different counties, et cetera, we may

13   ask for some additional time.

14        We had seemed to indicate it

15   wasn't some inordinate amount, that it

16   would probably be reasonable.  We will

17   deal with it at the end.

18        MR. GRANDINETTE:  Exactly.  If

19   you need, you need it, we'll address it.

20   EXAMINATION BY

21   MR. SCHROEDER:

22        Q     Mr. Moroughan, how are you?

23        A     All right.

24        Q     My name is Frank Schroeder and I

251

1        Thomas M. Moroughan

2    represent the Deputy Chief of Patrol John

3    Hunter.

4              I'm going to be asking you a

5    series of questions as well.  The same basic

6    rules apply.

7              First of all, if I ask you

8    something that you don't understand, you let

9    me know and I'll be happy to rephrase it.

10             Okay?  Will you do that?

11       A     Yes.

12       Q     Please let me finish my question

13   before you answer so the court reporter can

14   take everything down.  Okay?

15       A     Okay.

16       Q     If at any time you need a break,

17   just let us know, we can accommodate that.

18   With the exception, if I've asked a question

19   I'm going to ask that you answer it first,

20   before we take a break.

21             Can you do that?

22       A     Yes.

23       Q     Firstly, you and I have never met

24   before; is that right?

25       A     I don't believe so.

252

Thomas M. Moroughan

1

2      Q      First time we met was this

3      morning?

4      A      Yes.

5      Q      I want to just talk to you a

6      little bit about some of the things -- some of

7      the documents that you've reviewed in

8      connection with this case.

9             You reviewed -- and I am talking

10     about since the beginning of the case.  Okay?

11            You've reviewed your Notices of

12     Claim that you filed against both Nassau and

13     Suffolk County?

14     A      Yes.

15     Q      Your -- the statement that was

16     marked today that purports to be your written

17     statement marked as Suffolk C, you've reviewed

18     that before?

19     A      Yes.

20     Q      You reviewed your three pages of

21     notes marked as Exhibit B?

22     A      Yes.

23     Q      You've reviewed some photographs

24     in connection with this case?

25     A      Yes.

253
                    Thomas M. Moroughan

1

2          Q        What kind of photographs have you

3    reviewed?

4          A        Pictures from the scene.  Photos

5    of the wounds themselves when they first

6    originally occurred.

7          Q        The photos of the wounds, who

8    took those?

9          A        Myself.

10         Q        What did you take those with?

11         A        My camera phone.

12         Q        Did you take them on February 27,

13   2011?

14         A        No.

15                  MR. SCHROEDER:  Have they been

16              exchanged, Anthony?

17                  MR. GRANDINETTE:  I don't know if

18              they have.  I'll double-check.

19   BY MR. SCHROEDER:

20         Q        You still have those photos?

21         A        Yes.  They're on my phone.

22         Q        You have them with you today?

23         A        On my phone.

24         Q        Would you mind just bringing them

25   up just so we can see whether they've been

```
                                             254
 1                 Thomas M. Moroughan
 2    exchanged or not?
 3              MR. GRANDINETTE:  I don't know if
 4         they have been or not.
 5              I don't know if there's been a
 6         demand made, if they've been exchanged,
 7         but we will be more than happy to
 8         provide them to you.
 9    BY MR. SCHROEDER:
10         Q     Do you have -- - is that one of
11    the photos?
12         A     I'm waiting --
13              MR. GRANDINETTE:  I told him to
14         turn off his phone.
15         Q     Actually, if you have the photos
16    on your phone I'm going to ask to look at them
17    today during the deposition.
18         A     Okay.
19              ^ FEMALE:  no, he meant to turn
20         off his phone before the deposition
21         started.
22              MR. GRANDINETTE:  I told him to.
23                      ---
24         (Witness using cell phone.)^
25                      ---
```

255

Thomas M. Moroughan

1

2      A      Do you want me to walk over to

3   you?

4      Q      No.  That's okay.

5             Do you know approximately how

6   many photos there were?

7      A      No.

8                    ---

9      (Counsel viewing witness' cell phone.)^

10                   ---

11  BY MR. SCHROEDER:

12     Q      This is a photo -- just tell me

13  what we are looking at here.

14     A      This is the bullet wound to my

15  chest.

16     Q      Do you recall approximately when

17  you took the photos?

18     A      I took this like two days after

19  it happened.  This was inside Dr. Martin's

20  office.  This is the first time I took the

21  bandage off and looked at it.

22             That was one of my arm.

23             MR. CLARKE:  Would you flash back

24        to the other photo, please.

25             The date 3/2/2011, is that the

256

Thomas M. Moroughan

2      date of the photograph?  The date there

3      that flashes on your screen.

4              THE WITNESS:  Yes.  3/2/2011.

5              MR. CLARKE:  That's your chest as

6      well?  The third photograph?

7              THE WITNESS:  This is a few

8      months later, when I got the car back,

9      when I finally got to see the car.

10             MR. CLARKE:  There are no photos

11     of the arm?

12               ^ FEMALE:  He showed you that

13     one.

14             MR. CLARKE:  They were three of

15     the chest I thought.

16             THE WITNESS:  No, that's --

17             MR. CLARKE:  That's the arm?

18             THE WITNESS:  Yes.  That's the

19     arm.

20             MR. CLARKE:  You're holding your

21     arm up?

22             THE WITNESS:  Yes.

23     BY MR. SCHROEDER:

24         Q     After the car was released to

25     you you took X-rays^ ???? of the car, but this

257

Thomas M. Moroughan

1  was --

3     A     That was taken by, I believe,

4  Kristie or her friend.

5          This is at the hospital.  This

6  shows the --

7     Q     This is on the morning of

8  February 27, 2011?

9     A     Yes.

10     Q     Is there any others from

11  February 27, 2011?

12     A     ^ Answer here???

13     Q     Okay.

14          Do you have any idea -- I noticed

15  that -- let see that photo again.

16          Did I just see -- it says

17  10/6/2014.  Do you have any idea why it says

18  that?

19     A     Probably saved it.

20     Q     That's not the day it was taken?

21     A     No.  That's probably the date it

22  was saved.

23     Q     How about the other photos; when

24  were they taken?

25     A     The ones that were taken after it

258

1              Thomas M. Moroughan

2    was released from impound, I think they're all

3    coming up basically the same day.  Yeah,

4    6/24/2011.

5         Q      You think that's about when you

6    took them?

7         A      Yes.

8         Q      Where did you take them?  Where

9    were those photos taken?

10        A      They were taken at one of the

11   owners' of the company's personal house.  I

12   believe it was like Centereach or Mount Sinai.

13        Q      What was his name?

14        A      Boris.

15        Q      Last name?

16        A      Goldberg.  Goldstein, maybe.

17        Q      Okay.

18             MR. CLARKE:  Boris Goldstein?

19             THE WITNESS:  Boris Goldstein or

20        Goldberg.

21   BY MR. SCHROEDER:

22        Q      Thank you.

23             I'm going to ask you to preserve

24   those.  I'm going to ask for copies of them.

25             MR. CLARKE:  I would -- and I'll