460

1              Thomas M. Moroughan

2         A       Yes.

3         Q       And you were asked some questions

4    and I think you said as a cab driver you begin

5    to see certain behaviors and you begin to

6    correlate that with certain conduct, right?

7         A       Correct.

8         Q       So, is it fair to say that when

9    you saw these two cars cut you off and speed

10   past you and flashing their lights and the way

11   they were behaving as you have described, you

12   had in your mind that these the guys were

13   drunk?

14        A       Yes.

15        Q       Would you agree that the manner

16   in which you observed them operating their

17   cars, cutting you off as you described, they

18   were driving in an aggressive way?

19        A       Yes, they were -- it was

20   dangerous.

21        Q       And after they passed you you

22   flashed your brights, correct?

23        A       Yes.

24        Q       Was that in response to their

25   aggressive behavior, to flash your brights in

461

Thomas M. Moroughan

2  their rearview mirror?

3        A       I believe I only did it to the
4  Acura.  And that was like as he was cutting me
5  off.

6        Q       And you said you did it to let
7  him know you were there, because your horn
8  didn't work?

9        A       Yes.

10       Q       And other than flashing it that
11  one time you didn't put your brights on at all
12  at any other time that evening?

13       A       That evening?  At that particular
14  instance, no.

15       Q       I am not talking about when you
16  drove to Huntington Hospital.

17               Between the time you flashed it
18  at the Acura and to the point you pulled away
19  following the shooting, did you put the
20  brights back on?

21       A       No, I don't believe so.

22       Q       But when you pulled up next to
23  these two vehicles who were now pulled over to
24  the side of the road, you thought you were
25  going to argue with a couple of drunk guys; is

462

1                    Thomas M. Moroughan

2       that right?

3            A       I wasn't trying to argue, but

4       yes.

5            Q       Did they wave you over?

6            A       No.

7            Q       Did they do anything with a

8       flashlight or step inside into your lane to

9       ask you to pull over?

10           A       No.

11           Q       Did anyone ask you to stop?

12           A       No.

13           Q       You stopped on your own?

14           A       Yes.

15           Q       To confront and curse at a guy

16      you thought was drunk, right?

17           A       Yes.

18           Q       Okay.

19                   You could have, if you had wanted

20      to, continued simply to drive on back to the

21      train station, right?

22           A       Correct.

23           Q       You had been told moments before

24      when you were at the intersection that your

25      fare had cancelled, right?

463

Thomas M. Moroughan

1

2      A      Correct.

3      Q      Did that anger you?

4      A      No.

5      Q      How many fares that night had

6  cancelled on you?

7      A      Not quite sure.  That was

8  probably the only one.

9      Q      But your game plan, once that

10 thing was cancelled, was to head back to the

11 train station?

12     A      Head back to Huntington Village.

13     Q      To go back to the Village, did

14 you need at some point to make a U-turn?

15     A      No.

16     Q      You were already heading north?

17     A      Yes.

18     Q      Okay.

19            But you thought, you know what, I

20 am going to give these guys a piece of my

21 mind, and just stopped anyway?

22            MR. GRANDINETTE:  Objection.

23     A      I don't know.

24     Q      Were you showing off for your

25 girlfriend?

```
 1                    Thomas M. Moroughan

 2                    MR. GRANDINETTE:  Objection.

 3          A      No.

 4          Q      What was her purpose in being in

 5      the car that night?

 6          A      She worked days; I worked nights.

 7      So occasionally she would hang out with me

 8      just to spend some time together.

 9          Q      Okay.  What was her occupation at

10      that time?

11          A      She was a dog groomer.

12          Q      And did she work for herself or

13      for some company or outfit?

14          A      She worked for PetSmart.

15          Q      What was the location?  Or was it

16      various different places?

17          A      The one in, I believe it's

18      Huntington.  It may be Huntington Station.

19      It's adjacent to the Walt Whitman Mall.

20          Q      Do you recall her hours?

21          A      It varied.  Most of the time it

22      was 7 to 3 or 9 to 5.

23          Q      So your business that evening was

24      that of being a taxi cab driver, correct?

25          A      Yes.
```

465

1               Thomas M. Moroughan

2          Q       And was there some other business

3     that was being conducted by the two of you in

4     driving around all night in the cab?

5          A       What do you mean?

6          Q       You were going to drive a car for

7     12 hours, right?

8          A       Yes.

9          Q       And she works days so she sleeps

10    at night, right?

11         A       Yes.

12         Q       But at 1:30 in the morning she is

13    driving around in the car with you?

14         A       Yes.

15         Q       What was the purpose, if there

16    was any purpose, beside simply keeping each

17    other company?

18         A       She was keeping me company.  You

19    know, normally, when I picked her up it was

20    after dinner.  When I dropped her off it was,

21    you know, somewhere, 2, 3 o'clock in the

22    morning.

23         Q       Were you on your way that night

24    to drop your girlfriend off so you could go to

25    sleep?

1                    Thomas M. Moroughan

2          A      No.

3          Q      Are you sure there was a fare at

4    131 West 19th Street that night?

5          A      Yes.

6          Q      Are you sure you weren't just

7    following these guys because they aggravated

8    you?

9          A      Yes, I'm sure.

10         Q      Do you have any documentation,

11   such as a trip sheet, to substantiate that

12   statement?

13              MR. GRANDINETTE:  Objection to

14         form.

15         A      No.  I believe we already said

16   that I didn't have a trip sheet.

17         Q      Have you ever gone back to Dobro

18   to secure any paperwork from them to track and

19   establish your movements that night and

20   different fares that you had?

21              MR. GRANDINETTE:  Objection.

22         A      No.

23         Q      Do you know why, when your blood

24   and urine was drawn at the hospital on

25   February 27th, why opiates were shown to be in

467

1                Thomas M. Moroughan

2      your bloodstream?

3                MR. GRANDINETTE:  Objection.

4                You can answer.

5           A     Yes.

6           Q     Why?

7           A     Because I was on pain medicine.

8           Q     What pain medicine were you aware

9      you were on in Huntington Hospital emergency

10     room that night?

11          A     That I knew of that night or that

12     I know of now?

13          Q     What did they tell you they were

14     giving you?

15          A     I know they were giving me

16     morphine.

17          Q     Do you have a recollection of the

18     manner in which the morphine was administered?

19          A     I believe it was through my IV.

20          Q     And do you remember or do you

21     know the names of any of the other

22     medications, if any, you were given that

23     night?

24          A     As of right now do I know them?

25          Q     Did you know them then?

468

Thomas M. Moroughan

1
2      A      No.

3      Q      What do you know them to be now?

4      A      Dilaudid.  Percocet.  Morphine.

5             And then there was an antibiotic

6      that I don't know the name of.

7      Q      How did you come to learn that

8      information since being hospitalized?  Have

9      you reviewed the medical record?

10     A      Yes.

11     Q      When did you last look at the

12     Huntington Hospital medical record?

13     A      Not too long ago.

14     Q      Did you review it in preparation

15     for today's deposition?

16     A      I don't believe so, no.

17     Q      Had you, prior to that night,

18     ever been prescribed morphine?

19     A      Morphine?  Yes.

20     Q      On how many different occasions?

21     A      I believe when I was a child,

22     when I was 11, I was struck by two cars and I

23     broke my right femur.  So I know I was on

24     serious pain killers because I kept having

25     muscle contractions for the first few weeks I

469

Thomas M. Moroughan

1    was in the hospital.  You know, I believe that

2    was probably one of them.

3

4          MR. GRANDINETTE:  Don't guess.

5    If you don't know, you don't know.

6    Q          Other than remotely when you were

7    a child, do you have any recollection of ever

8    being prescribed narcotics, such as Dilaudid

9    or Percocet or morphine?

10   A          No.

11         MR. GRANDINETTE:  Objection.

12   Q          Did you at that time have any

13   understanding of how you uniquely respond to

14   those medications?

15         MR. GRANDINETTE:  Objection.

16   Q          Whether they cloud your judgment,

17   whether they affect your vision?  Did you have

18   any experience with them before?

19         MR. GRANDINETTE:  Objection.

20         You can answer to the best of

21         your abilities.

22   A          I don't know how -- I didn't know

23   how it would affect me.

24   Q          Back in February of 2011, during

25   that particular week that you worked for

470

                    Thomas M. Moroughan

1  Dobro, did you only ever work the night shift?

3       A       Yes.

4       Q       So, tell me, on the preceding

5  day, I guess -- the night in question was a

6  Saturday, Saturday night into a Sunday?

7       A       Yes.

8       Q       Correct?

9       A       Yes.

10      Q       Did you work Friday night into

11 Saturday?

12      A       Yes.

13      Q       Did you work Thursday night into

14 Friday?

15      A       Yes.

16      Q       Did you work Wednesday into

17 Thursday?

18      A       Yes.

19      Q       Did you work Tuesday into

20 Wednesday?

21      A       Yes.

22      Q       Had you worked every day that

23 week?

24      A       Yes.

25      Q       Eight days in a row?

471

1                    Thomas M. Moroughan

2          A       Yes.

3          Q       6 in the evening to 6:00 at

4     night, correct?

5          A       Yes.

6          Q       And with Dobro, would you have to

7     work the full 12?

8          A       Yes.

9          Q       Okay.  So busy or not busy,

10    you're sitting in the car waiting for a call?

11         A       Not necessarily.  Since it was a

12    cell phone, in comparison to like Orange &

13    White where we had the radios that were built

14    into the car, if it was slower, there's a gap

15    from -- about an hour-and-a-half where there's

16    no train, nothing going on, on a Tuesday night

17    there's nothing in the Village, so I could go

18    home, watch TV and just listen for the radio,

19    and then if you had a call I could go back.

20    But I didn't necessarily have to sit in the

21    car.

22         Q       Were you physically acclimated to

23    working that particular shift?

24         A       Yes.

25         Q       Had you worked the night shift

472

1          Thomas M. Moroughan

2     for other cab companies?

3          A     Yes.

4          Q     Is that what you typically would

5     ask for when you signed up to work as a cab

6     driver?

7          A     Yes.

8                MR. GRANDINETTE:   Objection.

9          Q     The day before, when you worked

10    Friday into Saturday, did you work the full

11    12 hours?

12         A     Yes.

13         Q     And at 6 o'clock, do you have

14    to -- in the morning, did you bring the car

15    to -- so the next driver could pick it up?

16         A     Yes.

17         Q     Where would you bring the car to?

18         A     The office.

19         Q     On Main Street in Huntington?

20         A     Yes.

21         Q     And did you have your own vehicle

22    parked there?

23         A     Yes.

24         Q     And you would then drive it home?

25         A     Yes.

473

1                     Thomas M. Moroughan

2          Q       So the night before, when you

3    worked the 12 hours, you brought your car back

4    at 6 in the morning, where did you go at 6 in

5    the morning after clocking out?

6          A       I don't want to guess.  I'm going

7    to say -- I most likely went to one of the

8    delis around my house to get breakfast.  That

9    is my normal practice.

10              MR. GRANDINETTE:  Don't guess.

11              THE WITNESS:  I am not guessing.

12          I'm just saying --

13              MR. GRANDINETTE:  You're

14          guessing.

15   BY MR. CLARKE:

16          Q       Do you have any specific

17   recollection of doing something that

18   particular Saturday that was unusual or out of

19   what you ordinarily do?

20          A       No.

21          Q       Okay.  So let's talk about your

22   custom and practice, okay?

23          A       Okay.

24          Q       Unless there's some unique,

25   bizarre, unusual occurrence or requirement or

474

1              Thomas M. Moroughan

2    appointment, when you finish up work would you

3    normally go get some breakfast?

4         A      Yes.

5              MR. GRANDINETTE:   Objection.

6         Q      After would you bring breakfast

7    home to eat or would you eat it out?

8         A      Normally I would grab a breakfast

9    sandwich and bring it home.

10        Q      Would you have coffee or

11   something caffeinated to have with your

12   breakfast?

13        A      No.  Because I want to go to

14   sleep.

15        Q      After having breakfast, what

16   would be the next things you would normally do

17   under normal custom and practice?

18              MR. GRANDINETTE:   Objection to

19         form.  You haven't established custom

20         and practice.

21              You can answer it.

22        A      Shower.

23        Q      After taking a shower, what would

24   you do next?

25        A      Go to sleep.

475

Thomas M. Moroughan

1

2      Q      And on the nights when you were

3  working -- on the days you worked the night

4  shift, would there be a certain number of

5  hours you would try to get of sleep?

6      A      Yes.

7      Q      How much sleep would you try to

8  get before going out to work the next shift?

9      A      Normally I would sleep from 7 to

10  3, 3:30.

11      Q      Now, did you and your girlfriend

12  live together at the time, February of 2011?

13      A      Sort of.

14      Q      She wasn't permanently there, but

15  she was there a lot?

16      A      No.  It's her family's house.  So

17  I rented the studio apartment downstairs, but

18  she lived upstairs.  So we did live in the

19  same house, but we weren't living together

20  per se.

21      Q      Okay.  And in the upstairs living

22  portion of the home, your girlfriend lived

23  there with who?

24      A      Her aunt, her grandfather and her

25  little cousin.

476

1                    Thomas M. Moroughan

2         Q      What are their names?

3         A      Nicholas.

4         Q      Nicholas what?

5         A      Nicholas Mondo was the

6    grandfather.  And Marie Mondo is her aunt.

7    And ██████████ is her little cousin.

8         Q      The little cousin was how old in

9    2011?

10        A      6 or 7.

11        Q      Okay.  And Ann Marie is still

12   alive?

13        A      Yes.

14        Q      The grandfather, is he still

15   alive?

16        A      No.

17        Q      My condolences.

18               How old was the aunt, Ann Marie,

19   at the time, in 2011?

20        A      48.

21        Q      Did you see her at any point in

22   time during the course of the day before the

23   shooting?

24        A      Probably, yes.

25               MR. GRANDINETTE:  Don't guess.

477

1                    Thomas M. Moroughan

2          A      I don't know.  I don't recall.

3          Q      Do you recall if the Saturday

4    before the shooting, if you slept from 7:30 or

5    8 in the morning until about 3:00 in the

6    afternoon?

7                    MR. GRANDINETTE:  Objection.  Are

8          you referring to --

9                    MR. CLARKE:  I will rephrase.

10   BY MR. CLARKE:

11         Q      How much sleep did you get the

12   night before you went out to work on the night

13   of the shooting?

14         A      I don't recall.  It was around

15   the same amount of time that I would normally

16   get.

17         Q      Do you recall if you reported to

18   work on time, at 6 in the evening?

19         A      Yes, I did.

20         Q      And before reporting to work,

21   what did you do that late afternoon?

22         A      Probably when I woke up I

23   probably ate.

24                    I know, no guessing.

25                    I ate.

478

Thomas M. Moroughan

1

2    Q        What meal would you have on a

3    normal basis, before going out to work for the

4    night shift?

5    A        Lunch.

6             MR. GRANDINETTE:  Objection.

7    Q        You would have a sandwich or an

8    omelet?  What would you eat?  Breakfast?

9    What -- most people who /SR-PBT vampires

10   /-FPLT you.

11            The night shift -- you eat

12   breakfast, lunch and dinner.  What would be

13   your first meal of the day?

14   A        It varies.  It would be a lunch.

15   It could be a burger from one of the fast food

16   joints.  It could be Taco Bell.  It could be a

17   sandwich.

18   Q        On February 26th, 2011 do you

19   recall when you woke up?

20   A        No.

21   Q        Do you recall what you had as

22   your first meal that day after waking up?

23   A        No.

24   Q        Do you recall anything you did

25   between waking up and reporting to work at 6

479

1                    Thomas M. Moroughan

2       o'clock?

3            A       No.

4            Q       And would you report to work at 6

5       or sometime before?

6            A       Normally I tried to be early.  So

7       I'm normally there a few minutes early.

8                    I was probably there a few

9       minutes early.

10                   I remember that I -- actually, I

11      was waiting for the day guy to get back.  He

12      went out of town.  So I didn't get on the road

13      until about 6:30.

14           Q       When did you find out that

15      Kristie Mondo was pregnant with ▮▮▮▮▮?

16                   MR. GRANDINETTE:  Objection.

17           A       Fall of 2012.

18           Q       Okay.  I'm sure you agree that

19      children are only ever blessings and they're

20      the best parts of life.

21                   I would be curious to know if

22      ▮▮▮▮▮▮ -- if you were trying to conceive a

23      child or if he was just a joyful surprise?

24                   MR. GRANDINETTE:  Objection to

25           form.

```
 1                    Thomas M. Moroughan
 2        Q       What's the answer?
 3        A       We both wanted a child.
 4        Q       Had you decided to start a family
 5   together?
 6        A       Yes.
 7        Q       So ███████ was planned?
 8                MR. GRANDINETTE:  Objection.
 9        A       Yes.
10        Q       Okay.
11                On the morning after you got out
12   of the hospital you talked about smoking a
13   cigarette and talking to Risco, correct?
14        A       Correct.
15        Q       Did any lawyer other than Risco
16   ever show up at the emergency room that night
17   or that morning?
18        A       No.
19        Q       You had testified earlier that
20   you had a belief that Risco was calling some
21   other lawyer to come and represent you?
22                MR. GRANDINETTE:  Objection to
23        form.
24        Q       Do you recall that testimony?
25                MR. GRANDINETTE:  Objection.
```

481

1              Thomas M. Moroughan

2         A     Not that I recall from that

3    night.

4              I later found out that she told

5    someone that she was getting a lawyer for me,

6    but I had no idea.

7         Q     You found out that she later told

8    someone from what source?  Did she tell you

9    that or from someone else?

10        A     I don't remember.

11        Q     Well, do you recall her on that

12   day ever telling you that she was calling to

13   get you a lawyer?

14        A     No.  I remember the lawyer

15   calling me at the precinct.

16        Q     Okay.  Now, on February 27th, did

17   you know that Risco Lewis was a Nassau County

18   ADA?

19        A     Yes.

20        Q     Did you believe that she also

21   worked in private practice?

22        A     No.

23        Q     Did you believe that she had

24   private clients?

25        A     No.

482
1          Thomas M. Moroughan
2          Q      Had you ever known her to be
3     retained by a private client?
4          A      No.
5          Q      Okay.  And for how long had she
6     been a Nassau ADA, as far as you were aware,
7     as of February of 2011?
8          A      I want to say 15 years plus.
9          Q      Had she been a Nassau ADA as long
10    as you had known her?
11         A      Almost as long as I've known her,
12    correct.
13         Q      So you were aware that she was
14    involved in law enforcement when you were
15    calling out to ask her to be your lawyer,
16    right?
17         A      Correct.  But -- but me as a
18    regular -- I want to say as a regular
19    civilian, had no idea that -- you know, what
20    type of lawyer needs to do what.  You know?  I
21    just knew she was a lawyer.  I knew that I
22    wanted her there next to me.  And I know to
23    this day that if she would have been there to
24    have some type of an objection, this BS
25    wouldn't have happened, wouldn't have been

```
                                                    483
 1                   Thomas M. Moroughan

 2       there.

 3                   MR. CLARKE:  Move to --

 4                   MR. GRANDINETTE:  Referring to

 5            Defendant's -- Suffolk County

 6            Defendant's Exhibit C.

 7                   MR. CLARKE:  Move to strike the

 8            entire statement as not responsive to

 9            any pending question.

10                        ---

11                   (Motion to Strike)^

12                        ---

13       BY MR. CLARKE:

14            Q      Did she ever speak to you about

15       anything other than how you were feeling and

16       how you were doing physically that evening?

17            A      She wasn't allowed to talk to me

18       that evening.

19            Q      You had a cigarette with her

20       outside the emergency room, correct?

21            A      As I was getting put in the

22       patrol car, yes.

23            Q      Were you having a cigarette as

24       you were getting in the patrol car or did you

25       have the cigarette chat with her first?
```

484

Thomas M. Moroughan

1

2          MR. GRANDINETTE:   Objection.

3          A       It was a few minutes.  We talked

4    for a few minutes and then they put me in the

5    patrol car.

6          Q       In those few minutes that you

7    were chatting, did she ask you anything other

8    than how you were feeling?

9          A       She asked me how I was feeling.

10   I don't recall any other conversation with

11   her.

12         Q       Do you recall her ever

13   specifically telling you not to tell her what

14   happened?

15         A       No.

16         Q       Okay.

17                 Do you recall having a discussion

18   with her about which entity, whether it would

19   be Suffolk County, Nassau or some other

20   entity, was investigating these events?

21         A       No.

22         Q       You made a statement to my

23   colleague, counsel for Chief Hunter,

24   Mr. Schroeder, regarding your complaints

25   regarding Mr. Schroeder -- Mr. Hunter, excuse

485

1                    Thomas M. Moroughan

2       me.

3                    Without quoting you, I'm fairly

4       certain you said something along the lines of

5       criticism about the deadly force response

6       team, that they never investigated.

7                    Do you recall that statement?

8            A       Yes.

9            Q       Did you have -- do you have some

10      belief that the deadly force response team was

11      responsible for investigating this event?

12                   MR. GRANDINETTE:  Objection.

13           A       From Nassau, they are responsible

14      for investigating police-involved shootings,

15      correct.

16           Q       That specific verb,

17      "investigate," is that something that you

18      believe on your own, or is that from some

19      investigation or research you've done?

20                   MR. GRANDINETTE:  Objection.

21      BY MR. CLARKE:

22           Q       What is the source of that

23      opinion, that you believe they're supposed to

24      investigate the shooting?

25                   MR. GRANDINETTE:  Objection.

486

1                    Thomas M. Moroughan

2                    You can answer.

3          A       Well, the fact of just what they

4    are called is, I think, pretty

5    self-explanatory.  The deadly force response

6    team means they respond to deadly force

7    scenarios.

8          Q       Are you saying that your belief

9    that they're supposed to investigate is your

10   own opinion based upon the name of the team?

11                 MR. GRANDINETTE:  Objection.

12         A       No.  I believe that -- that their

13   job, from what I know it to be, is that

14   they're supposed to look into police-involved

15   shootings and report to the Police

16   Commissioner within 24 hours after the

17   shooting.

18         Q       When you say "what I know it to

19   be," have you ever been in the police academy?

20         A       No.

21         Q       So when you say "what I know it

22   to be," what is basis of your knowledge?

23                 MR. GRANDINETTE:  Objection.

24         A       The Newsday article that was

25   posted about how they cleared every single cop

487

1                    Thomas M. Moroughan

2         that's ever done a shooting in the past couple

3         of years.  That was a big thing, if I remember

4         correctly.

5                    They actually pointed out the

6         fact that the deadly force response team is --

7         investigates deadly -- and that's also -- I

8         also saw the newspaper article about how --

9         they were actually getting a review board for

10        the deadly response team in Nassau County to

11        review after the deadly force -- deadly

12        response team does.

13                    And the fact that -- I'm trying

14        to remember correctly -- Nassau County

15        actually hired a firm to go over the ethics of

16        their police department and how they treat

17        people.

18                    MR. SCHROEDER:  Move to strike

19             the portions not responsive.

20                         ---

21             (Motion to Strike)^

22                         ---

23        BY MR. CLARKE:

24             Q      From what I'm hearing -- I want

25        to make sure I am not leaving anything out --

488

1
2     the basis for your opinion is -- that they
3     were supposed to investigate the shooting is
4     what you can deduce from the name of the team
5     and a Newsday article.
6               Is there any other source of
7     information that you use as a basis for your
8     prior answer?
9               MR. GRANDINETTE:   Objection.
10         Objection.
11              You can answer, if you can.
12         A     No.
13         Q     When you were brought into the
14    detectives interview room at the Second
15    Precinct, were you handcuffed?
16         A     No.
17         Q     Were you initially handcuffed
18    when you walked into that room?
19         A     I don't believe so, no.
20         Q     While you were in that room, were
21    you put in handcuffs?
22         A     Yes.
23         Q     While you were in that room were
24    you placed under arrest?
25         A     Yes.

489

1                    Thomas M. Moroughan

2          Q       And were there any members of the

3     Nassau County Police Department in that room

4     when you were placed under arrest?

5          A       No.

6          Q       Were there any members of the

7     Nassau County Police Department in the squad

8     car when they drove you from Huntington

9     Hospital to the Second Precinct?

10         A       Not that I know of.

11         Q       Have you ever been in court when

12    anyone from the Nassau County Police

13    Department has testified against you?

14                 MR. GRANDINETTE:   Objection.

15         Q       With respect to this particular

16    event?

17                 MR. GRANDINETTE:   Same objection.

18         A       Physically, no.

19         Q       Okay.

20                 And the statement that we've

21    talked about a great deal, that three-page

22    document, Exhibit C, was taken from you and

23    written up by Suffolk County police officers,

24    correct?

25         A       Correct.

490

1              Thomas M. Moroughan

2        Q      When you were interviewed by

3    people you believed to be Nassau County

4    detectives they never asked you to sign any

5    statement, right?

6        A      Correct.

7        Q      After you were placed under

8    arrest in the Second Precinct, where did you

9    go next, physically?

10       A      Into a cell.

11       Q      Within the Second Precinct or

12   somewhere else?

13       A      Within the Second Precinct.

14       Q      How long did you stay there?

15       A      Overnight.

16       Q      Into Monday?

17       A      Monday morning, yes.

18       Q      And on Monday, where were you

19   taken?

20       A      A courthouse.

21       Q      In Riverhead?

22       A      In Central Islip.

23       Q      And after -- did you see a judge

24   there?

25       A      Yes.

491

1                    Thomas M. Moroughan

2          Q       Were you then charged, or

3     arraigned?

4          A       I was arraigned, yes.

5          Q       From there where were you taken

6     physically?

7          A       Riverhead jail.

8          Q       And how long did you remain in

9     the Riverhead jail?

10         A       A few hours.

11         Q       At what time of day were you

12    released from the Riverhead jail?

13         A       Late that night.  Monday.

14         Q       Do you have a recollection as to

15    what time of day on Sunday morning you were

16    arrested?

17         A       That I was finally told that I

18    was under arrest?

19         Q       Did you understand my question?

20         A       No.

21         Q       I asked you a question, you asked

22    me a question.  I'm the one asking the

23    questions.  Let's try it again.

24                 What time of day were you placed

25    under arrest?

492

1          Thomas M. Moroughan

2          MR. GRANDINETTE:  Objection.

3     A     I don't understand the question.

4     Q     You testified that you were told

5  in the detectives interview room at the Second

6  Precinct you were under arrest.  At what time

7  did that happen?

8          MR. GRANDINETTE:  Can I state an

9          objection for a second?  I just want to

10         speak to you for one second.

11         Tom, can you step out?

12         MR. CLARKE:  There is a pending

13         question.  I'd like an answer to my

14         question.

15         MR. GRANDINETTE:  Okay.  I

16         object.  Is the question what time he

17         was told or what time he was placed

18         under arrest?  There's a big difference.

19         MR. CLARKE:  I don't think it's

20         that complicated.

21         He has been very clear:  Up until

22         the time that he was in the detectives

23         office he was walking around, he was

24         smoking cigarettes, he was not in

25         handcuffs.

493

1              Thomas M. Moroughan

2    BY MR. CLARKE:

3         Q      In the Second Precinct, in the

4    detectives room, someone put you in handcuffs,

5    said you're under arrest.

6              When was that?  What time of day

7    did that happen?

8         A      The morning.

9         Q      You were discharged from the

10   emergency room sometime around 7 o'clock in

11   the morning, correct?

12              MR. GRANDINETTE:  Objection.

13        That is a misstatement.

14        Q      8 o'clock in morning.  Excuse me.

15              MR. GRANDINETTE:  Sometime after

16        8.

17        A      Yes.

18        Q      Sometime before noon you were

19   told you were under arrest and put in

20   handcuffs?

21        A      I believe so.

22        Q      And you were then bailed out

23   sometime the following morning?

24        A      Monday night.

25        Q      Do you have any recollection of

494

1          Thomas M. Moroughan

2    the time that you were released from the

3    Riverhead jail, when you were bailed out?

4          A     Late night.  Somewhere between 12

5    and midnight -- I'll mean 10 and midnight.

6          Q     Do you have any other tattoos

7    beside the tattoo on your arm and on your

8    bullet wound on your chest?

9               MR. GRANDINETTE:  Objection to

10         relevance.

11              You can answer.

12         A     Yes.

13         Q     How many tattoos do you have?

14              MR. GRANDINETTE:  Same objection.

15         A     Three others.

16         Q     Are they also of blood spatter

17    and blood?

18              MR. GRANDINETTE:  Objection.

19         A     No.

20         Q     Do you have any other tattoos of

21    bullet wounds?

22         A     No.

23         Q     Do you know a rapper named Kidd

24    Kidd?

25              MR. GRANDINETTE:  Objection to

495

1          Thomas M. Moroughan

2      relevance.

3          Q      Do you know a rapper named Kidd

4      Kidd?

5          A      No.

6          Q      Do you know the rap song,

7      "Tattoos on My Bullet Wounds"?

8          A      No.

9          Q      Are you a member of a gang?

10         A      Is that a serious question?

11         Q      Yes.

12         A      No.

13         Q      You testified that you found the

14     bullet wounds to be disfiguring and drawing

15     unwelcome attention.

16              Is that a fair summary of what

17     you testified?

18              MR. GRANDINETTE:   Objection to

19         form.

20         A      I said the scars.

21         Q      You were -- you weren't happy

22     with people asking you questions all the time,

23     I think is what you testified to?

24         A      Yes.

25         Q      That it brought up a bad, sad,

496
                    Thomas M. Moroughan

1    unpleasant memory?

2         A       Right.

3         Q       And you chose then to adorn the

4    bullet wounds with blood splatter, is that

5    correct?

6              MR. GRANDINETTE:  Objection to

7         form.

8         A       I don't understand the question.

9         Q       Well, you have now adorned the

10   bullet wounds with tattoos of blood splatter;

11   is that correct?

12             MR. GRANDINETTE:  Objection to

13        form.

14        A       What is "adorned"?

15        Q       Decorated.

16             MR. GRANDINETTE:  Objection to

17        form.

18        A       No.  I don't believe I decorated

19   it.

20        Q       Well, the wounds, after they were

21   healed, did not have any residue of blood

22   splatter permanently on the skin, correct?

23        A       Correct.

24        Q       The wounds had been cleaned in

497

Thomas M. Moroughan

1   the hospital and cleaned by your treating

2   physicians as they healed, correct?

3

4        A        Correct.

5        Q        They stopped bleeding within

6   24 hours of the wound, correct?

7                 MR. GRANDINETTE:  Objection.

8        Relevance.

9        A        I don't know how long it took to

10  stop bleeding.

11       Q        At the time you had tattoos of

12  blood put on them were they actively bleeding

13  wounds?

14       A        No.

15       Q        Now, the tattoos that you have of

16  blood splatter where -- in the vicinity of the

17  two bullet wounds, are those permanent tattoos

18  or are those temporary tattoos?

19       A        They're permanent.

20       Q        So you'll have them the rest of

21  your life; is that correct?

22       A        They'll be there, yes.

23       Q        That was your intention, correct,

24  to have these permanently scarred on your body

25  with blood splatter in the area where you had

498

1                    Thomas M. Moroughan

2    been shot; is that correct?

3         A      Yes.

4         Q      What is the name of the tattoo

5    artist who did the blood splatter tattoos at

6    the two locations?

7         A      I have no idea.

8         Q      Where was the -- what is the name

9    of the tattoo parlor where they were done?

10        A      Couldn't even tell you.  It was

11   in Islip.

12        Q      Was it a private business or

13   somebody who did it in their kitchen, or

14   something else?

15        A      It was a business.

16        Q      You have no recollection of the

17   name of it?

18        A      No.

19        Q      Had that location ever done

20   tattoos for you before?

21        A      No.

22        Q      And when did you have these

23   tattoos made, the tattoo on the forearm and

24   tattoo on your chest?

25        A      August or September of 2011.

499

1                   Thomas M. Moroughan

2       Q       So six months after the shooting?

3       A       Yes.

4                       - - -

5               (A recess was taken.)

6                       - - -

7               MR. CLARKE:   In deference to the

8       hour and the hard work everyone has done

9       today with minimal interruptions and

10      minimal argument, we have had an

11      opportunity to consult off the record

12      among counsel.

13              The defendants have asked

14      plaintiff to consent to extend this

15      deposition an additional 90 minutes.

16      And that we have asked him to consent to

17      produce his witness tomorrow morning to

18      continue and complete his deposition,

19      which we will then immediately follow

20      with the deposition of Ms. Mondo which

21      is scheduled for tomorrow.

22              And, Counsel, how do you feel

23      about that?

24              MR. GRANDINETTE:   I consent to

25      that request as reasonable under the

500

1                    Thomas M. Moroughan

2          circumstances, given our prior

3          discussions.

4                    Plaintiff agrees to produce

5          plaintiff and extend the deposition for

6          an additional 90 minutes if necessary.

7                    MR. SCHROEDER:   Thank you very

8          much.

9                    (Time noted:   7:15 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

501

1                    Thomas M. Moroughan

2              (Whereupon, the following is a

3         continuation of the previous day's

4         testimony.)

5              (Time started:  10:10 a.m.)

6              *              *              *

7              THOMAS MOROUGHAN, recalled as a

8         witness, having been previously duly

9         sworn by a Notary Public, was examined

10        and testified further as follows:

11             *              *              *

12   EXAMINATION BY

13   MR. CLARKE:

14        Q    Mr. Monaghan, with your

15   attorney's permission, as you know, we

16   extended the deposition a little bit.

17             I'm going to do my best to try to

18   keep you here even -- finish within the 90

19   minutes, or much sooner than that.  So let's

20   get started.  Okay, sir?

21             Anything happen since I saw you

22   last night until this morning that would

23   prevent us from going ahead today?  Are you

24   feeling okay?  Have you taken any medications?

25   How do you feel?

502

1          Thomas M. Moroughan

2     A      I feel fine.

3     Q      All set?  No problems?  Had a

4  good night's sleep?

5     A      Yes.

6     Q      Good.

7            If you could tell me -- I'll try

8  not to interrupt you -- starting from the time

9  that you were brought to the emergency room,

10 up until today, the names of every doctor that

11 you have gone to see for treatment for any of

12 the injuries you had sustained that day?

13    A      Okay.

14           I'll start from the beginning,

15 until today?

16    Q      I know we had the Huntington

17 emergency room.

18    A      I don't know the doctors at the

19 Huntington emergency room.

20    Q      Fair enough.

21    A      After that, Dr. Martin.

22    Q      Okay.

23    A      Dr. German.

24    Q      Could you spell that?

25    A      It is like German, G-E-R-M-A-N.

503

 1              Thomas M. Moroughan

 2              Dr. Gluck.

 3              I'm trying to remember the

 4    vascular surgeon's name.

 5          Q      If you can't remember a name, but

 6    you know it was a vascular surgeon, perhaps we

 7    can leave a blank in the transcript.  When you

 8    review the transcript you can provide that

 9    name for us?

10          A      Yes.^

11    TO BE FURNISHED: _____

12    _____

13    BY MR. CLARKE:

14          Q      So there's a vascular surgeon,

15    the name you cannot remember.

16          A      He was the one that took the

17    bullet out of my chest.

18          Q      Any others?

19          A      Medical physicians?

20          Q      Any medical provider, counselor,

21    therapist --

22          A      Then --

23          Q      -- nurse practitioner?

24          A      -- Sylvia Freed, you guys already

25    know about.

504

```
 1                 Thomas M. Moroughan
 2               Dr. Mitra, that you know about.
 3        Q       Okay.  So just repeating the
 4  list:
 5               Huntington emergency room;
 6  Dr. Martin, Dr. German; Dr. Gluck; the
 7  vascular surgeon to be named; Therapist Freed;
 8  and Dr. Mitra.
 9               So that is the universe of people
10  who cared for you for injuries you claim in
11  this case?
12               MR. MITCHELL:  Spell Freed.
13               THE WITNESS:  F-R-E-E-D.
14  BY MR. CLARKE:
15        Q       Do you know what Dr. Martin's
16  specialty is?
17        A       I believe he is a
18  vascular-something as well.  He was part of
19  the hospital.
20        Q       Okay.  And had you ever been his
21  doctor [sic] ^ before February 2011?
22               MR. MITCHELL:  Patient.
23        Q       Patient, excuse me.
24        A       No.
25        Q       When did you last see him for
```

505

Thomas M. Moroughan

1  care related to the injuries you sustained

2  that day?

4      A       March of 2011.

5      Q       When you saw him last in March,

6  was that at the hospital or an office or

7  somewhere else?

8      A       His office.

9      Q       Okay.

10             Now Dr. German, prior to

11  February 6, 2011 had you been his patient?

12     A       Yes.

13     Q       Is he your internist?

14     A       He was my primary at the time,

15  yes.

16     Q       So before February of 2011 you

17  would go to see him for any number of

18  different ailments, colds, that sort of thing?

19     A       Yes.

20     Q       And was he the physician who

21  monitored your diabetes?

22     A       Yes.

23     Q       And provided you with whatever

24  medications you need?

25     A       Yes.

506

```
 1                    Thomas M. Moroughan
 2        Q       When did you last see Dr. German
 3   in his office?
 4                 MR. GRANDINETTE:  Objection;
 5        relevance.  Objection, but answer the
 6        question.
 7        A       I believe it was 2012.
 8        Q       When did you last see Dr. German
 9   with respect to treatment you wanted or needed
10   for any injury you claim in this case?
11        A       Okay.  Either March --
12        Q       If ever.
13        A       Either March or April of 2011.
14                 MR. SCHROEDER:  Which doctor?
15                 MR. CLARKE:  German.
16   BY MR. CLARKE:
17        Q       What treatment did Dr. German
18   provide for any of the injuries you claim in
19   this case?
20        A       Cleanup.  Cleaning out the
21   wounds.  Wound care.
22        Q       So any treatment since April of
23   2011 has been for other issues, other
24   conditions, unrelated to the events of
25   February 2011; is that fair?
```

507

Thomas M. Moroughan

1

2      A      I'm going to say June.  Because

3   he had actually wrote -- sorry.  I want to say

4   June because he actually wrote the referral

5   for the vascular surgeon who took the bullet

6   out of my chest, and for the arm surgeon, Dr.

7   Gluck, who took the one out of my arm.

8      Q      Did Dr. Martin ever refer you to

9   any physician?

10     A      No.

11     Q      Dr. German referred you to Gluck

12  and the vascular?

13     A      Yes.

14     Q      And that was in June of 2011?

15     A      Yes.

16     Q      And as far as you can recall

17  that's the last time Dr. German provided you

18  with any care or treatment for the injuries

19  you sustained in February of 2011, correct?

20     A      Yes.

21     Q      Now, Dr. Gluck, what is

22  Dr. Gluck's specialty?

23     A      He is an arm -- hand and arm

24  surgeon.

25     Q      If I use the word orthopedic

508

```
 1              Thomas M. Moroughan

 2     surgeon, is that what he is?

 3         A       No.

 4                 He just specializes in hand and

 5     arm.  So it is something else.  I forget.

 6         Q       Fair enough.

 7                 When did you begin treating with

 8     him?

 9         A       June/July.

10         Q       Of...?

11         A       2011.

12         Q       And when did you last treat with

13     him?

14         A       Same time.

15         Q       How many times did you see him?

16         A       Twice.

17         Q       Forgive me, is Dr. Gluck a man or

18     a woman?

19         A       Man.

20         Q       What's his first name?

21         A       Don't know.

22                 MR. SCHROEDER:  Where is his

23         office?

24                 THE WITNESS:  Lake Success.

25     BY MR. CLARKE:
```

509

1              Thomas M. Moroughan

2        Q       And had you ever been a patient

3   of Dr. Gluck prior to June of 2011?

4        A       No.

5        Q       The vascular surgeon that you

6   went to see, where was that vascular surgeon

7   located?

8        A       124 Main Street in Huntington.

9        Q       Is that a building that houses a

10  number of different physicians' offices?

11       A       Yes.

12       Q       And when did you begin treating

13  with that vascular surgeon?

14       A       Same time; June or July of 2011.

15       Q       When did you last treat with that

16  person?

17       A       Same time.

18       Q       How many visits did you have with

19  that doctor?

20       A       Two or three.

21       Q       You say he removed blood from

22  your chest?

23       A       He removed the bullet from my

24  chest.

25       Q       Okay.  After removing the

510

Thomas M. Moroughan

1   bullet -- was that something that was done in

2   his office?

3            A       No.  It was done at the Melville

4   Day Surgery Center, I believe it was called.

5            Q       By definition, was that a place

6   where you went for you surgery but you were

7   not admitted; in other words, you didn't say

8   overnight?

9            A       Yes.

10           Q       You went in, he performed the

11   procedure, and you went home?

12           A       Yes.

13           Q       Approximately how long did it

14   take the physician to perform that procedure?

15           A       I couldn't even tell you.

16           Q       Were you unconscious during the

17   process --

18           A       Yes.

19           Q       -- or in that twilight condition?

20           A       No.  It was anesthesia.

21           Q       What time did you go there that

22   day?

23           A       I believe it was like 8:30 in the

24   morning I was there.

511

1                      Thomas M. Moroughan

2          Q       What time did you come home?

3          A       I don't know.

4          Q       Who brought you there?

5          A       Kristie Mondo.

6          Q       She brought you home?

7          A       Yes.

8          Q       And after having the procedure,

9      the bullet removed, did you go back to that

10     surgeon at his office on Main Street for a

11     checkup?

12         A       I'm not sure.  I might have.  I

13     don't want to guess.

14         Q       You saw him the one time for this

15     procedure at the Melville Surgery Center.  The

16     other times were at his office; is that

17     correct?

18         A       Yes, I saw him once -- I believe

19     it was either once or twice prior to the

20     surgery for a consultation and stuff.  And

21     then the surgery.

22         Q       And you last saw him June or July

23     of 2011, correct?

24         A       Yes.

25         Q       Now, this therapist named Freed,

512

1            Thomas M. Moroughan

2    Sylvia Freed, when did you begin seeing

3    Therapist Freed?

4         A       About six months ago.  July, June

5    or July.

6         Q       Of 2014?

7         A       Yes.

8         Q       When did you last see her most

9    recently?

10        A       Not this past Monday because of

11   the holiday, but the Monday before.

12        Q       And were you referred to the

13   Pederson-Krag facility by any of your doctors?

14        A       No.

15        Q       Were you referred there by any of

16   your lawyers?

17        A       No.

18        Q       Were you referred there by any of

19   your family members?

20        A       No.

21        Q       How did you find that center; how

22   did you settle up on that center among the

23   others that are available to treat the

24   conditions you're complaining of?

25                MR. GRANDINETTE:   Objection to

513

1                   Thomas M. Moroughan

2        form.

3        A       They were listed in my book for

4   my healthcare.

5        Q       What is that book?  What's it

6   called?

7        A       Just the treatment -- it shows

8   the people, the doctors that are in my

9   network.

10       Q       Who provided you with that book?

11       A       Fidelis.

12       Q       What is the name of your network?

13       A       Fidelis.

14       Q       Fidelis Healthcare?

15       A       Yes.

16       Q       Is that private insurance or is

17  that Medicare/Medicaid, or something else?

18       A       Medicaid.

19       Q       Has all of the medical treatment

20  that you have received for the injuries you

21  claim in this case been paid for through

22  Medicaid?

23               MR. GRANDINETTE:  If you know.

24       A       I'm not 100 percent sure.

25       Q       Do you have a Medicaid card?

514

1                Thomas M. Moroughan

2      A      Yes.

3      Q      Do you have it with you today?

4      A      Yes.

5             MR. CLARKE:  Okay.  When we are

6      on a break I'd ask counsel to permit a

7      copy to be made so we can have it for

8      our records.

9                        ---

10            (Request for Production)^

11                       ---

12            MR. CLARKE:  I'm going to demand

13     authorizations for the plaintiff's

14     Medicaid records, claims history and

15     billing history.

16                       ---

17            (Request for Production)

18                     ---^

19            MR. GRANDINETTE:  We'll take it

20     under advisement.  Submit us a demand.

21     He won't produce it today, but submit us

22     a demand and we will take it under

23     advisement.

24            MR. CLARKE:  I am demanding it

25     now.