SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
-----------------------------------------------------------------X
In the Matter of the Application of      :
Nassau County Police Officer Anthony DiLeonardo,

              :

        Petitioner,     :   **NOTICE OF**
                   **PETITION**
For Judgment in the Nature of Mandamus to Review :
under Article 78 of the Civil Practice Law and Rules, :

     -against-     :

               Index No.: **14-008686**
The Nassau County Police Department, the Nassau County
Commissioner of Police; Thomas J. Krumpter,

              :

       Respondents.   :
-----------------------------------------------------------------X

  **PLEASE TAKE NOTICE**, that upon the annexed verified petition, the undersigned will move this Court, on the 26th day of September, 2014, at a term of this Court to be held at the Courthouse located at 100 Supreme Court Drive, Mineola, New York 11501, at 9:30 o'clock in the forenoon of that day, or as soon thereafter as counsel can be heard, for an order pursuant to Article 78 of the Civil Practice Law and Rules:

  (1)  vacating the May 5, 2014 determinations of the Nassau County Police Department and its Interim Commissioner terminating the employment of the Petitioner, Anthony DiLeonardo which, respectively, denied petitioner defense and indemnification pursuant to General Municipal Law §50-I, and then summarily adhered to that determination on appeal;

  (2)  compelling the Nassau County Police Department and Commissioner Krumpter to reinstate Officer DiLeonardo to his prior employment and status with the department and ordering that he receive all retroactive the pay from the date of his termination until his reinstatement; and

1

(3)      Alternatively, remitting to the Commissioner to grant petitioner a *de novo* hearing on the issue of his termination at a proceeding for which there are known and published rules and procedures and at which only competent credible evidence is received.

(4)      And any other relief this Court deems appropriate and just.

Respectfully submitted,

Bruce A. Barket, Esq.
Barket, Marion, Epstein, & Kearon, LLP
*Counsel for Petitioner*

TO:      Nassau County Police Department
Legal Affairs Bureau
1490 Franklin Avenue
Mineola, NY 11501

Commissioner Thomas J. Krumpter
Nassau County Police Department
Legal Affairs Bureau
1490 Franklin Avenue
Mineola, NY 11501

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
----------------------------------------------------------------X
In the Matter of the Application of :
Nassau County Police Officer Anthony DiLeonardo,
:
                          Petitioner, **VERIFIED**
: **PETITION**
For a Judgment in the Nature of Mandamus to Review
under Article 78 of the Civil Practice Law and Rules, :

              -against- :
                                  Index No.: 14-008686

:
The Nassau County Police Department, the Nassau County
Commissioner of Police; Thomas J. Krumpter,
:
                       Respondent. .
----------------------------------------------------------------X
STATE OF NEW YORK   )
                    ) ss.
COUNTY OF NASSAU   )

**RECEIVED**

SEP 05 2014

NASSAU COUNTY
COUNTY CLERK'S OFFICE

      **Bruce A. Barket,** an attorney admitted to practice law in the State of New York,

and a partner at Barket Marion Epstein & Kearon, LLP, counsel for petitioner Anthony

DiLeonardo, deposes and states the following upon information and belief:

## PRELIMINARY STATEMENT

      1.     This petition seeks relief pursuant to Article 78 of the Civil Practice Law and

Rules, §7803(3), in the nature of mandamus to review.

      2.     Relief should be granted in this case because the determination of the Nassau

County Police Department terminating the employment of Office DiLeonardo was made was

arbitrary and capricious, and constituted an abuse of discretion.

      3.     This petition is timely made within four months of the Nassau County Office

DiLeonardo's termination on May 5, 2014.

4.     At all times hereinafter mentioned, the Respondent, Thomas J. Krumpter was and still is the Nassau County Interim Commissioner of the Police Department, an agency organized under and pursuant to the General Municipal Law of the State of New York.

5.     The Petitioner was a duly sworn and appointment member of the Nassau County Police Department having been sworn in as a Nassau County Police officer on November 2, 2007.

6.     While the Petitioner was employed as a Police Officer he was a Civil Service Employee entitled to the rights and privileges of the Civil Service Law of the State of New York, particularly Section 75 of said Law.

7.     On April 22, 2012, Officer Dileonardo was served with allegations that he violated 13 Rules and Regulations of the Department.

8.     On March 10, 2014 "hearing" was held before a hearing officer handpicked by the Commissioner. The hearing continued on March 11th and March 19th. (the transcript of the proceeding is attached as exhibit "A") Only one witness, Detective Sergeant JoAnne Distler, was called, who was not present for any of the relevant events. Her testimony merely offered her interpretation of some of the witness statements and reports in an Internal Affairs report she helped prepare. There was not a shred of first hand evidence presented. All of the evidence came in the form of witness statements and reports. This was not a "hearing" by any rational standard. One person offered her opinion—an opinion, by the way, that she was not qualified to render--under oath about the paper work in the file.

9.     There were no rules published by the department regarding how the purported hearing should be conducted. The presiding officer did rule on objections but there was not a

4

published or stated standard governing his rulings. Without a set of rules, the "hearing" was nothing more than a proceeding intended to mask a predetermined result.

10.    In addition to the testimony, the respondent offered an expert opinion letter from a retired New York City Detective qualified to render opinions (attached as exhibit "B") about police shootings.

11.    At the conclusion of the proceeding the department and the petitioner submitted memos summarizing their respective positions. (attached as exhibit "C" is the department's memo and exhibit "d" is the petitioner's memo)

12.    In a written decision dated March 30, 2014 the hearing officer determined that officer Dileonardo had violated 3 rules and recommended that he be fired. (exhibit "E") What is shocking and revealing is March 30th, the date of the decision, predates the submission of the closing memos by each side. Clearly, the decision was not only predetermined, but apparently written before the petitioner even had a chance to draft and serve the closing arguments. The hearing officer simply inserted and rebutted a few arguments made in the closing memo into the decision firing officer DiLeonardo, which had already been written. The hearing was sham.

## FACTS

13.    The uncontroverted proof from the witness statements establishes that on the evening of February 26, 2011, into the early morning hours of February 27, 2011, off-duty police officers Anthony D. DiLeonardo and Edward Bienz, accompanied by DiLeonardo's girlfriend Sophia Cornia, and Bienz's wife Jillian Bienz, had gone out together for dinner and then to a couple of bars in Huntington, where they each consumed a few alcoholic and non-alcoholic drinks, and went dancing (*see* 3/17/2012 P.O. DiLeonardo Statement at ¶2-11; 3/13/2012 P.O. Bienz Statement at ¶2-3). At around 1:00 a.m., they left the last bar, and DiLeonardo and

Sophia, who were in Sophia's white Infinity and were unfamiliar with Huntington, followed the Bienzes' blue Acura toward Jericho Turnpike (3/17/12 P.O. DiLeonardo Statement at ¶¶13-14; 3/13/12 P.O. Bienz Statement at ¶4; 2/27/11 J. Bienz Statement at pg. 1; 2/27/11 S. Cornia Statement at pg. 1).

14.     At approximately 1:15 a.m., Bienz got lost and pulled over to the side of the road on Oakwood Drive, parking his vehicle near the curb. DiLeonardo pulled up behind him, and sat in the Infinity with Sophia, waiting for Bienz to continue driving (3/17/12 P.O. DiLeonardo Statement at ¶¶15-18; 3/13/12 P.O. Bienz Statement at ¶4-5; 2/27/11 J. Bienz Statement at pg. 1; 2/17/11 S. Cornia Statement at pg. 1).

15.     As they were sitting in the car, a white Prius with a male driver and a female passenger pulled up alongside DiLeonardo's car, blocking one lane of traffic (3/17/12 P.O. DiLeonardo Statement at ¶19; 3/13/12 P.O. Bienz Statement at ¶5). The Prius was a taxi owned by Dobro Express, being driven by a new employee, Thomas Moroughan, with his girlfriend, Kristie Mondo in the passenger seat (2/2711 Statement of K. Mondo at pg. 1; 2/27/11 Statement of T. Moroughan at pg. 1).[3]

---

[3] Moroughan, a new driver at Dobro Express with less than a week on the job, had three prior arrests and two misdemeanor convictions, and was wanted in Tennessee for a federal fraud case. On the day of the incident, he was "having a bad day [as] there was a lot of traffic and [he] wasn't making any lights" (2/27/11 Statement of Moroughan at pg. 1). He got angry because he was driving behind the Bienzes' blue Acura sometime before it stopped, and was flashing his high beams at it for driving erratically (2/27/11 Statement of Mondo at pg. 1; 2/27/11 Statement of Moroughan at pg. 2). Moroughan perceived that DiLeonardo's white Infinity, which was then behind him, had flashed its beams at him, so he began to drive slowly to "piss off" the driver of the Infinity, who passed him in spite of Moroughan's attempts to prevent this (2/27/11 Statement of Mondo at pg. 1). Moroughan then got stuck at a light as the cars turned the corner, but when the light turned green, he followed them and saw them stopped at the side of the road (2/27/11 Statement of Mondo at pg. 1; 2/27/11 Statement of Moroughan at pg. 2) Neither Bienz, DiLeonardo, Jillian, or Sophia was aware that the Prius had brighted anyone, and DiLeonardo denied brighting the Prius. It thus appears that Moroughan got angry because the Acura, which was lost, was driving erratically, and he perceived that the Infinity was being belligerent when, in fact, it was just passing him to keep up with the Acura. This explains why, in contrast to Moroughan and Mondo, no one in the Acura or Infinity even recalled any earlier incident with the Prius.

16.     Believing that the driver of the Prius was going to ask him for directions, DiLeonardo, who was at the wheel of the Infinity, rolled down his window (3/17/12 P.O. DiLeonardo Statement at ¶19-21). Moroughan, yelled out of his car's open passenger window, "You need to learn how to fucking drive, I'm going to teach you how to fucking drive right now." (3/17/12 P.O. DiLeonardo Statement at ¶22; *see also* 2/27/11 K. Mondo Statement at pg. 2; 2/27/11 T. Moroughan Statement at pg. 2). DiLeonardo exchanged words with Moroughan, and as DiLeonardo began to close his window, Moroughan exited his car, walking around the front of the Prius toward DiLeonardo's car, while pointing at him with his right hand and yelling, "I'm going to kill you." (3/17/12 P.O. DiLeonardo Statement at ¶23-26; *see also* 2/27/11 T. Moroughan Statement at pg. 2). DiLeonardo could not see Moroughan's left hand, and, concerned that Moroughan might have a weapon, he exited his car, keeping the open door of the Infinity between himself and Moroughan (3/17/12 P.O. DiLeonardo Statement at ¶27). Moroughan continued to yell at DiLeonardo, saying, "I don't care about this fucking car. I'm going to smash your car and I'm going to kill you." (3/17/12 DiLeonardo Statement at ¶26). Moroughan then got back into his car, and floored it into reverse (*Id.*; 2/27/11 T. Moroughan Statement at pg. 2), as DiLeonardo, fearing for his and Sophia's safety, and believing that Moroughan was going to ram the Infinity in which Sophia was still sitting, drew his gun from his ankle holster and attempted to get around the back of the Infinity to get Sophia out of the car (P.O. DiLeonardo Statement at ¶28-30). As he walked towards the back of the car, he pulled out his shield, which was on a chain around his neck, and held it out in front of him with one hand, yelling to the Prius that he was a police officer and ordering the driver of the Prius to stop (2/27/11 J. Bienz Statement at pg. 1-2; 2/27/11 S. Cornia Statement at pg. 2).[4]

---

[4]  Jillian Bienz, who saw the Prius pull up next to DiLeonardo's car, and heard DiLeonardo and the driver of the Prius cursing and yelling at each other, "with the people in the taxi [] doing most of the yelling", also observed the

17.     Before DiLeonardo could get fully around the back of his car, the Prius, which had backed up a few car lengths and had now stopped with its front facing the back of the Infinity at a diagonal angle, began accelerating toward the rear of the Infinity, where DiLeonardo was standing (DiLeonardo Statement at ¶30; 2/27/11 T. Moroughan Statement at pg. 2). DiLeonardo shouted, "Stop, police, don't move" and pointed his gun at the Prius, which was heading straight towards him. Moroughan did not stop or slow down, and DiLeonardo fired, emptying all five rounds of his weapon (P.O. DiLeonardo Statement at ¶30-34).[5]

18.     The Prius then came to a stop between 10 and 25 feet away from DiLeonardo's car, and DiLeonardo approached the driver's side door with his shield out and his gun drawn, stating, "Police, don't move, you are under arrest." (3/17/12 P.O. DiLeonardo Statement at ¶38-39; 3/13/12 P.O. Bienz Statement at ¶9). Moroughan refused DiLeonardo's commands to unlock the door, so DiLeonardo smashed the driver's side window with the butt of his gun, unlocked the door, and pulled it open.[6]  As he attempted to remove Moroughan from the car, the latter resisted, cursing at DiLeonardo and threatening to kill him.  A struggle ensued, during which Moroughan grabbed DiLeonardo's gun with one hand and punched him with the other, as DiLeonardo was leaning into the vehicle.  Moroughan then shifted the car into reverse, and sped

---

Prius back up and then stop, and saw DiLeonardo holding up what she believed was his shield as he moved towards the back of his car, yelling that he was a police office, and ordering the driver of the Prius to stop the car (2/27/11 J. Bienz Statement at pg. 1-2). Sophia Cornia, who was sitting in the Infinity, saw the taxi back up aggressively and stop behind her car. She also saw DiLeonardo move towards the back of the car while holding out his shield, which he was wearing on a chain around his neck (2/27/11 S. Cornia Statement at pg. 2).

[5]  In a signed statement given on the day of the incident, Moroughan told police that, "I felt [DiLeonardo] fired at me to protect himself because I drove at him." (2/27/11 T. Moroughan Statement at pg. 2-3). At the hearing the Detective Sergeant Dissler hinted that the confession was taken under suspicious circumstances. However, there is not any testimony in the record that would corroborate any claim that the confession was either involuntary, false or taken in violation of the Moroughan's rights.

[6]  According to Kristie Mondo, the passenger in the Prius, during the struggle DiLeonardo "said he was a cop and that [Moroughan] was going to jail." (2/27/11 Statement of K. Mondo at pg. 2). Moroughan also recalled that DiLeonardo "said he was a police officer and that [Moroughan] was under arrest," but Moroughan claimed that he was not sure DiLeonardo was a cop, so he drove away (2/27/11 Statement of T. Moroughhan at pg. 3).

backwards, dragging the Officer alongside the vehicle. DiLeonardo twisted away from the car, and ran away from the Prius towards Bienz, who was running to assist him, but both Officers were hit by the driver's side door of the Prius, which was still open, and were thrown to the ground (3/17/12 P.O. DiLeonardo Statement at ¶48-51; 3/13/12 P.O. Bienz Statement at 9; 2/27/11 T. Moroughan Statement at pg. 3). The Prius made a U-turn and sped away (2/27/11 J. Bienz Statement at pg. 3; 2/27/11 S. Cornia Statement at 2). DiLeonardo's gun had fallen into the Prius during the struggle.

19.     DiLeonardo immediately called 911, identified himself as a police officer, and reported that the driver of a white Prius with gold plates had tried to run him over, that DiLeonardo had shot at the Prius, and that the driver of the Prius had taken his gun (3/17/12 P.O. DiLeonardo Statement at ¶56). EMS arrived within minutes, transporting DiLeonardo, Bienz, Sophia, and Jillian to Huntington Hospital (Id. at ¶57).

20.     Meanwhile, Moroughan realized he had been shot and also drove to Huntington hospital, while his girlfriend-passenger, Kristie Mondo, called 911 (2/27/11 Statement of K. Mondo at pg. 3; 2/27/11 Statement of T. Moroughan at pg. 3).

## CAUSES OF ACTION UNDER C.P.L.R. ARTICLE 78

21.     The Department's determination made by Commissioner Krumpter,. Terminating Officer DiLeonardo was arbitrary and capricious and constituted an abuse of discretion.[19] It cannot be permitted to stand.

---

[19]  Although, for the sake of clarity and organization, petitioner's claims are divided into sections identifying separate causes of action based on each cognizable claim under CPLR 7803(3), there is quite a bit of overlap among the sections. Indeed, an error of law or a violation of lawful procedure will also generally render an agency's determination arbitrary and capricious. And, of course, all of these errors will lead to a conclusion that the agency abused its discretion. To avoid repetition, claims are not repeated in multiple sections; however, the classification of a claim as an error or law or a violation of lawful procedure should not be deemed a waiver of any argument that such claim also resulted in an arbitrary determination or an abuse of discretion; to the contrary, all of the causes of action, taken cumulatively, overwhelmingly support this conclusion.

## FIRST CAUSE OF ACTION:

## THE DEPARTMENT'S DETERMINATION WAS ARBITRARY AND CAPRICIOUS

### A. The Standard governing the hearing was so vague that the Department's decision is Facially Arbitrary and Capricious

Under well-established case law, "Protection . . . against the exercise of arbitrary administrative power demands both procedural safeguards within the agency and outside checks upon the exercise of untrammeled administrative discretion." *Nicholas v. Kahn*, 47 N.Y.2d 24 (1979). Thus, "a legislative enactment may rely on agency expertise," but such delegation is permissible "only if the legislature limits the field in which the agency's discretion is to operate and provides standards to govern its exercise." *164th Bronx Parking, LLC v. City of New York*, 862 N.Y.S.2d 248, 257 (N.Y. Sup. Ct. 2008). So, too, the administrative agency must "articulate objective standards against which an ultimate determination could be measured." *Timber Point Homes, Inc v. County of Suffolk*, 155 A.D.2d 671 (2d Dept. 1989).

Here there was not any standard employed at all, except "substantial evidence" as used by the hearing officer in his decision but that phrase was not defined and it was not clear how or to whom it was applied. It was not announced at the beginning of hearing. If the hearing officer's intent was to sustain the charges based merely on "substantial evidence" then that choice was made by him alone without any guidance from the Department, union contract or legislative enactment. The hearing officer simply created a standard on his own. The standard may, or may not, be appropriate for a court to review a determination made by an agency, but it cannot be used as the sole basis to terminate an officer's employment.

**B.  There were no rules at all governing how the "hearing" should be conducted.**

The presiding inspector in a manner devoid of any rationale rooted in law or logic seemed to be accepting or not "evidence" based on nothing but mere whim, and, of course, that whim nearly always permitted the department to do whatever it wanted to do. The hearing officer frequently admitted evidence after saying that he would give the evidence the weight it is due. It would be difficult to imagine anything more arbitrary.  The hearing officer revealed that the proceeding was not a fair hearing with rules applicable to both sides.  Instead, it was proceeding wherein he would take anything the Department offered and would use it as he saw fit, without even bothering to tell the petitioner which evidence was entitled to weight and which would be disregarded completely.

## THE DEPARTMENTS'S DECISION CONSTITUTED AN ABUSE OF DISCRETIONAND WAS CONTRARY TO THE FACTS

For all the reasons stated on the record and in the closing Memo and as outlined above the decision by the Commissioner and the Department was contrary to the facts that could be fairly found from an examination of the record.  Firing Officer DiLeonardo was an abuse of discretion because Officer DiLeonardo was not offered a fair hearing.

### PRAYER FOR RELIEF

WHEREFORE, and for the reasons set forth above, petitioner's request for a judgment in the nature of a writ of mandamus-to-review pursuant to Article 78 of the Civil Practice Law and Rules vacating the decision by the department terminating the employment of Officer DiLeonardo should be granted; this Court should order the Department to reinstate

DiLeonardo to his position as a police officer and grant him back pay. Alternatively, this Court should remit the matter to the Police Department for a new hearing and determination.

Dated: Garden City, New York
        August 13, 2013

Bruce Barket
Barket, Marion, Epstein & Kearon, LLP
*Counsel for Petitioner*
(516) 745-1500

Sworn to before me this
5th day of September, 2014

Notary Public

SUZANNE M. O'DONOGHUE
NOTARY PUBLIC, State of New York
No. 01OD6288460
Qualified in Suffolk County
Commission Expires Sept. 30, 2017

SUZANNE M. O'DONOGHUE
NO⁻                    rk

Comm

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

------------------------------------------------------------------X

In the Matter of the Application of                               :
Nassau Police Officer Anthony DiLeonardo,

                                                                  :
                                    Petitioner,                       **VERIFICATION**

                                                                  :
For Judgment in the Nature of Mandamus to Review
under Article 78 of the Civil Practice Law and Rules,             :

                      -against-                                   :

                                                                      Index # _____
The Nassau County Police Department, the Nassau County
Commissioner of Police; Thomas J. Krumpter,

                                    Respondents.

------------------------------------------------------------------X

STATE OF NEW YORK          )
                           :ss.:
COUNTY OF NASSAU           )

    **ANTHONY DILEONARDO,** the petitioner in this proceeding, being duly sworn, states:

    I have read the annexed **Verified Petition** and know the contents thereof and the same are true to my knowledge, except those matters that constitute legal argument or are alleged on information and belief, and as to those matters I believe them to be true.

                     _____
                       Anthony DiLeonardo

Sworn to before me this
5th day of September 2014

_____
Notary Public

LENSKA RODRIGUEZ
NOTARY PUBLIC, State of New York
No. 01RO6147462
Qualified in Suffolk County
Commission Expires June 5, 2018

# EXHIBIT A

DISTLER

1      - - - - - - - - - - - - - - - - - -x

2      POLICE DEPARTMENT COUNTY OF
       NASSAU, NEW YORK,

3                                    CASE NO. 8118

4          AGAINST

5      ANTHONY DILEONARDO
       POLICE OFFICER, SERIAL NO. 9013

6      - - - - - - - - - - - - - - - - - -x

7                    NASSAU COUNTY POLICE DEPARTMENT

8                    1490 FRANKLIN AVENUE

9                    MINEOLA, NEW YORK 11501

10                   MARCH 10, 2014

11                   10:15 a.m.

12

13     BEFORE:  INSPECTOR MICHAEL STUDDERT

14              HEARING OFFICER

15

16

17

18

19

20

21

22

23

24

25

NORTH SHORE COURT REPORTERS     1-800-794-5342

DISTLER

```
 1          A P P E A R A N C E S:

 2

 3          HEARING OFFICER: INSPECTOR MICHAEL STUDDERT

 4

 5          NASSAU COUNTY POLICE DEPARTMENT

 6          ATTORNEYS FOR CLAIMANT

 7          1490 FRANKLIN AVENUE

 8          MINEOLA, NEW YORK 11501

 9          BY:  LESLI P. HILLER, ESQ.

10          FILE # 8118

11

12          BARKET, MARION, EPSTEIN & KEARON, LLP

13          ATTORNEYS FOR RESPONDENT

14          666 OLD COUNTRY ROAD

15          SUITE 700

16          GARDEN CITY, NEW YORK 11530

17          BY:  BRUCE A. BARKET, ESQ.

18

19  ALSO PRESENT:

20  Israel Santiago, Sergeant Commanding Officer Legal Bureau

21  Tara Comiskey, Detective Sergeant Legal Bureau

22  Karen Taggart, ESQ., Legal Bureau

23  William Purcell, Third Precinct PBA Trustee

24  Joanne DeLorenzo, Legal Bureau

25
```

DISTLER

```
 1        HEARING OFFICER STUDDERT:  Good
 2   morning.  I am Inspector Michael Studdert.
 3   This hearing is now in session.  I have
 4   been designated a hearing officer as set
 5   forth by Commissioner's Departmental
 6   Personnel Order 12-080 dated July 23,
 7   2012.  This hearing is an administrative
 8   departmental disciplinary hearing held
 9   pursuant to New York State Civil Service
10   Law, Article 75.
11        It is my understanding that Police
12   Officer DiLeonardo has been served with
13   the charges and specifications under Case
14   8188, alleging 13 counts of violations of
15   the rules and regulations of the NCPD.
16        It is also my understanding that the
17   Department is only presenting counts 3, 4,
18   and 11, and therefore this hearing is
19   limited in scope to evidence concerning
20   only those three charges.
21        I remind both parties that this is an
22   administrative hearing and is not a
23   criminal trial nor a civil trial in the
24   normal course of the meaning.  As such,
25   cross-examination of testifying parties
```

4

**DISTLER**

1     will be allowed to the extent I think it

2     is necessary.  I will hear testimony that

3     is relevant and allow documentary evidence

4     into the record.  All questions concerning

5     this proceeding, testimony, objections,

6     and any statements made by the attorneys

7     should be addressed to me.  If it is

8     necessary, I will obtain a clarification

9     for the record.  I also remind both

10    parties that hearsay evidence is

11    admissible.

12         May I have the appearance for counsel

13    for the record?  Counsel for the

14    respondent?

15         MR. BARKET:  It is Bruce Barket,

16    B-A-R-K-E-T.  Barket, Marion, Epstein &

17    Kearon is the name of the law firm.  Our

18    office is at 666 Old Country Road in

19    Garden City.

20         Good morning, Inspector.  Sorry.

21         HEARING OFFICER STUDDERT:  Good

22    morning.

23         May I have the appearance for the

24    Department's representative?

25         MS. HILLER:  Yes.  Lesli Hiller,

DISTLER

L-E-S-L-I, Nassau County Police Department
Legal Bureau.

And just for the record, I think the
case number that was entered into the
record was not right.  I have Case 8118,
not eight — I thought I heard 881.

HEARING OFFICER STUDDERT:  I have
8188.

MS. HILLER:  I have 8118.  8118.

HEARING OFFICER STUDDERT:  Okay.

Are there any observers here who are
going to take part in the hearing?

MS. TAGGART:  Karen Taggart, Nassau
County Police Department's Legal Bureau.
I am here for observation purposes.

HEARING OFFICER STUDDERT:  State your
name for the record.

MR. PURCELL:  Yes.  William Purcell,
P-U-R-C-E-L-L.

MS. DELORENZO:  Joanne DeLorenzo.

MS. COMISKEY:  Tara Comiskey.

MR. SANTIAGO:  Detective Sergeant
Israel Santiago, Commanding Officer of the
Legal Bureau.

HEARING OFFICER STUDDERT:  Okay.

DISTLER

```
 1        May I have brief opening statements?

 2        MS. HILLER:  I just have a couple of

 3   preliminary issues that I wanted to

 4   address before we went into openings.  The

 5   first thing is, I have already passed up

 6   to the hearing officer a copy of discovery

 7   that was exchanged prior to this hearing

 8   via email on November 15, 2012.  I have

 9   another copy if you need one, counsel —

10        MR. BARKET:  Sure.

11        MS. HILLER:  — but it was exchanged

12   to your office.  I am going to read into

13   the record what it is, and then I'll give

14   it to you, because this is my copy.

15        MR. BARKET:  Okay.

16        MS. HILLER:  Within that package were

17   copies of the Police Department County of

18   Nassau Forms 209.

19        Also within that package is a copy of

20   the actual charges and specifications,

21   PDCN Form 210.

22        Also included in that package were

23   statements of Police Officer Anthony

24   DiLeonardo, one of them being to the

25   Suffolk County Police Department; another
```

DISTLER

1    one, which is titled PDCN 206A, which is a

2    Nassau County form.

3          Also included as far as statements is

4    a statement made by Police Officer Anthony

5    DiLeonardo to the Nassau County Police

6    Department Internal Affairs Unit, dated

7    March 17, 2012.  There are copies of

8    portions, I should say, that were

9    exchanged of Police Officer Anthony

10   DiLeonardo's hospital record from

11   Huntington Hospital.

12         There is a copy of the County of

13   Suffolk Shooting Incident Reconstruction

14   Report, nine pages.

15         There are two pages of a hospital

16   report with respect to Thomas Moroughan,

17   M-O-R-O-U-G-H-A-N.

18         And there are multiple statements

19   also in that package.  Three-page

20   statement from Thomas Moroughan.  A

21   three-page statement from Jillian Bienz,

22   B-I-E-N-Z.  A three-page statement from

23   Kristie, K-R-I-S-T-I-E, Mondo, M-O-N-D-O.

24   A three-page statement from Sophia Cornia,

25   C-O-R-N-I-A.

DISTLER

```
 1        A three-page statement from Eric

 2    Klug, K-L-U-G.  A one-page statement from

 3    Timothy -- Johen, I believe it is,

 4    J-O-H-N -- J-O-H-E-N.  Sorry.

 5     A one-page statement from Ruthie

 6    B-E-S-A-R-E-S, and a four-page statement

 7    from Dennis D-O-B-R-O-C-H-A-S-R-E.

 8        Let the record reflect that I've

 9    handed another copy to counsel and a

10    copy -- the hearing officer also has a

11    copy.

12        In addition to that, prior to this

13    hearing counsel and I discussed possibly

14    stipulating to certain facts and possibly

15    stipulating to one document.  And I'm not

16    certain that we've reached any agreements

17    on that or not yet, and so I just wanted

18    to ask counsel on the record if we did

19    agree to any of them.

20        MR. BARKET:  I have a couple of

21    questions, if I can.

22        HEARING OFFICER STUDDERT:  To?

23        MR. BARKET:  To -- I guess, to the

24    hearing officer, to you, Inspector.  This

25    is being conducted, you said, governed by
```

DISTLER

1       Department Rules Article 9?  Do I have

2       that correct?

3               HEARING OFFICER STUDDERT:  The rules,

4       yes.

5               MR. BARKET:  Okay.  And what's

6       happening to the other counts, if I can

7       call them that, or the other charges and

8       specifications they're not pursuing?

9               MS. HILLER:  Well, at this point I'm

10      presenting today counts 3, 4, and 11, and

11      the others we are holding in abeyance at

12      this point, depending on what happens with

13      respect to this -- this particular

14      hearing.

15              MR. BARKET:  I'm going to, I guess,

16      object to that process.  I don't think

17      it's appropriate for the Department to

18      take what will amount to be multiple

19      shots -- forgive the use of that phrase

20      here -- at my client.  They have charged

21      him with 13 specific violations, and

22      assuming that he is exonerated on the

23      three they presented, I hear that it is

24      their intent to proceed on three more and

25      then three more and so forth.  I don't

DISTLER

1    think that's a fair process.  Maybe they

2    can go forward on all 13 now or the ones

3    they choose, and then the other ones

4    should be dismissed.

5       MS. BILLER:  At this point I'm not

6    moving to dismiss the additional charges.

7    I don't — I don't believe that there is a

8    double jeopardy issue with respect to

9    presenting three of the 13 at this point.

10    My position would be that we are moving

11    forward with the three.

12       With respect to the departmental

13    procedure -- like I'll give you a

14    for-instance -- sometimes officers, they

15    retire or they are terminated with charges

16    open, and they merely get filed.  They

17    remain pending.  I believe the status is

18    they remain pending at that point.

19       MR. SANTIAGO:  Yes.  For

20    clarification, the reason we cite Civil

21    Service Law 75 is to make it clear that

22    this is a state-mandated hearing.  It's

23    important for the record to reflect that.

24       Additionally, we are planning to go

25    forward with the three charges you

DISTLER

```
 1        indicated.  If — and I doubt this will
 2        happen, but if she — if the policeman
 3        does go forward with other charges, of
 4        course we would have to re notice those
 5        charges so you could adequately prepare.
 6        But it has been determined, and it's
 7        within our administrative prerogative to
 8        go forward for our purpose, to go with
 9        these three.
10            This is not cloaked with the — all
11        the — like I said, this is not a trial as
12        one would — or a proceeding as one would
13        find in a judicial proceeding.  So, what
14        this is in an administrative proceeding,
15        we determine — it is upon the
16        Commissioner and the hearing officer that
17        this the charge we'll go forward with
18        presenting at this hearing.
19            But she is correct.  Those charges
20        and specifications are routinely filed and
21        are addressed at different stages of this
22        hearing process.
23            MR. BARKET:  I don't — I can't speak
24        to what's done or the example you gave,
25        but there is a fundamental due process
```

DISTLER

1    concern that we have, and whether double

2    jeopardy applies in the criminal sense or

3    not, certainly overall due process

4    applies.  And taking multiple -- using

5    multiple hearings to try and prove the

6    same transaction of events would violate

7    any sense of fairness or due process that

8    would exist.  You go forward with what the

9    charges you think you can prove, and if

10   you don't prove those, that ends it.  You

11   don't get to come back again and again and

12   again.  Otherwise --

13        HEARING OFFICER STUDDERT:  The

14   record's going to reflect your concern.

15        MR. BARKET:  Thirteen --

16        HEARING OFFICER STUDDERT:  Did you

17   have any other concerns?  You said you had

18   a couple of questions.

19        MS. HILLER:  Can I just address just

20   that one thing?

21        MR. BARKET:  Otherwise, we'd have

22   13 -- potentially 13 separate hearings

23   concerning the same transaction.

24        MS. HILLER:  I think your argument --

25        MR. BARKET:  That cannot be -- that

DISTLER

| | |
|---|---|
| 1 | cannot be an appropriate process. |
| 2 | MS. HILLER:  I think that argument is |
| 3 | for another day, like if that actually |
| 4 | happened, and I don't think it's ripe at |
| 5 | this point.  That would be my position, |
| 6 | for the record. |
| 7 | MR. BARKET:  Well, the other part of |
| 8 | this, assuming that he's exonerated of the |
| 9 | three, it would leave pending these three |
| 10 | charges, which would still prevent him |
| 11 | from, if he chose to resign, or it would |
| 12 | have an effect on his continued |
| 13 | employment. |
| 14 | At some point the charges that you've |
| 15 | brought against him have to be adjudicated |
| 16 | in some way or another.  You can't just |
| 17 | leave them hanging forever, nor can you |
| 18 | take multiple shots at him, take multiple |
| 19 | attempts to sustain the same set of |
| 20 | allegations.  Just it violates any sense |
| 21 | of due process that would exist. |
| 22 | HEARING OFFICER STUDDERT:  Okay.  The |
| 23 | record's going to reflect your concerns. |
| 24 | Was there anything else you had?  You said |
| 25 | you had a couple of questions? |

DISTLER

1          MR. BARKET:  Just in terms of timing,

2     my understanding is that the Department is

3     going to proceed with one witness today.

4     We -- I looked at the rule -- I gave a

5     list of the witnesses awhile ago to the

6     Department, that we wanted to call, and

7     they gave us back a number of subpoenas.

8     I looked at the rules, and it seems as

9     though the Department is actually

10    responsible for producing the witnesses,

11    unless I've misread that.

12        I'm looking at Section 6 of Rule 6,

13    Item 3.  It says:  "The department

14    attorney will arrange to give notice of

15    the hearing to the witnesses whose

16    presence is requested at the hearing by

17    either the Department or the member."

18        Several of the witnesses are from

19    Suffolk County.  We've had a conversation

20    with an attorney for the Suffolk County

21    Attorney's Office, Brian Mitchell, who is

22    representing the Suffolk officers for

23    this.  And for whatever reason, they're

24    not available today.  And I note that at

25    least one Nassau police officer or -- I'm

DISTLER

1  not sure of his rank.

2          MS. HILLER:  Sergeant.

3          MR. BARKET:  Oh.  Flanagan?

4          MS. HILLER:  Inspector.

5          MR. BARKET:  Inspector Flanagan.

6  Sorry.  Is not going to be available until

7  next Monday.  So I know we want to proceed

8  day to day, but that might not be

9  possible, given this, but we'll see how we

10  do today, I guess.

11          HEARING OFFICER STUDDERT:  Okay.

12          MS. HILLER:  Just with respect to the

13  concern with -- on the notice, which

14  section did you cite to, Bruce, on -- on

15  Article 9?

16          MR. BARKET:  I'm looking at Rule 6

17  and then Item 3.

18          MS. HILLER:  Notice to the members to

19  appear as complainants or witnesses at the

20  hearing may be given by telephone instead

21  of subpoena.  And we have notified every

22  member that's in our control, pursuant to

23  Article -- Rule 3A of Article 9.  And for

24  our non-members, they will be given

25  administrative subpoenas, which will be

DISTLER

1    issued by the trial commissioner.  The

2    trial commissioner has signed all the

3    subpoenas for all the witnesses that were

4    requested, and it's my understanding that

5    they were returned back to you for

6    service.

7         MR. BARKET:  They — they were, and

8    we actually went about serving them, but

9    that was before I read this rule.  It

10    looks like — I mean, hopefully, they'll

11    show up, but it looks like you're supposed

12    to be — the Department will arrange and

13    give notice to the witnesses, and it

14    spells out how to do that.

15         MS. HILLER:  We have.

16         MR. BARKET:  For department members

17    you can simply call them on the phone.  If

18    they're non-department members, you have

19    to issue a subpoena.

20         MS. HILLER:  And my belief is we did

21    that pursuant to the rule.

22         MR. BARKET:  All right.  Let's see

23    what happens; if they show up.

24         MS. HILLER:  As far as counsel's

25    concern for Flanagan, I — I would ask for

17

DISTLER

| 1 | an explanation as to what your need for |
|---|---|

1     an explanation as to what your need for

2     him is, because I think we can negate that

3     if we can stip to the opinion or result of

4     the Deadly Force Response Team Report.

5     Because I believe that's his only

6     involvement.

7         MR. BARKET:  I'm not prepared to do

8     that at this time.  We'll see what happens

9     at the end of the Department's case.

10         MS. HILLER:  Okay.

11         HEARING OFFICER STUDDERT:  Okay.  Do

12     you want to call your first witness?

13         MS. HILLER:  Sure.  Let me just make

14     sure that I don't have anything else I

15     wanted to read into the record.

16         Do you want the charges read in as

17     part of the opening?

18         HEARING OFFICER STUDDERT:  Yes, the

19     ones you're going forward with.

20         MS. HILLER:  Do you want me to open?

21         HEARING OFFICER STUDDERT:  Yes.

22         MS. HILLER:  Okay.  My name is Lesli

23     Hiller.  I'm an attorney for the Nassau

24     County Police Department Legal Bureau.

25     The charges that we'll be presenting today

DISTLER

1  are as follows:

2      Under Case Number 8118, charges and

3  specifications, Count 3, which reads as

4  follows:  "On February 27, 2011, at about

5  0115 hours, at Oakwood Road and Tippen

6  Drive, Huntington, New York, engaged while

7  off duty in unlawful conduct, in that

8  Police Officer DiLeonardo, without

9  justification, struck Thomas Moroughan in

10  the face with his .38-caliber Smith &

11  Wesson revolver.  The blow broke Mr.

12  Moroughan's nose, caused him substantial

13  pain, and required medical treatment at a

14  hospital.

15      "At the time of the incident,

16  Mr. Moroughan was seated in the driver's

17  seat of a stopped Toyota Prius" --

18  P-R-I-U-S -- "New York State Registration

19  Number 13100TY.

20      "Pursuant to New York State Penal Law

21  Section 120.05, Subdivision 2, Police

22  Officer DiLeonardo's actions constitute

23  the crime of assault in the second degree,

24  which is a Class D felony.  This is a

25  violation of Article 5, Rule 2,

DISTLER

1      Subdivision 1."

2          Count 4:  "On February 27, 2001, at

3      approximately 0115 hours, at Oakwood Road

4      and Tippen Drive, Huntington, New York,

5      engaged while off duty in unlawful

6      conduct, in that Police Officer DiLeonardo

7      intentionally caused damage in excess of

8      $1,500 to a 2010 Toyota Prius, New York

9      State Registration Number 13100TY, being

10     operated by Thomas Moroughan.

11         "Police Officer DiLeonardo fired his

12     .38-caliber Smith & Wesson revolver five

13     times at the motor vehicle.  Three of the

14     shots entered the passenger compartment.

15     Once the Toyota stopped moving, Police

16     Officer DiLeonardo then broke the driver's

17     side window with his revolver.

18         "Pursuant to New York State Penal Law

19     Section 145.10, Police Officer

20     DiLeonardo's actions constitute the crime

21     of criminal mischief in the second degree,

22     which is a Class D felony.  This is a

23     violation of Article 5, Rule 2,

24     Subdivision 1."

25         Count or Charge Number 11:  "On

**DISTLER**

1    February 27, 2011, at or about 0115 hours,

2    at Oakwood Road and Tippen Drive,

3    Huntington, New York, not properly

4    safeguard his uniforms and equipment and

5    any other department property issued for

6    or assigned for his use, in that Police

7    Officer DiLeonardo, after using" -- I'm

8    sorry -- after, A, use -- I'm reading it

9    from the charges.  I apologize for the

10   grammar -- "his .38-caliber Smith & Wesson

11   revolver in physical confrontation with

12   Thomas Moroughan, the driver of a 2010

13   Toyota Prius, dropped said revolver inside

14   Mr. Moroughan's vehicle.

15        "This is a violation of Article 8,

16   Rule 12, Subdivision 2."

17        For the record, the charges and

18   specifications previously read into the

19   record were served on Police Officer

20   DiLeonardo on August 22, 2012.  Officer

21   DiLeonardo answered the charges through

22   his attorney via letter dated August 28,

23   2012, by answering not guilty.

24        You will hear from Sergeant Jo-Ann

25   Distler, who will tell you that she is

DISTLER

```
 1      assigned to the Internal Affairs Unit and
 2      that she was assigned to investigate the
 3      incident that is the subject of this
 4      departmental hearing.
 5          As a result of the Internal Affairs
 6      Unit investigation, Police Officer Anthony
 7      DiLeonardo was served with the
 8      aforementioned charges and specifications
 9      alleging violations of the department
10      rules and regs.
11          At this point we're not stipulating
12      to any facts; correct?
13          MR. BARKET:  No.
14          MS. HILLER:  You will hear testimony
15      that on February 27, 2011, Police Officer
16      Anthony DiLeonardo was in fact a member of
17      the Nassau County Police Department.  The
18      evidence that we will present will be more
19      than what a reasonable mind might find
20      supports the position that Police Officer
21      Anthony DiLeonardo was, in fact, in
22      violation of two counts of Article 5, Rule
23      2, Subdivision 1 of the departmental rules
24      and regs and of one count of Article 8,
25      Rule 12, Subdivision 2.
```

DISTLER

1    You will hear from Sergeant Distler

2    that on February 27, 2011, at

3    approximately 1:15 in morning, Police

4    Officer Anthony DiLeonardo was in his car

5    pulled over at Oakwood Road and Tippen

6    Drive in Huntington, New York, Suffolk

7    County.

8    You will hear that several other

9    people were present at that location at

10   that time, including multiple civilians.

11   The Department will show that DiLeonardo

12   was off duty and had a Smith & Wesson

13   .38-caliber revolver that was assigned to

14   him, and that he was involved in an

15   incident involving civilians in the early

16   morning hours of that date, February 27,

17   2011.

18   You will hear from Sergeant Distler

19   that an incident took place involving

20   Police Officer DiLeonardo wherein he

21   was -- wherein he fired -- I'm sorry --

22   that weapon into a taxicab that was driven

23   by Thomas Moroughan.

24   You will hear from Sergeant Distler

25   that Police Officer DiLeonardo approached

DISTLER

1    the car in a state of rage.  He broke the

2    driver's side window with the .38 Smith &

3    Wesson revolver that was assigned to him.

4         You will hear that Police Officer

5    DiLeonardo hit Mr. Moroughan in the face

6    with the .38 Smith & Wesson, all with the

7    intent to cause physical injury to Mr.

8    Moroughan, and that he did, in fact, cause

9    physical injury to Mr. Moroughan,

10   including but not limited to breaking his

11   nose.

12        Sergeant Distler will explain for the

13   record how this was not in the course of a

14   lawful arrest, but instead how P.O.

15   DiLeonardo was acting outside the scope of

16   his duties as a police officer.

17        The Department will show through

18   Sergeant Distler that by intentionally

19   firing five shots, three of which hit

20   Moroughan's car, or taxi, three of which

21   broke the windshield, and -- excuse me --

22   that P.O. DiLeonardo broke the driver's

23   side window of the taxicab that Mr.

24   Moroughan was driving, he caused damage in

25   excess of $1,500 to that vehicle,

DISTLER

1    constituting what would be considered

2    criminal mischief in the second degree, a

3    violation of the New York State Penal Law

4    and Article 5, Rule 2, Subdivision 1 of

5    the departmental rules and regs.

6        Furthermore, his actions also

7    constituted assault in the second degree,

8    a violation of the New York State Penal

9    Law and Article 5, Rule 2, Subdivision 1

10   of the rules and regs.

11       The Department will also show that

12   Police Officer DiLeonardo violated Article

13   8, Rule 12, Subdivision 2 by failing to

14   properly safeguard his authorized weapon,

15   a .38-caliber Smith & Wesson revolver, by

16   proving that the weapon was recovered in

17   Mr. Moroughan's taxi, on the floor in the

18   back behind the driver's seat.

19       You will hear that the weapon ended

20   up there as a result of P.O. DiLeonardo

21   smashing the window with the .38, conduct

22   not prescribed under the rules and regs

23   when effectuating a lawful arrest.

24       At the end of the Department's direct

25   case there will be no question as to

25

DISTLER

1    whether or not the hearing officer has

2    substantial evidence before him that P.O.

3    DiLeonardo's conduct constituted the

4    crimes of criminal mischief in the second

5    degree, assault in the second degree, both

6    felonies under the penal law and both

7    violations of the department rules,

8    Article 5, Rule 2, Subdivision 1; and also

9    that P.O. DiLeonardo failed to properly

10   safeguard his Smith & Wesson revolver that

11   was assigned to him, a violation of

12   departmental rule, Article 8, Rule 12,

13   Subdivision 2.

14        Therefore, at the end of our case we

15   will be asking that the hearing officer

16   find P.O. DiLeonardo in violation of the

17   departmental rules that are before this

18   tribunal.

19        Thank you.

20        HEARING OFFICER STUDDERT:   Okay.

21   Before you give your opening, just let the

22   record reflect that Officer DiLeonardo is

23   present with his attorney and with his

24   union representative.

25        Go ahead, Mr. Barket.

26

DISTLER

1     MR. BARKET:  Good morning.  This

2  incident was started by Mr. Moroughan, who

3  pulled up next to Officer DiLeonardo's

4  car.  Moroughan got out of his car, was

5  shouting obscenities at Police Officer

6  DiLeonardo and conducting himself in a way

7  where a reasonable individual would be

8  concerned that Moroughan was going to

9  injure Officer DiLeonardo or -- and or a

10  civilian companion of Officer DiLeonardo.

11  Further, a reasonable person could

12  conclude that Moroughan had a weapon on

13  him when he got out of the car.

14     Officer DiLeonardo acted in a manner

15  that was reasonable and prudent.  He got

16  out of his car, confronted Moroughan,

17  asked him questions, told him to calm

18  down.  Moroughan got into his car, backed

19  up, and then began to accelerate towards

20  Officer DiLeonardo and towards his car

21  where another occupant was located.

22     Officer DiLeonardo fired shots in

23  order to protect himself and protect his

24  companion.  DiLeonardo -- excuse me --

25  Moroughan refused repeated requests to

DISTLER

1    stop his car, to get out of his car, to

2    submit to a lawful arrest.  Officer

3    DiLeonardo displayed his shield, announced

4    himself as a police officer, was pointing

5    a weapon at Moroughan.

6        After the shots were fired, Moroughan

7    locked the cars -- locked the doors to his

8    car.  Officers DiLeonardo broke the window

9    in an attempt to pull Moroughan out of the

10   car and to stop the car from traveling.

11       Ultimately, Moroughan ran over both

12   Officer DiLeonardo and, I believe, Officer

13   Bienz, who was present, and the gun that

14   Officer DiLeonardo had ended up in the

15   back of the car pursuant to the struggle

16   that took place between the two

17   individuals.

18       This account that I gave was reviewed

19   and sustained by a number of Nassau County

20   police officers and Suffolk police

21   officers who interviewed the witnesses at

22   the time or shortly thereafter of the

23   incident.  There is really no way for

24   this, bearing officer -- Inspector, for

25   you to determine which of these two

DISTLER

1 accounts is correct without hearing from

2 the witnesses themselves.

3  While hearsay is permissible, what

4 will end up happening at this particular

5 hearing is the Department will put on a

6 witness who wasn't present, who will tell

7 you what witnesses said to her, and then

8 she'll tell you what her conclusion was

9 from those witnesses.

10  We will put on witnesses who also --

11 some of whom were present, and will tell

12 you what their opinion was about what

13 happened.  Without hearing from the

14 witnesses themselves as to what took

15 place, all the hearing -- all the

16 inspector would be doing -- the hearing

17 officer would be doing to sustain the

18 charges is selecting one set of hearsay

19 statements over another, or more to the

20 point, one opinion of a witness who was

21 not present over the opinion of another

22 witness who was not present.

23  That kind of determination, if found

24 against Officer DiLeonardo, would be

25 arbitrary, would be -- would violate any

DISTLER

```
 1    sense of due process.  It will literally
 2    be impossible for you, Inspector, to
 3    conclude that Officer DiLeonardo violated
 4    any rules unless you were to hear from the
 5    individuals present and make your own
 6    credibility determinations.
 7          It's not a case where you're simply
 8    going to have hearsy from one side.  We
 9    have to recognize that police officers,
10    high-ranking police officers, inspectors,
11    chiefs responded to the hospital where
12    both DiLeonardo and Moroughan were taken.
13    They interviewed individuals.  Moroughan
14    confessed to his criminal conduct that
15    night.  And these Nassau police officers,
16    some of whom are high ranking, who are
17    charged with making a determination at
18    that point as to the propriety of the
19    shooting incident, sustained Officer
20    DiLeonardo's account, concluded that he
21    was fit for duty, that he had violated no
22    rules and certainly had committed no
23    crimes.
24          There is no reason to credit the
25    opinion of an Internal Affairs officer
```

DISTLER

1       over that of the inspectors and or chiefs

2       who responded to the scene that night.

3       There's also no reason and there will be

4       no reason to credit the Internal Affairs

5       officer's account -- or opinion, I should

6       say, over the police officers, detectives,

7       who interviewed the witnesses, from

8       Suffolk County Police Department.

9            It is simply her view, and to allow

10      her opinion to be sustained without

11      hearing from any of the witnesses would in

12      essence pass the responsibilities the

13      hearing officer has to the Internal

14      Affairs officer, and that would be wholly

15      inappropriate.  She's clearly made her

16      determination.  It's impossible for the

17      hearing officer to make a determination

18      without hearing from somebody other than

19      an individual who has already formed an

20      opinion, an opinion that, by the way, is

21      not shared by a number of high-ranking

22      very experienced police officers from both

23      Nassau County and Suffolk County.

24           What you will also hear, I believe,

25      is that there was an assistant district

31

DISTLER

```
 1        attorney, a low-ranking assistant attorney
 2        from Nassau County, Risco Lewis, who was
 3        present at the time in the hospital.  She
 4        is a close friend, the godmother, I
 5        believe, of Moroughan, who later became a
 6        deputy chief in the Suffolk County Police
 7        Department, and her presence was wholly
 8        inappropriate, was the source of, I think,
 9        much of the poor and inaccurate
10        information that has come forward.  She's
11        given an account that is inconsistent with
12        police officers who — from Suffolk and
13        from Nassau.  It seems to be based on
14        nothing other than bias.  She referred the
15        individual to his lawyer — Moroughan.
16        And she continued to push this in a way
17        that was inappropriate.
18            I think at the end of this hearing a
19        fair and reasonable conclusion will be
20        that the Department cannot sustain their
21        charges, particularly in the manner in
22        which they intend to proceed.  But even if
23        they were to call witnesses, I think that
24        a fair and objective view of this from the
25        witnesses who were present would be that
```

DISTLER

1         Officer DiLeonardo acted reasonably,

2         prudent, and in a manner consistent with

3         his duties as a police officer and

4         consistent with the rules and regulations.

5             This is an unfortunate incident that,

6         frankly, has been driven by inaccurate

7         press reports, leaked information.  As we

8         all know, the Internal Affairs report here

9         was leaked to Newsday, I think fair to

10        say, by the Moroughan's civil attorney.

11        And the press in this case has been in

12        some ways remarkably unfair to Officer

13        DiLeonardo.  And I'm hopeful that we will

14        have a fair review of the real evidence at

15        this hearing and that we just not simply

16        accept the word and the opinion of one

17        Internal Affairs officer.

18            HEARING OFFICER STUDDERT:  Call your

19        first witness.

20            MS. HILLER:  Before I call my first

21        witness, I'm going to ask for a brief

22        recess.

23            HEARING OFFICER STUDDERT:  Okay.

24        Take ten minutes.  Is that enough time?

25            MS. HILLER:  Yes.

DISTLER

1          (Thereupon, a brief recess was

2      taken.)

3          HEARING OFFICER STUDDERT:  We're back

4      on the record.  Let the record reflect

5      that Ms. Hiller has called her first

6      witness.

7          MS. HILLER:  Police Department calls

8      Detective Sergeant Jo-Ann Distler.

9          HEARING OFFICER STUDDERT:  Please

10     state your rank, name, shield number, and

11     command.

12         THE WITNESS:  Detective Sergeant

13     Jo-Ann Distler, Internal Affairs Unit,

14     Shield No. 164.

15         HEARING OFFICER STUDDERT:  And your

16     serial number?

17         THE WITNESS:  6384.

18  J O - A N N   D I S T L E R, the witness,

19  herein, after having been first duly sworn by Danielle

20  Stieglitz, a Certified, Professional Court Reporter and

21  Notary Public in and for the State of New York was examined

22  and testified as follows:

23  EXAMINATION BY MS. HILLER:

24     Q     Sergeant, you just testified that you are

25  part of the Internal Affairs Unit.

DISTLER

1      A      Yes.

2      Q      How long have you been assigned to the

3  Internal Affairs Unit?

4      A      Three and a half years.

5      Q      As part of that assignment do you do

6  investigations?

7      A      Yes.

8      Q      Generally what do those investigations

9  entail?

10      A      The investigations entail somebody making

11  an allegation or a complaint.  It could be either

12  anonymously or directly to a supervisor or it could

13  be an investigation that can be directed by the

14  Commission of Police.

15              The investigations entail alligations

16  of misconduct of -- or violation of the rules and

17  regulations or criminal conduct by members of the

18  police department.

19      Q      Did there come a time that you were

20  assigned to investigate an incident regarding Police

21  Officer Anthony DiLeonardo?

22      A      Yes.

23      Q      When was that?

24      A      June 7, 2011.

25      Q      Did you generate some type of report as a

35

DISTLER

1    result of that investigation?

2        A    Yes.

3        Q    Did you reach conclusions as a result of

4    that investigation?

5        A    Yes.

6        Q    Was there another report generated by the

7    Nassau County Police Department prior to your

8    investigation that also addressed this incident?

9        A    Yes.

10       Q    What was that report?

11       A    It was a Deadly Force Incident Report --

12   Deadly Force Response Team Incident Report.

13            MS. HILLER:  For procedural purposes

14            do you want me to pass up items that I am

15            moving into evidence to you first?

16            HEARING OFFICER STUDDERT:  Yes.

17            MS. HILLER:  At this time, let the

18            record reflect that I am passing up a copy

19            of the Deadly Force Response Team

20            Investigation Shooting Incident to the

21            Hearing officer Studdert.

22            At this time I would also like to

23            move this document into evidence.  I am

24            passing a copy up to my witness and I am

25            also passing a copy over to counsel.  I

DISTLER

1      would like this document to be marked as

2      Department Exhibit 1 (handing).

3          HEARING OFFICER STUDDERT:   Please

4      mark this.

5          (Deadly Force Response Team Report

6      was marked as Department's Exhibit 1 for

7      evidence, as of this date.)

8    Q    Sergeant Distler, do you recognize the

9  document that has been marked as Department 1?

10    A    Yes.

11    Q    What do you recognize that to be?

12    A    It's a copy of the Deadly Force Response

13  Team Investigation Preliminary Report.

14    Q    Did you review that document prior to your

15  conclusions that you reached in your IAU report?

16    A    Yes.

17    Q    Does it appear to be that same report?

18    A    Yes.

19    Q    I ask you to read that document in its

20  entirety into the record.

21    A    The date was February 27, 2011.  To:

22  Commissioner of Police through official channels.

23  From: Deputy Chief John P. Hunter, Deputy Chief of

24  patrol.  Subject: Deadly Force Response Team

25  Investigation Shooting Incident, Oakwood Road,

DISTLER

| 1 | Huntington Station, New York preliminary report.
| 2 | "On Sunday, February 27, 2011 the
| 3 | deadly force response team consisting of the below
| 4 | listed members investigated a shooting incident
| 5 | which took place at approximately 0115 hours on
| 6 | Oakwood Road, approximately 50 feet south of Tippen
| 7 | Drive, Huntington Station, New York.
| 8 | "Deputy Chief John P. Hunter, Deputy
| 9 | Chief of Patrol, Inspector Edmund Horace, Commanding
| 10 | officer ITU, Captain Daniel P. Flanagan, Commanding
| 11 | Officer Police Academy, Detective Sergeant John
| 12 | DeMartinis, Homicide Squad."
| 13 | "Paragraph 2. The incident involved
| 14 | the following police officers: P.O. Anthony
| 15 | DiLeonardo, Serial number 9013, Shield number 3632,
| 16 | Third Precinct. P.O. Edward Bienz, Serial number
| 17 | 8943, Shield number 3466, Third Precinct.
| 18 | "Paragraph 3. The investigation
| 19 | consisted of an on-scene evaluation and a review of
| 20 | the investigation by the Suffolk County Police
| 21 | Department's Homicide Squad and Second Squad. All
| 22 | preliminary information was received from Suffolk
| 23 | County Police Department investigators. Interviews
| 24 | with police officers DiLeonardo and Bienz have not
| 25 | yet been conducted. As a result of this preliminary

38

DISTLER

```
 1   investigation it is the opinion of the Deadly Force
 2   Response Team that the actions of all officers
 3   involved with regard to use of force issues are
 4   within the departmental guidelines pertaining to the
 5   use of deadly physical force, as well as those of
 6   Article 35 of the Penal Law of New York State.  All
 7   officers involved are found fit for duty.
 8              "Paragraph 4.  The details of the
 9   incident are as follows:  At approximately 0115
10   hours officers DiLeonardo and Bienz were off duty
11   and in plain clothes separately operating their
12   privately owned vehicles after dinning in the
13   Huntington Station, New York area.  Also present
14   with the officers in the vehicles were Officer
15   DiLeonardo's girlfriend and Officer Bienz's wife.
16   Both officers DiLeonardo and Bienz, while attempting
17   to leave the area became lost in the residential
18   area of Huntington Station.  While attempting to
19   find their way out of the area the operator of a
20   white Toyota Prius taxi cab, later identified as
21   Thomas Moroughan, date of birth 7/23/84 and his
22   female passenger became involved in a traffic
23   incident with both of the officers.  At one point
24   Moroughan was flashing his headlights from behind
25   Officer DiLeonardo's vehicle and Officer Bienz was
```

DISTLER

| | |
|---|---|
| 1 | flashing his headlights from behind the taxi cab. |
| 2 | "Paragraph 5.   The police officers |
| 3 | eventually separated themselves from Moroughan and |
| 4 | were still navigating through the streets of |
| 5 | Huntington Station and made a right turn, northbound |
| 6 | onto Oakwood Road.  Both of the officers pulled |
| 7 | their vehicles over to the right-hand shoulder of |
| 8 | Oakwood Road, approximately 50 feet south of Tippen |
| 9 | Drive in order to ascertain how to get out of the |
| 10 | residential area.  Moroughan, now traveling |
| 11 | westbound on West 19th Street arrived at the |
| 12 | intersection of West 19th Street and Oakwood Road. |
| 13 | Moroughan observed the officers pulled over on |
| 14 | Oakwood Road and decided to confront them.  Made a |
| 15 | right turn onto Oakwood Road.  Moroughan pulled up |
| 16 | adjacent to the officers' vehicles and began to |
| 17 | shout at the officers.  Officer DiLeonardo exited |
| 18 | his vehicle, identified himself as a police officer, |
| 19 | and had a verbal exchange with Moroughan.  Officer |
| 20 | Bienz also exited his vehicle and Moroughan then |
| 21 | decided to put his vehicle in reverse and back up |
| 22 | his vehicle. |
| 23 | "Paragraph 6.  Once Moroughan backed |
| 24 | up a short distance, he stopped his vehicle, reeved |
| 25 | the engine, put the vehicle in drive and began to |

DISTLER

 1   drive his vehicle directly at Officer DiLeonardo.

 2   Officer DiLeonardo, fearing for his life fired at

 3   least three rounds from his off-duty .38 caliber

 4   revolver at Moroughan, striking him through the

 5   windshield.  Subject Moroughan suffered wounds to

 6   both his chest and arm.  The subject vehicle now

 7   came to a stop and Officer DiLeonardo approached the

 8   subject vehicle from the driver side and Officer

 9   Bienz approached from the passenger side.  Officer

10   DiLeonardo broke the driver side window with his .38

11   caliber revolver in an attempt to terminate

12   Moroughan's actions and to arrest him.  During this

13   time Officer DiLeonardo's revolver fell into the

14   subject vehicle.  Moroughan once again put the

15   vehicle in reverse and backed up the subject

16   vehicle.  This time striking and dragging Officer

17   Bienz.  Moroughan then drove off and fled the scene.

18          "Paragraph 7.  Subject Moroughan

19   eventually drove his vehicle to Huntington Hospital

20   for treatment.  Officers DiLeonardo and Bienz were

21   removed to Huntington Hospital and treated for their

22   injuries and released.  None of the injuries are

23   life threatening.

24          "Paragraph 8.  The Suffolk County

25   Police Department Homicide Squad and Second Squad

41

DISTLER

| | |
|---|---|
| 1 | are conducting the police investigation.  Moroughan |
| 2 | was treated for his injuries and transported to |
| 3 | Suffolk County Police Department Second Squad, where |
| 4 | preliminarily he will be charged in connection with |
| 5 | assault on a police officer and reckless driving. |
| 6 | Signed by John P. Hunter Deputy Chief." |
| 7 | BY MS. HILLER: |
| 8 | Q     Thank you. |
| 9 | After your investigation for IEU, did |
| 10 | you reach any conclusions? |
| 11 | A     Yes. |
| 12 | Q     What conclusions did you reach? |
| 13 | MR. BARKET:  Objection.  I would like |
| 14 | to be heard, please. |
| 15 | HEARING OFFICER STUDDERT:  Okay. |
| 16 | MR. BARKET:  Outside of the presence |
| 17 | of the witness. |
| 18 | HEARING OFFICER STUDDERT:  Okay. |
| 19 | Please wait outside. |
| 20 | (Whereupon, the witness left the |
| 21 | room.) |
| 22 | MR. BARKET:  Thank you.  I understand |
| 23 | that hearsay is going to be permitted, but |
| 24 | it's one thing to ask the witness what she |
| 25 | learned factually.  It is inappropriate |

42

DISTLER

1    and irrelevant as to what the witness

2    thinks -- what her conclusions are, what

3    her opinions are.  That is solely the

4    determination for the hearing officer to

5    make.  Whether or not Detective Sergeant

6    Distler has a view that the charges should

7    be sustained or shouldn't be sustained,

8    that Officer DiLeonardo did something

9    wrong or didn't do something wrong, it's

10   irrelevant.  We are not here to hear

11   witness's opinions.  We are here to hear

12   facts.  Some through hearsay and some

13   through hopefully personal knowledge.  The

14   hearing officer will ultimately make the

15   determination in judgment so any opinion

16   evidence should be excluded.

17          HEARING OFFICER STUDDERT:  Okay.

18       I am going to allow Sergeant Distler

19   to continue her testimony.  Your concerns

20   are on the record.

21          MR. BARKET:  Note my exception.

22          (Whereupon, the witness returned.)

23   BY MS. HILLER:

24       Q    Sergeant Distler, after your investigation

25   did you reach any conclusions?

DISTLER

1       A    Yes.

2       Q    What were those conclusions?

3            MR. BARKET:  Objection.  Same

4       objection.

5            HEARING OFFICER STUDDERT:  Overruled.

6       The record is noted.

7       A    That Officer DiLeonardo be charged with

8  violation of certain rules and regulations.

9       Q    In what form did that information get to

10 the Commissioner's office?

11      A    In a form PDCN 209.

12      Q    Is that a conclusion or a recommendation?

13      A    It's a conclusion.

14      Q    Okay.

15           So at the end of your investigation

16 you did reach certain conclusions and you did make a

17 recommendation?

18      A    Yes.

19      Q    What was that?

20      A    That he be charged with certain violations

21 in the rules and regulations.

22      Q    Sergeant, can you explain why your

23 results, the results and conclusions that you came

24 to are different from those that were the results of

25 the Deadly Force Response Team?

DISTLER

1        MR. BARKET:  Objection.  This really

2    is nothing more than having the witness

3    say, "Here is what I think."  We are here

4    to determine some facts, not her opinion.

5    It is completely irrelevant.

6        HEARING OFFICER STUDDERT:  Okay.  I

7    am going to overrule.  I will give it the

8    weight it's due.  Continue.  You can

9    answer the question.

10   A    Can you repeat that?

11   Q    Sure.  Can you explain why the results of

12   your investigation are different from the results

13   and opinion that were generated from the Deadly

14   Force Response Team.

15   A    Yes.  At the time that the preliminary

16   report was done by the Deadly Force Response Team

17   all the facts were not available to the team.  They

18   prepared that report the same date that the shooting

19   incident occurred.  The Crime Scene Reconstruction

20   Report by the Suffolk County Police Department was

21   not complete.  Interviews of the subjects were not

22   done and interviews of many witnesses were not done.

23   Q    As a result of this incident was anybody

24   arrested?

25   A    Yes.

DISTLER

1      Q     Who was arrested?

2      A     Thomas Moroughan.

3      Q     Do you personally know the results of his

4   arrest at this point?

5      A     Yes.

6             MR. BARKET:   Objection.  It's

7             completely irrelevant to what Officer

8             DiLeonardo did or did not do or with

9             respect to his conduct.

10            HEARING OFFICER STUDDERT:   Overruled.

11     A     He was arrested for assault second degree

12   and reckless endangerment, and on June 6, 2011 the

13   Suffolk County District Attorney's Office dismissed

14   all the charges.

15     Q     Going back to the results of your

16   investigation at the Internal Affairs:  One of the

17   charges that's before us today is the charge of

18   violation Article 5, Rule 2, Subdivision 1, unlawful

19   conduct.

20     A     Yes.

21     Q     Can you please explain what actions

22   constituted that unlawful conduct — or what actions

23   you determined as a result of your investigation —

24   unlawful conduct.

25     A     Yes.  I determined that Officer DiLeonardo

DISTLER

1     -- his actions constituted what could have been

2     charged as a criminal mischief under the New York

3     State Penal Law.

4         Q     What was the basis of your conclusion with

5     respect to the criminal mischief?

6         A     A review of the Suffolk County Shooting

7     Reconstruction Report, the photographs provided to

8     me from the Suffolk County District Attorney's

9     Office of the crime scene, statements of Mr. Thomas

10    Moroughan, Ms. Kristie Mondo, Police Officer

11    DiLeonardo, Police Officer Bienz, and Eric Klug.

12        Q     Describe what you learned about the damage

13    to the windshield of the car.

14        A     The windshield had three bullet holes in

15    it.

16            MS. HILLER:  I would like to pass up

17            to the hearing officer to be marked into

18            evidence two copies of photographs to

19            identify them at the top of the

20            photographs one of them has number 870 on

21            it and the other one has number 846, and

22            let the record reflect I am handing a copy

23            over to counsel as well (handing).

24            MR. BARKET:  So which is going to be

25            marked 2 and 3?

DISTLER

```
 1          MS. HILLER:  Let's separate them into

 2     Department 2 and 3, please.

 3          (Copy of Photograph #870 was marked

 4     as Department's Exhibit 2 for evidence, as

 5     of this date.)

 6          (Copy of Photograph #846 was marked

 7     as Department's Exhibit 3 for evidence, as

 8     of this date.)

 9          MS. HILLER:  Inspector, I have two

10     other photos.  I can enter them now just

11     to save time.  They are with respect to

12     damage of the car.

13          HEARING OFFICER STUDDERT:  Okay.

14          MS. HILLER:  I'll just address them a

15     little bit later.  They will be 4 and 5.

16          HEARING OFFICER STUDDERT:  Please

17     mark them.

18          (Copy of Photograph #966 was marked

19     as Department's Exhibit 4 for evidence, as

20     of this date.)

21          (Copy of Photograph #964 was marked

22     as Department's Exhibit 5 for evidence, as

23     of this date.)

24          MS. HILLER:  At that time I would ask

25     that you pass the copy to the witness.
```

48

DISTLER

1          Thank you, Inspector.

2              HEARING OFFICER STUDDERT:  All four?

3              MS. HILLER:  Yes.  That's fine.

4    BY MS. HILLER:

5          Q     Detective Sergeant, do you recognize the

6    items that have been marked as Department 2, 3, 4,

7    and 5?

8          A     Yes.

9          Q     What do you recognize those items to be?

10         A     They are copies of photographs, which were

11   provided to me by the Suffolk County District

12   Attorney's Office.

13         Q     Have you seen them before?

14         A     Yes.

15         Q     Did you see those photos before you

16   reached your conclusion?

17         A     Yes.

18         Q     Did you use them as part of your

19   investigation?

20         A     Yes, I did.

21         Q     What do those photos depict?

22         A     Exhibit 2 and 3 depict three bullet holes

23   into the windshield of the Toyota Prius taxi.

24   Exhibit 4 and 5 exhibit damage which was done to the

25   driver's side window.

DISTLER

1      Q      Where did you get the photos from by the

2  way, when you were doing your investigation?

3      A      Special Investigator Anthony Palumbo from

4  the Suffolk County District Attorney's Office.

5      Q      In addition to those photos what else did

6  you review with respect to this charge of Article 5,

7  Rule 2, Subdivision 1?

8      A      Statements -- numerous statements that I

9  referred to earlier.

10     Q      In addition to the statements was there

11  anything else that you reviewed with respect to your

12  opinion?

13     A      The Crime Scene Reconstruction Incident

14  Report.

15            MS. HILLER:  At this time please let

16            the record reflect that I am passing a

17            copy of the County of Suffolk Shooting

18            Incident Reconstructive Report to the

19            hearing officer.  This document has

20            already been exchanged during discovery

21            via email to counsel in November of 2012.

22            I'll provide you with another copy as

23            well.  I would ask that it be marked as

24            Department 6, please (handing).

25            HEARING OFFICER STUDDERT:  Please

NORTH SHORE COURT REPORTERS   1-800-794-5342

DISTLER

1    mark this.

2              (Shooting Incident Reconstructive

3         Report was marked as Department's Exhibit

4         6 for evidence, as of this date.)

5              HEARING OFFICER STUDDERT:  Let the

6         record reflect that Exhibit 6 has been

7         marked into evidence.

8              MS. HILLER:  Thank you.  I would ask

9         that you please pass that over to the

10        witness.

11   BY MS. HILLER:

12        Q    Detective Sergeant Distler, is that the

13   report that you reviewed with respect to your

14   investigation?

15        A    Yes, it is.

16        Q    With respect to the items that are

17   depicted in Department Exhibit's 2 and 3, which

18   would be the windshield of the car; correct?

19        A    Yes.

20        Q    With respect to those items can you please

21   read from the report what additional information

22   that you used as a basis for your investigation with

23   respect to that particular damage?

24        A    Yes.  On page — sheet number three of six

25   on the report I referred to the conclusion that was

DISTLER

1    stated in the report, "The examination of Dobro

2    Express Taxi 2010, Toyota Prius Hybrid with New York

3    reg. 13100TY revealed the presence of damage

4    consisting of three bullet impacts. See attached

5    diagram."

6        Q    When you had this report as part of your

7    investigation, where did you get it from?

8        A    Special Investigator Palumbo.

9        Q    What was your understanding as to how this

10   report was generated?

11       A    It was generated by the Suffolk County

12   Police Department's Forensic Science Crime

13   Laboratory, which they reconstructed the shooting

14   and with all the evidence and faxes that they

15   gathered, they generated the report.

16       Q    With respect to Department 5 and 6, can

17   you please let the record reflect what those

18   documents are again.

19       A    4 and 5?

20       Q    Yes.

21       A    They are photographs of damage to the

22   driver's side door.

23       Q    With respect to --

24       A    Window.

25       Q    Got you.

DISTLER

```
 1              With respect to that damage, what
 2    else in the Suffolk County report did you base your
 3    ultimate conclusion on?
 4              MR. BARKET:  Which conclusion?
 5              MS. HILLER:  With respect to count
 6              number 4, unlawful conduct.  DiLeonardo's
 7              actions constitute the crime of criminal
 8              mischief in the second degree.
 9        A    On sheet number five of the Suffolk County
10    report, I refer to the final paragraph where it
11    stated that, "DiLeonardo approaches the driver's
12    door then shatters the driver's window with the
13    revolver."
14        Q    In addition to the photographs that were
15    provided to you and your review of the Suffolk
16    County Shooting Incident Report, were there other
17    items or documents that you reviewed before you
18    reached your conclusion?
19        A    Yes.
20        Q    What was that?
21        A    Statements.
22        Q    What statement were those?
23        A    Statements of Officer DiLeonardo,
24    statements of Police Officer Bienz, statements of
25    Thomas Moroughan, statements of Kristie Mondo, and a
```

DISTLER

1   statement from Mr. Eric Klug.

2          MS. HILLER:  At this time I would

3   like the record to reflect that I am

4   passing up multiple statements to the

5   hearing officer.  I am also providing

6   copies to counsel.  I believe every single

7   statement is provided in this packet, but

8   for the last two, counsel has received as

9   part of prior discovery.

10         For the record I am passing up to the

11   hearing officer to be marked into evidence

12   a statement by Police Officer Anthony

13   DiLeonardo to the Internal Affairs Unit

14   dated March 17 of 2012.

15         I am passing up a copy of the PDCN

16   form 206.  A statement of Anthony

17   DiLeonardo.

18         I am passing up a three-page

19   statement made by Jillian Bienz.

20   B-I-E-N-Z.

21         I am passing up a three-page

22   statement made by Thomas Moroughan.

23         A three-page statement by Kristie

24   Mondo.  A three-page statement by Eric

25   Klug.  A three-page statement dated

**DISTLER**

1    March 13, 2012 by P.O. Bienz, and portions
2    of a 50-H, specifically of Thomas
3    Moroughan.  One from Suffolk County and
4    one from Nassau County (handing).
5        HEARING OFFICER STUDDERT:  Mark these
6    into evidence.
7        (Anthony DiLeonardo's Statement was
8    marked as Department's Exhibit 7 for
9    evidence, as of this date.)
10        (PDCN Form 206 was marked as
11    Department's Exhibit 8 for evidence, as of
12    this date.)
13        (Jillian Bienz's Statement was marked
14    as Department's Exhibit 9 for evidence, as
15    of this date.)
16        (Thomas Moroughan's Statement was
17    marked as Department's Exhibit 10 for
18    evidence, as of this date.)
19        (Kristie Mondo's Statement was marked
20    as Department's Exhibit 11 for evidence,
21    as of this date.)
22        (Eric Klug's Statement was marked as
23    Department's Exhibit 12 for evidence, as
24    of this date.)
25        (Edward Bienz's Statement was marked

DISTLER

```
 1              as Department's Exhibit 13 for evidence,

 2              as of this date.)

 3                   (Suffolk County 50-H Hearing of

 4              Moroughan was marked as Department's

 5              Exhibit 14 for evidence, as of this date.)

 6                   (Nassau County 50-H Hearing of

 7              Moroughan was marked as Department's

 8              Exhibit 15 for evidence, as of this date.)

 9                   MS. HILLER:  At this time I would

10              like the record to reflect that I have had

11              statements passed up to the hearing

12              officer marked as number 7 through 15.  I

13              would like them to be moved into evidence

14              and I would like them to be moved over to

15              Sergeant Distler.

16                   HEARING OFFICER STUDDERT:  Let the

17              record reflect that they are accepted into

18              evidence.

19   BY MS. HILLER:

20        Q    Sergeant Distler, the statements that you

21   have in your hand -- did you review them prior to

22   you concluding that Police Officer DiLeonardo

23   violated Article 5, Rule 2, Subdivision 1 with

24   respect to the actions constituting criminal

25   mischief?
```

DISTLER

1    A    Yes, I did.

2    Q    For the economy of time with respect to

3  the hearing and everybody present, those items in

4  your hand marked 7 through 15, did you also review

5  those items with respect to count three before you

6  came to your conclusion that — and recommendation

7  that P.O. DiLeonardo violated another section of

8  Article 5, Rule 2, Subdivision 1.  That being

9  conduct that would constitute assault in the

10  second degree?

11    A    Yes, I did.

12    Q    For the record, at this time I would ask

13  you to read each of those statements in their

14  entirety into the record.

15    A   The first statement is dated March 17,

16  2012.  It is addressed to the Commanding Officer of

17  the Internal Affairs Unit.  From Police Officer

18  Anthony DiLeonardo, Serial number 9103, Shield

19  number 3632, Third Precinct, subject is IAU-27-2010.

20        "Paragraph 1.  I am making this

21  statement for administrative purposes only.  I have

22  not done so voluntarily but in compliance with an

23  order of a superior officer.  This statement in no

24  way constitutes any waiver of my rights and this

25  statement or any part thereof may not be used

DISTLER

1  against me in any subsequent criminal proceeding.

2  "Paragraph 2. Officer Bienz — Eddie

3  and I made plans to go out during the early part of

4  the week of February 27, 2011.

5  "Paragraph 3. The evening of

6  February 26, 2011 my girlfriend Sophia Cornia and

7  myself met Eddie and his wife Jillian at a German

8  restaurant in Farmingdale, which I now know to be

9  Black Forest Brew Haus.

10  "Paragraph 4. We arrived at the

11  restaurant at approximately 8:00 p.m.

12  "Paragraph 5. We ate dinner and I

13  had two drinks as did everyone else. I drank

14  Jameson and pineapple juice. I am not sure what the

15  others had to drink but I do know that everyone was

16  drinking alcoholic beverages.

17  "Paragraph 6. We were at the

18  restaurant for approximately one and one half hours

19  and then we left to go to Huntington to have some

20  drinks.

21  "Paragraph 7. I drove my girlfriend

22  Sophia's car, which is a white 2011 Infiniti and I

23  followed Eddie, who was driving a blue Acura.

24  "Paragraph 8. We arrived in

25  Huntington and parked in a municipal parking lot.

58

## DISTLER

1          "Paragraph 9. We went to several

2 different bars while in Huntington. I am not sure

3 at this time which bar we went to first. I know

4 that we went to Blue Hanu and that we went to The

5 Artful Dodger and one other bar. I don't recall the

6 name of the other bar.

7          "Paragraph 10. I remember that I

8 ordered two drinks at The Artful Dodger. I do not

9 recall if I finished the last drink. I had one

10 drink at Blue Hanu and one drink at the other bar.

11 I also consumed water as well. The other

12 individuals also ordered the same amount of

13 alcoholic beverages as I did.

14          "Paragraph 11. I recall that we were

15 at Blue Hanu for approximately 30 to 40 minutes and

16 I also recall that we were at The Artful Dodger for

17 one and one half to two hours, and that we were

18 dancing. I also recall that we were dancing in the

19 other bar which name I cannot recall.

20          "Paragraph 12. We walked from bar to

21 bar leaving our vehicles parked in the parking lot.

22          "Paragraph 13. When we left the last

23 bar we returned to our vehicles.

24          "Paragraph 14. I did not know my way

25 around Huntington so I followed Eddie who was going

DISTLER

```
 1   to lead me to Jericho Turnpike.

 2              "Paragraph 15.  We traveled down a

 3   main road and then at some point Eddie turned off

 4   the main road and onto a side street.  At that point

 5   I knew he was lost because I believed we were

 6   supposed to be taking a main road until we got to

 7   Jericho Turnpike.

 8              "Paragraph 16.  Eddie pulled off the

 9   side of the road, parked his vehicle adjacent to the

10   curb and I pulled behind him.  I assumed he was

11   trying to figure out where he was.  I now know that

12   this road is Oakwood Drive.

13              "Paragraph 17.  At no time did I

14   notice anyone flashing high beams at me and I did

15   not flash my high beams at any vehicle.  I do not

16   believe that I cut anyone off, nor did I notice

17   anyone cutting off Eddie or myself.  There was no

18   type of road rage incident between myself and any

19   other vehicle.

20              "Paragraph 18.  I sat in the car with

21   Sophia and we were waiting for Eddie to continue

22   driving.

23              "Paragraph 19.  While I was located

24   at the side of the road, still seated in my vehicle

25   a white Prius taxi pulled up next to my car and this
```

DISTLER

1    vehicle was blocking one lane of traffic.

2             "Paragraph 20.  Oakwood Drive is a

3    two-lane road with a double yellow line separating

4    the lanes.

5             "Paragraph 21.  Within a minute from

6    the time I stopped my vehicle the Prius pulled up

7    next to me.  Its passenger side window was directly

8    next to my driver's side window.  I rolled down my

9    window because I thought that he was going to ask me

10   for directions.  There was a female passenger in the

11   Prius and I never spoke to her and she never spoke

12   to me and she did not pose a threat to me.

13            "Paragraph 22.  The driver yelled out

14   the open passenger window from where he was seated

15   in his vehicle, 'You need to learn how to fucking

16   drive.  I am going to teach you how to fucking drive

17   right now.'

18            "Paragraph 23.  I didn't say anything

19   to him to escalate the confrontation.  I looked at

20   him having no idea what he was talking about and why

21   he was talking to me, and I said words to the affect

22   of why are you doing this?  I cannot recall the

23   exact words which I used.  I could have exchanged

24   more words with him but I do not recall at this time

25   if I did or not.

61

DISTLER

1           "Paragraph 24.  He continued to yell
2       at me and I began to close my window and attempt to
3       ignore him in an attempt to avoid a confrontation.
4           "Paragraph 25.  He then exited his
5       vehicle, walked to the front of his car, and
6       continued towards my window while yelling at me,
7       pointing at me with his right hand.  He came to a
8       stop at the midline of his vehicle.  I could not see
9       his left hand and I believed that he may have had a
10      weapon in his hand since he was keeping it down and
11      out of sight.
12          "Paragraph 26.  He continued to yell,
13      'I'm going to kill you.  I don't care about this
14      fucking car.  I am going to smash your car and I'm
15      going to kill you.'
16          "Paragraph 27.  I then exited my
17      vehicle as he was approaching it because I did not
18      think that I could defend myself or my girlfriend
19      from a seated position in the vehicle.  I kept my
20      door between us.  He then began to go back into his
21      car.
22          "Paragraph 28.  This man was
23      completely out of control and irrational at this
24      point stating that he was going to kill me.  He
25      immediately entered his vehicle and floored it into

DISTLER

1   reverse, backing up approximately four or five car

2   lengths to the best of my recollection.

3           "Paragraph 29.  At this time I

4   believed that he was preparing to run his vehicle

5   into me and my vehicle.

6           "Paragraph 30.  Fearing for mine and

7   Sophia's safety I removed my off-duty weapon from my

8   ankle holster and attempted to get around the back

9   of my vehicle to get Sophia out of the car.  I did

10  not make it to the other side of the vehicle because

11  the vehicle started accelerating in my direction.

12  The front of the vehicle was pointed at me and the

13  vehicle was at a diagonal angle with the rear of the

14  vehicle slightly over the yellow line.

15          "Paragraph 31.  At this point I

16  feared that he was going to strike me and my vehicle

17  where Sophia was still seated.  I turned toward the

18  car and shouted, 'Stop.  Police.  Don't move,' and

19  pointed my weapon at his vehicle, which was headed

20  straight for me.

21          "Paragraph 32.  He did not stop his

22  vehicle and he did not slow down.  He continued to

23  drive his car toward me and my vehicle.

24          "Paragraph 33.  As this crazed and

25  enraged man was driving toward me I feared for my

63

**DISTLER**

1   life and fired my weapon at the driver in an attempt

2   to stop the vehicle.

3   "Paragraph 34.  I continued to fire

4   my weapon because his vehicle was still headed

5   towards us.  I emptied all five rounds in the gun

6   and continued to fire even though there was no more

7   ammunition because the vehicle was still moving

8   towards me.

9   "Paragraph 35.  When I fired my

10  weapon I was confident in my accuracy that I would

11  hit him and not harm anyone else, including the

12  passenger in the vehicle.  I believe that I began to

13  fire my first shot when the vehicle was

14  approximately 50 feet away from me, to the best of

15  my recollection at this time.

16  "Paragraph 36.  I did not move my

17  position while I was firing my weapon other than

18  blading my body to shoot more accurately and limit

19  my exposure to him hitting me.

20  "Paragraph 37.  I do not believe my

21  intake of alcohol that evening impaired my ability

22  during this incident.

23  "Paragraph 38.  His vehicle

24  eventually stopped approximately 20 to 25 feet away

25  from where I was located.  I immediately pulled out

## DISTLER

1   my shield, which was around my neck but hidden

2   beneath my clothing.

3               "Paragraph 39.  I then approached the

4   driver's side door of the Prius with my shield out,

5   my gun drawn, stating, 'Police.  Don't move.  You

6   are under arrest.'  I observed that the windshield

7   was still in its place but shattered.  It appeared

8   that my shots had damaged the windshield.

9               "Paragraph 40.  I was attempting to

10  arrest him for trying to kill both me and my

11  girlfriend.  I did not notice any injures on the

12  subject.

13              "Paragraph 41.  When I was standing

14  at the driver's side door I ordered this man to

15  unlock the door and he ignored my commands.

16              "Paragraph 42.  I believe that I

17  smashed the driver's side window with the butt of my

18  weapon.  I unlocked the car door with my left hand

19  and pulled it open.

20              "Paragraph 43.  I attempted to remove

21  the driver from the vehicle in order to arrest him.

22  He resisted arrest and would not exit the vehicle.

23  He was saying, 'Fuck you.  I am going to kill you,'

24  to me.

25              "Paragraph 44.  A struggle ensued and

DISTLER

1  he was holding my gun with one hand and punching me

2  about the head with his other hand. The door was

3  open and I was leaning into the vehicle attempting

4  to pull him out. I did not deliberately smash him

5  in the nose with the butt of my gun.

6          "Paragraph 45. He then tried to

7  shift the vehicle and drive away.

8          "Paragraph 46. I was trying to

9  prevent him from shifting the car out of park.

10          "Paragraph 47. During the struggle

11  he ripped the gun out of my hand and I do not know

12  where it went. I did not drop it or lose it.

13          "Paragraph 48. He also was able to

14  shift the car into reverse and he began speeding

15  backwards, dragging me along side the vehicle.

16          "Paragraph 49. I was able to get my

17  feet under me and twist away from the car. I was

18  then hit by the driver's door which was still open.

19          "Paragraph 50. I was thrown to the

20  ground. I then immediately got up and started to

21  run away from his vehicle. Eddie was in front of

22  me. I was running towards him and when I caught up

23  to him the Prius hit both of us causing us to be

24  thrown to the ground.

25          "Paragraph 51. After getting up from

DISTLER

1    the ground I ran towards the Prius in an attempt to

2    read his rear license plate.

3              "Paragraph 52.  I then called 911 and

4    told them that the guy tried to kill me.  I

5    identified myself as a police officer.  I said, 'Ten

6    seventy-eight.'  I said that he stole my gun, that

7    he tried to run me over, and that I shot him.  She

8    asked me if I was shot and I remember that I then

9    looked at myself and I was taking a while to look

10   and then she said, 'Where are you,' and then I ran

11   to look at the street sign.  I believe I told the

12   911 operator that I did not know if I was shot.  I

13   gave the 911 operator a description of the car and I

14   told her that the color of the license plate was

15   gold.

16             "Paragraph 53.  I did not hear Eddie

17   say anything to me.

18             "Paragraph 54.  Approximately three

19   to four minutes after the call the police arrived.

20             "Paragraph 55.  A female officer

21   arrived on the scene and asked me about the gun and

22   ordered us to sit on the curb.

23             "Paragraph 56.  I told her that the

24   gun was taken from me by the driver of the vehicle.

25   She then asked me what happened.  I told her that

DISTLER

1  the guy tried to run me over and I shot him. I told

2  her that the guy took the gun.

3        "Paragraph 57. EMS arrived and we

4  were all transported to the hospital in one

5  ambulance. Me, Sophia, Jill, Eddie, one police

6  officer, and one EMT were transported to the

7  hospital together.

8        "Paragraph 58. En route to the

9  hospital I telephoned Mike Covais, my PBA trustee

10  and informed him that I was involved in an off-duty

11  shooting. I asked him to notify the desk officer

12  about this incident, and I told Mike that we were

13  okay.

14        "Paragraph 59. I did not speak with

15  anyone at the hospital about the incident other than

16  Sophia.

17        "Paragraph 60. The first Nassau

18  County officer I saw was Sergeant Maranese. I then

19  saw William Purcell and then I saw Mike Covais.

20  They both asked me if I was okay.

21        "Paragraph 61. I was then taken to a

22  cubicle and I saw other individuals, PBA attorney

23  Willard Miller and Chief Hunter. Both asked me if I

24  was okay and nothing more. I saw Suffolk County

25  bosses who I did not know by name. I could tell

DISTLER

1    they were bosses by their insignia.

2                "Paragraph 62.  I did not have any

3    conversation with anyone from Suffolk County at the

4    hospital.

5                "Paragraph 63.  Michael Covais told

6    him that Suffolk County wanted me to go to the

7    Second Precinct.

8                "Paragraph 64.  I remained at the

9    hospital until I was driven to the Second Precinct

10   by my PBA rep. P.O. William Purcell.

11               "Paragraph 65.  At the Second

12   Precinct I was interviewed by a detective from the

13   Suffolk County Police Department.  I gave him a

14   written statement.  He was the only person I spoke

15   with at the Second Precinct regarding the incident.

16               "Paragraph 66.  In the conference

17   room at the Second Precinct I had a very brief

18   conversation with PBA attorney Willard Miller.  This

19   was after I had already given my statement to the

20   Suffolk County detective.

21               "Paragraph 67.  Sophia and I were

22   driven home from the Second Precinct by Michael

23   Covais."  This statement is signed by Detective

24   Lieutenant Ralph Hoffman, myself, and Police Officer

25   Anthony DiLeonardo.

DISTLER

1          MR. BARKET:  Can I give you a break

2     for a second?

3          THE WITNESS:  Yes.

4          MR. BARKET:  Is this hearing public?

5          MS. HILLER:  The hearing can only be

6     made public at your client's request.

7          MR. BARKET:  Okay.  So obviously we

8     haven't done that.

9          Is the proceeding part of the

10     officer's confidential file?

11          MR. SANTIAGO:  It is.

12          MR. BARKET:  So it shouldn't be

13     discussed with anybody?  Nobody should

14     know about this -- the testimony or

15     anything like that?

16          MR. SANTIAGO:  These proceedings are

17     confidential unless the officer requests

18     the public to participate or view the

19     hearing.

20          MR. BARKET:  We clearly haven't done

21     that.  Okay.  Just curious.

22          MS. HILLER:  Do you want to take a

23     break?

24          MS. DISTLER:  Do you want me to

25     continue reading statements?

DISTLER

1          MS. HILLER:  Yes.  I need all of them

2     read in.  Let's take a break.

3          INSPECTOR MICHAEl STUDDERT:  Let's

4     take a ten minute break.

5          (Whereupon, a brief recess was

6     taken.)

7          HEARING OFFICER STUDDERT:  Back on

8     the record.

9          MS. HILLER:  So, for the record,

10    after a brief recess, Sergeant Distler

11    just completed reading in the first of the

12    statements that we're asking to be read

13    into the record.

14          DIRECT EXAMINATION

15  BY MS. HILLER:

16    Q    You can continue.  You can continue on

17  reading the rest of them in, and then we'll break

18  after that.

19    A    The second statement is a PDCN 206A, which

20  is titled Police Department, County of Nassau, New

21  York, Incident/Accident Statement, dated February

22  27, 2011.  Member involved, Police Officer

23  DiLeonardo, Serial No. 9013; Command, Third

24  Precinct.

25          Check box incident, date of

71

DISTLER

```
 1    occurrence 2/27 of 2011; time of occurrence 0115;

 2    location, Oakwood Road, Tippen Drive, Huntington.

 3              "While acting within the scope of my

 4    official duties, I was injured when I attempted to

 5    place the subject under arrest.  I sustained

 6    injuries to both hands, my left forearm, my left

 7    leg, and my ears.  These injuries resulted from the

 8    subject hitting me with his car and from me breaking

 9    the driver's side window in an attempt to arrest the

10    subject."

11              It's signed by Police Officer Anthony

12    DiLeonardo.

13              MR. BARKET:  See, I told you I'd give

14         you a break.

15              THE WITNESS:  That was too quick.

16              MR. BARKET:  Okay.  Sorry.  Keep

17         going.

18              MS. HILLER:  Every time you do that,

19         I think Newsday is on the phone or

20         something.

21              MR. BARKET:  Well, you're prophetic.

22         You should know.  I've gotten a call, an

23         inquiry from —

24              THE COURT REPORTER:  Do you want this

25         on the record?
```

DISTLER

1          MR. BARKET: Yeah, I do.

2          This hearing was originally

3     scheduled, I think, in February, and prior

4     to the hearing I had several inquiries

5     from Newsday about the nature of the

6     hearing, when it was going to begin.  I

7     was told from the reporter when it was

8     scheduled to begin and what was going to

9     take place.  I deferred or demurred on my

10    comments about it, other than to say I

11    didn't think it would take place, and it

12    ended up being adjourned until today.

13         I — as we're sitting here, I've

14    gotten multiple e-mails from Patrick

15    Whittle, who is a reporter at Newsday,

16    telling me that "We were told DiLeonardo

17    has an administrative hearing in Mineola

18    today.  I would like to know when, where,

19    and if it's public."

20         "Who told you that?"

21         "Sources."

22         So apparently somebody from the

23    Department has leaked this, which is

24    troubling to me, because it was leaked the

25    first time when the hearing was scheduled,

73

DISTLER

1      and then it's leaked again.  I think over

2      lunch I'll consider what remedy I'm going

3      to ask for, but certainly disbanding the

4      hearing at this point in time certainly

5      seems appropriate to me.  But I'll — I'll

6      reserve.  It really is — the opening

7      statement that I gave that this is all

8      being driven by Newsday seems to be

9      correct.  I mean, the only people who know

10     about this hearing are myself, Officer

11     DiLeonardo, and the union.  It's

12     inconceivable that any of us would have

13     leaked this to Newsday.

14          MS. HILLER:  And the witnesses that

15     have now been subpoenaed, which we don't

16     have much control over with that.

17          MR. BARKET:  Well, the witnesses

18     weren't subpoenaed before it was leaked

19     the first time, so somebody in the

20     Department has been leaking this.  It

21     really is just unfortunate that the

22     Department seems to be driven by Newsday's

23     inaccurate reporting, and then serving

24     them up notice of when the hearings are

25     taking place.

DISTLER

1     HEARING OFFICER STUDDERT:  Okay.  The

2     record reflects your concerns.

3         MS. HILLER:  Do you want us to

4     proceed with the statements, and then

5     you'll --

6         MR. BARKET:  Yeah.  We'll break at

7     lunch, I'll look at this and think about

8     it some.

9         THE WITNESS:  Okay.  The next

10    statement is a statement from the Police

11    Department, County of Suffolk, dated

12    February 27, 2011, one of three pages.

13    There's three pages in total.

14        "I, Jillian Bienz, being duly sworn,

15    deposes and says that I am 24 years old.

16    I was born on 7/21 of 1986.  I live at 1

17    Barley Place, Commack, New York, with my

18    husband, Edward Bienz.  Last night I was

19    out with my husband, Edward.  We were in

20    my husband's Acura TL, which is blue.  He

21    was driving.  We were out with another

22    couple, Anthony DiLeonardo and his

23    girlfriend, Sophia.  I don't know her last

24    name.  They were in a white Infiniti.

25    Anthony was driving.

DISTLER

1   "We were coming from The Artful

2  Dodger in Huntington Village, which is a

3  bar.  We were driving towards Jericho

4  Turnpike, and we made a wrong turn.  We

5  pulled over to the side of Oakwood Road

6  opposite Stimson Middle School.  We pulled

7  over to the right side.  We were going to

8  make a U-turn.

9   "Anthony had pulled up behind us.

10  Anthony had got out of his car to talk to

11  us.  As we were stopped there, a taxi

12  pulled up and stopped next to Anthony's

13  car.  There was some yelling and cursing

14  between Anthony and the people in the

15  taxi.  The people in the taxi were doing

16  most of the yelling.

17   "The taxi revved his engine and

18  accelerated in reverse and stopped behind

19  Anthony's car.  Ed saw the taxi back up

20  and got out of our car."

21   It's signed.  This is the end of page

22  1, signed by Jillian Bienz.  Continued on

23  page 2.

24   "I got out of our car also, and I

25  stood next to our car, between the door

**DISTLER**

1    and the car. I saw Anthony holding

2    something up in his hand. I thought it

3    was his shield, but I'm not sure. It was

4    definitely not a gun. He was moving to

5    the back of his car, and he was yelling

6    that he was a police officer and telling

7    the driver to stop the taxi.

8       "The taxi started accelerating

9    towards Anthony. Anthony was still

10    yelling at the guy to stop the car. Then

11    I saw a gun in Anthony's hand. He was

12    still yelling at the taxi, and then I

13    heard gunshots. I don't know how many I

14    heard. I turned away and covered my head

15    with my arms.

16       "Sophia started screaming. Sophia

17    and I moved towards each other on the

18    grass on the side of the road from where

19    she was standing on the passenger side of

20    Anthony's car. After I reached Sophia, I

21    looked up and saw the taxi in the middle

22    of the road. I saw my husband rolling

23    down the middle of the street, and Anthony

24    was at the window of the taxi at the

25    driver's door.

DISTLER

1    "I'm not sure if the taxi was moving

2    at" — that was the end of page 2 — "at

3    that time, because I was focused on my

4    husband. Then I saw Anthony moving

5    towards Ed to see if he was okay. The

6    taxi had backed up, made a U-turn, and

7    left.

8    "Anthony called 911 immediately. We

9    waited for the police to come. We had a

10   couple of drinks last night, but I did not

11   think my husband or Anthony was

12   intoxicated. I am not aware of anything

13   that went on between us and the taxi

14   before he stopped next to us. I never saw

15   the taxi before he stopped next to us.

16   "I have read the above statement

17   consisting of three pages taken by

18   Detective Ciccotto here at the Second

19   Precinct, and I swear it is all true."

20   Signed by Jillian Bienz and sworn to

21   before me February 27, 2011, Alfred

22   Ciccotto, as a notary.

23   The next statement is a three-page

24   statement from the Police Department,

25   County of Suffolk, New York, Advice of

DISTLER

1       Rights.  It's got a complaint number on

2       it, 11-95045.  One of three pages.

3           The top part states:  "You must

4       understand your rights before being asked

5       any questions.  Your rights.  You have the

6       right to remain silent."  It's initialed

7       by TMM.

8           "Anything you say can and will be

9       used against you in a court of law."

10      Initials by TMM.

11          "You have the right to talk to a

12      lawyer right now and have him present with

13      you while you are being questioned."

14      Initialed by TMM.

15          "If you cannot afford a lawyer and

16      want one, a lawyer will be appointed for

17      you by the court before any questioning.

18      If you decide to answer questions now

19      without a lawyer present, you will have

20      the right to stop the questioning at any

21      time until you talk to a lawyer."

22      Initials TMM.

23          "Waiver of Rights.  Do you understand

24      each of these rights I have explained to

25      you?"

DISTLER

1        Answer: "Yes." TMM.

2        "Having these rights in mind, do you

3    wish to talk to me/us now?"

4        Answer: "Yes."  TMM.

5        And it's got a signature of

6    defendant, which is hard for me to

7    decipher, but I would assume it says it's

8    Thomas Moroughan's signature.

9        The date is 2/27 of '11.  The time is

10   0700 hours.  The witness is Detective

11   Charles E. Lesser II.  951.

12       "Sworn to me before -- "this 27th day

13   of February, 2011, Charles -- "Detective

14   Charles E. Lesser."

15       "State of New York, County of

16   Suffolk.  I, Thomas Moroughan" -- uh --

17   solely -- it's hard for me to read on this

18   copy.  He's got initials next to it as if

19   he crossed out underneath.

20       "Being" -- "being duly sworn, deposes

21   and says:  I was born August 17th [sic],

22   1984, in Stony Brook -- and he crosses out

23   August 19th, and above it that's the July

24   23rd.  That's his birth date -- "in Stony

25   Brook, New York.  I live at 143 West 19th

80

**DISTLER**

1   Street, Huntington Station.

2          "On February 27, 2011, at about 1:10

3   to 1:15 A.M., I was driving a white Prius

4   taxi for Dobro Express.  I was working a

5   6:00 p.m. to 6:00 a.m. shift, and at that

6   time I had my girlfriend in the car with

7   me.  Her name is Kristie Mondo.  I had

8   been working for the company for one week.

9          "My shift started with me having a

10  bad day.  There was a lot of traffic, and

11  I wasn't making any lights.  Some time

12  after 2:00 a.m. a blue Acura passed me,

13  and I got annoyed and flashed my high

14  beams at him.  I left them on

15  continuously.  I was mad at the way the

16  guy was driving.

17          "A white car then came up behind me

18  and flashed his bright lights at me.  At

19  that time I was driving" –– he had written

20  southbound, and he crossed it out,

21  initialed it, and put westbound –– "on

22  West Hills Road."  He crossed out New York

23  Avenue, initialed it –– "in Huntington

24  Station.

25          "The white car passed me, and I got

DISTLER

```
 1      pissed off and followed the cars.  I drove
 2      west on West 19th Street, then north on
 3      Oakwood Drive.  I saw the two cars parked
 4      on the side of Oakwood Drive at Tippen
 5      Street.  I rolled down my passenger window
 6      and pulled next to the white Infiniti.  I
 7      yelled to the guy who was in his
 8      mid-twenties and white:  'Why don't you
 9      learn how to drive, you fucking asshole?'
10          "He cursed back at me, and we yelled
11      back and forth.  I went to get out of my
12      car, and so did the guy in the white car,
13      and so did the guy in the blue car, who
14      was stopped directly in front of the white
15      car.
16          "I then got back in my car and backed
17      it up.  I continued yelling at the guy in
18      the white car, and he yelled back.  The
19      guy in the white car started walking
20      towards my car, and I revved my engine.  I
21      drove forward toward the guy who was
22      standing in the street near his white car.
23          I then saw the guy fire about three
24      or four shots at my car, and I felt I was
25      hit.  I felt he fired at me to protect
```

DISTLER

1    himself because I drove at him.  The guy

2    then came up to my driver's window and

3    smashed his gun, busting my window and

4    hitting me in the face.

5        "The guy told me to get out, and we

6    struggled.  He said he was a police

7    officer and that I was under arrest.  I

8    wasn't sure he was a cop, so I drove

9    backwards.  My door was still open, and as

10    I went backwards, I knocked the guy down.

11        "I know the gun had a revolver.  When

12    I went forward with my car, I meant to go

13    backwards, but I had trouble shifting.  At

14    the end, I drove to the hospital, and my

15    girlfriend called 911 as I drove to the

16    hospital.

17        "I have read this three-page

18    statement Detective Tavares has written,

19    and I swear it is true.

20        Signed by Thomas Moroughan.  "Sworn

21    before me on the 27th day of February by

22    Detective Charles E. Lesser."

23        Next statement.  Police Department,

24    County of Suffolk, dated 2/27 of 2011.

25    It's a three-page statement.

83

DISTLER

| | |
|---|---|
| 1 | "I, Kristie Mondo, being duly sworn, |
| 2 | deposes and says:  I am 23 years old.  I |
| 3 | was born on 8/29/87.  I live at 143 West |
| 4 | 19th Street in Huntington Station with my |
| 5 | boyfriend, Thomas Moroughan. |
| 6 | "Tonight I was riding around with my |
| 7 | boyfriend in his taxi.  He was working. |
| 8 | At about 1:00 a.m. we were on West 19th |
| 9 | Street to pick up a trip.  There was a |
| 10 | blue Acura driving in front of us.  I |
| 11 | wasn't paying much attention to what |
| 12 | happened, but I think something happened |
| 13 | with this car for my boyfriend to put his |
| 14 | high beams on the car. |
| 15 | "The car was driving" -- she crossed |
| 16 | out bag, initialed it, and put erratic. |
| 17 | "He was driving a little bit from |
| 18 | side to side on the road before my |
| 19 | boyfriend put his high beams on their car. |
| 20 | "There was a white Infiniti driving |
| 21 | behind us.  When my boyfriend turned his |
| 22 | high beams on, the white car behind us |
| 23 | started flashing their high beams at us. |
| 24 | My boyfriend started driving slow to piss |
| 25 | off the car behind us.  The car behind us |

DISTLER

1    passed us.  My boyfriend sped up as he was

2    passing us, to try and prevent him from

3    passing us, but he still passed us.

4        "We were now driving behind the two

5    cars.  We came to a red light at West 19th

6    Street and Oakwood Road.  The other two

7    cars turned right on red.  My boyfriend

8    waited until the light turned green, and

9    then he turned right on Oakwood Road.

10    "We were heading north on Oakwood

11    Road when we saw the two cars stopped on

12    the right side of the road.  My boyfriend

13    stopped next to them and started yelling

14    at them to learn how to drive.  Everybody

15    was cursing at each other.  The blue car

16    was parked up on the right side of the

17    road in front of us about 10 or 15 feet.

18    I saw a guy in an orange shirt standing in

19    the road next to that car.

20    "My boyfriend was trying to do

21    something with the gearshift.  I don't

22    know if he was going forward or backward,

23    because there was a lot of yelling going

24    on, and I wasn't paying attention.  Then

25    the guy in the orange shirt started

85

DISTLER

1   shooting at the car.  I think he fired two

2   times.  I was sitting in the front

3   passenger seat, and I ducked down.

4        "I was ducking down when I heard my

5   boyfriend's window to his door break.  It

6   shattered.  I looked up, and my boyfriend

7   was struggling with the guy in the orange

8   shirt.  He said he was a cop and that my

9   boyfriend was going to jail.

10        "The driver's door was open, and he

11   was trying to drag my boyfriend out of the

12   car.  My boyfriend was struggling with the

13   guy when I heard, I think, one shot.  I

14   didn't see where the gun was when I heard

15   the shot.  I never actually saw the gun,

16   but even though I couldn't see it, I could

17   tell we were being shot at when the guy

18   was in front of the car and I heard —

19   "and I heard the shot when he was

20   struggling at the door with my boyfriend.

21        "After that last shot, my boyfriend

22   put the car in reverse and started driving

23   backwards, with the guy in the orange

24   shirt hanging onto the door.  Then the guy

25   fell off the door, and Tommy drove away.

DISTLER

1          "Tommy" — "Tommy's car — "Tommy

2     said he was bleeding and he thought he was

3     shot.  I told him to drive to the

4     hospital, and I called 911.

5          "I have read the above statement

6     consisting of three pages taken by

7     Detective Ciccotto here at Huntington

8     Hospital, and I swear it is all true."

9          Signed by Kristie Mondo.  "Sworn to

10    before me on February 27, 2011.  Alfred M.

11    Ciccotto, Notary Public."

12         The next statement is a three-page

13    statement of Eric Klug.  This is a

14    statement that I took from Mr. Klug.

15         "My name is Eric Klug.  I am 25 years

16    of age, having been born on 7/6/1986.  I

17    currently reside at 422 Oakwood Drive,

18    Huntington, New York, with Sabrina Torres,

19    friend" — "my friend.  My home telephone

20    number is" — there is no home phone.

21    It's blank.  "My cell phone number is

22    631-522-5906.  I am currently employed by

23    contracting through private contractors."

24    The telephone number there is blank.

25         "I have been advised by Sergeant

87

**DISTLER**

1     Jo-Ann Distler, and I understand that any

2     false statement made herein is punishable

3     by a Class A misdemeanor pursuant to

4     Section 210.45 of the Penal Law of the

5     State of New York.

6     "On February 27, 2011, at around 1:00

7     a.m., I was sitting on my couch in my

8     living room, playing a video game, when I

9     heard a screeching sound and I heard what

10    I thought was a gunshot.  I looked out of

11    my front picture window, and I saw a man

12    with a gun walking towards a white car

13    which was stopped in the middle of the

14    road.  The man with the gun was shooting

15    his gun at the windshield of the car.  I

16    saw the flash coming from the gun.

17    "The white car was stopped in the

18    travel lane of Oakwood Drive, facing

19    northbound.  I saw a white Infiniti was

20    parked on the roadway, also facing

21    northbound.  The white car which was being

22    shot at had a male driver and a female

23    passenger.  The female passenger was

24    yelling.

25    "Immediately as I looked at the car

DISTLER

1   which was being shot at, I saw the white

2   car begin to move in reverse.  As the car

3   was backing up, the man that was shooting

4   at the car was continuing to move towards

5   the car as he was shooting.  The female

6   passenger opened the door and got out of

7   the vehicle" — "got out of the white car

8   which was being shot at.  She was yelling.

9   I saw her get knocked to the ground

10  because the white car was backing up.

11      "The man that was shooting at the car

12  made it to the front of the hood of the

13  white car before the white car was able to

14  move away in reverse.  I did not see the

15  female get back into the white car,

16  because they were out of my vision.

17      "I could not see if the man that was

18  shooting had anything in his hand, but I

19  believe he may have had something large

20  around his neck.

21      "I left the window and went to call

22  911.  When I looked out the window again,

23  I saw three people sitting on my lawn, and

24  the police were there.

25      "When the shots were fired, I heard

89

DISTLER

1    one shot, then I looked out the window,

2    and the other shots seemed to be grouped

3    together without hesitation.

4    "I am giving this statement to

5    Detective Sergeant Distler.  I am

6    currently present at 422 Oakwood Drive,

7    Huntington, New York, giving this

8    statement to Sergeant Jo-Ann Distler of

9    the Nassau County Police Department

10    Internal Affairs Unit, who is writing it

11    down for me.  I have read this statement

12    that consists of three pages, and it is

13    the truth.  I have initialed any

14    corrections and signed all of the pages."

15    Signed by Eric Klug, 422 Oakwood

16    Road, Huntington Station, New York, and

17    signed by myself, Detective Sergeant

18    Jo-Ann Distler.

19    The next statement is a statement

20    taken of Police Officer Edward Bienz by

21    myself.  It is dated March 13, 2012.  It's

22    addressed to the Commanding Officer,

23    Internal Affairs Unit, from Police Officer

24    Edward Bienz, Serial No. 8943, Shield No.

25    3466, subject, IAU27-2011.

DISTLER

1   "Paragraph 1.   I am making this
2   statement for administrative purposes
3   only.   I have not done so voluntarily, but
4   in compliance with an order of a superior
5   officer.   This statement in no way
6   constitutes any waiver of my rights, and
7   this statement or any part thereof may not
8   be used against me in any subsequent
9   criminal proceeding.
10   "Paragraph 2.   On or about February
11   25th, 2011, I had made plans to go out to
12   dinner with my wife, Jillian Bienz, and my
13   cousin Christopher Bienz and his
14   girlfriend.   I was doubled up with P.O.
15   Anthony DiLeonardo while I was making
16   these plans.   He suggested that he and I
17   should hang out together some evening.   I
18   had never socialized with him before.   I
19   invited him to join us for dinner on
20   February 26, 2011.   My cousin Christopher
21   ended up canceling due to illness.   My
22   wife and I decided to keep our plans with
23   Anthony and his date, Sophia Cornia, who I
24   was meeting for the first time.
25   "Paragraph 3.   On February 26, 2011,

DISTLER

1    we all met at Black Forest Brew Haus,

2    Farmingdale, New York, at about 8:00 p.m.

3    We had appetizers and dinner.  I had three

4    house-brewed beers.  Anthony had at least

5    two vodka mixed drinks.  My wife had a

6    martini, and Sophia had a mixed vodka

7    drink.  We paid our bill with cash and

8    left about 9:30 or 10:00 p.m.  We left and

9    drove to Huntington, with Anthony and

10   Sophia following me.  I was driving my

11   car, and Anthony was driving Sophia's car.

12          "We went to Blue Hanu, where I had —

13   I had a beer and Anthony had a vodka

14   drink.  The women both had a drink, but

15   they did not finish their drinks.  It was

16   hot and crowded, and we left after about a

17   half hour.  We went across the street to

18   the tavern, where I had two beers.

19   Anthony had two vodka mixed drinks, and

20   the girls had one drink each.

21          "We stayed there for about an hour

22   before walking to The Artful Dodger.  I

23   had two beers at The Artful Dodger, and

24   Anthony had two vodka mixed drinks.  The

25   women may have had one drink.  We probably

92

DISTLER

```
 1      stayed there for about an hour.  We paid

 2      all our tabs with cash, and we split the

 3      bills.

 4           "Paragraph 4.  We discussed doing

 5      something else, but we all decided to call

 6      it a night and head home at about 1:00

 7      a.m.  Anthony was unfamiliar with the

 8      area, and I told him to follow me down

 9      Route 110 and I would get him to Jericho

10      Turnpike.  I was driving my car, and

11      Anthony was driving Sophia's car —

12      driving Sophia's car.  I was aware of his

13      car following me.

14           "I made a wrong turn when I merged

15      right onto West Hills Road, which became

16      19th Street.  I then made another wrong

17      turn when I turned right onto Oakwood

18      Drive traveling northbound and away from

19      Jericho Turnpike.  My wife commented that

20      I was going the wrong way.  I was not in

21      contact with Anthony on our cell phones.

22           "I pulled over to the shoulder of the

23      road in order to tell Anthony that we

24      needed to turn around.  At no time was I

25      in a confrontation or road rage type of
```

**DISTLER**

1   incident with any other car or driver.  No

2   one flashed their lights at me, and I had

3   not been flashing my lights at any other

4   vehicle.

5       "Paragraph 5.  Anthony pulled up

6   behind me slightly offset from my vehicle.

7   My wife got out on her side of the car and

8   began walking back towards Anthony's

9   vehicle to tell them that we needed to

10   turn around.  I was watching in the rear

11   and side-view mirrors.  I saw a smaller

12   white compact car, which I later was told

13   by a Suffolk County detective that it was

14   a cab, pull up adjacent to Anthony's car.

15       "I initially thought Anthony was

16   waving the vehicle to go around him.  My

17   wife got to within 10 feet of Anthony's

18   car when she began backpedaling to our

19   car.  I saw Anthony get out of his car and

20   a male white get out of the driver's side

21   of the cab.  My window was up, and I could

22   not hear what they were saying, but I

23   could tell by their body language that

24   they were having an angry exchange.

25       "Paragraph 6.  The cab driver was

DISTLER

1    standing near the driver's side quarter

2    panel of his car, and Anthony was in

3    between his car and the cab.  They were

4    talking to each other over the hood of the

5    white cab.  The cab driver reentered his

6    car and backed it up.  I got out of my car

7    to join my wife, who was standing near the

8    rear quarter panel of the trunk of my car.

9        "Paragraph 7.  I asked Jill what

10   happened -- what had happened.  She said,

11   'I don't know.  They were yelling.'

12       "Anthony was still standing near his

13   door.  He began walking toward the rear of

14   his vehicle.  I couldn't see his hands.  I

15   don't recall hearing Anthony saying

16   anything.  The other car backed up about

17   three to four car lengths -- three to four

18   car lengths behind Anthony's car.  I

19   believe the other car was stopped.  I did

20   not hear the revving of an engine.  I

21   later learned at the hospital that this

22   other car was a cab.

23       "Paragraph 8.  I was continuing to

24   stand behind my car and in front of

25   Anthony DiLeonardo's car when I heard

DISTLER

```
 1    gunshots.  I thought I heard three
 2    gunshots.  I immediately ducked down and
 3    cover" -- "I immediately ducked and
 4    covered my head.  I heard the other car's
 5    brakes lock up.  Up to this point I did
 6    not know that Anthony DiLeonardo was
 7    carrying a weapon.  I did not have my
 8    weapon or shield with me, although I had
 9    my ID card.
10         "Paragraph 9.  When I looked up after
11    the shots had stopped, I heard the cab
12    brakes locking up, and I observed that the
13    cab had advanced about two car lengths in
14    the travel lane before it came to a stop
15    approximately 15 to 20 feet from Anthony
16    DiLeonardo.
17         "I saw Anthony DiLeonardo run up to
18    the driver's side of the cab and begin
19    smashing the driver's window with his
20    weapon in his right hand, causing it to
21    shatter.  He was yelling, 'You're under
22    arrest.'  This was the first time that I
23    saw Anthony's gun in his hand.
24         "He managed to get the car door open
25    and was trying to pull the driver out of
```

96

DISTLER

1    the vehicle.  Anthony had his gun in his

2    right hand and appeared to be attempting

3    to pull the driver out with his right hand

4    by grabbing the driver's upper torso, and

5    simultaneously Anthony was reaching inside

6    the vehicle with his left hand.  I believe

7    the gun to still be loaded.  It also

8    appeared that the driver -- it also

9    appeared that the driver was trying to

10   push Anthony out of the car.

11        "I ran towards the cab with the

12   intention of helping Anthony secure his

13   weapon.  As I got to the driver's-side

14   quarter panel of the cab" -- "driver's

15   side quarter panel, the cab turned his

16   wheel to the right and backed up, clipping

17   me and causing me to hit and roll on the

18   pavement.  I ended up in the southbound

19   lane of traffic.

20        "I never got the" -- "I never got to

21   the driver, and I did not have any

22   physical contact with him.  I was not

23   aware of any other persons in the cab

24   until I heard a female screaming.  I did

25   not observe Anthony with his shield out at

DISTLER

1    any time the whole evening.  I did not

2    know that he had his shield on him.

3        "Paragraph 10.  I eventually got up

4    and went over to the sidewalk.  My wife

5    was on the sidewalk, and she was upset.  I

6    don't recall seeing any other people in

7    the vicinity, nor do I recall any specific

8    vehicular traffic.  I think Sophia

9    remained in her vehicle until everything

10   was over.  Anthony was standing in the

11   street talking on the phone with 911

12   immediately, and stayed on the phone until

13   Suffolk County police arrived.

14       "I said to Anthony, 'Dude, what the

15   fuck did you just do?'  I don't recall him

16   responding to me or saying anything to me

17   at this point.  I don't recall him telling

18   me to get on the sidewalk.  I don't recall

19   asking him if he had his gun with him.

20   Anthony did tell me at some point that he

21   lost his gun in the cab.

22       "Paragraph 11.  A Suffolk County

23   female P.O. arrived and asked me what

24   happened.  I don't recall what my response

25   was, other than I got hit by the car.  She

**DISTLER**

 1    asked me if I had lost consciousness.  I

 2    think I said 'Kind of.'  I was in a daze.

 3    I was put in a neck brace and placed on

 4    an — placed in an ambulance.  One or two

 5    EMTs, my wife, and a male white Suffolk

 6    County PD P.O. accompanied me to

 7    Huntington Hospital.  I don't know if

 8    anyone else was in the ambulance with me.

 9         "Paragraph 12.  When I arrived at

10    Huntington Hospital I received treatment,

11    and I was placed in a room by myself.

12    Anthony DiLeonardo came to my room in the

13    hospital and spoke to me briefly.  He told

14    me that the cab driver had tried to run

15    him over.  He also told me that he had

16    lost his gun in the cab.  Sergeant

17    Maranese came to the hospital and asked me

18    if I was all right.  He did not ask me

19    what happened.  At least one Suffolk

20    County detective spoke to me and asked me

21    what happened.  I don't know the identity

22    of this detective or detectives.  Mike

23    Covais came to the hospital and asked if I

24    was all right.  We did not discuss the

25    particulars of the incident.  Jim Carver,

DISTLER

```
 1      Alex Phillippas, Bill Purcell, and Brian

 2      McQuade also came to the hospital to ask

 3      how I was.  I recall two higher-ranking

 4      officers coming to the hospital to ask me

 5      how I was doing.  I do not know who they

 6      were.  They did not discuss the incident

 7      itself, nor did they ask me if I had been

 8      drinking.

 9          "Paragraph 13.  While at the

10      hospital, I was x-rayed and treated for

11      abrasions and contusions.  I am not

12      signing an authorization for release of my

13      medical records, on the advice of my

14      attorney, William F. Miller, who is

15      present with me.

16          "Paragraph 14.  After I was released

17      from the hospital, I was driven to Suffolk

18      County Police Department Second Precinct

19      by Brian McQuade.  Anthony --- Anthony

20      DiLeonardo was transported in another

21      vehicle.  We were in a common area along

22      with at least one Suffolk County

23      detective.  I was interviewed by the

24      Suffolk County Homicide Squad while at the

25      Second Precinct.  I gave them a verbal
```

100

DISTLER

1     account of the facts and circumstances of

2     the incident.  After the interview was

3     completed, my wife and I were driven home

4     by Brian McQuade.

5          "Paragraph 15.  I do not know who

6     notified the Nassau County Police

7     Department of this incident.

8          "Paragraph 16.  I have not given any

9     written statements other than a brief

10    narrative in my workers' compensation

11    report.

12         "Paragraph 17.  I have been

13    interviewed by the Suffolk County Police

14    Department Homicide Squad and the Suffolk

15    County DA investigators.  These interviews

16    were not reduced to writing, nor have I

17    signed any statements.  I have not given

18    any other statements."

19         Signed by Police Officer Edward Bienz

20    and signed by myself, Detective Sergeant

21    Jo-Ann Distler.

22         Two more short ones.  Okay.  The next

23    statement is a transcript of a 50-H

24    hearing In The Matter of the Claim of

25    Thomas Moroughan Against The County of

DISTLER

1    Nassau, and Police Officer Anthony

2    DiLeonardo, Shield 3632, Nassau Police

3    John Does 1 through 10, The County of

4    Suffolk, Detective Charles E. Lesser II,

5    and P.O. William J. Lamb and Suffolk

6    Police John Does 1 through 10.

7         "Deposition of Thomas M. Moroughan,

8    the claimant in the above-captioned

9    action, held on the 20th day of July,

10   2011, at 1:45 p.m., at the Office of the

11   Suffolk County Attorney, H. Lee Dennison

12   Building, 100 Veterans Memorial Highway,

13   Hauppauge, New York, pursuant to Notice of

14   Claim, and before Judi Gallop, a Notary

15   Public of the State of New York."

16        Page — beginning on page 66.  Thomas

17   Moroughan.  It's a continuation from a

18   prior page, so I'll just read what it

19   says.

20        "You first started to move the car

21   forward at the time you heard the shots.

22   Do you know how much time went by?

23        "Mr. Grandinette:  Objection.  Asked

24   and answered.  I believe he said he didn't

25   know exactly that it was simultaneously.

102

DISTLER

1   "Question:  You said the guy came

2   over and put his arm to the window the way

3   that you described.  Focusing on that same

4   period of time, do you know what the guy

5   in the blue Acura was doing?

6   "Answer:  No idea.

7   "Question:  Tell me what happened

8   after that, after the fellow hit —

9   "Answer:  Hit me on my nose with the

10  butt of gun.  That put me in a daze, kind

11  of out of it.  The next thing I know, he

12  has my driver's door open, he's leaned

13  over me, he's punching me on the side of

14  my face and the head.  At the same time,

15  he's trying to pull me out of the car.

16  "Question:  Was he saying any words?

17  "Answer:  No.  Just, 'Get out the

18  car.'

19  "Question:  Maybe I misunderstood.

20  Was he saying anything at all?

21  "Answer:  Just, 'Get out of the car.'

22  "Question:  Was he cursing at all?

23  "Answer:  I don't recall.

24  "Question:  Was your girlfriend

25  saying anything at that time?

DISTLER

1   "Answer:  Yeah, my girlfriend was

2   screaming, 'Leave us alone.  Leave us the

3   fuck alone.'

4        "Question:  If you know, did he

5   respond to her at all?

6        "Answer:  No.

7        "Question:  Was he saying get out of

8   the car and had — and he had his hands on

9   you at the same time?

10       "Answer:  Yes.

11       "Question:  Punched you, as well?

12       "Answer:  He grabbed me by my arm

13  with his left hand.  He's punching me in

14  my face with his right arm.

15       "Question:  The door was opened?

16       "Answer:  The door was open.

17       "Question:  Up to that point, other

18  than him saying, 'Get out of the car,' did

19  he ever say, 'You're under arrest' or

20  anything?

21       "Answer:  No.

22       "Question:  Did he identify himself

23  in any way as a police officer?

24       "Answer:  Yes.

25       Question:  By the way, did you come

104

DISTLER

1     to learn he was a police officer?"

2          Okay.  The next statement is an

3     excerpt of a 50-H hearing held in Nassau

4     County.  It's In The Matter of the Claim

5     of Thomas Moroughan against The County of

6     Nassau, Police Officers Anthony

7     DiLeonardo, Shield 3632, and Nassau Police

8     John Does 1 through 10, The County of

9     Suffolk, Detective Charles E. Lesser II,

10    P.O. William J. Lamb, and Suffolk Police

11    John Does 1 through 10.

12         Dated August 29th, 2011, at 12:44

13    p.m. 50-H Hearing of Thomas Moroughan

14    held at the offices of the Nassau County

15    Attorney, 1 West Street, Mineola, New

16    York, before Renate Reid, Registered

17    Professional Reporter and Notary Public of

18    the State of New York.

19         Page — page 132.  Thomas M.

20    Moroughan.  Mr. Ferguson speaking:

21    "Please give me the last question.

22         "Record was read back.

23         "Answer:  I want to clarify,

24    actually, for the record.  The five shots,

25    that I wasn't actually counting the shots.

DISTLER

```
 1        I know it was five shots, from the

 2        forensic report in which we received,

 3        which I received later on.  So my actual

 4        knowledge of it being five shots is based

 5        upon that, not based upon my recollection.

 6            "Mr. Ferguson:  What was the

 7        question?

 8            "Record read back.

 9            "Mr. Ferguson:  You can delete the

10        word 'five' if you want.  You can say

11        'after the shots were fired.'  What was

12        the rest of the question?

13            "Question:  What happened next?

14            "Answer:  The guy from the white

15        Infiniti approached the driver's side of

16        my vehicle.  He busted open the driver's

17        window with the butt of his gun.  He then

18        struck me in the face with the butt of the

19        gun, proceeded to open up my car door.  He

20        was — reached over me.  He was punching

21        me in my face.  At that time, uh, I get

22        the car into reverse.  I step on the gas,

23        and I backed up to drive away.  And then I

24        swung myself around and drove away and

25        drove myself to the emergency room.
```

106

DISTLER

```
 1          "Question:  At this --
 2          "Answer:  He was just swinging away.
 3     Like he punched me in my face at least ten
 4     times.
 5          "Question:  As of this time, did you
 6     have any knowledge that this person was a
 7     police officer?
 8          "Answer:  No.
 9          "Question:  Had this person said that
10     they were a police officer?
11          "No.
12          "Question:  Had this person — this
13     had — this person was wearing anything
14     that indicated that they were a police
15     officer?
16          "Answer:  No."
17          HEARING OFFICER STUDDERT:  Okay.
18     We'll adjourn for lunch at this point.
19     We'll be back here in one hour.
20          MR. BARKET:  Could we have an hour
21     and a half?
22          MS. HILLER:  I have no objection.
23          HEARING OFFICER STUDDERT:  Okay.
24     Hour and a half.
25          (Whereupon, a lunch recess was taken
```

107

DISTLER

```
1        at 12:45 p.m.)
2              INSPECTOR MICHAEL STUDDERT:  We're
3        back on the record.  Let the record
4        indicate that Officer DiLeonardo, his
5        attorney, and his union rep are present.
6              Call the witness back.
7              MS. HILLER:  Yes.  The Department is
8        calling Joanne DeLorenzo back, Detective
9        Sergeant, to continue her testimony.
10             What did I say?  Detective Sergeant
11       Jo-Ann Distler.  Can P.A. DeLorenzo please
12       procure the witness for me?
13             MS. DELORENZO:  Yes.
14             MS. HILLER:  Thank you.
15             HEARING OFFICER STUDDERT:  Sergeant
16       Distler, you're still under oath.
17             THE WITNESS:  Yes.
18             MS. HILLER:  So, I neglected to put
19       one statement in that I'm going to add to
20       the list here.  So I'm passing up to the
21       hearing officer a statement of Sophia
22       Cornia, asking that it be marked into
23       evidence.  It's a three-page statement.
24             HEARING OFFICER STUDDERT:  Please
25       mark this.
```

NORTH SHORE COURT REPORTERS   1-800-794-5342

DISTLER

```
 1              (Sophia Cornia's Statement was marked
 2         as Department's Exhibit 16 for evidence,
 3         as of this date.)
 4              MS. HILLER:  I am asking that
 5         Department 16 be passed over to Detective
 6         Sergeant Distler, and I'd ask the
 7         detective sergeant to read it into the
 8         record in its entirety.
 9              THE WITNESS:  Exhibit 16 is a
10         three-page statement from the Police
11         Department, County of Suffolk, of Sophia
12         Cornia.
13              "I, Sophia Cornia, being duly sworn,
14         deposes and says:  I am 23 years old.  I
15         was born on 5/1/87.  I live at 23 Oakwood
16         Avenue, Miller Place.
17              "Last night I was with my boyfriend,
18         Anthony DiLeonardo.  We were also with
19         another couple named Jill and Eddie.  We
20         were in separate cars.  Jill and Eddie
21         were in a blue Acura.  Eddie was driving.
22         We were in my white Infiniti G25X.
23         Anthony was driving.  We went to dinner,
24         and then we went to Huntington Village.
25         At about 12:15 a.m. or 12:30 a.m. we left
```

DISTLER

1 The Artful Dodger, and we were following

2 Jill and Eddie to their house.

3 "We pulled over behind Jill and Eddie

4 on the right side of some road. I don't

5 know the name of the road. Anthony got

6 out to talk to Eddie, because I think we

7 were lost. I saw a white Prius taxi pull

8 up and stop next to my car. The taxi

9 driver was exchanging words with Anthony.

10 I couldn't understand what was being said.

11 It looked like Anthony was waving the taxi

12 on, telling him to go ahead of us.

13 "Eddie got out of his car and started

14 walking towards Anthony. Jill also got

15 out of the car and was on the passenger

16 side of our car" — "cars, on the grass.

17 I saw the taxi back up aggressively in

18 reverse and took a position behind my car.

19 The taxi was revving its engine. Anthony

20 moved to behind my car. He was between my

21 car and the cab. I could see that he was

22 holding his shield that he keeps on a

23 chain around his neck.

24 "I got out of my car. I was on the

25 grass by Jill. I heard the car revving

110

DISTLER

```
 1          its engine.  Anthony was saying something,
 2          but I don't remember what it was.  I was
 3          standing outside my car when I heard
 4          gunshots.  I don't know how many shots.  I
 5          didn't see Anthony with a gun in his hand.
 6          I didn't know who was shooting.  I thought
 7          Anthony might have been shot.  I was not
 8          facing them when I heard the shots.
 9               "I started crying.  I don't know
10          where Ed or Anthony was at that point.
11          The next thing I remember is the taxi
12          making a U-turn and driving away.  Anthony
13          called 911.  Anthony also told the" -- it
14          looks like dispatcher -- "that the cab
15          driver took his gun away.  Anthony was
16          absolutely not intoxicated that night.  He
17          only had a couple of drinks.
18               "I have read the above statement
19          consisting of three pages, taken by
20          Detective Ciccotto here in the Second
21          Precinct, and I swear it is all true."
22               Signed by Sophia Cornia.  Sworn to
23          me, before Alfred Ciccotto, February 27,
24          2011.
25  BY MS. HILLER:
```

DISTLER

1    Q    Sergeant Distler, was that report

2    something you -- that statement something that you

3    took into consideration during your investigation?

4    A    Yes.

5    Q    There are comments in that statement that

6    you just read with respect to the taxicab and

7    revving its engine.

8    A    Yes.

9    Q    Was there anything else with respect to

10   that statement that you looked into with respect to

11   your investigation?

12   A    Yes.  I actually went to the taxi station

13   at some point and examined the car after it had been

14   repaired, to determine if the cab could rev its

15   engine; along with reviewing the Suffolk County

16   reconstruction -- Shooting Incident Reconstruction

17   Report, which stated that vehicle is a hybrid

18   vehicle, which the engine does not rev.  It cannot

19   rev like a normal engine because it's part electric,

20   part whatever else.  I'm not a car person, so.  And

21   I also went to the Toyota dealer in Hempstead and

22   had them demonstrate the car for me, a Prius.

23   Q    So did you come to any conclusion with

24   respect to whether or not the car could rev its

25   engine?

DISTLER

```
 1        A    The vehicle in question cannot rev its

 2   engine without a delay, a significant delay.  There

 3   is a significant delay —

 4              MR. BARKET:  I'm going to object to

 5              this, because it seems to be expert

 6              testimony well beyond this witness's

 7              expertise.

 8              MS. HILLER:  I can rephrase.

 9              MR. BARKET:  And it's actually just

10              inaccurate.  It's factually wrong, in

11              addition to being expert testimony that

12              shouldn't be allowed.  I mean, if you're

13              going to try to put in testimony that a

14              vehicle can or can't do something, you've

15              got to be able to — especially if you're

16              going to do something that's just provably

17              wrong, it ought to be done through

18              somebody with the qualifications to speak

19              to the car.

20   BY MS. HILLER:

21        Q    Sergeant Distler, did you review any

22   reports from Suffolk County with respect to the

23   vehicle?

24        A    Yes.

25              MS. HILLER:  Can I have the witness
```

DISTLER

| | |
|---|---|
| 1 | repass up the Suffolk County |
| 2 | reconstruction report? I'm not sure |
| 3 | what -- I think it's -- |
| 4 | THE WITNESS: 1? 2? |
| 5 | THE COURT REPORTER: 6. |
| 6 | BY MS. HILLER: |
| 7 | Q    With respect to that report, did you rely |
| 8 | on any of the information in that report with |
| 9 | respect to the capability of that car to rev its |
| 10 | engine? |
| 11 | A    Yes. |
| 12 | Q    What portions of that report would you be |
| 13 | referring to? |
| 14 | A    On sheet number 5, the results and |
| 15 | conclusions, was stated: "Special consideration |
| 16 | must be given to the Dobro Express taxi, as it not |
| 17 | your typical car.  This vehicle is a 2010 Toyota |
| 18 | Prius hybrid and operates in a manner totally |
| 19 | different from your normal passenger car, as it |
| 20 | operates under both electric and gasoline motors. |
| 21 | Having a key fob that contains an electric chip in |
| 22 | proximity of the vehicle, stepping on the brake |
| 23 | pedal and pushing a button on the dashboard starts |
| 24 | the car.  A series of lights on the dashboard |
| 25 | indicate that the car is started and now ready to |

114

DISTLER

1    drive.

2              "When the car is stopped, it is

3    totally quiet.  As the car moves forward, the

4    electric motor is responsible for the initial

5    acceleration.  Even when the car is pushed to full

6    acceleration, there is a very significant delay

7    before the gasoline engine starts, which slightly

8    increases the noise level.  By the time the gasoline

9    engine starts, the vehicle has already accelerated

10   and covered significant distance.  The vehicle very

11   easily shifts between forward, neutral, and

12   reverse."

13              MR. BARKET:  I have the same

14         objection.  There's no basis for the way

15         this conclusion is any better or based

16         upon any more expertise than the detective

17         sergeant has.

18              HEARING OFFICER STUDDERT:  Okay.  The

19         objection is overruled.

20   BY MS. HILLER:

21        Q    Detective Sergeant Distler, if you know,

22   do you know if the Deadly Force Response Team had

23   this report when they came to their conclusions on

24   February 27, 2011?

25        A    They did not.

115

DISTLER

```
1        Q    And can you explain for the record what
2    the purpose is of the Deadly Force Response Team?
3        A    It's to provide the police commissioner
4    with a preliminary report as to the circumstances
5    surrounding the incident.
6        Q    And does the Deadly Force Response Team
7    have the benefit of -- or did they, I should say,
8    have the benefit of all of the information that you
9    did?
10       A    No.
11       Q    Okay.  Regarding the two charges -- let me
12   go back.
13            Regarding the one charge for unlawful
14   conduct, with respect to the -- specifically the
15   criminal mischief, please explain for the record,
16   with respect to the items in evidence -- which with
17   respect to the items in evidence, if you need to be
18   refreshed, we can help you -- what you took into
19   consideration with respect to that -- what you
20   thought constituted criminal mischief.
21       A    I reviewed the Suffolk County Shooting
22   Incident Reconstruction Report; the photographs
23   provided to me by the Suffolk County District
24   Attorney's Office of the crime scene; the statements
25   of Police Officer DiLeonardo, Police Officer Bienz,
```

DISTLER

1   Eric Klug, Thomas Moroughan, Kristie Mondo, Sophia

2   Cornia, and Jillian Bienz.

3       Q   And specifically what led you to the

4   conclusion that this was -- this conduct constituted

5   criminal mischief?

6               MR. BARKET:  Objection.

7               HEARING OFFICER STUDDERT:  On what

8           grounds?

9               MR. BARKET:  Her opinion is

10          irrelevant.

11              HEARING OFFICER STUDDERT:  I'm going

12          to overrule.

13              You can answer the question.

14      A   The facts that I reviewed.  The crime

15  scene report showed that there was an -- Officer

16  DiLeonardo intentionally shot at the cab, causing

17  the damage.

18      Q   What about the other portions that

19  constituted the criminal mischief?

20      A   And he intentionally went over to the

21  driver's side window, smashed the window with the

22  butt of his gun.

23      Q   Do we know -- do we know what it cost to

24  fix the car?

25      A   I interviewed the owner of the cab

117

DISTLER

1    company, Mr. Boris Goldstein, in September of 2011,

2    and he stated to me that it was a couple of thousand

3    dollars to repair the vehicle.

4        Q    Okay.  After your investigation with

5    regard to this conduct that you felt constituted

6    criminal mischief, did you generate a report?

7        A    Yes.

8        Q    Okay.  What is that report?

9        A    It is a Violation of Department Rules and

10   Regulations, PDCN 209.

11              MS. HILLER:  Okay.  At this point I'm

12          going to be passing up a copy of the —

13          well, actually, I don't have multiples.

14          Sorry.  So I didn't mean to do that.  I'll

15          do one at a time.

16              I'm passing up PDCN 209 to be

17          marked — just looking to see if it

18          delineates — to be marked into evidence.

19          Counsel does have a copy of this.  I'm

20          providing him another copy.  It was

21          exchanged in discovery.

22              HEARING OFFICER STUDDERT:  Does this

23          relate to Count 3?

24              MS. HILLER:  This relates to Count 4,

25          I believe, the criminal mischief.  This

NORTH SHORE COURT REPORTERS   1-800-794-5342

118

DISTLER

1     relates to Count 4.

2          And I'd ask that -- is it -- what

3     number are we up to?

4          HEARING OFFICER STUDDERT:  Mark it as

5     17.

6          (PDCN 209 FOR COUNT 4 was marked as

7     Department's Exhibit 17 for evidence, as

8     of this date.)

9          MS. HILLER:  Can Department 17 be

10    passed to the witness.

11 BY MS. HILLER:

12    Q    Do you recognize what's been marked as

13 Department's 17 in evidence?

14    A    Yes.

15    Q    What is that?

16    A    This is a copy of the PDCN 209, Report of

17 Violation of Department Rules, which was served upon

18 Police Officer DiLeonardo.

19    Q    Can you please read into the record the

20 "to-wit" clause of that 209, please?

21    A    "While off duty, at time and place of

22 occurrence, P.O. DiLeonardo did violate New York

23 State Penal Law 145-10, criminal mischief in the

24 second degree, a D felony.  P.O. DiLeonardo did

25 intentionally damage the property of another person

119

DISTLER

1   when he fired five shots from his weapon at a 2010

2   Toyota Prius, New York Registration 13100TY,

3   damaging the windshield.  P.O. DiLeonardo then

4   smashed the driver's side window of the vehicle with

5   his weapon, causing damage in a total amount

6   exceeding $1,500.

7           "This charge is based upon

8   information and belief, the source of which includes

9   Suffolk County Shooting Incident Reconstruction

10  Report, Suffolk County Police Department crime scene

11  photographs, statements of Thomas Moroughan, Kristie

12  Mondo, Jillian Bienz, Sophia Cornia, Eric Klug, and

13  written statements of P.O. Bienz and P.O.

14  DiLeonardo."

15      Q    After the 209 is generated and served on a

16  member, what happened procedurally next?

17      A    The charge and the report supporting the

18  information, reporting the charge, gets submitted to

19  the DRB board, which is the Disciplinary Review

20  Board, consisting of five chiefs.  They review the

21  charges, and they make a determination if they will

22  remain as 209s or if they convert them into charges

23  and specs.

24      Q    And in this particular case what happened

25  as a result of the Disciplinary Review Board

120

DISTLER

1   meeting?

2       A    This charge was converted into charges and

3   specs, into PDCN 210.

4       Q    So there was a review by the board of your

5   initial findings.

6       A    Yes.

7       Q    Moving on to the second charge and spec,

8   which is out of order.  We did 4 first.  Now I'm

9   looking at Count 3 in the 210.

10              As a result of your investigation,

11  was Office DiLeonardo -- withdrawn.  I'm sorry.  I

12  lost my train of thought.

13              As a result of your investigation,

14  did you make any other conclusions with respect to

15  P.O. DiLeonardo?

16      A    Yes.

17      Q    And with respect to the rules and regs,

18  what did you conclude?

19      A    That he violated Article 5, Rule 2, Sub 1,

20  unlawful conduct, in that his actions constituted

21  what could have been charged as an assault under the

22  New York State Penal Law.

23      Q    And with respect to that, what did you

24  consider in your investigation with respect to that

25  charge?

DISTLER

1          A     The Suffolk County Shooting Incident

2    Reconstruction Report; the Suffolk County

3    photographs; the statements of P.O. DiLeonardo, P.O.

4    Bienz, Thomas Moroughan, Kristie Mondo, Eric Klug ——

5    not Eric Klug in that one —— Jillian Bienz, Sophia

6    Cornia, and the hospital records of Thomas

7    Moroughan.

8          Q     With respect to the statements, are all

9    those statements in evidence already?

10         A     Yes.

11         Q     And specifically with respect to the

12   statements that are in evidence, what did you

13   consider with respect to your feelings on whether or

14   not he violated the penal law, assault second?

15         A     There were statements from Officer

16   DiLeonardo which stated that he approached the car,

17   he smashed the window with the butt of his gun.  And

18   also the statements of Thomas Moroughan where he

19   stated that he smashed the window with the butt of

20   his gun, striking him in the nose.  His 50 —— Thomas

21   Moroughan's 50-H hearings in Suffolk County and

22   Nassau County, he testifies that he was struck

23   numerous times in the face by Officer DiLeonardo

24   with the butt of his gun and his fists.  And Kristie

25   Mondo also made a statement that she observed her

122

DISTLER

1   boyfriend struggling with Office DiLeonardo at the

2   side of the car.

3      Q    Did the Disciplinary Review Board -- I'm

4   sorry -- did the Deadly Force Response Team have the

5   transcript of the 50-H hearings before they made

6   their determination?

7      A    No.

8      Q    And with respect to -- oh.  Sorry.

9           MS. HILLER:  At this time I'm passing

10        up to the hearing officer portions of the

11        Huntington Hospital record with respect to

12        Thomas Moroughan, dated 2/27 of '11.

13           MR. BARKET:  Sorry to interrupt.  Are

14        you going to do the 209 for Count 3?  Just

15        'cause I already wrote it down.

16           MS. HILLER:  No, not yet.  I'll get

17        there, though, tomorrow.  Do you want me

18        to, Bruce?

19           MR. BARKET:  Yeah.  I already wrote

20        it down.  That's okay.

21           MS. HILLER:  Yeah, sorry.

22           I'm passing up the -- I'm passing up

23        four pages of the Huntington Hospital

24        record.  I'm passing a copy over to

25        counsel.  I believe counsel at least has

DISTLER

1       the first two pages and should have the

2       remainder of that, as well, in the

3       discovery package.

4           HEARING OFFICER STODDERT:  Please

5       mark this.

6           (Huntington Hospital Record was

7       marked as Department's Exhibit 18 for

8       evidence, as of this date.)

9           MS. HILLER:  I would ask that what's

10      been marked as Department 18 be passed

11      over to Sergeant Distler.

12  BY MS. HILLER:

13      Q    Sergeant Distler, do you recognize that

14  document?

15      A    Yes.

16      Q    And what is that document?

17      A    It is a copy of the medical records of

18  Mr. Thomas Moroughan that I reviewed in this case.

19      Q    As a result of your review of those

20  records, did you make any determinations with

21  respect to Mr. Moroughan?

22      A    Yes.

23      Q    And what would that be?

24      A    That he had a fracture to his nasal bone.

25      Q    Is that indicated in the record itself?

124

DISTLER

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And can you read from the record -- |
| 3 | A | Yes. |
| 4 | Q | -- the portions of that document that |

5  indicated that to you?

6       A    Yes.  On page 1 of the report, of Exhibit

7  18, at bottom:  "CAT scan of the face.  Left nasal

8  bone fracture, medial displacement of fracture

9  fragments, and left soft tissue swelling."

10              On page 3 of Exhibit 18, the

11  impression states that there was a left-sided nasal

12  bone fracture with mild displacement of the fracture

13  fragments.  There is facial soft tissue swelling,

14  most prominent on the left.

15       Q    Based on your review of that record and

16  based on the -- so far you said the statements of

17  Thomas Moroughan plus the other witnesses, what made

18  you conclude that P.O. DiLeonardo did in fact break

19  Tom Moroughan's nose?

20       A    The -- hospital reports.  The findings in

21  the hospital reports.

22       Q    What about his actions led you to believe

23  that?

24       A    His statement.  The statement of the

25  witnesses.  The statement of Mr. Moroughan.

125

DISTLER

1      Q      Specifically, though?

2      A      Specifically that he -- that he struck him

3   in the face with the butt of his gun and punched him

4   numerous times in his face.

5      Q      Was there something in the Suffolk County

6   Reconstruction Incident Report that you also

7   reviewed with respect to this charge?

8      A      Yes.

9      Q      Do have the report?

10     A      Yes.

11     Q      And that's Department 6.

12     A      On Sheet number 5 of 6, in the results and

13  conclusions portion, it states that the --

14  DiLeonardo approaches the driver's door, then

15  shatters the driver's window with his revolver.  The

16  taxi backed up, now in reverse, begins to back up as

17  a struggle ensues to extract Moroughan from the

18  vehicle.

19     Q      And as a result of your investigation with

20  respect to the conduct that you felt constituted

21  assault, did you generate any reports?

22     A      Yes.

23     Q      And what did you generate?

24     A      PDCN Form 209.

25             MS. HILLER:   I'm going to pass a copy

126

DISTLER

1       of that over to counsel, which also again

2       was in the discovery package.  I am

3       passing a copy up to the hearing officer

4       and ask that it be marked into evidence as

5       Department 19.

6               HEARING OFFICER STUDDERT:  Accepted

7       into evidence.  Mark it 19, please.

8               (PDCN Form 209 was marked as

9       Department's Exhibit 19 for evidence, as

10       of this date.)

11               MS. HILLER:  And I'd ask that

12       Department 19 be shown to the witness.

13   BY MS. HILLER:

14       Q    Sergeant, do you recognize what's been

15   passed over to you?

16       A    Yes.

17       Q    And what is that?

18       A    It's a copy of the PDCN 209 that was

19   served upon P.O. DiLeonardo.

20       Q    Can you please read the to-wit into the

21   record for us from that form?

22       A    Yes.  "While off duty, at the time and

23   place of occurrence, P.O. DiLeonardo did violate New

24   York State Penal Law 120.00, Sub 1, assault in the

25   third degree, a misdemeanor.  P.O. DiLeonardo did

DISTLER

1    intentionally strike Mr. Moroughan, who was

2    operating a 2010 Toyota Prius, New York Reg.

3    13100TY, with his fist numerous times, causing

4    contusions to Mr. Moroughan's head.

5            "This charge is based upon

6    information and belief, the source of which includes

7    Suffolk County Shooting Incident Reconstruction

8    Report; Suffolk County Police Department crime scene

9    photographs; medical records of Mr. Moroughan;

10   statements of Thomas Moroughan, Kristie Mondo,

11   Jillian Bienz, Sophia Cornia, Eric Klug; and written

12   statements of P.O. Bienz and P.O. DiLeonardo.

13       Q    Did that 209 go to the department -- the

14   Disciplinary Review Board?

15       A    Yes.

16       Q    And as a result of the review by the

17   Disciplinary Review Board, what happened with

18   respect to that charge?

19       A    It was converted into a charge, a PDCN 210

20   charge and spec.

21       Q    If you know, do you know why the 209 is

22   classified as a misdemeanor and the 210 is a D

23   felony?  If you know.

24       A    No, I do not know.

25       Q    Okay.  As a result of your investigation,

DISTLER

1    did you determine that P.O. DiLeonardo violated any

2    additional charges of the rules and regs?

3        A    Yes.

4        Q    Specifically what other charge did you

5    determine that he was in violation of?

6        A    Article 8, Rule 12, Sub 2, the proper

7    safeguarding of equipment.

8        Q    And what did you conclude with respect to

9    P.O. DiLeonardo and his equipment?

10       A    I concluded that as a result --

11            MR. BARKET:  Sorry.  Objection to her

12            conclusion.  Same objection I've been

13            making.

14            HEARING OFFICER STUDDERT:  Overruled.

15       A    I concluded that Officer DiLeonardo lost

16   control of his weapon while he was striking Mr.

17   Moroughan in the head, ultimately losing control of

18   it and dropping it in the rear seat, passenger seat.

19       Q    And what was that -- did you come to that

20   conclusion as a result of your investigation?

21       A    Yes.

22       Q    And what did your investigation entail

23   with respect to that particular charge?

24       A    A review of the Suffolk County Shooting

25   Incident Reconstruction Report, and the photographs

129

DISTLER

1    of — provided to me by the Suffolk County District

2    Attorney's Office, and the statements of Police

3    Officer Bienz and Police Officer DiLeonardo.

4        Q    And those are the statements that are in

5    evidence currently?

6        A    Yes.

7        Q    With respect to those statements, what

8    specifically in the statements led you to believe

9    that he violated this rule and reg?

10       A    I need to review.

11       Q    Which one do you need to look at?

12       A    Officer Bienz's first (perusing).

13            In paragraph 9 of Police Officer

14   Bienz's statement, he speaks about that — this was

15   when he sees Police Officer DiLeonardo at the side

16   of the cab.  He states that he observes him trying

17   to pull Mr. Moroughan out of the vehicle and that he

18   had his gun in his right hand and he was grabbing

19   Mr. Moroughan with his right hand in the upper

20   torso.  At this point -- then later on in the

21   statement Police Officer Bienz states that while

22   he's at Huntington Hospital, Anthony DiLeonardo came

23   to his room in the hospital and spoke to him

24   briefly.  He told him that the cab driver had tried

25   to run him over and that he had lost his gun in the

130

DISTLER

1   cab.

2      Q     Did you take that statement from Police

3   Officer Bienz?

4      A     Yes.

5      Q     With respect to Anthony DiLeonardo's

6   statement, was there anything that you also used to

7   base this count on?

8      A     I can review it (perusing).

9            Officer DiLeonardo states in his

10  statement that he had a struggle with Mr. Moroughan,

11  and that Mr. Moroughan ripped the gun out of his

12  hand, and he did not know where it went.

13     Q     Did Anthony DiLeonardo, with respect to

14  this statement, mention to you what else he did

15  while he had that revolver in his hand?

16     A     Yes.

17     Q     What else did he do with the revolver in

18  his hand?

19     A     He smashed the driver's side window with

20  the butt of his weapon.  And as the struggle ensued,

21  he was holding the gun with one hand, and he stated

22  that Mr. Moroughan was punching him about the head

23  with his other hand.

24     Q     As a police officer, are you trained to

25  effectuate an arrest by breaking a window with your

DISTLER

1    revolver?

2         A    No.

3         Q    With respect to -- okay.  I think I'm done

4    with those exhibits.

5                    With respect to the Suffolk County

6    Shooting Incident Reconstruction Report --

7         A    Yes.

8         Q    -- was there anything in that report that

9    you used in your investigation with respect to this

10   charge?

11        A    Yes.

12        Q    Okay.  And what was that?

13        A    In the results and conclusions portion,

14   the report stated that during the struggle

15   DiLeonardo will lose possession of his revolver

16   within the taxi, where it will eventually be covered

17   on the left rear passenger floor area.

18        Q    And that's on what page of that report?

19        A    It's sheet number 6 of 6.

20        Q    Was there anything else that you reviewed

21   with respect to your investigation on this count?

22        A    Crime scene photographs.

23        Q    I am going to pass up a photo.  At the top

24   the photo has the number 956 on it.  I'm passing up

25   to the hearing officer and ask that it be marked

132

DISTLER

```
 1    into evidence, and then passing a copy over to

 2    counsel.

 3                 HEARING OFFICER STUDDERT:  Accept

 4            that into evidence.  Exhibit 20.

 5                 (Copy of Photograph #956 was marked

 6            as Department's Exhibit 20 for evidence,

 7            as of this date.)

 8        Q    Okay, Detective Sergeant.  Do you

 9    recognize what's been passed over to you and marked

10    as Department No. 20?

11        A    Yes.

12        Q    And what is it that you have in front of

13    you?

14        A    It is a copy of the crime scene photograph

15    depicting a .38-caliber revolver on the rear

16    passenger floor area of the Toyota Prius.

17        Q    And have you seen the photo before?

18        A    Yes.

19        Q    And where did you get that photo?

20        A    From Special Investigator Polumbo from the

21    Suffolk County District Attorney's Office.

22        Q    And do you know whose weapon that is, as

23    we sit here today?

24        A    Yes.  It's Police Officer DiLeonardo's.

25        Q    Did you reach any conclusions after your
```

133

DISTLER

1    investigation with respect to how that weapon got to

2    where it is in that photo?

3         A    Yes.

4         Q    And what was the that?

5         A    I — my conclusion was that during the

6    struggle and the assault where Police Officer

7    DiLeonardo struck Mr. Moroughan with the butt of his

8    weapon, he lost control of his weapon, dropping it

9    in the rear compartment of the taxicab.

10        Q    And what is that based on, that

11   information that you just put into the record?

12        A    The crime scene — the Suffolk County

13   Shooting Reconstruction — Shooting Incident

14   Reconstruction Report; the crime scene photographs;

15   statements of Officer Bienz and Officer DiLeonardo.

16        Q    And all of those things are in evidence,

17   that you relied on?

18        A    Yes.

19             MS. BILLER:  Sorry.  At this time I'm

20             going move in evidence Police Department

21             PDCN 209 with respect to this charge, and

22             ask that it be marked into evidence and

23             returned to the witness.  I am also

24             providing counsel with a copy, which again

25             was in the discovery package already

134

DISTLER

1          exchanged.

2                    HEARING OFFICER STUDDERT:   Accept

3          that into evidence.  Exhibit 21.

4                    (PDCN FORM 209 was marked as

5          Department's Exhibit 21 for

6          identification, as of this date.)

7      Q    Sergeant Distler, do you recognize what's

8  been passed up to you as Department 21?

9      A    Yes.

10     Q    Okay.  What is that document?

11     A    PDCN Form 209, which was served upon

12 Officer Anthony DiLeonardo.

13     Q    And can you please read the "to-wit"

14 statement in that document as well?

15     A    "P.O. DiLeonardo, while off duty at time

16 and place of occurrence, did fail to safeguard his

17 .38-caliber Smith & Wesson revolver when he dropped

18 it inside of a 2010 Toyota Prius, New York Reg.

19 13100TY, after engaging in a road rage incident."

20     Q    With respect to that PDCN 209, did that

21 charge go before the Disciplinary Review Board?

22     A    Yes.

23     Q    And as a result of the Disciplinary Review

24 Board, what happened with respect to that charge?

25     A    It was converted into a PDCN Form 210.

135

DISTLER

1      Q     And did that charge become Charge 11 in

2    the 210, to the best of your knowledge?

3      A     To the best of my knowledge.  I would have

4    to look at the --

5                MS. HILLER:  At this time I'm going

6                have the 210 related to this incident,

7                Case number 8118, passed up to the hearing

8                officer and ask that it be marked for --

9                marked into evidence.

10               HEARING OFFICER STUDDERT:  Accept

11               that into evidence.  Exhibit 22.

12               (Copy of  the 210 was marked as

13               Department's Exhibit 22 for evidence, as

14               of this date.)

15               MR. BARKET:  Can I see a copy?

16               MS. HILLER:  Counsel has a copy of

17               it.  I don't have an extra one.  It is in

18               the packet that's been turned over this

19               morning.

20   BY MS. HILLER:

21     Q     Sergeant Distler, so you have in your hand

22   what's been marked as Department 22.  With respect

23   to the 209 that we just discussed with the "to-wit"

24   that addressed the failure to safeguard the weapon,

25   did that charge make it into the 210?

DISTLER

1    A   Yes.

2    Q   And what charge is that?

3    A   Number 11.

4    Q   With respect to the two other 209s that

5   are in evidence, that have been passed up to you,

6   what charges in the 210 do they reflect?

7    A   Charge number 4 is the criminal mischief,

8   and Charge number 3 is the assault.

9    Q   Thank you.  After your investigation did

10   you reach any conclusions with respect to the

11   actions of Anthony DiLeonardo as far as his use of

12   deadly force under the departmental rules and regs?

13    A   Yes.

14    Q   And what was that?

15    A   I determined that Officer DiLeonardo's

16   actions were reckless and unjustifiable under the

17   Article 35.  His actions constituted reckless

18   behavior when he shot at a cab with a passenger

19   inside and other bystanders in the area.

20       MR. BARKET:  I'm going to object.

21       Her conclusions and opinions are

22       irrelevant.

23       INSPECTOR MICHAEL STUDDERT:  Okay.

24       Overruled.  I'll give it the weight it's

25       due.

137

DISTLER

1    MS. HILLER:  I just have to think one

2    second.

3    So at this time I am done with my

4    direct examination of Sergeant Distler.

5    For the record, the Department feels that

6    we have given the hearing officer

7    substantial evidence with respect to the

8    three counts before the hearing officer,

9    and at this time we would move to amend

10   the charges and specs under Case 8118 to

11   reflect only Counts 3, 4, and 11.

12   INSPECTOR MICHAEL STUDDERT:  Okay.

13   What -- are we going to ask some questions

14   here now?

15   MR. BARKET:  Do I get to?

16   HEARING OFFICER STUDDERT:  Yes.

17   MR. BARKET:  Excellent.

18   HEARING OFFICER STUDDERT:  Do you

19   want to take a break first or --

20   MR. BARKET:  No.  I can -- we'll be

21   fine.  I can get started.

22   CROSS-EXAMINATION

23   BY MR. BARKET:

24

25

138

DISTLER

1      Q    Good afternoon.  Let me start with Count

2  11, if I can.  The count reads:  "Did not properly

3  safeguard his uniform and equipment and other

4  department property issued for or assigned for his

5  use, in that" — do you see that?  I'm just curious.

6  What does -- what does that refer to?  I mean, would

7  that be -- would that be anything?  Any property?

8  Like if he lost his hat?

9      A    Assigned property.  Hat would be his

10  uniform, would be considered uniform?

11            MS. HILLER:  Objection to form.  Can

12         you ask specifically what you mean?

13            MR. BARKET:  I thought I did.

14  BY MR. BARKET:

15      Q    In other words, is it any property that he

16  possesses or -- at the time of the incident, or some

17  it have to be some property that was issued by the

18  Department?

19      A    It's property that — property and

20  equipment that is assigned to him or that he owns.

21  For instance, his .38 revolver off duty is assigned

22  to him as a result of him being a police officer.

23  If he were not a police officer, he would not be

24  allowed to have that.

25      Q    Why not?

139

DISTLER

1        A      Because he would need a permit.  By the

2    nature of his employment he's entitled to have it.

3        Q      So that -- I guess that's what I'm curious

4    about.  Is it any property that he owns or just the

5    property the police department issues to him?

6        A      It is police department property or

7    property that he would have as a result of his

8    employment as a police officer.

9        Q      What would that -- what would that

10   include?

11       A      An off duty weapon that he would not have

12   had it not been for his employment.

13       Q      How do we know he wouldn't?  As a police

14   officer, he has to have a weapon; right?  He gets --

15       A      Yes.

16       Q      Is there a weapon that's issued to police

17   officers of his rank?

18       A      Yes.

19       Q      Do they get to carry anything they want,

20   or is there a specific weapon that's issued to them?

21       A      There's a specific weapon that's issued.

22       Q      What kind of weapon is that?

23       A      It's a .40 caliber.

24       Q      40-caliber what?

25       A      What brand?

DISTLER

```
 1        Q     No.   What -- well, is it an automatic or a

 2   revolver?

 3        A     Automatic.

 4        Q     And those are issued to every police

 5   officer with Officer DiLeonardo's assignments and

 6   rank, by the Department?

 7        A     Yes.

 8        Q     And then the officer, the individual

 9   officers, they have the ability and the right,

10   actually, to purchase other weapons if they so

11   choose; yes?

12        A     Yes.

13        Q     So they you could purchase rifles, other

14   pistols, other firearms.  Is that right?

15        A     Yes.

16        Q     And so the .38-caliber Smith & Wesson,

17   that wasn't something that the Department required

18   him to own, was it?

19        A     No.

20        Q     It wasn't something that was issued to him

21   as part of his position as a police officer, was it?

22        A     Not issued to him.

23        Q     He chose to purchase the weapon, I

24   suppose, privately?

25        A     I suppose.
```

141

DISTLER

```
 1        Q    And his purchase of the weapon was a

 2    voluntary act on his part.  Is that right?

 3        A    I suppose it would be, yes.

 4        Q    And it was — that decision is unrelated

 5    to his function as a police officer.

 6        A    Again, I think I stated earlier he would

 7    not be able to have that weapon without a permit,

 8    and by the nature of his employment as a police

 9    officer, he is entitled to carry the weapon.

10        Q    Well, he is entitled to carry — he's

11    entitled to purchase the weapon and carry it, by the

12    constitution; right?  He has a right to bear arms.

13    He just would have to apply for a permit.

14        A    Correct.

15        Q    Okay.

16        A    In New York State.

17        Q    In New York State.  So it's not issued to

18    him through the Department.  He just is able to

19    carry it legally because he's a police officer.

20        A    Correct.

21            MR. SANTIAGO:  Actually, may I

22            interject?  You're not able to charge him

23            criminally for his possession of the

24            handgun.  He's exempt.  Provision 265 —

25            MR. BARKET:  Okay.
```

142

DISTLER

BY MR. BARKET:

2      Q     Okay.   So the property wasn't issued or

3   assigned for his use by the Department, was it?

4      A     It was not issued by the Department.

5      Q     Or assigned to him.

6      A     Not assigned to him.

7      Q     Let me roll back to kind of the beginning

8   of this.  Were you -- I guess you were assigned to

9   this investigation?

10     A     Yes.

11     Q     How did the complaint --

12            HEARING OFFICER STUDDERT:  Sergeant,

13         can you just direct your responses to me

14         so I can --

15            THE WITNESS:  Sure.

16   BY MR. BARKET:

17     Q     How did the complaint come in to the

18   Internal Affairs -- is it Unit?

19     A     Yes.

20     Q     How did it come in to the Internal Affairs

21   Unit?

22     A     On June 6th we were directed by Acting

23   Police Commissioner Krumpter to generate an

24   investigation into the incident involving the

25   shooting with Police Officer DiLeonardo.

143

DISTLER

```
 1        Q    Okay.  Is that the same individual who is

 2   now the police commissioner or acting police

 3   commissioner?

 4        A    Yes.

 5        Q    Was he the acting commissioner then or the

 6   first deputy?

 7        A    He was the acting police commissioner.

 8        Q    And did he give you any — any specific

 9   orders with respect to that?

10        A    No.

11        Q    Was it a written assignment?

12        A    No.  It was an oral assignment that was

13   given to the deputy inspector of our unit at the

14   time, which was Edward Dordon.  And we generate what

15   we call a blue team complaint so it gets put into

16   the computer.

17        Q    Okay.  Anybody working this with you?

18        A    Yes.

19        Q    Who was that?

20        A    Multiple — multiple people in my unit,

21   but specifically Detective Lieutenant Ralph Hoffman

22   and myself were assigned the investigation.

23        Q    Who was in charge of the investigation?

24        A    Ultimately, Inspector Neil Deloggi, the

25   commanding officer.
```

144

DISTLER

1    Q    You indicated you'd been with IAU now for
2  three and a half years.  Is that right?
3    A    Yes.
4    Q    When did you start there?
5    A    I started in September or, I believe,
6  October of 2010.
7    Q    Okay.  And this incident took place in
8  February of 2011?
9    A    Yes.
10   Q    So you had been at that particular
11 assignment for about four months at the time that
12 the incident took place?
13   A    A little bit more, because, again, I
14 didn't receive the investigation until June; so
15 about eight months.
16   Q    All right.  And then once you began the
17 investigation, did you interview witnesses
18 personally?
19   A    Yes.
20   Q    By the way, one of the witnesses that you
21 interviewed was Officer Bienz.  Is that right?
22   A    Yes.
23   Q    What time did that interview take place?
24   A    1900 hours, in or abouts.
25   Q    What time did it end?

145

DISTLER

```
1      A    Officer Bienz.  I want to say it was about
2  2:00 a.m.

3      Q    What is your normal shift?

4      A    My normal shift?

5           MS. HILLER:  Objection.

6           INSPECTOR MICHAEL STUDDERT:  What

7      grounds?

8           MS. HILLER:  It's completely

9      irrelevant to the charges that are before

10     the officer -- Jo-Ann's normal hours.

11          MR. BARKET:  I think that -- well,

12     can I be heard outside of the witness?  I

13     think it's actually directly relevant.

14          (Witness leaves the hearing room.)

15          MR. BARKET:  In this particular case,

16     I at least know for my client, because we

17     represented him during the process, the

18     interview was ordered to take place at

19     night over the course of literally

20     overnight.  So from 5:00 or 6:00 in the

21     evening until 5:00 or 6:00 in the morning.

22     So Officer DiLeonardo was up for an

23     extended period of time, as well as,

24     frankly, the lawyer in my office who

25     accompanied him to the interview.
```

146

DISTLER

1      I think it's relevant because it goes

2   to literally the voluntariness of the

3   statements that are done.  It seems to be

4   the practice in Internal Affairs to

5   specifically interview the officers

6   they've targeted for discipline in the

7   middle of the night to deprive them of

8   sleep and, in Officer DiLeonardo's case,

9   food, to force them to give statements and

10  to, if you will, alter their account in

11  order to end the interviewing process.

12      And I intend to ask the internal

13  affairs officer whether or not she

14  interviewed other witnesses in a similar

15  fashion.  If this is just part of "I was

16  assigned, you know, I was working nights

17  that night so I did it 5:00 to 2:00 and

18  that's when he came in," that's one thing.

19  If what she did is specifically try to

20  bring people in on overnight in order

21  to -- officers in on overnight to do this,

22  I think that's relevant.

23      MS. HILLER:  With respect to the

24  voluntariness of the statements, we don't

25  have the -- we don't have the burden of

**DISTLER**

1  proving voluntariness of any statements

2  that were made to IAU for current members.

3      MR. BARKET:  You have the burden of

4  proving that they're not coercive.  There

5  is no -- there's no adjudication or

6  adjudicative board, in this country,

7  anyway, that would permit the use of

8  involuntary statements, statements that

9  are the product of classic coercion.  And

10  keeping somebody up extended hours,

11  depriving them of food, when you do that

12  on purpose certainly rings of classic

13  coercion.

14      MS. HILLER:  And I would object to

15  interjecting voluntariness into our

16  standard of proof at this hearing.

17      HEARING OFFICER STUDDERT:  Okay.  I

18  am just going to take a few minutes to

19  make a decision on this, and we'll

20  reconvene in about five minutes.  Okay?

21      (Whereupon, a brief recess was

22  taken.)

23      INSPECTOR MICHAEL STUDDERT:  Okay.

24  Back on the record.  I'm going to allow

25  that -- you to question her regarding her

DISTLER

```
1    tour of duty.

2          MR. BARKET:  Okay.

3          HEARING OFFICER STUDDERT:  Just as

4    we're starting, we want to agree that

5    we'll end around 4:00 so I don't interrupt

6    your questioning.

7          MR. BARKET:  I scheduled something

8    for 4:00 in my office, so figuring 3:30

9    was going to be it, but I'll find a good

10   spot to stop, if that's okay.

11         HEARING OFFICER STUDDERT:  That is

12   fine.

13         MS. HILLER:  And then presumably

14   we'll start back at 10:00 tomorrow?

15         HEARING OFFICER STUDDERT:  10:00

16   tomorrow.

17         MS. HILLER:  I'll let you address

18   that.

19   BY MR. BARKET:

20      Q    So, what is your normal tour of duty?

21      A    We work two shifts —

22         HEARING OFFICER STUDDERT:  Hold on.

23   Just — you're still under oath, Sergeant.

24         THE WITNESS:  Yes.  Okay.

25         We work two shifts, either 8:00 a.m.
```

DISTLER

```
 1            to 6:00 p.m. or 12:00 noon to 10:00 p.m.
 2   BY MR. BARKET:
 3       Q    Okay.  What shift were you working on the
 4   day you interviewed Officer Bienz?
 5       A    I believe I was working the 12:00 noon to
 6   the 10:00 p.m. shift.
 7       Q    Okay.  How about when you interviewed
 8   Officer DiLeonardo?
 9       A    I believe I was working the 12:00 noon to
10   10:00 p.m. shift.
11       Q    With respect to the witnesses that you
12   interviewed, you prepared a report of the entire
13   internal investigation; is that right?
14       A    I'm not certain what you're asking me.
15       Q    So you interviewed a number of witnesses,
16   more than just the witnesses that were on detail
17   today; is that right?
18       A    Yes.
19       Q    And you prepared a report based on that;
20   yes?
21       A    Yes.
22       Q    Several hundred pages?
23       A    Yes.
24       Q    Now, you indicated that you took into
25   account a 50-H testimony from Mr. Moroughan; is that
```

150

DISTLER

```
 1    right?

 2        A    Correct.

 3        Q    What is a 50-H — what is 50-H testimony?

 4        A    It's a deposition.

 5        Q    For what purpose?

 6             MS. HILLER:  Objection.

 7             HEARING OFFICER STUDDERT:  On what

 8        ground?

 9             MS. HILLER:  I'm not sure that the —

10        well, objection as to Sergeant Distler

11        explaining what a 50-H hearing is for

12        purposes of this particular hearing.  She

13        did testify that she reviewed testimony of

14        Thomas Moroughan.  My position is that

15        would be enough.  She reviewed sworn

16        testimony.  She doesn't have to explain

17        under the circumstances of which that

18        testimony was taken.

19             HEARING OFFICER STUDDERT:  I'm going

20        to allow it.

21        A    To the best of my knowledge, a 50-H

22   hearing is a deposition that an attorney requests as

23   part of his preparation for his case.

24        Q    As part of your responsibilities here, you

25   had to make some credibility evaluations, didn't
```

NORTH SHORE COURT REPORTERS    1-800-794-5342

151

DISTLER

1    you?

2        A    Yes.

3        Q    And is that part of what you did; yes?

4        A    Yes.

5        Q    So, it's not just that -- you didn't just

6    accept what Mr. Moroughan had to say.  You made some

7    assessment of his account; yes?

8        A    Yes.

9        Q    By the way, did you ask Mr. Moroughan to

10   be interviewed by you?

11       A    Yes.

12       Q    And did you end up speaking to him?

13       A    No.

14       Q    Why not?

15       A    His attorney would not allow him to be

16   interviewed.

17       Q    Did you make one request?  More than one

18   request?

19       A    More than one request.

20       Q    And they repeatedly refused?

21       A    Yes.

22       Q    Mr. Moroughan did, however, speak to — I

23   guess, in this deposition?  Is that right?

24       A    Yes.

25       Q    Were you aware that Mr. Moroughan sued

152

DISTLER

1    Nassau County?

2         A    Yes.

3         Q    Were you aware that he -- prior to suing,

4    he filed what's called a notice of claim?

5         A    Yes.

6         Q    Are you aware that when such a notice is

7    filed, the County has the right to examine the

8    person who's intending to sue the County, under

9    oath?

10        A    I'm not sure if I knew that as a fact.

11        Q    Well, would it matter to you at all if you

12   knew that Thomas Moroughan's testimony was part of a

13   lawsuit that he had commenced in an effort for him

14   to acquire several million dollars from Nassau and

15   or Suffolk County?

16        A    Would it matter to me?

17        Q    Sure.

18        A    Sworn testimony, I would —

19        Q    Well, you wouldn't take into account the

20   motive and the bias the individual would have in

21   giving testimony?

22        A    Yes, I would.

23        Q    Okay.  So in this instance, if Mr.

24   Moroughan had brought a lawsuit against the County

25   and he was seeking to recover literally several

153

DISTLER

1  million dollars, and a required part of that lawsuit

2  was that he give testimony under oath in a

3  deposition, would those facts influence -- or would

4  you take into account those facts when assessing his

5  credibility?

6           MS. BILLER:  Objection to form.  I'm

7       not really sure what your question is.

8       You lost me after two sentences.

9  BY MR. BARKET:

10      Q    Well, it may be more convolutedly stated,

11 but the fact that the guy is trying to get million

12 dollars out of the County, does that affect your

13 view of his credibility?

14      A    There were multiple statements made by

15 Mr. Moroughan.  Some were prior to his lawsuit.

16      Q    I'm not asking you about the prior ones.

17 I'm asking you about the 50-H testimony that you --

18      A    I took everything into consideration.

19      Q    Well, you didn't take that into

20 consideration, because you didn't even know that

21 that's what the testimony was from.  Is that right?

22      A    I'm not sure what you're saying.

23      Q    In other words, the 50-H testimony that

24 you've said you relied upon and you read into the

25 record, until you and I spoke you didn't know that

DISTLER

1   that was part of his lawsuit where he was trying to

2   get 50 -- or several million dollars from the County

3   of Nassau and the County of Suffolk.

4      A   I knew that there was a lawsuit. I knew

5   that he was -- he was deposed in a statement. I did

6   not know that they were connected, that he was

7   obligated to testify at the 50-H hearing as a result

8   of that, but I did take everything into

9   consideration. Absolutely.

10      Q   Well, did it raise any concerns on your

11   part that Mr. Moroughan was willing to speak at a

12   deposition where at stake was, you know, millions of

13   dollars in his pocket or not, but refused to speak

14   to you?

15      A   No.

16      Q   That doesn't matter to you at all?

17      A   No.

18      Q   Have you ever known anybody to lie under

19   oath?

20           MS. HILLER: Objection. I don't see

21         how this goes to the charges and specs

22         which are before this court right now with

23         respect to Anthony DiLeonardo.

24           MR. BARKET: I have to -- if I can't

25         have the witness --

155

DISTLER

1          HEARING OFFICER STUDDERT:  Sustained.

2      I've heard enough regarding Mr.

3      Moroughan's testimony and whether -- his

4      credibility, where I can, you know --

5          MR. BARKET:  Inspector, I would

6      respectfully suggest that if we're going

7      to allow the witness to offer her opinion,

8      especially over my objection, and we're

9      going to allow the witness to offer the

10      opinion based upon a portion of sworn

11      testimony, I -- just as a matter of

12      fundamental fairness I ought to be able to

13      inquire about the veracity of the

14      underlying statements.

15          HEARING OFFICER STUDDERT:  You've

16      made your point, and it's on the record,

17      so let's move on to the next question.

18  BY MR. BARKET:

19      Q    Mr. Moroughan, in another statement to

20  police officers the night of the incident, confessed

21  to trying to run over Officer DiLeonardo.  Is that

22  right?

23      A    I don't know if I would use the word

24  "confessed."  He made some statements.

25      Q    Well, let's take a look at what he said,

156

DISTLER

1   precisely.

2                    HEARING OFFICER STUDDERT:  Is there

3        an exhibit number you have?

4            MR. BARKET:  Yeah, I do.  Just give

5        me one second, Judge.  Sorry.

6            Should I call you Judge or Inspector?

7            HEARING OFFICER STUDDERT:  Inspector

8        is fine.  Thank you.

9            MR. BARKET:  It's 10.

10           Sorry.  I might have slipped and

11           called you Judge.  Habit.

12  BY MR. BARKET:

13      Q    So, 10 is the statement that was taken by,

14  I guess, two Suffolk County detectives; is that

15  right?

16      A    Yes.

17      Q    And I say "confession" because it's in the

18  form of a statement that's given to individuals who

19  are under arrest.  The rights are at the beginning;

20  correct?

21      A    Correct.

22      Q    So it indicates that he was given the

23  right to remain silent and so forth; yes?

24      A    Correct.

25      Q    In this he says, among other things, that

NORTH SHORE COURT REPORTERS   1-800-794-5342

157

DISTLER

 1    he pulled up next to — excuse me.  On a quote from

 2    page 2:  "I drove west on 19th Street, then north on

 3    Oakwood Road.  I saw the two cars parked on the side

 4    of Oakwood Drive at Tippen.  I rolled down my

 5    passenger window and pulled next to the white

 6    Infiniti.  I yelled to the guy who was in his

 7    mid-twenties and white, 'Why don't you learn to

 8    drive'" — and I'm quoting him, of course — "you

 9    fucking asshole."

10              That's part of what he told the

11    police on, I guess, the day of the incident,

12    February 27, 2011?  Is that right?

13        A    Correct.

14        Q    And so by his own words he indicated that

15    the — Officer DiLeonardo and Officer Bienz weren't

16    doing anything to him at that point in time; were

17    they?

18        A    Correct.

19        Q    That he decided to initiate some

20    confrontation in this case, and that with Officer

21    DiLeonardo; right?

22        A    Absolutely.

23        Q    And he was driving in a car; yes?

24        A    Mr. Moroughan?

25        Q    Yes.

158

DISTLER

1       A    Yes.

2       Q    He stopped?  Yes?

3       A    Yes.

4       Q    Specifically rolled down his window -- his

5   passenger window?

6       A    Yes.

7       Q    And then began cursing at Officer

8   DiLeonardo.

9       A    Yes.

10            HEARING OFFICER STODDERT:  Sergeant,

11            just again, direct your responses to me.

12            Thank you.

13            THE WITNESS:  Okay.

14   BY MR. BARKET:

15       Q    A little bit later in the statement it

16   says he got back in his car and backed it up.  "I

17   continued yelling at the guy in the white car, and

18   he yelled back at me.  The guy in the white car

19   started walking towards my car, and I revved my

20   engine.  I drove forward toward the guy who was

21   standing in street near his white car.  I then saw

22   the guy fire about three or four shots at my car,

23   and I felt I was hit.  I felt he fired at me to

24   protect himself because I drove at him."

25            That's what Mr. Moroughan told two

159

DISTLER

```
 1    Suffolk County detectives a few hours after this
 2    incident took place.  Is that right?
 3         A    Yes.
 4         Q    That, too, was under oath, wasn't it?
 5         A    Yes.
 6         Q    Did you interview the two detectives who
 7    took this statement?
 8         A    Personally, no.  They were interviewed by
 9    Suffolk County Internal Affairs.  That's how we work
10    it.
11         Q    And they conveyed to you the results of
12    those interviews?
13         A    Yes.
14         Q    That's in your overall report here?
15         A    Yes, it is.
16         Q    Okay.  We'll come back to this later, but
17    for now, the Toyota Prius that people seem to think
18    can't rev its engine, you said something that the
19    report said that, without a quote, a significant
20    delay.  The engine obviously can rev.  It just takes
21    time.  Is that right?
22         A    Yes.
23         Q    Okay.  How much time?
24              MS. HILLER:  Objection.  You objected
25              earlier to her not being an expert, so if
```

DISTLER

| | |
|---|---|
| 1 | you want to read from the document, I |
| 2 | would not have a problem, but -- |
| 3 | MR. BARKET:  She said she went out |
| 4 | and did things.  She went out to Hempstead |
| 5 | Toyota or something.  I'm curious about |
| 6 | her basis of knowledge. |
| 7 | HEARING OFFICER STUDDERT:  I'll allow |
| 8 | it. |
| 9 | BY MR. BARKET: |
| 10 | Q    How much time? |
| 11 | A    It took about six to ten seconds before |
| 12 | you would be -- the electric engine would convert |
| 13 | over to the gasoline engine. |
| 14 | Q    After it started? |
| 15 | A    After you revved it. |
| 16 | Q    After you push on the gas. |
| 17 | A    Yes. |
| 18 | Q    So, what happens if you went in reverse |
| 19 | and then shifted into drive quickly -- |
| 20 | MS. HILLER:  Objection. |
| 21 | Q    -- and it was about six or ten seconds |
| 22 | between when you went in reverse until you went in |
| 23 | drive?  Would the engine rev then? |
| 24 | MS. HILLER:  Objection.  It calls for |
| 25 | speculation. |

161

DISTLER

```
 1              HEARING OFFICER STUDDERT:   Okay.

 2         Sustained.

 3    BY MR. BARKET:

 4         Q    Did you consider that possibility?  When

 5    you were at the Hempstead Toyota, did you have them

 6    back the car up and move it forward?

 7         A    Yes, we did.

 8         Q    And did you hear the engine rev?

 9         A    The engine revved once the car was stopped

10    and it was put into drive from — you go in reverse,

11    stop it, put it into drive.  It took about a six- to

12    ten-second delay.

13         Q    Well, what if the person just flipped it

14    into drive?  Did you do that?

15         A    Yes, we did.

16         Q    Did you hear Mr. Moroughan say that he had

17    trouble with his car because he wasn't used to it?

18         A    That was in his statement.

19         Q    And did you hear his girlfriend say that

20    she wasn't sure what he was doing, that he was

21    trying to put it in reverse or drive; he was having

22    trouble with it?

23         A    Yes.

24         Q    And he was trying to drive the car at the

25    time?  He was trying to move it, wasn't he?
```

162

DISTLER

1       A    Yes.

2       Q    Okay.  And the car was running, obviously,

3    this entire time.  He didn't turn it off.

4       A    Yes.

5       Q    And Mr. Moroughan actually said he revved

6    his engine.

7       A    Yes, he did.

8       Q    I think everybody at the scene said that

9    the engine revved?  Yes?

10       A    No.

11       Q    Except Officer Bienz said he didn't hear

12    it?

13       A    Correct.

14       Q    He just heard the screeching of the tires.

15       A    Correct.

16       Q    Indicating the car had been moved and

17    stopped suddenly.

18       A    Correct.

19       Q    Okay.  Officer DiLeonardo said he heard

20    the engine rev?

21       A    He did not say he heard the engine rev.

22       Q    How about his companion that night,

23    Sophia?

24       A    Yes, I believe she did say she heard the

25    engine rev.

163

DISTLER

```
 1        Q    And that was part of what was in the

 2   Deadly Force Response Team Incident Report; yes?

 3        A    What was in —

 4        Q    That the engine was revved just before the

 5   car was driven at Officer DiLeonardo.

 6        A    I would need to review that.

 7                  HEARING OFFICER STUDDERT:  What

 8             exhibit number is that?

 9                  MR. BARKET:  Sure.  It's 1.

10                  HEARING OFFICER STUDDERT:  Exhibit 1?

11   BY MR. BARKET:

12        Q    Paragraph 6, the first sentence there?

13        A    Yes.

14        Q    You said you accepted the number of

15   several thousand dollars for the damage to the

16   vehicle?

17        A    Yes.

18        Q    Did you look at any bills or insurance

19   documents or auto repair ship --

20        A    No.

21        Q    -- auto repair slips?

22        A    No.

23        Q    The damage to the vehicle, as I understand

24   it, was damage to the windshield, the front driver's

25   side window?
```

164

DISTLER

1   A    Yes.

2   Q    And a hole in the upholstery?

3   A    Correct.

4   Q    Does that strike you as several thousand

5   dollars' worth of damage?

6   A    I'm basing it on what the owner of the cab

7   company told me.

8   Q    That's it?

9   A    Correct.

10  Q    And you're not saying that mere damage

11  itself constitutes the crime; right?  It's the

12  damage without the justification.

13              MS. HILLER:  Objection.

14  BY MR. BARKET:

15  Q    Do you understand what I'm saying?

16              I'll rephrase it.  In other words,

17  you're not saying that just because Officer

18  DiLeonardo fired his gun at the car and damaged it,

19  that therefore he committed a crime, are you?

20  A    I'm not quite sure — clear on what you're

21  asking me.

22  Q    Sure.  Isn't part of your conclusion,

23  inherent in it, that he was not justified in firing

24  a gun?

25              MS. HILLER:  Objection.

165

DISTLER

1    BY MR. BARKET:

2        Q    If he's trying to defend himself, he had a

3    right to do so, didn't he?

4                    MS. HILLER:  Objection.  This is with

5                respect to the criminal mischief count?

6                    MR. BARKET:  Yeah.

7                    MS. HILLER:  I'm objecting.

8                    HEARING OFFICER STUDDERT:  On what

9                ground?

10                   MS. HILLER:  Because the charge is

11               unlawful conduct.  Article 5, Rule 2, Sub

12               1 says conduct that would constitute

13               criminal mischief.  Justification has

14               nothing to do with criminal mischief.

15                   MR. BARKET:  I'm sure the Department

16               is not seriously arguing that an officer

17               doesn't have the right to fire at a

18               vehicle, because it might damage it,

19               although his intent, purpose, and

20               reasonable belief is to save his life.

21                   HEARING OFFICER STUDDERT:  I'm going

22               to sustain the objection.  Next question.

23                   MR. BARKET:  And I'm not arguing with

24               you, Inspector.  I just want to be clear

25               what the Department's position is.  The

DISTLER

1   Department's position is that it's

2   irrelevant as to whether or not Officer

3   DiLeonardo was acting to save his life.

4   The fact is, they think they've sustained

5   the charge because he damaged the vehicle?

6          MS. HILLER: Objection again.

7          MR. BARKET: I'm not asking the

8   witness this. I'm curious as to the

9   Department's position. I just don't

10  understand it.

11         MS. HILLER: I'm not sure --

12         MR. BARKET: I mean, are we really

13  saying that the -- the officer doesn't

14  have the right to damage the vehicle in

15  order to save his life?

16         MS. HILLER: We did not say that.

17  That is not in the record.

18         MR. BARKET: Okay. So, if he --

19         MR. SANTIAGO: It seems you are

20  enunciating a legal maxim, right. Is an

21  officer, even though he discharges a

22  weapon justified, cannot be charged

23  independently with criminal mischief,

24  damaging property recklessly. As those

25  issues come before us in civil litigation,

**DISTLER**

1   which is a remedy outside the criminal

2   realm, but it's been dealt with in that

3   realm, in that forum.   That is possible.

4   Why would it not be possible?

5   MR. BARKET:  Well, of course.

6   MR. SANTIAGO:  Our officers act many

7   times from justification or in furtherance

8   of the duties and damage property, and may

9   I say could a third party bring criminal

10   charges against him?  It could happen.  It

11   doesn't happen.  I mean, usually, you

12   repair it civilly.  That's the remedy that

13   we approach the person who is wronged, the

14   property or with that type of remedy.  But

15   to say it could not happen is wrong.  Do

16   you understand what I'm saying?

17   MR. BARKET:  No, I — I — I do.  I

18   think my position is that Officer

19   DiLeonardo was justified in firing at the

20   vehicle, at the occupant of the vehicle,

21   because he was — his life was in danger.

22   The Department seems to object to that,

23   saying his life is in danger is an

24   irrelevant thing, because he's charged

25   here with criminal mischief and not

DISTLER

```
 1          shooting at the individual.
 2              MS. HILLER:  Well, you didn't ask the
 3          question with respect to was his life in
 4          danger.  You asked — actually, if you
 5          want to repeat the question back, that
 6          would be fine, because I want to make sure
 7          I'm clear on this.
 8              MR. BARKET:  Okay.
 9              MS. HILLER:  But I —
10              MR. BARKET:  Okay.  Let me rephrase
11          it.  Maybe it was confusing.
12 BY MR. BARKET:
13     Q    As part of your analysis of the criminal
14 mischief, did you consider whether or not Officer
15 DiLeonardo's life was in danger at that point in
16 time?
17     A    Yes.
18     Q    And did you consider whether or not
19 Mr. Moroughan was doing as he said he was, driving
20 his vehicle towards Officer DiLeonardo?
21     A    Yes.
22     Q    You indicated, before, that there was
23 no -- there was no training that's issued or
24 direct -- no training given for an officer to break
25 a side window of a car in order to effectuate an
```

169

DISTLER

1    arrest.  Do you remember that testimony?

2        A    Yes.

3        Q    Is there anything that prohibits that?

4        A    No.

5        Q    If the arrest is lawful and the person is

6    refusing to comply, the officer has the right, in

7    fact the obligation, to apprehend the suspect,

8    doesn't he?

9        A    Correct.

10       Q    A person's not allowed to lock their car

11   and say, like, I'm on home base; you can't get in.

12       A    No.  If it's a lawful arrest, and it's

13   reasonable to assume that that's what needs to be

14   done, yes.

15       Q    So in this instance the — if I can,

16   the — whether or not that change is sustained turns

17   not only on whether he broke the window, but whether

18   or not it was a lawful arrest that he was

19   effectuating.

20       A    Correct.

21           MR. BARKET:  Inspector, this is a

22           fine time for me to break, if it's okay

23           with you.

24           HEARING OFFICER STUDDERT:  We will

25           reconvene tomorrow at 10:00 o'clock.

**DISTLER**

1          MR. BARKET:  In terms — in terms of

2     scheduling tomorrow, I have an appearance

3     in federal court at 1:00, which means I

4     have to leave the area around 12:00, maybe

5     a little bit before, to get something to

6     eat.

7          HEARING OFFICER STUDDERT:  Do you

8     want to make it a little earlier, 9:00,

9     and work until about 12:00?

10         MS. HILLER:  9:30 would be better for

11    me.

12         MR. BARKET:  9:30 would be fine.

13         HEARING OFFICER STUDDERT:  9:30 work

14    for everyone?

15         MS. HILLER:  Sure.

16         HEARING OFFICER STUDDERT:  Okay.  And

17    we'll go until about 12:00.

18         MS. HILLER:  Can I — actually one

19    other question.  It can go on the record.

20    With respect to witnesses for tomorrow.

21         MR. BARKET:  I don't have any.

22         MS. HILLER:  Okay.

23         MR. BARKET:  I don't think we'd get

24    to any.

25         MS. HILLER:  Okay.  Just checking.

172

DISTLER

1    You don't want me to call any of our

2    departmental members that were on your

3    list?

4         MR. SANTIAGO:  Yes, Sergeant

5    Maranese, but notify him he won't be

6    coming in tomorrow — I'm sorry.  I wanted

7    to clarify if you are going to be calling

8    any witnesses tomorrow afternoon?

9         I believe that Maranese was here --

10   Sergeant Maranese.  I'm asking if you need

11   him tomorrow, we can notify him.

12        MR. BARKET:  I doubt that.

13        MR. SANTIAGO:  Okay.

14             — o0o -

15        (Whereupon, the examination of JO-ANN

16   DISTLER was concluded at 3:45 p.m.)

17

18        _____

19             JO-ANN DISTLER

20

21   Subscribed and sworn to before me

22   this _____ day of _____, 20__.

23

24   _____

25   NOTARY PUBLIC

NORTH SHORE COURT REPORTERS    1-800-794-5342

172

DISTLER

```
 1                    INDEX
 2
 3    OPENING STATEMENTS
 4    MS. HILLER                        17 - 25
 5    MR. BARKET                        26 - 32
 6
 7    EXAMINATION OF SERGEANT JO-ANN DISTLER
 8    DIRECT EXAMINATION BY MS. HILLER  33 - 137
 9    CROSS-EXAMINATION BY MR. BARKET   137 - 169
10
11              DEPARTMENT'S EXHIBITS
12
13    1          Deadly Force Response Report  36
14    2          Copy of Photograph #870       47
15    3          Copy of Photograph #846       47
16    4          Copy of Photograph #966       47
17    5          Copy of Photograph #964       47
18    6          Shooting Incident Report      50
19    7          Anthony DiLeonardo's Statement 54
20    8          PDCN Form 206                 54
21    9          Jillian Bienz's Statement     54
22    10         Thomas Moroughan's Statement  54
23    11         Kristie Mondo's Statement     54
24    12         Eric Klug's Statement         54
25    13         Edward Bienz's Statement      54
```

NORTH SHORE COURT REPORTERS   1-800-794-5342

173

DISTLER

| 1  | 14 | Suffolk County 50-H hearing | 55  |
|----|----|------------------------------|-----|
| 2  | 15 | Nassau County 50-H hearing   | 55  |
| 3  | 16 | Sophia Cornia's Statement    | 107 |
| 4  | 17 | PDCN Form 209                | 118 |
| 5  | 18 | Huntington Hospital Report   | 123 |
| 6  | 19 | PDCN Form 209                | 126 |
| 7  | 20 | Copy of Photograph #956      | 132 |
| 8  | 21 | PDCN Form 209                | 134 |
| 9  | 22 | Copy of 210                  | 135 |
| 10 |    |                              |     |
| 11 |    |                              |     |
| 12 |    |                              |     |
| 13 |    |                              |     |
| 14 |    |                              |     |
| 15 |    |                              |     |
| 16 |    |                              |     |
| 17 |    |                              |     |
| 18 |    |                              |     |
| 19 |    |                              |     |
| 20 |    |                              |     |
| 21 |    |                              |     |
| 22 |    |                              |     |
| 23 |    |                              |     |
| 24 |    |                              |     |
| 25 |    |                              |     |

174

1         CERTIFICATE BY COURT REPORTER

2         I, Danielle Stieglitz, a Certified, Professional

3    Court Reporter and Notary Public in and for the State of New

4    York do hereby certify that the foregoing testimony taken in

5    the matter of NASSAU COUNTY POLICE DEPARTMENT against

6    ANTHONY DILEONARDO, consisting of page 1 through 174 is an

7    accurate transcription of my cryptic notes.

8    IN WITNESS WHEREOF, I SET MY HAND THIS DAY.

9

10

11

12       _____

13         Danielle Stieglitz

14         CERTIFIED COURT REPORTER

15         NORTH SHORE COURT REPORTERS

16         NOTARY PUBLIC — STATE OF NEW YORK

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| **$** | **134** [1]  173/8 | **29** [1]  62/3 |
| **$1,500** [3]  19/3 23/25 119/6 | **135** [1]  173/9 | **29th** [1]  104/12 |
| | **137** [2]  172/8 172/9 | **2:00** [2]  80/12 146/17 |
| **'** | **14** [4]  55/5 58/24 99/16 173/1 | **2:00 a.m.** [1]  145/2 |
| **'11** [2]  79/9 122/12 | **143** [2]  79/25 83/3 | |
| **'after** [1]  105/11 | **145-10** [1]  118/23 | **3** |
| **'cause** [1]  122/15 | **145.10** [1]  19/19 | **30** [2]  58/15 62/6 |
| **'Dade** [1]  97/14 | **1490** [2]  1/8 2/7 | **31** [1]  62/15 |
| **'five** [1]  105/10 | **15** [9]  6/8 55/8 55/12 56/4 59/2 84/17 95/15 | **32** [2]  62/21 172/5 |
| **'Fuck** [1]  64/23 | 100/5 173/2 | **33** [2]  62/24 172/8 |
| **'Get** [3]  102/17 102/21 103/18 | **16** [6]  59/8 100/8 108/2 108/5 108/9 173/3 | **34** [1]  63/3 |
| **'I** [1]  94/11 | **164** [1]  33/14 | **3466** [2]  37/17 89/25 |
| **'I'm** [1]  61/13 | **169** [1]  172/9 | **35** [3]  38/6 63/9 136/17 |
| **'Kind** [1]  98/2 | **17** [11]  7/7 53/14 56/15 59/13 100/12 118/5 | **36** [2]  63/16 172/13 |
| **'Leave** [1]  103/2 | 118/7 118/9 118/13 172/4 173/4 | **3632** [4]  37/15 56/19 101/2 104/7 |
| **'Police** [1]  64/5 | **174** [1]  174/6 | **37** [1]  63/20 |
| **'Stop** [1]  62/18 | **17th** [1]  79/21 | **38** [1]  63/23 |
| **'Ten** [1]  66/5 | **18** [6]  59/20 123/7 123/10 124/7 124/10 | **39** [1]  64/3 |
| **'Where** [1]  66/10 | 173/5 | **3:30** [1]  143/8 |
| **'Why** [2]  81/8 157/7 | **19** [6]  59/23 126/5 126/7 126/9 126/12 173/6 | **3:45** [1]  171/16 |
| **'You** [1]  60/15 | **1900** [1]  144/24 | **3A** [1]  15/23 |
| **'You're** [2]  95/21 103/19 | **1984** [1]  79/22 | |
| | **1986** [2]  74/16 86/16 | **4** |
| **-** | **19th** [10]  39/11 39/12 79/23 79/25 81/2 83/4 | **40** [2]  58/15 64/9 |
| **-x** [2]  1/1 1/6 | 83/8 84/5 92/16 157/2 | **40-caliber** [1]  139/24 |
| | **1:00** [4]  83/8 87/6 92/6 170/3 | **41** [1]  64/13 |
| **.** | **1:10** [1]  80/2 | **42** [1]  64/16 |
| **.38** [14]  18/10 19/12 20/10 22/13 23/2 23/6 | **1:15** [2]  22/3 80/3 | **422** [3]  86/17 89/6 89/15 |
| 24/15 24/21 40/3 40/10 132/15 134/17 | **1:45** [1]  101/10 | **43** [1]  64/20 |
| 138/21 140/16 | | **44** [1]  64/25 |
| **.38-caliber** [3]  18/10 19/12 20/10 22/13 | **2** | **45** [1]  65/4 |
| 24/15 132/15 134/17 140/16 | **2/27** [4]  71/1 79/9 82/24 122/12 | **46** [1]  65/8 |
| **.40** [1]  139/23 | **20** [8]  60/2 63/24 95/15 132/4 132/6 132/10 | **47** [5]  65/10 172/14 172/15 172/16 172/17 |
| | 171/22 173/7 | **48** [1]  65/13 |
| **0** | **2001** [1]  19/2 | **49** [1]  65/16 |
| **0115** [6]  18/5 19/3 20/1 37/5 38/9 71/1 | **2010** [9]  19/8 20/12 51/2 56/19 113/17 119/1 | **4:00** [2]  149/5 148/8 |
| **0700** [1]  79/10 | 127/2 134/18 144/6 | |
| **080** [1]  3/6 | **2011** [32]  18/4 20/1 21/5 22/2 22/17 34/24 | **5** |
| | 36/21 37/2 45/12 57/4 57/6 57/22 70/22 71/1 | **571/87** [1]  108/15 |
| **1** | 74/12 77/21 79/13 80/2 82/24 86/10 87/6 | **50** [7]  37/6 39/8 63/14 65/19 121/20 154/2 |
| **10** [14]  1/10 54/17 58/7 84/17 93/17 97/3 | 89/25 90/11 90/20 90/25 101/10 104/12 | 172/18 |
| 101/3 101/6 104/8 104/11 118/23 156/9 | 110/24 114/24 117/1 144/8 157/12 | **50-H** [18]  54/2 55/3 55/6 100/23 104/3 |
| 156/13 172/22 | **2012** [10]  3/7 6/8 7/7 20/20 20/23 49/21 | 104/13 121/21 122/5 149/25 150/3 150/3 |
| **100** [1]  101/12 | 53/14 54/1 56/16 89/21 | 150/11 150/21 153/17 153/23 154/7 173/1 |
| **107** [1]  173/3 | **2014** [1]  1/10 | 173/2 |
| **10:40** [7]  93/8 143/14 143/15 145/1 145/6 | **206** [3]  53/16 54/10 172/20 | **51** [1]  65/25 |
| 145/10 169/25 | **206A** [2]  7/1 70/19 | **52** [1]  66/3 |
| **10:15** [1]  1/11 | **209** [22]  67/8 43/11 117/10 117/16 118/6 | **53** [1]  66/16 |
| **11** [11]  3/18 9/10 19/25 54/20 58/14 97/22 | 118/16 118/20 119/15 122/14 125/24 126/8 | **54** [8]  66/18 172/19 172/20 172/21 172/22 |
| 135/1 136/3 137/11 138/2 172/23 | 126/18 127/13 127/21 133/21 134/4 134/11 | 172/23 172/24 172/25 |
| **11-95045** [1]  78/2 | 134/20 135/23 173/4 173/6 173/8 | **55** [3]  66/20 173/1 173/2 |
| **110** [1]  92/9 | **20th** [2]  119/22 136/4 | **56** [1]  66/23 |
| **11501** [2]  1/9 2/8 | **24th** [1]  101/9 | **57** [1]  67/3 |
| **11530** [1]  2/16 | **21** [6]  60/5 74/16 134/3 134/5 134/8 137/8 | **58** [1]  67/8 |
| **115** [1]  173/4 | **210** [12]  6/21 126/3 126/9 127/19 127/22 | **59** [1]  67/14 |
| **12** [9]  20/16 21/5 24/13 25/12 54/23 58/20 | 134/25 135/2 135/6 135/12 135/25 136/6 | **5906** [1]  86/22 |
| 98/9 128/6 172/24 | 173/9 | **5:00** [3]  145/20 145/21 146/17 |
| **12-080** [1]  3/6 | **210.45** [1]  87/4 | |
| **120.00** [1]  126/24 | **22** [6]  20/20 60/13 135/11 135/13 135/22 | **6** |
| **120.05** [1]  18/21 | 173/9 | **60** [1]  67/17 |
| **123** [1]  173/5 | **23** [5]  3/6 60/18 83/2 108/14 108/15 | **61** [1]  67/21 |
| **126** [1]  173/6 | **23rd** [1]  79/24 | **62** [1]  68/2 |
| **12:00** [6]  149/1 149/5 149/9 170/4 170/9 | **24** [2]  61/1 74/15 | **63** [1]  68/5 |
| 170/17 | **25** [6]  61/4 63/24 86/15 172/4 | **631-522-5906** [1]  86/22 |
| **12:15** [1]  108/25 | **25th** [1]  141/24 | **6384** [1]  33/17 |
| **12:30** [1]  108/25 | **26** [5]  57/6 61/12 90/20 90/25 172/5 | **64** [1]  68/8 |
| **12:44** [1]  104/12 | **265** [1]  141/24 | **65** [1]  68/11 |
| **12:45** [1]  107/1 | **27** [23]  18/4 19/2 20/1 21/15 22/2 22/16 | **66** [2]  68/16 101/16 |
| **13** [12]  3/14 9/21 102 10/9 12/22 12/22 54/1 | 36/21 37/2 57/4 61/16 70/22 71/1 74/12 | **666** [2]  2/14 4/18 |
| 55/1 58/22 89/21 99/9 172/25 | 77/21 79/9 80/2 82/24 86/10 87/6 130/23 | **67** [1]  68/21 |
| **13108TY** [6]  18/19 19/9 51/3 119/2 127/3 | 114/24 122/12 157/12 | **6:00** [4]  80/5 80/5 145/20 145/21 |
| 134/19 | **27th** [2]  79/12 82/21 | **6:30 p.m.** [1]  149/1 |
| **132** [2]  104/19 173/7 | **28** [2]  20/22 61/22 | **6th** [1]  142/21 |

**7**

7/23/84 [1] 38/21
7/6/1986 [1] 86/16
708 [1] 2/15
75 [2] 3/10 10/21

**8**

8/29/87 [1] 83/3
8118 [8]  1/3 2/10 5/5 5/9 5/9 18/2 135/7 137/10
8188 [2] 3/14 5/8
84 [1] 38/21
846 [3] 46/21 47/6 172/15
87 [2] 83/3 108/15
870 [3] 46/20 47/3 172/14
881 [1] 5/6
8943 [2] 37/17 89/24
8:00 [2] 57/13 91/2
8:00 a.m [1] 148/25

**9**

9013 [3]  1/5 37/15 70/23
9103 [1] 56/18
911 [9]  66/3 66/12 66/13 77/8 82/15 86/4 88/22 97/11 110/13
95045 [1] 78/2
951 [1] 79/11
956 [3] 131/24 132/5 173/7
944 [2] 47/21 172/17
946 [2] 47/18 172/16
9:00 [1] 170/8
9:30 [4]  91/8 170/10 170/12 170/13

**A**

a.m [11]  1/11 80/3 80/5 80/12 83/8 87/7 92/7 108/25 108/25 145/2 148/25
abeyance [1] 9/11
ability [2] 63/21 140/9
able [8]  65/13 65/16 88/13 112/15 141/7 141/18 141/22 155/12
about [51]  16/8 18/4 20/1 28/12 46/12 60/20 61/13 65/2 66/21 67/15 69/14 72/5 72/10 73/10 74/7 80/2 83/23 83/8 84/17 90/10 91/2 91/8 91/16 91/21 92/1 92/6 94/16 95/13 108/25 116/18 124/22 129/14 130/22 139/4 144/11 144/15 145/11 147/20 149/7 153/16 153/17 155/13 158/22 160/5 160/11 160/21 161/11 162/22 170/9 170/17
abouts [1] 144/24
above [5]  77/16 79/23 86/5 101/8 110/18
above-captioned [1] 101/8
abrasions [1] 99/11
absolutely [3] 110/16 154/9 157/22
Academy [1] 37/11
accelerate [1] 26/19
accelerated [2] 75/18 114/9
accelerating [2] 62/11 76/2
acceleration [2] 114/5 114/6
accept [5]  32/16 132/5 134/2 135/10 151/6
accepted [5] 55/17 126/6 163/14
Accident [1] 70/21
accompanied [2] 98/6 145/25
account [10]  27/18 29/20 30/5 31/11 100/1 146/10 149/25 151/7 152/19 153/4
accounts [1] 28/1
accuracy [1] 63/10
accurate [2] 174/7
accurately [1] 63/18
acquire [2] 152/14
acrest [1] 91/17
act [2] 143/2 167/6
acted [2] 26/14 32/1
acting [7]  23/15 71/3 142/22 143/2 143/5

action [1] 101/9
actions [15]  18/22 19/20 24/6 38/2 40/12 45/21 45/22 46/1 52/1 55/24 120/20 124/22 136/11 136/16 136/17
actual [2] 6/20 105/3
actually [15]  13/3 14/9 16/8 85/15 104/24 104/25 111/12 112/9 117/13 140/10 141/21 145/13 162/15 163/4 170/18
Acura [6]  57/23 74/20 80/12 83/10 102/5 108/22
add [1] 107/19
addition [5]  8/12 49/5 49/10 52/14 112/11
additional [3]  10/6 50/21 128/2
Additionally [1] 10/24
address [4]  64 12/19 47/14 148/17
addressed [6]  4/7 11/21 35/8 56/16 89/22 135/24
adequately [1] 11/5
adjacent [3]  39/16 53/9 93/14
adjourn [1] 106/18
adjourned [1] 72/12
adjudicated [1] 13/15
adjudication [1] 147/5
adjudicative [1] 147/6
administrative [8]  3/7 3/22 11/7 11/14 15/25 56/21 72/17 90/2
admissible [1] 4/11
advanced [1] 95/13
advice [2]  77/25 99/13
advised [1] 86/25
affairs [21]  7/6 21/11 21/5 29/25 30/4 30/14 32/8 32/17 33/13 33/25 34/3 45/16 53/13 56/17 89/10 89/23 142/18 142/20 146/4 146/13 159/9
affect [2]  60/21 153/12
afford [1] 78/15
aforementioned [1] 21/8
after [32]  20/7 20/8 27/6 33/19 38/12 41/9 42/24 65/25 66/19 68/19 70/10 70/18 76/20 80/12 83/21 91/16 95/10 99/16 100/2 102/8 102/8 111/13 117/4 119/15 132/25 134/19 136/9 153/8 159/1 160/14 160/15 160/16
afternoon [2]  138/1 171/8
again [13]  12/11 12/11 12/22 40/14 51/18 73/1 83/22 126/1 133/24 141/6 144/13 158/11 166/6
against [11]  1/4 13/15 28/24 57/1 78/9 90/8 100/25 104/5 152/24 167/10 174/5
age [1] 86/16
aggressively [1] 109/17
ago [2] 14/5
agree [2]  8/19 148/4
agreements [1] 8/16
ahead [2]  25/25 108/12
alcohol [1] 63/21
alcoholic [2]  57/16 58/13
Alex [1] 99/1
Alfred [3]  77/21 86/10 110/23
all [39]  4/4 10/2 13/18 16/2 16/3 16/22 23/6 28/15 28/15 32/8 37/21 38/2 38/6 44/17 45/14 48/2 51/14 63/5 67/4 70/1 73/7 77/19 86/8 89/14 91/1 92/2 92/5 98/18 98/24 102/20 102/22 103/5 110/21 115/8 121/8 133/16 143/16 152/11 154/16
allegation [1] 34/11
allegations [1] 34/15
alleging [2]  3/14 21/9
allegations [1] 34/15
allow [9]  4/3 30/9 42/18 147/24 150/20 151/15 155/7 155/9 168/7
allowed [4]  4/1 112/12 138/24 169/10
alone [1] 103/2

alone.' [1] 103/3
along [3]  65/15 99/21 111/15
already [9]  6/5 30/19 49/20 68/19 114/9 121/9 127/15 127/19 133/25
also [42]  2/19 3/16 4/9 6/19 6/22 7/3 7/19 8/10 24/6 24/11 25/8 28/10 30/3 30/24 35/8 35/22 35/25 38/13 39/20 53/5 54/4 58/11 58/12 58/16 58/18 65/13 75/24 87/20 96/7 96/8 98/15 99/2 108/18 109/14 110/13 111/21 121/18 121/25 125/6 126/1 130/6 133/23
alter [1] 146/10
although [2]  9/58 165/19
am [39]  3/2 5/15 6/12 35/14 35/18 35/23 35/24 42/18 44/7 46/22 49/16 53/3 53/5 53/18 53/15 53/18 53/21 56/20 57/14 58/2 60/16 61/14 64/23 74/15 77/12 83/2 86/15 86/22 89/4 89/5 90/1 99/11 108/4 108/14 126/2 131/23 133/23 137/3 147/18
ambulance [3]  67/5 98/4 98/8
amend [1] 137/9
ammunition [1] 63/7
among [1] 156/25
amount [3]  9/18 58/12 119/5
analysis [1] 168/13
angle [1] 62/13
angry [1] 93/24
ankle [1] 62/8
Ann [11]  20/24 33/8 33/13 87/1 89/8 89/18 100/21 107/11 171/15 171/19 172/7
Ann's [1] 145/10
announced [1] 27/3
annoyed [1] 80/13
anonymously [1] 34/12
another [18]  6/9 6/25 8/9 13/3 13/16 26/21 28/19 28/21 35/6 49/22 56/7 74/21 92/16 99/20 108/19 117/20 118/25 155/19
answer [22]  44/9 78/18 79/1 79/4 102/6 102/9 102/17 102/22 102/23 103/1 103/6 103/10 103/12 103/16 103/21 103/24 104/23 105/14 106/2 106/8 106/16 116/13
answered [2]  20/21 101/24
answering [1] 20/23
ANTHONY [86]  1/5 6/23 7/4 7/9 21/6 21/16 21/21 22/4 34/21 37/14 49/5 53/12 53/16 54/7 56/18 68/25 71/11 74/22 74/25 75/9 75/19 75/14 76/1 76/9 76/9 76/23 77/4 77/8 77/11 90/15 90/23 91/4 91/9 91/11 91/13 91/19 91/24 92/7 92/11 92/21 92/23 93/5 93/15 93/19 94/2 94/12 94/15 94/25 95/6 95/15 95/17 96/1 96/5 96/10 96/12 96/25 97/10 97/14 97/20 98/12 99/19 99/19 101/1 104/6 108/18 108/23 109/5 109/9 109/11 109/14 109/19 110/17 110/18 110/12 118/13 110/15 129/22 130/5 130/13 134/12 136/11 154/23 172/19 174/6
Anthony's [9]  75/12 75/19 76/11 76/20 93/8 93/14 93/17 94/18 95/23
any [68]  4/6 5/11 8/16 8/19 12/7 12/17 13/20 28/5 22/12 28/25 29/4 30/11 41/18 42/15 42/25 56/24 56/25 57/1 59/15 59/18 64/11 68/2 131/12 78/5 78/17 78/20 88/11 87/1 89/13 90/6 90/7 90/8 93/1 93/3 96/21 96/23 97/1 97/6 97/17 100/8 100/17 100/18 102/16 103/23 106/6 111/23 112/21 113/8 114/15 114/16 120/14 123/20 125/21 128/1 132/25 136/10 138/7 138/15 139/4 143/8 143/8 147/1 154/10 163/18 170/2 170/24 171/1 171/8
anybody [4]  44/23 69/13 143/17 154/10
anyone [7]  59/14 59/16 59/17 63/11 67/15 68/3 98/8
anything [23]  13/24 17/14 49/11 60/18 66/17

**B**

behavior [1] 136/18
behind [18] 24/18 38/24 39/1 59/10 75/9 75/18 80/17 83/21 83/22 83/25 83/25 84/4 95/6 94/18 94/24 109/3 109/18 109/20
being [22] 6/24 8/25 19/9 56/8 72/12 73/8 74/14 78/4 78/13 79/20 79/20 83/1 85/17 87/21 88/1 88/8 105/4 108/13 109/10 112/11 138/22 159/25
belief [4] 16/20 119/8 127/6 165/20
believe [26] 8/3 10/7 10/17 17/5 27/12 30/24 31/5 55/6 59/16 63/12 63/20 64/16 66/11 88/19 94/19 96/6 101/24 117/25 122/25 124/22 129/8 144/5 149/5 149/9 162/24 171/9
believed [3] 59/5 61/9 62/4
below [1] 37/3
beneath [1] 64/2
benefit [2] 115/7 115/8
best [5] 62/2 63/14 135/2 136/3 150/21
better [2] 114/15 170/10
between [10] 27/16 59/18 61/20 75/14 75/25 77/13 94/3 109/20 114/11 168/22
beverages [2] 57/16 58/13
beyond [1] 112/6
bias [3] 31/14 152/20
Biecz [42] 7/21 27/13 37/16 37/24 38/10 38/16 38/25 39/20 40/9 40/17 40/20 46/11 52/24 53/19 54/1 57/2 74/14 74/18 75/22 77/20 89/20 89/24 90/12 98/13 100/19 115/25 116/2 119/12 119/13 121/14 121/15 127/11 127/12 129/3 129/21 130/3 133/15 144/21 145/1 149/4 157/15 162/11
Biecz's [7] 38/15 54/13 54/25 129/12 129/14 172/21 172/25
bill [2] 91/7 99/1
bills [2] 92/3 163/18
birth [2] 38/21 79/24
bit [5] 47/15 83/17 144/13 158/15 170/5
Black [2] 57/9 91/1
blading [1] 63/18
blank [2] 86/21 86/24
blocking [1] 86/2
blocking [1] 60/1
blow [1] 18/11
blue [13] 57/23 58/4 58/10 58/15 74/20 80/12 81/13 83/10 84/15 91/12 102/5 108/21 143/15
board [10] 119/19 119/20 119/25 120/4 122/3 127/14 127/17 134/21 134/24 147/6
body [2] 63/18 93/23
bone [3] 123/24 124/8 124/12
Boris [1] 117/1
bosn [5] 74/16 79/21 83/3 86/16 108/15
bosses [2] 67/25 68/1
both [18] 3/21 4/9 25/5 25/6 27/11 29/12 30/22 38/16 38/23 39/6 40/6 64/10 65/23 67/20 67/23 71/6 91/14 113/20
bottom [1] 124/7
box [1] 70/25
boyfriend [18] 83/5 83/7 83/13 83/19 83/21 83/24 84/1 84/7 84/12 84/20 85/6 85/9 85/11 85/72 85/20 85/21 108/17 122/11
boyfriend's [1] 85/5
brace [1] 98/3
brake [1] 113/22
brakes [2] 95/5 95/12
brand [1] 139/25
break [12] 69/1 69/21 70/2 70/4 70/17 71/14 74/6 85/5 124/18 137/19 168/24 169/22
breaking [3] 23/10 71/8 130/25
Brew [1] 57/9 91/1

---

brewed [1] 91/4
Brian [4] 14/21 99/1 99/19 100/4
brief [8] 6/1 32/21 33/1 68/17 70/5 70/10 108/9 147/12
briefly [2] 98/13 129/24
bright [1] 80/18
bring [2] 146/20 161/9
broke [8] 18/11 19/16 23/1 23/21 23/22 27/8 40/10 169/17
Brook [2] 79/22 79/25
brought [2] 13/15 152/24
BRUCE [4] 2/17 4/15 15/14 122/18
Building [1] 101/12
bullet [3] 46/14 60/22 51/4
burden [2] 146/25 147/3
Bureau [8] 2/20 2/21 2/22 2/24 5/2 5/14 5/24 17/24
busted [1] 105/16
bustling [1] 82/3
butt [12] 64/17 65/5 102/10 105/17 105/18 116/22 121/17 121/19 121/24 125/3 130/20 133/7
button [1] 113/23
bystanders [1] 136/19

**C**

C-O-R-N-I-A [1] 7/25
cab [29] 38/20 39/1 93/14 93/21 93/25 94/3 94/5 94/5 94/22 95/11 95/13 95/18 96/11 96/14 96/15 96/23 97/21 98/14 98/16 108/21 118/14 111/14 116/16 116/25 129/16 129/24 130/1 136/18 164/6
calibre [12] 18/10 19/12 20/10 22/13 24/15 40/3 40/11 132/15 134/17 139/23 139/24 140/16
call [15] 9/7 14/6 16/17 17/12 31/23 32/18 32/20 66/19 71/22 83/21 92/5 107/6 143/15 156/6 171/1
called [8] 33/5 66/3 77/8 82/15 86/4 110/13 152/14 156/11
calling [2] 107/8 171/7
calls [2] 33/7 160/24
calm [1] 26/17
came [16] 40/7 43/23 56/6 61/7 80/17 82/2 84/5 95/14 98/12 98/17 98/23 99/2 102/1 114/23 129/22 146/18
can [57] 8/21 9/6 10/2 12/9 12/19 13/17 16/17 17/2 17/3 34/13 43/22 44/8 44/10 44/11 45/21 47/10 50/20 50/21 69/1 69/5 70/16 70/16 78/8 105/9 105/10 107/11 112/8 112/24 112/25 115/1 115/18 116/13 118/9 118/19 124/2 126/20 130/8 134/13 135/15 135/7 135/25 136/7 136/8 141/22 143/23 165/10 166/5
can't [6] 11/23 13/14 112/14 154/24 159/18 169/11
canceling [1] 90/21
cannot [9] 12/25 13/1 31/20 58/19 60/22 78/15 111/18 112/1 166/22
capability [1] 113/9
Captain [1] 37/19
captioned [1] 101/8
car [166] 22/4 23/1 23/20 26/4 26/4 26/13 26/16 26/18 26/20 27/1 27/1 27/8 27/10 27/10 27/15 46/13 47/12 50/18 57/22 59/20 59/25 61/5 61/14 61/14 61/21 62/1 62/9 62/18 62/23 64/18 65/9 65/14 65/17 66/13 71/8 75/10 74/10 76/20 80/6 80/17 80/25 81/12 81/12 81/13 81/15 81/16 81/19 81/20 81/22 81/24 82/12 83/13 83/14 83/15 83/19 83/22 83/25 83/25 84/15 84/19 84/19 85/1

---

s...t 85/18 85/22 86/1 87/12 87/15 87/17 87/21 87/25 88/2 88/2 88/4 88/5 88/7 88/10 88/11 88/13 88/13 88/15 91/11 91/11 92/10 92/11 92/12 92/13 93/1 93/7 93/12 93/14 93/18 93/19 93/19 94/2 94/3 94/6 94/6 94/8 94/16 94/7 94/18 94/18 94/19 94/22 94/21 93/18 93/19 93/19 94/2 94/3 94/6 96/10 97/25 101/20 102/15 103/8 105/19 105/22 109/8 109/13 109/15 109/16 109/18 109/20 109/21 109/24 109/25 110/3 111/13 111/20 111/22 111/24 112/19 113/9 113/17 113/19 113/24 113/25 144/2 144/3 144/5 146/14 146/14 121/22 157/23 158/16 158/17 158/18 158/19 158/21 158/22 161/16 161/9 161/17 161/24 162/2 162/16 163/5 164/18 168/25 169/10
car's [1] 95/4
car.' [1] 103/18
car.' [2] 102/18 102/21
card [1] 95/9
care [1] 61/13
carry [5] 139/19 141/9 141/10 141/11 141/19
carrying [2] 95/7
cars [9] 2/7/7 81/1 81/3 84/5 84/7 84/11 108/20 109/16 157/3
Carrer [1] 98/25
case [18] 1/3 3/13 5/4 5/5 17/9 18/2 24/25 25/14 29/7 32/11 119/24 123/18 135/7 137/10 145/15 146/8 150/23 157/20
cash [2] 91/7 92/2
CAT [1] 124/7
caught [1] 65/22
cause [2] 23/7 23/8
caused [3] 18/12 19/7 23/24
causing [6] 65/23 95/20 96/17 116/16 119/5 127/3
cell [2] 86/21 92/21
certain [6] 8/14 8/16 43/8 43/16 43/20 149/14
certainly [5] 12/3 29/22 73/3 73/4 147/12
CERTIFICATE [1] 174/1
Certified [3] 33/20 174/2 174/14
certify [1] 174/4
chain [1] 109/23
change [1] 169/16
channels [1] 36/22
charge [32] 11/17 19/25 45/17 49/6 115/3 119/7 119/17 119/18 120/2 120/7 120/25 125/7 127/15 127/18 127/19 127/20 128/4 128/23 131/10 133/21 134/21 134/24 135/1 135/1 135/25 136/2 136/7 136/8 141/22 143/23 165/10 166/5
charged [9] 9/20 29/17 41/4 43/7 43/20 46/2 128/21 166/22 167/24
charges [35] 3/13 3/20 67/8 9/7 10/6 10/15 10/25 11/3 11/5 11/19 119 13/10 13/14 11/16 117/25 18/2 20/9 29/17 29/21 21/8 28/18 31/21 42/6 45/14 45/17 115/11 119/21 119/22 120/2 128/12 136/6 137/10 145/9 154/21 167/10
Charles [6] 79/11 79/13 79/14 82/22 101/4 104/9
Check [1] 70/25
checking [1] 170/25
chest [1] 40/6
chief [7] 31/6 36/23 36/23 37/8 37/9 41/6 67/23
chiefs [3] 29/11 30/1 119/20
chip [1] 113/21
choose [2] 140/1 140/1
chose [2] 13/11 140/23
Christopher [2] 90/13 90/20
Clicottis [6] 77/18 77/22 86/7 86/11 110/20 110/23

## C

circumstances [3] 100/1 115/4 150/17
cite [2] 10/20 15/14
CITY [2] 27/14 4/19
civil [5] 3/9 3/23 10/20 32/10 166/25
civilian [1] 26/10
civilians [2] 22/10 22/15
civilly [1] 167/12
claim [4] 100/24 101/14 104/4 152/4
claimant [2] 2/6 101/8
clarification [2] 4/8 10/20
clarify [2] 104/23 171/7
Class [3] 18/24 19/22 87/3
classic [2] 147/19 147/12
classified [1] 127/22
clause [1] 118/20
clear [4] 10/21 164/20 165/24 168/7
clearly [2] 30/15 69/20
client [2] 9/20 145/16
client's [1] 69/6
clipping [1] 96/16
cloaked [1] 11/10
close [2] 31/4 61/2
clothes [1] 38/11
clothing [1] 64/2
coercion [2] 147/9 147/13
coercive [1] 147/4
color [1] 66/14
come [11] 12/11 31/10 34/19 77/9 103/25
  111/23 128/19 142/17 142/20 159/16 166/25
coming [4] 75/1 87/16 99/4 171/6
Comiskey [2] 2/21 5/21
Commack [1] 74/17
command [2] 33/11 70/23
commanding [5] 2/28 5/23 37/9 37/10 56/16
  80/22 143/25
commands [1] 64/15
commenced [1] 152/13
commented [2] 92/19
comments [2] 72/10 111/5
Commission [1] 34/14
commissioner [10] 11/16 16/1 16/2 36/22
  115/3 142/23 143/2 143/3 143/5 143/7
Commissioner's [2] 3/5 43/10
committed [2] 28/22 164/19
common [1] 99/21
compact [1] 93/12
companion [3] 26/10 26/24 162/22
company [3] 80/8 117/1 164/7
compartment [2] 19/14 133/9
compensation [1] 100/10
complainants [1] 15/19
complaint [5] 34/11 78/1 142/11 142/17
  143/15
complete [1] 44/21
completed [2] 70/11 100/3
completely [4] 44/5 45/7 61/23 145/8
compliance [2] 56/22 90/4
comply [1] 169/6
computer [1] 143/16
concern [4] 12/1 12/14 15/13 16/25
concerned [1] 26/8
concerning [3] 3/19 4/4 12/23
concerns [5] 12/17 13/23 42/19 74/2 154/10
conclude [5] 26/12 29/3 120/18 124/18 128/8
concluded [4] 29/20 128/10 128/15 171/16
concluding [1] 55/22
conclusion [18] 27/8 31/19 43/12 43/13 46/4
  48/16 50/25 52/3 52/14 52/18 56/6 111/23
  114/15 116/4 128/12 128/20 133/5 164/22
conclusions [17] 35/3 34/15 43/10 44/12 42/2
  42/25 43/2 43/16 43/23 113/15 114/23

120/14 125/13 131/13 132/25 136/10 136/21
conduct [19] 18/7 19/6 24/21 25/3 29/14
  34/17 45/9 45/19 45/22 45/24 52/6 56/9
  115/14 116/4 117/5 120/20 125/20 165/11
  165/12
conducted [2] 8/25 31/25
conducting [2] 26/6 41/1
conference [1] 68/16
confessed [3] 29/14 155/20 155/24
confession [1] 156/17
confident [1] 63/10
confidential [2] 69/10 69/17
confront [1] 39/14
confrontation [5] 22/11 60/19 61/3 92/25
  157/20
confronted [1] 39/14
confusing [1] 168/11
connected [1] 154/6
connection [1] 41/4
consciousness [1] 98/1
consider [6] 73/2 128/24 123/13 161/4
  168/14 168/18
consideration [6] 111/3 113/15 115/19
  153/18 153/20 154/9
considered [2] 24/1 138/10
consisted [1] 57/19
consistent [2] 32/2 32/4
consisting [7] 37/3 51/4 77/17 86/4 118/19
  119/20 174/6
consists [1] 89/12
constitute [5] 18/22 19/20 52/7 56/9 165/1
constituted [1] 24/7 25/3 45/22 46/1 115/20
  116/4 116/19 117/5 120/20 125/20 134/11
constitutes [1] 56/24 90/6 164/11
constituting [2] 24/1 55/24
constitution [1] 141/12
construed [1] 58/11
contact [2] 92/21 96/22
contains [1] 113/21
continuation [1] 101/17
continue [7] 42/19 44/8 59/21 69/25 70/10
  70/16 107/9
continued [1] 13/12 31/16 61/1 61/6 61/12
  62/22 63/3 63/6 75/22 81/17 158/17
continuing [2] 83/4 94/23
continuously [1] 80/15
contracting [1] 86/23
contractors [1] 86/23
control [6] 15/22 61/23 73/16 128/16 128/17
  133/8
contusions [2] 59/11 127/4
conversation [3] 14/19 68/3 68/18
convert [2] 119/22 160/12
converted [3] 120/2 127/19 134/25
conveyed [1] 158/11
convulsively [1] 153/10
cop [2] 82/8 85/8
copies [5] 6/17 7/7 46/18 48/10 53/6
copy [44] 6/6 6/9 6/14 6/19 7/12 8/9 8/10
  8/11 35/18 35/24 35/25 36/12 46/22 47/3
  47/6 47/18 47/21 47/25 49/17 49/22 53/15
  79/18 117/12 117/19 117/20 118/16 122/24
  123/17 125/25 126/3 126/18 132/1 132/5
  132/14 133/24 135/12 135/15 135/16 172/14
  172/15 172/16 172/17 173/7 173/9
Corazin [11] 7/24 57/6 90/23 107/22 108/12
  108/13 110/22 116/2 119/12 121/6 127/11
Corazin's [2] 108/1 173/3
correct [26] 9/2 11/19 21/12 28/1 50/18 73/9
  141/14 141/20 150/2 156/20 156/24 156/24
  157/13 157/18 162/15 162/15 162/18 164/3
  164/9 169/9 169/20
corrections [1] 89/14

cus... [1] 116/23
couch [1] 87/7
could [22]  11/5 26/11 34/11 34/12 46/1 60/23
  61/8 61/18 67/25 85/16 88/17 93/21 93/23
  106/20 109/21 113/14 111/24 120/21 140/13
  167/9 167/10 167/15
couldn't [3] 85/16 94/14 109/10
council [18] 4/12 4/13 6/9 8/9 8/13 8/18
  35/25 46/23 49/21 53/6 53/8 117/19 122/25
  122/25 126/1 132/2 133/24 135/16
council's [1] 162/14
count [17] 18/3 19/2 19/25 21/24 52/5 56/5
  117/23 117/24 118/1 118/6 124/9 122/14
  130/7 131/21 138/1 138/2 165/5
counting [1] 104/25
country [3] 2/14 4/18 147/6
counts [7] 3/14 3/17 9/6 9/10 21/22 137/8
  137/11
COUNTY [185] 1/2 1/7 2/5 5/1 5/14 6/17
  6/25 7/2 7/5 7/12 14/19 14/20 17/24 21/17
  22/7 27/19 30/8 30/23 30/23 31/2 31/6 35/7
  37/20 37/23 40/24 41/3 44/20 45/13 46/6
  46/8 48/11 49/4 49/17 51/11 52/2 52/9 52/16
  54/3 54/4 55/3 55/6 67/18 67/24 68/3 68/6
  68/13 68/20 70/20 74/11 77/25 79/15 82/24
  83/9 93/13 97/13 97/22 98/6 98/20 99/18
  99/22 99/24 100/6 100/13 100/15 100/25
  101/3 101/11 101/24 104/4 104/8 104/14
  108/11 111/15 113/22 113/4 115/21 115/23
  119/9 119/10 121/1 121/2 121/21 121/22
  125/5 127/17 127/18 128/24 129/1 131/5
  132/22 133/12 152/1 152/7 152/8 152/15
  152/24 153/12 154/2 154/3 156/14 159/1
  159/9 173/1 173/2 174/5
comple [5] 6/1 8/20 12/18 13/25 74/22 77/10
  106/19 118/17 117/2
comce [6] 3/24 11/4 23/13 145/19 151/8
  167/5
court [9] 33/20 78/9 78/17 154/22 370/3
  174/1 174/3 174/14 174/15
cousin [2] 90/13 90/20
Covais [5] 6/19 67/19 68/5 68/23 98/23
cover [1] 95/3
covered [4] 74/14 95/4 114/10 131/16
crazed [1] 62/24
credibility [5] 29/6 150/25 153/5 153/13
  155/4
credit [2] 29/24 30/4
crime [17] 18/23 19/20 44/19 46/9 49/13
  51/12 52/7 115/24 116/14 119/10 127/8
  131/22 132/14 133/12 133/14 164/11 164/19
crimes [2] 25/4 29/23
criminal [29] 3/23 12/2 19/21 24/2 25/4
  29/14 34/17 46/1 46/5 52/7 55/24 57/1 90/9
  115/15 115/20 116/5 116/19 117/6 117/25
  118/23 126/7 165/5 165/13 165/14 166/23
  167/1 167/9 167/25 168/13
criminally [1] 141/23
cross [3] 3/25 137/22 172/9
cross-examination [3] 3/25 137/22 172/9
crossed [4] 79/19 80/20 80/22 83/15
crosses [1] 79/22
crowded [1] 91/16
crying [1] 110/9
cryptic [1] 174/7
cubicle [1] 67/22
curb [2] 59/10 66/22
curious [5] 69/21 138/5 139/3 160/5 166/8
current [1] 147/2
currently [4] 86/17 86/22 89/6 129/5
cursing [4] 75/13 84/15 102/22 158/7
cut [1] 59/16

**C**

cutting [1] 59/17

**D**

D-O-B-R-O-C-H-A-S-R-E [1] 8/7
DA [1] 100/15
damage [2] 19/7 23/24 46/12 47/12 48/24 50/23 51/3 52/21 52/1 116/17 118/25 119/5 163/15 163/23 163/24 164/5 164/10 164/12 165/18 166/14 167/8
damaged [3] 64/8 164/18 166/5
damaging [2] 119/3 166/24
dancing [2] 58/18 58/18
danger [4] 167/21 167/23 168/4 168/15
Daniel [1] 37/10
Danielle [3] 33/19 174/2 174/13
dashboard [2] 113/23 113/24
date [30] 19/4 42/20 47/23 50/4 54/9 54/12 54/15 54/18 54/21 54/24 55/2 55/5 55/8 70/25 79/9 79/24 90/23 108/3 118/8 123/8 126/10 132/7 134/6 135/14
dated [12] 3/6 7/6 20/22 53/14 53/25 56/15 70/21 74/11 82/24 89/21 104/12 122/12
day [11] 13/3 15/8 158 79/12 80/10 82/21 101/9 149/4 157/11 171/22 174/8
daze [2] 98/2 102/10
deadly [20] 17/4 35/11 35/12 35/19 36/5 34/12 36/24 37/3 38/1 38/5 43/25 44/13 44/16 114/22 115/2 115/6 122/4 136/12 163/2 172/13
dealer [1] 1/1/21
dealt [1] 16/7/2
decide [1] 78/18
decided [5] 39/14 39/21 90/22 92/5 157/19
decipher [1] 79/7
decision [2] 141/4 147/19
defend [2] 61/18 145/2
defendant [1] 79/6
deferred [1] 72/9
definitely [1] 76/4
degree [11] 18/23 19/21 24/2 24/7 25/5 25/5 45/11 52/8 56/10 118/24 126/25
delay [6] 112/2 112/2 112/3 114/6 159/20 161/12
delete [1] 105/9
deliberately [1] 65/4
delineates [1] 117/18
Delorgi [1] 143/24
DeLorenzo [4] 2/24 5/20 107/8 107/11
DeMartinis [1] 37/12
demonstrate [1] 111/22
demurred [1] 72/9
Dennis [1] 8/7
Dennison [1] 101/11
department [86] 1/2 1/7 2/5 3/17 5/1 6/17 6/25 7/6 9/1 9/17 14/2 14/6 14/9 14/13 14/17 16/12 16/16 16/18 17/24 28/5 29/3 29/12 22/11 23/17 24/11 25/7 28/5 30/8 33/7 31/20 33/7 34/18 35/7 36/2 36/9 37/23 40/25 41/3 44/20 47/2 48/6 49/24 50/17 51/16 68/13 70/20 72/23 73/20 73/22 74/11 77/24 89/9 99/18 100/7 100/14 107/7 108/5 108/11 117/9 118/9 118/17 119/10 123/10 125/11 126/5 126/12 127/8 127/13 132/10 133/20 134/8 135/22 137/5 138/4 138/18 139/5 139/6 140/6 140/17 141/1 141/8 142/3 142/4 165/15 167/22 174/5
Department's [33] 4/24 5/14 17/9 24/24 36/6 37/21 47/14 47/7 47/19 47/22 50/3 51/12 54/8 54/11 54/14 54/17 54/20 54/23 55/1 55/4 55/7 108/2 118/7 118/13 123/7 126/9 132/6

**DeLeonardo**

departmental [11] 3/5 3/8 10/12 21/4 21/23 24/5 25/12 25/17 38/4 136/12 171/2
depending [1] 9/12
depict [2] 48/21 48/22
depicted [1] 50/17
depicting [1] 132/15
deposed [1] 154/5
deposes [4] 74/15 79/20 83/2 108/14
depositing [6] 101/7 150/4 150/22 151/23 153/9 154/12
deprive [1] 146/7
depriving [1] 147/11
deputy [8] 31/6 36/23 36/23 37/8 37/8 41/6 143/6 143/13
Describe [1] 46/12
described [1] 102/3
description [1] 66/13
designated [1] 3/4
desk [1] 67/11
detail [1] 149/16
details [1] 38/8
detective [35] 2/21 5/22 33/8 33/12 37/11 42/5 48/5 50/12 68/12 68/20 68/23 77/18 79/10 79/13 82/12 82/22 86/7 89/5 89/17 93/13 98/20 98/22 99/23 100/20 101/4 104/9 107/8 107/10 108/5 108/7 110/20 114/16 114/21 132/8 143/21
detectives [5] 30/6 98/22 156/14 159/1 159/6
determination [8] 28/23 29/17 30/16 30/17 42/4 42/15 119/21 122/6
determinations [2] 29/6 123/20
determine [6] 11/15 27/25 44/4 111/14 128/1 128/5
determined [4] 11/6 45/23 45/25 136/15
diagonal [1] 62/13
diagram [1] 51/5
did [151] 8/18 12/16 15/14 16/20 23/8 34/19 34/25 35/3 36/14 41/9 41/12 42/8 42/25 43/9 43/16 43/16 45/8 45/8 48/5 48/18 48/20 49/1 49/5 51/7 52/2 55/21 56/1 56/4 56/11 57/13 58/13 58/24 59/13 59/14 59/16 60/12 62/5 61/17 62/9 62/21 62/22 63/6 64/11 65/4 65/12 66/12 66/16 67/14 67/25 68/2 77/18 81/12 81/13 88/14 91/15 94/19 95/5 95/7 96/21 96/24 97/1 97/15 97/20 98/18 98/24 99/6 99/7 103/4 103/18 103/22 103/25 106/5 107/19 111/1 111/1 111/3 111/7 116/2 117/3 118/3 118/5 119/23 119/24 120/3 120/18 120/23 121/12 122/3 122/4 123/20 124/18 125/21 125/23 126/23 126/25 127/13 128/1 128/4 128/8 128/19 128/12 130/2 130/12 130/13 130/14 130/17 132/19 132/25 134/16 134/20 135/1 135/25 136/9 138/2 138/13 142/11 142/17 142/20 143/8 144/4 144/17 144/23 144/25 146/17 146/19 150/13 151/3 151/9 151/12 151/17 151/22 154/5 154/8 154/10 159/6 160/4 161/4 164/5 154/15 155/15 153/19 153/20 153/25 162/3 162/11 165/3 162/2
didn't [18] 42/9 60/13 72/11 85/14 101/24 110/5 110/6 117/14 141/14 150/25 151/5
different [5] 11/21 43/24 44/12 58/2 113/19
DILEONARDO [129] 1/5 3/12 6/24 7/5 18/8 19/6 19/11 19/16 20/7 20/20 20/21 21/7 21/16 21/21 22/4 22/11 22/20 22/25 23/5 23/12 23/21 24/12 24/20 24/24 26/20 26/22 26/24 26/6 26/9 26/10 26/14 26/20 26/22 26/24 27/3 27/8 27/12 27/14 28/24 29/3 29/12 30/7 30/7 31/11 32/13 34/21 37/15 37/24 38/10 38/16 39/17

**E**

40/2 40/7 40/10 40/20 42/8 43/7 45/8 45/25 46/11 52/11 52/23 53/13 53/17 55/22 56/7 56/18 68/25 70/23 71/12 72/14 73/11 74/12 90/15 95/6 95/16 95/17 98/12 99/20 101/2 104/7 107/4 108/18 115/25 116/16 118/18 118/22 118/24 119/3 119/14 120/11 120/15 121/3 121/16 121/23 122/1 124/18 125/14 126/19 126/23 126/25 127/12 128/1 128/9 129/3 129/15 129/22 130/9 131/13 131/15 134/12 134/5 136/11 142/25 146/22 149/8 154/23 155/22 157/15 157/21 158/8 167/9 163/5 164/18 166/3 167/19 168/20 174/6
DiLeonardo's [19] 7/10 18/22 19/20 25/3 26/3 29/20 38/15 38/25 40/13 52/6 54/7 94/25 130/5 132/24 136/15 140/5 146/8 168/15 172/19
dinner [5] 57/12 90/12 90/19 91/3 108/23
dinning [1] 39/12
directed [2] 34/13 142/72
direction [1] 62/11
directions [1] 60/10
directly [5] 34/12 40/1 60/7 81/14 145/13
disbanding [1] 73/3
discharges [1] 166/21
disciplinary [8] 3/8 113/19 119/25 122/3 122/14 127/17 134/21 134/23
discipline [1] 146/6
discovery [7] 64 49/20 53/9 117/21 123/3 126/2 133/25
discuss [2] 98/24 99/6
discussed [4] 8/13 69/13 92/4 135/23
dismiss [1] 10/6
dismissed [2] 10/4 45/13
dispatcher [1] 110/14
displacement [2] 124/8 124/12
displayed [1] 27/3
distance [3] 39/24 134/10
Dister [36] 20/25 22/1 22/18 22/24 23/12 23/18 33/8 33/13 36/8 42/6 42/18 42/24 50/12 55/15 55/20 70/10 87/1 89/5 89/8 89/18 100/21 107/11 107/16 108/6 111/3 112/21 114/21 123/11 123/13 134/7 135/21 137/4 158/10 171/16 173/19 172/7
district [8] 30/25 45/13 46/8 48/11 49/4 115/23 129/1 132/21
do [78] 9/1 15/10 16/14 17/7 17/11 17/16 17/20 34/5 34/5 34/8 35/14 36/8 36/11 42/9 45/3 45/8 48/5 48/9 48/21 57/15 58/8 59/15 60/24 63/20 65/11 69/22 69/24 71/18 71/24 72/1 74/3 78/23 79/2 84/20 97/7 97/15 99/5 100/5 101/22 102/1 102/22 116/23 116/23 117/14 117/15 118/12 122/24 122/17 123/13 125/9 126/14 127/21 127/20 129/11 130/17 132/8 132/22 134/7 134/6 137/13 137/18 138/5 139/1 139/19 146/21 147/13 154/4 161/14 164/15 165/3 165/14 165/15 167/17 169/1 170/7 174/4
Dobro [3] 51/1 80/4 113/16
document [13] 8/15 35/23 36/1 36/9 36/14 36/19 49/19 123/14 123/16 134/4 134/10 134/14 16/1
documentary [1] 4/3
documents [3] 51/18 52/17 163/19
Dodger [7] 58/5 58/8 58/16 75/22 91/23 169/1
does [14] 11/3 34/17 101/3 101/6 104/8 104/11 111/18 115/6 117/19 117/22 138/6 138/6 153/12 164/4
doesn't [6] 150/16 154/16 165/17 166/13 167/11 169/8

**E**

extra [1] 135/17
extract [1] 125/17

**F**

face [12] 18/10 23/5 82/4 102/14 103/14 105/18 105/21 106/3 121/23 124/7 125/3 125/4
facial [1] 124/13
facing [5] 87/18 87/20 110/8
fact [8] 21/16 21/21 23/8 124/18 152/10 153/11 166/4 169/7
facts [9] 8/14 21/12 42/12-44/14 44/17 100/1 116/14 153/3 153/4
factually [2] 41/25 112/10
fail [1] 134/16
failed [1] 25/9
failing [1] 24/13
fair [5] 10/1 33/19 31/24 32/9 32/14
fairness [2] 12/7 155/12
false [1] 87/2
far [4] 7/3 14/24 124/16 136/11
Farmingdale [2] 57/8 97/2
fashion [1] 146/15
faces [1] 51/14
feared [2] 62/16 62/25
fearing [2] 40/2 62/6
February [26] 18/4 19/2 20/1 21/15 22/2 22/16 34/21 37/2 57/4 57/6 70/21 72/3 74/12 77/21 79/13 80/2 82/21 86/10 87/6 90/10 90/20 90/25 110/23 114/24 144/8 157/12
February 27 [3] 19/2 34/21 37/2
February of [1] 144/8
federal [1] 170/3
feelings [1] 121/13
feels [1] 137/5
feet [8] 37/6 39/8 63/14 63/24 65/17 84/17 93/17 95/15
fell [2] 40/13 85/25
fellow [1] 102/8
felonies [1] 25/6
felony [4] 23/24 19/22 118/24 127/23
felt [6] 81/24 81/25 117/5 125/20 158/23 158/23
female [9] 38/22 60/10 66/20 83/7 22 87/23 88/5 88/15 96/24 97/23
Ferguson [3] 104/20 105/6 105/9
few [2] 147/13 159/1
figure [1] 59/11
figuring [1] 148/8
file [2] 2/10 69/10
filed [4] 10/16 11/20 152/11 152/7
final [1] 52/10
find [5] 11/13 21/19 25/16 33/19 143/9
findings [2] 120/5 124/20
fine [7] 48/3 137/21 148/12 156/8 168/6 169/22 170/12
finish [1] 91/15
finished [3] 58/9
fire [6] 63/3 63/6 63/13 81/23 158/22 165/17
firearms [1] 140/14
fired [13] 19/11 22/21 26/22 27/6 40/2 63/1 63/9 81/25 85/1 88/25 119/1 158/23 164/18
fired! [1] 105/11
firing [4] 23/19 63/17 164/23 167/19
firm [1] 4/17
first [23] 6/5 17/12 32/19 32/20 33/5 33/19 35/15 56/15 58/3 63/13 67/17 70/11 72/25 73/19 90/24 95/22 101/20 120/8 123/1 129/12 137/19 143/6 163/12
fist [1] 127/3

fists [1] 121/24
fit [2] 29/21 38/7
five [11] 19/12 23/19 52/9 52/1 63/5 104/24 105/1 105/4 119/1 119/20 147/20
fix [1] 116/21
Flanagan [4] 15/3 15/5 16/25 37/10
flash [2] 59/15 87/16
flashed [3] 80/13 80/18 93/2
flashing [5] 38/24 39/1 59/14 83/23 93/3
fled [1] 40/17
flipped [1] 161/13
floor [3] 24/17 131/17 132/16
floored [1] 61/25
fob [1] 113/21
focused [1] 73/13
Focusing [1] 102/3
follow [1] 92/8
followed [5] 57/23 58/25 81/1
following [4] 37/14 91/10 92/13 109/1
follows [4] 18/1 18/4 33/22 38/9
fond [2] 146/9 147/11
for-instance [1] 10/14
force [22] 17/4 35/11 35/12 35/19 36/5 36/12 36/24 37/3 38/1 38/3 38/5 43/25 44/14 44/16 114/22 115/2 115/6 122/4 136/12 146/9 163/2 172/13
forearms [1] 71/6
foregoing [1] 174/4
forensic [2] 51/12 105/2
Forest [2] 57/9 91/1
forever [1] 13/17
forgive [1] 9/19
form [19] 6/21 7/2 43/9 43/11 53/16 54/10 125/24 126/8 126/21 134/4 134/11 134/25 138/11 153/6 156/18 172/20 173/4 173/10 173/8
formed [1] 30/19
Forms [1] 6/18
forth [4] 3/5 9/25 81/11 156/23
forum [1] 167/3
forward [17] 10/2 10/11 10/25 11/3 11/8 11/17 12/8 17/19 31/10 81/21 82/12 84/22 101/21 114/3 114/11 158/20 161/6
found [2] 28/23 38/7
four [18] 84/4 82/6 62/1 66/19 81/24 94/17 94/17 122/23 144/11 153/22
four-page [1] 8/6
fracture [5] 123/24 124/8 124/8 124/12 124/12
fragments [2] 124/9 124/13
FRANKLIN [2] 1/8 2/7
frankly [2] 32/6 145/24
friend [3] 31/4 86/19 86/19
front [13] 61/5 62/12 65/21 81/14 83/19 84/17 85/2 85/18 87/11 88/12 94/24 132/12 163/24
fuck [2] 97/15 183/3
fucking [5] 60/15 60/16 61/14 81/9 157/9
full [1] 114/5
function [1] 141/5
fundamental [2] 11/25 155/12
Further [1] 26/11
furtherance [1] 167/7
Furthermore [1] 2/16

**G**

G25X [1] 108/22
Gallop [1] 101/14
game [1] 87/8
GARDEN [2] 2/16 4/19
gas [2] 105/22 160/6
gasoline [3] 113/20 114/7 114/8 160/13
gathered [1] 51/15

gave [8] 11/24 14/4 14/7 27/18 66/13 68/13 73/7 99/25
gearshift [1] 84/21
Generally [1] 34/8
generate [6] 34/25 117/4 125/21 125/23 142/23 143/14
generated [6] 35/6 44/13 51/10 51/11 51/15 119/15
Geraseno [1] 57/7
get [31] 10/16 12/11 27/1 39/9 43/9 49/1 51/7 62/8 62/9 65/16 81/11 82/5 83/9 88/15 92/9 93/19 93/20 95/24 97/18 103/7 105/21 122/16 132/19 137/15 137/21 138/19 153/11 154/2 169/11 170/5 170/23
gets [3] 119/18 139/14 143/15
getting [2] 65/25
girlfriend [12] 38/15 57/6 57/21 61/18 64/11 74/23 80/6 82/15 90/14 102/24 103/1 161/19
girls [1] 91/20
give [16] 6/13 10/13 14/14 16/13 25/24 44/7 69/1 71/13 104/21 136/24 143/8 146/9 153/2 156/4
given [5] 15/9 15/20 15/24 31/11 68/19
good [6] 3/1 4/20 4/21 26/1 138/1 148/9
got [33] 26/4 26/13 26/15 26/18 51/25 59/6 65/20 75/10 75/20 75/24 78/1 79/5 79/18 88/13 88/25 81/16 83/6 88/7 93/7 93/17 94/6 96/13 96/20 96/20 97/8 97/25 105/5 105/13 109/14 109/24 112/15 133/1 158/16
gotten [2] 71/22 72/14
governed [1] 8/25
grabbed [1] 103/12
grabbing [2] 96/4 129/18
grammar [1] 28/10
Grandinette [1] 101/23
grass [3] 76/18 109/16 109/25
grease [1] 84/12
ground [6] 63/20 65/24 66/1 83/9 150/8 165/9
grounds [2] 116/8 145/7
grouped [1] 89/2
guess [8] 8/23 9/15 15/10 139/3 142/8 151/23 156/14 157/11
guidelines [1] 38/4
guilty [1] 20/23
gun [42] 19/7 21/3 63/5 64/5 65/1 65/5 65/11 66/6 66/21 66/24 67/2 76/4 76/11 82/3 82/21 85/14 85/15 87/12 87/14 87/15 87/16 95/23 96/1 96/7 97/19 97/21 98/16 102/10 105/19 110/5 110/15 116/22 121/17 121/20 164/18 164/24 125/3 125/13 129/18 129/25 130/11 130/21 164/18 164/24
gunshot [1] 87/10

**G**

gunshots [4]  76/13 95/1 95/2 110/4
guy [31]  66/4 67/1 67/2 76/10 88/16 81/7
81/12 81/13 81/17 81/19 81/21 81/23 82/1
82/5 82/10 84/18 84/25 85/7 85/13 85/17
85/23 85/24 102/1 102/4 105/14 153/11
157/6 158/17 158/18 158/20 158/22

**H**

Habit [41]  156/11
had [86]  12/17 13/24 13/25 14/19 22/12
26/12 27/14 28/21 29/22 39/19 46/14 53/6
55/10 57/13 57/15 58/9 61/9 64/8 68/17
68/19 72/4 75/9 75/10 77/6 77/9 80/6 80/7
80/19 82/11 82/12 87/12 88/18 88/19 90/11
90/18 91/3 91/3 91/4 91/5 91/6 91/12 91/13
91/23 91/14 91/18 91/19 91/20 91/23 91/24
91/25 93/2 94/10 95/8 95/11 95/13 96/1 97/2
97/19 98/1 98/14 98/15 99/7 103/8 103/8
106/9 106/12 106/13 110/17 111/13 111/22
114/22 123/24 129/18 129/24 129/25 130/10
130/15 139/12 144/10 150/25 151/6 152/13
152/24 161/16 162/16 165/2
hair [7]  34/4 57/18 58/17 91/17 106/21
106/24 144/2
hand [29]  39/7 55/21 56/4 61/7 61/9 61/10
64/18 65/1 65/2 65/11 76/2 76/11 88/18
95/20 95/23 96/2 96/3 96/6 103/13 110/5
129/18 129/19 130/12 130/15 130/18 130/21
130/23 135/21 174/8
handed [1]  8/9
handgun [1]  141/24
handing [5]  34/2 46/2 46/23 49/24 54/4
hands [5]  71/6 94/14 103/8
hang [1]  90/17
hanging [2]  13/17 85/24
Hann [4]  58/4 58/10 58/15 91/12
happen [4]  11/2 167/10 167/11 167/15
happened [16]  13/4 28/13 46/8 50/23 87/12
94/19 94/10 97/24 98/19 98/21 102/7 105/13
119/16 119/24 127/17 134/24
happening [2]  9/6 28/4
happens [4]  9/12 16/23 17/8 160/18
hard [2]  79/6 79/17
harm [1]  63/11
has [33]  3/12 8/10 11/6 16/2 25/1 30/13
30/19 31/10 32/6 32/11 33/5 36/9 42/6 46/20
46/21 49/19 50/6 53/8 72/17 72/23 73/20
82/18 102/12 134/9 114/17 122/25 131/24
135/16 139/14 141/12 152/7 165/13 169/6
hat [2]  138/8 138/9
Hauppauge [1]  101/13
Haus [2]  52/9 91/1
have [112]  3/4 4/12 4/23 5/5 5/7 5/9 6/1 6/2
6/5 6/8 8/20 9/1 9/20 11/4 12/1 12/17 12/21
13/12 13/15 15/21 16/15 16/18 17/14 29/8
29/9 32/14 34/2 37/24 46/1 47/9 48/6 48/13
55/10 55/21 56/21 57/19 60/23 61/9 68/2
73/12 73/15 73/14 77/16 78/5 78/11 78/12
78/19 78/24 82/17 86/5 86/25 88/19 89/11
89/13 90/3 93/25 95/7 96/21 100/8 100/12
100/16 100/17 104/6 106/20 106/22 110/7
110/18 112/25 114/13 115/7 115/8 117/13
117/19 120/4 121/21 123/1 125/9 132/12
132/17 135/3 135/6 135/17 135/21 136/5
137/1 137/6 138/17 138/24 139/2 139/7
139/11 139/14 140/9 141/7 141/13 146/25
146/25 147/3 150/16 152/20 154/18 154/24
154/25 156/3 156/10 160/2 161/5 165/17
166/14 170/2 170/4 170/21
haven't [2]  69/8 69/20
having [9]  33/19 44/2 60/20 79/2 80/9 86/16

93/24 113/21 161/21
be [23]
he's [13]  13/8 79/18 102/12 102/13 102/15
103/13 129/22 139/2 141/10 141/19 141/24
165/2 167/24
head [8]  65/2 76/14 92/6 95/4 102/14 127/4
128/17 130/22
headed [2]  62/19 63/4
heading [1]  84/10
headlights [2]  33/24 39/1
hear [21]  4/2 9/23 20/24 21/14 22/1 22/8
22/18 22/24 23/4 24/19 29/4 30/24 42/10
42/11 64/6 93/22 94/20 164/8 161/16
161/19 162/11
heard [27]  5/6 41/14 76/13 76/14 85/4 85/13
85/14 85/18 85/19 87/9 87/9 88/25 94/25
95/1 95/4 95/11 96/24 101/21 109/25 110/3
110/8 145/12 155/2 162/14 162/19 162/21
162/24
hearing [77]  1/14 2/3 3/4 3/7 3/8 3/18
3/22 5/12 6/6 6/7 8/10 8/13 8/24 9/14 10/22
11/16 11/18 14/15 14/16 16/10 16/18 20/5
25/1 25/15 27/24 28/1 28/5 28/13 28/15
28/16 30/13 30/18 30/18 33/18 33/25 35/21
35/21 42/4 42/14 46/17 49/19 53/5 53/11
55/5 55/6 55/11 56/3 69/4 69/5 69/19 72/2
72/4 72/6 72/17 72/25 73/4 73/10 94/15
100/24 104/3 104/13 107/21 122/10 126/3
131/25 133/7 137/6 137/8 145/14 145/17
159/11 159/12 150/22 154/7 173/1 173/5
hearings [4]  4/18 28/3 28/18 41/23
hearsay [2]  29/8 42/12
held [4]  3/8 101/9 104/3 104/14
help [1]  115/18
helping [1]  96/12
Hempstead [3]  111/21 164/4 164/5
her [32]  28/7 28/8 30/9 30/10 30/15 31/7
33/5 42/2 42/3 42/19 44/4 60/11 66/14 66/23
66/25 67/12 74/23 80/7 88/9 93/7 97/9 103/5
107/9 115/9 121/25 128/11 136/21 147/25
147/25 155/7 159/25 160/6
here [20]  5/11 5/15 9/20 32/8 42/10 42/11
44/3 44/3 72/13 77/18 86/7 106/19 107/20
110/20 132/23 137/14 150/24 159/14 167/25
171/9
hereby [1]  174/4
herein [2]  33/19 87/2
hesitation [1]  89/3
hidden [2]  64/1
high [10]  29/10 29/16 30/21 59/14 59/15
80/13 83/14 83/19 83/22 83/23
high-ranking [2]  29/10 30/21
higher [1]  59/3
higher-ranking [1]  59/3
Highway [1]  101/12
HILLER [7]  2/9 4/25 17/23 33/5 33/23 172/4
172/8
Hills [2]  80/22 92/15
him [86]  9/21 13/10 13/15 13/18 17/2 18/12
22/14 23/3 25/2 25/11 26/13 26/17 26/17
40/4 40/12 59/9 60/19 60/20 60/24 61/3
63/11 63/19 64/10 64/21 65/4 65/4 65/9
65/22 65/23 66/7 67/1 67/10 67/11 68/6
68/13 78/12 80/14 81/1 84/2 86/3 90/18
90/19 92/8 92/9 93/16 96/22 97/2 97/15
97/17 97/19 97/19 98/11 103/12 109/12
117/20 121/20 125/2 125/3 129/16 129/23
129/24 129/25 131/3 131/3 131/24 133/19
133/5 136/20 138/9 143/7 147/24 149/14
159/9 159/19 152/10 153/6 153/6 153/17
153/22 157/8 160/5 164/6 164/15 164/20
165/7 165/15 165/21 165/23 166/7 166/8
166/11 167/16 168/7 169/11 171/6 171/10
171/11 171/11

himself [8]  26/6 26/23 27/4 39/18 82/1
103/22 153/24 165/2
his [205]
hit [11]  23/5 73/19 43/11 65/18 65/23 81/25
94/17 97/25 102/8 102/9 158/23
hitting [3]  63/19 71/8 82/4
Hoffman [2]  68/24 143/21
Hold [1]  148/22
holding [5]  9/11 65/1 76/1 109/22 130/21
hole [1]  164/2
holes [2]  44/14 48/22
holster [1]  62/8
homicide [5]  37/12 37/21 40/25 99/24
100/14
hood [2]  88/12 94/4
hopeful [1]  32/13
hopefully [2]  16/10 42/13
Horace [1]  37/9
hospital [37]  17/10 7/13 17/15 18/14 29/11 31/3
40/19 40/21 67/14 67/17 67/9 67/15 68/4 68/9
82/14 82/16 86/4 86/8 94/21 98/7 98/10
98/13 98/17 98/23 99/2 99/4 99/10 99/17
121/6 122/11 122/23 123/6 124/20 124/21
129/22 129/23 173/5
hot [1]  91/16
hour [6]  91/17 91/21 92/1 106/19 106/20
106/24
hours [13]  18/5 19/3 20/1 22/16 37/5 38/10
159/1
house [2]  91/4 109/2
house-brewed [1]  91/4
how [27]  15/9 16/14 23/13 23/14 34/2 39/9
51/9 60/15 60/16 76/13 81/9 84/14 99/3 99/5
101/22 110/4 133/1 139/13 142/11 142/17
142/20 149/7 154/12 159/9 159/23 160/10
162/22
however [1]  151/22
hundred [1]  149/22
Hunter [4]  36/23 37/8 41/6 67/23
Huntington [34]  7/11 18/6 19/4 20/3 22/6
37/1 37/7 39/13 38/18 39/5 40/19 40/21
57/19 57/25 58/2 58/25 71/2 75/2 80/1 80/23
83/4 86/7 86/18 89/7 89/16 91/9 98/7 98/10
108/24 122/11 122/23 123/6 129/22 173/5
husband [5]  74/18 74/19 76/22 77/4 77/11
husband's [1]  74/20
hybrid [3]  51/2 111/17 113/18

**I**

I'd [4]  71/13 108/6 118/2 126/11
I'll [16]  4/13 10/13 47/14 49/22 73/2 73/5
73/5 74/7 101/18 117/14 122/16 136/24
143/9 148/17 160/7 164/16
I'm [68]  8/15 9/9 9/15 10/5 14/12 14/25
15/16 17/7 17/23 20/7 20/8 22/21 32/13
32/21 61/14 73/2 76/3 77/1 107/19 107/20
111/20 112/14 113/2 116/11 117/11 117/16
117/19 120/8 120/11 122/5 122/9 122/22
122/22 122/24 125/25 131/3 131/24 133/19
135/5 136/20 138/9 143/7/24 149/14
159/9 159/19 152/10 153/6 153/6 153/17
153/22 157/8 160/5 164/6 164/15 164/20
165/7 165/15 165/21 165/23 166/7 166/8
166/11 167/16 168/7 169/11 171/6 171/10
I've [6]  8/8 14/11 71/22 72/13 128/12 155/2
IAU [4]  36/15 56/19 144/1 147/12
IAU-27-2010 [1]  56/19
IAU27 [3]  89/25
IAU27-2011 [1]  89/25
ID [1]  95/9

**I**
idea [2] 60/20 102/6
identification [1] 134/6
identified [3] 38/20 39/18 66/5
identify [2] 46/19 103/22
identity [1] 98/21
IEU [1] 41/9
ignore [1] 61/3
ignored [1] 64/15
II [3] 79/11 101/4 104/9
illness [1] 90/21
immediately [8] 61/25 63/25 65/20 77/8 87/25 95/2 95/3 97/12
impacts [1] 51/4
impaired [1] 63/21
important [1] 10/23
impossible [2] 29/2 30/16
impression [1] 124/11
inaccurate [4] 31/9 32/6 73/23 112/10
inappropriate [4] 30/15 31/8 31/17 41/25
incident [58] 7/13 18/15 21/3 22/15 22/19 26/2 27/23 29/19 32/5 34/20 35/8 35/11 35/12 35/20 36/25 37/4 37/13 38/9 38/23 44/19 44/23 49/13 49/18 50/2 52/16 59/18 63/22 67/12 67/15 68/15 70/21 70/25 93/1 98/25 99/6 100/2 100/7 111/16 115/5 115/22 119/9 121/1 125/6 127/7 128/25 131/6 133/13 134/19 135/6 138/16 142/24 144/7 144/12 155/20 157/11 159/2 163/2 172/18
Incident/Accident [1] 70/21
include [1] 139/10
included [2] 6/22 7/3
includes [2] 119/8 127/6
including [3] 22/10 23/10 63/11
inconceivable [1] 73/12
inconsistent [1] 31/11
increases [1] 114/8
independently [1] 166/23
INDEX [1] 172/1
indicate [2] 107/4 113/25
indicated [8] 11/1 106/14 123/25 124/5 144/1 149/24 157/14 168/22
indicates [1] 156/22
indicating [1] 162/16
individual [7] 26/7 30/19 31/15 140/8 143/1 152/20 168/1
individuals [6] 27/17 29/5 29/13 58/12 67/22 156/18
Infield [8] 57/22 74/24 81/6 83/20 87/19 107/15 108/22 157/6
influence [1] 153/3
information [11] 31/10 32/7 37/22 43/9 50/21 113/8 115/8 119/8 119/18 119/18 127/6 133/11
informed [1] 67/10
inherent [1] 164/23
initial [2] 114/4 120/5
initialed [6] 78/6 78/14 80/21 80/23 83/16 89/15
initially [1] 93/15
initials [3] 78/10 78/22 79/18
initiate [1] 157/19
injure [1] 26/9
injured [1] 73/4
injures [1] 64/11
injuries [5] 40/22 40/22 41/2 71/6 71/7
injury [2] 23/7 23/9
inquire [1] 155/13
inquiries [1] 72/4
inquiry [1] 71/23
inside [2] 29/13 96/5 134/18 136/19
insignia [1] 68/1

inspector [20] 1/13 2/3 3/2 4/20 8/24 15/4 15/5 27/24 28/16 29/2 37/9 47/9 48/1 143/13 143/24 155/5 156/6 156/7 163/24 169/21
inspectors [2] 29/10 30/1
instance [4] 10/14 138/21 152/23 169/15
instead [2] 15/20 73/14
insurance [1] 163/18
intake [1] 63/21
intend [2] 31/22 146/12
intending [1] 152/8
intent [3] 9/24 23/7 165/19
intention [1] 96/12
intentionally [6] 19/7 23/18 116/16 116/20 118/25 127/1
interject [1] 141/22
interjecting [1] 147/15
internal [22] 7/6 21/1 21/5 29/25 30/4 30/13 32/8 32/17 33/13 33/25 34/3 45/16 53/13 56/17 89/10 89/23 142/18 142/20 146/4 146/12 149/13 159/9
interrupt [2] 122/13 148/5
intersection [1] 39/12
interview [7] 100/2 144/17 144/23 145/18 145/25 146/5 159/6
interviewed [16] 27/21 29/13 30/7 68/12 99/23 100/13 116/25 144/21 146/14 149/4 149/7 149/12 149/15 151/10 151/16 159/8
interviewing [1] 146/11
interviews [5] 37/23 44/21 44/22 100/15 159/12
intoxicated [2] 77/12 110/16
investigate [2] 21/2 34/20
investigated [1] 37/4
investigation [44] 21/6 34/13 35/1 35/4 35/8 35/20 36/13 36/25 37/18 37/20 38/1 41/1 41/9 42/24 43/15 44/12 45/6 45/23 48/19 49/2 50/14 50/22 51/7 111/3 111/11 111/14 120/10 120/13 120/24 125/19 125/25 128/20 128/22 131/9 131/21 133/1 136/9 142/9 142/24 143/22 143/23 144/14 144/17 149/13
investigations [4] 34/6 34/8 34/10 34/15
investigator [3] 49/3 51/8 132/20
investigators [2] 37/23 100/15
invited [1] 90/19
involuntary [1] 147/8
involved [7] 22/14 37/13 38/3 38/7 38/22 67/10 70/22
involvement [1] 17/6
involving [3] 22/15 22/19 142/24
irrational [1] 61/23
irrelevant [9] 42/1 42/10 44/5 45/7 116/10 136/22 145/9 166/2 167/24
is [245]
isn't [1] 164/22
Israel [2] 2/20 5/23
issue [2] 10/8 16/19
issued [14] 16/1 20/5 138/4 138/17 139/16 139/20 139/21 140/4 140/20 140/22 141/17 142/2 142/4 168/23
issues [4] 6/3 38/3 139/5 166/25
it [219]
it's [56] 9/17 10/22 11/6 13/4 16/4 29/7 30/16 36/12 41/24 42/9 42/9 43/13 44/8 45/6 71/11 72/19 73/1 73/11 75/21 78/1 78/6 79/5 79/7 79/17 82/25 86/21 89/21 101/17 104/4 107/23 111/19 112/9 112/10 113/3 115/3 115/16 116/9 156/17 163/9 164/11 166/1
Item [2] 14/13 15/17
items [10] 35/14 43/6 48/9 50/16 50/20 52/17 56/3 56/5 115/16 115/17

...2] 36/19 60/7 64/7 108/8 109/19 110/1
111/7 111/14 111/24 112/1 113/9 159/18
itself [3] 99/7 123/25 164/11
IVU [1] 37/10

**J**
J-O-H-E-N [1] 8/4
J-O-H-N [1] 8/4
jail [1] 85/9
Jameson [1] 57/14
jeopardy [2] 10/8 12/2
Jericho [5] 59/1 59/7 75/3 92/9 92/19
Jill [11] 67/5 94/9 108/19 108/20 109/2 109/3 109/14 109/25
Jillian [13] 7/21 53/19 54/13 57/7 74/14 75/22 77/20 90/12 116/2 119/12 121/5 127/11 172/21
Jim [1] 98/25
Jo [12] 20/24 33/8 33/13 87/1 89/8 89/18 100/22 107/11 145/19 171/15 171/19 172/7
Jo-Ann [21] 20/24 33/8 33/13 87/1 89/8 89/18 100/21 107/13 171/15 171/19 172/7
Jo-Ann's [1] 145/10
Joanne [3] 2/24 5/20 107/8
Johen [1] 8/3
John [8] 36/23 37/8 37/11 41/6 101/3 101/6 104/8 104/11
join [2] 90/19 94/7
Judge [3] 154/5 156/6 156/11
judgment [1] 42/15
Judi [1] 101/14
judicial [1] 11/13
juice [1] 57/14
July [3] 3/6 79/23 101/9
July [2] 3/1 3/6
June [4] 34/24 45/12 142/22 144/14
June 6 [1] 45/12
June 6th [1] 142/22
June 7 [1] 34/24
just [54] 5/3 6/2 8/17 12/19 12/19 13/16 13/20 14/1 15/12 17/13 25/21 32/15 33/24 47/10 47/14 69/21 70/11 73/21 97/15 101/18 102/17 102/21 106/2 115/16 112/9 112/16 117/17 122/14 133/11 135/23 137/11 138/5 139/4 141/13 141/18 142/13 146/15 147/18 148/3 148/23 149/16 151/5 151/5 155/11 156/4 158/11 159/20 161/13 162/14 163/4 164/7 165/24 166/9 170/25
justification [8] 18/9 164/12 165/13 167/7
justified [3] 164/23 166/22 167/19

**K**
K-L-U-G [1] 8/2
K-R-I-S-T-I-E [1] 7/23
Karen [2] 2/22 5/13
KEARON [3] 2/12 4/17
keep [2] 71/16 90/22
keeping [2] 44/10 147/10
keeps [1] 109/22
kept [1] 63/19
key [1] 113/21
kill [6] 61/13 61/15 61/24 64/10 64/23 66/4
kind [4] 28/23 110/10 139/22 142/7
King [13] 87/24 41/1 53/1 53/25 86/13 86/14 86/15 89/15 116/1 119/12 121/4 121/5 127/11
Klug's [2] 54/22 172/24
knew [5] 39/5 152/18 152/12 154/4 154/4
knocked [2] 82/10 83/9
know [55] 15/7 32/8 45/3 57/8 57/15 58/3 58/24 59/11 65/11 66/12 67/25 69/14 71/22 72/18 73/9 74/23 76/13 82/11 84/22 94/11 95/6 97/2 98/7 98/21 99/5 100/5 101/22

**K**

know... [28]  101/25 102/4 102/11 103/4
105/1 109/5 110/4 110/6 110/9 114/21
114/22 116/23 116/23 127/21 127/21 127/23
127/24 130/12 132/22 139/13 145/16 146/16
153/20 153/25 154/6 154/12 155/4 155/23
knowledge [7]  42/13 105/4 106/6 135/2
135/3 150/21 160/6
known [1]  154/18
Kristie [14]  7/23 46/10 52/25 53/23 54/19
80/7 83/1 86/9 116/1 119/11 121/4 121/24
127/10 172/23
Kreuzter [1]  142/23

**L**

L-E-S-L-I [1]  5/1
Laboratory [1]  51/13
Lamb [2]  101/5 104/10
lane [5]  60/1 60/3 87/18 95/14 96/19
lanes [1]  60/4
language [1]  93/23
large [1]  88/19
last [9]  53/8 58/9 58/22 74/18 74/23 77/10
85/21 104/21 108/17
later [9]  31/5 38/20 47/15 93/12 94/21 105/3
129/20 158/15 159/16
law [16]  3/10 4/17 10/21 18/20 19/18 24/3
24/9 25/6 38/6 46/3 78/9 87/4 118/23 120/22
121/14 126/24
lawful [6]  23/14 24/23 27/2 169/5 169/12
169/18
lawn [1]  83/23
lawsuit [6]  152/13 152/24 153/1 153/15
154/1 154/4
lawyer [7]  31/15 78/12 78/15 78/16 78/19
78/21 145/24
lead [1]  59/1
leaked [7]  32/7 32/9 72/23 72/24 73/1 73/13
73/18
leaking [1]  73/20
learn [1]  102/12
learning [1]  65/3
learn [5]  60/15 81/9 84/14 104/1 157/7
learned [3]  41/25 46/12 94/21
least [8]  14/25 40/3 91/4 98/19 99/22 106/3
122/25 145/16
leave [5]  13/9 13/17 38/17 103/2 170/4
leaves [1]  145/14
leaving [1]  58/21
led [3]  116/3 124/22 129/8
Lee [1]  101/11
left [21]  41/20 57/19 58/22 61/9 64/18 71/6
71/6 77/7 80/14 88/21 91/8 91/8 91/16 96/6
103/13 108/25 124/7 124/9 124/11 124/14
131/17
left-sided [1]  124/11
leg [1]  71/7
legal [9]  2/20 2/21 2/22 2/24 5/2 5/14 5/24
17/24 166/20
legally [1]  141/19
lengths [4]  62/2 94/17 94/18 95/13
LESLI [3]  2/9 4/25 17/22
Lesor [5]  79/11 79/14 82/22 101/4 104/9
let [16]  8/8 17/13 25/21 33/4 35/17 46/22
49/15 59/5 51/17 55/16 107/3 115/11 138/1
142/7 148/17 168/10
let's [6]  16/22 47/1 70/2 70/3 155/17 155/25
letter [1]  20/22
level [1]  114/8
Lewis [1]  31/2
license [2]  66/2 66/14
lie [1]  154/18

Lieutenant [2]  68/24 143/21
life [10]  40/2 40/23 63/1 165/20 166/3 166/15
167/21 167/23 168/3 168/15
light [2]  84/5 84/8
lights [5]  80/11 80/18 93/2 93/5 113/24
like [21]  18/13 131/11 133/1 161/10 161/1 35/22
36/1 41/13 46/16 53/5 55/10 55/13 55/14
69/15 72/18 106/3 109/1 110/14 111/19
138/8 169/11
limit [1]  63/18
limited [2]  3/19 23/10
line [2]  60/3 62/14
list [3]  14/5 167/20 171/3
listed [1]  37/4
literally [4]  29/1 145/19 146/2 152/25
litigation [1]  166/25
little [6]  47/15 83/17 144/13 158/15 170/5
170/8
live [4]  74/16 79/25 83/3 108/15
living [1]  87/8
LLP [1]  2/12
loaded [1]  96/7
located [3]  26/21 59/23 63/25
location [2]  22/9 71/2
lock [2]  95/5 169/10
locked [2]  27/7 27/7
locking [1]  95/12
long [1]  34/2
look [7]  66/9 66/11 74/7 129/11 135/4 155/25
163/18
looked [13]  14/4 14/8 60/19 66/9 76/21 85/6
87/10 87/25 88/22 89/1 95/10 109/11 111/10
looking [4]  14/12 15/16 117/17 120/9
looks [3]  16/10 16/11 110/14
lose [2]  65/2 131/15
losing [1]  128/17
lost [12]  38/17 59/5 97/21 98/1 98/16 109/7
129/12 128/15 129/25 133/8 138/8 153/8
lot [4]  57/25 58/21 80/10 84/23
low [1]  31/1
low-ranking [1]  31/1
lunch [6]  73/2 74/7 106/18 106/25

**M**

M-O-N-D-O [1]  7/23
M-O-R-O-U-G-H-A-N [1]  7/17
mad [1]  80/15
made [24]  4/6 7/4 30/15 39/5 39/14 53/19
53/22 57/3 69/6 75/4 77/6 87/2 88/12 90/11
92/14 92/16 121/25 122/5 124/17 147/2
151/6 153/14 155/16 155/24
mails [1]  72/14
main [3]  59/3 59/4 59/6
make [13]  10/21 17/13 29/5 30/17 42/5 42/14
43/16 67/20 75/8 119/21 120/14 123/20
132/25 147/19 159/25 151/17 168/6 170/8
making [8]  29/17 34/10 56/20 80/11 90/1
90/15 110/12 128/13
male [5]  87/22 93/20 98/5
man [8]  61/22 62/25 64/14 87/11 87/14 88/3
88/11 88/17
managed [1]  95/24
mandated [1]  10/22
maneuver [4]  26/14 31/21 32/2 113/18
many [4]  44/22 76/13 118/4 167/16
Maronese [5]  67/18 98/17 171/5 171/9
171/10
MARCH [6]  1/10 7/7 53/14 54/1 56/15 89/21
March 13 [1]  54/1
MARION [3]  2/12 4/16
mark [8]  36/4 47/17 59/1 54/5 107/25 118/4
123/5 126/7
marked [44]  36/1 36/6 36/9 46/17 46/25 47/3

4.... 47/18 47/21 48/6 49/23 50/3 50/7 53/11
54/8 54/10 54/13 54/17 54/19 54/22 54/25
55/4 55/7 55/12 56/4 107/22 108/1 137/17
117/18 118/6 118/12 123/7 123/10 126/4
126/8 131/25 132/5 132/9 133/22 134/4
135/8 135/9 135/12 136/22
martial [1]  91/6
master [7]  100/24 104/4 152/11 152/16
154/16 155/11 174/5
matter [1]  166/20
may [12]  4/12 4/23 6/1 15/20 56/25 61/9
88/19 90/7 91/25 141/21 153/10 167/8
maybe [4]  10/1 102/19 168/11 170/4
McQuade [5]  99/2 99/19 100/4
me [23]  4/7 17/13 17/20 23/21 26/24 35/14
46/8 48/11 57/1 59/1 59/14 60/7 60/9 60/12
60/12 60/23 61/2 61/6 61/7 61/24 62/5 62/12
62/16 62/20 62/23 62/25 63/8 63/14 63/19
64/10 64/24 65/1 65/15 65/17 65/22 66/4
66/7 66/8 66/17 67/6 67/21 67/24 66/25 67/1 67/5
67/20 67/23 68/6 69/24 71/8 71/8 72/16
72/24 73/5 73/21 79/3 79/6 79/12 79/17 80/7
80/9 80/12 80/17 80/18 80/25 81/10 81/25
82/4 82/5 82/21 86/10 89/11 90/8 91/10 92/8
92/13 93/2 93/6 95/8 96/17 96/17 97/16
97/16 97/18 97/20 97/23 98/1 98/6 98/8
98/13 98/15 98/17 98/17 98/18 98/20 98/20
99/4 99/7 99/15 102/7 102/9 102/10 102/13
102/13 102/15 103/12 103/13 104/21 105/18
105/20 105/21 106/3 107/12 110/23 111/12
115/11 115/23 117/2 122/17 129/1 138/1
142/7 142/13 149/14 152/16 153/8 156/5
157/1 158/11 158/18 158/23 164/7 164/21
163/10 169/22 170/11 171/1 171/21 171/25
me/as [1]  79/5
means [8]  16/10 73/9 112/12 117/14 138/6
138/12 166/22 167/11
meaning [1]  3/24
means [1]  170/3
meant [1]  82/12
medial [1]  124/8
medical [4]  18/13 99/13 123/17 127/9
meeting [2]  90/24 120/1
member [5]  14/17 15/22 21/16 70/22 113/16
members [8]  15/18 15/24 16/16 16/18 34/17
37/4 147/2 171/2
Memorial [1]  101/12
mention [1]  130/14
mere [1]  164/10
merely [1]  10/16
merged [1]  92/14
met [2]  57/7 59/1
MICHAEL [5]  1/13 2/3 3/2 68/5 68/22
mid [2]  81/8 157/7
middle [5]  75/6 76/21 76/23 87/13 146/7
midline [1]  61/8
might [5]  15/8 21/19 110/7 156/10 165/18
Mike [4]  67/9 67/12 67/19 98/22
mild [1]  124/12
Miller [4]  67/23 68/18 99/14 108/16
million [4]  152/14 153/1 153/11 154/2
millions [1]  154/12
mind [2]  21/19 79/2
mine [1]  62/6
MINEOLA [4]  1/9 2/8 72/17 104/15
minute [2]  60/5 70/4
minutes [5]  32/24 58/15 66/19 147/18 147/20
mirrors [1]  93/11
mischief [21]  19/21 24/2 25/4 46/2 46/5 52/8
55/25 135/15 135/20 116/5 116/5 116/19 117/6
117/25 118/23 134/7 165/5 165/13 165/14
166/23 167/25 168/14

## M

misconduct [1] 34/16
misdemeanor [3] 87/3 126/25 127/22
misread [1] 14/11
misunderstood [1] 102/19
Mitchell [1] 14/21
mixed [4] 91/5 91/6 91/19 91/24
Monday [1] 15/7
Mondo [12] 7/23 46/10 52/25 53/24 80/7
83/1 86/9 116/1 119/12 121/4 121/25 127/10
Mondo's [2] 54/19 172/23
months [2] 144/11 144/15
more [16] 9/24 9/25 21/18 28/19 44/2 60/24
63/6 63/18 67/24 100/22 114/16 144/13
149/16 151/17 151/19 153/10
morning [8] 3/2 4/20 4/22 22/3 22/16 26/1
135/19 145/21
Moroughan [93] 7/16 7/20 13/9 18/16 19/10
20/12 22/23 23/5 23/8 23/9 23/24 26/2 26/4
26/8 26/12 26/16 26/18 26/25 27/5 27/6 27/9
27/11 29/12 29/13 31/5 31/15 38/21 38/24
39/3 39/10 39/13 39/15 39/19 39/20 39/23
40/4 40/5 40/14 40/17 40/18 41/1 45/2 46/10
52/25 53/22 54/3 55/4 55/7 79/16 82/20 83/5
100/25 101/7 103/17 104/5 104/13 104/20
116/1 119/11 121/4 121/7 121/18 122/12
123/18 123/21 124/17 124/25 125/17 127/1
127/9 127/10 128/17 129/17 129/19 130/10
130/11 130/22 133/7 149/25 150/14 151/6
151/9 151/22 151/25 152/24 153/15 154/11
155/19 157/24 158/25 161/16 162/5 163/19
Moroughan's [14] 18/12 20/14 23/20 24/17
32/10 40/12 54/16 79/8 121/21 124/19 127/4
152/12 155/3 172/22
most [7] 75/16 124/14
motive [1] 152/20
motor [2] 19/13 114/4
motors [1] 113/20
move [12] 35/23 63/16 64/5 88/2 88/4 88/14
101/20 133/20 153/9 155/17 161/6 161/25
move,' [1] 62/18
moved [5] 55/13 55/14 76/17 109/24 129/1
moves [1] 114/3
moving [9] 106/10/10 19/15 35/15 63/7 76/4
77/1 77/4 128/7
Mr [33] 13/11 23/7 23/9 23/23 24/17 25/25
53/1 86/14 101/25 104/20 105/6 105/9 117/1
123/21 124/25 127/1 127/14 127/9 128/16
129/19 130/10 130/11 130/22 133/7 137/23
151/6 152/23 154/11 155/2 155/19 157/24
172/5 172/9
Mr. [16] 18/16 20/14 23/5 26/2 46/9 123/18
129/17 149/25 151/9 151/22 151/25 153/15
158/25 161/16 162/5 163/19
Mr. Moroughan [13] 18/16 23/5 26/2 129/17
149/25 151/9 151/22 151/25 153/15 158/25
161/16 162/5 163/19
Mr. Moroughan's [1] 20/14
Mr. Thomas [2] 46/9 123/18
Ms [5] 33/5 33/23 46/10 172/4 172/8
much [6] 31/9 73/16 83/11 101/22 159/23
160/10
multiple [12] 7/18 9/18 12/4 12/5 13/18
13/18 22/10 53/4 72/14 143/20 143/20
153/14
multiples [1] 117/13
municipal [1] 57/25
must [2] 78/3 113/16
my [189]
myself [15] 57/7 59/17 59/18 61/18 66/5 66/9
68/24 73/10 89/17 89/21 98/11 100/20
105/24 125/25 143/22

## N

name [11] 4/17 5/17 17/22 33/10 58/6 58/19
67/25 74/24 80/7 86/15 109/5
named [1] 108/19
narrative [1] 100/10
nasal [3] 123/24 124/7 124/11
NASSAU [35] 1/2 1/7 2/5 5/1 5/13 6/18 7/2
7/5 14/25 17/23 21/17 27/19 29/15 30/23
31/2 31/13 35/7 54/4 55/6 67/17 70/20 89/9
100/6 101/1 101/2 104/3 104/6 104/7 104/14
121/22 152/1 152/14 154/3 173/2 174/5
nature [3] 7/25 139/2 141/8
navigating [1] 39/4
NCPD [1] 3/15
near [5] 81/22 94/1 94/7 94/12 158/21
necessary [2] 4/2 4/8
neck [4] 64/1 88/20 98/3 109/23
need [10] 6/9 17/1 60/15 70/1 115/17 129/10
129/11 129/1 163/6 171/10
needed [2] 92/24 93/9
needs [1] 169/13
negate [1] 17/2
neglected [1] 107/18
Neit [1] 143/24
neutral [1] 114/11
never [7] 60/11 60/17 71/14 85/15 90/18
96/20 96/20
NEW [47] 1/2 1/9 2/8 2/16 3/9 18/6 18/18
18/20 19/4 19/8 19/18 20/3 22/6 24/3 24/8
33/21 37/1 37/7 38/6 38/13 46/2 51/2 70/20
74/17 77/25 79/15 79/25 80/22 86/18 87/5
89/7 89/16 91/2 101/13 101/15 104/15
104/18 118/22 119/2 120/22 126/23 127/2
134/18 143/16 143/17 174/3 174/16
Newsday [6] 32/9 71/19 72/5 72/15 73/8
73/13
Newsday's [1] 73/22
next [29] 15/7 24/3 59/25 60/7 60/8 74/9
75/12 75/25 77/14 77/15 77/23 79/18 81/6
82/23 84/13 84/19 96/22 118/7 118/19 100/22
102/11 104/2 105/13 109/8 110/11 119/16
155/17 157/1 157/5 165/22
night [12] 29/15 30/2 74/18 77/10 92/6
108/17 110/16 145/19 146/7 146/17 155/20
162/22
nights [1] 146/16
nine [1] 3/7
no [58] 1/3 1/5 21/13 24/25 27/23 29/21
29/22 29/24 30/3 30/4 33/14 56/23 59/13
59/17 60/20 63/6 70/23 86/20 89/24 89/24
90/5 92/24 93/1 102/6 102/17 103/6 103/21
106/8 106/11 106/16 106/22 114/14 115/10
122/7 122/16 127/24 131/2 132/10 137/20
140/1 140/19 143/10 143/12 145/5 147/5
151/13 154/15 154/17 155/8 162/10 163/20
163/22 167/17 168/23 168/23 168/24 169/4
169/12
Nobody [1] 69/13
noise [1] 114/8
non [2] 15/24 16/18
non-department [1] 16/18
non-members [1] 15/24
None [1] 40/22
noon [3] 149/1 149/5 149/9
normal [7] 3/24 111/19 113/19 145/3 145/4
145/10 148/20
north [4] 81/2 84/10 157/2 174/15
northbound [4] 39/5 87/19 87/21 92/18
nose [6] 18/12 23/11 65/5 102/9 121/20
124/19
not [156] 3/22 5/5 5/6 8/15 8/17 9/8 10/5
11/10 11/11 12/3 14/24 15/1 15/6 15/8 17/7

## O

2xr3 20/23 21/11 23/10 23/13 24/22 24/1
28/21 28/22 29/7 30/21 32/15 37/24 42/7
42/10 44/4 44/17 44/21 44/21 44/22 45/8
56/22 56/25 57/14 58/2 58/5 58/24 59/15
59/15 60/12 60/24 60/25 61/8 61/17 62/10
62/21 62/22 63/11 63/16 63/20 64/11 64/22
65/4 65/11 65/12 66/12 66/16 67/14 67/25
68/2 76/3 76/4 77/1 77/10 77/12 88/14 88/17
90/3 90/7 91/15 92/20 93/3 93/22 94/20 95/6
95/7 96/22 96/22 96/25 97/1 98/18 98/24
99/5 99/6 99/15 100/5 100/8 100/8 100/17
105/5 110/7 110/16 111/18 111/20 111/24
113/2 113/16 114/25 121/5 121/18 122/16
127/24 139/2 123/8 138/23 138/23 138/25
139/11 139/12 140/22 141/7 141/17 141/22
142/4 142/6 146/13 147/14 149/14 150/9
151/5 151/14 151/15 152/10 153/7 153/16
153/22 154/6 154/13 159/25 160/2 162/21
164/18 164/17 164/20 164/23 165/16 165/23
166/1 166/7 166/15 166/16 166/17 167/4
167/15 167/25 168/14 168/18 168/10 168/16
168/17 169/18
notary [31] 33/21 77/22 86/11 101/14 104/17
171/25 174/3 174/16
note [2] 14/24 42/21
noted [1] 43/6
notes [1] 174/7
nothing [4] 31/14 44/2 67/24 165/14
notice [12] 11/4 14/14 15/13 15/18 16/13
50/4 59/16 60/11 73/24 101/13 152/4 152/6
notified [2] 15/21 100/6
notify [3] 67/11 171/5 171/11
November [2] 6/8 49/21
November 15 [1] 6/8
now [21] 3/3 10/2 39/10 40/6 47/10 57/8
59/11 73/15 78/12 78/18 79/3 84/4 113/25
120/8 125/16 137/14 143/2 144/1 149/24
154/22 159/17
now.' [1] 60/7
number [39] 5/4 14/7 18/2 18/19 19/9 19/25
27/19 30/23 33/9 36/3 37/5 37/15 37/15 37/16
37/17 46/20 46/21 59/24 52/6 52/9 55/12
56/18 56/19 78/1 86/20 86/21 84/24 113/14
118/3 125/12 131/19 131/24 135/7 136/3
136/7 136/8 149/15 163/6 163/8 163/14
unscreen [4] 49/8 121/23 125/4 127/3

## O

o'clock [1] 169/25
o0o [3] 171/14
Oakwood [28] 18/5 19/3 20/2 22/5 36/25
37/6 39/6 39/8 39/12 39/14 39/15 59/12 60/2
71/2 75/5 81/5 81/4 84/6 84/9 84/10 86/17
87/18 89/6 89/15 92/17 108/15 157/3 157/4
oath [6] 107/16 148/23 152/9 153/2 154/19
159/4
object [5] 9/16 112/4 126/20 147/14 167/22
objected [1] 159/24
objecting [1] 165/7
objection [27] 41/13 43/3 43/4 44/1 45/6
101/23 106/22 114/14 114/19 116/6 128/11
128/12 138/11 149/5 150/6 150/10 153/6
154/20 155/3 159/24 162/10 160/24 164/13
164/25 165/4 165/22 166/6
objections [1] 4/5
objective [1] 31/24
obligated [1] 154/7
obligation [1] 169/7
obscenities [1] 26/5
observation [1] 5/15
observe [1] 96/25
observed [4] 39/13 64/6 95/12 121/25
observers [1] 5/11

**O**

observes [1] 129/16
obtain [1] 4/8
obviously [3] 69/7 139/20 162/2
occupant [2] 26/21 167/20
occurred [1] 44/19
occurrence [5] 71/1 71/1 118/22 126/23 134/16
October [1] 144/6
of... [1] 98/2
off [21] 18/7 19/5 22/12 38/10 40/3 40/17 59/5 59/8 59/16 59/17 60/7 67/18 81/1 83/25 85/25 118/21 126/22 134/15 138/21 139/11 162/3
off-duty [3] 40/3 62/7 67/10
officer [2] 155/7 155/9
office [16] 4/18 6/12 14/21 43/10 45/13 46/9 48/12 49/4 101/10 115/24 120/11 122/1 129/2 132/21 145/24 148/8
officer [195]
officer's [2] 30/5 69/10
officers [32] 10/14 14/22 27/8 27/20 27/21 29/9 29/10 29/15 30/6 30/22 31/12 37/14 37/24 38/2 38/7 38/10 38/14 38/23 39/2 39/6 39/13 39/17 40/20 99/4 104/6 139/17 140/9 146/5 146/21 155/20 167/6
officers' [1] 39/16
offices [1] 104/14
official [2] 36/22 71/4
offset [1] 93/6
oh [2] 15/3 122/8
okay [72] 5/10 5/25 6/15 9/5 13/22 15/11 17/10 17/11 17/22 25/20 32/23 41/15 41/18 42/17 43/14 44/6 47/13 61/13 67/20 67/24 69/7 69/21 71/16 74/1 74/9 77/5 100/22 104/2 106/17 106/23 114/18 115/11 117/4 117/8 121/13 122/20 122/25 131/3 131/12 132/8 134/19 136/23 137/12 140/15 141/25 142/2 143/1 143/17 144/7 147/17 147/20 147/23 148/2 148/10 148/24 149/3 149/7 152/23 158/13 159/16 159/23 161/1 162/2 162/19 166/18 168/8 168/10 169/22 170/16 170/22 170/25 171/13
old [5] 2/14 4/18 74/15 83/2 108/14
on-scene [1] 37/19
once [5] 19/15 39/23 40/14 144/16 161/9
one [63] 6/9 6/24 7/1 8/2 8/5 8/15 11/12 10/12 12/20 14/3 14/25 21/24 28/18 28/20 29/8 32/16 38/23 41/24 45/16 46/20 46/21 54/3 54/4 57/18 57/18 58/5 58/9 58/10 58/17 58/17 60/1 65/1 67/4 67/5 67/6 74/12 78/2 78/16 80/8 85/13 88/1 91/20 91/25 93/2 98/4 98/19 99/22 106/19 107/19 115/13 117/15 121/5 129/11 130/21 135/17 137/1 144/20 146/18 151/17 151/17 151/19 156/5 170/18
one-page [2] 82/8/5
ones [5] 10/2 10/3 17/19 100/22 153/16
only [11] 3/17 3/20 17/5 56/21 68/14 69/5 73/9 90/3 110/17 137/11 169/17
open [13] 10/16 17/20 60/14 64/19 65/3 65/18 82/9 85/10 95/24 102/12 103/16 105/16 105/19
opened [2] 83/6 103/15
opening [5] 6/1 17/17 25/21 73/6 172/3
openings [1] 6/4
operated [1] 149/10
operates [2] 113/18 113/20
operating [2] 38/11 127/2
operator [3] 38/19 66/12 66/13
opinion [18] 17/3 28/12 28/20 28/21 29/25 30/5 30/10 30/20 30/22 32/16 38/1 42/15 44/4 44/13 49/12 116/9 155/7 155/10

**P**
opinions [3] 42/3 42/11 136/21
opposite [1] 75/6
oral [1] 143/12
orange [4] 84/18 84/25 85/7 85/23
order [12] 3/6 26/23 39/9 56/23 64/21 90/4 92/23 120/8 146/11 146/20 166/15 168/25
ordered [5] 58/8 58/12 64/14 66/22 145/18
orders [1] 143/9
originally [1] 72/2
other [59] 9/6 9/7 10/3 11/3 12/17 13/7 20/5 22/8 30/18 31/14 46/21 47/10 52/16 58/5 58/6 58/10 58/11 58/19 59/19 62/10 63/17 65/2 67/15 67/22 72/17 67/18 81/1 81/4 84/15 89/2 93/1 93/3 94/4 94/16 94/19 94/22 95/4 94/23 97/6 97/25 100/9 100/18 103/17 116/18 120/14 124/17 128/4 130/23 136/4 136/19 138/3 138/15 140/10 140/13 140/14 146/14 153/23 156/25 164/16 170/19
others [2] 9/11 57/15
Otherwise [2] 12/12 12/21
ought [2] 112/17 155/12
our [21] 4/17 11/17 11/8 15/22 15/24 25/14 58/21 58/23 75/20 75/24 75/25 90/22 91/7 90/2 92/21 93/18 109/16 143/13 147/15 167/6 171/1
out [64] 16/14 26/4 26/13 26/16 27/1 27/9 38/19 39/9 57/3 59/11 60/13 61/11 61/23 62/9 63/25 64/4 65/4 69/5 74/19 74/21 75/18 75/20 75/24 75/19 79/22 80/20 80/22 81/11 82/5 83/16 85/11 87/10 88/6 88/7 88/16 88/22 89/1 90/11 90/17 93/7 93/19 93/20 94/6 95/25 96/3 96/19 96/25 102/11 102/15 102/17 102/21 103/7 103/18 103/25 108/13 109/15 109/24 120/8 129/17 130/11 153/12 160/3 160/4
outside [6] 23/15 41/16 41/19 110/3 145/12 167/1
over [42] 22/5 27/11 28/19 28/23 30/1 30/6 30/25 39/7 39/13 46/23 50/9 55/14 62/14 66/7 67/1 73/1 73/16 75/5 75/7 92/22 94/4 97/4 97/10 98/15 102/2 102/13 105/20 108/5 109/3 116/20 122/24 123/11 162/2 129/25 132/1 132/9 135/18 145/19 155/8 155/21 160/13
overall [2] 12/3 158/14
overnight [3] 145/20 146/20 146/21
override [2] 44/7 116/12
overruled [5] 43/5 45/10 114/19 128/14 136/24
own [3] 29/5 140/18 157/14
owned [1] 38/12
owner [2] 116/25 164/6
owns [2] 138/20 139/4

**P**
P-R-I-D-S [1] 18/18
P-O-R-C-E-L-L [1] 5/19
P-A [1] 107/11
pan [12] 57/11 80/5 91/2 91/8 101/10 104/13 107/1 149/1 149/1 149/6 149/10 117/16
P.O [33] 23/14 23/22 24/20 25/2 25/9 25/16 37/14 37/16 54/1 56/7 68/10 90/14 97/23 98/6 101/5 104/10 118/22 118/24 119/3 119/13 119/13 120/15 121/3 121/3 124/18 124/19 126/23 126/25 127/12 127/12 128/1 128/9 134/15
package [7] 6/16 6/19 22/7 119 123/3 126/2 133/25
packet [2] 53/7 135/18
page [33] 7/19 7/21 7/22 7/24 8/1 8/2 8/5 8/6 50/24 53/18 53/25 53/23 53/24 53/25 75/21 75/23 77/2 77/23 82/17 82/25 86/12 101/16 101/16 101/18 104/19 104/19 107/23 108/10

**P**
...6 124/10 131/18 157/2 174/6
pages [13] 7/14 7/15 74/12 74/13 77/17 78/2 88/6 88/12 89/14 118/19 122/23 123/1 149/22
paid [2] 91/7 92/1
pain [1] 18/13
Palumbo [2] 49/3 51/8
paper [94] 37/13 37/18 38/8 39/2 39/23 40/18 40/24 52/10 56/20 57/2 57/5 57/10 57/12 57/17 57/21 57/24 58/1 58/7 58/14 58/20 58/22 58/24 59/2 59/8 59/13 59/20 59/23 60/2 60/5 60/18 60/18 61/1 61/4 61/12 61/16 61/22 62/3 62/6 62/15 62/21 62/24 63/3 63/9 63/16 63/20 63/23 64/3 64/9 64/13 64/16 64/20 64/25 65/6 65/8 65/10 65/13 65/16 65/19 65/25 66/1 66/20 66/23 67/3 67/8 67/14 67/17 67/21 68/2 68/5 68/8 68/11 68/16 68/21 90/1 90/10 90/25 92/4 93/5 93/25 94/9 94/23 95/10 97/13 97/22 98/9 99/9 99/16 100/5 100/8 108/12 129/13 163/12
park [1] 65/9
packed [7] 57/25 58/21 59/9 81/3 84/16 87/20 157/3
parking [2] 57/25 58/21
part [29] 5/12 13/7 17/17 33/25 34/5 48/18 53/6 53/9 56/25 57/3 69/5 78/3 90/7 111/19 111/20 140/21 141/2 146/15 150/23 150/24 151/3 153/12 153/24 154/1 157/10 163/1 164/22 168/13
participate [1] 49/13
particular [28] 9/13 28/4 58/23 119/24 128/23 144/10 145/15 150/12
particularly [1] 31/21
particulars [1] 98/25
parties [3] 3/21 3/25 4/10
party [1] 167/9
pass [7] 30/12 35/14 46/16 47/25 50/9 125/25 131/23
passed [14] 6/5 55/11 80/12 80/25 84/1 84/3 108/5 118/10 123/10 126/15 132/9 134/8 135/7 136/5
passenger [21] 19/14 38/22 40/9 60/7 60/10 60/14 63/12 76/19 81/5 85/3 87/23 87/23 88/6 109/15 113/19 128/18 131/17 132/16 136/18 157/5 158/5
passing [21] 35/18 35/24 35/25 49/16 53/4 53/10 53/15 53/18 53/21 84/2 84/3 107/20 117/12 117/16 122/9 122/22 122/22 122/24 126/3 131/24 132/1
Patrick [1] 72/14
patrol [2] 36/24 37/9
pavement [1] 96/18
paying [2] 83/11 84/21
PBA [5] 2/23 67/9 67/22 68/10 68/18
PD [1] 98/6
PDCN [24] 6/21 7/1 43/11 53/15 54/10 70/19 117/10 117/16 118/6 118/16 120/3 125/24 126/8 126/18 127/19 133/12 134/4 134/11 134/20 134/25 172/20 173/4 173/6 173/8
pedal [1] 113/12
penal [12] 18/20 19/18 24/3 24/8 25/6 38/6 84/3 87/4 118/23 120/2 121/3 124/24
pending [3] 10/17 10/18 13/9
people [9] 22/9 73/14 75/14 75/15 88/23 97/6 143/20 146/20 159/17
period [2] 102/4 145/23
permissible [1] 28/3
period [4] 139/1 144/7 141/13 147/7
permitted [1] 41/23
person [2] 26/11 68/14 106/6 106/9 106/12 106/13 111/20 118/25 152/8 161/13 167/13

**P**

person... [1] 169/5
person's [1] 169/10
personal [1] 42/13
personally [3] 45/3 144/18 159/8
Personnel [1] 3/6
persons [1] 96/23
pertaining [1] 38/4
perusing [2] 129/12 130/8
Phillippus [1] 99/1
phone [6] 16/17 71/19 86/20 86/21 97/11 97/12
phones [1] 92/21
photo [5] 131/23 131/24 132/17 132/19 133/2
photograph [11] 47/3 47/6 47/18 47/21 132/5 132/14 172/14 172/15 172/16 172/17 173/7
photographs [13] 46/7 46/18 46/20 48/10 51/23 52/14 115/22 119/11 121/3 127/9 128/25 133/22 133/14
photos [5] 47/10 48/15 48/21 49/1 49/5
phrase [1] 9/19
physical [5] 20/11 23/7 23/9 38/5 96/22
pick [1] 83/9
picture [1] 87/11
pineapple [1] 57/14
piss [1] 83/24
pissed [1] 83/1
pistols [1] 140/14
place [19] 22/19 27/16 28/15 37/5 64/7 71/5 72/9 72/11 73/25 74/17 108/16 118/21 126/23 134/16 144/7 144/12 144/23 145/18 159/2
placed [3] 58/3 98/4 98/11
plain [1] 38/11
planning [1] 10/24
plans [4] 57/3 90/11 90/16 90/22
plate [2] 66/2 66/14
playing [1] 87/8
please [23] 33/9 36/3 41/14 41/19 45/21 47/2 47/16 49/15 49/24 49/25 50/9 50/20 51/17 104/21 107/11 107/24 115/15 118/19 118/20 123/4 126/7 126/20 134/13
plus [1] 124/17
pocket [1] 154/13
point [29] 9/9 9/12 10/5 10/9 10/18 13/5 13/14 23/11 28/20 29/18 38/23 45/4 59/3 59/4 61/24 62/15 73/4 95/5 97/17 97/20 103/17 106/18 110/10 111/13 117/1 129/20 155/16 157/16 168/15
pointed [2] 62/12 62/19
pointing [2] 27/4 61/7
police [143] 1/2 1/5 1/7 2/5 3/11 5/1 5/14 6/17 6/23 6/25 7/4 7/5 7/9 14/25 17/24 18/8 18/21 19/6 19/11 19/15 19/19 20/6 20/19 21/6 21/15 21/17 21/20 22/3 22/20 22/25 23/4 23/16 24/12 26/5 27/4 27/20 27/20 29/5 29/10 29/15 30/6 30/8 30/22 31/6 31/12 32/3 33/7 34/14 34/18 34/20 35/7 36/22 37/11 37/14 37/20 37/23 37/24 39/2 39/18 40/25 41/1 41/3 41/5 44/20 46/10 46/11 51/12 52/24 53/12 55/22 56/17 62/18 66/5 66/19 67/5 68/13 68/24 70/20 70/22 71/11 74/10 76/6 77/9 77/24 82/6 82/23 88/24 88/9 89/20 89/23 97/13 99/18 100/6 100/13 100/19 101/1 101/2 101/6 103/23 104/1 104/6 104/7 104/10 106/7 106/10 106/14 108/10 115/3 115/25 115/25 118/18 119/10 127/8 129/2 129/3 129/13 129/15 129/21 130/2 130/24 132/24 133/6 133/20 138/22 138/23 139/5 139/8 139/13 139/16 140/4 140/21

141/5 141/8 141/19 142/23 142/25 143/2 143/2 143/7 155/20 157/11 174/5
policeman [1] 11/2
Polumbo [1] 132/20
poor [1] 31/9
portion [3] 125/13 131/13 155/10
portions [6] 7/8 54/1 113/12 116/18 122/10 124/4
pose [1] 60/12
position [12] 10/10 13/5 21/20 61/19 63/17 109/18 140/21 150/14 165/25 166/1 166/9 167/18
possesses [1] 138/16
possession [2] 131/15 141/23
possibility [1] 161/4
possible [5] 15/9 167/3 167/4
possibly [2] 8/13 8/14
potentially [1] 12/22
practice [1] 164/4
Precinct [15] 2/23 37/16 37/17 56/19 68/7 68/9 68/12 68/15 68/17 68/22 70/24 77/19 99/18 99/25 110/21
precisely [1] 156/1
preliminarily [1] 41/4
preliminary [7] 6/3 36/13 37/1 37/22 37/25 44/15 115/4
preparation [1] 150/23
prepare [1] 11/5
prepared [4] 17/7 44/18 148/12 149/19
preparing [1] 62/4
prerogative [1] 11/7
prescribed [1] 24/22
presence [4] 14/16 31/7 41/16 51/3
present [19] 2/19 21/18 22/9 25/23 27/13 28/6 28/11 28/21 28/22 29/5 31/3 31/25 38/13 54/3 78/12 78/19 85/6 99/15 107/5
presented [1] 9/23
presenting [5] 3/17 9/10 10/9 11/18 17/25
press [2] 32/7 32/11
presumably [1] 148/13
prevent [3] 13/18 65/9 84/2
previously [1] 20/18
prior [11] 6/7 8/12 35/7 36/14 53/9 55/21 72/3 101/18 152/3 153/15 153/16
Prizes [21] 18/17 19/8 20/13 33/20 48/23 51/2 59/25 60/6 60/11 64/4 65/23 66/1 80/3 109/7 111/22 113/18 119/2 127/2 132/16 134/18 159/17
private [1] 86/23
privately [2] 38/12 140/24
probably [1] 91/25
problem [1] 160/2
procedural [1] 35/13
procedurally [1] 119/16
procedure [1] 10/13
proceed [5] 9/24 14/3 15/7 31/22 74/4
proceeded [1] 105/19
proceeding [7] 4/5 11/12 11/13 11/14 57/1 69/9 90/9
proceedings [1] 69/16
process [11] 9/16 10/1 11/22 11/25 12/3 12/7 13/1 13/21 29/1 145/17 146/11
procure [1] 107/12
producing [1] 14/10
product [1] 147/9
Professional [3] 33/20 104/17 174/2
prohibits [1] 169/3
pronounced [1] 124/14
proof [1] 147/16
proper [1] 123/6
properly [4] 20/3 24/14 25/9 138/2
property [17] 20/5 113/25 138/4 138/7 138/9 138/15 138/17 138/19 138/19 139/4 139/5

...6 139/7 142/2 166/24 167/8 167/14
prophetic [1] 71/21
propriety [1] 29/18
protect [4] 26/23 26/23 81/25 158/24
provably [1] 112/16
prove [1] 12/5 12/9 12/10
provide [2] 49/22 115/13
provided [6] 46/7 48/11 52/15 53/7 115/23 129/1
providing [5] 53/5 117/20 133/24
proving [5] 24/16 147/1 147/4
Provision [1] 141/24
proximity [1] 113/22
prudent [2] 26/15 32/2
public [11] 33/21 69/4 69/6 69/18 72/19 86/11 101/15 104/17 171/25 174/3 174/16
pull [8] 27/9 65/4 93/14 95/25 96/3 102/15 109/7 129/17
pulled [21] 22/5 26/3 39/6 39/13 39/15 59/8 59/10 59/25 60/6 62/25 64/19 75/5 75/6 75/9 75/12 81/6 92/22 93/5 109/3 157/1 157/5
punched [3] 103/11 106/3 125/3
punching [5] 6/5 1 102/13 103/13 105/20 130/22
punishable [1] 87/2
Purcell [5] 2/23 5/18 67/19 68/10 99/1
purchase [5] 140/10 140/13 140/23 141/1 141/11
purpose [5] 11/8 115/2 147/12 150/5 165/19
purposes [5] 5/15 35/13 56/21 90/2 150/12
pursuant [6] 3/9 152/2 162/1 15/20 19/18 27/15 87/3 101/13
pursuing [1] 9/3
push [3] 32/16 96/10 160/16
pushed [1] 114/5
pushing [1] 113/23
put [20] 22/5 28/10 39/21 39/25 40/14 80/21 83/13 83/16 83/19 85/22 98/3 102/2 102/10 107/18 112/13 133/11 143/15 161/10 161/11 161/21

**Q**

qualifications [1] 112/18
quarter [4] 94/1 94/8 96/14 96/15
question [32] 24/25 44/9 102/1 102/7 102/16 102/19 102/22 102/24 103/4 103/7 103/11 103/25 103/17 103/22 103/25 104/21 105/7 105/22 105/23 106/5 106/9 106/12 112/11 116/13 147/25 153/7 155/17 165/22 168/3 168/5 170/19
questioned [1] 78/13
questioning [3] 78/17 78/20 148/6
questions [8] 44/8 8/21 12/18 13/25 26/17 78/5 78/18 137/13
quick [1] 71/15
quickly [1] 160/19
quiet [1] 114/3
quite [1] 164/20
quote [2] 157/1 159/19
quoting [1] 157/8

**R**

rage [4] 23/1 59/18 92/25 134/19
raise [1] 154/10
Ralph [2] 68/24 143/21
ran [4] 27/11 66/1 66/10 96/11
rank [4] 15/1 33/10 139/17 140/6
ranking [5] 29/10 29/16 30/21 31/1 99/3
rapid [1] 99/10
re [1] 11/4
reach [7] 35/3 41/10 41/12 42/25 43/16 132/25 136/10
reached [6] 8/16 36/15 48/16 52/18 76/20

**R**

reached.... [1] 105/20
reaching [1] 96/5
read [28] 6/12 16/9 17/15 17/16 20/18 36/19 58/21 56/13 66/2 70/9 70/12 77/16 79/17 82/17 86/5 89/11 101/18 104/22 105/8 108/7 110/18 111/6 118/19 124/2 126/20 134/13 153/24 160/1
reading [4] 20/8 69/25 70/11 70/17
reads [2] 18/3 138/2
ready [1] 113/25
real [1] 32/14
really [6] 27/23 44/1 73/6 73/21 153/7 166/12
realm [2] 167/2 167/3
rear [9] 62/13 66/2 93/10 94/8 94/13 122/18 131/17 132/15 133/9
reason [5] 10/28 14/23 29/24 30/3 30/4
reasonable [7] 21/19 26/7 26/11 26/15 31/19 165/20 169/13
reasonably [1] 32/1
recall [17] 58/5 58/9 58/14 58/16 58/18 58/19 60/22 60/24 94/15 97/6 97/17 97/15 97/17 97/18 97/24 99/3 102/23
receive [1] 144/14
received [5] 37/22 53/8 98/10 105/2 105/3
recess [6] 32/22 33/1 70/5 70/10 106/25 147/21
reckless [4] 41/5 45/12 136/16 136/17
recklessly [1] 166/24
recognize [10] 29/9 36/8 36/11 48/5 48/9 118/12 123/13 126/4 132/9 134/7
recollection [3] 62/2 63/15 105/5
recommendation [3] 43/12 43/17 56/6
reconstructed [1] 51/3
reconstruction [16] 7/13 44/19 46/7 49/13 111/16 111/16 113/2 115/22 119/9 121/2 125/6 127/7 128/25 131/6 133/13 133/14
Reconstructive [2] 49/18 50/2
reconvene [2] 147/20 169/25
record [61] 4/4 4/9 4/13 5/3 5/5 5/17 6/13 7/10 8/8 8/18 10/23 13/6 17/15 20/17 20/19 23/13 25/22 33/4 33/4 35/18 36/20 42/28 43/6 46/22 49/16 50/6 51/17 53/3 53/10 55/10 55/17 56/12 56/14 70/8 70/9 70/13 71/25 74/2 104/22 104/24 105/8 107/3 108/8 115/1 115/15 118/19 122/11 122/24 123/6 123/25 124/2 124/15 126/21 133/11 137/5 147/24 152/25 155/16 166/17 170/19
record's [2] 12/14 13/23
records [5] 99/13 121/6 123/17 123/20 127/9
recover [1] 152/25
recovered [1] 24/16
red [2] 84/5 84/7
reduced [1] 100/16
reentered [1] 94/5
reeval [1] 39/24
refer [2] 52/10 138/6
referred [3] 31/14 49/9 50/25
referring [1] 113/13
reflect [16] 8/8 18/23 12/14 14/23 25/22 35/4 35/18 46/22 49/16 50/6 51/17 53/3 55/10 55/17 136/4 137/11
reflects [1] 74/2
refreshed [1] 115/18
refused [3] 26/25 151/20 154/13
refusing [1] 16/6
reg [4] 51/3 127/2 129/9 134/18
regard [2] 38/3 117/5
regarding [6] 37/20 68/15 115/11 115/13 147/25 155/2
Registered [1] 104/16

Registration [3] 18/18 19/9 119/2
reg [8] 21/10 21/24 24/5 24/10 24/22 120/17 128/2 136/12
regulations [6] 3/15 32/4 34/17 43/8 43/10 117/18
Reid [1] 104/16
rebate [1] 117/23
related [1] 136/6
relates [2] 117/24 118/1
release [1] 99/12
released [2] 40/22 99/16
relevant [4] 4/3 145/13 146/1 146/22
relied [2] 133/17 153/24
rely [1] 113/7
remain [5] 10/17 110/18 78/6 119/22 156/23
remainder [1] 123/2
remained [2] 68/8 9/9
remarkably [1] 32/12
remedy [4] 73/2 167/1 167/12 167/14
remember [5] 58/7 66/8 110/2 110/11 169/1
remind [2] 3/21 4/9
restore [1] 64/20
removed [2] 40/21 62/7
Rienatz [1] 104/16
rep [2] 63/10 107/5
repair [4] 137/3 163/19 163/21 167/12
repaired [1] 111/14
repass [1] 113/1
repeat [2] 44/10 168/5
repeated [1] 26/25
repeatedly [1] 151/20
rephrase [3] 112/8 164/16 168/10
report [67] 7/14 7/16 17/4 32/8 34/25 35/6 35/10 35/11 35/12 36/5 36/13 36/15 36/17 37/1 44/16 44/18 44/20 46/7 49/14 49/18 50/3 50/13 50/21 50/25 51/1 51/6 51/10 51/15 52/2 52/10 52/16 100/11 105/2 111/1 111/17 113/2 113/7 113/8 113/12 114/23 115/4 115/22 116/15 117/16 117/18 118/16 119/10 119/17 121/2 124/6 125/6 125/9 127/8 128/25 131/6 131/8 131/14 131/18 133/14 149/12 149/19 159/14 159/19 163/2 172/13 172/18 173/5
reporter [7] 33/20 72/7 72/15 104/17 174/1 174/3 174/14
REPORTERS [1] 174/15
regarding [2] 73/23 119/18
reports [5] 32/7 112/22 124/20 124/21 125/21
representative [2] 4/24 25/24
represented [1] 145/17
representing [1] 14/22
request [4] 49/6 151/17 151/18 151/19
requested [2] 34/16 16/4
requests [3] 26/25 69/7 150/22
required [3] 13/13 140/17 153/1
reserve [1] 73/6
reside [1] 86/17
residential [2] 38/17 39/10
resign [1] 13/11
resisted [1] 64/22
respect [69] 7/16 9/13 10/8 10/12 15/12 45/9 46/5 47/11 49/6 49/11 50/13 50/16 50/20 50/23 51/16 51/23 52/1 52/25 55/24 56/2 56/5 111/6 111/9 111/10 111/24 112/22 113/7 113/9 115/14 115/16 115/17 115/19 120/14 120/17 120/23 120/24 121/8 121/11 121/13 122/8 122/11 123/21 125/17 125/20 127/18 128/8 128/23 129/17 129/18 131/5 131/11 131/13 131/21 131/22 132/1 132/2 132/21 132/21 132/25 133/2 133/13 133/22 134/20 134/24 135/22 136/4 136/10 137/7 143/9 144/23 149/11 154/23 165/5 168/3 170/20
respectfully [1] 155/6

respond [1] 103/5
responded [2] 29/11 30/2
respondent [2] 2/13 4/14
responding [1] 97/16
response [18] 17/4 35/10 35/19 36/5 36/12 36/21 37/3 38/2 43/25 44/4 44/16 97/24 114/22 115/2 115/6 122/4 163/2 172/13
responsibility [2] 142/13 143/11
responsibilities [2] 30/12 150/24
responsible [2] 14/10 114/4
rest [7] 70/17 105/12
restaurant [2] 57/8 57/11 57/18
result [21] 17/3 21/5 24/20 35/1 35/3 37/25 44/23 45/23 119/25 120/10 120/13 123/19 125/19 127/16 127/25 128/10 128/20 134/23 138/22 139/7 154/7
resulted [1] 71/7
results [11] 43/23 43/23 43/24 44/11 44/12 45/3 45/15 113/14 125/7/2 131/13 159/11
retire [1] 10/15
returned [4] 16/5 42/22 58/23 133/23
rev [13] 111/14 111/18 111/19 111/24 112/1 113/9 159/18 159/20 160/23 161/8 162/20 162/21 162/25
revealed [1] 51/3
reverse [16] 39/21 40/15 62/1 65/14 75/18 85/22 88/2 88/14 105/22 109/18 134/12 125/16 149/8 168/22 163/10 161/21
review [25] 10/14 36/14 37/19 46/6 48/6 52/15 53/23 56/4 112/21 119/19 119/20 119/25 120/4 122/3 122/9 124/15 127/14 127/16 127/17 128/24 129/10 130/8 134/21 134/23 163/6
reviewed [11] 27/18 49/11 50/13 52/17 52/21 116/14 123/18 125/7 131/20 150/13 158/15
reviewing [2] 111/15
revolver [23] 33/11 19/12 19/17 20/11 20/13 22/13 23/3 24/15 25/10 40/4 40/11 40/13 52/13 82/11 125/15 130/15 130/17 131/1 131/15 132/15 134/17 138/21 140/2
rezving [4] 75/17 81/20 158/19 160/15 161/9 162/5 162/9 163/4
riding [1] 83/6
rifles [1] 140/13
right [57] 5/5 16/22 39/5 39/7 39/15 68/17 61/7 75/7 78/6 78/11 78/12 78/20 84/7 84/9 84/12 84/16 92/15 92/17 95/20 96/2 96/3 96/16 98/18 98/24 103/14 109/4 129/18 129/19 139/14 140/9 140/14 141/2 141/12 141/12 144/2 144/16 144/21 149/13 149/17 150/1 151/23 152/7 153/21 154/22 155/22 156/15 156/23 157/12 157/21 159/2 159/21 164/11 165/3 165/17 166/14 166/20 16/24
right-hand [1] 39/7
rights [9] 54/24 78/1 78/4 78/5 78/23 78/24 79/2 90/6 150/19
rings [1] 147/12
ripe [1] 13/4
ripped [2] 65/11 130/11
Risco [1] 31/2
road [42] 2/14 4/18 18/5 19/3 20/2 22/5 36/25 39/6 39/6 39/8 39/12 39/14 39/15 39/15 59/4 59/6 59/9 59/12 59/18 59/24 60/3 71/2 75/5 76/18 76/22 80/22 83/18 84/6 84/9 84/11 84/12 84/17 84/19 87/14 89/16 92/15 92/23 92/25 109/4 109/5 134/19 157/3
roadway [1] 87/20
roll [2] 76/17 142/7
rolled [6] 60/8 81/5 157/4 158/4
rolling [1] 76/22
room [8] 41/21 63/17 87/8 98/11 98/12

## R

room... [3] 105/25 129/23 145/14
rounds [2] 40/3 63/5
route [2] 67/8 92/9
routinely [1] 11/20
rule [25] 144 14/12 15/16 15/23 16/9 16/21 18/25 19/23 20/16 21/22 21/25 24/4 24/9 24/13 25/8 25/12 25/12 45/18 49/7 55/23 56/8 120/19 128/6 129/9 165/11
rules [22] 3/15 9/1 9/3 14/8 21/10 21/23 24/5 24/10 24/22 25/7 25/17 29/4 29/22 32/4 34/16 43/8 43/21 117/9 118/17 120/17 128/2 134/12
run [8] 62/4 65/21 66/7 67/1 95/17 98/14 129/25 155/21
running [2] 65/22 162/2
Ruthie [1] 8/5

## S

Sabrina [1] 86/18
safeguard [6] 28/4 24/14 25/10 134/16 135/24 138/3
safeguarding [1] 128/7
safety [1] 62/7
said [32] 6/25 11/11 12/17 13/24 20/13 28/7 60/21 66/5 66/6 66/10 82/6 85/8 86/2 94/10 97/14 98/2 101/24 102/1 106/9 109/10 124/16 153/24 155/25 155/18 159/19 160/3 162/5 162/8 162/11 162/19 163/14 168/19 same [13] 12/6 12/23 13/19 36/17 43/3 44/18 58/12 102/3 102/14 103/9 114/13 128/12 143/1
Santiago [2] 2/20 5/23
sat [1] 59/20
save [4] 47/11 165/20 166/3 166/15
saw [31] 67/18 67/19 67/19 67/22 67/24 75/19 76/1 76/11 76/21 76/22 77/4 77/14 81/3 81/23 84/11 84/18 85/15 87/11 87/16 87/19 88/9 88/9 88/23 93/11 93/19 95/17 95/23 109/7 109/17 157/3 158/21
say [23] 7/8 30/6 32/10 44/5 60/18 66/17 72/10 78/8 103/19 105/10 107/10 115/7 145/1 151/6 156/17 161/6 161/19 162/21 162/24 166/16 167/9 167/15 169/11
saying [17] 64/23 93/22 94/15 97/16 102/16 102/20 102/25 103/7 103/18 110/1 153/22 164/10 164/15 164/17 166/13 167/16 167/23
says [10] 14/13 24/15 79/7 79/21 83/2 101/19 108/14 156/25 158/16 165/12
scene [16] 30/2 37/19 40/17 44/19 46/9 49/13 66/21 115/24 116/15 119/10 127/8 131/22 132/14 133/12 133/14 162/8
scheduled [4] 72/3 72/8 72/25 148/7
scheduling [1] 170/2
School [1] 75/6
Science [1] 51/12
scope [3] 3/19 23/15 71/3
screaming [3] 74/16 96/24 103/2
screeching [2] 67/9 162/14
seat [5] 18/17 24/18 85/3 128/18 128/18
seated [3] 16/16 59/24 60/14 61/19 62/17
second [30] 18/23 19/21 24/2 24/7 25/4 25/5 37/21 40/25 41/3 45/11 52/8 56/10 67/8 68/9 68/11 68/15 68/17 68/22 69/2 70/19 77/18 99/18 99/25 110/20 118/24 120/7 121/14 137/2 156/5 161/12
second degree [1] 56/10
seconds [2] 160/11 160/21
section [6] 14/12 15/14 18/21 19/19 56/7 87/4
secure [1] 96/12

see [19] 15/9 16/22 17/8 48/15 51/4 61/8 71/13 77/5 85/14 85/16 88/14 88/17 94/14 109/21 110/5 117/1 135/15 138/5 154/20
seeing [1] 97/6
seeking [1] 152/25
seen [1] 158/17
seemed [1] 89/2
seems [9] 14/8 31/13 73/5 73/8 73/22 112/5 146/3 166/19 167/22
seen [2] 48/13 132/17
sees [1] 129/15
selecting [1] 28/18
sense [4] 12/2 12/17 13/20 29/1
sentence [1] 163/12
sentences [1] 153/8
separate [3] 12/22 47/1 108/20
separated [1] 39/3
separately [1] 38/11
separating [1] 60/3
September [2] 117/1 144/5
sergeant [54] 2/20 2/21 5/22 15/2 20/24 22/7 22/18 22/24 23/12 23/18 33/8 33/12 33/24 34/8 37/11 42/5 42/18 42/24 43/22 48/5 50/12 55/15 55/20 67/13 70/10 86/23 89/5 89/8 89/17 98/16 100/20 107/9 107/10 107/15 108/6 108/7 111/1 112/21 114/17 114/21 123/11 123/13 126/14 132/8 134/7 135/21 137/4 142/12 148/23 150/10 158/10 171/4 171/10 172/7
serial [7] 1/5 33/16 37/15 37/16 56/18 70/23 89/24
series [1] 113/24
seriously [1] 165/16
served [7] 3/12 20/19 21/7 118/17 119/15 126/19 134/11
service [3] 3/9 10/21 16/6
serving [2] 16/8 73/23
session [1] 3/3
set [4] 3/4 13/19 28/18 174/8
severity [1] 66/6
seventy-eight- [1] 66/6
several [10] 14/18 22/8 58/1 72/4 145/22 152/14 152/25 154/2 163/15 164/4
shared [1] 30/21
shatter [1] 95/21
shattered [2] 64/7 85/6
shatters [2] 52/12 125/15
she [33] 11/2 11/19 20/25 21/2 31/3 31/14 31/16 41/24 60/11 60/12 61/20 66/25 76/19 83/15 88/8 93/18 94/10 97/5 97/25 121/25 146/13 146/19 150/12 150/13 150/15 156/16 160/3 160/3 160/4 161/20 162/24
she'll [1] 28/8
She's [2] 30/15 31/10
sheet [5] 50/24 52/9 113/14 125/12 131/19
shield [16] 27/3 33/10 33/14 37/15 37/17 56/18 64/1 64/4 76/3 89/24 95/8 96/25 97/2 101/2 104/7 109/22
shift [9] 65/7 65/14 80/5 80/9 145/3 145/4 149/3 149/6 149/10
shifted [1] 160/19
shifting [2] 65/9 82/13
shifts [3] 114/11 148/21 148/25
ship [1] 163/19
shirt [4] 84/18 84/25 85/8 85/24
shoot [1] 63/18
shooting [31] 7/13 29/19 35/20 36/25 37/4 44/15 46/6 49/7 50/7 50/2 51/13 52/6 67/11 85/1 87/14 88/3 88/5 88/11 88/18 110/6 111/1/6 115/21 119/9 121/1 127/7 128/24 131/6 133/13 133/13 142/25 168/1 172/18

short [1] 39/24 100/22
shortly [1] 27/22
shot [18] 63/13 66/7 66/8 66/12 67/1 85/13 85/15 85/17 85/19 85/21 86/3 87/22 88/1 88/8 88/11 110/7 116/16 136/18
shots [2] 9/19 13/18 19/14 23/19 26/22 27/6 64/8 81/24 88/24 88/25 89/1 101/21 104/24 104/25 105/1 105/4 105/11 110/4 110/8 119/1 158/22
should [12] 4/7 7/8 10/4 30/5 42/6 42/16 69/13 71/22 90/17 115/7 123/1 156/6
shoulder [2] 39/7 92/22
shouldn't [3] 42/7 69/12 112/12
shout [1] 39/7
shouted [1] 62/18
shouting [1] 26/5
show [5] 16/11 16/23 22/11 23/17 24/11
showed [1] 116/15
shown [1] 126/12
six [1] 79/21
side [48] 19/17 23/2 23/23 29/8 40/8 40/9 40/10 48/25 51/22 54/4 59/9 59/24 60/7 60/8 62/10 64/4 64/14 64/17 65/15 71/9 75/5 75/7 76/18 76/19 81/4 83/18 83/18 84/24 84/16 93/7 93/11 93/20 94/1 95/18 96/13 96/15 102/13 105/15 109/4 109/16 116/21 119/4 122/2 129/15 139/19 157/3 163/25 168/25
side-view [1] 93/11
sided [1] 124/11
sidewalk [3] 97/4 97/5 97/18
sigh [1] 64/11
sign [1] 66/11
signature [2] 79/5 79/8
signed [16] 16/2 41/6 68/23 71/11 75/21 75/22 77/20 82/20 86/9 89/14 89/15 89/17 100/17 100/19 100/20 110/22
significant [5] 112/2 112/3 114/6 114/10 159/19
signing [1] 99/12
silent [2] 78/6 156/23
similar [1] 146/14
simply [4] 16/17 29/7 30/9 32/15
simultaneously [2] 96/5 101/25
since [1] 61/19
single [1] 53/6
sit [2] 66/22 132/23
sitting [4] 72/13 85/2 87/7 88/23
six [4] 50/24 160/11 160/21 161/11
sleep [1] 146/8
slightly [3] 62/14 93/6 114/7
slipped [1] 156/10
slips [1] 163/21
slow [2] 62/22 83/24
smaller [1] 93/11
smash [2] 61/14 65/4
smashed [7] 64/17 82/3 116/21 115/4 121/17 121/19 130/19
smashing [2] 24/21 95/19
Smith [10] 18/10 19/12 20/10 22/12 23/2 23/4 24/15 25/10 134/17 140/16
so [59] 8/17 9/25 11/5 11/13 15/7 42/15 43/15 46/24 56/22 58/25 69/7 69/12 70/9 72/22 73/19 81/12 81/13 82/8 90/3 101/18 103/3 107/18 107/20 113/20 117/21 117/14 120/4 124/16 135/21 137/3 137/13 140/10 140/13 140/16 141/17 142/2 142/14 143/15 144/10 144/14 145/20 145/22 146/17 148/5 148/8 148/20 149/15 151/5 152/23 155/17 156/13 156/22 156/23 157/14 159/25 160/18 163/3 166/18 169/15
socialized [1] 90/13
soft [2] 124/9 124/13
solely [2] 42/3 79/17

**S**

sense [26] 13/14 13/16 28/11 29/16 32/12 34/25 42/12 42/12 44/4 57/19 59/3 74/8 75/13 80/11 94/11 97/20 109/4 111/13 137/13 139/16 138/17 158/25 151/6 153/15 155/24 157/19

somebody [6] 38/18 34/19 72/22 73/19 112/18 147/10

something [20] 42/8 42/9 71/20 76/2 83/12 84/21 88/19 92/5 110/1 111/2 111/2 112/14 112/16 125/5 140/17 140/20 148/7 159/18 160/5 170/5

sometimes [1] 10/14

Sophia [27] 7/24 57/6 59/21 62/9 62/17 67/5 67/16 68/21 74/23 76/16 76/16 76/20 90/23 91/6 91/10 97/8 107/21 108/1 108/11 108/13 110/22 116/1 119/12 121/5 127/11 162/23 173/3

Sophia's [5] 57/22 62/7 91/11 92/11 92/12

sorry [17] 4/20 8/4 15/6 20/8 22/21 71/16 117/14 126/11 122/4 122/8 122/13 122/21 128/11 133/19 156/5 156/10 171/6

sound [1] 87/9

source [3] 31/8 119/8 127/6

Sources [1] 72/21

south [2] 37/6 39/8

southbound [2] 80/20 96/18

speak [6] 11/23 67/14 112/18 151/22 154/11 154/13

speaking [2] 104/20 151/12

speaks [1] 129/14

spec [2] 120/7 127/20

Special [4] 49/3 51/8 131/15 132/20

specific [5] 9/21 97/7 139/20 139/21 143/8

specifically [13] 54/2 135/14 136/3 121/11 125/1 125/2 128/4 129/8 138/12 143/21 146/5 146/19 158/4

specifications [7] 3/13 6/20 9/8 11/20 18/3 20/13 21/8

specs [4] 119/23 129/3 137/10 154/21

speculation [1] 160/25

sped [1] 84/1

speeding [1] 65/14

spells [1] 16/14

split [1] 92/2

spoke [7] 68/11 69/11 68/14 98/13 98/20 129/23 153/25

spot [1] 143/10

Squad [8] 37/12 37/21 37/21 40/25 40/25 41/3 99/24 160/14

stages [1] 11/21

stake [1] 154/12

stand [1] 94/24

standard [1] 147/16

standing [10] 64/13 76/19 81/22 84/18 94/1 94/7 94/12 97/10 110/3 158/21

start [3] 138/1 144/4 148/14

started [20] 26/2 62/11 65/20 76/8 76/16 80/9 81/19 83/23 83/24 84/13 84/25 85/22 101/20 109/13 110/9 113/25 131/21 144/5 158/19 160/14

starting [1] 143/4

starts [3] 113/23 134/7 114/9

state [25] 3/9 5/16 10/22 18/18 18/20 19/9 19/18 23/1 24/3 24/8 33/10 33/21 38/6 46/3 79/15 87/5 101/15 104/18 118/23 120/22 126/24 141/16 141/17 174/3 174/16

state-mandated [1] 10/22

stated [11] 51/1 52/11 111/17 113/15 117/2 121/16 121/19 130/21 131/14 143/6 153/10

statement [92] 7/4 17/20 17/21 17/22 17/24 3/1 8/2 8/5 8/6 52/22 53/1 53/7 53/12 53/16

53/19 53/22 53/23 53/24 53/25 54/7 54/13 54/16 54/19 54/22 54/25 56/15 56/21 56/23 56/25 68/14 68/19 68/23 70/19 70/21 73/7 74/10 74/10 77/16 77/23 77/24 82/18 82/23 82/25 86/5 86/12 86/13 86/14 82/12 89/4 89/8 89/11 89/19 89/19 94/2 94/5 96/7 100/23 104/2 107/19 107/21 107/23 108/1 108/10 110/18 111/2 111/5 111/10 121/25 124/24 124/24 124/25 129/14 129/21 130/2 130/6 130/10 130/14 134/14 154/5 155/19 156/13 156/18 158/15 158/16 172/19 172/22 172/23 172/24 172/25 173/3

statements [52] 4/6 6/1 6/23 7/3 7/18 23/19 52/23 52/25 53/4 55/11 55/20 56/13 69/25 79/12 74/4 100/9 100/17 100/18 115/24 119/11 119/13 121/3 121/8 121/9 121/12 121/15 121/18 124/16 127/10 127/12 129/2 129/4 129/7 129/8 133/15 146/3 146/9 146/24 147/1 147/18 147/8 153/14 155/14 155/24 172/3

states [6] 78/3 124/11 125/13 129/16 129/21 130/9

stating [2] 61/24 64/5

station [10] 37/1 37/7 38/13 38/18 39/5 80/1 80/24 83/14 89/16 111/12

station [1] 10/17

stayed [3] 91/21 92/1 97/12

step [1] 105/22

stepping [1] 113/22

Stieglitz [3] 33/20 174/2 174/13

still [16] 13/10 39/4 59/24 62/17 63/4 63/7 64/7 65/18 76/9 76/12 82/9 84/3 94/12 96/7 107/16 148/23

Stimson [1] 75/6

stip [1] 17/3

stipulating [3] 8/14 8/15 21/11

stale [1] 66/6

Stony [2] 79/22 79/24

stood [1] 75/25

stop [13] 27/1 27/10 40/7 61/8 62/21 63/2 76/7 76/10 78/20 95/14 109/8 143/10 161/11

stopped [21] 18/17 19/15 39/24 60/6 63/24 75/11 75/12 75/18 77/14 77/15 81/14 84/11 84/13 87/13 87/17 94/19 95/11 114/2 158/2 161/9 162/17

straight [1] 62/20

street [18] 39/11 39/12 59/4 66/11 76/23 80/1 81/2 81/5 81/22 83/4 83/9 84/6 91/17 92/16 97/11 104/15 157/2 158/21

streets [1] 39/4

strike [3] 62/16 127/1 164/4

striking [4] 40/4 40/16 121/20 128/16

struck [5] 33/9 105/18 121/22 125/2 133/7 139/19 139/20 131/14 133/6

struggled [1] 82/6

struggling [4] 85/7 85/12 85/20 122/1

STUDDERT [4] 1/13 2/3 3/2 35/21

Sub [4] 120/19 126/24 129/6 165/1

Subdivision [15] 18/21 19/1 19/24 20/16 21/23 23/25 24/4 24/9 24/13 25/8 25/13 45/18 49/7 55/23 56/8

subject [14] 21/3 36/24 40/5 40/6 40/8 40/14 49/15 40/18 56/19 64/12 71/5 71/8 71/10 89/25

subjects [1] 44/21

submit [1] 27/2

submitted [1] 119/18

subpoena [2] 15/21 16/19

subpoenaed [2] 73/15 73/18

subpoenas [3] 14/7 15/25 16/3

Subscribed [1] 171/21

subsequent [2] 57/1 90/8

substantial [3] 18/12 25/2 137/7

such [2] 3/24 152/6

suddenly [1] 162/17

sue [1] 152/8

sued [1] 151/25

suffered [1] 40/5

Suffolk [77] 6/25 7/13 14/19 14/20 14/22 22/6 27/20 30/8 30/23 31/6 31/12 37/20 37/22 40/24 41/3 44/20 45/13 46/6 46/8 48/11 49/4 49/7 51/11 52/2 52/9 52/15 54/3 55/3 67/24 68/3 68/6 68/13 68/20 74/11 77/25 79/16 82/24 93/13 97/13 97/22 98/5 98/19 99/17 99/22 99/24 100/13 100/14 100/4 100/5 101/11 100/10 108/11 111/15 112/22 113/1 115/22 119/10 119/9 121/1 121/12 121/22 121/16 125/5 127/7 127/8 128/24 129/1 131/5 131/2 152/15 154/3 156/14 159/1 159/9 173/1

suggest [1] 155/6

suggested [1] 50/16

suing [1] 152/3

SUITE [1] 2/15

Sunday [1] 37/2

superior [2] 56/23 90/4

supervisor [1] 34/12

supporting [2] 119/17

supports [1] 21/20

suppose [3] 140/24 140/25 141/3

supposed [2] 16/11 59/6

sure [25] 6/10 15/1 17/23 17/14 44/11 57/14 58/7 76/3 77/1 82/8 113/2 142/15 150/9 152/10 152/17 153/7 153/22 161/20 163/9 164/20 164/22 165/15 166/11 168/6 170/15 surrounding [1] 115/5

suspect [1] 169/7

sustain [4] 13/19 28/17 31/20 165/22

sustained [18] 27/19 29/19 30/10 42/7 42/7 71/5 155/1 161/2 164/4 168/16

swear [4] 71/19 82/19 86/8 110/21

swelling [2] 124/9 124/13

swinging [1] 106/2

sworn [14] 33/19 74/14 77/20 79/12 79/20 82/20 83/1 86/9 108/13 110/22 150/15 152/18 155/10 171/21

swung [1] 105/24

**T**

tabs [1] 92/2

Taggart [2] 2/22 5/13

take [20] 15/2 9/18 13/18 13/18 32/24 69/22 70/2 70/4 72/9 72/11 130/2 137/19 144/23 145/18 147/18 152/19 153/4 153/19 154/8 155/25

taken [14] 29/12 33/2 66/24 67/21 70/6 77/17 86/6 89/20 106/25 110/19 147/22 150/18 156/13 174/4

takes [1] 159/20

taking [4] 12/4 59/6 66/9 73/25

talk [5] 75/10 78/11 78/21 79/3 109/6

talking [4] 68/20 60/21 94/4 97/11

Tara [2] 2/21 5/21

targeted [1] 146/6

Terrares [1] 82/18

tavern [1] 91/18

taxi [33] 23/20 24/17 37/20 39/1 48/23 51/2 59/25 75/11 75/15 75/15 75/19 76/7 76/8 76/12 76/21 76/24 77/1 77/6 77/13 77/15 80/4 83/7 109/7 109/8 109/11 109/17 109/19 110/11 111/12 113/16 125/16 131/16 taxicab [4] 22/22 23/23 111/6 133/9

teach [1] 60/16

team [18] 17/4 35/12 35/19 36/5 36/13 36/24

**T**

team... [12] 37/3 38/2 43/25 44/14 44/16 44/17 114/22 115/2 115/6 122/4 143/15 163/2
telephone [3] 15/20 86/19 86/24
telephoned [1] 67/9
tell [11] 20/25 28/6 28/8 28/11 67/25 85/17 92/23 93/9 93/23 97/20 102/7
telling [4] 72/16 76/6 97/17 109/12
ten [6] 32/24 70/4 106/3 164/11 160/21 161/12
ten-second [1] 161/12
terminate [1] 40/11
terminated [1] 10/15
terms [3] 14/1 170/1 170/1
testified [2] 33/22 33/24
testifies [1] 121/22
testify [2] 158/11 154/7
testifying [1] 3/25
testimony [25] 4/2 4/5 21/14 42/19 60/14 107/9 112/6 112/11 112/13 149/25 150/3 150/13 150/16 150/18 152/12 152/18 152/21 153/12 153/17 153/21 153/23 155/3 155/11 169/1 174/4
than [14] 21/19 30/18 31/14 44/2 63/17 67/15 72/10 97/25 100/9 103/18 114/16 149/16 151/17 151/19
Thank [9] 25/19 41/8 41/22 48/1 50/8 107/14 136/9 156/8 158/12
that [568]
that's [30] 10/1 15/22 17/5 45/17 48/3 79/23 79/24 112/16 122/20 125/11 131/18 135/18 139/3 139/16 139/20 139/21 146/18 146/18 146/22 148/10 153/21 156/18 157/10 158/25 159/9 159/14 164/8 167/12 168/23 169/13
their [19] 9/24 28/12 31/20 38/11 38/19 39/7 40/22 54/13 68/1 83/19 83/23 91/15 93/2 93/23 109/2 114/23 122/6 146/10 169/10
them [35] 6/24 8/19 9/7 13/17 16/8 16/17 39/14 46/19 46/20 47/1 47/10 47/14 47/17 48/13 48/18 55/13 55/14 55/21 66/4 70/1 70/17 73/24 80/14 84/13 84/14 93/9 99/25 110/8 111/22 119/22 139/20 146/7 146/9 147/11 161/5
themselves [3] 28/2 28/14 39/3
then [40] 6/13 9/25 10/3 15/17 19/16 26/19 28/7 39/20 40/17 52/12 57/19 59/3 61/4 61/16 61/24 64/5 65/6 65/18 65/20 66/3 66/8 66/10 66/10 66/25 67/18 67/19 67/21 70/17 73/1 73/23 74/4 76/10 76/12 77/4 80/17 81/2 81/16 81/23 82/2 84/9 84/24 85/24 89/1 92/16 105/17 105/23 108/24 119/3 125/14 129/20 132/11 140/8 143/5 144/16 148/13 157/2 158/7 158/21 160/19 160/23
there [57] 5/11 7/17 7/22 17/15 17/18 10/7 11/25 13/24 24/20 24/25 27/23 29/24 34/3 36/25 34/19 35/6 49/10 52/16 59/17 60/10 63/6 75/11 75/13 88/16 83/9 83/20 84/23 86/20 86/24 88/24 91/21 92/1 111/5 111/9 112/2 114/6 116/15 120/4 121/15 122/17 124/11 124/13 125/5 136/6 131/8 131/20 139/16 139/20 144/4 147/4 153/14 154/4 156/2 163/12 168/22 168/23 169/3
there's [5] 30/3 74/13 114/14 139/21 147/5
thereafter [1] 27/22
therefore [3] 34/9 35/4 164/19
thereof [2] 56/25 90/7
Thereupon [1] 33/1
these [11] 11/9 13/9 27/25 29/15 54/5 69/16 71/7 78/24 79/2 90/16 100/15
they [61] 9/20 9/23 10/1 10/3 10/14 10/15 10/16 10/16 10/18 14/7 15/24 16/5 16/7 16/7
16/23 29/13 31/22 31/23 44/17 47/1 47/15 48/10 51/13 51/14 51/15 51/21 55/17 67/20 68/1 74/24 83/16 91/15 93/22 93/24 94/3 94/11 99/5 99/6 99/7 106/10 106/14 114/23 114/25 115/7 119/20 119/21 119/22 119/22 122/5 136/6 139/19 139/19 140/9 140/10 140/13 151/20 154/6 157/17 159/8 159/11 164/4
the'll [1] 16/10
they're [8] 9/8 14/23 16/18 147/4
they've [2] 146/6 164/4
thing [7] 6/5 12/20 41/24 102/11 110/11 146/18 167/24
things [3] 133/16 156/25 160/4
think [40] 4/1 5/3 9/16 10/1 12/9 12/24 13/12 13/4 17/2 31/8 31/18 31/23 32/9 44/3 61/18 71/19 72/3 72/11 73/1 74/7 77/11 83/12 85/17 85/13 97/8 98/2 109/6 113/3 131/3 137/1 141/6 145/11 145/13 146/1 146/22 159/17 162/8 166/4 167/18 170/23
thinks [2] 42/2
third [7] 2/23 37/16 37/17 56/19 70/23 126/25 167/9
Thirteen [1] 12/15
this [212]
Thomas [36] 7/16 7/20 18/9 19/10 20/12 22/23 38/21 45/2 46/9 52/25 53/22 54/2 54/16 79/8 79/16 82/20 83/5 100/25 101/7 101/16 104/5 104/13 104/19 116/1 119/11 121/14 121/16 121/18 121/20 122/12 123/18 124/17 127/10 150/14 152/12 172/22
those [30] 3/20 11/4 11/19 12/10 28/9 34/8 38/5 43/2 43/24 48/9 48/15 48/21 49/5 50/20 51/17 52/22 56/3 56/5 56/13 121/9 123/19 128/4 129/7 131/4 133/16 140/4 153/3 153/4 153/12 166/24
though [6] 14/9 63/6 85/16 122/17 125/1 166/21
thought [11] 5/6 60/9 76/2 86/2 87/10 93/15 95/1 110/6 115/20 120/12 138/13
threat [1] 60/12
threatening [1] 40/3
three [53] 3/20 7/19 7/21 7/22 7/24 8/1 9/23 9/24 9/25 10/9 10/11 10/25 11/9 13/9 13/9 19/13 23/19 23/20 34/4 40/3 44/14 48/22 58/24 51/4 53/18 53/21 53/25 53/24 53/25 54/5 60/18 74/12 74/13 77/17 77/23 78/2 81/23 82/17 82/25 86/6 86/12 88/23 89/12 91/3 94/17 94/17 95/1 107/23 108/10 110/19 137/8 144/2 158/22
three-page [1] 7/19 7/21 7/22 7/24 8/1 53/18 53/21 53/23 53/24 53/25 77/23 82/17 82/25 86/12 107/23 108/10
through [17] 29/21 23/17 36/22 39/4 40/4 42/12 42/15 55/12 56/4 86/23 101/3 101/6 104/8 109/11 112/17 141/18 174/6
thrown [2] 65/19 65/24
time [22] 17/8 18/15 22/10 27/22 31/3 32/24 34/19 35/17 35/22 40/13 40/16 44/15 47/11 47/24 49/15 53/2 55/9 56/2 56/12 58/3 59/13 68/6 68/24 62/3 63/15 71/1 71/18 72/25 73/4 73/19 77/3 78/21 79/9 80/6 80/11 88/19 90/4 92/24 95/22 97/1 101/21 101/22 102/4 102/14 102/25 103/9 105/9 105/23 105/25 106/4 117/15 118/21 122/9 126/22 133/9 134/15 135/5 137/3 137/3 138/16 143/14 144/11 144/23 144/25 145/23 157/16 159/21 159/23 160/10 161/25 162/3 168/16 169/22
times [7] 19/13 85/2 106/4 121/23 125/4 127/3 167/7
timing [1] 34/1
Timothy [1] 8/3

---

happen [9] 18/5 19/4 20/2 22/5 37/6 39/8 71/2 81/4 157/4
three [1] 162/14
tissue [2] 124/9 124/13
titled [2] 7/1 70/20
TL [1] 74/20
TMM [6] 78/7 78/10 78/14 78/22 79/1 79/4
to-wit [4] 118/20 126/20 134/13 135/23
today [20] 3/10 14/3 14/24 15/10 17/25 45/17 72/12 72/18 132/23 148/17
together [3] 67/1 89/3 90/17
told [24] 26/17 66/4 66/11 64/14 66/25 66/25 67/1 67/12 68/5 71/13 72/7 72/16 73/20 82/5 86/3 92/8 93/12 98/13 98/15 110/13 129/24 157/10 158/25 164/7
Tom [1] 124/19
Tommy [3] 85/25 86/1 86/1
Tommy's [1] 86/1
tomorrow [9] 122/17 148/14 148/16 169/25 170/2 170/20 171/6 171/8 171/11
Tonight [1] 83/6
too [2] 71/15 159/4
took [13] 22/19 77/16 28/14 37/5 67/2 86/14 109/18 110/15 111/3 115/18 144/7 144/12 149/24 153/18 159/2 159/7 160/11 161/11
top [3] 46/19 78/3 131/23
Torres [1] 86/18
total [2] 74/13 119/5
totally [2] 113/18 114/3
tour [2] 148/1 148/20
toward [6] 62/17 62/23 62/25 81/24 94/13 158/20
towards [19] 26/19 26/20 61/6 63/5 63/8 65/22 66/1 75/3 76/9 76/17 77/5 81/20 87/12 88/4 93/8 96/11 104/19 158/19 163/20
Toyota [16] 18/17 19/8 19/15 20/13 38/20 48/23 51/2 111/21 113/17 119/12 117/22 132/16 134/18 159/17 160/5 161/5
traffic [5] 38/22 60/1 80/10 96/19 97/8
train [1] 128/12
trained [1] 130/24
training [2] 168/23 168/24
transactions [2] 12/6 12/23
transcript [2] 100/23 172/5
transcription [1] 174/7
transported [4] 43/2 67/4 67/6 99/20
travel [2] 87/18 95/14
traveled [1] 59/2
traveling [3] 27/10 39/10 92/18
treated [3] 40/21 41/2 99/10
treatment [3] 18/13 40/20 98/10
trial [5] 3/23 3/23 11/11 16/1 16/2
tribunal [1] 25/18
tried [6] 65/6 64/4 66/7 67/1 98/14 129/24
trip [1] 83/9
trouble [3] 82/13 161/17 161/22
troubling [1] 72/24
true [4] 17/19 82/19 86/8 110/21
trunk [1] 94/8
trustee [2] 2/23 67/9
truth [2] 89/13
try [4] 12/5 84/2 112/13 146/19
trying [16] 59/11 64/10 65/8 84/20 85/11 95/25 96/9 102/15 129/16 153/11 154/1 155/21 161/21 161/24 161/25 165/2
turn [11] 3/8 5 35/4 75/4 75/8 77/6 92/14 92/17 97/24 93/10 110/12 162/3
turned [10] 59/3 62/17 76/14 83/21 84/7 84/8 84/9 92/17 94/15 135/18
Turnpike [5] 59/1 59/7 75/4 92/10 92/19
turns [1] 162/16
tweeties [2] 81/8 157/7

**T**

twist [1] 65/17
two [35] 7/15 21/22 27/16 21/25 46/18 47/9
53/8 57/13 58/8 58/17 60/3 81/3 84/4 84/6
84/11 85/1 91/5 91/18 91/19 91/23 91/24
95/13 98/4 99/3 100/21 115/11 123/11 134/24
148/21 148/25 153/8 156/14 157/3 158/25
159/6
two-lane [1] 60/3
type [4] 34/25 59/18 92/25 161/14
typical [1] 113/17

**U**

U-turn [3] 75/8 77/6 130/12
uh [2] 79/16 185/21
ultimate [1] 52/3
ultimately [4] 27/11 42/14 128/17 143/24
65/17 71/5 82/7 95/21 103/19 107/16 113/20
129/21 134/12 136/16 137/10 148/23 150/17
152/8 153/2 154/18 156/19 159/4
underlying [1] 153/14
underneath [1] 79/19
understand [9] 41/22 78/4 78/23 87/1 109/10
163/23 164/15 166/10 167/16
understanding [5] 3/11 3/16 14/2 16/4 51/9
unfair [1] 32/12
unfamiliar [1] 92/7
unfortunate [2] 32/5 73/21
uniform [3] 138/3 138/10 138/10
uniforms [1] 2/14
union [3] 25/24 73/11 107/5
unit [14] 7/6 21/1 21/6 33/13 33/25 34/3
53/13 56/17 89/10 89/23 142/18 142/21
143/13 143/20
unjustifiable [1] 136/16
unlawful [9] 18/7 19/5 45/18 45/22 45/24
57/6 115/13 129/20 165/11
unless [3] 14/11 29/4 69/17
unlock [1] 64/15
unlocked [1] 64/18
unrelated [1] 143/14
until [15] 15/6 59/6 68/9 72/12 78/21 84/8
96/24 97/9 97/12 144/14 145/21 153/25
168/22 170/9 170/17
up [87] 6/5 16/1 16/23 24/20 26/3 26/19
27/14 28/4 35/14 35/18 35/24 39/15 39/21
39/24 40/15 46/16 53/4 53/10 53/15 53/18
53/21 55/11 59/25 60/6 62/1 65/20 65/22
65/25 72/12 73/24 75/9 75/12 75/19 76/2
76/21 77/6 80/17 81/17 82/23/9 84/1 84/16
85/6 88/3 89/10 90/14 90/21 93/5 93/14
93/21 94/6 94/16 95/5 95/5 95/10 95/12
95/17 96/16 96/18 97/3 103/17 105/19
105/23 107/20 109/8 109/17 113/1 117/12
117/16 118/3 122/10 122/22 122/22 125/16
125/16 126/3 131/23 131/24 134/8 135/7
136/5 145/22 147/10 151/12 157/11 158/16
161/6
upholstery [1] 164/2
upon [11] 11/15 18/5 18/5 114/16 118/17
119/7 126/19 127/5 134/11 153/24 155/10
upper [2] 96/4 129/19
upset [1] 71/17
us [32] 14/7 45/17 61/20 63/5 65/23 65/23
66/22 73/12 74/3 75/9 75/11 77/13 77/14
77/15 79/3 83/10 83/21 83/22 83/23 83/25
83/25 84/1 84/2 84/3 84/3 84/17 90/19 103/2
103/2 109/12 126/21 166/25
use [11] 9/19 29/6 28/8 38/3 38/5 48/18
136/11 138/5 142/3 147/7 157/23
used [8] 50/22 56/25 60/23 78/9 90/8 130/6
131/9 161/17
using [2] 12/4 20/7
usually [1] 167/11

**V**

vehicle [86] 19/13 20/14 23/25 38/25 39/18
39/20 39/21 39/22 39/24 39/25 40/1 40/6
40/8 40/14 40/15 40/16 40/19 58/9 59/15
59/19 59/24 60/6 60/15 61/5 61/8 61/17
61/19 61/25 62/4 62/5 62/9 62/10 62/11
62/12 62/13 62/14 62/16 62/19 62/22 62/23
63/2 63/4 63/7 63/12 63/13 63/23 64/21
64/22 65/3 65/5 65/16 65/21 66/24 88/7 93/4
93/6 93/9 93/16 94/14 96/1 96/6 97/9 99/21
105/16 111/17 111/18 112/1 112/14 112/23
113/17 113/22 114/9 114/10 117/3 119/4
125/18 129/17 163/16 163/23 165/18 166/5
166/14 167/20 167/20 168/20
vehicles [6] 38/12 38/14 39/7 39/16 58/21
58/23
vehicular [1] 97/8
veracity [1] 155/13
verbal [2] 39/19 59/25
very [4] 30/22 68/17 114/6 114/10
Veterans [1] 101/12
via [3] 6/8 20/22 49/21
vicinity [1] 9/11
video [1] 87/8
view [6] 30/9 31/24 42/6 69/18 93/11 153/13
Village [2] 75/2 108/24
violate [4] 126 28/25 118/22 126/23
violated [9] 24/12 29/3 29/21 55/23 56/7
170/19 121/14 128/1 129/9
violates [1] 13/20
violation [14] 18/25 19/23 20/15 21/22 24/3
24/8 25/11 25/16 34/16 43/8 45/18 117/9
118/17 128/5
violations [5] 3/14 9/21 21/5 25/7 43/20
vision [1] 88/16
vodka [5] 91/5 91/6 91/13 91/19 91/24
voluntarily [2] 56/22 90/3
voluntariness [4] 146/2 146/24 147/1 147/15
voluntary [1] 141/2

**W**

wait [1] 41/19
waited [2] 71/9 84/8
waiting [1] 59/21
waiver [3] 56/24 78/23 90/6
walked [2] 58/20 61/5
walking [7] 81/19 87/12 91/22 93/8 94/13
109/14 158/19
want [23] 15/7 17/12 17/16 17/20 35/14
69/22 69/24 71/24 74/3 78/16 104/23 105/10
122/17 137/19 139/19 145/1 148/4 160/11
165/24 168/5 168/6 170/8 171/11
wanted [6] 6/3 8/17 14/6 17/15 68/6 171/6
was [446]
wasn't [13] 28/6 80/11 82/8 83/11 84/24
104/25 140/17 140/20 142/2 159/4 161/17
162/10 161/25
watching [1] 93/10
water [1] 58/11
waving [2] 93/16 109/11
way [18] 13/16 26/6 27/23 30/20 31/16 38/19
49/2 56/24 58/24 80/15 90/5 91/20 102/2
103/23 103/25 114/14 144/20 151/9
ways [1] 32/12
we [130] 6/4 8/18 9/11 10/10 10/20 10/24
11/4 11/15 12/1 14/1 14/6 15/7 15/9 15/21
16/8 16/15 16/20 17/2 17/3 21/18 25/14
28/10 29/8 32/7 32/13 32/15 42/10 42/11
44/3 57/10 57/12 57/17 57/19 57/24 58/1
58/4 58/4 58/14 58/16 58/17 58/18
58/20 58/22 58/23 59/2 59/5 59/6 59/21 67/3
67/12 69/7 69/20 72/16 73/15 74/19 74/21
75/1 75/5 75/4 75/4 75/6 75/7 75/11 77/8
77/9 81/10 82/5 83/8 84/4 84/5 84/10 84/11
85/17 91/1 91/5 91/7 91/8 91/12 91/16 91/17
91/21 91/25 92/1 92/2 92/4 92/5 92/23 93/9
98/24 99/21 105/2 106/20 108/18 108/19
108/22 108/23 108/24 108/25 109/1 109/3
109/6 115/18 116/23 116/23 118/3 120/8
132/23 135/23 137/6 137/9 137/13 139/13
142/22 143/14 143/15 145/16 146/24 146/25
148/4 148/21 148/25 159/9 161/7 161/15
162/16 162/16 167/13 169/24 171/11
we'd [2] 12/21 170/23
we'll [14] 11/17 159 17/8 117/25 70/17 74/6
106/18 106/19 137/20 147/19 148/5 148/14
159/16 170/17
we're [8] 21/11 33/3 70/12 72/13 107/2 148/4
155/6 155/8
we've [2] 8/16 14/19
weapon [19] 22/12 24/14 24/16 34/19 36/12
27/5 61/10 62/7 62/19 63/1 63/4 63/10 63/17
64/18 95/7 95/8 95/20 96/13 119/1 119/5
128/16 130/20 132/22 133/1 133/8 133/8
135/24 139/11 139/14 139/16 139/20 139/21
139/22 140/23 141/1 141/7 141/9 141/11
166/22
weapons [1] 140/10
wearing [1] 106/13
week [2] 57/4 86/8
weight [2] 44/8 136/24
well [27] 9/9 13/7 38/5 46/23 49/23 58/11
71/21 73/17 103/11 112/26 117/13 132/12
134/14 140/1 141/10 145/11 145/23 150/10
152/11 152/19 153/10 153/19 154/18 155/25
161/13 167/5 168/2
went [27] 6/4 16/8 58/1 58/3 58/14 58/24 65/12
71/13 81/11 82/10 82/12 88/21 91/12 91/17
97/4 101/22 102/4 102/23 108/24 111/22 111/21
116/20 130/12 160/3 160/4 168/18 160/22
were [99] 6/16 6/22 17/8 16/3 16/5 16/7 20/19
22/9 27/6 28/11 29/4 29/12 31/3 31/25
34/19 38/10 38/14 39/4 40/20 43/2 43/24
44/13 44/17 44/21 44/22 48/10 49/2 52/14
52/16 52/22 57/17 58/14 58/16 58/17 58/18
59/5 59/21 67/4 67/6 67/12 68/1 68/21 72/16
74/19 74/21 74/24 75/3 75/3 75/7 75/11
75/15 83/8 84/4 84/10 85/17 87/16 88/24
82/25 93/22 93/24 94/3 94/11 99/6 99/22
100/3 100/16 105/11 106/18 106/14 106/18
108/29 108/21 108/22 109/1 109/7 120/15
136/16 138/23 142/8 142/8 142/18 143/22
147/2 149/3 149/16 151/25 152/2 153/14
155/3 155/6 157/16 159/8 161/5 171/12
weren't [2] 73/18 157/15
Wesson [10] 18/11 19/12 23/4 23/22 23/23
23/6 24/15 25/10 134/17 140/16
west [12] 39/11 39/12 79/25 80/22 81/2 81/2
83/3 83/8 84/5 107/15 104/4 157/2
westbound [2] 39/11 80/21
what [156] 6/13 9/12 9/18 11/13 12/8 16/23
17/1 17/8 21/19 24/1 28/5 28/7 28/8 28/12
28/12 28/14 34/6 34/8 35/10 36/11 41/12
41/24 42/1 42/2 42/2 43/2 43/9 43/19 44/3
49/5 50/22 51/9 51/17 52/1 52/20 52/22
57/14 60/20 66/25 72/8 73/2 73/2 83/11 87/9
93/22 94/9 94/10 97/14 97/23 97/24 98/19
98/23 101/18 103/24 108/7 108/6 108/25
105/13 107/10 108/10 118/2 113/3 113/12
115/1 115/18 115/19 116/3 116/7 116/18

wary...
what... [80] 116/23 117/8 118/2 118/15 119/16 119/24 120/18 120/21 120/23 121/12 122/13 122/23 123/17 124/22 125/23 126/17 127/17 128/4 129/8 129/19 129/22 129/7 131/12 131/18 131/12 133/4 132/19 134/10 134/24 136/2 136/6 136/14 137/13 138/6 138/12 139/3 139/9 139/22 139/24 139/25 140/1 143/14 144/23 144/25 145/3 145/6 145/19 148/20 149/3 149/14 150/3 150/5 150/7 151/3 151/6 153/7 153/21 153/22 155/25 157/10 158/25 160/18 161/13 161/20 163/1 163/3 163/7 164/6 164/15 164/20 165/8 165/25 167/16 169/13
what's [9] 9/5 11/24 118/12 123/9 126/14 132/9 134/7 135/22 152/4
whatever [2] 14/23 111/20
wheel [1] 96/16
when [50] 24/23 26/13 34/23 49/2 51/6 58/22 63/9 63/13 64/13 65/22 71/4 72/6 72/7 72/18 72/25 73/24 82/11 83/21 84/11 85/4 85/13 85/14 85/17 85/19 87/8 88/22 88/25 92/14 92/17 93/18 94/25 95/10 98/9 110/3 110/8 114/2 114/5 114/23 119/1 129/15 134/17 136/18 144/4 146/18 147/11 149/7 152/6 153/4 160/22 161/4
where [28] 24/7 26/21 29/7 29/11 41/3 48/1 51/7 52/10 59/11 60/14 62/17 63/25 65/12 72/18 76/18 85/14 91/12 91/18 110/10 121/18 130/12 131/16 132/19 132/2 133/6 154/1 154/12 155/4
wherein [2] 22/20 22/21
WHEREOF [1] 174/8
Whereupon [6] 41/20 42/22 70/5 106/25 147/21 171/15
whether [13] 12/1 25/1 42/5 111/24 121/13 146/13 155/3 166/2 168/14 168/18 169/16 169/17
which [68] 7/1 7/1 13/10 15/13 15/25 18/3 18/24 19/22 23/19 23/20 27/25 33/22 37/5 46/24 48/10 48/24 50/17 51/13 52/4 57/8 57/22 58/3 58/19 60/23 62/19 64/1 65/18 70/19 72/23 73/15 74/20 75/2 79/6 87/13 87/21 88/1 88/8 92/15 93/12 106/2 106/3 111/17 111/18 114/7 115/16 118/17 119/8 119/19 120/8 121/16 126/1 127/6 129/11 133/24 134/11 143/14 150/17 154/22 167/1 170/3
while [21] 18/6 19/5 28/3 38/16 38/18 58/2 59/23 61/6 63/17 66/9 71/3 78/13 90/15 99/9 99/24 118/21 126/22 128/16 129/21 130/15 134/15
white [38] 38/20 57/22 59/25 74/24 80/3 80/17 80/25 81/6 81/8 81/12 81/14 81/18 81/19 81/22 83/20 83/22 87/12 87/17 87/19 87/21 88/1 88/7 88/10 88/13 88/15 93/12 93/20 94/5 98/5 105/14 108/22 109/7 115/25 117/7 158/17 158/18 158/21
Whistle [1] 72/15
who [46] 5/11 14/21 20/25 26/2 27/13 27/21 28/6 28/10 28/20 28/22 29/16 30/2 30/7 30/19 31/2 31/5 31/12 31/25 45/1 57/23 58/25 67/25 72/15 72/20 73/9 81/7 81/13 81/21 89/10 90/23 94/7 99/5 99/14 100/5 110/6 127/1 143/1 143/19 143/23 145/24 156/18 157/6 158/20 159/6 167/13
who's [1] 152/8
whole [1] 97/1
wholly [2] 30/14 31/7
whom [2] 28/11 29/16
whose [2] 14/15 132/22

wire [8] 43/22 44/11 60/20 60/22 127/21 138/25 151/14 167/4
wife [12] 38/15 57/7 95/23...
will [48] 4/1 4/2 4/8 9/18 11/1 14/14 15/24 15/25 16/12 20/4 20/25 23/14 21/18 22/1 22/8 22/11 22/16 22/19 23/14 23/12 23/17 24/11 24/19 24/25 25/15 28/4 28/5 28/6 28/10 28/11 29/16 30/1 30/24 31/19 32/13 41/4 42/14 44/7 47/15 78/8 78/16 78/19 119/21 131/15 131/16 146/10 163/24
Willard [2] 67/23 68/18
William [7] 22/3 5/18 67/19 68/10 99/14 101/5 104/10
willing [1] 154/11
window [44] 19/7 23/2 23/23 24/21 27/8 40/10 48/25 51/24 52/12 60/7 60/8 60/9 60/14 61/2 61/6 64/17 71/9 76/24 81/5 82/2 82/3 85/5 87/11 88/21 88/22 89/1 93/21 95/19 102/2 105/17 116/21 119/4 121/17 121/19 125/15 130/19 130/25 157/5 158/5 162/5 168/25 169/7
windshield [11] 23/21 40/5 46/13 46/14 48/23 58/18 64/6 64/8 87/15 119/3 163/24
wish [1] 79/3
wit [4] 118/20 126/20 134/13 135/23
withdrawn [1] 120/11
within [8] 6/16 6/19 11/7 38/4 60/5 71/3 93/17 131/16
without [11] 18/8 28/1 28/13 30/10 38/18 78/19 89/3 112/21 147/7 159/19 164/12
witness [32] 14/3 17/12 22/6 28/20 28/22 32/19 32/21 33/6 33/18 35/24 43/17 41/20 41/24 42/21 42/22 44/2 47/25 58/10 79/10 107/6 107/12 112/25 118/10 126/12 133/23 145/12 145/14 154/25 155/7 155/9 166/8 174/8
witness's [2] 42/11 112/6
witnesses [30] 14/5 14/10 14/15 14/18 15/19 16/3 16/13 27/21 28/2 28/7 28/9 28/10 28/14 30/7 30/11 31/23 31/25 44/22 73/14 73/17 124/17 124/25 144/7 144/20 146/14 149/11 149/15 149/16 170/20 171/8
women [2] 91/14 91/25
won't [1] 171/5
word [3] 32/16 105/10 155/23
words [9] 60/21 60/23 102/16 109/9 138/15 153/23 157/14 164/16
work [5] 148/21 148/25 159/9 170/9 170/13
workers' [1] 100/10
working [8] 80/4 80/8 83/7 143/17 146/16 149/3 149/5 149/9
words [1] 164/5
would [84] 10/10 11/4 11/12 12/6 12/8 13/5 13/9 13/10 13/11 13/21 16/25 24/1 26/7 28/16 28/17 28/24 28/25 30/11 30/14 31/25 35/22 36/1 41/13 46/16 47/24 49/23 50/8 50/18 53/2 55/9 55/13 55/14 56/9 56/12 62/10 64/22 72/11 72/18 73/12 79/7 92/9 113/12 123/9 123/23 135/3 137/9 138/6 138/7 138/9 138/10 139/1 139/11 140/5 140/13 140/16 140/17
wrong [9] 42/9 42/9 75/4 92/14 92/16 92/20 112/10 132/17 167/15

Y
Yeah [7] 72/1 74/6 103/1 122/19 122/21 156/4 165/6
years [6] 34/4 74/15 83/2 86/15 108/14 144/2
yell [2] 61/1 61/12
yelled [6] 60/13 81/7 81/10 81/13 157/6 158/18
yelling [13] 61/6 75/13 75/16 76/5 76/16 76/12 81/17 84/13 84/23 87/24 88/8 95/21 158/17
yelling.' [1] 94/11
yellow [2] 45/2 63/6
yes [147] 4/25 5/18 9/4 10/19 17/18 17/21 32/25 34/1 34/7 34/22 35/2 35/5 35/9 35/16 36/18 36/16 41/11 43/1 43/18 44/15 44/25 45/5 45/20 45/25 48/3 48/8 48/14 48/17 48/20 50/15 50/19 50/24 51/20 52/19 56/1 56/11 69/3 70/1 79/1 79/4 103/10 103/24 107/7 107/13 107/17 111/4 111/8 111/3 112/24 113/11 117/7 118/14 120/6 120/16 121/10 123/15 123/22 124/1 124/3 124/6 125/8 125/10 125/22 126/16 126/22 127/15 128/3 128/21 129/6 130/4 130/16 131/7 131/11 132/11 132/18 132/24 133/3 133/18 134/9 134/24 136/1 136/13 137/16 141/3 142/10 142/19 143/4 143/18 144/9 144/19 144/22 148/24 149/18 149/4 149/21 149/23 151/2 151/3 151/4 151/7 151/8 151/11 151/21 151/24 152/2 152/5 152/22 156/16 156/23 157/13 157/25 158/1 158/2 158/3 158/6 158/9 159/9 159/15 159/13 159/22 160/17 161/7 161/15 161/23 162/1 162/14 162/17 163/2 163/17 164/1 168/17 168/22 169/4 171/4
yet [3] 8/17 31/25 122/16
YORK [47] 1/2 1/9 2/8 2/16 3/9 18/6 18/18 18/20 19/4 19/8 19/10 20/3 22/6 24/3 24/8 33/21 37/1 37/7 38/6 38/13 46/2 51/2 70/21 74/17 77/25 79/15 79/25 80/22 86/18 87/5 89/7 89/16 91/2 101/13 101/15 104/16 104/18 118/22 119/2 120/22 124/24 127/2 134/18 141/16 141/17 174/4 174/16
you [343]
you'd [1] 144/1
you'll [1] 74/5
you're [14] 16/11 17/19 29/7 71/21 107/16 112/12 112/15 141/22 148/23 149/14 153/22 164/10 164/17 164/20
you're [4] 13/14 112/14 153/24 155/15
you,' [2] 64/23 66/10
you.' [1] 61/15
your [81] 5/16 6/12 12/14 12/24 13/23 17/1 17/12 25/21 29/5 32/18 33/10 33/15 35/7 36/14 36/15 41/9 42/19 42/24 43/5 43/22 44/12 45/15 45/23 46/4 49/16 48/18 49/1 49/11 50/13 50/22 51/6 51/9 52/2 52/15 52/18 55/21 54/6 61/14 69/6 74/2 78/5 102/24 111/3 111/11 113/17 113/19 117/4 120/4 120/10 120/13 120/24 121/13 123/19 124/15 125/19 127/25 128/20 128/22 130/25 131/9 131/12 132/25 135/2 135/21 136/9 142/13 145/3 148/6 148/20 153/7 153/12 155/16 158/11 159/14 164/22 168/13 171/12

Case 2:12-cv-00512-JFB-AKT Document 264-44 Filed 07/27/18 Page 209 of 366 PageID #: 8389

175

DISTLER



1  - - - - - - - - - - - - - - - - - - -x

2  POLICE DEPARTMENT COUNTY OF
   NASSAU, NEW YORK,

3                              CASE NO. 8118

4      AGAINST

5  ANTHONY DILEONARDO POLICE
   OFFICER, SERIAL NO. 9013

6  - - - - - - - - - - - - - - - - - - -x

7              NASSAU COUNTY POLICE DEPARTMENT

8              1490 FRANKLIN AVENUE

9              MINEOLA, NEW YORK 11501

10             MARCH 11, 2014

11             9:40 a.m.

12

13

14              CONTINUATION

15

16     BEFORE:  INSPECTOR MICHAEL STUDDERT

17              HEARING OFFICER

18

19

20

21

22

23

24

25

NORTH SHORE COURT REPORTERS   1-800-794-5342

DISTLER

| | |
|---|---|
| 1 | A P P E A R A N C E S: |
| 2 | |
| 3 | HEARING OFFICER:  INSPECTOR MICHAEL STUDDERT |
| 4 | |
| 5 | NASSAU COUNTY POLICE DEPARTMENT |
| 6 | ATTORNEYS FOR CLAIMANT |
| 7 | 1490 FRANKLIN AVENUE |
| 8 | MINEOLA, NEW YORK 11501 |
| 9 | BY:  LESLI P. HILLER, ESQ. |
| 10 | FILE # 8118 |
| 11 | |
| 12 | BARKET, MARION, EPSTEIN & KEARON, LLP |
| 13 | ATTORNEYS FOR RESPONDENT |
| 14 | 666 OLD COUNTRY ROAD |
| 15 | SUITE 700 |
| 16 | GARDEN CITY, NEW YORK 11530 |
| 17 | BY:  BRUCE A. BARKET, ESQ. |
| 18 | |
| 19 | ALSO PRESENT: |
| 20 | ISRAEL SANTIAGO, SERGEANT COMMANDING OFFICER |
| 21 | TARA COMISKEY, DETECTIVE SERGEANT LEGAL BUREAU |
| 22 | KAREN TAGGART, ESQ., LEGAL BUREAU |
| 23 | WILLIAM PURCELL, THIRD PRECINCT PBA TRUSTEE |
| 24 | JOANNE DELORENZO, LEGAL BUREAU |
| 25 | |

NORTH SHORE COURT REPORTERS   1-800-794-5342

177

**DISTLER**

1         HEARING OFFICER STUDDERT:  This

2  hearing is now in session.  We can get our

3  counsel for the record.

4         MS. HILLER:  Lesli Hiller for the

5  Nassau County Police Department.

6         MR. BARKET:  Bruce Barket for Officer

7  DiLeonardo.

8         HEARING OFFICER STUDDERT:  Let the

9  record reflect that Officer DiLeonardo is

10  present, as is his PBA representative.

11  Also can I get the observers in the room.

12         MS. TAGGART:  Karen Taggart, Nassau

13  County Police Department Legal Bureau.

14         MS. DELORENZO:  Joanne DeLorenzo,

15  Nassau County Police Department Legal

16  Bureau.

17         MR. PURCELL:  William Purcell.

18         MS. COMISKEY:  Tara Comiskey,

19  Detective Sergeant Legal Bureau.

20         MR. SANTIAGO:  Detective Sergeant

21  Israel Santiago, Commanding Officer of

22  Legal Bureau.

23         MR. BARKET:  Can I ask a — well,

24  continue what you are saying and I will

25  ask my question.

178

DISTLER

```
1           MS. BILLER:  Yeah?  Okay.  So
2    preliminarily before we start with our
3    witness, I just wanted to correct an error
4    I made earlier and I'd like to withdraw
5    from evidence Exhibit 19 and replace it
6    with the correct 209 that reflects one of
7    the charges that we're here before the
8    Court today on, or the hearing officer,
9    which would be the 209 that reflects
10   Count III in the 210, the assault.
11          I'm going to pass up a copy of that.
12   I already passed over a copy to counsel.
13          (209 Reflecting Assault was marked as
14   Department's Exhibit 19A for evidence, as
15   of this date.)
16          HEARING OFFICER STUDDERT:  Is there
17   anything else?
18          MS. BILLER:  Not for me, but I think
19   counsel had a question.
20          MR. BARKET:  Inspector, how does your
21   relationship with the legal bureau work?
22   Because I was told that during the course
23   of the hearing, you would take advice or
24   hints from one of the attorneys in the
25   Legal Bureau.
```

179

DISTLER

```
1          HEARING OFFICER STODDERT:  Just
2     procedural type of stuff and questions I
3     might have.
4          MR. BARKET:  Okay.  There is, I'll
5     admit, my naivety or ignorance here, but
6     the Legal Bureau is the one, if you will,
7     prosecuting this case on behalf of the
8     Commissioner, so it seems like an odd
9     situation to have one of the individuals
10    that works with Miss Hiller daily be
11    giving you advice about procedure.
12         HEARING OFFICER STODDERT:  Record's
13    noted.
14         MR. BARKET:  I'm not saying it's
15    right or right.  It strikes me as odd,
16    kind of like the law secretary of a judge
17    being a member of the District Attorney's
18    Office.  It would be disconcerting to
19    those being prosecuted by the District
20    Attorney's Office.
21         MR. SANTIAGO:  I understand you
22    concern, but we are members of the Legal
23    Bureau —
24         MS. HILLER:  I'm the only one that
25    does discipline.
```

180

DISTLER

1        MR. SANTIAGO:  — that's designated

2        as prosecutor.  Our role here is to make

3        sure that due process standards are met,

4        any concerns, both from the hearing

5        officer, from the prosecutor himself,

6        which I clarify.

7        MR. BARKET:  Which one gives me

8        private advice?

9        MR. SANTIAGO:  I'll step outside with

10       you.  No problem.  I do it all the time

11       when we have pistol hearings.

12       MR. BARKET:  Okay.  I'll take you up

13       on that.

14       MS. HILLER:  Haven't I answered any

15       of your procedure questions yet today,

16       Bruce?

17       MR. BARKET:  I'm just saying, it

18       just —

19       MR. SANTIAGO:  Let the record reflect

20       that Ms. —

21       MR. BARKET:  So you'll chat with me

22       about the procedures and rules and —

23       MR. SANTIAGO:  Yes, definitely.  You

24       know I will.  Ad nauseam.

25       MR. BARKET:  Okay.  I'll take you up

181

DISTLER

1        on that when we're done this morning.

2            HEARING OFFICER STUDDERT:  Okay.

3            MR. BARKET:  Thanks.

4            HEARING OFFICER STUDDERT:  Call the

5        witness.

6            MS. HILLER:  It's Mr. Barket's

7        witness at this point, I think, for cross,

8        Jo-Ann Distler.

9            HEARING OFFICER STUDDERT:  Can I have

10       those exhibits up here in case we need to

11       refer to them?

12           MR. BARKET:  May I proceed?

13           HEARING OFFICER STUDDERT:  Yes, you

14       may.

15   CROSS-EXAMINATION

16   BY MR. BARKET:

17       Q    Good morning.

18       A    Good morning.

19           HEARING OFFICER STUDDERT:  Just

20       before we start, you are still under oath,

21       okay?

22           THE WITNESS:  Yes.

23   BY MR. BARKET

24       Q    I'm holding something.  Do you recognize

25   this?  It is part one.  It looks like the report —

182

DISTLER

```
 1   the larger report that you drew up after this
 2   investigation was completed.
 3       A    Okay.
 4       Q    It has in it a number of things that you
 5   reviewed, and I just want to go through it with you
 6   and make sure that I'm right about that?
 7            MS. HILLER:  Are you moving the IAU
 8            report into evidence?
 9            MR. BARKET:  Oh, no.  No, no.
10       Q    So I take you it you spoke with all the
11   witnesses that are contained in this larger report?
12       A    If that's the report that I prepared, yes.
13   No, not necessarily.
14       Q    You or somebody in your team did?
15       A    Somebody in my team or somebody from
16   Suffolk County.
17       Q    Okay.  Then you reviewed the reports
18   before making your recommendations?
19       A    Yes.
20       Q    I take it that you formed an opinion about
21   this?
22       A    Yes.
23       Q    Okay.  Anything I can say to change your
24   mind about that?
25       A    No.
```

DISTLER

1     Q    So I'm not going to take a lot of your

2 time, then, this morning in trying to do that

3 because we'll just agree to disagree.

4     A    Okay.

5     Q    But there are a few questions I want to

6 ask.  For starters, you said you spoke to Mr. Klung,

7 or Mr. Klung was spoken to?

8     A    Klug?

9     Q   Klug, sorry.

10    A .  Yes.

11    Q    That's a statement that you actually took;

12 is that right?

13    A    Yes.

14    Q    Where did you do that?

15    A    At 422 Oakwood Road.

16    Q    That's where he lives?

17    A    Correct.  At that time.

18    Q    Am I correct that — have you spoken to

19 civilians in the past who have witnessed a part of a

20 violent episode?

21    A    Yes.

22    Q    Okay.  It's no uncommon for witnesses to

23 get things remarkably wrong, because they're not

24 accustomed to observing a high-pressure violent

25 situation; is that right?

184

DISTLER

```
 1      A     At times.

 2      Q     In this case —— Mr. Klug?

 3      A     Klug, K-L-U-G.

 4      Q     Klug.

 5            —— Eric got a number of things wrong;

 6  is that right?

 7      A     Yes.

 8      Q     To begin with, he didn't actually see how

 9  the incident started, did he?

10      A     No.

11      Q     He heard a gunshot and then went to his

12  window?

13      A     Correct.

14      Q     So whatever precipitated that gunshot, he

15  didn't see, has no knowledge of?

16      A     Correct.

17      Q     In addition to that, he said that the

18  female passenger in the car that was being shot at

19  got out of the car?

20      A     Yes.

21      Q     That's not right, is it?

22      A     That's was not my conclusion.

23      Q     That's not actually —— nobody said that

24  other than him; correct?

25      A     Correct.
```

DISTLER

1    Q    He was looking out his window.  How much

2    distance was it between his window and where this

3    incident took place?

4    A    Maybe 50 feet.

5    Q    It was right in front of his house?

6    A    Correct.

7    Q    Okay.  Dark out?

8    A    Dark out.

9    Q    Was he on the same side of the road as the

10   incident took place or the other side?

11   A    Same side.

12   Q    So the passenger door of that white Prius

13   would have been facing his house; yes?

14   A    Yes.

15   Q    So despite only being 50 feet away and

16   having an unobstructed view, I guess, of the Prius,

17   he still mistakenly thought that — I guess her name

18   is —

19   A    Kristie Mondo.

20   Q    — got out of the car when, in fact, she

21   didn't?

22   A    Yes.  Originally the vehicle was parallel

23   to Officer DiLeonardo, the car he was driving at the

24   time.  Then it backed up another additional 50 feet,

25   so I would say it was further back.

186

DISTLER

1    Q   Right.  Okay.  So this particular witness

2    didn't see how the incident started --

3    A   Correct.

4    Q   -- and made at least one error concerning

5    whether or not the female passenger in a car door

6    facing his house got out of the vehicle?

7    A   Yes.

8    Q   Just as a general proposition, if an

9    officer -- if a car was being driven at an officer

10    who was himself backed up to another car, he'd have

11    a right, or she would have a right to defend him or

12    herself in that situation, yes?

13    A   Yes.  We are trained to retreat in

14    situations like that.

15    Q   Officers are trained to retreat when

16    people are trying to run them over?

17    A   Yes.  That's our training.

18    Q   Okay.  And if they can't retreat because

19    there is a car behind them or there's somebody in

20    the car that could be injured, if the other car

21    continues on, they're trained to just retreat and

22    let that accident happen?

23    A   Yes.

24    Q   So what Officer DiLeonardo should have

25    done, according to you, is he should have stepped

187

DISTLER

1   aside and let -- tried to run from the Prius that

2   was trying to run him down?

3       A    It's my opinion that he had many other

4   options available to him, yes.

5       Q    If somebody's trying to run down a police

6   officer or trying to ram a car with a passenger in

7   it, would that be a crime?

8       A    Yes.

9       Q    What would the crime be?

10      A    Attempted assault.

11      Q    Potentially attempted murder, depending on

12  the person's intent?

13          MS. HILLER:  Objection.  It calls for

14          speculation.  There are more facts here.

15          This didn't happen in this case.

16  BY MR. BARKET

17      Q    Well, it actually did.  Everybody agrees.

18  Moroughan, DiLeonardo agree that they both said to

19  the police afterwards that he drove his vehicle

20  toward DiLeonardo.

21      A    I disagree with that.  I disagree with the

22  allegation -- the opinion that you're drawing from

23  that, that he --

24      Q    It's not -- well, it's not an opinion.

25  DiLeonardo told you that the car was being driven at

DISTLER

```
 1  him; correct?

 2      A    Yes.

 3      Q    And Moroughan told the police that

 4  morning --

 5      A    He drove forward.

 6      Q    -- that he drove forward towards the

 7  police officer?

 8      A    Yes.

 9      Q    So that would have been a crime of either

10  attempted assault or attempted murder?

11              MS. HILLER:  Objection.  Same

12          objection.

13              HEARING OFFICER STUDDERT:  Yes, I'm

14          going to have to sustain that objection.

15  BY MR. BARKET

16      Q    Police officers -- they're obligated to

17  make arrests and use deadly force in certain

18  circumstances; aren't they?

19      A    Yes.

20      Q    And if they --

21              MS. HILLER:  Objection to the use of

22          the term "obligated."  I don't know if

23          "obligated" is the right word to use, to

24          use deadly force.

25              HEARING OFFICER STUDDERT:  Rephrase
```

189

DISTLER

```
 1          —

 2                MR. BARKET:  She thinks it is.  And

 3          I'm comfortable with it, because I used

 4          it.  You may not like it, but that's what

 5          redirect is for.

 6   BY MR. BARKET

 7      Q    As far as the attempted arrest goes, there

 8   is no doubt, is there, that Officer DiLeonardo was

 9   attempting to arrest Moroughan at the point in time

10   when he smashed the driver's side window?

11      A    In my opinion, that is not true.

12      Q    Well, he told you he you was trying to

13   arrest him, yes?

14      A    That's what he stated.

15      Q    And Moroughan told you that he was saying

16   he was a police officer and was trying to pull him

17   out of the car, right?

18      A    Moroughan stated that he heard him state

19   that while he was at the side of the window.

20      Q    And the girl in the car, what was her name

21   again?

22      A    Kristie Mondo.

23      Q    She said that DiLeonardo was saying, "You

24   going to go to jail.  Get out" —

25      A    Yes.
```

190

DISTLER

```
 1       Q    So he was trying to effectuate an arrest,

 2  whether it be -- we can disagree about whether it

 3  was a lawful or unlawful arrest.  But that's what he

 4  was trying to do at that point in time, yes?

 5       A    I think that statement came after he

 6  shattered the window and punched him.

 7       Q    Doesn't it reveal what his intent was

 8  there?  You're not really suggesting that Officer

 9  Moroughan (sic) was trying to — his intent and his

10. subjective goal there was to simply beat up

11  Mr. Moroughan?

12       A    I believe that was his intent at the time.

13       Q    So despite him putting out his shield,

14  despite him saying, "Police officer," despite

15  Moroughan saying he identified himself as a police

16  officer, despite Kristie saying, "He told my

17  boyfriend he was going to jail that night," you

18  don't think he was trying to effectuate an arrest

19  there?

20       A    I do not.

21       Q    Your opinion of this is -- all of that,

22  all of that language, identifying himself as a

23  police officer, pulling out his shield, trying to

24  pull Moroughan out of the car, that was all a rouse,

25  and his real intent was to just beat up Moroughan?
```

191

DISTLER

```
 1      A    I think there is some inconsistencies as
 2  to when some of those statements and events may have
 3  occurred.  When he identified himself, I believe my
 4  investigation revealed that it's highly likely and
 5  reasonable that he did not identify himself as a
 6  police officer until after he was at the side of the
 7  window, broke the window and shattered it and
 8  punched him as Mr. Moroughan was attempting to
 9  retreat and leave from the scene.
10      Q    When did he take out his shield?
11      A    To the best of my knowledge, his shield,
12  according to Officer Bienz, was not out.  He never
13  saw it.
14      Q    Didn't Officer DiLeonardo say he took out
15  his shield?
16      A    Yes, he did.
17      Q    Did he have his shield on him that night?
18      A    Yes.  According to the records, yes, he
19  did.
20      Q    You say it's your opinion.  I mean, you're
21  drawing an opinion separate from what the witnesses
22  told investigators at the scene.
23      A    Not all of the witnesses.
24      Q    You're picking and choosing the witnesses
25  you want to believe?
```

DISTLER

1    A    I evaluated all of the testimony in this
2  case, all the evidence.
3    Q    And you picked and chose the ones you
4  wanted to believe?
5    A    No, that's not true.
6    Q    Well, you discounted some and you believed
7  others, yes?
8    A    Yes.
9    Q    You indicated that he lost control of his
10 weapon?
11   A    Yes.
12   Q    Did anyone tell you that he lost control
13 of his weapon?
14   A    Officer Bienz stated that Officer
15 DiLeonardo told him that he lost his weapon in the
16 vehicle.
17   Q    Lost, or that Moroughan took it from him?
18   A    No, Officer Bienz stated that when he was
19 in the hospital, Officer DiLeonardo came into his
20 room and stated that he lost his weapon in the cab.
21   Q    Did he mean that — did you interpret that
22 to mean lost as in misplaced or lost as in, it's
23 gone?
24   A    Lost, as in dropped.  Lost control of it.
25   Q    Didn't he tell the police officers who

193

DISTLER

1    arrived at the scene that the gun was taken from

2    him?

3         A    Yes.

4         Q    So right after the incident happened, he

5    told the police officers that the gun was taken from

6    him; yes?

7         A    He told 911 that the gun was taken from

8    him in his 911 call.

9         Q    That was seconds after the incident

10   happened; correct?

11        A    Correct.

12        Q    He told you that the gun was taken from

13   him, didn't he?

14        A    Yes.

15        Q    There are some things that we can agree

16   on, I think; right?  Actually, a number of things.

17   That there is no doubt that certain events took

18   place.  You talked about some of them yesterday.

19   That Moroughan was the initial aggressor in this

20   incident?

21        A    Yes.

22        Q    Pulling up his car, shouting, getting out

23   of his car, so forth; yes?

24        A    Yes.

25        Q    We can agree that he was unfamiliar with

194

DISTLER

1   how to operate the Prius; yes?

2        A    Yes.

3        Q    That after he got out of his car, he

4   returned to it; correct?

5        A    Yes.

6        Q    At that point in time, if he wanted to

7   leave, he could have simply driven straight and

8   continued on; yes?

9        A    Yes.

10       Q    So his backing up to get behind Officer

11  DiLeonardo's vehicle, that wasn't an act of somebody

12  leaving the scene, was it?

13       A    Yes.  In this instance, it was.

14       Q    In this instance, backing up — there were

15  no cars in front of him at that point, were there?

16       A    No, but he had Officer DiLeonardo

17  approaching him on foot and he had Officer Bienz

18  exiting his vehicle.

19       Q    So he backed up and then went forward?

20       A    Correct.  He backed up and then was

21  attempting to make a u-turn to exit the scene.

22       Q    Going forward with the u-turn?

23       A    Yes.

24       Q    Why didn't he just make the u-turn?

25       A    In reverse?

DISTLER

1    Q    No, without going into reverse.  Why

2  didn't he just pull away?  Wasn't there an entire

3  side of the street that was empty?  They're on the

4  right side of the street; yes?

5    A    I couldn't state that there was no traffic

6  coming the other way.

7    Q    How do you know this?  How do you know

8  that that's what his intent was?  He didn't speak to

9  you, did he?  Did his girlfriend speak to you?

10    A    No, she didn't.

11    Q    Both of them refused to speak to you?

12    A    Correct.

13    Q    His statement to the police that night

14  didn't indicate that he was trying to make a u-turn,

15  did it?

16    A    I'd have to review that statement.

17    Q    Officer DiLeonardo certainly didn't

18  interpret Mr. Moroughan's conduct of backing up and

19  then coming forward towards him in his car as him

20  attempting to make a u-turn, did he?

21    A    No, he didn't.

22    Q    But without getting into Mr. Moroughan's

23  head, a person that you've never spoken to, and I

24  guess none of us have, we do know that he got back

25  into his car, backed up; yes?

196

DISTLER

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And then began to move forward, correct? |
| 3 | A | Yes.  Correct. |
| 4 | Q | At that point in time, Officer DiLeonardo |

5  had his gun out; yes?

6      A    According to Officer DiLeonardo's

7  statement, after the car went into reverse and

8  stopped, that was when he felt that there was a

9  threat and he removed his weapon.

10      Q    Then the car began to move forward; yes?

11      A    Yes.

12      Q    And that's when Officer DiLeonardo fired

13  his weapon?

14      A    Yes.

15      Q    Officer DiLeonardo thereafter at some

16  point took his shield — excuse me, identified

17  himself as a police officer?

18      A    At some point.

19      Q    Moroughan and his girlfriend, I guess, had

20  questions about whether or not what he was actually

21  a police officer?

22      A    Yes.

23      Q    There said they weren't sure.

24      A    Correct.

25      Q    Officer DiLeonardo told you — we went

DISTLER

1    over this — that he was trying to effectuate an

2    arrest at that point; yes?

3        A    Yes.

4        Q    And Moroughan and Christine — Mondo, is

5    that her name?

6        A    Kristie.

7        Q    Kristie Mondo.  Their statements, I guess,

8    are both in evidence, so what they say happened is

9    what they say happened.

10            How many times did you try to speak

11   to Christine — or Kristie?

12       A    Kristie, I believe once, and then I spoke

13   to the attorney also a second time, who also told me

14   he would not allow her to be interviewed.

15       Q    Who is her attorney?

16       A    Mr. Grandinette was who was representing

17   Mr. Moroughan.

18       Q    How would Mr. Grandinette be able to

19   represent —

20       A    He told me that she would not be giving me

21   a statement, and I asked Ms. Mondo for a statement.

22       Q    Well, she's a witness to this.

23       A    Correct.

24       Q    So he can't represent a witness and a

25   party.

DISTLER

1      A      No, but — correct.

2      Q      So did you try and go and speak to her

3  anyway?

4      A      Yes.

5      Q      And she refused?

6      A      Yes.

7      Q      You spoke to her personally and she said,

8  "I'm not talking to you"?

9      A      I spoke to her mother or grandmother, I

10  believe, she lived with or maybe godmother, I'm not

11  sure who is was, at the residence.

12     Q      When you spoke to Mr. Grandinette, you

13  told him you were with Internal Affairs; yes?

14     A      Yes.

15     Q      You told him you were investigating the --

16  your job is to investigate not Moroughan but

17  DiLeonardo and Bienz?

18     A      Correct.

19     Q      And I assume you conveyed that same

20  information to Kristie or her godmother or whoever?

21     A      Correct.

22     Q      And despite you telling them that you were

23  there to investigate the officers who they

24  complained about, right?  They were complaining

25  about —

199

DISTLER

1   A    Actually, the complaint did not come from
2   them.
3   Q    Not to you.  But they were certainly
4   complaining publicly and in court and through their
5   lawyers about the conduct of Bienz and DiLeonardo,
6   weren't they?
7   A    I can only say that the public record was
8   made by the attorney.  I don't believe I ever saw
9   Mr. Moroughan or Ms. Mondo make a statement.
10  Q    Right.  They refused to speak to you?
11  A    Correct.
12  Q    But you knew full well that they were
13  complaining publicly through their lawyers about the
14  conduct of the police here, don't you?
15  A    Correct.
16  Q    So despite you telling their lawyers that
17  you were there to investigate the complaints they
18  were making, they still refused to speak to you?
19  A    Correct.
20  Q    The statement or confession, whatever you
21  want to call it, of Moroughan that I guess is also
22  in evidence at this point in time, that had a lot of
23  information in it separate and apart from his trying
24  to run down or driving towards Officer DiLeonardo,
25  didn't it?

NORTH SHORE COURT REPORTERS   1-800-794-5342

200

DISTLER

```
1      A    Yes.

2      Q    Did you go about corroborating the

3  information in that statement?

4      A    Can you be more specific what you're

5  speaking about.

6      Q    Sure.  There is a number of factual

7  assertions in here.  Did you investigate whether or

8  not those factual assertions were true?

9      A    I would ask you to specifically tell me

10  which statements you're speaking about.

11     Q    I'm asking, did you investigate any of it?

12     A    Yes.

13     Q    So, for example, we can go through this.

14  His date of birth was apparently written in wrong.

15  He corrected it from August to July?

16     A    Correct.

17     Q    Was he actually born in July or August, do

18  you know?

19     A    I'm not sure on that.

20     Q    Did you look at that at all?

21     A    No.

22     Q    He says that he was driving a white Prius.

23  That's true; correct?

24     A    Correct.

25     Q    He said he was working from 6:00 p.m. to
```

201

DISTLER

1     6:00 a.m., is that correct?

2         A     I did not verify that.

3         Q     Didn't you speak to the employer?

4         A     Yes.

5         Q     Okay.  He had his girlfriend in the car

6     with him, Kristie?  Yes?

7         A     Correct.

8         Q     He said he had been working for the

9     company for one week.  Was that true?

10        A     Yes.

11        Q     So you verified that?

12        A     Yes.

13        Q     It says that his shift started with him

14    having a bad day.  "There was a lot of traffic, and

15    I wasn't making any lights."  Do you have any idea

16    if that's true?

17        A     No.

18        Q     Any idea or belief that was false?

19        A     No.

20        Q     "Sometime after 1:00 a.m., a blue Acura

21    passed me and I got annoyed and flashed my high

22    beams at him.  I then -- I left them on

23    consciously."  Did you investigate that?

24        A     Independently just with the statements

25    that were presented to me of Ms. Mondo.

202

DISTLER

| | | |
|---|---|---|
| 1 | Q | Was that true? |
| 2 | A | Yes. |

3    Q    "I was mad at the way the guy was

4    driving." Is that correct?

5    A    Yes. That was —

6    Q    That's obvious, right, due to his conduct

7    afterwards?

8    A    Yes.

9    Q    "A white car then came up behind me and

10   flashed his brights at me." Was that correct?

11   A    That was corroborated by Ms. Mondo.

12   Q    Okay. Then it says, "At the time I was

13   driving southbound on New York Avenue," and that's

14   crossed off, and it says, "I was driving westbound

15   on West Hills Road in Huntington Station." Is that

16   accurate, the correction?

17   A    He did not give me a statement, so I could

18   not state that was —

19   Q    Given where the cars ended up and where

20   Mondo and I guess Officer DiLeonardo and Bienz told

21   you, is that consistent with the account that

22   everyone gave?

23   A    Yes.

24   Q    Okay. "The white car passed me, and I got

25   pissed off and followed the cars." Is that

203

DISTLER

1   accurate?

2       A   I could not speak to Mr. Moroughan.

3       Q   Well, didn't Mondo tell you that the white

4   car passed them and that --

5       A   Yes.

6       Q   -- Moroughan tried to stop him from

7   passing by accelerating?

8       A   Yes.

9       Q   And that he couldn't, and the car went

10  past him?

11      A   Correct.

12      Q   Okay.  Then it says, "I drove west on West

13  19th Street, then north on Oakwood Road."  That's

14  true, isn't it?

15      A   Yes.

16      Q   "I saw the two cars parked on the side of

17  Oakwood Road."  That's obviously true; yes?

18      A   Yes.

19      Q   "I rolled down my passenger window and

20  pulled up next to the white Infiniti.  I yelled to

21  guy who was in his mid-20s and white and" the quote

22  from yesterday.  That's obviously accurate; right?

23      A   Yes.

24      Q   "He cursed back at me and began yelling

25  back and forth.  I went to get out of my car, and so

NORTH SHORE COURT REPORTERS   1-800-794-5342

DISTLER

1    did the guy in the white car, and so did the guy in

2    the blue car, who was stopped directly in front of

3    the white car."  That's accurate, as far as it goes?

4        A    As far as the guy in the blue car did not

5    get out at the same time, so I believe my

6    investigation revealed that happened at a later

7    time.

8        Q    So Officer Bienz got out of his car a

9    little bit later?

10       A    Yes.

11       Q    But got out of his car?

12       A    Yes.

13       Q    Okay.  "I then got back in my car, backed

14   it up.  I continued yelling at the guy in the white

15   car.  He yelled back.  The guy in the white car

16   started walking toward my car and I revved my

17   engine."  Is that accurate?

18       A    I have a problem with the revving of the

19   engine.

20       Q    Let's just talk about that for a second.

21       A    Sure.

22       Q    You're not saying that a Prius, whether

23   the electronic ignition or the electronic portion of

24   the car, if that's the right word, is silent, are

25   you?

205

DISTLER

1      A     When the vehicle is stopped, it is silent.

2      Q     Right.  But when it's accelerating,

3  whether it's the gas combustion engine or electronic

4  portion of the engine, it still makes a noise, it's

5  just a slightly different noise?

6      A     When the vehicle is accelerating, there is

7  a slight increase in noise, a slight.

8      Q     It's kind of like a golf cart sound,

9  right?  You drive golf carts?

10     A     No, I don't.

11     Q     You don't?  Well, I've heard one or two in

12 my life, and they're not silent.

13     A     Yes, I've heard them.

14     Q     They're electric, right?  They make a

15 noise?

16     A     Slight increase, though, not a normal

17 motor on a regular car.

18     Q     Right.  It's a different noise.

19     A     Correct.

20     Q     But you can tell the car is accelerating?

21     A     It makes a noise, yes.

22     Q     Of course.  Okay.  "I drove toward the guy

23 who was standing in the street near his white car."

24 That's true, isn't it?

25     A     Yes.  He was in the travel lane.

NORTH SHORE COURT REPORTERS    1-800-794-5342

206

DISTLER

1      Q      "I then saw the guy" — what do you mean
2   he was in the travel lane?
3      A      He was in the travel lane of Oakwood Road,
4   not in the parking lane where the vehicles were
5   parked.
6      Q      How do you know that?
7      A      Based on the evidence that was collected
8   by the —
9      Q      How do you know where he backed up to?  We
10  know where the glass was found, right, from the
11  broken glass?
12     A      Right.
13     Q      We don't know where he backed up to.
14     A      Based on the Crime Scene Reconstruction
15  Shooting Report, he was backed up and moved forward
16  a light distance, which would make him in the same
17  lane that he was in.
18     Q      That's not possible to know, is it?  He
19  backed up, you said, 50 feet.
20     A      I think it's reasonable based on what I
21  had available to me to believe that.
22     Q      It's reasonable if you want to adopt your
23  conclusion, but we really don't have any evidence at
24  all as to where he backed up to, do we?
25     A      I believe that the crime scene reports

207

DISTLER

1    indicates that he was backed up in that same travel

2    lane, yes.

3        Q    Didn't you tell me he backed up 50 feet?

4        A    Yes.

5        Q    The crime scene is based upon where the

6    glass was found; yes?

7        A    Correct.

8        Q    They don't have any information, there's

9    no physical evidence about where the car backed up

10    to.  All they can tell us is where the glass was

11    that was broken from the side view — side window;

12    correct?

13        A    Yes.  And they also concluded how far

14    forward the car — they estimated how far forward

15    the car drove.

16        Q    And how did they do that exactly?

17        A    Based on their evidence collected and I

18    guess the statements of the witnesses.

19        Q    Ah, there we go.  So it's again relying

20    on, I don't know, what Moroughan's lawyer said?  I

21    mean, they didn't speak to anybody other than the

22    confession, and he doesn't say in here how far he

23    pulled forward.

24        A    I believe there were other statements that

25    they evaluated and interviews that were done prior

208

DISTLER

```
1    to them reaching that conclusion.

2         Q    Okay.  So there is no forensic evidence,

3    it's witness statements of —

4         A    It's a combination.

5         Q    But the only forensic evidence that

6    exists — tell me if I'm wrong — is the broken

7    glass in the roadway; yes?

8         A    And bloodstains.

9         Q    Right.  So that happened after the

10   shooting; yes?

11        A    Yes.

12        Q    And then when both Officer Bienz and

13   Officer DiLeonardo, I guess, got knocked down; yes?

14        A    What is?

15        Q    When the car door was opened and the

16   window was smashed, that's at the point of time when

17   Bienz and DiLeonardo were knocked down by the

18   operation of that vehicle?

19        A    They were knocked down after.

20        Q    Right.  So it says, "I drove forward

21   toward the guy who was standing in the street near

22   his white car.  I then saw the guy fire about three

23   or four shots at my car.  I felt I was hit."

24             Even Moroughan say, "I felt he fired

25   at me to protect himself because I drove at him."
```

DISTLER

1   That's what he says?

2       A    Correct.

3       Q    And that's exactly what DiLeonardo says;

4   right?  DiLeonardo says, I fired at him not because

5   I wanted to damage the car or assault him, but he

6   fired at him to protect himself and protect his

7   girlfriend?

8       A    Correct.

9       Q    And Moroughan says the same thing?

10      A    Yes.

11      Q    "The guy then came up behind my driver's

12  window and smashed his gun, busting my window and

13  hitting me in the face.  The guy told me to get out,

14  and we were struggling.  He said he was a police

15  officer."  That all happened, didn't it?

16      A    Yes.

17      Q    "I was under" -- he says, "that I was

18  under arrest."  Officer DiLeonardo says he said

19  that, right?

20      A    Yes.

21      Q    And so does Moroughan?

22      A    Yes.

23      Q    "I wasn't sure he was a cop, so I drove

24  backwards.  My door was still opened, and as I went

25  backwards, I knocked the guy down.  I know the gun

DISTLER

```
1    was a revolver when I went toward with my car" —

2         A    "Forward."

3         Q    Oh, forward.  I'll take your word for it,

4    but it looks like a T in my copy.

5              — "with my car.  I meant to go

6    backwards, but I had trouble shifting at the end.  I

7    drove to the hospital, and my girlfriend called 911

8    as I drove to the hospital."  All of that happened;

9    yes?

10        A    Yes.

11        Q    Okay.  So the statement that he gave,

12   whether you call it a confession or not, is largely

13   accurate and corroborated; yes?

14        A    Depending upon which portions of it you

15   want to believe or not believe.

16        Q    This is the complainant; yes?

17        A    Yes.

18        Q    This is the person who is quote/unquote

19   the victim of Officer DiLeonardo's misconduct.

20        A    Again, I think —

21        Q    I'm not asking anything other than —

22        A    I think —

23        Q    Am I wrong about that?  Is Moroughan the

24   person that is supposedly the victim of Officer

25   DiLeonardo's misconduct?
```

DISTLER

```
 1      A    The victim --

 2              MS. HILLER:  Objection.  When?  At

 3           what point in time are you saying that he

 4           is the victim?

 5              MR. BARKET:  Well, I don't think he

 6           was ever the victim, but that's your

 7           point.

 8      A    The victim, not the complainant.

 9      Q    Okay.

10              This is the written statement that he

11   gave to the police shortly after the incident took

12   place; right?

13      A    Yes.  While he was in the hospital with

14   two gunshots in him.

15      Q    Police aren't allowed to interview people

16   in those circumstances?

17      A    No, I didn't say --

18      Q    Are you saying that the detectives in

19   Suffolk did something wrong in taking his statement?

20      A    I'm saying that --

21      Q    Did you interview the detectives in

22   Suffolk?

23      A    I did not.

24      Q    Okay.

25      A    They were interviewed by --
```

NORTH SHORE COURT REPORTERS   1-800-794-5342

212

DISTLER

```
1        Q      Somebody else?

2        A      Yes.

3        Q      And they told you they met with him, they

4    gave him his rights, he agreed to waive his rights,

5    he initialed the form and he spoke to them, and they

6    wrote down what he said; right?

7        A      Correct.

8        Q      What he said here, from anything that you

9    tried to corroborate was all accurate and the other

10   witnesses said it, from the initial aggressor to him

11   backing up, to him pulling forward to the time --

12   where they went, to him getting angry at the cars.

13   It's all true, isn't it?

14       A      Those certain facts are true.

15       Q      How do you pick and choose between the

16   facts in the same statement?  They just don't

17   comport with your --

18       A      By corroboration.  By corroboration, by

19   evidence, by statements of other parties, by

20   reasonableness.

21       Q      He was lying to the police when he said he

22   backed up and drove forward?

23       A      It's possible, but I don't believe he was.

24   I believe that was factually true.

25       Q      Right.  He was backing up and he pulled
```

213

DISTLER

1    forward?

2        A    Correct.

3        Q    You could have investigated whether or not

4    his shift was that way; right?

5        A    Correct, but that was not relevant to my

6    investigation.

7        Q    Well, it would be relevant to somebody

8    saying that the confession was a fabrication by the

9    police, wouldn't it be?  You've take confessions

10   yourself during your career, haven't you?

11       A    Yes.

12       Q    You know what defense attorneys do with

13   confessions, don't you?

14       A    Yes.  I just want —

15       Q    You know that defense attorneys, after

16   somebody confesses, will allege that the confession

17   was either the product of coercion or was made up by

18   the police entirely; right?

19       A    Yes.

20       Q    And then what you do to rebut that is you

21   go about establishing that the information in the

22   statement is true, including the pedigree portion of

23   the statement; correct?

24       A    Yes.

25       Q    Okay.  So there is nothing to stop you

DISTLER

1   from investigating this statement from start to

2   finish to see whether or not it was accurate; right?

3       A    Correct.

4       Q    Okay.  I am done with my examination of

5   Detective Sergeant, and we are going to proceed --

6   I'm going to ask that we proceed the way we talked

7   about earlier.

8               MS. HILLER:  I have redirect.

9               HEARING OFFICER STUDDERT:  Okay.  Why

10              don't we take a ten-minute break and then

11              come back, you can redirect.

12              (Whereupon, a brief recess was

13              taken.)

14              HEARING OFFICER STUDDERT:  We are

15              back on the record.  Sergeant Distler is

16              still under oath testifying, and

17              Ms. Hiller is going to redirect.

18              MS. HILLER:  Thank you.

19   REDIRECT EXAMINATION

20   BY MS. HILLER:

21       Q    Sergeant Distler, I might jump around a

22   little bit.  I am just trying to hit some points

23   that counsel asked you on cross, so it might not be

24   in a particular order.  But the first thing I just

25   wanted to ask you is you were asked a little about

215

DISTLER

1    the revving of the taxi cab on cross.  And I want to

2    know if it is your opinion based on your interviews

3    and based on your investigation, do you believe that

4    any other people that were at that scene could hear

5    the actually noise the car was making when the car

6    accelerated forward?

7                    MR. BARKET:  Objection.  That is just

8            utter speculation.  It really is.

9                    HEARING OFFICER STUDDERT:  Can you

10           rephrase it?

11                   MS. HILLER:  I can't rephrase it.

12           I'll just ask a different question.

13   BY MS. HILLER

14       Q    Based on the Suffolk County crime scene

15   report that's in evidence, what did you learn about

16   the level of noise of that car when it's moving

17   forward?

18       A    There is a slight increase in the noise.

19       Q    Okay.  With respect to the — you were

20   asked a lot of questions about Mr. Moroughan's

21   statement that he gave on the morning of the

22   incident, after the incident that he gave to Suffolk

23   County.  Do you know at that time Suffolk was

24   considering him a suspect or a victim?

25       A    A suspect.

216

**DISTLER**

1      Q      Why do you say that?

2      A      Because he was arrested.

3      Q      Do you know at the time that they were

4  interviewing him, at the time they were interviewing

5  Moroughan, did Suffolk believe DiLeonardo's version

6  of the story?

7      A      Yes.

8      Q      Did there come a time when that changed?

9      A      Yes.

10              MR. BARKET:  Objection.

11              HEARING OFFICER STUDDERT:  On what

12          grounds?

13              MR. BARKET:  We are now asking the

14          witness not only her opinion, which I find

15          objectionable, but we're going to ask her

16          opinion of a County?  That's --

17              MS. HILLER:  Okay.  I can rephrase.

18  BY MS. HILLER

19      Q      Did there come a time when you understood

20  that Suffolk County Police Department and the

21  Suffolk County District Attorney's Office changed

22  their opinion about whose versions of the statements

23  they believed?

24              MR. BARKET:  It the same objection.

25          You can't, even in this kind of hearing,

217

DISTLER

```
1          ask a witness her opinion about an

2          entity's opinion, the office of the police

3          department.

4              ·    MS. HILLER:  I'm asking her based on

5          her knowledge of document that she

6          reviewed --

7                  MR. BARKET:  I'm not sure the office

8          has the ability to have an opinion.  It's

9          just an office.

10                 MS. HILLER:  Okay.  I'll rephrase.

11  BY MS. HILLER

12      Q    Do you know what happened to the case with

13  respect to Mr. Moroughan.?

14      A    Yes.

15      Q    And what happened?

16      A    Assistant District Attorney Pearl made a

17  motion on the record to dismiss all the charges

18  against Mr. Moroughan.  He stated that there were

19  deficiencies in their ability to prove the case,

20  there were inconsistent facts, and there were

21  allegations that the officers may have been

22  intoxicated.

23      Q    Based on what you just put on the record

24  with respect to what happened to that case, do you

25  feel that on the night that they took the statement
```

218

DISTLER

1     of Moroughan that the Suffolk County Police

2     Department again was believing DiLeonardo's version

3     of the story?

4               MR. BARKET:  Objection.

5               HEARING OFFICER STUDDERT:  On what

6          grounds?

7               MR. BARKET:  It's completely

8          irrelevant in all respects what the

9          Suffolk County Police Department believed

10         or didn't believe when they're taking a

11         statement unless they're going to allege

12         that the police in Suffolk somehow were

13         motivated by that belief to lie about how

14         they took the statement and what's in the

15         statement.

16              MS. HILLER:  I'm going to ask her

17         based on her expertise as an investigator

18         and somebody that actually interviews

19         suspects and victims that based on how

20         that statement is written, the format that

21         it's in, if Suffolk County believed he was

22         a suspect or a victim, and whose version

23         of the story they believed.

24              HEARING OFFICER STUDDERT:  Your

25         objection is noted.  I'll allow it.  Go

219

DISTLER

```
 1          ahead.

 2               MR. BARKET:  I thought we already

 3          asked and answered.  She already said he

 4          was a suspect because he was under arrest

 5          and his rights were read to him.

 6               MS. HILLER:  And why?  Why did you

 7          believe that?  I'm asking her now.

 8               MR. BARKET:  Because he was under

 9          arrest and his rights were read to him.

10               HEARING OFFICER STUDDERT:  She's

11          asking the witness.

12               MS. HILLER:  I'm asking her why.

13               MR. BARKET:  But she already said it,

14          so the objection is asked and answered.

15               MS. HILLER:  I'm asking her to

16          explain why.

17    BY MS. HILLER

18     Q     What was your basis for that?

19     A     Can you just repeat —

20     Q     For your belief in why Suffolk County

21    Police Department may have believed DiLeonardo's

22    version of the story the night they took — or the

23    morning they took Moroughan's statement.

24               MR. BARKET:  Objection.  Why Suffolk,

25          an entity, had a belief?  It's irrelevant.
```

220

DISTLER

```
 1                It really is irrelevant.

 2                     HEARING OFFICER STUDDERT:  Okay.

 3                Move on and ask another question.

 4   BY MS. HILLER

 5        Q    Do you think Anthony DiLeonardo was

 6   telling the truth when he spoke to Suffolk County

 7   the night of the incident?

 8                     MR. BARKET:  Objection.

 9                     HEARING OFFICER STUDDERT:  On what

10                grounds?

11                     MR. BARKET:  Her opinion of what —

12                Officer DiLeonardo's credibility when

13                speaking to somebody else is irrelevant.

14                She can talk about facts.  He said X.  If

15                there are facts that contradict X,

16                introduce them.  If there is not, it's

17                just her view.

18                     HEARING OFFICER STUDDERT:  Rephrase

19                the question.

20   BY MS. HILLER

21        Q    Are there facts in Moroughban's statement

22   that comport with DiLeonardo's version of the story,

23   that support DiLeonardo's version of the story?

24        A    Yes.

25        Q    At the time that they arrested —— I'm
```

221

DISTLER

1   sorry.  At the time they interviewed Moroughan, did

2   Suffolk County Police Department have all the facts?

3        A    No.

4        Q    What didn't they have?

5        A    They didn't have the Crime Scene

6   Reconstruction Shooting Report.  They did not have

7   interviews of witnesses.  They did not have

8   interviews of -- they hadn't done canvasses, I

9   believe.

10        Q    Whose version of the story did they have

11   at the time they interviewed Mr. Moroughan?

12        A    Police Officer DiLeonardo.

13        Q    What time, if you know, do you know what

14   time that statement of Mr. Moroughan was taken and

15   on what date?

16        A    On the morning of the incident,

17   February 27th, at 7:00 a.m.

18        Q    So it was soon after the incident?

19        A    Yes.

20        Q    And do you know when he was arrested and

21   charged?

22        A    He was arrested that morning.

23        Q    Was he arrested without the benefit of

24   this other information?

25        A    Yes.

222

DISTLER

1      Q     Additionally, there was some testimony

2   earlier about the Deadly Force Response Team.  At

3   the time that they gave they their preliminary

4   results, what information did they have?

5                  MR. BARKET:  I'm going to object.  I

6           think that's beyond the scope of my cross.

7           I don't think I touched on that at all.

8                  MS. HILLER:  Did you not talk about

9           that?  Okay, I'll withdraw.

10  BY MS. HILLER

11     Q     Going back to Mr. Moroughan's statement,

12  and if you need to look at the statement, that's

13  fine, it's in evidence, did Dr. Moroughan ever say

14  that he was driving at Anthony DiLeonardo?

15     A     No.

16     Q     Did he ever say he was trying to run

17  Anthony DiLeonardo down?

18     A     No.

19     Q     Did he say he was moving forward?

20     A     Yes.

21     Q     With respect to him moving forward, what's

22  your understanding as to why he had to move forward?

23     A     My understanding was that he was

24  attempting to make a u-turn to exit the area.

25     Q     And with respect to the scene, you were

NORTH SHORE COURT REPORTERS   1-800-794-5342

DISTLER

1   asked some questions about the scene.  I just want

2   to clarify some distances.  When you earlier -- you

3   were being asked questions about Eric Klug's

4   testimony.  Approximately how far did you say Eric

5   Klug -- where he was watching this from to the

6   roadway was?

7       A    From the inside of the house to the front

8   of the roadway?

9       Q    Yes.

10      A    I approximate that to be about 50 feet to

11  the roadway.

12      Q    Is that an estimate?

13      A    Yes.

14      Q    With respect to the distance that you were

15  asked about how far Mr. Moroughan backed up his car,

16  is that different than the 50 feet you testified to?

17  Because I wasn't clear on that.

18      A    Yes.

19      Q    Is there something that you can refer to

20  that you can clarify that distance with?

21      A    The Crime Scene Shooting Incident Report,

22  I believe.

23      Q    It's in evidence.  I think it might be 3

24  or 4 -- it's early on, I think.  Maybe right after

25  the photos.  So it's Department 6 (handing).

224

DISTLER

```
 1        A    In the Suffolk County Crime Scene

 2   Reconstruction Incident Report, in the Results and

 3   Conclusions section, sheet number 5, the conclusion

 4   was that after Mr. Moroughan re-entered his taxi, he

 5   backed up the vehicle a minimum distance of 30 to 45

 6   feet.

 7        Q    With respect to that scene, you were asked

 8   if it was dark out when this went on.

 9        A    Yes.

10        Q    Was there anything else about the scene

11   that either helped or inhibited Mr. Klug's vision of

12   the scene, or view?

13        A    There were street lights.  Just

14   remembering the scene, there was a mailbox which was

15   on the street curb area, the post was intact, but

16   the mailbox was actually on the ground.

17        Q    Was there a street light near Mr. Klug's

18   house?

19        A    Yes.

20        Q    Were there other -- you were asked about

21   Mr. Klug's statement, and in the statement, I

22   believe you said that -- or it was read to you, that

23   Mr. Klug saw the passenger of the taxi cab get out

24   of the car?

25        A    Yes.
```

225

DISTLER

| | | |
|---|---|---|
| 1 | Q | You testified that was inaccurate.  True? |
| 2 | A | Yes. |
| 3 | Q | Were there other females at the scene |

4  outside of their cars?

| 5 | A | Yes. |
| 6 | Q | So is it possible he may have seen one of |

7  those other females?

| 8 | A | It's possible. |
| 9 | Q | You were asked some questions on cross |

10  about the testimony that you took into consideration

11  when you were making your opinion of Thomas

12  Moroughan at two different at two different 50-H

13  hearings.  Do you remember being asked questions

14  about that?

| 15 | A | Yes. |
| 16 | Q | When you were reading that testimony as |

17  part of your investigation, did you understand what

18  you were reading?

| 19 | A | Yes. |
| 20 | Q | When you were reading that, did you have |

21  an understanding that Tom Moroughan was a plaintiff?

| 22 | A | Yes. |
| 23 | Q | Or a potential plaintiff? |
| 24 | A | Yes.  I knew he had filed a notice of |

25  claim, or his attorney had.

226

DISTLER

| 1 | Q    Did you take that into consideration when |
| 2 | you were reading the document? |
| 3 | A    Yes. |
| 4 | Q    So you knew what type of document you were |
| 5 | reading? |
| 6 | A    I knew I was reading a sworn deposition, |
| 7 | yes. |
| 8 | Q    You were asked questions again on direct |
| 9 | about — you were asked questions about Moroughan's |
| 10 | statement, you were asked about Klug's statement. |
| 11 | There are multiple other statements on the record. |
| 12 | Do you believe 100 percent of any of those |
| 13 | statements that you reviewed? |
| 14 | A    No.  There were inconsistencies in every |
| 15 | statement. |
| 16 | Q    Is that normal in the course of any |
| 17 | investigation? |
| 18 | A    Yes. |
| 19 | Q    With respect to all of the statements, did |
| 20 | you believe portions of them? |
| 21 | A    Yes. |
| 22 | Q    Did you discredit portions? |
| 23 | A    Yes. |
| 24 | Q    What did you do with the portions that you |
| 25 | believed? |

227

DISTLER

```
 1      A    I corroborated the parts that I — I

 2   corroborated the parts that — those were the parts

 3   I believed to be accurate.

 4      Q    After doing that, did you determine what

 5   you believed to be what was a reasonable version of

 6   the facts?

 7      A    Yes.

 8      Q    Okay.  And what was that?

 9           MR. BARKET:  Objection.  That's your

10           job, Inspector, the conclusion.

11           MS. HILLER:  I can rephrase.

12           HEARING OFFICER STUDDERT:  I'll make

13           my own conclusion at the end.

14           MS. HILLER:  I can rephrase.

15   BY MS. HILLER

16      Q    What did your investigation conclude that

17   happened?

18           MR. BARKET:  It wasn't the phrasing

19           that I objected to.  It was the substance.

20           MS. HILLER:  I thought it was —

21           MR. BARKET:  We know what she thinks.

22           She said she is not going to change her

23           mind.  We're not here to change her mind.

24           We're here to help the inspector make up

25           his.
```

DISTLER

1     HEARING OFFICER STUDDERT:  I will

2     make an independent conclusion when it's

3     done.  You can continue.

4     A     My opinion of what the events -- how the

5     events unfolded that night was that there was a road

6     rage incident which started on New York Avenue

7     where, Mr. Moroughan, got his vehicle in between

8     Police Officer Bienz and Police Officer DiLeonardo.

9     Eventually they separated.  Officer Bienz and

10    Officer DiLeonardo were lost.  I believe Officer

11    Bienz pulled over to the side of the road, Officer

12    DiLeonardo pulled behind him.  Mr. Moroughan pulled

13    up upon them, initiated a verbal shouting match.

14          He -- I believe Mr. Moroughan exited

15    his vehicle at least partially and continued the

16    verbal altercation over the hood of the taxi cab

17    which was adjacent to Officer DiLeonardo's vehicle.

18          Officer DiLeonardo made a choice, a

19    decision to exit his vehicle, which in my opinion

20    was a bad decision.  It escalated the situation.

21          At this time, Officer Bienz --

22    Mrs. Bienz had exited her car and was going to go

23    back and talk to Officer DiLeonardo and explain to

24    him that they were lost and that they were going to

25    have to make a u-turn.  As she was exiting her

DISTLER

1    vehicle, she saw the taxi cab pull up.  She saw this

2    verbal argument occurring.  She started

3    backpedaling.

4            Her husband, Eddie Bienz, who was

5    seated in his car with the windows up, was observing

6    her through the side-view and rearview mirrors, and

7    he then exited his vehicle because he saw her

8    backpedaling.

9            At this point, he went over to his

10   wife, he asked her what was going on.  She said, "I

11   don't know.  They're screaming."

12           Officer DiLeonardo is exiting his

13   vehicle at this point when Mr. Moroughan exits his

14   vehicle.  Mr. Moroughan seen Officer Bienz exit his

15   vehicle, feels now that he is a little intimidated,

16   there is two of them and one of me.  He gets in his

17   car, puts it in reverse in attempt to leave the

18   scene.  He does not go forward, because he feels the

19   threat is approaching him.

20           He backs up 30 to 45 feet, as per the

21   Shooting Incident Reconstruction Report.  At this

22   point, Officer DiLeonardo is walking toward the back

23   of his Infiniti.  If there was a threat, I don't

24   understand why somebody would walk towards the

25   threat.

DISTLER

1        In his statement, he told me that he
2    was not sure if Mr. Moroughan may have had a weapon,
3    because he couldn't see his left hand. And he said
4    that he -- Mr. Moroughan was going to smash his car,
5    and "I don't fucking care. I'm going to kill you."
6    There is no logic to believe that you would walk
7    toward that threat. So his statement says he is
8    walking behind the car to get his girlfriend out.
9        I believe he had many other options.
10   I believe he could have stayed in his car. He could
11   have called 911. He could have retreated to safety
12   and drove away in his car.
13       As the car backs up, Mr. Moroughan,
14   in an attempt to make a u-turn, progresses forward.
15   I believe Officer DiLeonardo is approaching the
16   vehicle, walking at the taxicab, which is in the
17   middle travel lane of Oakwood Road, as per the
18   witness Eric Klug. And he's shooting at the vehicle
19   as he's approaching it.
20       The vehicle then comes to a stop
21   after, admittedly, Officer DiLeonardo fires all five
22   rounds from his gun and continues to dry-shoot his
23   weapon, even though there are no bullets left. The
24   vehicle comes to a stop in the middle of Oakwood
25   Road. Officer DiLeonardo then runs at the car,

DISTLER

1   which he just told me was going to run him and his

2   girlfriend over, with an empty gun, approaches the

3   driver's sides door, believing that Mr. Moroughan

4   may have a weapon, smashes the window open,

5   shattering the window, is able to unlock the door,

6   and he hits Mr. Moroughan with the butt of his gun

7   and then continues to punch him numerous times about

8   the head.

9            At this point, I believe he is

10  yelling to Mr. Moroughan that he's a cop, he's under

11  arrest, something to that effect.  He then — Mr.

12  Moroughan, not believing that this person could be a

13  police officer, because he just shot him and tried

14  to beat him, puts his car in reverse with the car

15  door open, knocking Officer DiLeonardo over and

16  Officer Bienz, who was approaching the vehicle at

17  that point.

18           When the shooting stopped, Officer

19  Bienz then joined Officer DiLeonardo, or attempted

20  to join him.  He never quite made it to the driver's

21  side.

22       Q |  During this whole incident, do you have

23  any belief or reason to believe that based on your

24  investigation, Anthony DiLeonardo was in fear for

25  his life?

NORTH SHORE COURT REPORTERS    1-800-794-5342

232

DISTLER

1        A    No.

2        Q    Specifically, why?

3        A    Because he had many other options.  He

4    could have retreated, he could have called 911, he

5    could have drove away.

6        Q    Did Tom Moroughan have a gun?

7        A    No.

8        Q    You were asked some questions with respect

9    to the off duty weapon that Anthony DiLeonardo had

10   that night, the .38 Smith & Wesson.

11       A    Yes.

12            MS. HILLER:  At this time, I'd like

13            to pass up copies of Departmental Rules

14            Article 8 to the hearing officer and ask

15            that it be marked into evidence.

16            HEARING OFFICER STUDDERT:  Mark that

17            into evidence.

18            (Article 8, Departmental Rules was

19            marked as Plaintiff's Exhibit 23 for

20            evidence, as of this date.)

21            MS. HILLER:  I would ask that be

22            passed to the witness.

23   BY MS. HILLER

24       Q    Do you recognize what you have before you,

25   Sergeant Distler?

DISTLER

```
 1        A    Yes.

 2        Q    What is that?

 3        A    It's a copy of the Department Rules, the

 4   Article 8, Uniform and Equipment section.

 5        Q    Was Officer Anthony DiLeonardo ultimately

 6   charged with violating one of these sections of

 7   Article 8?

 8        A    Yes.

 9        Q    Do you know what section that was?

10        A    Yes.  Rule 12, Subdivision 1 -- 2.

11        Q    Can you read that section into the record,

12   please.

13        A    "Members are personally responsible for

14   the proper and authorized use, cleanliness,

15   serviceability and proper safeguarding of their

16   uniform and equipment and any other department

17   property issued for or assigned to their use."

18        Q    With respect to the .38 Smith & Wesson,

19   was that issued or assigned to Officer DiLeonardo?

20        A    Assigned.

21        Q    Was that assigned to him pursuant to a

22   different section of this rule and reg?

23        A    Yes.

24        Q    Was it an on-duty or off-duty weapon?

25        A    Off-duty.
```

NORTH SHORE COURT REPORTERS   1-800-794-5342

234

DISTLER

```
 1        Q    I direct your attention to Section 3 of
 2   the article -- I'm sorry, it's not 3.  It is Rule
 3   10(3).
 4        A    Yes.
 5        Q    Is this weapon one of the authorized, for
 6   lack of a better word, off-duty weapons?
 7        A    Yes.
 8        Q    Do you know if he was trained on that
 9   weapon?
10        A    Yes.
11        Q    Do you know anything about the training he
12   had on that weapon?
13        A    Yes.  I know he you was trained -- he
14   attended training two times in 2009 and twice in
15   2010 and he qualified in that off-duty weapon.
16             His final training was in December of
17   2010, and he received a score of 73 in qualifying
18   with that weapon.
19        Q    Okay.  So with respect to that weapon, you
20   testified that the weapon was assigned versus issued
21   to POD Anthony DiLeonardo; correct?
22        A    Correct.
23        Q    Can you just explain what that means for
24   the clarity of the record with respect to the
25   assignment issued?
```

DISTLER

1      A     The Department authorizes members to carry

2  off-duty weapons and in this section it explains

3  which weapons are acceptable and which ones are

4  authorized for us to carry.  The only qualification

5  — the only condition is that you attend a one day

6  familiarization qualification course with that

7  weapon at the firearms training unit.

8      Q     Does the Police Department of Nassau

9  County keep a list of weapons that members have been

10  assigned to by virtue of this off duty section of

11  Article 8?

12     A     Yes.

13     Q     Was this weapon assigned to him as off

14  duty as far as Nassau County Police Department was

15  considered?

16     A     Yes.

17          MR. BARKET:  Is that right?

18          MR. SANTIAGO:  Correct.

19          MR. BARKET:  Who assigned this?

20          MR. SANTIAGO:  Assigned means it was

21       designated as a weapon —

22          MS. HILLER:  It is like on a list.

23       It is a word we use.

24          MR. BARKET:  Aren't you confusing —

25       I mean she is not a lawyer.  Aren't you

236

DISTLER

1        confusing authorized with assigned?

2            MR. SANTIAGO:  No, I am not.

3        Authorized and assigned means that — each

4        are pre-cursers. One they train and then

5        you are supposed to requalify.

6            MR. BARKET:  What does assign mean?

7            MR. SANTIAGO:  Assigned means

8        assigned for use for off duty carriers.

9        It's recognized for that purpose as

10       opposed to a list of weapons.  You wanted

11       —

12           MR. BARKET:  It says, "Issued or

13       assigned."

14           MR. SANTIAGO:  Yes.

15           MR. BARKET:  So what else would be

16       assigned?

17           MS. HILLER:  There could be a list of

18       assigned weapons.

19           MR. BARKET:  Not weapons.  Assigned

20       would be —

21           MR. SANTIAGO:  Off duty or on duty,

22       because there are many on duty and few off

23       duty.  I don't know any off duty weapons

24       that would be assigned to you.

25           MR. BARKET:  Let me talk about this

237

DISTLER

```
1          afterwards because it can be confusing.
2          Authorized and assigned because --
3              MR. SANTIAGO:  Well, these are not
4          within the realm of legal definitions.  We
5          are talking about within the organization
6          as an agency.
7              MR. BARKET:  Your just making this up
8          after we heard this yesterday.  Assigned
9          equals organized.
10             MS. HILLER:  That's not accurate.
11             MR. BARKET:  Is there some prior
12         decision to indicate this?
13             MR. SANTIAGO:  There are no prior
14         decisions on this issue of definitions of
15         assigned.
16             MR. BARKET:  Okay.
17  BY MS. HILLER:
18      Q    Sergeant Distler, is it your understanding
19  that this .38 caliber Smith & Wesson was assigned to
20  P.O. DiLeonardo for off duty use.
21      A    Yes.
22      Q    Was it also an authorized weapon persaunt
23  to the rules and regs --
24      A    Yes.
25      Q    -- for off-duty use?
```

238

DISTLER

```
 1        A    Yes.
 2        Q    Where are the records kept with respect to
 3   assigned weapons?
 4        A    In the pistol license section.
 5        Q    If I wanted to see a list of assigned
 6   weapons for any officer, would I be able to find it
 7   there?
 8        A    Yes.
 9        Q    Off-duty use weapons, I should say.
10        A    Yes.  If they qualified under the rules
11   and regs, yes.
12        Q    Do you feel that Anthony DiLeonardo had a
13   reason to you tell that he was making an authorized
14   arrest?
15                  MR. BARKET:  Objection to "feel."
16                  HEARING OFFICER STUDDERT:  Can you
17            rephrase the question.
18        Q    It is your opinion?
19                  MR. BARKET:  Objection.
20                  HEARING OFFICER STUDDERT:  Rephrase.
21        Q    Why would Anthony DiLeonardo --
22                  MR. BARKET:  Objection.  Because he
23            actually was.  I mean this is just
24            absolutely irrelevant.
25        Q    What contradicted the statement that he
```

239

DISTLER

1    made to you that he was making an authorized arrest?

2                MS. HILLER:  Can she answer the

3           question?

4                HEARING OFFICER STUDDERT:  Yes.

5       A    The facts -- the fact that he was the

6    aggressor in the incident.  That he approached the

7    cab.  That he had other options to retreat and he

8    chose not to do them.

9       Q    Do you know why he told you that he was in

10   fear for his safety?

11               MR. BARKET:  Objection.

12      Q    Based on your investigation do you know

13   why he said that?

14               MR. BARKET:  Objection.

15               HEARING OFFICER STUDDERT:  Overruled.

16               MR. BARKET:  Are we going to allow

17          the witness to speculate as to Anthony's

18          motivation?

19               HEARING OFFICER STUDDERT:  Your

20          objection is noted.  I will give it the

21          weight its due.

22   BY MS. HILLER:

23      Q    You can base it on your expertise as well.

24      A    Yes.  I believe --

25               MR. BARKET:  What expertise could the

DISTLER

1   witness possibly have of Police Officer
2   DiLeonardo's operation of his mind?
3          MS. HILLER:  I would ask her to base
4          it on her expertise with respect to
5          somebody who is a detective sergeant in
6          the Internal Affairs Investigation Unit
7          that has interviewed —
8          MR. BARKET:  For three months or six
9          months?  Come on.
10         MS. HILLER:  She is also a detective
11         sergeant.
12         MR. BARKET:  Why he said something?
13         Unless he said it — unless he himself
14         said it, it's just utter guess work.
15  BY MS. HILLER:
16      Q    Do you have a theory as to why he told you
17  that?
18         MR. BARKET:  Objection.
19         HEARING OFFICER STUDDERT:  The record
20         reflects your objection.  You may answer
21         the question.
22      A    Yes.  I believe he knew the facts that
23  needed to be presented to establish what he claimed
24  was going be a lawful arrest and I believe he
25  presented those facts that way.

241

DISTLER

| 1 | MS. HILLER:  I don't have any other |
| 2 | further questions. |
| 3 | HEARING OFFICER STUDDERT:  Do you |
| 4 | want to re-cross? |
| 5 | MR. BARKET:  Thank you. |
| 6 | RE-CROSS EXAMINATION |
| 7 | BY MR. BARKET: |
| 8 | Q    Did you and anyone from the Legal Bureau |
| 9 | have any discussion about Article 8 between |
| 10 | yesterday and your testimony just now? |
| 11 | A    Yes. |
| 12 | Q    Who did you discuss this with? |
| 13 | A    With Lesli Hiller. |
| 14 | Q    When was the first time anyone ever asked |
| 15 | you about the definition of assigned and or |
| 16 | authorized? |
| 17 | A    I'm not sure that I was ever asked the |
| 18 | definition of assigned and or authorized. |
| 19 | Q    Do you have any experience or any training |
| 20 | in defining these terms in Rule 12 of Article 8? |
| 21 | A    Any? |
| 22 | Q    Sure.  There is a phrase here that you are |
| 23 | pointing to that you say he violated? |
| 24 | A    Yes. |
| 25 | Q    We talked about this yesterday a little |

242

DISTLER

```
 1   bit.  Let me rephrase the question:  Section 2 of
 2   Rule 12, "Members are personally responsible for the
 3   proper and authorized use, cleanliness,
 4   serviceability, and proper safeguarding of their
 5   uniform and equipment and any other department
 6   property issued for or assigned to their use."
 7                   Is this .38 caliber weapon the
 8   property of the police department?
 9        A    No, it is not.
10        Q    Are there things that are assigned to an
11   officer?
12        A    Yes.
13        Q    Cars?
14        A    Well —
15        Q    You would be assigned to a patrol car?
16        A    For a particular period of time.
17        Q    Of course.  Well that's the point.  It's
18   any other department property issued for or assigned
19   to their use and presumably used as a police
20   officer; right?
21        A    Yes.  But if you look at Subdivision D,
22   "The commanding officers have the authority when
23   approved by their —"
24        Q    No.  I am not reading from Subdivision D
25   in the other Article.  I am reading from the rule
```

NORTH SHORE COURT REPORTERS   1-800-794-5342

243

DISTLER

 1   that you charged him with violating.  Rule 12,

 2   Section 2.

 3        A    Correct.

 4        Q    This here says that you have to keep

 5   clean, serviceable, and safeguard and it lists off

 6   things:  Uniforms, equipment, and any other

 7   department property; right?

 8        A    Yes.

 9        Q    This was neither equipment nor a uniform

10   nor other department property, was it?

11        A    It was equipment.

12        Q    Equipment issued by the Department?

13        A    It says, "Equipment and other Department

14   property."

15        Q    And any other -- any other.

16        A    Correct.

17        Q    The first part of it has to be Department

18   property too.

19             The officers are assigned police

20   cars.  They are assigned all kinds -- they are

21   assigned shotguns, handcuffs, mace, gun belts, dogs

22   -- potentially if you want to look at it that way.

23   These are the things this rule is talking about;

24   isn't it?

25             MS. HILLER:  Objection.

DISTLER

```
 1              HEARING OFFICER STUDDERT:  Overruled.

 2          You can answer the question.

 3     Q    That's what this rule is referring to.

 4     A    I believe it includes his off duty weapon.

 5     Q    I know what your belief is.  I know what

 6  the ascertain is.  What I am saying to you is can

 7  you think of another instance where somebody owns

 8  private property -- this weapon belongs to Anthony

 9  DiLeonardo; right?  He bought it and paid for it;

10  yes?

11     A    Yes.

12     Q    He has a right to carry it if he gets a

13  permit as a civilian; yes?

14     A    Yes.

15     Q    Is there another instance where the

16  Department would claim ownership of or in somehow

17  force someone to maintain a personal item?  Baseball

18  bat, golf clubs --

19     A    It was assigned to him.

20     Q    It wasn't assigned to him.  He bought it.

21  He was authorized to carry it.  The Department

22  didn't tell him to carry it; did they?

23     A    No, but --

24     Q    It didn't require him to carry it.

25     A    -- when he qualifies in it he is
```

**DISTLER**

1   requesting the ability to carry it.  By attending

2   this course and receiving approval — by qualifying

3   for it, that gives him the authorization to carry

4   that.

5        Q    You are confusing authorization with

6   assigned.

7             MS. HILLER:  Objection.  She just

8             testified what her belief is in

9             understanding the rules and regs.

10       Q    He needs to be authorized to do it.  There

11  is lots of things that an officer needs to be

12  authorized to do, but he is not assigned to do;

13  right?

14       A    Yes.

15       Q    So he is not required to carry this

16  weapon, is he?

17       A    No.

18       Q    It wasn't part of his job, was it?

19       A    No.

20       Q    He was authorized to; yes?  If he

21  qualified.

22       A    Yes.

23       Q    He went through the steps that the

24  Department said that you have to qualify to be

25  authorized to do; correct?

246

DISTLER

1      A    Correct.

2      Q    Does an officer have the same obligations

3  when confronted with a violent situation as a

4  civilian?

5                MS. HILLER:  Objection.

6                MR. BARKET:  Do you understand my

7           question?

8                MS. HILLER:  I am objecting to the

9           question.

10               HEARING OFFICER STUDDERT:  On what

11          grounds?

12               MS. HILLER:  He is comparing her

13          understanding as to the understanding of a

14          civilian.  Is that it?

15     Q    Well, you repeatedly said on re-direct

16  that Anthony had other options:  He could have

17  retreated, he could have driven away, he could have

18  done this, he could have done that.  Are police

19  officers supposed to retreat from potentially

20  violent conduct?  Is that their job?

21     A    In certain situations, yes.

22     Q    If you have an instance where somebody is

23  posing a threat, who is behaved irrationally, who

24  screamed things, who confronted you, the officer is

25  supposed to retreat?  He was supposed to run into

247

DISTLER

1   Mr. Klug's house and call 911?

2       A    No.

3       Q    That's how you want police officers to

4   behave?

5       A    I don't believe there was a threat.

6       Q    You don't believe there was a threat but

7   at the time that Officer DiLeonardo was out on that

8   street, he was confronted by somebody who was

9   behaving irrationally; right?

10      A    Short of his abusive language, Mr.

11  Moroughan posed no threat to Officer DiLeonardo.

12      Q    How was Officer DiLeonardo supposed to

13  know that at the time?  Wasn't Officer DiLeonardo's

14  car blocked in?  You said he could have driven away.

15  Where was he going to drive to?

16      A    He could have --

17      Q    He could have backed up --

18      A    Absolutely.

19      Q    -- and left Ms. Bienz out on the street

20  for this person who pulled up next to his car,

21  blocked his car in --

22      A    He had other options --

23      Q    -- blocked his car in and was screaming at

24  him and was getting out of his car.  So at that

25  point in time the officer -- he is not a civilian,

248

DISTLER

1   but a police officer; yes?  He is a police officer?

2                MS. HILLER:  What is the question?

3                MR. BARKET:  He is a police officer;

4        isn't he?

5   A    Is he a police officer?  Yes.

6   Q    And are police officers trained that when

7   they are off duty their status as police officers

8   don't count?

9   A    No.

10               MS. HILLER:  Objection.  This is

11        outside the scope.

12               HEARING OFFICER STUDDERT:  Move on to

13        the next question.

14  Q    Isn't he a police officer 24/7?

15  A    Yes.

16  Q    So if he sees a crime going on or somebody

17  who is posing a danger to the community, he is not

18  free to simply say, "It's my day off.  I'm going to

19  ignore it."

20               MS. HILLER:  I am making my same

21        objection.  It is outside the scope of

22        both direct, re-direct, and cross.

23               MR. BARKET:  It goes exactly to the

24        heart of what they are trying to

25        establish.  They are trying to establish

249

DISTLER

1      that he could have backed away or ran in

2      or —

3              HEARING OFFICER STUDDERT:  Counselor,

4      go to the next question.  The record is

5      noted.

6  BY MR. BARKET:

7      Q     At the point in time that you are saying

8  that Officer DiLeonardo made a quote bad decision to

9  get out of the car, his car was blocked in the front

10 by Officer Bienz's car; correct?

11     A     Yes.

12     Q     It was blocked on the side by Moroughan's

13 car; correct?

14     A     Yes.

15     Q     Moroughan pulled up on a travel portion of

16 the road. Stopped his car and began yelling and

17 cursing at Officer DiLeonardo; yes?

18     A     Yes.

19     Q     Moroughan then got out of his car; yes?

20     A     Yes.

21     Q     And continued to curse and scream at

22 Officer DiLeonardo; yes?

23     A     Yes.

24     Q     The only place that Officer DiLeonardo

25 could have gone with his car is to back up far

250

DISTLER

1 enough to somehow drive away from this individual in

2 the middle of the street screaming and yelling;

3 right?

4   A  That would have been the most likely --

5   Q  Most likely -- that was the only thing he

6 could have done.

7   A  Yes.

8   Q  He would have left Officer Bienz where he

9 was; right?

10   A  Yes...

11   Q  Was his wife -- Officer Bienz's wife out

12 of the car at this point?

13   A  Yes.

14   Q  And would have left somebody -- one of his

15 companions out on the street to deal with this

16 person who stopped on the travel portion of the

17 road.  Who is cursing at them and screaming at them,

18 and you think it was reasonable for Officer

19 DiLeonardo at that point to just drive away?

20   A  I think it would have been more reasonable

21 for him to not engage in the verbal altercation and

22 roll up his window and call 911.

23   Q  Roll up his window --

24   A  Yes.

25   Q  -- and leave the individual to confront

DISTLER

1    Ms. Bienz?

2         A    There was no --

3              MS. HILLER:  Objection.

4              HEARING OFFICER STUDDERT:  On what

5         grounds?

6              MS. HILLER:  That is not in the

7         record anyway.

8              HEARING OFFICER STUDDERT:  Do you

9         have another question, counselor?

10   BY MR. BARKET:

11        Q    What made you think that Moroughan or what

12   would have made Officer DiLeonardo think Moroughan

13   wouldn't have dealt with Ms. Bienz once Officer

14   DiLeonardo pulled away?

15             MS. HILLER:  Objection.  Same

16        objection.  Calls for speculation.  You

17        attacked us for trying to --

18             HEARING OFFICER STUDDERT:  Do you

19        have any other questions for this witness?

20   BY MR. BARKET:

21        Q    You mentioned something about Police

22   Officer DiLeonardo or Bienz were intoxicated.  Did

23   Chief Hunter and other chiefs from the Department

24   interview Bienz and DiLeonardo that night?

25             MS. HILLER:  Objection.  Outside the

252

DISTLER

1    scope, completely.  Outside the scope of

2    my re-direct.

3         MR. BARKET:  It goes right to the

4    heart of the intoxication.

5         HEARING OFFICER STUDDERT:  Sustained.

6    Keep the testimony related --

7         MR. BARKET:  It is.  She said there

8    were allegations he was intoxicated.  They

9    know there was several chiefs who

10   interviewed him who said he wasn't.

11        MS. HILLER:  That has nothing to do

12   with whether or not he had been drinking

13   that night or not.

14        HEARING OFFICER STUDDERT:  He is not

15   being charged with that.

16        MR. BARKET:  It is not a question of

17   drinking.  The word, "intoxication" was

18   used.

19        MS. HILLER:  Whether or not he was

20   intoxicated has nothing to do with Chief

21   Hunter.  This is the first time his name

22   is coming out today.  Other than his

23   report being read into the record.

24        MR. BARKET:  Chief Hunter and other

25   personnel from the Nassau County Police

253

**DISTLER**

1    Department interviewed Officer DiLeonardo

2    and said that he was not intoxicated.

3        MS. HILLER:  Objection.  It's

4    completely outside the scope of my

5    redirect.

6        HEARING OFFICER STUDDERT:  Sustained.

7    Just move on to the next question.

8        MR. BARKET:  I am sorry.  I thought

9    that Detective Sergeant indicated that

10   there are allegations that Officer

11   DiLeonardo was intoxicated on re-direct.

12   If I am wrong about that then I apologize,

13   but I thought I heard that.

14       MS. HILLER:  I don't recall.  I could

15   be wrong but whether or not she said he

16   was intoxicated has nothing to do with

17   Chief Hunter, so I am objecting to that

18   portion of your question.

19       HEARING OFFICER STUDDERT:  The record

20   is noted.  It's on the record.

21       MR. BARKET:  But if Chief Hunter

22   interviewed Officer DiLeonardo and

23   concluded that he was not intoxicated —

24   interviewed him that night.  That —

25       MS. HILLER:  There is no testimony

254

DISTLER

```
 1          into that.  Especially in my re-direct,

 2          which is what you are now addressing.

 3               MR. BARKET:  Okay.  Well, if I am

 4          wrong about her saying that he was

 5          intoxicated, then I am wrong about that

 6          and i apologize.

 7   BY MR. BARKET:

 8       Q   Who told you that Moroughan was try trying

 9   make a u-turn?

10       A   It is in the Crime Scene Reconstructive

11   Incident Report.

12       Q   Who told them?  Where did that come from?

13       A   That came from their investigation.

14       Q   Did Moroughan say that?

15       A   Not in his statement, no.

16       Q   Did his girlfriend say that?

17       A   Not in her statement.

18               MR. BARKET:  Nothing else.

19               MS. HILLER:  I have nothing further.

20               HEARING OFFICER STUDDERT:  We will

21          conclude for today.  We will meet back

22          here on Monday.  Is that what we decided?

23               MR. BARKET:  Yes.

24               HEARING OFFICER STUDDERT:  Is 10:00

25          good?
```

255



DISTLER

1        MR. BARKET: 10:00 is good.

2        HEARING OFFICER STUDDERT: Are you

3    calling witnesses or no, just submissions?

4        MR. BARKET: I suspect I will. I

5    won't make that decision yet, but I

6    suspect that if I call witnesses that will

7    only be one or two — brief.

8        (Continued on the following page

9    to accommodate the jurat.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

256

DISTLER

```
 1            HEARING OFFICER STUDDERT:  Okay.

 2            MR. BARKET:  My suspicion is I will

 3      simply proceed without witnesses.

 4            HEARING OFFICER STUDDERT:  Okay.

 5      Thank you.

 6

 7                 - oOo -

 8            (Whereupon, the examination of JO-ANN

 9      DISTLER was concluded at 11:15 a.m.)

10

11      _____

12                 JO-ANN DISTLER

13

14   Subscribed and sworn to before me

15   this _____ day of _____, 20___.

16

17   _____

18   NOTARY PUBLIC

19

20   .

21

22

23

24

25
```

257

DISTLER

1               INDEX

2

3    EXAMINATION OF DETECTIVE SERGEANT JO-ANN DISTLER:

4    CROSS-EXAMINATION BY MR. BARKET        181-214

5    REDIRECT EXAMINATION BY MS. HILLER     214-241

6    RE-CROSS EXAMINATION BY MR. BARKET     241-254

7

8

9               DEPARTMENT EXHIBITS

10

11   19A              209 Reflecting Assault       178

12   23               Article 8 Departmental Rules  232

13

14

15

16

17

18

19

20

21

22

23

24

25

258

1    CERTIFICATE BY COURT REPORTER

2         I, Danielle Stieglitz, a Certified, Professional

3    Court Reporter and Notary Public in and for the State of New

4    York do hereby certify that the foregoing testimony taken in

5    the matter of NASSAU COUNTY POLICE DEPARTMENT against

6    ANTHONY DILEONARDO, consisting of page 175 through 258 is an

7    accurate transcription of my cryptic notes.

8    IN WITNESS WHEREOF, I SET MY HAND THIS DAY.

9

10

11

12

13        Danielle Stieglitz

14        CERTIFIED COURT REPORTER

15        NORTH SHORE COURT REPORTERS

16        NOTARY PUBLIC – STATE OF NEW YORK

17

18

19

20

21

22

23

24

25

**-**

-x [2] 175/1 175/6

**.**

.38 [4] 232/10 233/18 237/19 242/7

**1**

10 [1] 234/3
100 [1] 226/12
10:00 [2] 254/24 255/1
11 [1] 175/10
11501 [2] 175/9 176/8
11530 [1] 176/16
11:15 [1] 256/9
12 [4] 233/10 241/20 242/2 243/1
1490 [2] 175/8 176/7
175 [1] 236/6
178 [1] 257/11
181-214 [1] 257/4
19 [1] 178/5
19A [2] 178/14 257/11
19th [1] 203/13
1:00 [1] 201/20

**2**

20 [1] 256/15
2009 [1] 234/14
2010 [2] 234/15 234/17
2014 [1] 175/10
209 [4] 178/6 178/9 178/13 257/11
20s [1] 203/21
210 [1] 178/10
214 [1] 257/4
214-241 [1] 257/5
23 [2] 232/19 257/12
232 [1] 257/12
24/7 [1] 248/14
241 [1] 257/5
241-254 [1] 257/6
254 [1] 257/6
258 [1] 258/6
27th [1] 221/17

**3**

30 [2] 224/5 229/20

**4**

422 [1] 183/15
45 [2] 224/5 229/20

**5**

50 [3] 185/24 206/19 223/10
50 feet [4] 185/4 185/15 207/3 223/16
50-11 [1] 225/12

**6**

666 [1] 176/14
6:00 a.m [1] 201/1
6:00 p.m [1] 200/25

**7**

700 [1] 176/15
73 [1] 234/17
7:00 a.m [1] 221/17

**8**

8118 [2] 175/3 176/10

**9**

9013 [1] 175/5
911 [7] 193/7 193/8 210/7 230/11 232/4 247/1 250/22
9:40 [1] 175/11

**A**

a.m [5] 175/11 201/1 201/20 221/17 256/9
ability [3] 217/8 217/19 245/1
able [3] 197/18 231/5 238/6
about [53] 179/11 180/22 182/6 182/20 182/24 190/2 193/18 196/20 198/24 198/25 199/5 199/13 200/2 200/5 200/10 204/20 207/9 208/22 210/23 213/21 214/7 214/25 215/5 215/20 216/22 217/1 218/13 220/14 222/2 222/8 223/1 223/3 223/10 223/15 224/10 224/20 225/10 225/14 226/9 226/9 226/10 231/7 234/11 236/25 237/5 241/9 243/15 241/25 243/23 251/21 253/12 254/4 254/5
absolutely [2] 238/24 247/18
abusive [1] 247/10
accelerated [1] 215/6
accelerating [4] 203/7 205/2 205/6 205/20
acceptable [1] 235/3
accident [1] 186/22
accommodate [1] 255/9
according [4] 186/25 191/12 191/18 196/6
account [1] 202/21
accurate [11] 202/16 203/1 203/22 204/3 204/17 210/13 212/9 214/2 227/3 237/10 258/7
accustomed [1] 183/24
act [1] 194/11
actually [12] 183/11 184/8 184/23 187/17 193/16 196/20 199/1 200/17 215/5 218/18 224/16 238/23
Acura [1] 201/20
Asi [1] 180/24
addition [1] 184/17
additional [1] 185/24
Additionally [1] 222/1
addressing [1] 254/2
adjacent [1] 228/17
admit [1] 179/5
admittedly [1] 230/21
adopt [1] 206/22
advice [3] 178/23 179/11 180/8
Affairs [2] 198/13 240/6
after [19] 182/1 190/5 191/6 193/4 193/9 194/3 196/7 201/20 208/9 208/19 211/11 213/15 215/22 221/18 223/24 224/4 227/14 230/21 237/8
afterwards [3] 187/19 202/7 237/1
again [5] 189/21 207/19 210/20 218/2 226/8
against [3] 175/4 217/18 258/5
agency [1] 237/6
aggressor [3] 193/19 212/10 239/6
agree [4] 183/3 187/18 193/15 193/25
agreed [1] 212/4
agrees [1] 187/17
Ah [1] 207/19
ahead [1] 219/1
all [22] 180/10 182/10 190/21 190/22 190/24 191/23 192/1 192/2 200/20 206/24 207/10 209/15 210/8 212/9 212/13 217/17 218/8 221/2 222/7 224/19 230/21 243/20
allegation [1] 187/22
allegations [3] 217/21 252/8 253/10
allege [2] 213/16 218/11
allow [3] 197/14 218/25 239/16
allowed [1] 211/15
already [4] 178/12 219/2 219/5 219/13
also [8] 176/19 177/11 197/13 197/13 199/21 207/13 237/22 240/10
altercation [2] 228/16 250/21
am [15] 183/18 210/23 214/4 214/22 236/1 242/24 242/25 244/6 246/8 248/20 253/8

253/12 253/17 254/3 254/5
angry [1] 212/12
Ann [4] 181/8 256/8 256/12 257/3
annoyed [1] 201/21
another [6] 185/24 186/10 220/3 244/7 244/15 255/9
answer [3] 229/2 240/20 244/2
answered [3] 180/14 219/3 219/14
ANTHONY [13] 175/5 220/5 222/14 222/17 231/24 232/9 233/5 234/21 238/12 238/21 244/8 246/16 258/6
Anthony's [1] 239/17
any [26] 180/4 180/14 200/11 201/15 201/15 201/18 206/23 207/8 215/14 226/12 226/16 231/23 233/16 236/23 238/6 241/1 241/9 241/19 241/19 241/21 242/5 242/18 243/6 243/15 243/15 251/19
anybody [1] 207/21
anyone [3] 192/12 241/8 241/14
anything [6] 178/17 182/23 212/10 212/8 224/10 234/11
anyway [2] 198/3 251/7
apart [1] 199/23
apologize [2] 253/12 254/6
apparently [1] 200/14
approached [1] 239/6
approaches [1] 231/2
approaching [5] 194/17 229/19 230/15 230/19 231/16
approval [1] 245/2
approved [1] 242/23
approximate [1] 223/10
Approximately [1] 223/4
are [53] 177/24 179/22 180/3 181/20 182/7 182/13 183/5 184/13 186/15 186/16 187/14 193/15 197/8 204/24 211/3 211/18 212/14 214/5 214/14 216/13 228/15 228/21 226/11 230/23 233/13 235/3 235/3 236/4 236/5 236/22 237/13 237/15 237/13 238/2 239/16 241/22 242/2 242/10 242/10 243/19 243/20 243/20 243/23 245/5 246/18 248/6 248/7 248/24 248/25 249/7 253/10 254/2 255/2
area [2] 222/24 231/15
aren't [4] 188/18 211/15 235/24 235/25
argument [1] 229/2
around [1] 214/21
arrest [4] 189/7 189/9 189/13 190/1 190/3 190/13 197/7 200/18 219/4 215/9 231/11 238/14 239/1 240/24
arrested [5] 216/2 220/25 221/20 221/22 221/23
arrests [1] 188/17
arrived [1] 193/1
article [10] 232/14 232/18 233/4 233/7 234/2 235/11 241/9 241/20 242/25 257/12
Article 8 [2] 232/14 241/20
as [50] 177/10 178/13 178/14 179/15 180/2 185/9 186/8 189/7 189/7 190/15 190/22 191/1 191/5 191/8 192/22 192/22 192/24 195/19 196/17 204/3 204/3 204/4 204/4 206/24 209/24 210/8 218/17 222/22 225/16 228/25 229/20 230/13 230/17 230/19 232/19 232/13 235/14 235/24 235/21 236/9 237/16 238/17 239/23 240/16 242/19 244/13 246/3 246/13 248/7
ascertain [1] 244/6
aside [1] 187/1
ask [14] 177/23 177/25 183/6 200/9 214/6 214/25 215/12 216/15 217/1 218/16 220/3 232/14 232/21 240/3
asked [20] 197/21 214/23 214/25 215/20 219/3 219/14 223/1 223/13 223/15 224/7 224/20 225/9 225/13 226/8 226/9 226/10

## A

asked... [4]  229/19 232/8 241/14 241/17
asking [8]  200/11 210/21 216/13 217/14 219/7 219/11 219/12 219/15
assault [6]  178/10 178/13 187/10 188/10 209/5 257/11
assertions [2]  200/7 200/8
assign [1]  236/6
assigned [17]  233/17 233/19 233/20 233/21 234/20 235/10 235/13 233/19 235/20 236/1 236/3 236/7 236/8 236/13 236/16 236/18 236/19 236/24 237/2 237/8 237/15 237/19 238/3 238/5 241/15 241/18 242/6 242/10 242/15 242/18 243/9 243/20 243/21 244/19 244/20 245/6 245/12
assignment [2]  234/25
Assistant [1]  217/16
assume [1]  198/19
attacked [1]  251/17
attempt [2]  228/17 230/14
attempted [6]  187/10 187/11 188/10 188/10 188/7 231/19
attempting [5]  188/9 191/8 194/21 195/20 222/24
attend [1]  235/5
attended [2]  234/14
attending [1]  245/1
attention [1]  234/1
attorney [5]  197/13 197/15 199/8 217/16 225/25
Attorney's [1]  179/17 179/20 216/21
attorneys [5]  176/6 176/13 178/24 213/12 213/15
Augusti [2]  200/15 200/17
authority [1]  242/22
authorization [2]  245/3 245/5
authorized [17]  233/14 234/5 235/4 236/1 236/3 237/2 237/22 238/13 239/1 241/16 241/18 242/3 244/21 245/10 245/12 245/20 245/25
authorizes [1]  235/1
available [2]  187/4 206/21
AVENUE [4]  175/8 176/7 202/13 228/6
away [10]  185/15 195/2 230/12 232/5 246/17 247/14 249/1 250/1 250/19 251/14

## B

back [13]  185/25 195/24 203/24 203/25 204/13 204/15 214/11 214/15 222/11 228/23 229/22 249/25 254/21
backed [19]  185/24 186/10 194/19 194/20 195/25 204/13 204/9 206/13 206/15 206/19 206/24 207/1 207/13 207/9 212/22 223/15 224/5 247/17 248/1
backing [5]  194/10 194/14 195/18 212/11 212/25
backpedaling [2]  229/3 229/8
backs [2]  228/20 230/13
backwards [3]  209/24 209/25 210/6
bad [5]  201/14 228/20 249/8
BARRETT [6]  176/12 176/17 177/6 241/7 257/4 257/6
Barret's [1]  181/6
base [2]  239/23 240/3
Baseball [1]  244/17
based [14]  206/7 206/14 206/20 207/5 207/17 215/2 215/3 215/4 217/14 217/23 218/17 218/19 231/23 239/12
basis [1]  219/18
bat [1]  244/18
be [36]  178/9 179/10 179/18 186/20 187/7 187/9 190/2 197/14 197/18 197/20 200/4

213/7 213/9 214/23 223/10 223/23 227/3 227/5 231/12 232/15 232/21 236/15 236/17 236/20 236/24 237/1 238/6 240/23 240/24 242/15 243/17 245/10 245/11 245/24 253/15 255/7
beaus [1]  201/22
beat [3]  190/10 190/25 231/14
because [20]  178/22 183/3 183/23 186/13 189/3 208/25 209/4 216/2 219/4 219/8 223/17 229/7 229/18 230/3 231/13 232/3 232/22 237/1 237/13 238/22
been [8]  185/13 185/9 201/8 217/21 235/9 250/4 250/20 252/12
before [7]  175/16 178/2 178/7 181/20 182/18 232/24 256/14
began [4]  196/2 196/10 203/24 249/16
begin [1]  184/8
behalf [1]  179/7
behave [1]  247/14
behaved [1]  246/23
behaving [1]  247/9
behind [6]  186/19 194/10 202/9 209/11 228/12 230/8
being [10]  179/17 179/19 184/18 185/15 186/9 187/25 223/3 225/13 252/15 252/23
belief [7]  201/18 218/13 219/20 219/25 231/23 244/5 245/8
believe [35]  190/12 191/3 191/25 192/4 197/22 198/19 198/8 204/5 206/21 206/25 207/24 210/15 210/15 212/23 212/24 215/3 216/5 218/10 219/7 221/9 223/22 224/12 226/12 226/20 228/10 228/14 230/6 230/9 230/10 230/15 231/9 231/23 239/24 240/12 240/24 244/4 247/5 247/6
believed [9]  192/6 216/23 218/9 218/17 218/23 219/21 226/25 227/3 227/5
believing [3]  218/2 231/3 231/12
belongs [1]  244/8
belts [1]  243/21
benefit [1]  242/23
best [1]  191/11
better [1]  234/6
between [4]  185/2 212/15 228/7 241/9
beyond [1]  231/25
Bienz [25]  191/12 192/14 192/18 194/17 198/17 199/5 202/20 204/8 208/12 208/17 228/8 228/9 228/11 228/21 228/22 229/4 229/14 231/16 231/19 247/19 250/8 251/1 253/13 253/22 255/24
Bienz's [2]  249/10 250/11
birth [1]  200/14
bit [3]  204/9 214/22 242/1
blocked [5]  247/14 247/21 247/23 249/9 249/12
bloodstains [1]  208/8
blue [3]  201/20 204/2 204/4
born [1]  200/17
both [6]  188/4 187/18 195/11 197/8 208/12 248/22
bought [2]  244/9 244/20
boyfriend [1]  190/17
break [1]  214/10
brief [2]  214/12 255/7
brights [1]  202/10
broke [1]  191/7
broken [3]  206/11 207/11 208/6
BRUCE [3]  176/7 177/6 180/16
bullets [1]  230/23
bureau [12]  176/21 176/22 176/24 177/13 177/16 177/19 177/22 178/21 178/25 179/6 179/23 241/8
busting [1]  209/12
butt [1]  231/6

## C

cab [6]  192/20 215/1 224/23 228/16 229/1 239/7
caliber [2]  237/19 242/7
call [7]  181/4 193/8 199/21 210/12 247/1 250/22 252/6
called [3]  210/7 230/11 232/4
calling [1]  255/3
calls [2]  187/13 251/16
cause [5]  190/5 192/19 202/9 209/11 254/13
can [31]  177/2 177/11 177/23 181/9 182/23 190/2 193/15 193/25 199/7 200/4 200/13 205/20 207/10 214/11 215/9 216/17 219/19 220/14 223/19 223/20 223/21 227/11 227/14 228/3 233/11 234/23 237/1 238/16 239/2 239/23 244/2 244/6
can't [4]  186/13 197/14 215/11 216/25
canvasses [1]  221/8
car [81]  184/18 184/19 185/20 185/23 186/5 186/9 186/10 186/19 186/20 186/20 187/6 187/25 189/17 189/10 190/24 193/22 193/23 194/3 195/19 195/25 196/7 196/10 201/5 202/9 202/24 203/4 203/9 203/25 204/1 204/2 204/3 204/4 204/8 204/11 205/17 205/20 205/23 207/9 207/14 207/15 208/15 208/22 208/23 209/5 210/1 210/5 215/5 215/5 215/25 215/24 215/24 216/16 218/25 220/5 222/25 229/17 230/4 230/8 230/10 230/12 230/13 230/25 231/14 234/14 242/15 247/14 247/20 247/21 247/23 247/23 247/24 249/5 249/9 249/16 250/9 250/12 care [1]  230/5
career [1]  213/10
carriers [1]  236/8
carry [9]  235/1 235/4 244/12 244/24 244/22 244/24 245/1 245/3 245/15 cars [8]  194/15 202/19 202/25 203/16 212/12 225/4 242/13 243/20
cart [1]  205/8
carts [1]  205/9
case [9]  175/3 179/7 181/10 184/2 187/15 192/2 217/12 217/19 217/24
certain [4]  188/17 193/17 212/14 246/21
certainly [2]  195/17 199/5
CERTIFICATE [1]  258/1
Certified [2]  258/2 258/14
certify [1]  258/4
change [3]  182/23 227/22 227/23
changed [2]  216/8 216/21
charged [6]  212/21 233/6 243/1 252/15
charges [2]  178/7 217/17
chat [1]  180/21
Chief [5]  251/23 252/20 252/24 253/17 253/21
chiefs [2]  251/23 252/9
choice [1]  218/18
choose [1]  212/15
choosing [1]  191/24
chose [2]  192/3 239/8
Christine [2]  197/14 197/11
circumstances [2]  188/18 213/16
CITY [1]  176/16
civilian [4]  244/13 246/14 246/14 247/25
civilians [1]  183/19
claim [2]  255/23 255/23
CLAIMANT [1]  176/6
claimed [1]  240/23
clarify [3]  180/6 223/2 223/20
clarity [1]  234/24
clean [2]  243/5
cleanliness [2]  233/14 242/3

## C

clear [1] 223/17
clubs [1] 244/18
coercion [1] 213/17
collected [2] 206/7 207/17
combination [1] 208/4
combustion [1] 205/3
come [6] 199/1 214/11 216/8 216/19 240/9 254/12
comes [2] 230/20 230/24
comfortable [1] 189/3
coming [3] 195/6 195/19 252/22
COMISKEY [1] 176/21 177/18
commanding [3] 176/20 177/21 242/22
Commissioner [1] 179/8
community [1] 248/17
comparisons [1] 250/15
company [1] 201/9
comparing [1] 246/12
complainant [2] 210/16 211/8
complained [1] 198/24
complaining [3] 198/24 199/4 199/13
complaint [1] 199/1
complaints [1] 199/17
completed [1] 182/2
completely [3] 218/7 252/1 253/4
comport [2] 212/17 220/22
concern [1] 179/22
concerning [1] 186/4
concerns [1] 188/4
conclude [2] 227/14 254/21
concluded [3] 207/13 253/23 256/9
conclusion [7] 184/22 206/23 208/1 224/3 227/10 227/13 228/2
Conclusions [1] 224/3
condition [1] 235/5
conduct [5] 195/18 199/5 199/14 202/6 246/20
confesses [1] 213/16
confession [5] 199/20 207/22 210/12 213/8 213/16
confessions [2] 213/9 213/13
confront [1] 250/25
confronted [3] 246/3 246/24 247/8
confusing [4] 235/24 236/1 237/1 245/5
consciously [1] 201/23
consideration [2] 225/10 226/1
considered [1] 236/15
considering [1] 215/24
consistent [1] 202/21
consisting [1] 258/6
continued [1] 182/11
CONTINUATION [1] 175/14
continue [2] 177/24 228/3
continued [5] 194/8 204/14 228/15 249/21 255/8
continues [3] 186/21 230/22 231/7
contradict [1] 220/15
contradicted [1] 238/25
control [3] 192/9 192/12 192/24
conveyed [1] 198/19
cop [2] 209/23 231/10
copies [1] 232/13
copy [4] 178/11 178/12 210/4 233/3
correct [53] 178/3 178/6 183/17 183/18 184/13 184/16 184/24 184/25 185/6 186/3 188/1 193/10 193/11 194/4 194/20 195/12 196/2 196/3 196/24 197/23 198/1 198/18 198/21 199/11 199/15 199/19 200/16 200/23 200/24 201/11 200/14 201/7 201/12 202/24 202/10 203/11 205/19 207/7 207/12 209/2 209/8 212/7 213/2 213/5 213/9 213/23 214/1 234/21 234/1

CONTINUATION...

235/18 243/3 243/16 245/25 246/1 249/10 249/13
corrected [1] 200/15
correction [1] 202/16
corroborate [1] 212/9
corroborated [4] 202/11 210/13 227/1 227/2
corroborating [1] 208/2
corroboration [2] 212/18 212/18
could [26] 186/20 194/7 202/17 203/2 213/3 215/4 230/10 230/10 230/11 231/12 232/4 232/4 232/5 236/17 239/25 246/16 246/17 246/17 246/18 247/14 247/16 247/17 249/1 249/25 250/6 253/14
counsel [4] 177/13 178/12 178/19 214/23
counselor [2] 249/3 251/9
count [2] 178/10 248/8
Count III [1] 178/10
COUNTRY [1] 176/14
COUNTY [23] 175/2 175/7 176/5 177/5 177/13 177/15 182/16 215/14 215/23 216/16 216/20 216/21 218/1 218/9 218/21 219/20 220/6 221/2 224/1 235/9 235/14 252/25 258/5
course [6] 178/22 205/22 226/16 235/6 242/17 247/12
court [7] 178/8 194/4 258/1 258/3 258/14 258/15
credibility [1] 220/12
crime [12] 187/7 187/9 188/9 206/14 206/25 207/5 215/14 221/5 223/21 224/1 248/16 254/10
cross [11] 181/7 181/15 214/23 215/1 222/6 225/9 241/14 241/6 248/22 257/4 257/6
CROSS-EXAMINATION [2] 181/15 257/4
crossed [1] 202/14
cryptic [1] 258/7
curb [1] 224/15
curse [1] 249/21
cursed [1] 203/24
curses [1] 231/4
cursing [2] 249/17 250/17

## D

daily [1] 179/10
damage [1] 209/5
danger [1] 248/17
Danielle [2] 258/2 258/13
dark [3] 185/7 185/8 224/8
date [2] 178/15 200/14 221/15 232/20
day [2] 201/14 235/5 248/18 256/15 258/8
deadly [3] 188/17 188/24 222/2
deal [1] 250/15
dealt [1] 251/13
December [1] 234/16
decided [1] 254/22
decision [5] 228/19 228/20 237/12 249/8 255/5
decisions [1] 237/14
default [1] 186/11
defense [2] 213/12 213/15
deficiencies [1] 217/19
defining [1] 241/20
definitely [1] 180/23
definition [2] 241/15 241/18
definitions [2] 237/4 237/14
DELORENZO [2] 176/24 177/14
department [33] 175/2 175/7 176/5 177/5 177/13 177/15 216/20 217/3 218/2 218/9 219/21 221/2 223/25 233/3 233/16 235/1 235/8 235/14 242/25 242/8 242/18 243/7 243/10 243/12 243/13 243/17 244/16 244/21 245/24 251/23 253/1 257/19 258/5

Department's [1] 178/14
Departmental [3] 232/13 232/18 257/12
depending [2] 187/11 210/14
deposition [1] 226/6
designated [2] 180/1 235/21
despite [7] 185/15 190/13 190/14 190/14 190/16 198/22 199/16
detective [8] 176/23 177/19 177/20 214/5 240/5 240/10 253/9 257/3
detectives [2] 213/18 213/21
determine [1] 227/4
did [64] 182/14 183/14 184/9 187/17 191/5 191/10 191/14 191/17 191/19 192/12 192/21 192/23 195/9 195/9 195/15 195/25 197/10 198/2 199/1 200/2 200/7 200/18 200/20 201/2 201/23 202/17 204/1 204/1 204/4 207/16 211/19 211/21 213/17 215/15 216/5 216/8 216/19 219/6 221/1 222/6 221/7 221/10 222/4 222/8 222/23 222/22 222/19 223/4 223/14 223/25 224/7 224/18 226/22 226/24 226/24 231/13 232/6 241/13 242/25 254/14 254/15 258/4 258/8
didn't [27] 184/8 184/15 185/21 186/2 187/15 191/14 192/25 193/13 194/24 195/2 195/8 195/10 195/14 195/17 195/21 196/9 195/25 201/3 203/3 207/21 207/21 209/15 211/17 218/10 221/4 222/25 244/22 244/24 249/14 250/4 258/4
difference [7] 205/5 205/18 215/12 223/16 225/12 225/12 233/22
DELEONARDO [69] 175/5 177/7 177/9 185/23 186/24 187/18 187/20 187/25 189/23 191/14 192/15 192/19 194/16 195/17 196/4 196/12 196/15 196/25 198/17 199/5 199/24 202/20 208/13 208/17 209/3 209/4 209/18 208/5 213/12 223/12 223/14 222/17 225/8 228/18 228/18 228/23 229/12 229/22 230/15 230/21 230/25 231/15 231/19 231/24 232/9 235/5 235/19 234/21 237/20 238/12 238/21 244/9 247/7 247/14 247/12 248/8 249/17 248/22 249/24 250/19 253/14 251/22 251/24 253/1 253/11 253/22 258/6
DiLeonardo's [13] 194/11 196/6 210/19 210/25 216/5 218/2 219/21 220/12 220/22 229/23 228/17 240/2 247/13
direct [8] 226/8 234/1 246/15 248/22 248/22 252/2 252/11 254/1
directly [1] 204/2
disagree [4] 183/3 187/21 187/21 190/2
discipline [1] 179/25
disconcerting [1] 179/18
discounted [1] 192/6
discredit [1] 226/22
discuss [1] 241/12
discussion [1] 241/9
dismiss [1] 217/7
distance [5] 185/2 206/16 223/14 223/20 224/5
distances [1] 223/2
Distler [8] 181/8 214/15 214/21 232/25 237/18 256/9 256/12 257/3
District [4] 179/17 179/19 216/21 217/16
do [54] 180/10 182/24 183/2 183/14 190/4 190/20 195/7 195/7 195/24 200/17 201/15 206/1 206/6 206/9 206/24 207/16 212/15 213/12 213/20 215/3 215/25 216/1 216/3 217/12 217/14 220/5 220/20 222/10 223/5 223/10 223/13 223/9 223/8 224/1 238/12 238/8 239/9 239/12 240/16 241/3 241/19 245/19 245/12 245/25 246/6 251/8 251/18 252/2 245/25 246/6 251/8 251/18 252/20 253/16 258/4
document [3] 217/5 226/2 226/4
does [7] 178/20 179/25 209/21 229/18 235/8

**D**

doc\_ [2] 236/6 246/2
doesn't [2] 190/7 207/22
dogs [1] 243/21
doing [1] 227/4
don't [25] 188/22 190/18 199/8 199/14 205/10 205/11 206/13 206/23 207/8 207/20 211/5 212/16 212/23 213/13 214/10 222/7 229/12 229/23 230/5 236/23 241/1 247/5 247/6 248/8 253/14
done [9] 181/1 186/25 207/25 214/4 221/8 228/3 246/18 246/18 250/6
door [7] 185/12 186/5 208/15 209/24 231/3 231/5 231/15
doubt [2] 189/8 193/17
down [10] 187/2 187/5 199/24 203/19 208/13 208/17 208/19 209/25 212/6 222/17
Dr [1] 222/13
drawing [2] 187/22 191/21
drew [1] 182/1
drinking [2] 252/12 252/17
drive [4] 209/5 247/15 250/1 250/19
driven [5] 186/9 187/25 194/7 246/17 247/14
driver's [4] 189/10 209/11 231/3 231/20
driving [7] 185/23 199/24 200/22 202/4 202/13 202/14 222/14
dropped [1] 192/24
drove [14] 187/19 188/5 188/6 203/12 205/22 207/15 208/20 208/25 209/23 210/7 210/8 212/22 230/12 232/5
dry [1] 230/22
dry-shoot [1] 230/22
due [3] 180/3 202/6 239/21
during [3] 178/22 213/10 231/22
duty [20] 232/9 233/24 233/24 233/25 234/6 234/15 235/2 235/10 235/14 236/8 234/21 236/21 236/22 236/23 236/23 237/20 237/25 238/9 244/4 248/7

**E**

each [1] 236/3
earlier [4] 178/4 214/7 222/2 223/2
early [1] 223/24
Eddie [1] 223/4
effect [1] 233/11
electronic [3] 190/1 190/18 197/1
either [3] 188/9 213/17 224/11
electric [1] 205/14
electronic [3] 204/23 204/23 205/3
else [6] 178/17 212/1 220/13 224/10 236/15 254/18
employer [1] 201/3
empty [2] 195/3 231/2
end [2] 210/6 227/13
ended [1] 202/19
engage [1] 250/21
engine [4] 204/17 204/19 205/3 205/4
enough [1] 250/1
entered [1] 224/4
entire [1] 195/2
entirely [1] 213/18
entity [1] 219/25
entity's [1] 217/2
episode [1] 183/20
EPSTEIN [1] 176/12
equals [1] 237/9
equipment [8] 233/4 233/16 242/5 243/6 243/9 243/11 243/12 243/13
Eric [4] 184/5 223/3 223/4 230/18
error [2] 178/3 186/4
escalated [1] 228/20
Especially [1] 254/1

**ESQ** [3] 176/9 176/17 176/22
establish [3] 240/23 248/25 248/25
establishing [1] 213/21
estimate [1] 223/12
estimated [1] 207/14
evaluated [2] 192/1 207/25
even [3] 208/24 216/25 230/23
events [4] 191/2 193/17 228/4 228/5
Eventually [1] 228/9
ever [6] 199/8 211/6 222/13 222/16 241/14 241/17
every [1] 226/14
Everybody [1] 187/17
everyone [1] 202/22
evidence [19] 178/5 178/14 182/8 192/2 197/8 199/22 206/7 206/23 207/9 207/17 208/2 208/5 212/19 215/15 222/13 223/23 232/15 232/17 232/20
exactly [5] 207/16 209/3 248/23
examination [9] 181/15 214/4 214/19 214/6 256/8 257/3 257/4 257/5 257/6
example [1] 200/13
excuse [1] 196/16
Exhibit [3] 178/5 178/14 232/19
exhibits [2] 181/10 257/9
exists [1] 208/6
exit [4] 194/21 222/24 228/19 229/14
exited [3] 228/14 228/22 229/7
exiting [3] 194/18 228/25 229/12
exits [1] 229/13
experience [1] 241/19
expertise [4] 218/17 239/23 239/25 240/4
explain [2] 229/16 228/23 234/23
explains [1] 235/2

**F**

fabrication [1] 213/8
face [1] 209/13
facing [2] 185/13 186/6
fact [2] 185/20 239/5
facts [32] 187/14 212/14 212/16 217/20 220/14 220/15 220/21 221/2 222/16 239/5 240/22 240/25
factual [2] 200/6 200/8
factually [1] 212/24
false [1] 201/18
familiarization [1] 235/6
far [10] 189/7 204/3 204/44 207/13 207/14 207/22 222/44 223/15 235/14 249/25
fear [2] 231/24 239/10
February [1] 221/17
February 27th [1] 221/7
feel [3] 217/25 238/12 238/15
feels [2] 229/15 229/13
feet [9] 185/14 185/15 185/24 206/19 207/3 223/10 223/16 224/6 229/20
felt [3] 196/8 206/23 208/24
female [2] 184/18 186/5
females [2] 225/3 225/7
few [7] 183/5 236/22
FILE [1] 176/10
filed [1] 225/24
final [1] 236/14
find [2] 216/14 238/6
fine [2] 222/13
finish [1] 214/2
fire [1] 208/22
firearms [1] 235/7
fired [4] 196/12 208/24 209/4 209/6
fires [1] 230/22
first [4] 214/24 241/14 243/17 252/21
five [1] 230/21
flashed [2] 201/21 202/10

**F** (continued)
followed [1] 202/25
following [1] 225/8
foot [1] 194/17
force [4] 188/17 188/24 222/2 244/17
foregoing [1] 258/4
forensic [2] 208/2 208/5
form [1] 212/5
format [1] 218/20
formed [1] 182/20
forth [2] 193/23 203/25
forward [24] 188/5 188/6 194/19 194/22 195/19 196/2 196/10 206/15 207/14 207/14 207/23 208/20 210/2 210/3 212/11 212/22 213/1 215/6 215/17 222/19 222/22 222/22 229/18 230/14
found [2] 206/10 207/6
four [1] 208/23
FRANKLIN [2] 175/8 176/7
free [1] 248/18
front [5] 185/5 194/15 204/2 223/7 249/9
fucking [1] 230/5
full [1] 199/12
further [3] 185/25 241/2 254/19

**G**

GARDEN [1] 176/16
gas [1] 205/3
gave [7] 202/22 210/11 211/11 212/4 215/21 215/22 222/23
general [1] 186/8
get [11] 177/2 177/11 183/23 189/24 194/10 205/25 204/5 209/13 224/23 230/8 249/9
gets [2] 229/16 244/12
getting [4] 193/22 195/22 212/12 247/24
girl [1] 189/20
girlfriend [8] 195/9 196/19 201/5 209/7 210/7 230/8 231/2 254/16
give [2] 202/17 239/20
Given [1] 202/19
gives [2] 189/7 245/3
giving [2] 179/11 197/20
glass [5] 206/10 206/11 207/6 207/10 208/7
go [12] 182/5 189/24 198/2 200/2 200/13 207/19 210/5 213/21 218/25 228/22 229/18 249/4
goal [1] 190/10
godmother [2] 198/10 198/20
goes [4] 189/7 204/3 248/23 252/3
going [27] 178/11 183/1 188/14 189/24 190/17 194/22 195/1 214/5 214/6 214/17 216/15 218/11 218/16 222/5 222/11 222/12 228/22 228/24 229/10 230/4 230/5 231/1 239/16 240/24 247/15 248/16 248/18
golf [3] 205/8 205/9 244/18
gone [2] 192/23 249/25
good [4] 181/17 181/18 254/25 255/1
got [14] 184/5 184/19 185/20 186/6 194/3 195/24 201/21 202/24 204/8 204/11 204/3 206/13 228/7 249/9
Grandiocette [3] 197/16 197/18 198/12
grandmother [1] 198/9
ground [1] 224/16
grounds [5] 216/12 218/6 220/10 246/11 251/5
guess [10] 185/16 185/17 195/24 196/19 197/7 199/21 202/20 207/18 208/13 240/14
gun [12] 193/1 193/5 193/7 193/12 196/5 229/12 229/25 230/22 231/2 231/6 232/6 243/21
gunshot [2] 184/11 184/14
gunshots [1] 213/14
guy [14] 202/5 203/21 204/1 204/1 204/4 204/14 204/15 205/22 206/1 208/21 208/22

**G**

gay... [3] 209/11 209/13 209/25

**H**

had [26] 178/19 187/3 194/16 194/17 196/5 196/19 199/22 201/5 201/8 206/21 210/6 219/25 222/22 225/24 225/25 228/22 230/2 230/9 232/3 232/9 234/12 238/12 239/7 246/16 247/22 252/12
hadn't [1] 221/8
hand [2] 230/3 258/8
handcuffs [1] 243/21
handling [1] 223/25
happen [2] 186/22 187/15
happened [12] 193/4 193/10 197/8 197/9 204/6 208/9 209/15 210/8 217/12 217/15 217/24 227/17
has [9] 182/4 184/15 217/8 240/7 243/17 244/12 252/11 252/20 253/16
have [78] 178/3 179/9 180/11 181/9 183/18 183/19 185/13 186/10 186/11 186/24 186/25 188/9 188/14 191/2 191/17 194/7 195/16 195/24 201/15 204/18 206/23 207/8 213/3-214/8 217/8 217/21 219/21 221/2 221/4 221/5 221/6 221/7 221/10 222/4 222/5 225/20 228/25 230/2 230/10 230/11 230/1 231/4 231/12 232/4 232/24 232/4 232/5 232/6 232/24 235/9 240/1 240/16 241/3 241/9 241/19 242/22 243/4 245/24 246/2 246/16 246/17 246/17 246/18 246/22 247/14 247/16 247/17 249/1 249/25 250/4 250/6 250/8 250/14 250/20 251/9 251/12 251/13 251/19 254/19
haven't [2] 180/14 213/10
having [2] 185/16 201/14
he [251]
he'd [1] 186/10
he's [4] 230/13 230/19 231/10 231/10
head [2] 195/23 231/8
hear [1] 215/4
heard [6] 184/11 189/18 205/11 205/13 237/8 253/13
hearing [8] 175/17 176/3 177/2 178/8 178/23 180/4 216/25 232/14
hearings [2] 180/11 225/13
heart [2] 248/24 252/4
help [1] 227/24
helped [1] 224/11
her [35] 185/17 189/20 197/5 197/14 197/15 198/2 198/7 198/9 198/20 216/14 216/15 217/7 217/4 217/5 218/16 218/17 219/7 219/12 219/15 220/11 220/17 227/22 227/23 228/22 228/25 229/4 229/6 229/7 229/10 240/3 240/4 245/8 246/5 246/22 247/13 249/2 249/25 250/4 250/6 250/8 254/19
here [14] 178/7 179/5 180/2 181/10 187/14 199/14 200/7 201/12 212/8 227/23 227/24 241/22 243/4 254/22
hereby [1] 258/4
herself [1] 186/12
high [2] 183/24 201/21
high-pressure [1] 183/24
highly [1] 191/4
HILLER [6] 176/9 177/4 179/10 214/17 217/13 257/5
Hills [1] 202/15
him [66] 184/24 186/11 187/2 187/4 188/1 189/13 189/16 189/18 190/6 190/13 190/14 191/8 191/17 192/15 192/17 193/2 193/6 193/8 193/13 194/15 194/17 195/19 195/19 198/13 198/15 201/6 201/13 201/22 203/6 203/10 206/16 208/25 209/4 209/5 209/6 211/14 212/3 212/4 212/10 212/11 212/12

215/24 216/4 219/5 219/9 222/21 228/12 228/24 229/19 231/11 231/7 231/13 231/4 231/20 233/21 235/13 243/1 244/19 244/20 244/22 244/24 245/3 247/24 250/21 252/10 253/24
himself [10] 180/5 186/10 190/15 190/22 191/3 191/5 196/7 208/25 209/6 240/13
hints [1] 178/24
his [109]
hit [2] 208/23 214/22
hits [1] 231/6
hitting [1] 209/13
holding [1] 181/24
hood [1] 228/16
hospital [4] 192/19 210/7 210/8 211/13
house [6] 185/5 185/13 186/6 223/7 224/18 247/1
how [23] 178/20 184/8 185/1 186/2 194/1 195/7 195/7 197/10 197/18 204/6 206/9 207/13 207/14 207/16 207/22 212/15 218/13 218/19 223/4 225/1 228/14 231/5 228/4 243/3 247/12
Huster [5] 251/23 252/21 252/24 253/17 253/21
Huntington [1] 202/15
husband [1] 229/4

**I**

I'd [3] 178/4 195/16 232/12
I'll [10] 179/4 180/9 180/12 180/25 210/3 215/12 217/10 218/25 222/9 227/12
I'm [29] 178/11 179/14 179/24 180/17 181/24 182/6 183/1 183/11 183/16 190/25 198/10 200/11 200/19 208/14 210/21 211/20 214/6 217/14 217/7 218/16 219/17 219/15 220/5 222/5 230/5 234/2 241/17 248/18
I've [2] 205/11 205/13
IAU [1] 182/7
idea [2] 201/15 201/18
identified [3] 190/15 191/3 196/16
identify [1] 191/5
identifying [1] 190/22
ignition [2] 204/23
ignorance [1] 179/5
ignore [1] 248/19
III [1] 178/10
inaccurate [1] 225/1
incident [20] 184/9 185/3 185/10 186/2 193/4 193/9 193/20 211/11 215/22 215/22 220/7 221/16 221/18 223/21 224/2 224/6 229/21 231/22 239/6 254/11
includes [1] 244/4
including [1] 213/22
inconsistencies [2] 191/1 226/14
inconsistent [1] 217/20
increase [3] 205/7 205/16 215/18
independent [1] 228/2
independently [1] 201/24
INDEX [1] 257/1
indicate [2] 195/14 237/12
indicated [2] 192/9 253/9
indicates [1] 207/1
individual [2] 250/1 250/25
individuals [1] 179/9
Infiniti [2] 203/20 228/23
information [7] 198/20 199/23 200/3 207/8 213/21 221/24 222/4
inhibited [1] 224/11
initial [2] 193/19 212/10
initialed [1] 212/5
initiated [1] 228/13
injured [1] 186/20
inside [1] 223/7

inspector [5] 175/16 176/3 178/20 227/10 227/24
instance [5] 194/13 194/14 244/7 244/15 246/22
intact [1] 224/15
intend [6] 187/12 190/7 190/9 190/12 190/25 195/8
intereal [2] 198/13 240/6
interpret [2] 192/21 195/18
interview [5] 211/5 211/21 251/24
interviewed [9] 197/14 211/25 221/1 221/11 240/7 252/10 253/1 253/22 253/24
interviewing [2] 216/4 216/4
interviews [5] 207/25 215/2 218/18 221/7 221/8
intimidated [1] 229/15
intoxicated [9] 237/22 251/22 252/8 252/20 253/2 253/11 253/16 253/23 254/5
intoxication [2] 252/24 252/17
introduce [1] 220/16
investigate [6] 198/16 198/23 199/17 200/7 200/11 201/23
investigated [1] 213/3
investigating [2] 198/15 214/1
investigation [12] 181/2 191/14 204/6 213/6 215/3 215/17 226/17 227/16 231/24 239/12 240/6 254/13
investigator [1] 218/17
investigators [1] 191/22
irrationally [2] 246/23 247/9
irrelevant [5] 218/8 219/25 228/1 229/13 238/24
is [153]
isn't [6] 203/14 205/24 212/13 243/24 248/14 248/14
ISRAEL [2] 176/20 177/21
issue [2] 237/14
issued [8] 233/17 233/19 234/20 234/25 236/12 242/6 242/18 243/12
it [139]
it's [41] 179/14 181/6 183/22 187/3 187/24 187/24 191/14 191/20 192/22 202/25 203/5 205/4 205/8 205/18 206/20 206/22 207/19 208/3 208/4 212/13 212/23 215/16 217/8 218/7 218/22 219/25 220/16 222/13 223/23 223/24 223/25 225/8 228/2 233/3 234/2 236/9 240/14 242/17 248/18 253/3 253/20
item [2] 244/17
its [1] 239/21

**J**

jail [2] 189/24 190/17
Jo [4] 181/8 256/8 256/12 257/3
Jo-Ann [4] 183/8 256/8 256/12 257/3
JOANNE [2] 176/24 177/14
job [4] 198/16 217/10 245/18 246/20
join [1] 231/20
joined [1] 231/19
judge [2] 179/16
July [2] 200/15 200/17
jump [1] 214/21
jural [1] 255/9
just [38] 178/3 179/1 180/17 180/18 181/19 182/5 183/3 186/8 186/21 190/25 194/24 195/2 201/24 204/20 205/5 212/16 212/24 219/7 214/22 214/25 215/7 215/12 217/19 217/22 219/19 220/17 223/1 224/13 231/11 234/23 237/7 238/23 240/14 241/10 245/7 250/19 253/7 255/3

**K**

K-L-U-G [1] 184/3
KAREN [2] 176/22 177/12

**K**

KEARON [1]  176/12
keep [3]  235/9 243/4 252/6
kept [1]  238/2
kill [1]  230/5
kind [3]  179/16 205/8 216/25
kinds [1]  243/20
King [8]  183/8 183/9 184/2 184/3 184/4
  223/5 224/23 230/18
King's [6]  223/3 224/11 224/17 224/21
  226/10 247/1
Klang [2]  183/6 183/7
knew [5]  199/12 225/24 226/4 226/6 240/22
knocked [4]  208/13 208/17 208/19 209/25
knocking [1]  231/15
know [35]  180/24 188/22 195/7 195/7 195/24
  200/18 206/6 206/9 206/10 206/13 206/18
  207/20 209/25 213/12 213/15 215/2 215/23
  216/3 217/12 221/13 221/13 221/20 227/21
  229/11 233/9 234/8 234/11 234/13 236/23
  239/9 239/12 244/5 244/5 247/13 252/9
knowledge [3]  184/15 191/11 217/5
Kristie [9]  185/19 189/22 190/16 196/16 197/1
  197/13 197/12 198/20 201/6

**L**

lack [1]  234/6
lane [7]  205/25 206/2 206/3 206/4 206/17
  207/2 230/17
language [2]  190/22 247/10
largely [1]  218/12
larger [2]  182/1 182/11
later [2]  204/6 204/9
law [1]  179/16
lawful [2]  190/3 240/24
lawyer [2]  207/20 235/25
lawyers [3]  199/5 199/13 199/16
lean [1]  215/15
least [2]  186/4 228/15
leave [4]  191/9 194/7 229/17 250/25
leaving [1]  194/12
left [6]  201/22 230/3 230/23 247/19 250/8
  250/14
legal [13]  176/11 176/22 176/24 177/13
  177/15 177/19 177/22 178/21 178/25 179/6
  179/22 237/4 241/8
LESLI [3]  176/9 177/4 241/13
let [6]  177/8 180/19 186/22 187/1 236/25
  242/1
Let's [1]  204/20
level [1]  215/16
license [1]  238/4
lie [1]  218/13
life [2]  230/12 231/25
light [2]  206/16 224/17
lights [2]  201/15 224/13
like [16]  178/4 179/8 179/16 181/25 186/14
  189/4 205/8 210/4 232/12 235/22
likely [3]  191/4 250/4 250/5
list [5]  235/9 235/22 236/10 236/17 238/5
lists [1]  245/5
little [5]  204/9 214/22 214/25 229/15 241/25
lived [1]  198/10
lives [1]  183/16
LLP [1]  176/10
logic [1]  230/6
look [4]  200/20 222/12 242/21 243/22
looking [1]  185/1
looks [2]  183/25 210/4
lost [3]  192/9 192/12 192/15 192/17 192/20
  192/22 192/24 192/24 192/24 228/10 228/24
lot [4]  183/1 199/22 201/14 215/20

lots [1]  245/11
lying [1]  212/21

**M**

mace [1]  243/21
mad [2]  202/3
made [11]  178/4 186/4 199/8 213/17 217/16
  228/18 231/20 239/1 249/8 251/11 251/12
mailbox [2]  224/14 224/16
maintain [1]  244/17
make [18]  180/2 182/6 188/17 194/21 194/24
  195/14 195/20 199/9 205/14 206/16 222/24
  227/12 227/24 228/2 228/25 230/14 254/9
  255/5
makes [2]  204/5 205/21
making [9]  182/18 199/18 201/15 215/5
  225/11 237/7 238/13 239/1 248/20
many [5]  187/3 197/10 230/9 232/3 236/22
MARCH [1]  175/10
MARION [1]  176/12
Mark [1]  232/16
marked [3]  178/13 232/15 232/19
match [1]  228/13
matter [1]  258/5
may [10]  181/12 181/14 189/4 191/2 217/11
  219/21 225/16 230/2 231/14 240/20
maybe [4]  185/4 198/10 22/24
me [28]  178/18 179/15 180/7 180/21 196/16
  197/13 197/20 197/20 200/9 201/21 201/25
  202/9 202/10 202/17 202/24 203/24 206/21
  207/3 206/6 208/25 209/13 209/13 229/16
  230/1 231/1 236/25 242/1 256/14
mean [8]  191/20 192/21 192/22 206/1 207/21
  235/25 234/6 238/23
means [4]  234/23 235/20 236/3 236/7
meant [2]  210/5
meet [2]  251/21
member [1]  179/17
members [5]  179/22 233/13 235/1 235/9
  242/2
mentioned [1]  251/21
met [2]  188/3 212/3
MICHAEL [2]  175/16 176/3
mid [1]  183/21
mid-20s [1]  203/21
middle [3]  230/17 230/24 250/2
might [4]  179/3 214/21 214/23 223/23
mind [4]  182/24 227/23 227/23 240/2
MINEOLA [2]  175/9 176/8
minimum [1]  224/5
minute [1]  214/10
mirrors [1]  229/6
misconduct [2]  210/19 210/25
misplaced [1]  192/22
Miss [1]  179/10
Miss Hiller [1]  179/10
mistakenly [1]  215/17
Monday [1]  254/22
Mondo [10]  185/19 189/22 197/4 197/7
  197/21 199/9 201/25 202/11 202/20 203/3
months [2]  240/8 240/9
more [3]  187/14 200/4 250/20
morning [9]  181/1 181/17 181/18 183/2
  188/4 215/21 219/23 221/16 221/22
Moroughan [57]  187/18 188/3 188/9 189/15
  189/18 190/4 190/15 190/24 190/25
  191/8 192/17 193/19 196/19 197/14 197/17
  198/16 199/9 199/21 210/23 216/5 217/13 217/18
  218/1 221/1 221/11 221/14 222/13 223/15
  224/4 225/12 225/21 228/7 228/17 228/24
  229/9 229/21 230/23 230/25 231/3 231/3
  231/6 231/10 231/12 232/6 247/11 249/15

2xv/19 251/12 251/12 254/8 254/14
Moroughan's [9]  195/18 195/22 207/20
  215/20 219/23 226/21 226/11 226/9 249/12
most [2]  250/4 250/5
mother [1]  198/9
motion [1]  217/17
motivated [1]  218/13
motivation [1]  239/18
motor [1]  205/17
move [6]  196/2 196/10 200/3 222/22 248/12
  253/7
moved [1]  206/15
moving [4]  182/7 215/16 222/19 222/21
Mr [25]  181/6 183/7 191/8 195/18 197/17
  197/18 198/12 199/9 203/2 215/20 217/13
  217/18 221/11 223/15 224/4 228/12 230/4
  231/2 231/6 231/11 241/7 241/7 247/11 247/10
  257/4 257/6
Mr. [18]  183/6 184/2 190/11 195/22 197/16
  221/14 222/11 224/11 224/17 224/17 224/21
  228/7 228/14 228/13 229/14 230/2 230/13
  231/10
Mr. Grandinette [1]  197/16
Mr. King [2]  184/2 224/23
Mr. King's [3]  224/11 224/17 224/21
Mr. Klang [1]  183/6
Mr. Moroughan [9]  190/11 223/14 228/17
  228/14 229/13 223/14 230/2 230/13 231/10
Mr. Moroughan's [2]  195/22 222/11
Mrs. [1]  228/22
Mrs. Bienz [1]  228/22
Ms [6]  180/20 199/9 247/19 251/1 251/13
  257/5
Ms. [4]  197/21 201/25 202/11 214/17
Ms. Hiller [1]  214/17
Ms. Mondo [3]  197/21 201/25 202/11
much [1]  185/1
multiple [1]  226/11
murder [2]  187/11 183/10
my [41]  177/25 179/5 182/15 184/22 187/3
  189/11 190/16 191/3 191/11 201/21 203/19
  203/25 204/5 204/13 204/14 204/16 205/12
  248/23 209/11 209/12 209/24 218/1 210/4
  210/5 210/7 213/5 214/4 222/6 222/23
  227/13 228/4 228/19 246/6 248/13 248/20
  252/5 253/14 254/1 256/1 256/7 258/8

**N**

naivety [1]  185/4
name [4]  185/17 189/20 197/5 252/21
NASSAU [10]  175/2 175/7 176/5 175/5
  177/12 177/15 235/8 235/14 252/25 258/5
nauseous [1]  180/24
near [3]  205/23 208/21 224/17
necessarily [1]  182/13
need [2]  181/10 222/12
needed [1]  240/23
needs [2]  245/10 245/11
neither [1]  243/9
never [3]  191/12 195/23 231/20
NEW [8]  175/2 175/9 176/8 176/16 202/13
  228/6 258/3 258/16
next [5]  203/20 247/20 248/13 248/44 253/7
night [11]  190/17 191/17 195/13 217/25
  219/22 226/7 228/5 232/10 251/24 252/13
  253/24
no [51]  175/3 175/5 180/10 182/9 182/9
  182/9 182/13 182/25 183/22 184/10 184/15
  189/8 192/5 192/18 193/17 194/15 194/16
  195/1 195/5 195/10 195/21 198/1 200/21
  201/17 201/19 205/10 207/9 208/2 211/17
  221/3 222/15 222/18 224/14 230/6 230/23
  232/1 232/7 236/2 237/13 242/9 242/24

**N**

no... [10] 244/23 245/17 245/19 247/22 247/11 248/9 251/2 253/25 254/15 255/3
nobody [1] 184/23
noise [9] 205/4 205/5 205/7 205/15 205/18 205/21 215/5 215/16 215/18
none [1] 195/24
normal [2] 205/16 226/16
north [2] 203/13 258/15
not [86]
NOTARY [3] 256/18 258/3 258/16
noted [5] 179/13 218/25 239/20 249/5 253/20
notes [1] 258/7
nothing [6] 213/25 252/11 252/20 253/16 254/18 254/19
notice [1] 225/24
now [6] 177/2 216/13 219/7 229/15 241/10 254/2
number [5] 182/4 184/5 193/16 200/6 224/3
numerous [1] 231/7

**O**

oho [1] 256/7
Oakwood [6] 183/15 203/13 203/17 206/3 230/17 230/24
oath [2] 181/20 214/16
object [1] 212/5
objected [1] 227/19
objecting [2] 246/8 253/17
objection [33] 187/13 188/11 188/12 188/14 188/21 211/2 215/7 216/10 216/24 218/4 218/25 219/14 219/24 220/9 227/9 238/15 238/19 238/22 239/11 239/14 239/20 240/18 240/20 243/25 245/7 246/5 248/10 248/21 251/3 251/15 251/16 251/25 253/3
objectionable [1] 216/15
obligated [3] 188/16 188/22 188/23
obligations [1] 246/2
observers [1] 177/11
observing [2] 183/24 229/5
obvious [1] 202/6
obviously [2] 203/17 203/22
occurred [1] 191/3
occurring [1] 229/2
odd [2] 179/8 179/15
off [21] 202/14 202/25 232/9 233/24 233/25 234/6 234/15 235/2 235/10 235/13 236/8 236/21 236/22 236/23 237/20 237/25 238/9 243/5 244/4 248/7 248/18
off-duty [7] 233/24 233/25 234/6 234/15 235/2 237/25 238/9
office [6] 179/18 179/20 216/21 217/2 217/7 217/9
officer [105]
officers [12] 186/15 183/16 192/25 193/5 198/23 217/21 242/22 243/19 246/19 247/3 248/6 248/7
Oh [2] 182/9 210/3
okay [38] 178/1 179/4 180/12 180/25 181/2 181/21 182/3 182/17 182/23 183/4 183/22 185/7 186/1 186/18 201/5 202/12 202/24 203/12 204/13 205/22 208/2 210/11 211/9 211/24 213/25 214/4 214/9 215/19 216/17 217/10 220/2 222/9 227/8 234/19 237/16 254/3 256/1 256/4
OLD [1] 176/14
on-duty [1] 233/24
once [2] 197/12 251/13
one [18] 178/6 178/24 179/4 179/6 179/9 179/24 180/7 181/25 186/4 201/9 205/11 225/6 229/16 233/6 234/5 235/5 236/4 250/14 255/7

ones [2] 192/3 235/3
only [10] 179/24 185/15 199/7 208/5 216/14 235/4 235/5 248/24 256/5 255/7
open [2] 231/4 231/15
opposed [2] 208/15 209/24
operate [1] 194/1
operation [2] 208/18 240/2
opinion [20] 182/20 187/3 187/22 187/24 189/11 190/21 191/20 191/21 215/2 216/14 216/16 216/22 217/1 217/17 217/8 220/11 225/11 228/4 228/19 238/18
opposed [1] 236/10
options [6] 187/4 230/9 232/3 239/7 246/16 247/22
order [1] 214/24
organization [1] 237/5
organized [1] 237/9
Originally [1] 185/22
other [35] 184/24 185/10 186/20 187/3 195/6 207/21 207/24 210/21 212/9 212/19 215/4 221/24 222/20 225/3 225/7 226/11 230/9 232/3 233/16 239/7 241/1 242/5 242/18 242/25 243/6 243/10 243/13 243/15 243/15 246/16 247/22 251/19 251/23 252/22 252/24
others [1] 192/7
our [4] 177/2 178/2 180/2 186/17
out [33] 184/19 185/1 185/7 185/8 185/20 186/6 189/7 189/24 190/13 190/23 190/24 191/18 191/12 191/14 193/22 194/3 196/5 203/25 204/5 204/8 204/11 209/13 224/8 224/23 230/8 247/7 247/19 247/24 249/9 249/19 250/11 252/15 252/22
outside [7] 180/9 225/4 248/11 248/21 251/25 252/1 253/4
over [8] 178/12 186/16 197/1 228/11 228/16 229/8 231/2 231/15
Overruled [2] 239/15 244/1
own [1] 227/13
ownership [1] 244/16
owns [1] 244/7

**P**

p.m [1] 209/25
P.O [1] 237/20
page [2] 255/8 258/6
paid [1] 244/9
parallel [1] 185/22
parked [2] 203/16 246/5
parking [2] 206/4
part [5] 181/25 183/19 225/17 243/17 245/18
partially [1] 228/15
particular [3] 186/1 214/24 242/16
parties [1] 212/19
parts [3] 227/1 227/2 222/2
party [1] 197/25
pass [2] 178/11 233/13
passed [5] 178/12 201/21 202/24 203/4 232/22
passenger [6] 184/18 185/12 186/5 187/6 203/19 224/23
passing [1] 203/7
past [2] 183/19 203/10
patrol [2] 242/15
PBA [2] 176/23 177/10
Pead [1] 217/16
pedigree [2] 213/22
people [3] 186/16 211/15 215/4
per [2] 229/20 230/17
perceat [1] 226/12
period [1] 242/16
permit [1] 244/13
persaunt [1] 237/22
person [6] 195/23 210/18 210/24 231/12

247/20 250/16
person's [1] 187/12
personal [1] 244/17
personally [3] 188/7 233/13 242/2
personnel [1] 252/25
photos [2] 223/25
phrase [1] 241/22
phrasing [1] 217/18
physical [2] 207/9
pick [2] 212/15
picked [1] 192/3
picking [1] 191/24
pissed [1] 202/25
pistol [2] 180/11 238/4
place [5] 185/3 185/10 193/18 211/12 249/24
pixilated [2] 225/22 225/23
Plaintiff's [1] 232/19
please [1] 233/12
POD [1] 234/21
point [23] 181/7 189/9 190/4 194/6 194/15 196/14 196/16 196/18 197/2 199/22 208/16 211/3 211/7 229/9 229/13 229/22 231/9 231/17 242/17 247/25 249/7 250/1 250/2 250/19
pointing [2] 241/23
points [1] 214/22
police [58] 175/2 175/5 175/7 176/5 177/5 177/13 177/15 187/15 187/19 188/3 188/7 188/16 189/14 190/15 190/23 191/6 192/25 193/5 195/13 196/17 196/21 199/14 209/14 211/11 211/15 212/21 212/9 213/18 216/20 217/2 218/1 218/9 218/12 219/21 221/2 221/12 228/8 228/8 231/13 235/8 235/14 240/1 242/8 242/9 243/19 246/18 243/24 243/24 244/5 248/1 248/9 248/5 246/8 246/8 248/7 248/14 251/21 252/25 258/5
portion [6] 204/23 205/4 232/12 249/15 250/16 253/18
portions [4] 210/14 226/20 226/22 226/24
posed [3] 247/11
posing [2] 246/23 248/17
possible [4] 206/18 213/23 225/6 225/8
possibly [2] 240/1
post [1] 234/15
potential [1] 225/23
potentially [3] 187/11 243/22 246/19
pre [1] 236/4
pre-cursors [1] 236/4
PRECINCT [1] 236/4
precipitated [1] 184/14
preliminarily [1] 178/2
preliminary [1] 222/3
prepared [1] 182/12
present [2] 176/19 177/10
presented [3] 201/25 240/23 240/25
pressure [1] 183/24
presumably [1] 242/19
prior [3] 207/25 237/11 237/13
Prius [6] 185/12 185/16 187/1 194/1 200/22 204/22
private [2] 180/8 244/8
problem [2] 180/10 204/18
procedural [1] 179/2
procedure [2] 179/11 180/15
procedures [1] 180/22
proceed [4] 181/12 212/45 214/6 256/3
process [3] 180/3
product [3] 213/17
Professional [1] 258/2
progresses [1] 230/14
proper [6] 233/14 232/15 242/3 242/4
property [9] 233/17 242/6 242/8 242/18 243/7 243/10 243/14 243/18 244/8
proposition [1] 186/8

**P**

prosecuted [1] 179/19
prosecuting [1] 179/7
prosecutor [2] 180/2 180/5
protect [3] 208/25 209/6 209/6
prove [1] 217/19
public [4] 199/7 256/18 258/3 258/16
publicly [2] 199/4 199/13
pull [4] 189/16 190/24 195/2 229/1
pulled [9] 203/20 207/23 212/25 228/11 228/12 228/12 247/20 249/15 251/14
pulling [3] 190/23 193/22 212/11
punch [1] 231/7
punched [2] 190/6 191/8
PURCELL [2] 176/23 177/17
purpose [1] 236/9
pursuant [1] 233/21
put [4] 217/23
puts [2] 229/17 231/14
putting [1] 190/13

**Q**

qualification [2] 235/4 235/6
qualified [3] 234/15 238/10 245/21
qualifies [1] 244/25
quality [1] 245/24
qualifying [2] 234/17 245/2
question [19] 177/25 178/19 215/12 220/3 220/19 238/17 239/3 240/21 242/1 244/2 244/7 244/9 248/2 248/13 249/4 252/5 252/16 253/7 253/18
questions [14] 179/2 180/15 183/5 196/20 215/20 223/1 223/3 225/9 225/13 226/8 226/9 232/8 241/2 251/19
quite [1] 231/20
quote [3] 203/21 210/18 249/8
quote/unquote [1] 210/18

**R**

rage [1] 228/6
ran [1] 187/6
ras [1] 249/3
re [9] 224/4 241/4 241/6 246/15 248/22 252/2 253/1 254/1 257/6
re-cross [3] 241/4 241/6 257/6
re-direct [5] 246/15 248/22 252/2 253/11 254/1
re-entered [1] 224/4
reaching [1] 208/1
read [5] 219/5 219/9 224/22 233/11 252/23
reading [2] 225/16 225/18 225/20 226/2 226/5 226/6 242/24 242/25
real [1] 190/25
really [4] 190/8 206/23 215/8 220/1
realm [1] 237/4
rearview [1] 229/6
reason [2] 231/23 238/13
reasonable [6] 191/5 206/20 206/22 227/5 250/18 250/20
reasonableness [1] 212/20
rebut [1] 213/20
recall [1] 253/14
received [1] 234/17
receiving [1] 245/2
recess [1] 234/12
recognize [2] 181/24 232/24
recognized [1] 236/9
recommendations [1] 182/18
Reconstruction [4] 206/14 221/6 224/2 229/11
Reconstructive [1] 254/10
record [16] 177/3 177/9 180/19 199/7 214/15 217/17 217/23 226/11 233/11 234/24 240/19

249/4 251/7 252/23 253/19 253/20
Record's [1] 199/12
records [2] 191/18 238/2
redirect [7] 189/5 214/8 214/11 214/17 214/19 253/5 257/5
refer [2] 181/11 223/19
referring [1] 244/3
reflect [2] 177/9 180/19
Reflecting [2] 178/13 257/11
reflects [3] 178/6 178/9 240/20
refused [4] 195/11 198/5 199/10 199/18
reg [1] 233/22
regs [3] 237/23 238/11 245/9
regular [1] 205/17
related [1] 252/6
relationship [1] 178/21
relevant [2] 213/5 213/7
relying [1] 207/19
remarkably [1] 183/23
remember [1] 225/13
remembering [1] 224/14
removed [1] 196/9
repeat [1] 219/19
repeatedly [1] 246/15
rephrase [11] 188/25 215/10 215/11 216/17 217/10 220/18 227/11 227/14 238/17 238/20 242/1
replace [1] 178/5
report [13] 181/25 182/1 182/8 182/11 182/12 206/15 215/15 221/6 223/21 224/2 229/21 252/23 254/11
REPORTER [3] 258/1 258/3 258/14
REPORTERS [2] 258/15
reports [2] 182/17 206/25
represent [2] 197/19 197/24
representative [1] 177/10
representing [1] 197/16
repeatedly [1] 236/5
requesting [1] 245/1
require [1] 244/24
required [1] 245/15
residence [1] 198/11
respect [14] 215/19 217/13 217/24 222/21 222/25 223/14 224/7 226/19 232/8 233/18 234/19 234/24 238/2 240/4
respects [1] 218/8
RESPONDENT [1] 176/13
Response [1] 222/2
responsible [2] 233/13 242/2
results [2] 222/4 224/2
retreat [8] 186/13 186/15 186/18 186/21 191/9 239/7 246/19 246/25
retreated [3] 230/11 232/4 246/17
returned [1] 194/4
reveal [1] 190/7
revealed [2] 191/4 204/6
reverse [5] 194/25 195/1 196/7 229/17 231/14
review [1] 195/16
reviewed [4] 182/5 182/17 217/6 226/13
revolver [1] 230/1
revved [1] 204/16
revving [2] 204/18 215/1
right [25] 179/15 179/15 182/6 183/12 183/25 184/6 184/21 185/5 186/1 186/11 186/11 188/23 189/17 193/4 193/16 195/4 198/24 199/10 202/6 203/22 204/24 205/2 205/9 205/14 205/18 206/10 206/12 206/9 208/20 209/4 209/19 211/12 212/6 212/25 213/4 213/18 214/2 223/24 235/17 242/20 243/7 244/9 244/12 245/13 247/9 250/3 250/9 252/3
rights [4] 212/4 212/4 219/5 219/9

road [13] 176/14 183/15 185/9 202/15 203/13 203/17 206/3 228/5 228/11 230/17 230/25 249/16 250/17
roadway [4] 208/7 223/6 223/8 223/11
role [1] 180/2
roll [2] 250/22 250/23
rolled [1] 203/19
room [2] 177/11 192/20
rounds [1] 230/22
rouse [1] 190/24
rule [9] 233/10 233/22 234/2 241/20 242/2 242/25 243/1 243/23 243/3
rules [8] 180/22 232/13 232/19 233/3 237/23 238/10 245/9 257/12
run [8] 186/16 187/1 187/2 187/5 199/24 222/16 231/1 246/25
runs [1] 230/25

**S**

safeguard [1] 243/5
safeguarding [2] 233/15 242/4
safety [2] 230/11 239/10
said [35] 183/6 184/17 184/23 187/13 189/23 196/23 198/7 200/25 201/8 206/19 207/20 209/14 209/18 212/6 212/8 212/10 213/21 219/3 219/13 220/14 224/22 227/22 229/10 223/9 223/13 240/12 240/13 240/24 246/15 247/14 252/7 252/10 253/2 253/5 246/15 247/14 252/7 252/10 253/2 253/5
same [3] 185/9 185/11 188/10 198/19 204/5 206/16 207/1 209/9 212/16 216/24 246/2 248/20 251/15
SANTIAGO [2] 176/20 177/21
saw [9] 191/13 199/8 203/16 206/1 208/22 234/23 239/1 239/1 229/1 229/7
say [20] 182/23 185/25 191/14 191/20 197/8 197/9 199/7 287/22 208/24 211/17 216/1 222/13 222/16 222/19 223/4 238/9 241/23 248/18 254/14 254/16
saying [16] 177/24 179/14 180/17 189/15 189/23 190/14 190/15 190/16 204/22 213/3 211/18 213/20 213/8 246/6 249/7 254/4
says [16] 200/22 201/13 202/12 202/14 203/12 208/20 209/1 209/3 209/4 209/9 209/17 209/18 230/7 234/12 243/4 243/13
scene [22] 191/9 191/22 193/4 194/21 206/14 206/25 207/5 215/14 215/14 221/5 222/25 223/2 223/19 224/10 224/10 224/12 224/14 225/3 229/18 254/10
scope [6] 222/6 248/11 248/21 252/1 252/1 253/4
score [1] 234/17
scream [1] 249/21
screamed [1] 246/24
screaming [4] 229/11 247/23 250/2 250/17
seated [1] 229/5
second [2] 197/13 204/20
seconds [1] 193/9
secretary [1] 179/16
section [11] 224/3 233/4 233/9 233/11 233/22 234/1 235/2 235/10 238/4 242/1 243/2
sections [1] 233/6
see [6] 184/8 184/15 186/2 214/2 230/3 238/5
scenes [1] 178/8
seen [2] 225/6 229/14
sees [1] 249/16
separate [2] 191/21 199/23
separated [3] 228/9
sergeant [13] 176/20 176/21 177/19 177/20 214/5 214/15 214/21 232/25 237/18 240/5 240/11 253/9 257/3
SERIAL [1] 175/5
serviceability [2] 233/15 242/4

**S**

serviceable [1] 243/5
session [1] 177/2
SET [1] 258/8
several [1] 252/9
shattered [2] 190/6 191/7
shattering [1] 231/5
she [27] 195/20 196/11 189/22 189/23 195/10 197/20 198/5 198/7 198/10 217/5 219/3 219/13 220/14 227/21 222/22 222/22 228/25 229/1 229/1 229/2 229/10 235/25 239/2 240/10 245/7 252/7 253/15
she's [2] 197/22 219/10
sheet [1] 224/3
shield [7] 190/13 190/23 191/10 191/11 191/15 191/17 196/16
shift [2] 201/13 213/4
shifting [1] 210/6
shoot [1] 230/22
shooting [7] 206/15 208/10 221/6 223/21 229/21 230/18 231/18
SHORE [1] 258/15
Short [1] 247/10
shortly [1] 213/11
shot [2] 184/18 231/13
shotguns [1] 243/21
shots [1] 208/23
should [3] 186/24 186/25 238/9
shooting [2] 193/22 228/13
six [1] 190/9
side [15] 185/9 185/10 185/11 189/10 189/19 191/6 195/3 195/4 203/16 207/11 207/11 228/11 229/6 231/21 249/12
side-view [1] 229/6
sides [1] 231/3
silent [3] 204/24 205/1 205/12
simply [4] 190/10 194/7 248/18 256/3
situation [5] 179/9 183/25 186/12 228/20 246/3
situations [2] 186/14 246/21
six [1] 240/8
slight [4] 205/7 205/7 205/16 215/18
slightly [1] 205/5
smash [1] 230/4
smashed [3] 189/10 208/16 209/12
smashes [1] 231/4
Smith [3] 232/10 233/18 237/19
so [50] 178/1 179/8 180/21 182/10 183/1 184/14 185/12 185/15 185/25 186/1 186/24 188/9 190/1 190/13 193/4 193/23 194/10 194/19 197/8 197/24 198/2 199/16 200/13 201/11 202/17 203/25 204/1 204/5 204/8 207/19 208/2 208/9 208/20 209/21 209/23 210/11 213/25 214/23 219/14 221/18 223/25 225/6 226/4 230/7 234/19 236/15 245/15 247/24 248/16 253/17
some [14] 191/1 191/2 192/6 193/15 193/18 196/15 196/18 214/22 222/7 222/1 223/2 225/9 232/8 237/11
somebody [17] 182/14 182/15 182/15 184/19 194/11 212/1 213/7 213/16 218/18 220/13 229/24 240/5 244/7 246/22 247/8 248/16 250/14
somebody's [1] 187/5
somehow [3] 218/12 244/16 250/1
someone [1] 244/17
something [6] 181/24 231/19 223/19 231/11 240/12 253/23
Sometime [1] 201/20
soon [1] 221/18
sorry [4] 183/9 221/1 234/2 253/8
sound [1] 205/8

southbound [1] 202/13
speak [10] 195/8 195/9 195/11 197/10 198/2 199/18 199/18 201/3 203/2 207/21
speaking [3] 200/5 200/10 229/13
specific [1] 200/4
specifically [2] 200/9 232/2
speculate [1] 239/17
speculation [3] 187/14 215/8 251/16
spoke [8] 182/10 183/6 197/12 198/7 198/9 198/12 212/5 220/6
spoken [3] 183/7 183/18 195/23
standards [1] 180/3
standing [2] 205/23 208/21
start [3] 178/2 181/20 214/1
started [6] 184/9 186/2 201/13 204/16 228/6 229/2
starters [1] 183/6
state [5] 189/18 195/5 202/18 258/3 258/16
stated [6] 189/14 189/18 192/14 192/18 192/20 217/18
statement [39] 183/11 190/5 195/13 195/16 196/7 197/21 197/21 199/9 199/20 200/3 202/17 210/11 211/10 211/19 212/16 213/22 213/23 214/1 215/21 217/25 218/11 218/14 218/15 218/20 219/23 220/21 221/14 222/11 222/12 224/21 224/21 226/10 226/10 226/15 230/1 230/7 238/25 254/15 254/17
statements [12] 191/2 197/17 200/10 201/24 207/18 207/24 208/3 212/19 216/22 226/11 226/13 226/16
Station [1] 202/15
status [1] 248/7
stayed [1] 230/10
step [1] 180/9
stepped [1] 186/25
steps [1] 245/23
Stieglitz [2] 258/2 258/13
still [6] 181/20 185/17 199/18 205/14 209/24 214/16
stop [4] 203/6 213/25 230/20 230/24
stopped [6] 196/8 204/2 205/1 231/18 249/16 250/16
story [7] 216/6 218/3 218/23 219/22 220/22 220/23 221/10
straight [1] 194/7
street [12] 195/3 195/4 203/13 205/23 208/21 224/13 224/15 224/17 247/8 247/19 250/2 250/15
strikes [1] 179/15
struggling [1] 209/14
STUDDERT [2] 175/16 176/3
stuff [1] 179/2
Subdivision [3] 233/10 242/21 242/24
subjective [1] 190/10
submissions [1] 255/3
Subscribed [1] 256/14
substance [1] 227/19
Suffolk [18] 182/16 213/19 231/22 215/14 215/22 215/23 216/5 216/20 216/21 218/1 218/9 218/12 218/21 219/20 219/24 220/6 221/2 224/1
suggesting [1] 190/8
SUICIDE [3] 176/15
support [1] 220/23
Supposed [5] 236/5 246/19 246/25 246/25 247/12
supposedly [1] 210/24
sure [12] 180/3 182/6 196/23 198/11 200/6 200/19 204/21 209/23 217/7 230/2 241/17 241/22
suspect [6] 215/24 215/25 218/22 219/4 255/4 255/6
suspects [1] 218/19

suspicion [1] 256/2
sustain [1] 183/14
Sustained [2] 252/5 253/6
sworn [2] 256/6 256/14

**T**

TAGGART [2] 176/22 177/12
take [11] 178/23 180/12 180/25 182/10 182/20 183/1 191/10 210/3 213/9 214/10 226/1
taken [7] 193/1 193/5 193/7 193/12 214/13 221/14 258/4
taking [2] 211/19 218/10
talk [5] 204/20 220/14 222/8 228/23 236/25
talked [3] 193/18 214/6 241/25
talking [3] 198/8 237/5 243/23
TARA [2] 176/21 177/18
taxi [5] 215/1 224/4 224/23 228/16 229/1
taxicab [1] 230/16
team [3] 182/14 182/15 222/2
tell [10] 192/12 192/25 200/9 203/3 205/20 207/3 207/10 208/6 238/13 244/22
telling [3] 198/22 199/16 220/6
ten [1] 214/10
ten-minute [1] 214/10
term [1] 188/22
terms [1] 241/28
testified [4] 223/16 225/1 234/20 245/8
testifying [1] 214/16
testimony [9] 192/1 222/1 223/4 225/10 225/16 241/10 252/6 253/25 258/4
than [5] 184/24 207/21 210/21 223/16 252/22
Thank [3] 214/18 241/5 256/5
Thanks [1] 181/3
that [355]
that's [38] 180/1 182/12 183/11 183/16 184/21 184/22 184/23 186/17 189/4 189/14 190/3 192/5 195/8 196/12 200/23 201/16 202/6 202/13 203/13 203/17 203/22 204/2 204/24 205/24 206/18 208/16 209/1 209/3 211/6 215/15 216/16 222/6 222/17 227/9 237/19 242/17 244/3 247/3
their [18] 197/7 199/4 199/13 199/16 207/17 216/22 217/19 222/3 225/4 233/15 233/17 242/14 242/6 242/19 242/23 246/20 248/7 254/13
them [28] 181/11 186/16 186/19 193/18 195/11 198/22 199/2 201/22 203/4 205/13 208/1 212/5 220/16 226/20 228/23 229/16 239/8 250/17 258/17 254/12
then [32] 182/17 183/2 184/11 185/24 194/19 194/20 195/19 196/2 196/10 197/12 201/22 202/9 202/12 203/12 203/13 204/18 204/24 204/25 206/8 208/16 208/1 208/12 208/23 209/11 213/20 214/10 229/7 230/20 230/25 231/7 231/11 231/19 236/4 248/19 253/12 254/5
theory [1] 240/16
there [68] 178/16 179/4 183/5 186/19 187/14 189/7 189/8 190/8 190/10 190/19 191/1 193/15 193/17 194/14 194/15 195/2 195/5 196/8 196/23 198/23 199/17 200/6 201/14 205/6 207/19 207/24 208/2 213/25 215/18 216/8 216/19 217/18 217/20 217/20 220/15 220/16 228/10 228/21 223/19 224/10 224/13 224/17 224/20 224/25 226/14 226/14 228/5 229/16 229/23 230/6 230/9 236/17 236/22 237/11 237/13 241/12 241/22 242/10 244/15 245/10 245/5 247/6 251/2 252/7 252/9 253/10 253/25
there's [2] 186/19 207/8
thereafter [1] 196/15
these [4] 233/6 237/13 241/20 243/23

**T**

they [63]  186/18 187/18 188/18 188/20 196/23 197/8 197/9 198/23 198/24 199/3 199/6 199/10 199/12 199/17 199/18 205/14 207/8 207/10 207/13 207/14 207/16 207/21 207/25 208/19 211/25 212/3 212/5 212/3 212/5 212/12 212/16 216/3 216/4 216/23 217/25 218/14 218/23 219/22 219/23 220/25 221/1 221/4 221/5 221/6 221/17 221/8 221/10 221/11 222/3 222/3 222/4 228/9 228/24 228/24 236/4 238/10 243/20 243/20 244/22 248/7 248/24 248/25 252/8 they're [9]  183/23 186/21 188/16 195/3 205/12 205/14 218/10 218/11 229/11 thing [3]  208/9 214/24 250/5 things [10]  182/4 183/23 184/5 193/15 193/16 242/10 243/6 243/23 245/11 246/24 think [20]  178/18 181/7 190/5 190/18 191/1 193/16 206/20 210/20 210/22 211/5 220/5 222/6 222/7 223/23 223/24 244/7 250/18 250/20 251/11 251/12 thinks [2]  189/2 227/21 THIRD [1]  176/23 this [76]  177/1 178/15 179/7 181/1 181/7 181/25 182/1 182/11 182/21 183/2 184/2 185/2 186/1 187/15 187/15 190/21 192/1 193/19 194/13 194/14 195/7 197/1 197/22 199/22 200/13 210/16 210/18 211/10 214/1 216/25 221/24 223/5 224/8 228/21 224/1 229/9 229/13 229/21 231/9 231/12 231/22 232/12 232/20 233/22 234/5 235/2 235/10 235/13 235/19 236/25 237/17 237/8 237/12 237/14 237/19 238/23 241/12 244/25 244/27 243/4 243/9 243/23 244/3 244/8 245/2 245/15 246/18 247/20 248/10 250/1 250/12 250/15 251/19 252/21 254/15 258/8 Thomas [1]  225/11 those [10]  177/9 187/10 191/2 200/8 211/16 212/14 225/17 226/12 227/2 240/25 though [2]  205/16 230/23 thought [5]  185/17 219/2 227/20 253/8 253/13 threat [9]  196/9 229/19 229/23 229/25 230/7 246/23 247/5 247/6 247/11 three [2]  208/22 240/8 through [7]  183/5 189/4 199/13 200/13 229/6 245/23 253/6 time [37]  180/10 183/2 183/17 185/24 189/9 190/4 190/12 194/6 196/4 197/13 199/22 202/12 204/5 204/7 208/16 211/3 212/11 215/23 216/3 216/4 216/8 220/4 226/25 223/1 221/11 221/13 221/14 222/3 228/21 232/12 241/14 242/16 247/17 247/13 247/25 249/7 252/21 times [4]  184/1 197/10 231/7 234/14 today [4]  178/8 180/15 252/22 254/21 told [25]  178/21 187/25 188/3 189/12 189/15 190/16 191/22 192/15 193/5 193/17 193/12 196/25 197/13 197/20 198/13 198/15 202/20 209/13 212/3 230/1 231/1 239/9 240/16 254/8 254/12 Tour [2]  225/21 232/6 too [3]  243/18 took [13]  183/11 185/3 185/10 191/14 192/17 193/17 196/16 211/11 217/25 218/14 219/22 219/23 225/10 touched [2]  222/7 toward [7]  187/20 204/16 205/22 208/21 210/1 229/2 230/7 towards [4]  188/6 195/19 199/24 229/24 traffic [2]  195/5 201/14 train [1]  236/4

trained [6]  186/13 186/15 186/21 234/8 234/13 248/6 training [6]  186/17 234/11 234/14 234/16 235/7 241/19 transcription [1]  258/7 travel [7]  205/25 206/2 206/3 207/1 230/17 249/15 250/16 tried [4]  187/1 243/6 212/9 231/13 trouble [1]  210/6 true [15]  189/11 192/5 200/8 200/23 201/7 201/16 202/1 203/14 203/17 205/24 212/13 212/14 212/22 224/2 224/9 224/25 249/15 249/25 TRUSTEE [1]  176/23 truth [1]  220/6 try [3]  197/10 198/2 254/8 trying [21]  183/2 186/16 187/2 187/5 187/6 189/12 189/16 190/8 190/9 190/18 190/23 195/14 197/1 199/23 214/22 222/16 248/24 248/25 251/17 254/8 turn [9]  194/21 194/22 194/24 195/14 195/20 222/24 228/25 231/16 254/9 twice [1]  234/14 two [8]  203/16 205/11 211/14 225/12 225/12 229/16 234/14 255/7 type [2]  179/2 226/4

**U**

u-turn [9]  194/21 194/22 194/24 195/14 195/20 222/24 228/25 230/14 254/9 ultimately [1]  223/5 uncommon [1]  183/22 under [8]  181/20 209/17 209/18 214/16 213/4 219/8 231/10 238/10 understand [4]  179/21 225/17 229/24 246/6 understanding [1]  222/22 222/23 225/21 237/18 245/9 246/13 246/13 understood [1]  216/19 unfamiliar [1]  193/25 unfolded [1]  228/5 uniform [4]  233/4 233/16 242/5 243/9 Uniforms [1]  243/6 unit [2]  235/7 240/6 unlawful [1]  193/20 unless [3]  218/11 240/13 240/13 unlock [1]  231/5 unobstructed [1]  185/16 unquote [1]  230/18 until [1]  191/6 up [49]  178/11 180/12 180/25 181/10 182/1 185/24 186/10 190/10 190/25 193/22 194/10 194/14 194/19 194/20 195/18 195/25 202/9 202/19 202/24 203/9 204/13 206/15 206/19 206/24 207/1 207/3 207/9 207/9 217/11 218/12 212/12 212/25 213/17 223/15 224/5 227/24 228/13 229/1 229/5 229/20 230/13 232/13 237/7 247/17 247/20 249/15 249/25 250/22 250/23 upon [3]  207/5 210/14 228/13 us [4]  195/24 207/10 235/4 251/17 use [14]  188/17 188/21 188/23 188/24 233/14 233/17 233/23 234/6 234/8 237/20 237/25 238/9 242/3 242/6 242/19 used [3]  189/3 242/19 252/18 utter [21]  215/8 240/14

**V**

vehicle [24]  185/22 186/6 187/19 192/16 194/11 194/18 205/1 205/6 208/18 224/5 228/7 228/15 228/17 228/19 229/1 229/7 229/13 229/24 229/15 230/16 230/18 230/20 230/24 231/16 vehicles [1]  206/4 verbal [4]  228/13 228/16 229/2 250/21

verified [1]  201/11 verify [1]  201/2 version [8]  216/5 218/2 218/22 219/22 220/22 220/23 221/10 227/5 versions [1]  221/22 verses [1]  234/20 victim [8]  218/19 219/24 211/1 211/4 211/6 211/8 215/24 218/22 victims [1]  218/19 view [5]  185/16 207/11 220/17 234/12 229/6 violated [1]  241/23 violating [2]  233/6 242/11 violent [4]  183/20 183/24 246/3 246/20 virtue [1]  231/9 vision [1]  224/11

**W**

waire [1]  212/4 walk [2]  229/24 230/6 walking [4]  204/16 229/22 230/8 230/16 want [12]  182/5 183/5 191/25 199/21 206/12 210/15 213/14 215/1 223/1 241/14 243/22 210/16 213/14 215/1 223/1 241/14 243/22 wanted [7]  178/3 192/14 194/6 209/5 214/25 236/10 238/5 was [225] wasn't [10]  194/11 195/2 201/15 209/23 223/17 227/18 244/20 245/18 247/13 252/10 watching [1]  223/5 way [6]  195/6 202/3 213/4 214/6 240/25 243/22 we [35]  177/2 178/2 179/22 180/11 181/10 181/20 186/13 190/2 193/15 193/25 195/24 196/25 200/13 206/9 206/13 206/23 206/24 207/19 209/14 214/5 214/6 214/14 214/24 214/1 214/24 216/13 219/2 221/21 235/23 237/14 237/8 239/16 241/25 254/20 254/21 254/22 we'll [1]  183/3 we're [5]  178/7 181/1 216/15 227/23 227/24 weapon [26]  197/10 192/13 192/15 192/20 196/9 196/13 230/2 230/23 231/4 232/9 233/24 234/5 234/9 234/11 234/15 234/18 234/19 234/20 235/7 235/13 235/21 237/22 242/7 244/14 244/8 245/16 weapons [11]  234/6 235/2 235/3 235/9 236/10 236/18 236/19 236/23 238/3 238/6 238/9 week [1]  201/9 weight [1]  226/21 well [17]  177/23 187/17 187/24 189/12 192/6 197/22 199/12 203/3 205/11 211/5 213/7 213/25 218/9 242/14 242/17 246/15 254/3 went [12]  184/11 194/19 196/7 196/25 203/9 205/9 209/24 210/1 212/12 224/18 245/23 were [56]  184/14 194/15 198/13 198/15 188/22 198/24 199/2 199/12 199/17 199/18 200/8 201/25 206/4 207/24 207/25 208/17 208/19 209/14 211/25 214/25 215/14 215/19 216/3 216/4 217/18 217/20 217/20 218/12 219/5 219/9 220/25 223/3 223/14 224/7 224/13 224/20 224/20 225/3 225/9 225/11 225/16 225/18 225/20 226/2 226/4 226/8 226/9 226/10 226/14 227/2 228/10 228/23 251/22 252/8 weren't [2]  196/23 199/6 Wessan [3]  232/10 233/18 237/19 west [3]  202/15 203/12 203/12 westbound [1]  202/14 what [73]  177/24 186/24 187/9 189/4 189/14 197/8 197/9 200/4 206/1 206/20 207/20 208/14 209/1 209/3 211/3 212/6 212/8

**W**

**what__** [50]  213/12 213/20 215/15 216/11 217/12 217/15 217/23 217/24 218/5 218/8 219/18 228/9 220/11 221/4 221/13 221/13 221/15 222/14 225/17 226/4 226/24 227/4 227/5 227/8 227/16 227/21 228/4 229/10 232/24 233/2 233/9 234/23 236/6 236/15 238/25 239/25 240/3 244/3 244/5 244/5 244/6 245/8 246/10 248/2 248/24 251/4 251/11 251/11 254/2 254/22

**what's** [2]  218/14 222/21

**whatever** [2]  184/14 199/20

**when** [43]  180/11 181/1 185/20 186/15 189/10 191/2 191/3 191/10 192/18 196/8 196/12 198/12 205/1 205/2 205/6 206/12 208/15 208/16 210/1 211/2 212/21 215/5 215/16 216/8 216/19 218/10 226/4 226/12 221/20 223/2 224/8 225/11 225/16 225/20 226/1 228/2 229/13 231/18 241/14 242/22 244/25 246/3 248/6

**where** [23]  183/14 183/16 185/2 202/19 202/19 206/4 206/9 206/10 206/13 206/24 207/5 207/9 207/10 212/12 223/5 228/7 238/2 244/7 244/15 246/22 247/15 250/8 254/12

**WHEREOF** [1]  258/8

**Whereupon** [2]  214/12 256/8

**whether** [13]  186/5 190/2 190/2 196/20 200/7 204/22 205/3 210/12 213/3 214/2 252/12 252/19 253/15

**which** [16]  178/9 180/6 180/7 200/10 206/16 210/14 216/14 224/14 228/6 228/17 228/19 230/16 231/1 235/3 235/3 254/2

**while** [2]  189/19 213/13

**white** [13]  185/12 200/22 202/9 202/24 203/3 203/20 203/21 204/1 204/3 204/14 204/15 205/23 208/22

**who** [30]  183/19 186/10 192/25 197/13 197/15 197/16 198/11 198/23 203/21 204/2 205/23 208/21 210/18 224/4 231/16 235/19 240/5 241/12 246/23 246/23 246/24 247/8 247/20 248/17 250/16 250/17 252/9 252/10 254/8 254/12

**whoever** [1]  198/20

**whole** [1]  231/22

**whose** [3]  216/22 218/22 223/10

**why** [18]  194/24 195/1 214/9 216/1 219/6 219/6 219/12 219/16 219/20 219/24 222/22 229/24 232/2 238/21 239/9 239/13 240/12 240/16

**wife** [3]  229/10 250/11 250/11

**will** [11]  177/24 179/6 180/24 213/16 228/1 239/20 254/20 254/21 255/4 255/6 256/2

**WILLIAM** [2]  176/23 177/17

**window** [17]  184/12 185/1 185/2 189/10 189/19 190/6 191/7 191/7 203/19 207/11 208/16 209/12 209/12 231/4 231/5 250/22 250/23

**windows** [1]  229/5

**withdraw** [2]  178/4 222/9

**within** [2]  237/4 237/5

**without** [4]  195/1 195/22 221/23 256/3

**witness** [16]  178/3 181/5 181/7 186/1 197/22 197/24 208/3 216/14 217/1 219/11 230/18 232/22 239/17 240/1 251/19 258/8

**witnessed** [1]  183/19

**witnesses** [11]  182/11 183/22 191/21 191/23 191/24 207/18 212/10 221/7 255/3 255/6 256/3

**won't** [1]  255/5

**word** [6]  188/23 204/24 218/3 234/6 235/23 252/17

**work** [2]  178/21 240/14

**working** [2]  200/25 201/8

**works** [1]  179/10

**would** [31]  178/9 178/23 179/18 185/13 185/25 186/11 187/7 187/9 188/9 197/14 197/18 197/20 200/9 206/16 213/7 229/24 230/6 232/21 236/15 236/20 236/24 238/6 238/21 240/3 241/2 244/16 250/4 250/8 250/14 250/20 251/12

**wouldn't** [2]  213/9 251/13

**written** [3]  200/14 211/10 218/20

**wrong** [10]  183/23 184/5 200/14 208/6 210/23 211/19 212/12 253/15 254/4 254/5

**wrote** [1]  212/6

**Y**

**Yeah** [1]  178/1

**yelled** [2]  203/20 204/15

**yelling** [5]  203/24 204/14 231/10 249/16 250/2

**yes** [181]

**yesterday** [5]  193/18 203/22 237/8 241/10 241/25

**yet** [2]  180/15 255/5

**YORK** [8]  175/2 175/9 176/8 176/16 202/13 228/6 258/4 258/16

**you** [240]

**you'll** [1]  180/21

**you're** [7]  187/22 190/8 191/20 191/24 200/4 200/10 204/22

**you've** [2]  195/23 213/9

**your** [37]  178/20 180/15 182/14 182/18 182/23 183/1 190/21 191/10 198/16 206/22 210/3 211/6 212/17 213/10 215/2 215/2 215/3 218/24 219/18 219/20 222/22 225/11 225/17 227/9 227/16 231/23 234/1 237/7 237/18 238/18 239/12 239/19 239/23 240/20 241/10 244/5 253/18

**yourself** [1]  213/10

Case 2:12-cv-00512-JFB-AKT   Document 264-44   Filed 07/27/18   Page 304 of 366 PageID #: 8484

DISTLER                    259

1    - - - - - - - - - - - - - - - - - X

2    IN THE MATTER OF THE CLAIM OF

3    POLICE DEPARTMENT

4    COUNTY OF NASSAU, NEW YORK            COPY

5

6            CLAIMANT,

7                        CASE NO. 8118
                         CHARGES SPECIFICATION

8        AGAINST

9    ANTHONY DILEONARDO

10   POLICE OFFICER, SERIAL NO. 9013

11            RESPONDENT.

12   - - - - - - - - - - - - - - - - - X

13   NASSAU COUNTY POLICE DEPARTMENT HEADQUARTERS

14        1490 FRANKLIN AVENUE

15        MINEOLA, NEW YORK 11501

16        MARCH 19, 2014

17        10:00 A.M.

18

19

20   CONTINUANCE

21   INSPECTOR MICHAEL STUDDERT, HEARING OFFICER

22

23

24

25

NORTH SHORE COURT REPORTERS 1-800-794-5342

DISTLER                    260

1                A P P E A R A N C E S:

2

3        POLICE DEPARTMENT ATTORNEY

4        ATTORNEY OR THE CLAIMANTS

5        1490 FRANKLIN AVENUE

6        MINEOLA, NEW YORK  11501

7        BY: LESLI HILLER ESQ.

8

9        BARKET MARION EPSTEIN & KEARON, LLP

10       ATTORNEYS FOR THE RESPONDENTS

11       666 OLD COUNTRY ROAD

12       GARDEN CITY, NEW YORK  11530

13       BY: BRUCE BARKET ESQ.

14

15   ALSO PRESENT:

16

17   SERGEANT ISRAEL SANTIAGO COMMANDING OFFICER,

18   LEGAL BUREAU

19   DETECTIVE CHRISTOPHER F. BELLISTRI,

20   LEGAL BUREAU

21   KAREN TAGGART ESQ.  POLICE DEPARTMENT ATTORNEY,

22   LEGAL BUREAU

23   PSA JOANNE DELORENZO, LEGAL BUREAU

24

25

DISTLER                261

1          HEARING OFFICER STUDDERT: This hearing

2     is now in session. Let the record reflect that

3     Officer Dileonardo's PBA Rep was given ample

4     time to appear.

5          He had prior notice of the hearing and

6     everyone was present at 10:00 and it is now

7     11:10 and he still did not come. We're going to

8     continue. Officer Dileonardo is present here

9     with his attorney.

10          For the record, we're just going to go

11     around and state who's here.

12          MS. HILLER: Lesli Hiller for the

13     Nassau County Police Department Legal Bureau.

14          MR. SANTIAGO: Detective Sergeant

15     Israel Santiago, Commanding Officer of Legal

16     Bureau.

17          MR. BELLISTRI: Detective Christopher

18     Bellistri, Legal Bureau.

19          MS. DELORENZO: Joanne Delorenzo, Legal

20     Bureau.

21          MS. TAGGART: Karen Taggart, Legal

22     Bureau.

23          MR. BARKET: Bruce Barket, I'm tempted

24     to say Legal Bureau, but I'm here for Officer

25     Dileonardo.

DISTLER                      262

1          I would just like to point out that I

2     thought that we received a phone call from the

3     PBA Representative who had an emergency with

4     his daughter and is expected to be here within

5     a half an hour, 45 minutes of when he called

6     about a half hour ago.

7          HEARING OFFICER STUDDERT: Off the

8     record.

9          ( Whereupon, a discussion was held off

10    the record.)

11         HEARING OFFICER STUDDERT: Let the

12    record reflect that Officer Percell is present.

13         Just state your full name for the

14    record, please.

15         MR. PURCELL: William Purcell,

16    P-U-R-C-E-L-L.

17         HEARING OFFICER STUDDERT: He's a PBA

18    Representative for Officer Dileonardo.

19         I just want everyone to remember that

20    this is an administrative hearing. This is not

21    a criminal trial nor a civil trial and this is

22    a normal course of the meeting.

23         Where are we at now with the hearing?

24         MS. HILLER: I just want to put on the

25    record, that at this point my understanding is

DISTLER                          263

1    that, Mr. Barket would like to recall Detective

2    Sergeant Distler, who is still on my case, I

3    guess, I think we're probably on somewhere in

4    re-recross or something to that effect.

5             MR. BARKET: I don't know the matter of

6    how we characterize it, but I have a few

7    questions.

8             HEARING OFFICER STUDDERT: Call in

9    Sergeant Distler, please.

10            Okay. Sergeant Distler, you're still

11   under oath and Mr. Barket is going to have some

12   more questions.

13   EXAMINATION BY MR. BARKET:

14       Q.   Good morning.

15       A.   Good morning.

16       Q.   I just have a couple of questions

17   about your experience. I forget, how long were

18   you a police officer?

19       A.   28 years, almost 29.

20       Q.   And you spent the last three and a

21   half in Internal Affairs?

22       A.   October of 2010.

23       Q.   And where were you assigned before

24   that?

25       A.   Chief of Patrol's Office.

DISTLER                    264

1          Q.   What role did you have there?

2          A.   I was the Sergeant. I worked

3     underneath four Chiefs and basically whatever

4     they needed done.

5          Q.   How long did you hold that position?

6          A.   Three years.

7          Q.   I take it, that was a job here in

8     Headquarters?

9          A.   Yes.

10         Q.   And you worked out of Headquarters?

11         A.   Yes.

12         Q.   Did you conduct investigations, field

13    interviews, patrols, during that time?

14         A.   No, field interviews; investigations,

15    minimally.

16         Q.   How about before that?

17         A.   From 1995 until 2007, I worked at the

18    Court Liaison Office.

19         Q.   Did you work in the courthouse?

20         A.   Yes.

21         Q.   Brings back memories, but you were the

22    person- You actually worked at the County Court

23    or District Court?

24         A.   District Court.

25         Q.   So you were in charge of making sure

DISTLER                265

1    officers showed up to testify?

2        A.   Amongst other things, there were many

3    duties. That was one of the duties.

4        Q.   And you worked in the courthouse

5    everyday, I take it?

6        A.   Yes.

7        Q.   So there were no field interviews, no

8    patrols, no investigations; you dealt with the

9    DA's office and the police department?

10       A.   For the most part, yes.

11       Q.   And trying to get back 28 years, you

12   have another eight years or so before that,

13   where did you work before that?

14       A.   I started out my career in the

15   1st Precinct. I worked for a period in the

16   Narcotics Bureau and I worked in the Community

17   Projects Bureau for a year.

18       Q.   Community what?

19       A.   Community Projects Bureau.

20       Q.   So you were a police officer in the

21   1st Precinct?

22       A.   Yes.

23       Q.   And when did you start?

24       A.   1985.

25       Q.   And you said that you worked in

DISTLER                266

1    Narcotics?

2        A.  Yes.

3        Q.  For how long did you work in

4    Narcotics?

5        A.  About nine months.

6        Q.  In an investigative capacity,

7    undercover capacity; what did you do for

8    Narcotics?

9        A.  Both; undercover, investigative.

10       Q.  And that was, I guess, between 1985

11   and when?

12       A.  1987.

13       Q.  Okay.  And then you worked in the

14   Community Projects, what was that?

15       A.  Community Projects, I did what we

16   called at the time, the PRIDE Program, which

17   was like the DARE Program, where we would go

18   into the schools.

19       Q.  Did that have an investigative

20   component to it or community relations?

21       A.  No, community relations.

22       Q.  I guess that's two years, so for the

23   other eight years or so you were on patrol in

24   the 1st Precinct.

25       A.  Yes.

DISTLER                           267

1      Q.   And when were you promoted to

2   Detective Sergeant?

3      A.   In April of 2011.  That's a

4   designation.

5      Q.   It's a designation, in other words,

6   explain the difference between designation--

7      A.   I got promoted to Sergeant in 1995 and

8   when the detective is not a promotional exam

9   it's a designation, you get designated

10  Detective.

11     Q.   In the course of your career, how many

12  police shootings have you investigated?

13     A.   On what level?

14     Q.   Where you were the lead or co-lead

15  investigator of a shooting that involved a

16  police officer firing his weapon?

17     A.   I didn't investigate this incident as

18  a police shooting.

19     Q.   I didn't ask that?

20     A.   Okay.

21     Q.   How many police shootings have you

22  investigated?

23     A.   As the lead investigator?

24     Q.   Yes.

25     A.   None.

DISTLER                    268

1        Q.   Do you have any specialized training

2   in the use of deadly force by police officers

3   other than at the academy?

4        A.   No.

5             MR. BARKET: I don't have any further

6   questions.

7             HEARING OFFICER STUDDERT: Ms. Hiller,

8   do you have anything?

9             MS. HILLER: Yes, please. I have just a

10  couple with respect to Bruce's questions.

11  EXAMINATION BY MS. HILLER:

12       Q.   You testified a few minutes ago that

13  you were the Chief of Patrol.

14       You were there for how many years, three?

15       A.   Approximately three years.

16       Q.   What commands does Chief of Patrol

17  supervise or oversee?

18       A.   All the precincts, Bureau of Special

19  Operations, Highway Patrol, Emergency Ambulance

20  Bureau. There's probably a few that I'm not-

21  That I'm missing.

22       Q.   Is Highway one of them?

23       A.   Highway is one.

24       Q.   Is Tactical Services one of them?

25       A.   It's called Tactical Services now, it

1   was Bureau of Special Operations then.

2         Emergency services is a part of Highway.

3   I'm not even sure where they fit on the

4   organizational chart right now, but at the time

5   they were a part of Highway.

6         Q.   So they oversee multiple units?

7         A.   Yes.

8         Q.   With respect to the incident on

9   February 27, 2011, were you assigned to

10  investigate the shooting?

11        A.   No.

12        Q.   What were you assigned to do?

13        A.   To investigate the officers for any

14  violations of the rules and regulations.

15        Q.   Okay. I have no further questions.

16             HEARING OFFICER STUDDERT: Did you want

17  to recross?

18             MR. BARKET: No.

19             HEARING OFFICER STUDDERT: Okay. The

20  witness is excused. Call your next witness.

21             MR. BARKET: I'm going to move strike

22  all of the opinion testimony from Detective

23  Sergeant Distler. She has no experience or

24  expertise to offer an opinion in any capacity.

25             All of that opinion testimony is utter

NORTH SHORE COURT REPORTERS 1-800-794-5342

DISTLER                    270

1   speculation. We just as easily could have

2   called in someone from off the street and asked

3   them what they thought, and that individual's

4   opinion would be just as valuable as hers.

5           To have that on the record, I think,

6   transforms whatever this proceeding is into

7   something that is significantly less than the

8   due process of Officer Dileonardo and should be

9   avoided.

10          HEARING OFFICER STUDDERT: Okay. I deny

11  your motion. I'll give it the weight it's due.

12          MR. BARKET: Then, I'm going to ask for

13  an opportunity to call an expert ourselves who

14  has actually investigated police shootings and

15  is trained on the proper use of deadly physical

16  force by police officers.

17          Once the hearing began, I realized

18  that we weren't going to just deal with the

19  facts and argue from there that Officer, excuse

20  me, Detective Sergeant Distler's opinion was

21  going to be taken into account.

22          I began to look at the calling of an

23  expert ourselves to review the matter and to

24  testify.

25          There are several experts that our

1    office have used on other matters and we made

2    contact with the union to see if the union

3    would pay for that.

4         I'm told that they want a definitive

5    number and it is possible they will pay for it,

6    so I'm going to ask for a reasonable

7    adjournment to call an expert to testify about

8    this.

9         HEARING OFFICER STUDDERT: I'm going to

10    deny your request. You've had ample time to

11    bring in a witness here.

12         I've actually heard enough where I can

13    make a decision regarding whether Officer

14    Dileonardo violated the rules and regulations

15    of the Nassau County Police Department.

16         MR. BARKET: Okay. I would think that

17    you would take an exception to that.

18         No disrespect to you, Inspector, but

19    you've allowed opinion testimony from somebody

20    who is obviously not an expert and you're

21    prohibiting us from calling an expert.

22         HEARING OFFICER STUDDERT:  The record

23    is noted with your objection.

24         MR. BARKET: Okay. We don't have any

25    other witnesses.

DISTLER                    272

1          HEARING OFFICER STUDDERT: Excuse me.

2          ( Whereupon, a discussion was held off

3    the record.)

4          HEARING OFFICER STUDDERT:  No more

5    witnesses on either side?

6          MS. HILLER: No.

7          HEARING OFFICER STUDDERT: Okay. With

8    this no additional witnesses being called at

9    this time, I'm directing that both parties

10   provide me with any additional submissions by

11   Wednesday, March 26.

12          When you do, please provide the

13   closing Counsel with copies of anything that is

14   provided.

15          Any additional briefs that you might

16   want to submit, needs to be exchanged

17   simultaneously between the parties on

18   Wednesday, April 2nd and to me.

19          Who should they submit those through?

20          MR. SANTIAGO: To the Legal Bureau.

21          MS. HILLER: So just to be clear, I'm

22   not really certain on what your March 26 date

23   is for, Inspector.

24          HEARING OFFICER STUDDERT:  If there's

25   any additional briefs that you might want to

**DISTLER**          273

1   submit that you want me to consider in reaching

2   my decision.

3          MS. HILLER: Would it be easier if

4   those submissions were made as an attachment to

5   our briefs or- I'm not really--

6          MR. BARKET: My sense is--

7          HEARING OFFICER STUDDERT: Yeah, those

8   would come in first and then, your briefs would

9   be separate and you have ten days for those.

10         MR. BARKET: If we submit something,

11  we're going to want to change that first and

12  then have a week after that.

13         The only thing is that, that schedule

14  is fine, provided that we have a transcript for

15  the proceedings prior with enough time in

16  advance to review them, sign to them, and

17  prepare them with the briefs.

18         If we're not going to get the minutes

19  until April 1st then I'm not going to be able

20  to prepare a written submission by April 2nd.

21         HEARING OFFICER STUDDERT: What do you

22  have to say?

23         MS. HILLER: I would like the benefit

24  of the brief out of the transcript as well.

25         I don't know if we can get a time

1  frame of when the transcripts are available

2  from the Court Reporter. Is that possible?

3          ( Whereupon, a discussion was held off

4  the record.)

5          HEARING OFFICER STUDDERT:  We're going

6  to go back on the record at this point.

7          After clarifying that we're going to

8  stay with the additional submissions by next

9  Wednesday, which is the 26, for additional

10  submissions.

11          The briefs, they will be due ten days

12  after the transcripts are available to you.

13          MR. BARKET: So no earlier than April

14  2nd?

15          HEARING OFFICER STUDDERT:  Correct.

16          MR. BARKET: Okay.

17          HEARING OFFICER STUDDERT: Now, before

18  we go on, does anyone have anything further

19  that they want bring into the record?

20          Any closing statement that you want to

21  make, Mr. Barket?

22          MR. BARKET: No, we'll stick with the

23  written submissions.

24          HEARING OFFICER STUDDERT: Ms. Hiller?

25      (Testimony continues to include Jurat.)

DISTLER                    275

1        MS. HILLER: That's fine with me.

2            HEARING OFFICER STUDDERT:  We're going

3    to close this hearing for today and the hearing

4    remains open until we receive the transcript

5    and those submissions. Okay?

6            And after receiving the briefs, I will

7    review the testimony, evaluate the evidence and

8    contemplate the arguments made in your briefs,

9    thereafter, I will prepare a memo to the

10   Commissioner Police reflecting my findings and

11   any recommendations, if necessary. Okay?

12       MR. BARKET: Okay.

13       MS. HILLER: Thank you.

14       ( Whereupon, the examination of the

15   witness was concluded Time noted:  11:38 a.m.)

16

17   _____

18       SGT. JO-ANN DISTLER

19

20   SUBSCRIBED AND SWORN BEFORE ME THIS_____ DAY

21   OF _____, 2014.

22

23

24   _____

25       Notary Public

DISTLER                    276

```
1                    I  D E X   P A G E

2    EXAMINATION OF SGT. JO-ANN DISTLER

3    BY MR. BARKET: PAGES  263 TO 268

4

5    EXAMINATION OF SGT. JO-ANN DISTLER

6    BY MS. HILLER: PAGES 268 TO 269

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                CERTIFICATE BY COURT REPORTER

2       I, SHATAVIA E. SANDERS, a Professional

3    Court Reporter and Notary Public in and for the

4    State of New York do hereby certify that the

5    foregoing testimony taken in the matter of the

6    claim of Police Department County of Nassau,

7    New York against Anthony Dileonardo Police

8    Officer, Serial No. 9013, consisting of pages

9    259 through 275 is an accurate transcription of

10   my cryptic notes.

11   IN WITNESS WHEREOF, I SET MY HAND THIS DAY.

12

13   ---------------------------------------------

14       SHATAVIA E. SANDERS

15       PROFESSIONAL COURT REPORTER

16       NORTH SHORE COURT REPORTERS

17       NOTARY PUBLIC - STATE OF NEW YORK

18

19

20

21

22

23

24

25

DEPARTMENT

--

**A**

ABLE (273:19)
ACADEMY (268:3)
ACCOUNT (270:21)
ACCURATE (277:9)
ACTUALLY (264:22)
(270:14) (274:12)
ADDITIONAL (272:8)
(272:10) (272:15)
(272:25) (274:8) (274:9)
ADJOURNMENT (271:7)
ADMINISTRATIVE
ADVANCE (273:16)
AFFAIRS (263:23)
AFTER (273:13) (274:7)
(274:12) (275:6)
AGAINST (259:8) (277:7)
AGO (262:6) (268:12)
ALL (268:18) (269:22)
(269:25)
ALLOWED (271:19)
ALMOST (263:19)
ALSO (260:15)
AMBULANCE (268:19)
AMONGST (265:2)
AMPLE (261:3) (271:10)
ANOTHER (265:12)
ANTHONY (259:9) (277:7)
ANY (268:11) (268:5)
(269:13) (269:24)
(271:24) (272:10)
(272:15) (272:25)
(274:20) (275:11)
ANYONE (274:18)
ANYTHING (260:8)
(272:23) (274:18)
APPEAR (261:4)
APPROXIMATELY (268:15)
APRIL (267:3) (272:18)
(273:19) (273:20)
(274:11)
ARE (262:23) (270:25)
(274:1) (274:12)
ARGUE (270:19)
ARGUMENTS (275:8)
AROUND (261:11)
ASK (267:19) (270:12)
(271:6)
ASKED (270:2)
ASSIGNED (263:23)
(269:9) (269:12)
ATTACHMENT (273:4)
ATTORNEY (260:3)
(260:4) (260:21) (261:9)
ATTORNEYS (260:10)
AVAILABLE (274:1)
(274:12)
AVENUE (259:14) (260:5)
AVOIDED (270:9)

**B**

BACK (264:21) (265:11)
(274:6)
BARRET (260:9)
(260:13) (261:23)

(263:1) (263:5) (263:11)
(263:13) (268:5)
(269:56) (269:22)
(270:12) (271:16)
(271:24) (273:6)
(273:10) (274:13)
(274:16) (274:21)
(274:22) (275:12) (276:3)
BASICALLY (264:3)
BEFORE (263:23)
(264:16) (265:12)
(265:13) (274:17)
(275:20)
BEGAN (270:17) (270:22)
BEING (272:8)
BELLISTRI (260:19)
(261:17) (261:18)
BENEFIT (273:23)
BETWEEN (266:10)
(267:6) (272:17)
BOTH (266:9) (272:9)
BRIEF (273:24)
BRIEFS (272:15)
(272:25) (273:5) (273:8)
(273:10) (274:11)
(275:6) (275:8)
BRING (271:11) (274:19)
BRINGS (264:21)
BROCK (260:13) (261:23)
BROCK'S (268:10)
BUREAU (260:18)
(260:20) (260:22)
(260:23) (261:13)
(261:16) (261:18)
(261:20) (261:22)
(261:24) (265:16)
(265:17) (265:19)
(268:18) (268:20)
(269:1) (271:20)
BUT (261:24) (263:6)
(264:23) (269:4) (271:18)

**C**

CALL (262:2) (263:8)
(269:20) (270:13) (271:7)
CALLED (262:5)
(266:16) (268:25)
(270:2) (272:8)
CALLING (270:22)
(271:21)
CAN (271:12) (273:25)
CAPACITY (266:6)
(266:7) (269:24)
CAREER (265:14)
(267:11)
CASE (259:6) (263:2)
CERTAIN (272:22)
CERTIFICATE (277:1)
CERTIFY (277:4)
CHANGE (273:11)
CHARACTERIZE (263:6)
CHARGE (264:25)
CHARGES (259:7)
CHART (269:4)
CHIEF (263:25)
(268:13) (268:16)
CHIEFS (264:3)
CHRISTOPHER (260:19)
(261:17)

CITY (260:12)
CIVIL (262:21)
CLAIM (259:2) (277:6)
CLAIMANT (259:5)
CLAIMANTS (260:4)
CLARIFYING (274:7)
CLEAR (272:21)
CLOSE (275:3)
CLOSING (272:13)
(274:20)
CO-LEAD (267:14)
COME (261:7) (273:8)
COMMANDING (260:17)
(261:15)
COMMANDS (268:16)
COMMISSIONER (275:10)
COMMUNITY (265:16)
(265:18) (265:19)
(266:14) (266:15)
(266:20) (266:21)
COMPONENT (266:20)
CONCLUDED (275:15)
CONDUCT (264:12)
CONSIDER (273:1)
CONSISTING (277:8)
CONTACT (271:2)
CONTEMPLATE (275:8)
CONTINUANCE (259:20)
CONTINUE (261:8)
CONTINUES (274:25)
COPIES (272:13)
CORRECT (274:15)
COULD (270:1)
COUNSEL (272:13)
COUNTRY (260:11)
COUNTY (259:4)
(259:13) (261:13)
(264:22) (271:15) (277:6)
COUPLE (263:16)
(268:10)
COURSE (262:22)
(267:11)
COURT (264:18)
(264:22) (264:23)
(264:24) (274:2) (277:1)
(277:3) (277:15) (277:16)
COURTHOUSE (264:19)
(265:4)
CRIMINAL (262:21)
CRYPTIC (277:10)

**D**

DARK (266:17)
DA'S (265:9)
DATE (272:22)
DAUGHTER (262:4)
DAY (275:20) (277:11)
DAYS (273:9) (274:11)
DEADLY (268:2) (270:15)
DEAL (270:18)
DEALT (265:8)
DECISION (273:2)
DECISION REGARDING
DEFINITIVE (271:4)
DELORENZO (260:23)
(261:19)
DENY (270:10) (271:10)
DEPARTMENT (259:3)
(259:13) (260:3)

**DESIGNATED**

DESIGNATED (260:21)(261:13)
(265:9)(271:15)(277:6)
DESIGNATED (267:9)
DESIGNATION (267:4)
(267:5)(267:9)
DESIGNATION-- (267:6)
DETECTIVE (260:19)
(261:14)(261:17)
(263:1)(267:2)(267:8)
(267:10)(269:22)
(270:20)
DID (261:7)(264:1)
(264:5)(264:12)
(264:15)(265:13)
(265:23)(266:3)(266:7)
(266:15)(266:19)
(269:16)
DIDN'T (267:17)
(267:19)
DIFFERENCE (267:6)
DILEONARDO (259:9)
(261:8)(261:25)
(262:18)(270:8)
(271:14)(277:7)
DILEONARDO'S (261:3)
DIRECTING (272:9)
DISCUSSION (262:9)
(272:2)(274:3)
DISRESPECT (271:18)
DISTLER (263:2)
(263:9)(263:10)
(269:23)(275:18)
(276:2)(276:5)
DISTLER'S (270:20)
DISTRICT (264:23)
(264:24)
DOES (268:16)(274:18)
DONE (264:4)
DON'T (263:5)(268:5)
(271:24)(273:25)
DUE (270:8)(270:11)
(274:11)
DURING (264:13)
DUTIES (265:3)

**E**

EARLIER (274:13)
EASIER (273:3)
EASILY (270:1)
EFFECT (263:4)
EIGHT (265:12)(266:23)
EITHER (272:5)
EMERGENCY (262:3)
(268:19)(269:2)
ENOUGH (271:12)
(273:15)
EPSTEIN (260:9)
ESQ (260:7)(260:13)
(260:21)
EVALUATE (275:7)
EVEN (269:3)
EVERYDAY (265:5)
EVERYONE (261:6)
(262:19)
EVIDENCE (275:7)
EXAM (267:8)
EXAMINATION (263:13)
(269:11)(275:14)
(276:2)(276:5)

EXCEPTION (271:17)
EXCHANGED (272:16)
EXCUSE (270:19)(272:1)
EXCUSED (269:20)
EXPECTED (262:4)
EXPERIENCE (263:17)
(269:23)
EXPERT (270:13)
(270:23)(271:7)
(271:20)(271:21)
EXPERTISE (269:24)
EXPERTS (270:25)
EXPLAIN (267:6)

**F**

FACTS (270:19)
FEBRUARY (269:9)
FEW (263:6)(268:12)
(268:20)
FIELD (264:12)
(264:14)(265:7)
FINDINGS (275:10)
FINE (273:14)(275:1)
FIRING (267:16)
FIRST (273:8)(273:11)
FIT (269:3)
FOR (260:10)(261:10)
(261:22)(261:24)
(262:13)(262:18)
(265:10)(265:15)
(265:17)(266:3)(266:7)
(266:22)(269:13)
(270:12)(271:3)(271:5)
(271:6)(272:22)(273:9)
(273:14)(274:9)(275:3)
(277:3)
FOR HOW (268:14)
FORCE (268:2)(270:16)
FOREGOING (277:5)
FORGET (263:17)
FOUR (264:3)
FRANK (274:1)
FRANKLIN (259:14)
(260:5)
FROM (262:2)(264:17)
(269:22)(270:2)
(270:19)(271:19)
(271:21)(274:2)
FULL (262:13)
FURTHER (268:5)
(269:15)(274:18)

**G**

GARDEN (260:12)
GET (265:11)(267:9)
(273:18)(273:25)
GIVE (270:11)
GIVEN (261:3)
GOING (261:7)(261:10)
(263:11)(269:21)
(270:12)(270:18)
(270:21)(271:6)(271:9)
(273:11)(273:18)
(273:19)(274:5)(274:7)
(275:2)
GOOD (263:14)(263:15)
GOT (267:7)
GUESS (263:3)(266:10)
(266:22)

**H**

HAD (262:3)(271:10)
HAD PRIOR (261:5)
HALF (262:5)(262:6)
(263:21)
HAND (277:11)
HAS (269:23)(270:14)
HAVE (263:6)(263:11)
(263:16)(264:1)
(265:12)(266:19)
(267:12)(267:21)
(268:1)(268:5)(268:8)
(268:9)(269:15)(270:1)
(270:5)(271:1)(271:24)
(273:9)(273:12)
(273:14)(273:22)
(274:18)
HEADQUARTERS (259:13)
(264:8)(264:10)
HEARD (271:12)
HEARING (259:21)
(261:1)(261:5)(262:7)
(262:11)(262:17)
(262:20)(262:23)
(263:8)(268:7)(269:16)
(269:19)(270:10)
(270:17)(271:9)
(271:22)(272:1)(272:4)
(272:7)(272:24)(273:7)
(273:21)(274:5)
(274:15)(274:17)
(274:24)(275:2)(275:3)
HELD (262:9)(272:2)
(274:3)
HERE (261:8)(261:11)
(261:24)(262:4)(264:7)
(271:11)
HEREBY (277:4)
HERS (270:4)
HE'S (262:17)
HIGHWAY (268:19)
(268:22)(268:23)
(269:2)(269:5)
HILLER (260:7)
(261:12)(262:24)
(268:7)(268:9)(268:11)
(272:6)(272:21)(273:3)
(273:23)(274:24)
(275:1)(275:13)(276:6)
HIS (261:9)(262:4)
(267:16)
HOLD (264:5)
HOUR (262:5)(262:6)
HOW (263:6)(263:17)
(264:5)(264:16)(266:3)
(267:11)(267:21)

**I**

I'LL (270:11)
I'M (261:23)(261:24)
(268:20)(268:21)
(269:3)(269:21)
(270:12)(271:4)(271:6)
(271:9)(272:9)(272:21)
(273:5)(273:19)
INCIDENT (267:17)
(269:8)
INCLUDE (274:25)

Case 2:12-cv-00512-JFB-AKT   Document 264-44   Filed 07/27/18   Page 325 of 366 PageID #: 8505

INDIVIDUAL'S                                           PBA

| | | |
|---|---|---|
| INDIVIDUAL'S (270:3) | MANY (265:2) (267:11) | OFFER (269:24) |
| INSPECTOR (259:21) | (267:21) (269:14) | OFFICE (263:25) |
| (271:18) (272:23) | MARCH (259:16) | (264:18) (265:9) (271:1) |
| INTERNAL (263:21) | (272:11) (272:22) | OFFICER (259:10) |
| INTERVIEWS (264:13) | MARION (260:9) | (259:21) (260:17) |
| (264:14) (265:7) | MATTER (259:2) (263:5) | (261:1) (261:3) (261:8) |
| INTO (266:18) (270:6) | (270:23) (277:5) | (261:15) (261:24) |
| (270:21) (274:15) | MATTERS (271:1) | (262:7) (262:11) |
| INVESTIGATE (267:17) | MEETING (262:22) | (262:12) (262:17) |
| (269:10) (269:13) | MEMO (275:9) | (262:18) (263:8) |
| INVESTIGATED (267:12) | MEMORIES (264:21) | (263:18) (265:20) |
| (267:22) (270:14) | MICHAEL (259:21) | (267:16) (268:7) |
| INVESTIGATIONS | MIGHT (272:15) (272:25) | (269:16) (269:19) |
| INVESTIGATIVE (266:6) | MINEOLA (259:15) | (270:8) (270:10) |
| (266:9) (266:19) | (260:6) | (270:19) (271:9) |
| INVESTIGATOR (267:15) | MISTAKINLY (264:15) | (271:13) (271:22) |
| (267:23) | MINUTES (262:5) | (272:1) (272:4) (272:7) |
| INVOLVED (267:15) | (268:12) (273:18) | (272:24) (273:7) |
| IS— (273:6) | MISSING (268:21) | (273:21) (274:5) |
| ISRAEL (260:17) | MONTHS (266:5) | (274:15) (274:17) |
| (261:15) | MORE (263:12) (272:4) | (274:24) (275:2) (277:8) |
| IT'S (267:5) (267:9) | MORNING (263:14) | OFFICERS (265:1) |
| (268:25) (270:11) | (263:15) | (268:2) (269:13) (270:16) |
| I'VE (271:12) | MOST (265:10) | OKAY (263:10) (266:13) |
| | MOTION (270:11) | (267:20) (269:15) |
| **J** | MOVE (269:21) | (269:19) (270:10) |
| JO-ANN (275:18) | MULTIPLE (269:6) | (271:16) (271:24) |
| (276:2) (276:5) | | (272:7) (274:16) (275:5) |
| JOANNE (260:23) | **N** | (275:11) (275:12) |
| (261:19) | NAME (262:13) | OLD (260:11) |
| JUN (264:7) | NARCOTICS (265:16) | ONCE (270:17) |
| JURAT (274:25) | (266:1) (266:4) (266:8) | ONE (265:3) (268:22) |
| JUST (261:10) (262:1) | NASSAU (259:4) | (268:23) (268:24) |
| (262:13) (262:19) | (259:13) (261:13) | ONLY (273:13) |
| (262:24) (263:16) | (271:15) (277:6) | OPEN (275:4) |
| (268:9) (270:1) (270:4) | NECESSARY (275:11) | OPERATIONS (268:19) |
| (270:18) (272:21) | NEEDED (264:4) | (269:1) |
| | NEEDS (272:16) | OPINION (269:22) |
| **K** | NEW (259:4) (259:15) | (269:24) (269:25) |
| KAREN (260:21) (261:21) | (260:6) (260:12) (277:4) | (270:4) (270:20) (271:19) |
| KEARON (260:9) | (277:7) (277:17) | OPPORTUNITY (270:13) |
| KNOW (263:5) (273:25) | NEXT (269:20) (274:8) | OR- (273:5) |
| | NINE (266:5) | ORGANIZATIONAL (269:4) |
| **L** | NONE (267:25) | OTHER (265:2) (266:23) |
| LAST (263:20) | NOR (262:21) | (267:5) (268:3) (271:1) |
| LEAD (267:14) (267:23) | NORMAL (262:22) | (271:25) |
| LEGAL (260:18) | NORTH (277:16) | OUR (270:25) (273:5) |
| (260:20) (260:22) | NOT (261:7) (262:20) | OURSELVES (270:13) |
| (260:23) (261:13) | (267:8) (269:3) (271:20) | (270:23) |
| (261:15) (261:18) | (272:22) (273:5) | OUT (262:1) (264:10) |
| (261:19) (261:21) | (273:18) (273:19) | (265:14) (273:24) |
| (261:24) (272:20) | NOT— (268:20) | OVERSEE (268:17) |
| LESLY (260:7) (261:12) | NOTARY (275:25) | (269:6) |
| LESS (270:7) | (277:3) (277:17) | |
| LET (261:2) (262:11) | NOTED (271:23) (275:15) | **P** |
| LEVEL (267:13) | NOTES (277:10) | PAGES (276:3) |
| LIAISON (264:18) | NOTICE (261:5) | PAGES (276:6) (277:8) |
| LIKE (262:1) (263:1) | NOW (261:2) (261:6) | PART (265:10) (269:2) |
| (266:2) (273:23) | (262:23) (268:25) | (269:5) |
| LLP (260:9) | (269:4) (274:17) | PARTIES (272:9) |
| LONG (263:17) (264:5) | NUMBER (271:5) | (272:17) |
| (266:3) | | PATROL (266:23) |
| LOOK (270:22) | **O** | (268:13) (268:16) |
| | OATH (263:11) | (268:19) |
| **M** | OBJECTION (271:23) | PATROLS (264:13) |
| MADE (271:1) (273:4) | OBVIOUSLY (271:20) | (265:8) |
| (275:8) | OCTOBER (263:22) | PATROL'S (263:25) |
| MAKE (271:13) (274:21) | OFF (262:7) (262:9) | PAY (271:3) (271:5) |
| MAKING (264:25) | (270:2) (272:2) (274:3) | PBA (261:3) (262:3) |

| PERCELL | TESTIMONY |
|---|---|

| | | |
|---|---|---|
| (262:17) | REALLY-- (273:5) | SHOOTING (267:15) |
| PERCELL (262:12) | REASONABLE (271:6) | (267:18)(269:10) |
| PERIOD (265:15) | RECALL (263:1) | SHOOTINGS (267:12) |
| PERSON (264:22) | RECEIVE (275:4) | (267:21)(270:14) |
| PHONE (262:2) | RECEIVED (262:2) | SHORE (277:16) |
| PHYSICAL (270:15) | RECEIVING (275:6) | SHOULD (270:8)(272:19) |
| PLEASE (262:14) | RECOMMENDATIONS | SHOWED (265:1) |
| (263:9)(268:9)(272:12) | RECORD (261:2) | SIDE (272:5) |
| POINT (262:1)(262:25) | (261:10)(262:8) | SIGN (273:16) |
| (274:6) | (262:10)(262:12) | SIGNIFICANTLY (270:7) |
| POLICE (259:3) | (262:14)(262:25) | SIMULTANEOUSLY |
| (259:10)(259:13) | (270:5)(271:22)(272:3) | SOME (263:11) |
| (260:3)(260:21) | (274:4)(274:6)(274:19) | SOMEBODY (271:19) |
| (261:13)(263:18) | RECROSS (269:17) | SOMEONE (270:2) |
| (265:9)(265:20) | REFLECT (261:2) | SOMETHING (263:4) |
| (267:12)(267:16) | (262:12) | (270:7)(273:18) |
| (267:18)(267:21) | REFLECTING (275:10) | SOMEWHERE (263:3) |
| (268:2)(270:14) | REGULATIONS (269:14) | SPECIAL (268:18) |
| (270:16)(271:15) | (271:14) | (269:1) |
| (275:10)(277:6)(277:7) | RELATIONS (266:20) | SPECIALIZED (268:1) |
| POSITION (264:5) | (266:21) | SPECIFICATION (259:7) |
| POSSIBLE (271:5) | REMAINS (275:4) | SPECULATION (270:1) |
| (274:2) | REMEMBER (262:19) | SPENT (263:20) |
| PRECINCT (265:15) | REP (261:3) | START (265:23) |
| (265:21)(266:24) | REPORTER (274:2) | STARTED (265:14) |
| PRECINCTS (268:18) | (277:1)(277:3)(277:15) | STATE (261:11) |
| PREPARE (273:17) | REPORTERS (277:16) | (262:13)(277:4)(277:17) |
| (273:20)(275:9) | REPRESENTATIVE | STATEMENT (274:20) |
| PRESENT (260:15) | REQUEST (271:10) | STAY (274:8) |
| (261:6)(261:8)(262:12) | RE-RECROSS (263:4) | STICK (274:22) |
| PRIDE (266:16) | RESPECT (268:10) | STILL (261:7)(263:2) |
| PRIOR (273:15) | (269:8) | (263:10) |
| PROBABLY (263:3) | RESPONDENT (259:11) | STREET (270:2) |
| (268:20) | RESPONDENTS (260:10) | STRIKE (269:22) |
| PROCEEDING (270:6) | REVIEW (270:23) | STUDENT (259:21) |
| PROCEEDINGS (273:15) | (273:16)(275:7) | (261:1)(262:7)(262:11) |
| PROCESS (270:8) | RIGHT (269:4) | (262:17)(263:8)(268:7) |
| PROFESSIONAL (277:2) | ROAD (260:11) | (269:16)(269:19) |
| (277:15) | ROLE (264:1) | (270:10)(271:9) |
| PROGRAM (266:16) | RULES (269:14)(271:14) | (271:22)(272:1)(272:4) |
| (266:17) | | (272:7)(272:24)(273:7) |
| PROHIBITING (271:21) | **S** | (273:21)(274:5) |
| PROJECTS (265:17) | | (274:15)(274:17) |
| (265:19)(266:14) | SAID (265:25) | (274:24)(275:2) |
| (266:15) | SANDERS (277:2) | SUBMISSION (273:20) |
| PROMOTED (267:1) | (277:14) | SUBMISSIONS (272:10) |
| (267:7) | SANTIAGO (260:17) | (273:4)(274:8)(274:10) |
| PROMOTIONAL (267:8) | (261:14)(261:15) | (274:23)(275:5) |
| PROPER (270:15) | (272:20) | SUBMIT (272:16) |
| PROVIDE (272:10) | SAY (261:24)(273:22) | (272:19)(273:1)(273:10) |
| (272:12) | SCHEDULE (273:13) | SUBSCRIBED (275:20) |
| PROVIDED (272:14) | SCHOOLS (266:18) | SUPERVISE (268:17) |
| (273:14) | SEE (271:2) | SURE (264:25)(269:3) |
| PSA (260:23) | SENSE (273:6) | SWORN (275:20) |
| PUBLIC (275:25) | SEPARATE (273:9) | |
| (277:3)(277:17) | SERGEANT (260:17) | **T** |
| PURCELL (262:15) | (261:14)(263:2)(263:9) | |
| P-U-R-C-E-L-L (262:16) | (263:10)(264:2)(267:2) | TACTICAL (268:24) |
| PUT (262:24) | (267:7)(269:23)(270:20) | (268:25) |
| | SERIAL (259:10)(277:8) | TAGGART (260:21) |
| **Q** | SERVICES (268:24) | (261:21) |
| | (268:25)(269:2) | TAKE (264:7)(265:5) |
| QUESTIONS (263:7) | SESSION (261:2) | (271:17) |
| (263:12)(263:16) | SET (277:11) | TAKEN (270:21)(277:5) |
| (268:6)(268:10)(269:15) | SEVERAL (270:25) | TEMPTED (261:23) |
| | SGT (275:18)(276:2) | TEN (273:9)(274:11) |
| **R** | (276:5) | TESTIFIED (268:12) |
| | SHATAVIA (277:2) | TESTIFY (265:1) |
| REACHING (273:1) | (277:14) | (270:24)(271:7) |
| REALIZED (270:17) | SHE (269:23) | TESTIMONY (269:22) |
| REALLY (272:22) | | |

282

**THAN**

(269:25) (271:19)
(274:25) (275:7) (277:5)
**THAN** (268:3) (270:7)
(274:13)
**THANK** (275:13)
**THAT** (261:2) (262:1)
(262:2) (262:12)
(262:19) (262:25)
(263:1) (263:4) (263:24)
(264:5) (264:7) (264:13)
(264:16) (265:3)
(265:12) (265:13)
(265:25) (266:10)
(266:14) (266:19)
(267:15) (267:19)
(268:12) (268:20)
(268:21) (269:25)
(270:3) (270:5) (270:7)
(270:18) (270:19)
(270:25) (271:3) (271:4)
(271:16) (271:17)
(272:9) (272:13)
(272:15) (272:25)
(273:1) (273:11)
(273:12) (273:13)
(273:14) (274:2) (274:7)
(274:19) (274:20) (277:4)
**THAT'S** (266:22)
(267:3) (275:1)
**THE** (259:2) (260:4)
(260:10) (261:2) (261:5)
(261:10) (261:12)
(262:2) (262:7) (262:10)
(262:11) (262:13)
(262:22) (262:23)
(262:24) (263:5)
(263:20) (264:2)
(264:17) (264:19)
(264:21) (264:22)
(265:3) (265:4) (265:8)
(265:9) (265:10)
(265:14) (265:15)
(265:16) (265:20)
(266:13) (266:16)
(266:17) (266:18)
(266:22) (266:24)
(267:6) (267:8) (267:11)
(267:14) (267:23)
(268:2) (268:3) (268:13)
(268:18) (269:3) (269:4)
(269:8) (269:10)
(269:13) (269:14)
(269:19) (269:22)
(270:2) (270:5) (270:7)
(270:11) (270:15)
(270:17) (270:18)
(270:22) (270:23)
(271:2) (271:14)
(271:15) (271:22)
(272:3) (272:12)
(272:17) (272:20)
(273:13) (273:15)
(273:17) (273:18)
(273:23) (273:24)
(274:1) (274:2) (274:4)
(274:6) (274:8) (274:9)
(274:11) (274:12)
(274:19) (274:22)
(275:3) (275:4) (275:6)

(275:7) (275:8) (275:9)
(275:14) (277:3) (277:4)
(277:5)
**THEM** (268:22) (268:24)
(270:3) (273:16) (273:17)
**THEN** (266:13) (269:1)
(270:12) (273:8)
(273:12) (273:19)
**THERE** (264:1) (265:2)
(265:7) (268:14)
(270:19) (270:25)
**THEREAFTER** (275:9)
**THERE'S** (268:20)
(272:24)
**THEY** (264:4) (269:3)
(269:5) (269:6) (270:3)
(271:4) (271:5) (272:19)
(274:11) (274:19)
**THING** (273:13)
**THINGS** (265:2)
**THINK** (263:3) (270:5)
(271:16)
**THIS** (261:1) (262:20)
(262:21) (263:25)
(267:17) (270:6) (271:8)
(272:8) (272:9) (274:6)
(275:3) (275:20) (277:11)
**THOSE** (272:19) (273:4)
(273:7) (273:9) (275:5)
**THOUGHT** (262:2) (270:3)
**THREE** (263:20) (264:6)
(268:14) (268:15)
**THROUGH** (272:19)
(277:9)
**TIME** (261:4) (264:13)
(266:16) (269:4)
(271:10) (272:9)
(273:15) (273:25)
(275:15)
**TODAY** (275:3)
**TOLD** (271:4)
**TRAINED** (270:15)
**TRAINING** (268:1)
**TRANSCRIPT** (273:14)
(273:24) (275:4)
**TRANSCRIPTION** (277:9)
**TRANSCRIPTS** (274:1)
(274:12)
**TRANSFORMS** (270:6)
**TRIAL** (262:21)
**TRYING** (265:11)
**TWO** (266:22)

**U**

**UNDER** (263:11)
**UNDERCOVER** (266:7)
(266:9)
**UNDERNEATH** (264:3)
**UNDERSTANDING** (262:25)
**UNION** (271:2)
**UNITS** (269:6)
**UNTIL** (264:17)
(273:19) (275:4)
**USE** (268:2) (270:15)
**USED** (271:1)
**UTTER** (269:25)

**V**

**VALUABLE** (270:4)

**VIOLATED** (271:14)
**VIOLATIONS** (269:14)

**W**

**WANT** (262:19) (262:24)
(269:16) (271:4)
(272:16) (272:25)
(273:1) (273:11)
(274:19) (274:20)
**WAS** (261:3) (261:6)
(262:9) (264:2) (264:7)
(265:3) (266:10)
(266:14) (266:17)
(269:1) (270:20) (272:2)
(274:3) (275:15)
**WEAPON** (267:16)
**WEDNESDAY** (272:11)
(272:18) (274:9)
**WEEK** (273:12)
**WEIGHT** (270:11)
**WELL** (273:24)
**WE'LL** (274:22)
**WERE** (263:17) (263:23)
(264:21) (264:25)
(265:21) (265:7) (265:20)
(266:23) (267:1)
(267:14) (268:13)
(268:14) (269:5) (269:9)
(269:12) (273:4)
**WE'RE** (261:7) (261:10)
(263:3) (273:13)
(273:18) (274:5) (274:7)
(275:2)
**WEREN'T** (270:18)
**WHAT** (264:1) (265:18)
(266:7) (266:14)
(266:15) (267:13)
(268:16) (269:12)
(270:3) (272:22) (273:21)
**WHATEVER** (264:3)
(270:6)
**WHEN** (262:5) (265:23)
(266:11) (267:1) (267:8)
(272:12) (274:1)
**WHERE** (262:23)
(263:23) (265:13)
(266:17) (267:14)
(269:3) (271:12)
**WHEREOF** (277:11)
**WHEREUPON** (262:9)
(272:2) (274:3) (275:14)
**WHETHER** (271:13)
**WHICH** (266:16) (274:9)
**WHO** (262:3) (263:2)
(270:13) (271:20)
(272:19)
**WHO'S** (261:11)
**WILL** (271:5) (274:11)
(275:6) (275:9)
**WILLIAM** (262:15)
**WITH** (261:9) (262:3)
(262:23) (265:8)
(268:10) (269:8)
(270:18) (271:2)
(271:23) (272:7)
(272:10) (272:13)
(273:15) (273:17)
(274:8) (274:22) (275:1)
**WITHIN** (262:4)

283

| WITNESS | | YOU'VE |
|---|---|---|
| **WITNESS** (269:28) (271:11) (275:15) (277:11) **WITNESSES** (271:25) (272:5) (272:8) **WORDS** (267:5) **WORK** (264:19) (265:13) (266:3) **WORKED** (264:2) (264:10) (264:17) (264:22) (265:4) (265:15) (265:16) (265:25) (266:13) **WOULD** (262:1) (263:1) (266:17) (270:4) (271:3) (271:16) (271:17) (273:3) (273:8) (273:23) **WRITTEN** (273:20) (274:23) | | |
| **Y** | | |
| **YEAH** (273:7) **YEAR** (265:17) **YEARS** (263:19) (264:6) (265:11) (265:12) (266:22) (266:23) (268:14) (268:15) **YES** (264:9) (264:11) (264:20) (265:6) (265:10) (265:22) (266:2) (266:25) (267:24) (268:9) (269:7) **YORK** (259:4) (259:15) (260:6) (268:22) (277:4) (277:7) (277:17) **YOU** (263:18) (263:20) (263:23) (264:1) (264:5) (264:10) (264:12) (264:19) (264:21) (264:22) (264:25) (265:4) (265:8) (265:11) (265:13) (265:20) (265:23) (265:25) (266:3) (266:7) (266:13) (266:23) (267:1) (267:9) (267:12) (267:14) (267:21) (268:1) (268:8) (268:12) (268:13) (268:14) (269:9) (269:12) (269:16) (271:17) (271:18) (272:12) (272:15) (272:25) (273:1) (273:9) (273:23) (274:12) (274:20) (275:13) **YOUR** (262:13) (263:17) (267:11) (269:20) (270:11) (271:10) (271:23) (272:22) (273:8) (275:8) **YOU'RE** (263:10) (271:20) **YOU'VE** (271:10) (271:19) | | |

NORTH SHORE COURT REPORTERS 1-800-794-5342

# EXHIBIT C

# Barket, Marion, Epstein & Kearon, LLP

Attorneys at Law

666 OLD COUNTRY ROAD, SUITE 700 • GARDEN CITY, NEW YORK 11530

[P] 516.745.1500 • [T] 516.745.1245

Bruce A. Barket                                                  Steven B. Epstein
Amy B. Marion                                                   Kevin T. Kearon

                                                              Hon. Elaine Jackson Stack
                                                                      Of Counsel

August 28, 2012

To:        Commanding Officer, Legal Bureau

From:      PO Anthony DiLeonardo, Shield No. 3632, Serial No. 9013, Third Precinct

Subject:   ANSWER TO CHARGES AND SPECIFICATIONS; CASE NO. 8118

    1.     On the advice of my counsel, Amy B. Marion, Esq., Barket, Marion, Epstein & Kearon, L.L.P, I hereby plead not guilty to all the charges and specifications, numbered 1 through 13, in connection with the above-referenced case number.

    2.     I reserve the right to call any witnesses as they become known to me.

    3.     I will be represented by Amy B. Marion, Esq., 666 Old Country Road, Suite 700, Garden City, New York 11530. 516-745-1500.

Respectfully,

PO Anthony DiLeonardo

Amy B. Marion, Esq.
Counsel for Anthony DiLeonardo

```
---------------------------------------------X
```
In the Matter of the Disciplinary Action:

                                  Hearing Officer - Inspector Michael Studdert

      POLICE DEPARTMENT
      County of Nassau, New York

      -against-                   Case No: 8118

      Anthony DiLeonardo
      Police Officer, Serial 9013

```
---------------------------------------------X
```

The Nassau County Police Department ("N.C.P.D.") respectfully submits it has demonstrated substantial evidence to the Departmental Hearing Officer to support the Charges and Specifications that were the subject of a Departmental Disciplinary Hearing against P.O. DiLeonardo. The Departmental Hearing was held pursuant to Article 9 of the N.C.P.D. Rules and Regulations and Civil Service Law § 75. The Department submits that substantial evidence was presented to support the three (3) charges that are before the Hearing Officer, Counts 3, 4, and 11 of the Charges and Specifications (Dept. Exhibit 22). The substantial evidence set forth at the Departmental Hearing included the testimony of Detective Sergeant Jo Ann Distler, twenty-three (23) documents submitted as evidence at the hearing and three (3) supplemental exhibits submitted by the Department while the record was still open.

## PROCEDURAL HISTORY

Reports of Violations of Department Rules (PDCN 209) (Dept. Exhibits 17, 19A, 21) were served on P.O. DiLeonardo on July 2, 2012. On July 10, 2012, the Disciplinary Review Board ("DRB"), reviewed the violations and converted the PDCN 209s to the service of formal Charges and Specifications, pursuant to Article 9 of the Department Rules and Regulations. The PDCN 209s were then converted to PDCN 210s (Dept. Exhibit 22) and endorsed by the Commissioner of Police on August 22, 2012. The Charges and Specifications were served on P.O. DiLeonardo on August 22, 2012.  P.O. DiLeonardo answered the Charges and Specifications on August 28, 2012 via letter from his attorneys Barket, Marion, Epstein & Kearon, LLP (See Exhibit A attached hereto). This matter was originally set down for a hearing on December 4, 2012, but adjourned at that time by the Department. The matter was again scheduled for February 10, 2014. On that date the case was adjourned by counsel for P.O. DiLeonardo and the parties agreed to an adjourn date of March 10, 2014. The Disciplinary Hearing did in fact commence on March 10, 2014. At the end of the Department's direct examination of their witness, the Department moved to amend the Charges and Specifications under case 8118 to reflect only Count 3, 4, and 11. Those are the counts before the Hearing Officer for determination and recommendation pursuant to N.C.P.D. Rules Article 9.

## STATEMENT OF FACTS

On February 27, 2011, at approximately 8:00 p.m. Police Officers Anthony DiLeonardo and Edward Bienz went out socially in Huntington, New York with their dates, Sophia Cornia (P.O. DiLeonardo's date "Cornia") and Jillian Bienz, (P.O. Bienz's wife). Both officers and their dates had admittedly been drinking alcohol throughout the night in several bars in the Huntington area (Dept. Exhibits, 7, 9, 13). P.O. DiLeonardo, by one account had seven (7) vodka drinks. At approximately 1:00 am (Dept. Exhibit 13, para 4) the two couples decided to leave the last bar. P.O. DiLeonardo was driving his girlfriend's car a white 2011 Infiniti, and P.O. Bienz was driving a blue Acura. P.O. DiLeonardo was following P.O. Bienz and at some point they got lost in the Huntington area. There are allegations of a road rage incident that took place between P.O. Bienz, P.O. DiLeonardo and a taxi cab that was being driven by Thomas Moroughan, ("Moroughan") who had a passenger, Kristie Mondo. Moroughan was driving a taxi and was initially passed by P.O. Bienz in the blue Acura. Moroughan was then passed by P.O. DiLeonardo in the white Infiniti. The statements and documents in evidence offer different opinions as to the level of aggressive driving (Dept. Exhibits 1, 6, 7, 9, 10, 11, 13). P.O. Bienz and P.O. DiLeonardo did separate from the cab. At approximately 01:15, approximately fifteen (15) minutes after they left the last bar, they encountered Moroughan again while they were pulled over on the side of Oakwood Road, trying to figure out where they were. P.O. Bienz's car was in front of the car that P.O. DiLeonardo was driving. Moroughan pulled up next to the Infiniti that P.O. DiLeonardo was driving and Moroughan and DiLeonardo got involved in a shouting match. As the shouting escalated all four people from the Acura and the Infiniti exited their vehicles at different times as did Moroughan. Moroughan retreated to his car / taxi, got in and reversed the taxi. P.O. DiLeonardo pursued him on foot. Moroughan then attempted to exit the area by trying to get his taxi moving forward. There are conflicting statements regarding both the movement of the taxi and the level of noise the car was making. However, the evidence has shown that it is almost silent when in the stopped position (Dept. Exhibit 6) and that P.O. DiLeonardo drew his weapon and approached the cab after Moroughan backed up the car a minimum of 35-45 feet, as Moroughan was attempting to leave.

It is at this time that P.O. DiLeonardo fired his off duty, .38 Caliber Smith & Wesson at Moroughan's taxi. Moroughan was attempting to get away from P.O. DiLeonardo. Moroughan then moved forward in an attempt to make a u-turn. P.O. DiLeonardo fired five (5) shots, striking the windshield three (3) times and Moroughan's body twice, emptying his weapon of bullets. Moroughan's vehicle came to a stop (Dept. Exhibits 1, 7, 6, 9, 10, 11, 12, 13) P.O. DiLeonardo continued to approach Moroughan's taxi with his empty weapon in his hand. Moroughan continued to try to get away from P.O. DiLeonardo. P.O. Dileonardo then took that weapon and used it to shatter the driver's side window of Moroughan's taxi (Dept. Exhibit 13, line 9). P.O. DiLeonardo never retreated. Moroughan was attempting to get away from P.O. DiLeonardo, he was not attempting to hurt him or run him down with his car.

P.O. DiLeonardo escalated the matter further by getting into a physical altercation with Moroughan. P.O. DiLeonardo punched Moroughan in the face at least ten (10) times including

striking him in his face with the butt of the .38. This was a violent altercation which resulted in Moroughan sustaining physical injury, a broken nose. P.O. DiLeonardo on the other hand, sustained minor injuries. Moroughan hit him with his car in an effort to break free of P.O. DiLeonardo.

It is during this violent altercation that P.O. DiLeonardo failed to safeguard his assigned off duty .38 caliber Smith & Wesson. It is undisputed that this weapon was later located in the rear compartment of the taxi that Moroughan was driving. There comes a time when Moroughan is able to drive away from this location and drive himself to the hospital. Kirstie Mondo called 911 as soon as they were free from P.O. DiLeonardo.

At Huntington Hospital Moroughan was treated for multiple gun shot wounds and a left nasal bone fracture (Dept. Exhibit 18). Moroughan's car was impounded at the hospital and P.O. DiLeonardo's off duty .38 caliber Smith & Wesson was recovered from the rear floor area of the taxi (Dept. Exhibit 6). It is also at this location that photographs were taken of the damage to the car, (including but not limited to damage to the windshield and drivers side window) and the location of the off duty weapon in the taxi (Dept. Exhibits 2,3,4,5, 20). D/Sgt. Distler interviewed one of the owners of the taxi that Moroughan was driving, Boris Goldstein who stated that it cost him a couple of thousand dollars to fix the damage to the car.

## ISSUE PRESENTED

Has the N.C.P.D. established substantial evidence to support Counts 3, 4, and 11 of the Charges and Specifications (PDCN 210)?

## BRIEF ANSWER

Yes. The N.C.P.D. has presented more than what a reasonable mind would consider substantial evidence for each of the three (3) charges before the Departmental Hearing Officer.

## SUBSTANTIAL EVIDENCE

The Nassau County Administrative Code (N.C. Admin.Code) sets forth under what circumstances the Commissioner of Police may discipline a Department member. N.C. Admin. Code § 8-13.0(b)(3), states, "[s]uch members shall be disciplined for the following reasons [only]: (3) Violation of Rules." Additionally, New York State Civil Service Law (hereinafter Civ. Serv.) § 75 governs removal and other disciplinary actions for police officers. Pursuant to N.Y.S. State Administrative Procedure Act § 306, the standard of proof at an administrative disciplinary hearing is "substantial evidence." Substantial evidence is defined as such relevant proof as a reasonable mind may accept as adequate to support a conclusion or ultimate fact. It is less than a preponderance of the evidence and, as a burden of proof, it demands only that a given inference is reasonable and plausible, not necessarily the most probable. Miller v. DeBuono, 90 N.Y.2d 783 (1997).

Furthermore, [h]earsay evidence can be [the] basis for administrative determination[s]. See Gray v. Adducci, 73 N.Y.2d 741 (1988). See also: People ex rel. Vega v. Smith, 66 N.Y.2d 130 (1985); Matter of Lahey v. Kelly, 71 N.Y.2d 135 (1987); Matter of National Basketball Assn. v. New York State Div. of Human Rights, 68 N.Y.2d 644 (1986); and People ex rel. McGee v. Walters, 62 N.Y.2d 317 (1984).

Finally, "Corroboration of accomplice testimony is not required in police disciplinary hearings involving charges of misconduct of criminal nature." See Berenhaus v. Ward, 70 N.Y.2d 436 (1987).

The N.C.P.D. has established substantial evidence to support the charges and specifications. P.O. DiLeonardo was obligated to abide by the Rules and Regulations of the N.C.P.D. P.O. DiLeonardo violated the Rules and Regulations. His actions on the morning of February 27, 2011 were a gross deviation from what would be expected from a Nassau County Police Officer. The charges against P.O. DiLeonardo were filed following a thorough and objective investigation by the Internal Affairs Unit ("IAU"). P.O. DiLeonardo has in fact admitted to most of the underlying actions/behavior which led to the charges filed in this matter.

Therefore, it is submitted that for the reasons more fully detailed below the N.C.P.D. has provided substantial evidence that P.O. DiLeonardo violated the Charges and Specifications before the Hearing Officer.

## WITNESSES PRESENTED

### I. N.C.P.D. Witness Detective Sergeant Jo Ann Distler

The N.C.P.D. called Detective Sergeant ("D/Sgt.") Jo Ann Distler, to testify in support of its position that P.O. DiLeonardo was in violation of multiple sections of the Departmental Rules and Regulations. D/Sgt. Distler testified that she has been a police officer for almost twenty-nine (29) years. Throughout, her career, D/Sgt. Distler has held various ranks and designations within the Department. D/Sgt. Distler began her career on patrol in the First Precinct and went on to work in the Narcotics Vice Bureau and Community Projects Bureau. In 1995, she was promoted to Sergeant and assigned to the Court Liaison Office. While at Court Liaison, her duties included but were not limited to; supervising, guiding, and instructing members who were scheduled to appear at court, coordinating the preparation, examination, and presentation of all documents and instruments submitted to the Court and coordinating the activities of the Police Department and the Criminal Court System.

In 2007, D/Sgt. Distler was assigned to the Chief of Patrol's Office. The Office of the Chief of Patrol is responsible for the oversight of the following commands: Emergency Ambulance Bureau, Auxiliary Police Section, all the Precincts (First through Eighth), Tactical Field Services, Field Services (Highway Patrol Bureau, Motorcycle Platoon, Motor Carrier Safety Unit, Expressway Platoon, Marine / Aviation Bureau).

D/Sgt. Distler was assigned to the Internal Affairs Unit in 2010. Six (6) months into this assignment she was designated Detective Sergeant.  In IAU one of her responsibilities is to preserve the reputation and protect the integrity of the N.C.P.D., through prompt and comprehensive investigation of all allegations of misconduct by its members. In addition, the Internal Affairs Unit, through the members assigned thereto, seeks to assure adherence to the highest standards of conduct by Department members. IAU members monitor and investigate the conduct of members through various proactive inspections, audits, and other measures of ensuring compliance with Department rules and procedures.

It is important to note, that D/Sgt. Distler has been a lead investigator on approximately forty-five (45) IAU Investigations and has assisted in over two hundred (200) IAU investigations (see Affidavit, Dept. Supplemental Exhibit 1).  For each case she has investigated, D/Sgt. Distler has been responsible for a complete and thorough investigation into allegations of violations of the rules and regulations of the N.C.P.D.  Additionally D/Sgt. Distler is required to detail her findings and present her conclusions and recommendations at the completion of each investigation. These conclusions and recommendations are approved by the Commanding Officer of IAU and the Commissioner of Police.

Counsel for P.O. DiLeonardo has argued that D/Sgt. Distler's testimony should be discounted because she has never investigated a police involved shooting. It is the position of the N.C.P.D. that the issue of whether or not D/Sgt. Distler has ever investigated a shooting is irrelevant to the instant matter. D/Sgt. Distler was not tasked with investigating a shooting. Rather, she was assigned to investigate if P.O. DiLeonardo violated the Rules and Regulations of the N.C.P.D. As demonstrated through her testimony and outlined above, (and in Dept. Supplemental Exhibit 1) it is clear that D/Sgt. Distler's experience and expertise uniquely qualifies her for these types of investigations.

The shooting of Moroughan by P.O. DiLeonardo was investigated by the Suffolk County Police Department. D/Sgt. Distler utilized the findings of the Suffolk County Police Department, which included the reports of various bureaus within that agency, to aid in her investigation as to potential violations of the N.C.P.D. Rules and Regulations.  These bureaus include but are not limited to the Crime Scene team and the Suffolk County Division of Medical- Legal Investigations & Forensic Sciences Crime Laboratory. The Division of Medical – Legal Investigations & Forensic Sciences generated the Shooting Incident Reconstruction Report (Dept. Exhibit 6) that D/Sgt. Distler referenced in the course of her investigation. The N.C.P.D. concedes that D/Sgt. Distler did not investigate the actual shooting. Rather, she relied upon the investigation conducted by Suffolk County, in reaching her ultimate determination. That determination being that P.O. DiLeonardo did engage in misconduct and did in fact violate the Rules and Regulations of the N.C.P.D.

Respondent's position, that the Hearing Officer should "strike" D/Sgt. Distler's testimony, because she is not an expert, is misplaced.  As outlined above, D/Sgt. Distler's experience and assignments/positions throughout the Department for almost thirty (30) years demonstrates that she is clearly competent and versed in the Departmental Rules and Regulations. D/Sgt. Distler testified that she was familiar with the facts of this case, the underlying IAU investigation

(including; statements of witnesses and P.O.s DiLeonardo and Bienz which she herself took), and the results of the Suffolk County Police Department's investigation. D/Sgt. Distler has the requisite expertise to formulate opinions and draw conclusions to come to findings with respect to the Nassau County Police Department Rules and Regulations. Therefore, N.C.P.D. submits that based on her training and experience, the testimony of D/Sgt. Distler, and her ultimate conclusion that P.O. DiLeonardo violated the Rules and Regulations, should be given great weight in this Departmental Disciplinary Hearing.

**II. P.O. DiLeonardo** did not call any witnesses on his behalf. Counsel for P.O. DiLeonardo made a late request to the Departmental Hearing Officer to call a rebuttal expert witness which was denied (see Hr'g Tr. 270-271).

**III. P.O. DiLeonardo did submit a supplemental expert opinion** while the record was still open. This expert report was signed by Joseph F. Zogbi, a retired N.Y.P.D Detective. While Mr. Zogbi has an impressive background with the N.Y.P.D., there is nothing in his report or his qualifications that indicates that Mr. Zogbi has ever been qualified as an expert in any court on any issue before this Departmental Hearing Officer (contrast Curriculum Vitae, George Krivosta, Department Supplemental Exhibit 3. Mr. Krivosta is the analyst who is the signature on the County of Suffolk Division of Medical – Legal Investigations & Forensic Sciences Crime Laboratory Shooting Incident Reconstruction Report (Dept. Exhibit 6). Mr. Krivosta has been recognized in multiple courts and jurisdictions as an expert in Ballistics, Department Exhibit 6). Mr. Zogbi's opinions will be addressed further below.

## ARGUMENT

**I. Internal Affairs Unit had more than Substantial Evidence to support the Charges and Specifications**

**P.O. DiLeonardo violated  Department Rules Article 5, Rule 2 (1),  when he engaged in Unlawful Conduct by Assaulting Thomas Moroughan**

While P.O. DiLeonardo was off duty, he did admittedly strike Moroughan in the nose with his .38 caliber Smith & Wesson revolver, causing a fracture to Moroughan's nose. The finding that P.O. DiLeonardo engaged in unlawful conduct by using his revolver to break Moroughan's nose was based on not only the admission of P.O. DiLeonardo to D/Sgt. Distler of IAU, that he used his weapon which was in his hand when he was engaged in a physical altercation (Dept. Exhibit 7, lines 42 &  44) with Moroughan, but several other critical pieces of evidence.

In his statement to D/Sgt. Distler in IAU, P.O. Bienz stated that, he saw P.O. DiLeonardo with his "gun in his hand" and he "beg[a]n smashing the driver's side window with his weapon in his right hand…he was trying to pull the driver out of the vehicle …[he] had his gun in his right hand … and was reaching inside the vehicle with his left hand…" (Dept. Exhibit 13, line 9).

Moroughan in his statement to Suffolk County Police Department, (Dept. Exhibit 10) and in both of his 50-H depositions under oath (Dept. Exhibits 14, 15) stated that P.O. DiLeonardo, "... came up to my driver's side window and smashed his gun busting my window and hitting me in the face (Dept. Exhibit 10), he "[h]it me on my nose with the butt of the gun...He's punching me on the side of my face and head. He grabbed me by my arm with his left hand. He's punching me in my face with his right arm." (Dept. Exhibit 14, page 66, lines 14-19, page 67 lines 13-14), and "He busted open the driver's side window with the butt of his gun. He then struck me in the face with the butt of the gun, proceeded to open my car door, He... reached over me; he was punching me in my face. .. He was just swinging away. Like he punched me in my face at least ten times" (Dept. Exhibit 15, page 132, lines 24-25, page 133, lines 2-5, 12-14).

Finally, the finding that P.O. DiLeonardo broke Moroughan's nose was supported by a review of the Huntington Hospital Report (Dept. Exhibit 18). The report confirms that Moroughan did in fact suffer a fracture of the left nasal bone with mild medial displacement of the fractured fragments among other injuries. See In re Dawn S., 201 A.D.2d 918 (1994), where "[t]he victim was punched and kicked repeatedly in the face and head. Respondent concedes that she struck the victim. The victim sustained numerous injuries, including a fractured nose and cheekbone. That evidence was sufficient to establish beyond a reasonable doubt that respondent intended to inflict serious physical injury upon the victim" (see People v. Delgado, 167 A.D.2d 181, 182, (1990) lv denied 77 N.Y.2d 905 (1991).

This finding was made by the members of the Internal Affairs Unit, D/Sgt.Distler, Detective Lieutenant Ralph Hoffman and Inspector Edward Dordon and approved by the Commissioner of Police.  The above actions taken by P.O. DiLeonardo were unlawful and could have been charged as a violation of N.Y.S Penal Law § 120.05(2).  Assault in the Second Degree: A person is guilty of assault in the second degree when: (2) With the intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument[.] See also, N.Y.S. Penal Law § 10.00 [10] "Physical injury" means impairment of physical condition or substantial pain.

### P.O. DiLeonardo violated  Department Rules Article 5, Rule 2 (1),  when he engaged in Unlawful Conduct by causing damage to the vehicle that Moroughan was driving in excess of $1500.00

While P.O. DiLeonardo was off duty, he did admittedly; "... fire[d] my weapon at the driver ...(Dept. Exhibit 7, line 33)...I continued to fire my weapon...I observed that the windshield was still in place but shattered, it appeared that my shots had damaged the windshield" (Dept. Exhibit 7, lines 34, 39); and " I believe that I smashed the driver's side window with the butt of my weapon" (Dept. Exhibit 7, line 42). These statements were made to D/Sgt. Distler of IAU.  This finding was also supported by photographs taken by the Suffolk County Police Department (Dept. Exhibits 2,3).

The finding that P.O. DiLeonardo engaged in unlawful conduct by using his revolver to cause damage to 2010 Toyota Prius taxi cab, being driven by Moroughan,  was made by the members of the Internal Affairs Unit, D/Sgt. Distler, Detective Lieutenant Ralph Hoffman and Inspector

Edward Dordon, and approved by the Commissioner of Police.  The finding that P.O. DiLeonardo engaged in unlawful conduct by causing damage to the vehicle in excess of $1500 was based not only the admission of P.O. DiLeonardo but several other critical pieces of evidence.

In his statement to D/Sgt. Distler in IAU P.O. Bienz stated, he saw P.O. DiLeonardo with his "gun in his hand" and he "beg[a]n smashing the driver's side window with his weapon in his right hand…" (Dept. Exhibit 13, line 9).

Moroughan in his statement to Suffolk County Police Department, (Dept. Exhibit 10) and in both of his 50-H depositions under oath (Dept. Exhibits 14, 15) stated; that P.O. DiLeonardo, "… came up to my driver's side window and smashed his gun busting my window and hitting me in the face (Dept. Exhibit 10), "He busted open the driver's side window with the butt of his gun." (Dept. Exhibit 15, lines 24-25).

Kristie M. Mondo, the girlfriend of Moroughan, in her statement to Suffolk County Police, stated, "I was ducking down when I heard my boyfriend's window to his door break. It shattered. I looked up and my boyfriend was struggling with the guy in the orange shirt." (Dept. Exhibit 11).

The report of the Suffolk County Division of Medical-Legal Investigations & Forensic Sciences Crime Laboratory, entitled Shooting Incident Reconstruction Report (Dept. Exhibit 6, page 6) "DiLeonardo approaches the driver's door then shatters the driver's  window with the revolver." This finding was also supported by photographs taken by the Suffolk County Police Department (Dept. Exhibits 4,5).

The report of the Suffolk County Division of Medical-Legal Investigations & Forensic Sciences Crime Laboratory, entitled Shooting Incident Reconstruction Report (Dept. Exhibit 6, Page 4,5) further states, "The vehicle described as being hit by three (3) shots… the bullet penetrated the left center portion of the windshield,…the bullet penetrated the right center lower portion of the windshield,…the bullet penetrated the right center portion of the windshield." This finding was also supported by photographs taken by the Suffolk County Police Department (Dept. Exhibits 2,3).

Finally, D/Sgt. Distler interviewed one of the owners of the vehicle that Moroughan was driving the morning of February 27, 2011, Boris Goldstein (Hr'g Tr. 116-117) on September 26, 2011, after the vehicle was repaired. Mr.Goldstein told D/Sgt. Distler that the vehicle cost him a couple of thousands of dollars to repair. See People v. Singleton, 291 A.D.2d 869 (2002), where the court held that the testimony of the victim established that the cost of repairing her property exceeded $ 1,500. See also, People v. Brown, 177 A.D.2d 942 (1991) stating, "In order to support a conviction for third degree criminal mischief, 'it is sufficient to define value in terms of the cost of repair to the property, so long as the property is repairable'" (People v. Simpson, 132 A.D.2d 894, 895, lv denied 70 N.Y.2d 937 (1987)).

All of the above actions taken by P.O. DiLeonardo were unlawful and could have been charged as a violation of N.Y.S Penal Law § 145.10.  Criminal Mischief in the Second Degree: A person

is guilty of criminal mischief in the second degree when with the intent to damage property of another person, and having no right to do so nor any reasonable ground to believe he has such right, he damages the property of another person in an amount exceeding one thousand five hundred dollars. Criminal Mischief in the second degree is a class D Felony.

**P.O. DiLeonardo violated Department Rules Article 8, Rule 12(2) when he failed to safeguard his weapon after using it to break the window of Moroughan's vehicle and used it during a physical altercation with Moroughan**

While P.O. DiLeonardo was off duty, he did admittedly use his assigned .38 caliber Smith & Wesson revolver to break the driver's side window of the 2010 Toyota Prius taxi cab being driven by Moroughan. P.O. DiLeonardo failed to safeguard the revolver and lost his weapon in the vehicle. (Dept. Exhibit 7). This weapon was assigned to him by virtue of him being a N.C.P.D. Police Officer and pursuant to the N.C.P.D. Rules and Regulations (Dept. Exhibit 23). This finding was made by the members of the Internal Affairs Unit, D/Sgt. Distler, Detective Lieutenant Ralph Hoffman and Inspector Edward Dordon and approved by the Commissioner of Police. The finding that he did not safeguard the off duty .38 caliber Smith & Wesson that was assigned to him pursuant to Department Rules Article 8, Rule 3(b), was based on not only the admission of P.O. DiLeonardo but several other critical pieces of evidence.

In his statement to D/Sgt. Distler in IAU, P.O. Bienz, (Dept. Exhibit 13, line 10) stated, "Anthony did tell me at some point he lost his gun in the cab."

The report of the Suffolk County Division of Medical-Legal Investigations & Forensic Sciences Crime Laboratory, entitled Shooting Incident Reconstruction Report (Dept. Exhibit 6, page 7), "During this struggle DiLeonardo will lo[o]se possession of his revolver within the taxi, where it will eventually be recovered on the left rear passenger floor area." This finding was also supported by photographs taken by the Suffolk County Police Department (Dept. Exhibit 20).

**II. P.O. DiLeonardo's was not denied due process by the Hearing Officer not allowing him to call an expert**

At the close of the hearing on March 19, 2014, counsel for the Respondent requested an adjournment to attempt to secure an expert. Indicating that an expert was needed to rebut the entire testimony of D/Sgt. Distler as she is not an expert in police shootings (Hr'g Tr. 270-271). Again, it is submitted that this line of reasoning is misplaced in the matter before the Department Hearing Officer. The request was denied and the objection noted for the record. It is submitted that counsel had more than enough notice to secure such a witness and at that juncture adjourning would just cause unnecessary delay.

Prior to this hearing, counsel for the Respondent actually requested that the Commissioner of Police sign fifteen (15) subpoenas to produce various witnesses from the Nassau County Police Department, the Suffolk County Police Department and one independent eye-witness. All

subpoenas were signed by the Commissioner of Police. In fact, included on that list were the members of the Suffolk County Crime Scene Laboratory that generated the Shooting Incident Report (Dept. Exhibit 6). None of these witnesses were called by P.O. DiLeonardo. It is submitted that the Commissioner of Police signed the subpoenas for the production of the very people that created the shooting incident report that D/Sgt. Distler relied on for facts and evidence about the shooting. The Respondent had the opportunity to call any of these witnesses, but none were produced. D/Sgt. Distler was not called as an expert shooting investigator, she was not offering an expert opinion on investigating a shooting. Therefore, P.O. DiLeonardo was not denied due process.

Furthermore, the Respondent was permitted to submit an expert opinion to supplement the record. Respondent offered the hearsay expert opinion of Mr. Joseph Zogbi which is in the record uncontested.

### III. P.O. DiLeonardo was not denied due process by being charged with Art 8, Rule 12 (2)

Respondent mentioned on and off the record, (Hr'g Tr. 233-238) and presumably will argue that he (a) didn't have notice that his off duty .38 caliber Smith & Wesson was subject to Article 8, Rule 12 (2) and; that (b) this rule does not apply to his off duty .38 caliber Smith & Wesson.

P.O. Dileonardo is required to know the Departmental Rules and Regulations. (See Nassau County Police Department Administrative Rule 1110 definitions, "Department Manual, a manual containing the written policies, procedures, and rules of the Department to be used by members in the performance of their official duties;" Nassau County Police Department Rules and Regulations, Article 1, Rule 7 (2), "Rules, orders and memoranda require strict compliance," and; Nassau County Police Department Rules and Regulations, Art 6, Rule 1(4), "Members of the Department who are issued a Department Manual will maintain the manual by properly inserting documents when they are issued").

It has been inferred/alleged that P.O. DiLeonardo did not have notice that failing to safeguard his weapon, included losing his off duty .38 caliber Smith & Wesson in someone else's vehicle, was a violation of the Rules and Regulations. P.O. DiLeonardo was served with the reports of Violations of the Rules and Regulations on July 2, 2012. It was not until this hearing that he challenged the nature of the charge as contained in the Charges and Specifications.

The U.S. Supreme Court has held that the Due Process Clause of the Fourteenth Amendment requires that an individual be given an opportunity to be heard before being deprived of any "significant property interest." Tenured public employees possess vested property rights in their continued employment and may not be terminated without a hearing. Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532 (1984). The Second Circuit expanded Loudermill by finding that a pre-demotion hearing is required because the Fourteenth Amendment protects an employee's property interest in a particular position or rank. Ciambriello v. County of Nassau, 292 F.3d 307 (2nd Cir. 2002). Although Civil Service Law § 75 states, "A person...shall not be removed or otherwise subjected to any disciplinary penalty (emphasis added)...except after a hearing upon stated charges." The Department submits that throughout the disciplinary process, P.O.

DiLeonardo was afforded the due process envisioned in Loudermill. Furthermore, the Department adhered to the stricter notice and due process mandates contained in Civil Service Law § 75.

It was also alleged/inferred by the Respondent that Art. 8, Rule 12(2) does not apply to his off duty .38 caliber Smith & Wesson. In fact, it was inferred that P.O. DiLeonardo should have been charged under a different section of the Rules and Regulations, specifically, Article 8, Rule 12 (1). "Section 75 of the Civil Service Law requires that a person suspected of misconduct be presented with 'stated charges'. Such person should be sufficiently apprised of the charges against him so as to enable him to prepare his defense." Pachucki v. Walters, 56 A.D.2d 677 (1977). In the instant matter, P.O. DiLeonardo was served with the reports of Violations of the Rules and Regulations on July 2, 2012, which outlined the facts and circumstances under which he was being accused of violating the Department Rules and Regulations (Dept. Exhibit 21). He was subsequently served with the Charges and Specifications on August 22, 2012. Both documents setting forth the nature of the allegations of the charges being made against P.O. DiLeonardo.

The argument that the charge was not the correct charge under the Department Rules and Regulations is weak at best. In Murphy v. County of Ulster, 218 A.D.2d 832 (1995), "[t]he employee instituted an action, alleging that the notice of discipline contained insufficient information to apprise him of the charges against him.... On appeal, the court held that the notice was sufficiently specific to apprise the employee of the charges against him and to allow him to prepare an adequate defense.... Moreover, the court found that the county's failure to cite specific statutes or rules did not render the notice insufficient." Furthermore, "[i]t is well settled that in the administrative forum, the charges need only be reasonably specific, in light of all the relevant circumstances, to apprise the party whose rights are being determined of the charges against him [or her] ... and to allow for preparation of an adequate defense." Id. at 832-33. (See also, Matter of Block v. Ambach, 73 N.Y.2d 323, 333 (1989) [citation omitted]; see, Matter of Langhorne v. Jackson, 213 A.D.2d 909, 909-910 (1995). Therefore, if the Departmental Hearing Officer is to believe arguendo, that P.O. DiLeonardo was charged under the wrong section of the Rules and Regulations, that being Article 8, Rule 12(1) instead of (2), it is submitted that substantial evidence to support a violation of either subsection and that Rule has been presented to the Departmental Hearing Officer.

Finally, P.O. DiLeonardo violated the Rules and Regulations, by failing to safeguard his weapon. His behavior was a gross deviation from what is expected of a member of the Nassau County Police Department on the morning of February 27, 2011. The charges against P.O. DiLeonardo were filed following a thorough and objective investigation by the IAU. Reports of Violations of Department Rules (PDCN 209) (Dept. Exhibits 17, 19A, 21) were served on P.O. DiLeonardo on July 2, 2012. On July 10, 2012, the Disciplinary Review Board (DRB) converted the PDCN 209s to the service of formal Charges and Specifications, pursuant to Article 9 of the Department Rules and Regulations. The PDCN 209s were then converted to PDCN 210s (Dept. Exhibit 22) and endorsed by the Commissioner of Police on August 22, 2012. The Commissioner of Police reviewed and endorsed the Charges and Specifications after not only the members of IAU reviewed and submitted them but also after they were reviewed by the DRB. The DRB is currently comprised of the Police Department's Division Chiefs. After a review of the facts and

the Violations of Rules and Regulations the DRB saw fit to convert the Violations of Rules and Regulations into formal Charges and Specifications.  It is important to note, that the facts that led to the Charges and Specifications were reviewed at multiple levels by high ranking police department personnel up to the Commissioner of Police. By endorsing the Charges and Specifications, based on the facts that were presented to him the Commissioner of Police agreed they were properly charged. Furthermore, the Commissioner of Police has broad discretion in interpreting the Rules and Regulations as the promulgator of same. Boss v. Raymond W. Kelly, 17 A.D.3d 269 (2005).

### IV. P.O. DiLeonardo was not acting in the scope of his duties, not effectuating a lawful arrest and therefore not similarly situated to other members involved in police shootings

P.O. DiLeonardo and his expert Mr. Joseph Zogbi (Respondent Supplemental exhibit 1), would have the Hearing Officer believe that his actions were justified because the Deadly Force Response Team (DFRT) report dated February 27, 2011 (Dept. Exhibit 1) concluded that his actions were within the Departmental guidelines and the Penal Law. This reliance is misplaced. D/Sgt. Distler testified that, the DFRT report is the result of a "preliminary investigation" by the DFRT (Hr'g Tr. 115). The DFRT is a team established to respond to incidents involving the use of deadly physical force, by a member of the department, in order to gather information for an administrative report to the Commissioner of Police. The report is used to brief the Commissioner of Police as close in time to the incident as possible. In the instant matter the DFRT report was generated within twenty-four (24) hours of the shooting. It is important to note, that this particular DFRT was not investigating the shooting from a criminal or even crime scene perspective. The scene was being investigated on those levels by Suffolk County authorities. D/Sgt. Distler testified that the DFRT did not have the benefit of interviewing any of the witnesses, the results of the Suffolk County Division of Medical-Legal Investigations & Forensic Sciences Crime Laboratory Shooting Incident Reconstruction Report, or photos (Hr'g Tr.115). In fact, the DFRT issued their report before even interviewing P.O. DiLeonardo. Any contact the N.C.P.D. had with P.O. DiLeonardo was peripheral at best, as it was Suffolk County Police Department's scene.

Mr. Zogbi in his "Expert Witness Report" opines, in paragraph 10, "P.O. DiLeonardo was found fit for duty, with no evidence of intoxication," by Inspector Edmund Horace and Deputy Chief John P. Hunter. This "opinion" was based on pages of the IAU report, a document which is not in this record as evidence and therefore cannot be considered by this Departmental Hearing Officer for purposes of this proceeding.  Furthermore, these witnesses were both on the Respondent's witness list, the Commissioner of Police signed a subpoena for the appearance of retired Deputy Chief Hunter, at the request of the Respondent, he was never called as a witness. Deputy Chief Edmund Horace was on stand by and prepared to testify from the first day this hearing was scheduled and the Respondent never called him. Finally, the DFRT Report is in evidence, notwithstanding the fact that some of those findings were found to be flawed after further investigation.

What is telling is that after all of the additional information, statements, and evidence was available, P.O. DiLeonardo was charged with Violating the Rules and Regulations. The DRB, another group of high ranking Departmental members, determined the matter warranted the service of formal Charges and Specifications.

P.O. DiLeonardo's position that he was justified in his actions is completely belied based upon the record in this case. Many times P.O. DiLeonardo, in his own words or through the arguments of his counsel and/or expert argue that P.O. DiLeonardo was attempting to make a "lawful arrest" (Dept. Exhibit 7, Dept. Supplemental Exhibit 2, and Respondent Supplemental Exhibit 1). There is nothing in the record before the Departmental Hearing Officer explaining what Moroughan did that violated the Penal Law, or what P.O. DiLeonardo was attempting to arrest Moroughan for. In fact, at the time P.O. DiLeonardo fired his first shot, Moroughan had not done anything criminal.

Even if one was to believe that P.O. DiLeonardo was afraid of Moroughan, based on the verbal altercation, Dt/Sgt. Distler testified that P.O. DiLeonardo had other options available. To begin with, "not engage in the verbal altercations and roll up his window and call 911" (Hr'g. Tr. 250: 20-21). It is submitted that P.O. DiLeonardo could have and should have made attempts to de-escalate the incident instead of escalating the incident to a shooting. P.O. DiLeonardo should not have gotten into a heated argument with Moroughan. P.O. DiLeonardo was in his girlfriend's car, and chose to get out of the car, in response to Moroughan getting out of his car, instead of calling 911 or even directing his girlfriend to call 911. P.O. DiLeonardo stated he thought Moroughan had a weapon in his left hand when Moroughan exited his taxi and walked towards P.O. DiLeonardo in his statement to IAU over one (1) year after the incident (Dept. Exhibit 7, line 25).

Interestingly, P.O. DiLeonardo did not tell Suffolk Police Department the night of the incident that he thought Moroughan had a weapon or that Moroughan threatened to kill him (S.C.P.D. Deposition of DiLeonardo Dept. Supplemental Exhibit 2). It flies in the face of reasonableness that P.O. DiLeonardo's reaction to someone coming at him with a weapon, was to approach that person (Dept. Exhibit 7, line 27) instead of again calling 911 and/or leaving the vicinity. In fact he never directs anyone to call 911 nor does he call 911 until after Moroughan leaves the scene. P.O. DiLeonardo's manner of taking control of the situation was inapposite to what a trained police officer should have done. P.O. DiLeonardo's statement indicates that Moroughan began to go back to his car at this point, and P.O. DiLeonardo unholstered his weapon while, Moroughan was retreating. P.O. DiLeonardo escalated the situation once again by going towards Moroughan with his weapon drawn and shooting, instead of getting back into his car, getting the other people back in their cars, calling 911 and making the scene safer. In fact, the independent eyewitness Eric Klug in his statement stated that P.O. DiLeonardo was shooting at the taxi as he observed the taxi moving in reverse and P.O. DiLeonardo continued to pursue the cab (Dept. Exhibit 12). Based on his own statement, the cab was about fifty (50) feet away from him when he started shooting, he had other options than to shoot at an allegedly moving vehicle with two (2) passengers, such as step out of the way, take cover behind one or both of the cars behind him or retreat to the lawn of 422 Oakwood Rd. His statement that he was concerned about defending his self and his girlfriend is self serving and his actions contradict same. He put all persons present in more danger than anyone else on the scene when he chose to get out of his car, unholster his

weapon and follow a retreating Moroughan to his cab. As explained above, at this time Moroughan had not done anything criminal. Therefore, it is submitted he was not attempting to "escape" arrest, he had not committed any crime.

Moroughan was not attempting to "escape" arrest (Respondent Supplemental Exhibit 1, para 4), he was attempting to get medical help, he was shot, Moroughan stated, "At that time, I'm – I get the car into reverse, I step on the gas, and I back up to drive away. And then I swung myself around and drove away, and drove myself to the emergency room" (Dept. Exhibit 15, lines 6-10).

P.O. DiLeonardo failed to safeguard his weapon when he used it improperly to break the window of the taxi and pistol whipped Moroughan. This is when he lost his .38. Mr. Zogbi relied on P.O. DiLeonardo's statement to IAU, made over a year after the incident to conclude that, "Moroughan, in an attempt to flee the scene in his vehicle dragged, P.O. DiLeonardo several feet, resulting in P.O, DiLeonardo to lose the grip on his off duty revolver" (Respondent Supplemental Exhibit 1). P.O. DiLeonardo never stated he was dragged by the cab until one year later. He did not tell Suffolk Police that he was dragged or that he lost his weapon because he was dragged (Dept. Supplemental Exhibit 2). He did not tell Sgt. Marinace that he lost his weapon because he was dragged. As a matter of fact, he did not tell Sgt. Marinace that the few injuries he sustained were from being dragged by the vehicle. As a matter of fact in P.O. DiLeonardo's statement to Sgt.Timothy Marinace he stated his minor injuries were the result of the "subject hitting [him] with his car, and from me breaking the driver's side window..." (Dept. Exhibit 8). P.O. DiLeonardo's minor injuries support the argument that he was not justified in his use of deadly physical force.

Moroughan's statement that is referred to in Mr. Zogbi's report paragraph 11, has been proven to be inaccurate. That statement was not only reduced to writing at 7:00am, but after Moroughan had been in the hospital for hours being treated for a broken nose and gunshot wounds. It was also taken in the early, preliminary stages of the investigation, and while Moroughan was believed to be a suspect (Hr'g. Tr. 215-221). This statement, among many other details that were first believed to be accurate were found to be flawed after further investigation.

P.O. DiLeonardo gave a lengthy statement to IAU. It should be noted that this statement was made over one (1) year after the incident. It is suggested that P.O. DiLeonardo had time to tailor his statement to meet his needs, to present the facts in a way that were favorable to his position that he was justified in his behavior.

P.O. DiLeonardo's actions were in violation of the Department Rules and Regulations. This sets him apart from other members of the Department that have been involved in recent police shootings. In the four (4) most recent shootings that involved N.C.P.D. members, the members were on-duty and made lawful arrests. P.O. DiLeonardo was off-duty, had been drinking and was not effectuating a lawful arrest. In fact, even if one was to believe he was justified in shooting at the vehicle (which N.C.P.D. submits he was not), his use of his revolver to break the window of the vehicle was improper police tactics (Hr'g Tr.130-131). Moroughan had not committed any crime at this point. In fact he put his taxi in reverse, moving away from P.O. DiLeonardo, when P.O. DiLeonardo fired the first shot. P.O. DiLeonardo stated to IAU that he was in fear for his

life, (Dept. Exhibit 7, line 33) yet he continued to approach the car, break the window with his revolver and get into a physical altercation with Moroughan who had never produced a weapon and was bleeding from gunshot wounds. It is not until Moroughan left the scene that P.O. DiLeonardo called 911.

In instances where indemnification was required/requested relating to the aforementioned recent on-duty police involved shootings, those members who were indemnified were found to be acting in the scope of their duties as police officers. In the instant matter, P.O. DiLeonardo has not been indemnified, as the indemnification board found he was not acting in the scope of his duties.

## V. Exigent Circumstances did not exist and reliance on United States v. McConney, a 9th Circuit Court of Appeals case is irrelevant.

Mr. Zogbi has opined that exigent circumstances existed that justified P.O. DiLeonardo's actions. His opinion is based on a 9th Circuit Court of Appeals case, United States v. McConney, 728 F.2d. 1195 (9th Cir. 1984). As the Departmental Hearing Officer is aware, this case was denied certiorari by the United States Supreme Court, therefore the decision is only binding on the 9th Circuit. Furthermore, in the McConney case, the federal officers involved were authorized to act pursuant to warrants, and had prior dealings with the suspect. The fear articulated in that case, was based on the fact that the officers knew the suspect had a previous felony conviction and was likely a member of the Hell's Angels gang. In the present case, P.O. DiLeonardo has encountered a taxi cab driver that he never met before, who had not committed a crime before P.O. DiLeonardo fired the first shot at him. There was no action by Moroughan, between P.O. DiLeonardo firing his weapon, and P.O. DiLeonardo breaking his window with the .38 that has been articulated that constituted a crime. P.O. DiLeonardo did not have probable cause to believe that Moroughan was attempting to escape arrest or even harm P.O. DiLeonardo. Therefore, it is not reasonable to believe P.O. DiLeonardo was trying to place him under arrest when he broke the window of the cab.

There is nothing in the record supporting the fact that P.O. DiLeonardo's weapon came into contact with Moroughan's face as a result of the breaking of the window. His intent to cause serious injury can be inferred by the severity of the injuries Moroughan sustained. Premeditation is not an element of Assault, as implied by Mr. Zogbi (Respondent Supplemental Exhibit 1, p. 2, para 3). The exigency of the circumstances was created in P.O. DiLeonardo's mind, one year later, to tailor the facts in an attempt to justify his actions.

Finally, with respect to McConney, that case involved search and arrest warrants. The federal agents were acting pursuant to these warrants.

In the instant matter, P.O. DiLeonardo did not have reasonable cause to believe that Moroughan committed any crime whatsoever. If the situation was truly one of exigency as P.O. DiLeonardo suggests, there is no possible review of the facts that supports him having enough time to

unholster his revolver from his ankle and fire off five (5) rounds once the exigent circumstances presented.

P.O. DiLeonardo's reliance on exigent circumstances is rooted in the car "accelerating in [his] direction"(Dept. Exhibit 7, line 30). However, he stated he unholstered his weapon prior to the car accelerating at him, therefore prior to the situation becoming "exigent." If he had time to unholster his weapon, he had time to simply move out of the way of the allegedly "accelerating" taxi. Notwithstanding this inappropriate reliance on McConney, exigent circumstances were not present or articulated. Moroughan had not committed any crime and was not attempting to escape arrest. P.O. DiLeonardo was not acting as a reasonable person. He had admittedly been drinking alcohol right before the encounter with Moroughan. P.O. DiLeonardo escalated the situation from the moment Moroughan pulled up next to his car.

### VI. Felony convictions mandate vacating position under the N.Y.S. Public Officer's Law

Finally, P.O. DiLeonardo's actions constituted unlawful conduct. Article 5, Rule 2 (1) states, "Members of the Department will not: 1. engage in unlawful conduct, whether on or off duty." It is submitted that P.O. DiLeonardo's conduct was equivalent to actions that constituted two (2) felonies. Assault in the Second Degree and Criminal Mischief in the Second Degree.

It is also respectfully submitted that his behavior was so egregious as to constitute what could have been charged under the New York State Penal Law as felonies. When a Public Officer is convicted of a felony or a crime involving a violation of his oath of office, Section 30(1)(e) of the New York State Public Officers law mandates his office be vacated. No hearing is required. In the instant matter, P.O. DiLeonardo has been afforded a hearing and while he has not been charged with violations of the Penal Law, it is submitted his actions constituted what could have been charged under the Penal Law. Had he been charged and convicted he would vacate his position by operation of law. This is not the forum to argue why he was not charged as his conduct occurred in another jurisdiction.

### CONCLUSION

P.O. DiLeonardo should not be able to allege or hide behind the claim of justification. His use of deadly physical force was not to effect a lawful arrest or prevent an escape. At the time he fired the first shot, Moroughan was not escaping and had not committed any crime. P.O. DiLeonardo claims he was in fear of his life and was firing at a vehicle that was accelerating towards him. According to the witness statements, and the crime scene reconstruction analysis, the only person other than P.O. DiLeonardo, who unequivocally said the cab was accelerating forward was Mrs. Bienz. Cornia, P.O. DiLeonardo's girlfriend stated she heard the engine revving. Interestingly, P.O. DiLeonardo never stated to IAU or Suffolk Police that he heard the engine revving. The independent witness (Eric Klug) at the window at 422 Oakwood Rd., did not see the cab moving after he heard the first shot. With the cab stopped Eric Klug saw flashes coming from the gun. Moroughan stated that he swung around and drove away. In what was clearly an attempt to make a U-turn he probably "moved forward about a foot or two at the most" when the shooting started.

It is likely, that Moroughan, who was only driving this vehicle for a week, in a moment of panic was having difficulty with shifting the gears after he went in reverse (this may explain the statements made by Mrs. Bienz and Cornia that the engine was revving). When Moroughan got the cab into drive it could have lurched forward more than a foot or two, but the evidence (and logic) shows Moroughan was trying to get away, not get closer to P.O. DiLeonardo. The crime scene report indicates the cab moved forward as little as half a car length.

Even if, one was to believe the cab moved forward, it could only have been a short distance, given the distance it was from P.O. DiLeonardo. Furthermore, based on P.O. DiLeonardo's statement, when he started shooting the cab was about fifty (50) feet away. It appears that P.O. DiLeonardo could have moved to his left and out of harms way, if he truly believed the cab was coming towards him.

By his own admission, P.O. DiLeonardo consumed alcohol that evening. P.O. Bienz statement documents P.O. DiLeonardo drinking seven (7) vodka drinks. What is perhaps most disturbing is that P.O. DiLeonardo appears to have unholstered his weapon before he started to approach the cab, and quite possibly when he was in his girlfriend's car. There is nothing to suggest, other than P.O. DiLeonardo's statement to IAU over a year later, that Moroughan may have had a weapon, that Moroughan or Ms. Mondo posed any risk beyond the use of foul language. Thus, there was no reason for P.O. DiLeonardo to have unholstered his weapon before he started to approach the cab. Given the circumstances of the shooting and the beating of an unarmed man over a minor verbal altercation, the evidence and logic dictates the P.O. DiLeonardo acted in a manner that grossly deviates from not only what the Police Department Rules and Regulations mandate, but what any reasonable person would do in a similar situation.

The N.C.P.D. submits once again that for the reasons set forth above, there was substantial evidence presented to support the Charges and Specifications before the Departmental Hearing Officer.

Dated: April 2, 2014

Nassau County Police Department

by: _____

Lesli P. Hiller
Attorney
Nassau County Police Department
Legal Bureau

# EXHIBIT D

--------------------------------------------------------X

IN THE MATTER OF THE CLAIM OF

POLICE DEPARTMENT

COUNTY OF NASSAU, NEW YORK                    Case No.: 8118

                              Claimant,

        -against-

ANTHONY DILEONARDO

POLICE OFFICER, SERIAL NO. 9013

                              Respondent.

--------------------------------------------------------X

## INTRODUCTION

The respondent is submitting this concluding brief but is not waiving the objections made concerning how the "hearing" was conducted.   In fact, it is the respondent's position that the proceeding was tantamount to having no hearing at all. The only evidence presented was the Internal Affairs officer reading from certain documents and her unsupported and unfounded opinion. Having her testify was pointless as she added nothing to the statements she read from.  Worse, the department was permitted to offer an affidavit from her after she testified concerning her qualifications and training, but the respondent was not permitted to ask the witness questions about the assertions in the affidavit.

There were no rules published concerning how the hearing was to be conducted and there were no rules enforced during the proceeding. It was literally a free-for-all where rulings were made by the presiding inspector without any rationale or reason.

1

There was no discernable standard by which the person presiding over the hearing accepted or rejected evidence.  The presiding inspector frequently allowed in evidence over objection stating that the evidence would be given "the weight that it is due." However, the neither the Department nor the respondent had or has any idea what weight that is.  The presiding inspector permitted an utterly unqualified witness to offer her "opinion" about virtually every disputed issue and about the ultimate issues of whether or not any department rule was violated.  The presiding inspector arbitrarily cut off valid lines of questioning.

It was apparent that there were not any rules at all.  The presiding inspector in a manner devoid of any rationale rooted in law or logic seemed to be accepting or not "evidence" based on nothing but mere whim, and, of course, that whim nearly always permitted the department to do whatever it wanted to do.   The proceeding or "hearing" was a sham which denied the respondent any semblance of due process.  No fact finding is possible from this record, except what is clearly a pre-determined result driven by media accounts and the interim commissioner's need to look like a disciplinarian in order impress the media and the county executive in an effort to have "interim" removed from his title.  Indeed, the fact that the hearing was being conducted was leaked to Newsday by someone in the department.  This was the second time the hearing was leaked to Newsday.  The matter had previously been scheduled in February and someone from the department leaked that date to Newsday as well.

2

The entire record ought to be scrapped, another presiding inspector should be appointed and rules ought to be published to both parties prior to the start of the proceeding.

Notwithstanding the arbitrary manner in which the proceeding was conducted, the department utterly failed to establish that there was any evidence at all that the respondent violated any department rule.

## FACTS

The uncontroverted proof from the witness statements establishes that on the evening of February 26, 2011, into the early morning hours of February 27, 2011, off-duty police officers Anthony D. DiLeonardo and Edward Bienz, accompanied by DiLeonardo's girlfriend Sophia Cornia, and Bienz's wife Jillian Bienz, had gone out together for dinner and then to a couple of bars in Huntington, where they each consumed a few alcoholic and non-alcoholic drinks, and went dancing (*see* 3/17/2012 P.O. DiLeonardo Statement at ¶2-11; 3/13/2012 P.O. Bienz Statement at ¶2-3). At around 1:00 a.m., they left the last bar, and DiLeonardo and Sophia, who were in Sophia's white Infinity and were unfamiliar with Huntington, followed the Bienzes' blue Acura toward Jericho Turnpike (3/17/12 P.O. DiLeonardo Statement at ¶13-14; 3/13/12 P.O. Bienz Statement at ¶4; 2/27/11 J. Bienz Statement at pg. 1; 2/27/11 S. Cornia Statement at pg. 1).

At approximately 1:15 a.m., Bienz got lost and pulled over to the side of the road on Oakwood Drive, parking his vehicle near the curb. DiLeonardo pulled up behind him, and sat in the Infinity with Sophia, waiting for Bienz to continue driving (3/17/12 P.O.

3

DiLeonardo Statement at ¶15-18; 3/13/12 P.O. Bienz Statement at ¶4-5; 2/27/11 J. Bienz

Statement at pg. 1; 2/17/11 S. Cornia Statement at pg. 1).

As they were sitting in the car, a white Prius with a male driver and a female

passenger pulled up alongside DiLeonardo's car, blocking one lane of traffic (3/17/12

P.O. DiLeonardo Statement at ¶19; 3/13/12 P.O. Bienz Statement at ¶5). The Prius was a

taxi owned by Dobro Express, being driven by a new employee, Thomas Moroughan,

with his girlfriend, Kristie Mondo in the passenger seat (2/2711 Statement of K. Mondo

at pg. 1; 2/27/11 Statement of T. Moroughan at pg. 1).[3]

Believing that the driver of the Prius was going to ask him for directions,

DiLeonardo, who was at the wheel of the Infinity, rolled down his window (3/17/12 P.O.

DiLeonardo Statement at ¶19-21). Moroughan, yelled out of his car's open passenger

window, "You need to learn how to fucking drive, I'm going to teach you how to fucking

drive right now." (3/17/12 P.O. DiLeonardo Statement at ¶22; *see also* 2/27/11 K. Mondo

---

[3] Moroughan, a new driver at Dobro Express with less than a week on the job, had three prior arrests and two misdemeanor convictions, and was wanted in Tennessee for a federal fraud case. On the day of the incident, he was "having a bad day [as] there was a lot of traffic and [he] wasn't making any lights" (2/27/11 Statement of Moroughan at pg. 1). He got angry because he was driving behind the Bienzes' blue Acura sometime before it stopped, and was flashing his high beams at it for driving erratically (2/27/11 Statement of Mondo at pg. 1; 2/27/11 Statement of Moroughan at pg. 2). Moroughan perceived that DiLeonardo's white Infinity, which was then behind him, had flashed its beams at him, so he began to drive slowly to "piss off" the driver of the Infinity, who passed him in spite of Moroughan's attempts to prevent this (2/27/11 Statement of Mondo at pg. 1). Moroughan then got stuck at a light as the cars turned the corner, but when the light turned green, he followed them and saw them stopped at the side of the road (2/27/11 Statement of Mondo at pg. 1; 2/27/11 Statement of Moroughan at pg. 2) Neither Bienz, DiLeonardo, Jillian, or Sophia was aware that the Prius had brighted anyone, and DiLeonardo denied brighting the Prius. It thus appears that Moroughan got angry because the Acura, which was lost, was driving erratically, and he perceived that the Infinity was being belligerent when, in fact, it was just passing him to keep up with the Acura. This explains why, in contrast to Moroughan and Mondo, no one in the Acura or Infinity even recalled any earlier incident with the Prius.

Statement at pg. 2; 2/27/11 T. Moroughan Statement at pg. 2). DiLeonardo exchanged words with Moroughan, and as DiLeonardo began to close his window, Moroughan exited his car, walking around the front of the Prius toward DiLeonardo's car, while pointing at him with his right hand and yelling, "I'm going to kill you." (3/17/12 P.O. DiLeonardo Statement at ¶23-26; *see also* 2/27/11 T. Moroughan Statement at pg. 2). DiLeonardo could not see Moroughan's left hand, and, concerned that Moroughan might have a weapon, he exited his car, keeping the open door of the Infinity between himself and Moroughan (3/17/12 P.O. DiLeonardo Statement at ¶27). Moroughan continued to yell at DiLeonardo, saying, "I don't care about this fucking car. I'm going to smash your car and I'm going to kill you." (3/17/12 DiLeonardo Statement at ¶26). Moroughan then got back into his car, and floored it into reverse (*Id.*; 2/27/11 T. Moroughan Statement at pg. 2), as DiLeonardo, fearing for his and Sophia's safety, and believing that Moroughan was going to ram the Infinity in which Sophia was still sitting, drew his gun from his ankle holster and attempted to get around the back of the Infinity to get Sophia out of the car (P.O. DiLeonardo Statement at ¶28-30). As he walked towards the back of the car, he pulled out his shield, which was on a chain around his neck, and held it out in front of him with one hand, yelling to the Prius that he was a police officer and ordering the driver of the Prius to stop (2/27/11 J. Bienz Statement at pg. 1-2; 2/27/11 S. Cornia Statement at pg. 2).[4]

---

[4] Jillian Bienz, who saw the Prius pull up next to DiLeonardo's car, and heard DiLeonardo and the driver of the Prius cursing and yelling at each other, "with the people in the taxi [] doing most of the yelling", also observed the Prius back up and then stop, and saw DiLeonardo holding up what she believed was his shield as he moved towards the back of his car, yelling that he was a

5

Before DiLeonardo could get fully around the back of his car, the Prius, which had backed up a few car lengths and had now stopped with its front facing the back of the Infinity at a diagonal angle, began accelerating toward the rear of the Infinity, where DiLeonardo was standing (DiLeonardo Statement at ¶30; 2/27/11 T. Moroughan Statement at pg. 2). DiLeonardo shouted, "Stop, police, don't move" and pointed his gun at the Prius, which was heading straight towards him. Moroughan did not stop or slow down, and DiLeonardo fired, emptying all five rounds of his weapon (P.O. DiLeonardo Statement at ¶30-34).[5]

The Prius then came to a stop between 10 and 25 feet away from DiLeonardo's car, and DiLeonardo approached the driver's side door with his shield out and his gun drawn, stating, "Police, don't move, you are under arrest." (3/17/12 P.O. DiLeonardo Statement at ¶38-39; 3/13/12 P.O. Bienz Statement at ¶9). Moroughan refused DiLeonardo's commands to unlock the door, so DiLeonardo smashed the driver's side window with the butt of his gun, unlocked the door, and pulled it open.[6] As he attempted

---

police office, and ordering the driver of the Prius to stop the car (2/27/11 J. Bienz Statement at pg. 1-2). Sophia Cornia, who was sitting in the Infinity, saw the taxi back up aggressively and stop behind her car. She also saw DiLeonardo move towards the back of the car while holding out his shield, which he was wearing on a chain around his neck (2/27/11 S. Cornia Statement at pg. 2).

[5] In a signed statement given on the day of the incident, Moroughan told police that, "I felt [DiLeonardo] fired at me to protect himself because I drove at him." (2/27/11 T. Moroughan Statement at pg. 2-3). At the hearing the Detective Sergeant Dissler hinted that the confession was taken under suspicious circumstances. However, there is not any testimony in the record that would corroborate any claim that the confession was either involuntary, false or taken in violation of the Moroughan's rights.

[6] According to Kristie Mondo, the passenger in the Prius, during the struggle DiLeonardo "said he was a cop and that [Moroughan] was going to jail." (2/27/11 Statement of K. Mondo at pg.

to remove Moroughan from the car, the latter resisted, cursing at DiLeonardo and threatening to kill him. A struggle ensued, during which Moroughan grabbed DiLeonardo's gun with one hand and punched him with the other, as DiLeonardo was leaning into the vehicle. Moroughan then shifted the car into reverse, and sped backwards, dragging the Officer alongside the vehicle. DiLeonardo twisted away from the car, and ran away from the Prius towards Bienz, who was running to assist him, but both Officers were hit by the driver's side door of the Prius, which was still open, and were thrown to the ground (3/17/12 P.O. DiLeonardo Statement at ¶48-51; 3/13/12 P.O. Bienz Statement at 9; 2/27/11 T. Moroughan Statement at pg. 3). The Prius made a U-turn and sped away (2/27/11 J. Bienz Statement at pg. 3; 2/27/11 S. Cornia Statement at 2). DiLeonardo's gun had fallen into the Prius during the struggle.

DiLeonardo immediately called 911, identified himself as a police officer, and reported that the driver of a white Prius with gold plates had tried to run him over, that DiLeonardo had shot at the Prius, and that the driver of the Prius had taken his gun (3/17/12 P.O. DiLeonardo Statement at ¶56). EMS arrived within minutes, transporting DiLeonardo, Bienz, Sophia, and Jillian to Huntington Hospital (Id. at ¶57).

Meanwhile, Moroughan realized he had been shot and also drove to Huntington hospital, while his girlfriend-passenger, Kristie Mondo, called 911 (2/27/11 Statement of K. Mondo at pg. 3; 2/27/11 Statement of T. Moroughan at pg. 3).

---

2). Moroughan also recalled that DiLeonardo "said he was a police officer and that [Moroughan] was under arrest," but Moroughan claimed that he was not sure DiLeonardo was a cop, so he drove away (2/27/11 Statement of T. Moroughhan at pg. 3).

7

## The Investigation and Charges Against Moroughan

At the hospital, DiLeonardo was visited by P.O. Michael Covais, and Deputy Chief of Patrol John Hunter who spoke to him and told him that the PBA attorney was on his way.  At that time, Officer DiLeonardo did not appear intoxicated, and did not smell of alcohol.  His speech was not slurred and his eyes were not bloodshot (3/20/12 Covais Statement at ¶3).

On the day of the incident, the Deadly Force Response Team, consisting of Deputy Chief John P. Hunter, Deputy Chief of Patrol, Inspector Edmund Horace, Commanding Officer, ITU, Captain Daniel P. Flanagan, Commanding Officer Police Academy, and Det. Sergeant John DeMartinis, Homicide Squad, conducted an investigation and issued a preliminary report finding that "the actions of all officers involved, with regard to Use of Force issues, were within Departmental guidelines pertaining to the Use of Deadly Physical Force as well as those of Article 35 of the Penal Law of New York State" and that "[a]ll officers involved were found fit for duty" (2/27/11 Deadly Force Response Team Report at ¶3).  With regard to the latter finding, both Chief Hunter and Inspector Horace reported that they spoke to Officer DiLeonardo at the hospital, and did not observe any odor of alcohol, slurred speech or glassy eyes, and that DiLeonardo exhibited no other signs of impairment (Ferguson Memo at 7).

That same day, Moroughan, who had been treated and released from the hospital, was arrested and charged with Reckless Endangerment in the Second Degree for accelerating his vehicle towards Officer DiLeonardo and placing him in fear of physical

8

injury or death, and Assault in the Second Degree for causing physical injury to a police officer performing a lawful duty, namely, trying to arrest him for reckless endangerment.

On June 6, 2011, in Suffolk County District Court, the charges against Moroughan were dismissed by the prosecution pursuant to C.P.L. §170.30(f) on the grounds of a jurisdictional or legal impediment.  In dismissing the charges, the ADA denied that Moroughan was actually innocent of the charged crimes (6/6/11 Proceedings at 10), stressing that a legal impediment to prosecution existed in view of the conflicting evidence, the fact that the officers had consumed alcohol prior to the incident, defendant's decision not to testify in the Grand Jury, and Kristie Mondo's refusal to speak with the District Attorney's office (*Id.* at 3-6).

Also on June 6, 2011, the Internal Affairs Unit of the Nassau County Police Department was directed by Acting Commissioner of Police Thomas Krumpter to commence an Internal Affairs investigation into the February 27, 2011 incident involving Officers Bienz and DiLeonardo.  That investigation resulted in departmental charges being brought.  Despite the "opinion" of the sole witness at the proceeding, there was not any proof that the respondent violated any rule.

The only other evidence in the matter was the opinion of Joseph Zogbi who is a highly trained retired New York City Detective. He reviewed the same material the department's sole witness reviewed but concluded that the responded did not violate any department rule.  Like the shooting response team, Retired Detective concluded that the responded was justified in firing his weapon because the vehicle was being driven at him at an increasingly high rate of speed.  He further concluded that the attempted arrest was

9

justified based on the conduct of the driver and therefore the breaking of the window was necessary to affect a lawful arrest.

Lastly, the department charged the respondent with failing to safeguard his firearm under a section that clearly was not written to include a weapon not issued by the department. There is another section that mandates that an officer safeguard any firearm, but that section was not charged. Therefore the respondent cannot be found to have violated the provision which does not apply to firearms and obviously cannot be found to have violated a provision he was not charged with.

We renew our request for a hearing de novo with published rules.

Dated: April 9, 2014
     Garden City, New York

                                   BARKET MARION EPSTIEN & KEARON, LLP

                         By:        /s/ Bruce Barket
                               Bruce A. Barket, Esq.
                               666 Old Country Road, Suite 700
                               Garden City, New York 11530
                               (516) 745-1500

# EXHIBIT E



**POLICE DEPARTMENT**
**COUNTY OF NASSAU, NEW YORK**

**INTERNAL CORRESPONDENCE**

| | | |
|---|---|---|
| **DATE:** | March 30, 2014 | **SNCC NO:** |
| **TO:** | Commissioner of Police | |
| **FROM:** | Inspector Michael G. Studdert, Hearing Officer | |
| **SUBJECT:** | **CASE NUMBER 8118- CHARGES AND SPECIFICATIONS- POLICE OFFICER ANTHONY DILEONARDO, SERIAL NUMBER 9013, SHIELD NUMBER 3632, THIRD PRECINCT** | |

This matter involves Charges and Specifications brought against Police Officer Anthony DiLeonardo, Serial Number 9013, Shield Number 3632, Third Precinct, in Case Number 8118 for violation of the Rules and Regulations of the Nassau County Police Department ("NCPD"). Police Officer DiLeonardo is charged with three violations of the Rules and Regulations arising out of an incident that occurred at 0115 hours on February 27, 2011 on Oakwood Road and Tippen Drive, Huntington, New York.

PROCEDURAL HISTORY

1. Police Officer DiLeonardo was served with Charges and Specifications for Case Number 8118 on August 22, 2012 (See Exhibit 19). On August 28, 2012, Police Officer DiLeonardo's attorney entered a plea of "Not Guilty" by way of a notification signed by Police Officer DiLeonardo and submitted by his attorney. A hearing was scheduled for this matter on December 4, 2012 and the parties were notified of that date. The hearing was adjourned on that date at the request of the Department and rescheduled to February 10, 2014, with notification of the new date to the parties. Officer DiLeonardo's attorney requested an adjournment at that time. That request was granted and the hearing was rescheduled to March 10, 2014, with notice of the new date given to both parties.

2. The hearing did in fact commence on March 10, 2014. The hearing continued on March 11, 2014 and was then adjourned at the request of the Respondent to March 19, 2014 in order to accommodate prior commitments and court appearances required of the respondent's attorney, Mr. Barket. The Hearing was conducted at Nassau County Police Department Headquarters, 1490 Franklin Avenue, Mineola, New York. The Nassau County Police Department was represented by Leslie Hiller, Esq., of the Nassau County Police Department's Legal Bureau. The respondent, Police Officer DiLeonardo, was represented by Bruce Barket, Esq., of Barket, Marion, Epstein & Kearon, LLP. Police Officer DiLeonardo's attorney and his union (PBA) representative were present each day of the proceeding. In fact, on the last day of testimony the proceeding was delayed so that the Union representative could be present with Police Officer DiLeonardo (Tr. p. 262). Although the Charges and Specifications in this case contained thirteen (13) charges of violations of the Rules and Regulations of the NCPD, the Department only presented three of the charges (Counts 3, 4 and 11). Therefore, only those three violations were the subject of this hearing. The remaining counts were dismissed by the Department.

3. The disciplinary case against Police Officer DiLeonardo was conducted pursuant to NYS Civil Service Law §75. The administrative disciplinary case proceeded in a manner consistent with the Rules and Regulations of the NCPD. The Nassau County Administrative Code provides that a member of the Department is subject to discipline for violations of the Rules and Regulations of the NCPD. Prior to taking testimony I reminded the parties that the hearing which was about to take place was an administrative proceeding and not criminal or civil litigation. The parties were advised that hearsay evidence would be accepted and that I would be applying the substantial evidence standard. Police Officer DiLeonardo, by way of service of the Charges and Specifications, was provided with adequate notice regarding the nature of the alleged violations of the Rules and Regulations which were pending against him. Moreover, both parties had been provided adequate notice of the hearing date in order to prepare and to secure and notify any potential witnesses they wished to call. In fact, the record reflects that Mr. Barket served subpoenas on several witnesses (Tr. p. 16), but ultimately did not request that they testify. The parties were permitted to conduct cross examination of witnesses and make objections. Both parties were given ample opportunity to set forth their respective positions on the record. Although this was not a formal judicial proceeding, it did comply with the standards set forth in the NY State Administrative Act. Consequently, I reject Mr. Barket's position that the proceeding which was held was "tantamount to having no hearing at all." ( Resp. Brief p. 1).

4. At the conclusion of testimony I advised the parties that I would accept additional submissions and leave the record open until March 26, 2014. Both parties declined an opportunity to make a closing statement and requested an opportunity to submit briefs. The parties were informed that closing briefs were to be submitted jointly on April 4, 2014.

5. I received submissions from the Department and the Respondent on March 26, 2014. The Department's submissions included an affidavit from Det. Sgt. Jo Ann Distler, a deposition of Officer Anthony DiLeonardo, and curriculum vitae of George G. Krivosta. Mr. Barket's submission was a report prepared by Mr. Joseph F. Zoghi. There were numerous emails between the parties regarding the submissions and additional requests and objections made by the parties. In order to maintain a clear record I requested that the parties send one joint email setting forth any outstanding issues which required a determination or ruling from me. A printout of that joint email, reflecting the parties' objections and positions on the submissions as well as my determination thereof, has been printed and added to the record.

6. On April 3, 2014, Mr. Barket requested that the deadline for submission of the briefs be extended from April 4, 2014 to April 9, 2014. His request was granted.

7. On April 9, 2014, the briefs were jointly submitted. This memorandum, setting forth my findings and recommendations is submitted following the hearing which was conducted as outlined above and after review and evaluation of the testimony, the evidence presented and the briefs submitted by the parties.

8. The Respondent argues that the Department has pre-determined the result of this hearing and that result is "driven by media accounts and the interim commissioner's need to look like a disciplinarian." (Resp. Brief p. 2). As I indicated throughout the hearing, I have remained neutral and have had no conversations with Acting Commissioner Krumpter regarding the Charges and Specifications pending against Police Officer DiLeonardo or this administrative hearing. My decision was reached after a review of the testimony, evidence, submissions and submitted briefs.

9. I have not spoken with the media about this proceeding or my role as a hearing officer.  As I indicated during the hearing, I understand my obligation to evaluate the testimony and the evidence and reach my own independent conclusions (Tr. pp227-228).  Moreover, there is no evidence that any member of the Department leaked any information to any media outlet regarding this hearing.


## WITNESSES CALLED AND EVIDENCE PRESENTED

10. Despite the fact that there is some contradiction and inconsistencies in the statements that were offered into evidence, it is not impossible to conclude what actually occurred on the date of the incident after reviewing all of the testimony and the evidence. I have considered the possible motivations for the varying statements and have endeavored in my duty as the hearing officer to weigh the testimony and evidence and to make determinations about the credibility of the witnesses and the accuracy of their statements.

11. The Department called Det. Sgt. JoAnne Distler, currently assigned to the Internal Affairs Unit, as its only witness. The Department presented evidence detailing Det. Sgt. Distler's training and experience by way of testimony and an affidavit. Det. Sgt. Distler testified regarding the Internal Affairs investigation relating to the three charges which are the subject of this hearing. After receiving evidence with regard to her training and experience and having had the opportunity to observe her demeanor during testimony, I find Det. Sgt. Distler's testimony to be reliable and credible. I find that Det. Sgt. Distler is qualified to testify regarding the Rules and Regulations of the NCPD and investigations into violations thereof. I further find that Det. Sgt. Distler is qualified to testify regarding the facts of the investigation into the alleged violations of the Rules and Regulations by Office DiLeonardo which were the subject of this hearing.

12. The Respondent did not present any witnesses at the hearing. The Respondent did request to bring in an unnamed witness on the final day of testimony but did not have a witness present. The Respondent, aware of the nature of the allegations against him since the service of the Charges and Specifications and having had adequate notice of the hearing date had not made arrangements to have the witness present.  Further, the hearing began on March 10, 2014 and continued through March 19, 2014 during which time the Respondent could have produced a witness but did not. Rather, the Respondent's attorney indicated on the last day of testimony that he "began to look at the calling of and expert" (Tr. p. 270) and went on to state that whether or not he did in fact retain or call this witness would depend not on the importance of the proposed testimony, but rather on the cost of one witness versus another one. (Tr. p. 271). Additionally, the Respondent indicated that he was requesting an adjournment to possibly call a witness to testify regarding police shootings.  As this hearing was a proceeding to determine whether or not the Respondent violated the Rules and Regulations of the NCPD, I did not believe that a witness called to testify with regard to tactical operations, and not violations of the Rules and Regulations of the NCPD, would be relevant.

13. The Respondent did submit the affidavit of Joseph Zogbi, a retired New York City Police Department member, in support of his position. However, it must be noted that after a review of Mr. Zogbi's resume, I find that he would be unable to testify with regard to the Rules and Regulations of the NCPD or violations thereof. Additionally, it is important to note that Mr. Zogbi relies on and cites to sections of the IAU report which are not in evidence. Both Mr. Zogbi's report and the Respondent's brief rely on facts contained in the Deadly Force Response Team report. The Deadly Force Response Team report is a preliminary report that was prepared shortly after the incident and without the benefit of a complete and thorough investigation.

**FACTS:**

14. After listening to and reviewing the testimony in this case and evaluating the evidence presented I make the following findings of facts:

15. On February 27, 2011, at 0115 hours, while off duty in Huntington Station, N.Y., Officer DiLeonardo, accompanied by his girlfriend Sophia Cornia, was driving a 2011 white Infiniti. Officer Bienz, accompanied by his wife Jillian Bienz, was operating a 2008 blue Acura. They were on their way home from a night out in Huntington. Officer DiLeonardo was following Officer Bienz. Officer Bienz made a wrong turn and they got lost in Huntington Station. Officer Bienz pulled over to the side of the road on Oakwood Rd. in the vicinity of Tippen Drive, Huntington Station, N.Y. Officer DiLeonardo pulled over behind Officer Bienz's vehicle. Just prior to pulling over, there was some type of a road rage incident between Officer DiLeonardo and a white Toyota Prius taxi cab being driven by Thomas Moroughan ("Moroughan"). Moroughan's girlfriend, Kristie Mondo, was a passenger in that taxi. It is my finding that Police Officer DiLeonardo's continued escalation of this road rage incident, as outlined below, led to the charges which are the subject of this hearing.

16. Within a minute of the officers pulling over, the taxi cab being operated by Moroughan, pulled along side the Infiniti being driven by PO DiLeonardo. Moroughan and Officer DiLeonardo then engaged in a verbal confrontation.

17. There are conflicting statements as to whether Officer DiLeonardo had exited his vehicle prior to the cab pulling up. However, at some point both Moroughan and Officer DiLeonardo exited their vehicles and continued the argument over the hood of the white taxi cab. As the argument escalated, everyone at the scene, including Police Officer Bienz exited their vehicles with exception of Kristie Mondo who remained inside the taxi.

18. Moroughan reentered his vehicle and backed it up 30 to 45 feet. The verbal argument between Moroughan and Officer DiLeonardo continued as Moroughan backed up his vehicle. Officer DiLeonardo, who remained outside of his vehicle, chose to escalate the situation by removing his off duty weapon from his ankle holster. Officer DiLeonardo walked towards the taxi which was in the travel lane of Oakwood Road. As Officer DiLeonardo walked towards the cab he fired five shots at the windshield of the taxi. The windshield of the taxi was struck with bullets three times. Two shots struck Moroughan, one in the chest and one in the arm. Moroughan was unarmed and there is nothing in the record to indicate that Moroughan had engaged in criminal activity or had a prior criminal history. Following the shooting, the taxi moved forward a short distance and came to a stop 20 to 25 feet from Officer DiLeonardo. Officer DiLeonardo did not seek cover or attempt to order the driver out of the taxi. Rather, Officer DiLeonardo escalated this situation even further. Officer DiLeonardo ran up to the driver's side of the taxi, which was not moving and smashed the driver's side window with his weapon in his right hand, causing it to shatter. Officer DiLeonardo smashed Moroughan in the nose with the butt of his gun, and punched him in the face numerous times, fracturing his left nasal bone.

19. Officer DiLeonardo opened the driver's door to the cab and attempted to pull Moroughan out. During the struggle with Moroughan, Police Officer DiLeonardo lost his gun in the cab. That weapon was eventually recovered on the left rear passenger floor area of the taxi by the Suffolk County Police Department. Moroughan, while Officer DiLeonardo was attempting to pull him out of the taxi, put the taxi in reverse and backed up, knocking Police Officer DiLeonardo to the ground and bumping Police Officer Bienz causing him to hit the ground. Moroughan drove himself to the hospital.

4

FINDINGS

20. The following is my analysis and finding with regard to each of the three charges before me:

**Charge 3: Violation of Article 5, Rule 2, Subdivision 1:** On February 27, 2011, at about 0115 hours, at Oakwood Road and Tippen Drive, Huntington, New York, Police Officer DiLeonardo, while off duty, did engage in unlawful conduct, in that Police Officer DiLeonardo without justification struck Thomas Moroughan in the face with his .38 caliber Smith & Wesson revolver. The blow broke Mr. Moroughan's nose, caused him substantial pain and required medical treatment at a hospital. At the time of the incident Mr. Moroughan was sitting in the driver's seat of a stopped Toyota Prius, New York Registration Number # 13100TY. Pursuant to New York State Penal Law § 120.05(2), Police Officer DiLeonardo's actions constitute the crime of Assault in the Second Degree, which is a Class D felony. This is in violation of Article 5, Rule 2, Subdivision 1.

The findings of facts as outlined above detail the actions of Police Officer DiLeonardo which support the finding of this violation of the Rules and Regulations of the NCPD. Additionally, it should be noted that in his statement, Officer DiLeonardo admits striking Thomas Moroughan in the nose with the butt of his gun. (See Exhibit 7). Moroughan, in his statement to the Suffolk County Police Department, stated that Officer DiLeonardo "came up to my driver's window and smashed his gun busting my window and hitting me in the face." (See Exhibit 10). As a result of Officer DiLeonardo punching him in the face numerous times and smashing him in the nose with the butt of his gun, Moroughan sustained a broken nasal bone (See Exhibit 18). The actions of Officer DiLeonardo were unlawful, a violation of the Rules and Regulations of the NCPD and his actions could have been charged as a violation of NYS Penal Law.

**Charge 4. Violation of Article 5, Rule 2, Subdivision 1:** On February 27, 2011, at about 0115 hours, at Oakwood Road and Tippen Drive, Huntington, New York, Police Officer DiLeonardo, while off duty, did engage in unlawful conduct, in that Police Officer DiLeonardo intentionally caused damage in excess of one thousand five hundred dollars ($1500.00) to a 2010 Toyota Prius, New York State Registration Number # 13100TY, being operated by Thomas Moroughan. Police Officer DiLeonardo fired his .38 caliber Smith & Wesson revolver five (5) times at the taxi being driven by Moroughan. Three of the shots entered the passenger compartment. Once the taxi stopped moving Police Officer DiLeonardo then broke the driver's side window with his revolver. Pursuant to New York State Penal Law § 145.10, Police Officer DiLeonardo's actions constitute the crime of Criminal Mischief in the Second Degree which is a Class D felony. This is in violation of Article 5, Rule 2, Subdivision 1.

The findings of facts as set forth above detail the actions of Police Officer DiLeonardo which support the finding of this violation of the Rules and Regulations of the NCPD. Additionally, in his statement, Officer DiLeonardo admits he fired his weapon at the driver (See Exhibit 7, ¶33). He also states "that my shots damaged the windshield."(See Exhibit 7, ¶ 39) Mr. Eric Klug, in his statement to Sgt. Distler states, "I saw a man with a gun walking towards a white car which was stopped in the middle of the road. The man with the gun was shooting his gun at the windshield of the car." (See Exhibit 12.) In his statement to Sgt. Distler, Officer Bienz stated he "saw Anthony DiLeonardo run up to the driver's side of the cab and begin smashing the driver's window with his weapon in his right hand causing it to shatter." (See Exhibit 13, ¶ 9). The damage to the cab, operated by Moroughan, included three bullet holes to the windshield and a shattered driver's side window (See Exhibits 2,3,6). Sgt. Distler testified that she interviewed the owner of the cab, Mr. Boris Goldstein and that he stated it was a couple of thousand dollars to repair the vehicle. (Tr. pp116-117.). The actions taken by Officer DiLeonardo were

5

unlawful, a violation of the Rules and Regulations of the NCPD and his actions could have been charged as a violation of NYS Penal Law.

**Charge 11. Violation of Article 8, Rule 12, and Subdivision 2:** On February 27, 2011, at about 0115 hours, at Oakwood Road and Tippen Drive, Huntington, New York, Police Officer DiLeonardo did not properly safeguard his uniforms and equipment and any other Department property issued for or assigned for his use in that Police Officer DiLeonardo after using his .38 caliber Smith & Wesson revolver in physical confrontation with Thomas Moroughan the driver of a 2010 Toyota Prius, dropped said revolver inside Mr. Moroughan's vehicle. This weapon remained in the taxi while Moroughan drove himself to the hospital and was later recovered by Suffolk County PD from the rear passenger floor of the taxi. This is in violation of Article 8, Rule 12, and Subdivision 2.

The finding of facts as set forth above detail the actions of Police Officer DiLeonardo which support the finding of the violation of this Rule and Regulation of the NCPD. Additionally, in his statement to Sgt. Distler, Officer Bienz states "I ran towards the cab with the intention of helping Anthony secure his weapon." (See Exhibit 13 ¶9). Officer Bienz also states that while standing on the sidewalk at some point Officer DiLeonardo told him "that he lost his gun in the cab." (See Exhibit 13 ¶10). Officer Bienz states he was treated at Huntington Hospital, and then was placed in a room by himself at the hospital. Officer Bienz states that Police Officer DiLeonardo came to his room and spoke to him briefly. Officer Bienz states that at this time Officer DiLeonardo told him again "that he lost his gun in the cab."(See Exhibit 13 ¶12). Officer DiLeonardo's .38 caliber Smith & Wesson revolver was later recovered by the Suffolk County Police Department on the left rear passenger floor area of the cab. (See Exhibits 6, 20) The actions of Officer DiLeonardo were a violation of the Rules and Regulations of the NCPD.

21. Based on the findings of facts outlined above, I find there is substantial evidence in the record to support the following findings:

Charge 3. I find Police Officer Anthony DiLeonardo violated Article 5, Rule 2, Subdivision 1 of the Rules and Regulations of the Nassau County Police Department.

Charge 4. I find Police Officer Anthony DiLeonardo violated Article 5, Rule 2, Subdivision 1 of the Rules and Regulations of the Nassau County Police Department.

Charge 11. I find Police Officer Anthony DiLeonardo violated Article 8, Rule 12, Subdivision 2 of the Rules and Regulations of the Nassau County Police Department.

RECOMMENDATION

As a police officer, Officer DiLeonardo must command the absolute confidence and respect of the public he serves. Police Officer Anthony DiLeonardo's actions, on February 27, 2011 at 0115 hours, reflect unfavorably upon his moral character and fitness for public service; he has brought discredit to the Nassau County Police Department. His own actions have made it impossible for him to carry out his duties as a Nassau County Police Officer.

There is substantial evidence that Officer DiLeonardo violated the Rules and Regulations of the Nassau County Police Department and his Oath of Office. In light of the egregious nature of these violations the only appropriate punishment in this case is termination.


Michael G. Studdert
Inspector


APPROVED

Office of Commissioner of Police


7