UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------*

THOMAS M. MOROUGHAN,

                    Plaintiffs,

       -against-

COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPARTMENT, SUFFOLK DETECTIVES
RONALD TAVARES, CHARLES LESER, EUGENE
GEISSINGER, NICHOLAS FAVATTA, and ALFRED
CICCOTTO, DETECTIVE/SGT. WILLIAM LAMB,
SGT. JACK SMITHERS, SUFFOLK POLICE OFFICERS
WILLIAM MEANEY, JESUS FAVA and SUFFOLK
JOHN DOES 1-10, THE COUNTY OF NASSAU, NASSAU
COUNTY POLICE DEPARTMENT, SGT. TIMOTHY
MARINACI, DEPUTY CHIEF OF PATROL JOHN
HUNTER, INSPECTOR EDMUND HORACE,
COMMANDING OFFICER DANIEL FLANAGAN,
DETECTIVE/SGT. JOHN DEMARTINIS, NASSAU
POLICE OFFICERS ANTHONY D. DILEONARDO,
EDWARD BIENZ and JOHN DOES 11-20,

                    Defendants.
-------------------------------------------------------------*

12 Civ. 0512 (JFB)(AKT)

**DECLARATION**

**SERGEANT EDWARD BIENZ**, pursuant to 28 U.S.C. sec. 1746 deposes and states:

1.     My name is Edward Bienz. I am a named defendant in this action. I am fully familiar with the facts and circumstances that relate to my involvement in the events that form the basis of the claims made against me. I submit this Declaration in support of my motion before this Court seeking summary judgment and a dismissal of Plaintiff's Complaint.

2.     I grew up in Suffolk County in the town of Kings Park. In December, 2006 I graduated from S.U.N.Y. Farmingdale with a B.S. in Management Technology. In January 2007

I entered the Nassau County Police Department ("NCPD") Academy and became a member of the NCPD[1].

3.      In February 2011 I was employed by the NCPD as a police officer assigned to the Third Precinct.

4.      Approximately a year before these events I became acquainted with Anthony DiLeonardo ("DiLeonardo") when he was assigned to the Third Precinct.

5.      For a period of several months before these events, from time to time DiLeonardo and I were assigned to adjoining posts within the Third Precinct and therefore, from time to time we worked together.

6.      Prior the February 26, 2011 I had never socialized outside of work with DiLeonardo.

7.      On February 26, 2011 my wife and I joined DiLeonardo and his girlfriend for dinner. This was the first time I had ever socialized with DiLeonardo outside of work. I had never met his girlfriend before that night and my wife had never met DiLeonardo or his girlfriend before that night.

---

[1] In June, 2018 I was promoted to the rank of Sergeant and am presently assigned to the 4th Precinct. At the time of these events I held the rank of Police Officer.

8.      We met at the Black Forest Brew Haus in Farmingdale for dinner at 8:00 p.m. on February 26, 2011.

9.      After dinner we decided to continue socializing and drove in separate cars into Huntington village where we visited several different establishments.  I was driving our blue Acura; DiLeonardo and his girlfriend were in a white Infiniti.

10.     At approximately 1:00 a.m. on February 27, 2011 we decided it was time to go home.  DiLeonardo was not familiar with the area so I told him to follow me in his car and I would lead them from Huntington village to Jericho Turnpike.  I was driving my car with my wife as my passenger and DiLeonardo was driving his girlfriend's car and she was traveling as his passenger.

11.     At the time we left the village I did not believe I was intoxicated or impaired.

12.     As we were driving south toward Jericho Turnpike at a fork in the road I headed right where I should have headed left, and ended up on West Hills Road which further down becomes West 19th Street.  I then made another wrong turn onto Oakwood Road and then pulled over to the side of the road in order to tell DiLeonardo that we needed to turn around.

13.     I did not become involved in any confrontation or road rage with any vehicle along this short drive out of Huntington village. I did not flash high beams at any car and did not see a taxi along the way either.

14.     Shortly after I pulled over on Oakwood Road DiLeonardo's white Infiniti pulled over behind me.

15.     After DiLeonardo pulled over behind me I saw through my rear view mirrors another car that appeared to be a small white or silver colored cab come to a stop next to DiLeonardo's vehicle adjacent to the driver's side door.

16.     My wife got out of our car and began walking back toward DiLeonardo's vehicle to tell them we needed to turn around.

17.     I then saw both DiLeonardo and the cab driver exit their vehicles.  I could not hear anything that was being said because the doors and windows of my car were closed.  From their body language they appeared to be having a heated exchange.

18.     I did not see a weapon in the hands of either person at that time.

19.     I was not armed that night and I was not carrying my NCPD badge.

20.     I then saw my wife backpedaling toward our car.

21.     The two men appeared to argue briefly, then the cab driver got back into his car and backed up.

22. At that time I exited my car.

23. The cab that had stopped next to DiLeonardo was backing up as I exited my car.

24. I walked toward the back of my car to my wife to speak with her and ask her what was going on.

25. While I was facing her on the passenger side of my car I heard three shots fired. The shots were fired behind me.

26. I was not looking in the direction of DiLeonardo and the other car at the time shots were fired.

27. When I heard the shots I took cover.

28. Prior to the shots being fired I did not hear DiLeonardo identify himself as a police officer and he was not displaying his shield. At the time I did not know who had discharged a weapon.

29. Immediately after the shots were fired I heard the sound that anti-lock brakes make when the lock up. I stood up and saw DiLeonardo running toward the other vehicle.

30.     When I turned around I saw that the cab was 15-20 feet closer to DiLeonardo's car than it had been when I last observed it.

31.     DiLeonardo ran toward the driver's side of the cab.  As he did so I saw a handgun in DiLeonardo's hand.  This was the first time I had seen him with a weapon that night. Prior to that moment I had no idea that DiLeonardo was armed that night.

32.     DiLeonardo and the driver of the other car ended up in a physical altercation and appeared to be fighting over the handgun.

33.     The driver's side door of the cab was open and DiLeonardo appeared to be trying to pull the driver out of the cab.

34.     At some point during their altercation I heard DiLeonardo say "you're under arrest".  He did not identify himself as a police officer and he was not in uniform.

35.     I believed that the gun was still loaded so I ran to assist DiLeonardo to help him secure his weapon.

36.     It appeared that two men were involved in a physical altercation and a loaded handgun was involved which presented a danger to myself and others.

37.     It was my intention to help DiLeonardo secure his weapon and stop what was going on.

38.     As I got to the cab's side quarter panel the cab driver turned his wheel to the right and backed the cab up, causing me to be knocked to the pavement.

39.     I never spoke with the cab driver nor did I ever have any contact with him.

40.     After the incident DiLeonardo called 911. I checked on my wife's well being and she checked on mine.

41.     Police and an ambulance arrived in short order. The first SCPD officer to arrive was a female officer who asked me if I was injured. I told her that I was and explained that the car had struck me and knocked me to the road and that I had struck my head. Shortly thereafter I was placed in a neck brace and a backboard and loaded into an ambulance. I did not discuss the shooting with the SCPD officers that responded to the scene on Oakwood Road that night.

42.     While at the scene where the shooting occurred I did not have any substantive conversations about what had transpired there with anyone. I had just been struck by a car and I was in a bit of a daze.

43.     While in the ambulance I was asked questions about my health.  There was a male uniformed SCPD officer in the ambulance with us but he did not ask me any questions.  I was only aware of my wife, the SCPD officer and the EMT in the ambulance with me.

44.     After the incident I did not know exactly what had occurred and I did not know if the other driver was under arrest.  Certainly he was never placed in custody by DiLeonardo and I never interacted with him in any way.  I did not arrest Moroughan nor did I ever tell him that he was under arrest.

45.     I did not tell any member of the SCPD or the NCPD that Thomas Moroughan had been placed under arrest and I was not asked by any member of the SCPD if he had been arrested.

46.     When I arrived in Huntington Hospital I was placed in an area alone with my wife.  The area was cordoned off with curtains.  I was in a neck brace and placed on a backboard.  I remained on that backboard the entire time I was in the hospital.

47.     After I arrived Anthony DiLeonardo came into my room and told me that the cab had tried to run him over.

48.     I recall later that NCPD Sergeant Marinace from the Third Precinct came into my room to inquire as to my well being.  He did not ask me what had occurred.

49.     I recall one or two SCPD detectives came into the room and asked me what had happened. I do not know their names. I told them what I had seen and observed. I answered all questions asked of me.

50.     My PBA representatives came in to check on my well being as well. They did not ask me what had occurred.

51.     I recall two high ranking NCPD officers came in briefly to ask me how I was doing. They did not discuss the incident with me. None of the people from NCPD who saw me that night asked me what had happened in the street.

52.     While at the hospital I was tended to by medical staff. I answered all of their questions candidly as always. I consented to whatever tests or procedures that requested of me including blood tests.

53.     After I was discharged from the hospital I was driven by a PBA representative to the SCPD 2nd Precinct where I was interviewed by SCPD detectives. I was not asked for a written statement. After the interview the PBA representative drove my wife and I home.

54.     My Third Precinct supervisor Sgt. Marinace prepared paperwork for a worker's compensation form to be filed. I did not prepare that paperwork other than one brief description prepared by me which stated that I was injured while attempting to assist DiLeonardo effect a lawful arrest. As I stated under oath in my deposition, this was a poor choice of words. I was

not attempting to assist in effecting an arrest but intended to intervene between two individuals who were fighting over a loaded handgun which represented a direct threat to me, and to the two individuals who were fighting.

55.     After these events took place I was subsequently interviewed by an investigator from the Suffolk County District Attorney's Office as well as the NCPD Internal Affairs Bureau. I was represented by counsel during these interviews and answered all questions honestly and with candor.

56.     Ultimately the NCPD Internal Affairs alleged certain departmental charges and specifications against me regarding the events of that night limited to allegations pertaining to driving and consumption of alcohol. I subsequently entered into a Stipulation of Settlement with the Department where I denied all allegations of misconduct and was departmentally disciplined. I was never charged criminally with respect to these events.

57.     I never spoke with, communicated or came into contact with Thomas Moroughan on February 27, 2011 or at any time since.

58.     I never struck or fired a weapon at Thomas Moroughan.

59.     I never arrested Thomas Moroughan.

60.     I did not confine Thomas Moroughan nor did I attempt to do so.

61.     I did not initiate any criminal proceedings against Thomas Moroughan.

62.     I cooperated fully in all investigations into this incident.

63.     I did not provide any statements or other information to SCPD or anyone about Mr. Moroughan which served as a basis for the SCPD's arrest of Thomas Moroughan.

64.     I have never testified in any criminal matter against Thomas Moroughan.

65.     I was not consulted in any capacity with respect to the basis for any charges to be brought against Thomas Moroughan by the Suffolk County District Attorney.

66.     I have never conspired with any individual in any manner to deprive Thomas Moroughan of his constitutional rights.

67.     I respectfully request that this Court dismiss Plaintiff's Complaint in its entirety.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2018.

EDWARD BIENZ