UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

THOMAS M. MOROUGHAN,

                Plaintiff,

    -against-

THE COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPARTMENT, SUFFOLK DETECTIVES
RONALD TAVARES, CHARLES LESER, EUGENE
GEISSINGER, NICHOLAS FAVATTA and ALFRED
CICCOTTO, DETECTIVE/SGT. WILLIAM J. LAMB,
SGT. JACK SMITHERS, SUFFOLK POLICE OFFICERS
WILLIAM MEANEY and JESUS FAYA and SUFFOLK
JOHN DOES 1-10, THE COUNTY OF NASSAU, NASSAU
COUNTY POLICE DEPARTMENT, SGT. TIMOTHY
MARINACI, DEPUTY CHIEF OF PATROL JOHN
HUNTER, INSPECTOR EDMUND HORACE,
COMMANDING OFFICER DANIEL FLANAGAN,
DETECTIVE/SGT. JOHN DEMARTINIS, NASSAU
POLICE OFFICERS ANTHONY D. DILEONARDO,
EDWARD BIENZ and JOHN DOES 11-20,

                Defendants.

Case No.: 12-cv-0512
(JFB)(AKT)

**RULE 56.1 STATEMENT
OF UNDISPUTED
MATERIAL FACTS**

Defendants, COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT,

SGT. TIMOTHY MARINACE (s/h/a SGT. TIMOTHY MARINACI), INSPECTOR EDMUND

HORACE, COMMANDING OFFICER DANIEL FLANAGAN, DETECTIVE/SGT. JOHN

DEMARTINIS, and NASSAU POLICE OFFICER EDWARD BIENZ (collectively "Movants"),

by their attorneys, Leahey & Johnson, P.C., submit this Statement of Undisputed Material Facts

pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1 in support of their Motion

for Summary Judgment:

**Procedural Background**

1.      Plaintiff's Notice of Claim as to the County of Nassau was filed on May 26, 2011. See Exhibit "A"[1].

2.      Plaintiff filed this lawsuit on or about February 3, 2012 alleging various claims related to an incident that occurred in Huntington, New York on February 27, 2011 (DE 1)

3.      Movants answered Plaintiff's Complaint on March 9, 2012 (DE 6)

4       Plaintiff amended his Complaint on December 17, 2012 (DE 54)

5.      Movants answered Plaintiff's First Amended Complaint on November 29, 2012 (DE 120)

6.      Following motion practice, Plaintiff filed a Second Amended Complaint on April 14, 2015 (DE 177).

7.      Movants answered Plaintiff's Second Amended Complaint on August 11, 2015 (DE 195).

8.      By Order of this Court dated May 25, 2018, the time for the parties to file motions pursuant to Fed.R.Civ.P. 56 *et seq*., was enlarged to July 30, 2018 (DE 260, 261)

9.      By Order of Magistrate Judge Tomlinson discovery was re-opened to allow for a deposition of a Suffolk County witness (DE 263).   That witness was deposed on July 9, 2018 and discovery is now closed.

**The Incident.**

10.      On February 26, 2011, Defendant Nassau County Police Officer Edward Bienz ("Bienz") and his wife went out to dinner with Defendant Nassau County Police Officer Anthony DiLeonardo ("DiLeonardo") and his girlfriend, Sophia Cornia at a restaurant located in

---

[1] Unless otherwise indicated the referenced exhibits are attached to the Declaration of Christopher Delamere Clarke dated July 26, 2018, submitted herewith.

2

Farmingdale, New York known as the Black Forest Brew Haus (See Exhibit "B", deposition of Bienz dated December 2, 2015, page 136, line 3-15) (Bienz Decl. ¶7-8).

11.    The officers were off duty at the time (See Exhibit "B", page 195, line 2-4).  The officers had not socialized together in the past, this was the first time they were going out together (See Exhibit "B", page 83, line 6-9) (Bienz Decl. ¶6-7).

12.    The couples met at the restaurant at 8 o'clock p.m. (See Exhibit "B", page 194, lines 23-25) (Bienz Decl. ¶8).

13.    Bienz was not armed that night and he was not carrying his Nassau County Police Department ("NCPD") issued badge (Bienz Decl. ¶19).

14.    At 10 o'clock p.m., after concluding their meal the two couples decided to continue to socialize and drove north to the nearby village of Huntington, New York, where they visited various establishments (see Exhibit "B", page 196, line 19-22, page 200-201, 202, line 16-17) (Bienz Decl. ¶9).

15.    At roughly 1 o'clock a.m. on February 27, 2011 the couples decided to go home (see Exhibit "B", page 206)  (Bienz Decl. ¶10).

16.    DiLeonardo followed Bienz who drove out of Huntington Village south leading DiLeonardo toward Route 25/Jericho Turnpike. (see Exhibit "B", pages 212-213) (Bienz Decl. ¶10).

17.    DiLeonardo was driving a white Infiniti (Bienz Decl. ¶9).  Bienz was driving a blue Acura (Bienz Decl. ¶9).  Bienz's wife Jillian travelled in the front passenger seat of her husband's car. (Bienz Decl. ¶10).

18.     While driving a cab that evening on West Hills Road in Huntington Station, Plaintiff says he was cut off by a blue Acura followed by a white Infiniti (see Exhibit "C", deposition of Thomas Moroughan, dated January 20, page 50-51).

19.     Plaintiff flashed his high beams at the blue Acura (see Exhibit "C", page 345).

20.     When the white Infiniti passed Plaintiff, he got very angry (see Exhibit "C", page 348).

21.     As Bienz led DiLeonardo south toward Jericho Turnpike, Bienz made a wrong turn (see Exhibit "B", page 216, lines 16-23) (Bienz Decl. ¶12).

22.     Bienz quickly realized his error and pulled over onto Oakwood Road to converse with DiLeonardo to tell him they needed to turn around. (see Exhibit "B", pages 217-218, 224-225, 233-234) (Bienz Decl. ¶12).

23.     Almost immediately after DiLeonardo pulled over onto the shoulder behind Bienz, Bienz saw a white or silver car pull up next to DiLeonardo's vehicle. (see Exhibit "B", pages 241-242) (Bienz Decl. ¶14-15).

24.     After DiLeonardo pulled up behind Bienz, Jillian got out of the car to walk back to tell DiLeonardo and his girlfriend that they had to turn around (Bienz Decl).

25.     Although Plaintiff denied that he followed the blue Acura and white Infiniti, Plaintiff concedes that he continued to drive in the same direction and quickly came upon the two cars pulled over on Oakwood Road (see Exhibit "C", pages 349-350).

26.     Plaintiff's girlfriend, Kristie Mondo, was seated in the front passenger seat of Plaintiff's taxi (see Exhibit "C", page 112, lines 16-19)

27.     Plaintiff brought his vehicle to a stop next to DiLeonardo's vehicle with his front passenger door parallel to DiLeonardo's driver's side front door. (see Exhibit "C", page 454-455)

28.     Plaintiff rolled down his passenger window and yelled at DiLeonardo, the driver of the white Infiniti,"What the hell is wrong with you? You can kill somebody! Learn how to drive!" (see Exhibit "D", 50-h hearing of Plaintiff Thomas Moroughan conducted by County of Nassau, dated August 29, 2011, page 105, line 2-5).

29.     Plaintiff then yelled "F**k you!" at DiLeonardo (see Exhibit "D", page 106, lines 2-17).

30.     After cursing at DiLeonardo, Plaintiff put his car into "Reverse" and began to back up, moving approximately half of a car length (see Exhibit "D", page 107).

31.     Bienz and DiLeonardo were still inside their respective vehicles when Plaintiff began to back up his car. (see Exhibit "D", line 107).

32.     As Plaintiff backed up, DiLeonardo yelled out of his window, "and tell your fat-ass girlfriend to learn how to use a diet" (see Exhibit "D", page 107, line 4-9; line 10-12).

33.     After hearing this insult Plaintiff put his cab in park, opened his door and got out of his cab to confront DiLeonardo (see Exhibit "D", page 109).

34.     Plaintiff placed his left foot on the ground and stood up to yell over his car toward DiLeonardo (see Exhibit "D", page 109).

35.     Plaintiff was the first person to exit a vehicle that night (see Exhibit "D", page 110).

36.     After getting out of his car, Plaintiff yelled, "What the hell is your problem?" at DiLeonardo whose window was open (see Exhibit "D", page 109).

5

37.     DiLeonardo got out of his car and yelled "I'll show you what my f**king problem is".  (see Exhibit "D", page 110, line 9-10; page 111, line 17-18).

38.     DiLeonardo did not identify himself as a police officer at this time (see Exhibit "D", page 115-116).

39.     At the time DiLeonardo and Plaintiff were engaged in this confrontation Bienz was inside his car with the windows closed (Bienz Decl ¶16).

40.     Through his rearview mirrors Bienz could see DiLeonardo and Plaintiff in a heated exchange. (Bienz Decl. ¶17).

41.     Bienz saw his wife begin to backpedal away from DiLeonardo's car, so he got out of his car to see what was going on. (Bienz Decl. ¶20).

42.     As Bienz walked back towards his wife he saw the cab backing away. (Bienz Decl. ¶21-23).

43.     After DiLeonardo said he would show Plaintiff "what his problem was", Plaintiff saw the other driver get out of the blue Acura (see Exhibit "D", page 111).

44.     When Plaintiff saw the second driver exit his car, Plaintiff got back into his cab, placed the cab in reverse and backed up 2-3 car lengths (see Exhibit "D", 111-112).

45.      Plaintiff then put the cab into "Drive" in order to drive forward to make a U-turn to leave (see Exhibit "D", page 114, 121).

46.     After Plaintiff put his car into "Drive" he drove forward and was shot by DiLeonardo, the driver of the Infiniti (see Exhibit "D", pages 112, 123-4).

47.     At the time the shots were fired, Bienz was facing his wife and his back was turned to DiLeonardo and Plaintiff (Bienz Decl. ¶25-26).

48.     Plaintiff concedes that he was driving his vehicle forward when DiLeonardo shot him (see Exhibit "D", page 129, lines 12-19)

49.     On June 6, 2011, Plaintiff's criminal attorney, William Petrillo, stated in open court on the record before Justice Gaetan Lozito, "I will acknowledge on the record Judge, that we do agree that at the time the shots were fired Mr. Moroughan was moving forward in his - - in his taxicab."  (see DE 177, Exhibit "H", Nassau County Police Department's Internal Affairs Bureau Report ("IAB"), Bates pages 196-206, minutes of court proceedings, *Peo. v. Moroughan*, Case No. 2011SU007884, dated June 6, 2011).

50.     Plaintiff does not know where Bienz, the driver of the blue Acura, was when shots were fired by DiLeonardo (see Exhibit "D", page 128).

51.     Plaintiff stopped moving his cab forward after the shots were fired (see Exhibit "D", page 130, line 9-14).

52.     After the shots were fired Bienz heard the sound of anti-lock brakes (Bienz Decl. ¶29).

53.     After the shots were fired and Plaintiff had stopped his car, DiLeonardo ran to the driver's side door of the cab with his gun in his hand (Bienz Decl. ¶30-31).

54.     DiLeonardo smashed the driver's window of the cab with the butt of his gun, opened the door and punched Plaintiff in the face at least 10 times (see Exhibit "D", page 132-133).

55.     While struggling with DiLeonardo, Plaintiff placed the cab in reverse and backed away and drove himself to the emergency room (see Exhibit "D", page 133).

56.     Bienz saw DiLeonardo and Plaintiff struggling with a gun that he believed to be loaded, therefore he ran toward them with the intention of securing the gun and stopping the altercation (see Exhibit "B", pages/line; Bienz Decl. ¶32-37).

57.     Plaintiff did not hear DiLeonardo identify himself as a police officer at any time during this incident and he was not wearing anything to indicate he was a police officer (see Exhibit "C", page 112; Exhibit "D", 133, lines 15-25).

58.     Plaintiff concedes that nobody identified themselves as a police officer or cop at any time that night – Plaintiff did not hear those words used during the entire incident (see Exhibit "D", page 116, line 4-7).

59.     Bienz did not hear DiLeonardo identify himself as a police officer but believes at some point he heard DiLeonardo tell Plaintiff that he was under arrest.  (Bienz Decl. ¶34). Plaintiff did not hear this (see Exhibit "D", page 167, lines 6-13).

60.     DiLeonardo, the man who shot and beat Plaintiff, "…never said that he was a police officer or that I was under arrest" (see Exhibit "D", page 167, line 6-9)

61.     Bienz did not punch Plaintiff, strike Plaintiff, shoot Plaintiff, or break Plaintiff's car window (see Exh. "C", page 108-109; Bienz Decl. ¶57-58).

62.     Bienz never spoke a single word to Plaintiff (see Exhibit "C", page 324 line 16-24; Bienz Decl. ¶57).

63.     Bienz never told Plaintiff that he was under arrest (see Exhibit "C", page 332, line 25 to page 333 line 6; Bienz Decl. ¶59-61).

64.     As Plaintiff maneuvered his car in order to drive away, his vehicle knocked Bienz to the ground causing Bienz to sustain injuries. (Bienz Decl. ¶38)

8

65.     After he pulled, away Plaintiff drove himself to the Huntington Hospital (see Exhibit "C", page 105, line 23 to page 106, line 11).


**Suffolk County Police Department Responds to the Scene on Oakwood Road**

66.     DiLeonardo called 911 to report this incident (Bienz Decl. ¶40).

67.     During that call DiLeonardo misrepresented to the 911 operator that he had been shot. (see Exhibit "E", a CD containing a recording of the 911 call placed by DiLeonardo).

68.     DiLeonardo asked for immediate assistance, including an ambulance, and erroneously reported that his gun had been taken by Plaintiff (see Exhibit "E").

69.     During that call DiLeonardo reported to Suffolk County Police Department's 911 operator that he fired at the car because the cab tried to ram him.  (see Exhibit "E").

70.     Suffolk County Police Officers Channon Rocchio and Enid Nieves were the first two Suffolk County police officers to arrive on the scene (see Exhibit "F", deposition transcript of SCPD Officer Rocchio at page 37).

71.     According to Officer Nieves, she and her partner Rocchio were dispatched to the scene to a call of "possible shots fired" (see Exhibit "G", deposition transcript of SCPD Officer Nieves at page 59; see Exhibit "F", pages 8-9).  When they arrived they saw two men and two women standing in the street and two cars pulled to the side of Oakwood Road (see Exhibit "G", page 64; see Exhibit "F", pages 10-11).

72.     As soon as the SCPD arrived, DiLeonardo identified himself as a Nassau County Police Officer (see Exhibit "G", page 68).  He was not wearing a badge (see Exhibit "G" at page 72).  DiLeonardo told the officers that that that the taxi charged at him and he shot at the vehicle (see Exhibit "G" pages 74-75, 86, 87, 88, 92, 93, 101; see Exhibit "F", page 18).

73.     DiLeonardo did not know where his gun was but told the officer it was possible that it was in the taxi (see Exhibit "G", pages 88-89). He explained that he had tried to take the driver of the cab out of the vehicle and did not know where his gun was (see Exhibit "F", page 19).  DiLeonardo told the Officer Rocchio that the cab driver may have taken his gun or he may have dropped his gun into the cab (see Exhibit "F", page 20).

74.     When Officer Rocchio learned that the gun was missing, she broadcast that fact over the police radio (see Exhibit "F", page 23).  The officer was aware that the cab may have been heading to the hospital and that officers had been dispatched there as well (see Exhibit "F" at page 24).

75.     Either Nieves or Rocchio called for an ambulance because the off-duty Nassau police officers appeared injured (see Exhibit "G", pages 93-4, 96).

76.     Bienz told the officers that he was injured and needed assistance (Bienz Decl. ¶41).  Bienz was not asked and did not discuss the shooting with these officers (Bienz Decl. ¶41)

77.     When the SCPD officers arrived they asked Bienz how he was feeling (Bienz Decl. ¶41).  Bienz told them he had been struck by the car and knocked to the ground and was quickly placed in an ambulance.  (Bienz Decl. ¶41).

78.     Suffolk County Police Department Sergeant Jack Smithers also responded to the scene when he heard the call of possible shots fired (see Exhibit "H", the deposition transcript of SCPD Sergeant Jack Smithers dated June 27, 2014, at page 9).

79.     When he arrived at the scene he spoke with his officers, Rocchio and Nieves immediately (see Exhibit "H", page 11).

80.     Rocchio told him that she had learned that there was an incident between a cab driver and an off duty Nassau Police Officer and that the weapon had been lost, possibly inside the cab (see Exhibit "H", page 12).

81.     Smithers spoke with DiLeonardo who told him that he and the other off duty officer were in separate cars, that they were lost, that they had pulled over to discuss where they were when a cab driver pulled up, upset at something they apparently had done, and started cursing at them. DiLeonardo further told Smithers that and when DiLeonardo exited his car, the cab driver backed up his vehicle and drove at him at which point DiLeonardo fired several rounds at the cab.  The cab struck the other officer as it fled.  (see Exhibit "H", pages 17; 20).

82.     Smithers believed that this conversation with DiLeonardo lasted about a minute (see Exhibit "H", pages 17-18).  Smithers had no further discussion with DiLeonardo (see Exhibit "K", page 27).

83.     Smithers did not speak with Bienz (see Exhibit "H", page 35).

84.     When the ambulance arrived rescue personnel tended to the injured individuals (see Exhibit "F" at page 41).  They were transported to Huntington Hospital Emergency Room and Rocchio and Suffolk County Det. Geissinger went in the ambulance with them (see Exhibit "G" at pages 42-44).

85.     None of the police personnel in the ambulance spoke with the DiLeonardo, Bienz or the others while en route (see Exhibit "F", page 45).

86.     Bienz only recalls that his wife, an EMT and an SCPD officer were in the ambulance with them.  He was not asked anything about the shooting and did not speak with anyone in the ambulance (Bienz Decl. 43).

87.     As reflected in the Suffolk County Crime Scene log for the Oakwood Road shooting location prepared by SCPD Officer Enid Nieves, there were no Nassau County Police Department personnel at the Oakwood Road crime scene at any time prior to 4:39 a.m. on February 27, 2011 (DE 177, Exh. "H", Bates page 179).

**The Huntington Hospital Emergency Room.**

88.     At the time Suffolk County Police Officer William Meaney ("Meaney"), was on duty as a SCPD Police Officer assigned to Suffolk County's 2nd Precinct.  When he heard the call of "shots fired" he went directly to Huntington Hospital which is in his sector (see Exhibit "I", deposition of SCPD Police Officer William Meaney dated June 26, 2014 at pages11-12).

89.     As reflected in the SCPD Scene Log created by SCPD for the Huntington Hospital scene, Meaney was the first police officer there and recorded as present there at 1:22 a.m. (see Scene Log, DE 177, Exh. "H", Bates page 178).

90.     Immediately upon arriving at the Huntington Hospital Emergency Room Plaintiff spoke with Meaney, someone he was already acquainted with as Meaney had previously written him traffic tickets (see Exhibit "D", pages 115-116).

91.     Because Meaney had heard on the radio that a gun was missing, in order to make sure the hospital was safe he located the cab driver and searched for the gun (see Exhibit "I", pages 17-19).

92.     Inside the Emergency Room, Meaney asked Plaintiff directly if he had a gun and Plaintiff told him it might have dropped inside the cab (see Exhibit "I", page 19).

93.     Meaney went back outside and found the gun inside the cab (see Exhibit "I", page 20).

12

94.     Meaney asked SCPD Officer Robert Lubansky to secure the cab (see Exhibit "I", page 20).

95.     Meaney then returned to the emergency room where he remained with Moroughan (see Exhibit "I", pages 41-42, 46-47), sometimes inside his room, but mostly outside his room (see Exhibit "I", page 42).

96.     Moroughan was never handcuffed the entire time Meaney was with him (see Exhibit "I", pages 47-48).

97.     No one ever told Meaney that Moroughan was under arrest (see Exhibit "I", page 49).

98.     While he was in the hospital Plaintiff was not under arrest and was not handcuffed (see Exhibit "I", page 49, line 5-7; page 97; see Exhibit "C", pages 158-159).

99.     Meaney remained with Moroughan from the time he arrived at the hospital until the time he left the hospital sometime between 6:30 a.m. and 8:00 a.m. (see Exhibit "I", page 41, line 20, to page 42, line 9; page 46, line 24 to page 47, line 4; page 83, lines 6-14).

100.    During that entire time Meaney saw only SCPD personnel and medical staff entered Plaintiff's room (see Exhibit "I", page 83-84).

101.    No one from the Nassau County Police Department ever entered Plaintiff's hospital room (see Exhibit "I", pages 132-133).

102.    At some point that morning Plaintiff engaged Meaney in conversation and told him what happened at the roadside, which resulted in Plaintiff getting shot. (see Exhibit "I", page 34, line 9-12)

103.    On February 27, 2011, at approximately 8:00 a.m. Meaney went to the Suffolk Police Department's 2nd Precinct and prepared a Supplementary Report where he documented

13

the substance of his conversation with Plaintiff (see Exhibit "M", page 131, lines 6 to page 132, line 7; see SCPD Officer Meaney's Supplemental Report dated February 27, 2011, annexed to Plaintiff's Second Amended Complaint at DE 177, Exh. "H", Bates page 194).

104.    Plaintiff mistakenly believed that two NCPD detectives entered his room and attempted to speak to him to find out what had occurred at approximately 2:30 – 3:00 a.m. on February 27, 2011 (see Exhibit "C", pages 148-150).

105.    There were no NCPD detectives present at the Huntington Hospital at any time that morning.  (see Scene Log, annexed to Plaintiff's Second Amended Complaint, DE 177, Exh. "H", Bates page 178).

106.    SCPD's Scene Log detailing police personnel present at Huntington Hospital reflects that Nassau County Police Sergeant Tim Marinace was present at 2:11 a.m. and Nassau County Police Inspector Edmund Horace was present at 2:51 a.m.  (See Scene Log, annexed to Plaintiff's Second Amended Complaint, DE 177, Exh. "H", Bates page 178).

107.    Neither of these men are detectives (Marinace Decl., Horace Decl. ¶3).

108.    Both deny ever speaking with Moroughan (Marinace Decl., Horace Decl. ¶11).

109.    SCPD's Scene Log lists the presence of the following SCPD detectives at Huntington Hospital Emergency Room: Detective Gene Geissinger at 2:05 a.m., Nick Favata at 3:14 a.m., Ronald Tavares at 3:57 a.m., Charles Leser at 4:15 a.m., Thomas Walsh at 5:50 a.m., and James Faughman at 5:50 a.m. (see Scene Log, annexed to Plaintiff's second supplemental Complaint, DE 177, Exh. "H", Bates page 178).

110.    Later that morning, while at Huntington Hospital, Plaintiff was interviewed by Suffolk County Detectives Lesser and Tavares (see Exhibit C", page 162; 174-75).

111.    Detective Lesser wrote a statement and asked Plaintiff to sign it (see Exhibit "C", page 150).

112.    Plaintiff agreed to sign it, and did sign and initial every page of that statement on February 27, 2011 (see Exhibit "D", page 150-151; see SCPD Rights Statement and Sworn Statement of Thomas Moroughan dated February 27, 2011, annexed Plaintiff's second Complaint, DE 177, Exh. "H", Bates pages 108-110).


**Plaintiff is Discharged from Huntington Hospital and Arrested by SCPD**

113.    Plaintiff's hospital record for February 27, 2011 reflects that he was admitted to the Huntington Hospital Emergency Room at 1:30 a.m., and discharged from the hospital later that morning at 8:00 a.m.  (see Plaintiff's Huntington Hospital Emergency Room chart; annexed as an exhibit to Plaintiff's Second Amended Complaint, DE 177, Exh. "H", Bates pages 308-339).

114.    As reflected in Plaintiff's medical records, Plaintiff was discharged at 8:00 a.m. and was under arrest by SCPD (see DE 177, Exh. "H", Bates page 314).

115.    At the time of his discharge Huntington Hospital's medical staff deemed Plaintiff "fit for confinement" (see Exhibit "Q", DE 177, Exh. "H", Bates page 322).

116.    At the time Plaintiff was discharged, he was not in handcuffs, was not aware that he was under arrest, and was permitted to speak with his godmother at that time (see Exhibit "C", pages 222-225).  He was thereafter driven to the Suffolk County Police Department's 2nd Precinct (see Exhibit "C", pages 226-227).

117.    DiLeonardo never told Plaintiff that he was under arrest (see Exhibit "C", page 329, line 6-8).

118.    The first time Plaintiff was told that he was being placed under arrest was when he was in the Suffolk County Police Department's Second Precinct when someone he believed to be the head of Suffolk County homicide told him that he was being placed under arrest (see Exhibit "C", page 329, line 9-24).

119.    This took place on February 27, 2011, sometime after 8:15 a.m. (see Exhibit "C", page 333 lines 7-23). This information was shocking to Plaintiff and caused him to cry because he did not understand that he was being arrested or why (see Exhibit "C", page 330)

120.    SCPD's Detective Sergeant William Lamb is identified as the Complainant on the Felony and Misdemeanor Complaints that he signed in the matter of *Peo. v. Thomas Moroughan* with respect to this incident (see the Felony and Misdemeanor Complaints; annexed as exhibits to Plaintiff's Second Amended Complaint, see DE 177, Exh. "H", Bates pages 181-182).

121.    As reflected in the criminal Complaints signed by SCPD Detective Sergeant William Lamb, the charges he asserted in the Complaints he executed (DE 177, Exh. "H", pages 181-182), were based solely upon the statement DiLeonardo provided to SCPD Detective Leser on February 27, 2011, which was annexed to said Complaints (see DiLeonardo's sworn deposition dated February 27, 2011; annexed as an Exhibit to Plaintiff's Second Amended Complaint, DE 177, Exh. "H", Bates page 183).

122.    SCPD's arrest of Plaintiff was based solely upon information provided to SCPD by DiLeonardo (see DE 177, Exh. "H", pages 181-182).

**SCPD Conducted and Controlled the Entire Investigation.**

123.    When a police involved shooting occurs in Suffolk and a person is hit, Suffolk County homicide leads the investigation (see Exhibit "K", the deposition of SCPD Detective Ronald Tavares ("Tavares" at page 38).  Suffolk County homicide was running the investigation of the shooting incident starting that night (see Exhibit "J", the deposition of SCPD Detective Charles Leser ("Leser"), at page 92).

124.    Suffolk County Detective Leser never asked anyone outside of his bureau to interview DiLeonardo or Bienz (see Exhibit "J" at page 93).

125.    As reflected in the SCPD arrest paperwork the criminal complaint filed against Thomas Moroughan records that the charges made against him were based solely on information provided by Anthony DiLeonardo (see Exhibit "J" at page 147; see DE 177, Exh. "H", pages 181-182).

126.    DiLeonardo told SCPD Detective Tavares that he wanted Moroughan arrested for attempted murder (see Exhibit "K", at pages 202-3).

127.    Tavares told DiLeonardo that "after listening to both sides" arresting Moroughan for attempted murder was "not on the table", and he then worked with SCPD Detective Sergeant Lamb to formulate the best charges to assert against Moroughan (see Exhibit "K" at page 202-203).

128.    All members of the NCPD Deadly Force Response ("DFR") Team understood and respected the fact that that this was SCPD's investigation and did not want to interfere (see Exhibit "L", deposition of NCPD Deputy Chief John Hunter, at pages 163-165, 172, lines 8-22; 179, line 15 to page 180 line 10; Horace Decl. ¶¶5, 10, 11, 14, 16, 17, 18; DeMartinis Decl. ¶¶5, 9, 11, 12; Flanagan Decl. ¶¶8, 21, 23, 24).

**Undisputed Facts Supporting Dismissal of All Claims Asserted Against The Deadly Force Response Team Defendants (Inspector Edmund Horace; Captain Daniel Flanagan and Detective Sergeant John DeMartinis)**

129.    Nassau County Police Department's DFRT is a team made up of ranking members of the Nassau County Police Department which responds to incidents involving use of deadly force by members of the department, as governed and outlined within the protocol and procedures found within the Nassau County Police Department's Departmental Manual, Departmental Procedure ADM 1221.  (see NCPD Department Procedure ADM 1221, Deadly Force Response (DFR) Team; annexed as an exhibit to Plaintiff's Second Amended Complaint, DE 177, Exhibit "H", Bates pages 207-210).

130.    Pursuant to NCPD's manual, the DFR Team is defined as a team that responds to incidents involving the use of deadly physical force, by a Member of the Department, in order to gather information for an administrative report to the Commissioner of Police (see DE 177, Exhibit "H", Bates pages 207-210).

131.    The Team Coordinator is to verbally report to the Commissioner as soon as practical, and to prepare and deliver a narrative report containing the initial account of the incident to the Commissioner before the end of the next business day (see DE 177, Exhibit "H", Bates pages 207-210, at paragraphs (B)(18); (B)(19)(a) and (B)(19)(b); see Exhibit "L", deposition of Deputy Chief of Patrol John Hunter dated November 20, 2015, pages 107-108; see Exhibit "M", deposition of NCPD Inspector Edmund Horace, page 37, lines 15-21; see Horace Decl. ¶¶4, 16; DeMartinis Decl. ¶3, 5, 6, 11, 12; Flanagan Decl. ¶¶3, 21)

132.    Pursuant to ADM 1221, the full team response requires the Duty Chief; an Administrative Officer from the Member's Command or the Duty Inspector; the Commanding Officer of the Police Academy, and a Supervisor from the Homicide Squad.  With respect to this

incident NCPD's DFR Team was made up of a Deputy Chief of Patrol John Hunter, the Duty Inspector Edmund Horace, Captain Daniel Flanagan, the CO of the NCPD Police Academy, and Detective Sergeant John DeMartinis, a Supervisor from NCPD Homicide (see Horace Decl. ¶¶3-5; DeMartinis Decl. PP3-7; Flanagan Decl. ¶¶3-5).

**Undisputed Facts Supporting Dismissal of Claims Asserted Against NCPD Deputy Chief Daniel Flanagan[2].**

133.    Inspector Daniel Flanagan has provided a Declaration in Support of his motion to dismiss all claims made against him.  All undisputed facts recited therein are incorporated here by reference.

134.    On February 27, 2011, Daniel Flanagan was a Nassau County Police Captain assigned to the Nassau County Police Academy (see Exhibit "N", the deposition of NCPD Captain Daniel Flanagan dated February 25, 2013 at page 49; Flanagan Decl. ¶2).

135.    In his capacity as the commanding officer of the Police Academy he was responsible to be available to respond to incidents where a Nassau County Police Officer discharges his or her weapon, as part of the Deadly Force Response ("DFR") Team (see Exhibit "N", at page 49).

136.    As a member of that team he was responsible for gathering information to be used in the preparation of a preliminary report which was prepared for the Commissioner of the Nassau County Police Department's eyes only (see Exhibit "N", pages 49-51)(Flanagan Decl. ¶3).

---

[2] Daniel Flanagan has been promoted since these events to the rank of Deputy Chief.  At the time of these events he held the rank of Captain and was the Commanding Officer of the Nassau County Police Department's Police Academy (Flanagan Decl ##)   Deputy Chief Flanagan is identified as Captain in the pleadings before this Court.

137.    On February 27, 2011 Daniel Flanagan was notified by the Nassau County Police Department's Communications Bureau that there had been an incident involving the discharge of a weapon by an off-duty Nassau County police officer in Huntington, New York, in Suffolk County (see Exhibit "N", page 54; Flanagan Decl. ¶4).

138.    At the time Flanagan received this notification he was home asleep (see Exhibit "N", at page 55; Flanagan Decl. ¶4).

139.    After receiving this notification Flanagan got up, got dressed and left his home to respond (see Exhibit "N", page 55; Flanagan Decl ¶6).

140.    Captain Flanagan reported to the Oakwood Road scene first.  (See Exhibit "N", pages 65-66; Flanagan Decl. ¶¶4-6).

141.    According to Suffolk County Police Department's Scene Log, Flanagan was present at the Oakwood scene at 4:37 a.m. (see DE 177, Exh. "H", Bates page 179).

142.    When Flanagan arrived he had a brief conversation with NCPD Deputy Chief Hunter (see Exhibit "N", page 75; Flanagan Decl. ¶6). Flanagan did not speak with anyone else at the Oakwood shooting scene (see Exhibit "N" at page 76; Flanagan Decl. ¶6)

143.    Flanagan left the Oakwood scene and went to Huntington Hospital (see Exhibit "N" at page 76; Flanagan Decl ¶¶6-7).

144.    Flanagan understood that Deputy Chief Hunter was to act as the DFR Team Coordinator (see Exhibit "N" at page 76; Flanagan Decl. ¶¶6-7).

145.    When Flanagan arrived at Huntington Hospital he entered the lobby of the hospital and awaited instruction from Hunter (see Exhibit "N" at page 98; Flanagan Decl. ¶¶7-8).

146.    While at Huntington Hospital Flanagan had no conversations with anyone from SCPD, nor did he attempt to have any such conversations (see Exhibit "N" at page 89).

147.    After Hunter arrived at the hospital, he told Flanagan that NCPD Detective Sergeant DeMartinis was going to be the liason with SCPD detectives and that DeMartinis would attempt to get the facts from SCPD personnel for the DFR Team report (see Exhibit "N" at pages 92-93).  DeMartinis would relate whatever facts he learned from SCPD back to Flanagan and Hunter (see Exhibit "N" at pages 101, 102).

148.    Flanagan was directed by Hunter to go to the Police Academy to begin to draft the DFR Team report.  (see Exhibit "N" at page 105; Flanagan Decl. ¶9)

149.    Plaintiff concedes that the NCPD DFR Team report is a preliminary report (see Exhibit "N" at pages 110).

150.    Flanagan did not communicate with DiLeonardo or Bienz that night (see Exhibit "N" at page 107; Flanagan Decl. ¶10).

151.    Flanagan did not communicate with Plaintiff that night (see Flanagan Decl. ¶11).

152.    The only members of the NCPD that Flanagan saw at the hospital were Hunter and DeMartinis (see Exhibit "N" at pages 108-109).

153.    The DFR Team report went through several drafts before Chief Hunter finalized it (see Exhibit "N" at pages 112-114).

154.    Plaintiff concedes that the DFR Team report is a preliminary report based on the facts that they were provided from Suffolk County (see Exhibit "N" at pages 114-115).

155.    After returning to the Police Academy, sometime later that morning DeMartinis emailed Flanagan with information he had received from Suffolk County detectives (see Exhibit "N" at page 118, see Flanagan Decl, see DeMartinis Decl; see Exhibit "O", the email sent by DeMartinis to Flanagan reflecting information provided to him from SCPD investigators).

156.   Flanagan did not review the final draft of the DFR Team report before it was submitted by Hunter to the NCPD Police Commissioner (see Exhibit "N" at page 121; Flanagan Decl. ¶17).

157.   Prior to his February 2013 deposition conducted in this lawsuit, Flanagan had never seen the final DRF Team report (Flanagan Decl. ¶17)

158.   The email that DeMartinis prepared for Flanagan contained the following heading

**THIS IS A PRELIMINARY REPORT ONLY, AS SUCH THE FACTS AND DETAILS MAY NOT BE COMPLETE. SUFFOLK HOMICIDE SQUAD IS IN CHARGE OF THE INVESTIGATION. THE INVESTIGATTION IS ONGIONG AT THIS TIME.** (See Exhibit "O").

159.   The final version of the DFR Team report (annexed as an Exhibit to Plaintiff's Second Amended Complaint, see DE 177, Exh. "H", Bates pages 211-212) provides in pertinent part:

> 3.   The investigation consisted of an on scene evaluation and a review of the investigation by the Suffolk County Police Department's Homicide Squad and Second Squad.  All preliminary information was received from SCPD investigators.  Interviews with police officers DiLeonardo and Bienz have not been conducted.

160.   At the time the DFR Team report was submitted to the Commissioner, Flanagan believed they were submitting a fair and accurate preliminary assessment of the underlying facts and circumstances based upon information received from SCPD detectives (see Exhibit "N" at pages 123, 135-6).

161.   Flanagan was never contacted by any member of SCPD regarding these events and has had no communication with SCPD since February 27, 2011 (see Exhibit "N", page 10).

162.    Flanagan never testified against Plaintiff in any criminal proceeding (Flanagan Decl. ¶32).

163.    Flanagan did not provide any information to SCPD regarding Plaintiff and did not provide SCPD with any basis to arrest or charge Plaintiff with a crime (Flanagan Decl. ¶31-4; see DE 177, Exh. "H", pages 181-182).

**Undisputed Facts Supporting Dismissal of Claims Asserted Against NCPD Detective Sergeant John DeMartinis (retired)**

164.    Detective Sergeant John DeMartinis has submitted a Declaration in support of his motion to dismiss Plaintiff's Complaint.  All undisputed facts recited therein are incorporated here by reference.

165.    On February 27, 2011, John DeMartinis ("DeMartinis") was a Detective Sergeant assigned to the Nassau County Police Department Homicide Squad. (DeMartinis Decl. ¶¶2-4).

166.    On February 27, 2011, DeMartinis was the Homicide Bureau's member on-call for that weekend.  (see Exhibit "P", the deposition of DeMartinis dated March 12, 2013 at page 63; DeMartinis Decl. ¶7).

167.    On February 27, 2011, DeMartinis was home, asleep, when he received a call from Assistant Chief Hunter alerting him that a shooting involving two off duty Nassau police officers had occurred in Huntington (see Exhibit "P", pages 56-57, 64-65).

168.    Deputy Chief Hunter directed him to respond to Oakwood Road in Huntington, New York (see Exhibit "P" at page 68).

169.    DeMartinis understood that he was responding as part of an NCPD DFR Team as the supervisor from the Homicide Squad (see Exhibit "P" at page 57).

170.   SCPD's Scene Log reflects that DeMartinis was present at Oakwood Road at 4:59 a.m. on February 27, 2011 (see DE 177, Exh. "H", Bates 179).

171.   After DeMartinis arrived at the Oakwood scene he spoke briefly with Chief Hunter (see Exhibit "P" at page 74).

172.   While at the Oakwood scene DeMartinis was never told that DiLeonardo had effectuated an arrest, that there was a prisoner under arrest, that the shooting involved a perpetrator who was in fact arrested or that there was a perpetrator under arrest (see Exhibit "P" at page 86)

173.   When DeMartinis responded to the Huntington Hospital Emergency Room he saw that Bienz and DiLeonardo were present, but he never spoke with or questioned either officer. (see Exhibit "P" pages 57-58).

174.   DeMartinis did not question Bienz or DiLeonardo (see Exhibit "P" at page 101).

175.   The DFR team's source for information regarding the shooting was Suffolk County's homicide squad (see Exhibit "P" at pages 105-6; DeMartinis Decl. ¶9).

176.   DeMartinis never saw Thomas Moroughan in the hospital (see Exhibit "P" at pages 124-5).

177.   Later that morning DeMartinis was told Bienz and DiLeonardo would be brought to the SCPD 2nd Precinct and would be interviewed there (see Exhibit "P" pages 116-118).

178.   DeMartinis drove to the 2nd Precinct from the hospital (see Exhibit "P", page 120).

179.   While at the 2nd Precinct DeMartinis received information from homicide detectives Leser and Tavares regarding the incident. (DeMartinis Decl. ¶11)

180.    Tavares and Leser were the only sources for the information DeMartinis received regarding the underlying facts (see Exhibit "P" page 131; DeMartinis Decl. ¶¶11-12).

181.    The information provided by SCPD detectives to DeMartinis was then relayed by DeMartinis to Flanagan via email later that morning (see Exhibit "P" page 143; see Exhibit "O"; DeMartinis Decl. ¶11-12)

182.    Before DeMartinis left the 2nd Precinct SCPD Detective Sergeant Lamb told him that Plaintiff would be arrested for assault (see Exhibit "P" page 140).

183.    Lamb did not say that Plaintiff had been arrested earlier that night, Lamb told DeMartinis that SCPD would be effectuating an arrest. (see Exhibit "P" page 141).

184.    DeMartinis was not told that this was a Nassau arrest that was being processed by Suffolk (see Exhibit "P" page 141).

185.    Lamb did not say this was DiLeonardo's arrest (see Exhibit "P" at page 141).

186.    Demartinis never saw the DFR Team final report (see Exhibit "P" at pages  155, 160), and was never asked if he agreed with the conclusions expressed by Deputy Chief Hunter in the report (see DeMartinis Decl. ¶6).

187.    As a member of the NCPD DFR Team responding to a shooting that occurred in a neighboring county where he had no criminal jurisdiction, DeMartinis understood his role was to assist SCPD investigators with information they may need, and to ascertain the facts and circumstances of the discharge of the gun (see Exhibit "P" pages 59-60).

188.    The NCPD DFR Team had no investigative supervision over or interaction with SCPD's homicide squad's investigation into the incident; it was not Nassau's investigation; Nassau did not have jurisdiction (see Exhibit "P" page 63; see DeMartinis Decl. ¶5).

189.    The memorandum prepared by DeMartinis that morning reflected that the report was preliminary, that the facts and details may not have been complete, that Suffolk County was in charge of the investigation, and that the investigation was on-going. (See Exhibit "O").

190.    This memorandum was sent by DeMartinis to Flanagan on February 27, 2011 at 11:35 a.m., only 10 hours after the incident occurred (see Exhibit "O").

191.    With respect to a shooting occurring outside Nassau the duties and responsibilities of the DFR Team are different inasmuch as NCPD has no investigative power or criminal jurisdiction for an incident that occurs in Suffolk County (see Exhibit "P" pages 52-53).

192.    Prior to his deposition on March 12, 2013, DeMartinis had never seen the DFR Team report (see Exhibit "P" page 54). He never saw it or reviewed it before it was submitted by Chief Hunter to the Commissioner (see Exhibit "P" page 55).

193.    DeMartinis never met or communicated with Thomas Moroughan (DeMartinis Decl. ¶P14, 24).

194.    DeMartinis did not provide any statements or other information which served as a basis for the SCPD's arrest of Thomas Moroughan (DeMartinis Decl; see DE 177, Exh. "H", Bates pages 181-182).

195.    DeMartinis never testified in any criminal matter against Thomas Moroughan (DeMartinis Decl. ¶26).

196.    DeMartinis was not consulted in any capacity with respect to the basis for any charges to be brought against Thomas Moroughan by the Suffolk County District Attorney (DeMartinis Decl.¶27).

197.    DeMartinis was never interviewed by any member of the SCPD with respect to their investigation into the subject incident (DeMartinis Decl. ¶28).

**Undisputed Facts Supporting Dismissal of Claims Asserted Against NCPD Deputy Chief Edmund Horace[3]**

198.　Deputy Chief Edmund Horace has submitted a Declaration in support of his motion to dismiss Plaintiff's Complaint.  All undisputed facts recited therein are incorporated here by reference.

199.　On February 27, 2011, Deputy Chief Edmund Horace ("Horace") was employed by the NCPD and held the rank of Inspector. At that time he was the Commanding Officer of NCPD's Information Technology Bureau (see Exhibit "M", pages 22-23; Horace Decl. ¶¶2-3).

200.　On the evening of February 27, 2011, Horace had "county duty", meaning once a month each Inspector and/or Deputy Inspector are given "county duty" and are therefore on call in case someone at that rank is needed to respond to an incident (see Exhibit "M", pages 25).

201.　On February 27, 2011, Horace received a call to respond to this incident (see Exhibit "M", page 25) from the operations desk supervisor (see Exhibit "M" at page 50) at around 1:50 a.m. (see Exhibit "M" at page 53).

202.　Horace was asleep at home when he received this call (see Exhibit "M" at page 53).

203.　Horace called Chief Lorraine Hannon, the Chief on Duty, to notify her of the incident and to tell her a DFR Team needed to be activated (see Exhibit "M" at pages 50; 53).

204.　Horace got up, got dressed and drove to Huntington Hospital (see Exhibit "M", at pages 53-54).  Horace arrived at the Huntington Hospital at roughly 2:51 a.m. (see Exhibit "M", at page 54).

---

[3] Deputy Chief Edmund Horace is presently retired from the Nassau County Police Department.  At the time of these events he held the rank of Inspector and is identified as such in the pleadings before this Court.  Prior to his retirement in 2015 after faithfully serving the County of Nassau for 36 years, he had been promoted to the rank of Deputy Chief.  (Horace Decl. ¶2)

205.    Prior to arriving at the hospital Horace was instructed by Chief Hannon that this is not Nassau's investigation, that it is Suffolk's investigation and that they were not to get involved in SCPD's investigation.  (see Exhibit "M" at pages 85-86).

206.    Horace did not go to the scene of the shooting on Oakwood Road. (see Exhibit "M" at pages 59-60).

207.    Horace was not an active part of the investigation because this was Suffolk's investigation (see Exhibit "M" at page 71).

208.    When Horace arrived at the hospital both off-duty NCPD officers were in x-ray and receiving medical care (see Exhibit "M" at pages 61, 73, 82). When Horace did speak with DiLeonardo is was only to introduce himself, ask him how he was and if he needed anything (see Exhibit "M" at pages 86-87; Horace Decl. ¶8).

209.    Because this was an active SCPD investigation Horace did not spend more time with DiLeonardo or ask him what happened (see Exhibit "M" at pages 88, 94).

210.    After speaking briefly with DiLeonardo and his girlfriend, Horace located Bienz and had a similar, brief conversation with him (see Exhibit "M" at pages 103-4; see Horace Decl. ¶10).  Horace did not inquire as to the specifics of the incident because it was Suffolk County's investigation (see Exhibit "M" at pages 104-5).

211.    Plaintiff conceded that Horace did not make factual inquiries of Bienz or his wife, or DiLeonardo or his girlfriend, because this was Suffolk County's investigation (see Exhibit "M" at pages 111-112).

212.    Although Horace was aware that Plaintiff was in the Huntington Hospital emergency room, he never saw him and never spoke with him (see Exhibit "M" at pages 116-117, 119-120, 121; see Horace Decl. ¶11).

213.    Horace made no effort to speak with Plaintiff because this was an active Suffolk County investigation (see Exhibit "M" page 120, see Horace Decl. ¶11).

214.    Horace never read the DFR Team report and did not contribute to its content (see Exhibit "M", page 133, Horace Decl. ¶13).

215.    At roughly 6:00 a.m. Horace went to the SCPD 2nd Precinct where he saw DiLeonardo and Bienz (see Exhibit "M" at pages 146-147).

216.    Horace was not present when DiLeonardo and Bienz were interviewed at the 2nd Precinct by Suffolk County investigators (see Exhibit "M" page 149).

217.    Horace never met or communicated with Thomas Moroughan (Horace Decl).

218.    Horace did not provide any statements or other information which served as a basis for the SCPD's arrest of Thomas Moroughan (Horace Decl; see DE 177, Exh. "H", Bates pages 181-182).

219.    Horace never testified in any criminal matter against Thomas Moroughan (Horace Decl. ¶25).

220.    Horace was not consulted in any capacity with respect to the basis for any charges to be brought against Thomas Moroughan by the Suffolk County District Attorney (Horace Decl. ¶26).

221.    Horace was never interviewed by any member of the SCPD with respect to their investigation into the subject incident (Horace Decl. ¶27).

**Undisputed Facts Supporting Dismissal of All Claims Asserted Against Defendant Edward Bienz**

222.    Sergeant Edward Bienz[4] has submitted a Declaration in support of his motion to dismiss Plaintiff's Complaint.   All undisputed facts recited therein are incorporated here by reference.

223.    Plaintiff has conceded that Bienz did not interact with him in any fashion (see Bienz Decl. ¶57; see Exhibit "C" pages 324, line 16-24).

224.    Plaintiff has conceded that Bienz did not arrest, detain or attempt to detain him in any fashion (see Bienz Decl. ¶¶58-60; see Exhibit "C", page 332).

225.    Bienz did not provide any statement, documents, writing, information or any evidence which was relied upon as a basis to arrest Moroughan or to charge him with a crime (see see DE 177, Exh. "H", Bates pages 181-182).

226.    Bienz did not discharge a weapon at Moroughan (see Bienz Decl. ¶58; See Exhibit "C" page 108-109, see Exhibit "D", page 128).

227.    Bienz did not assault or in way come into physical contact with Moroughan (see Bienz Decl. ¶58, see Exhibit "C" page 108-109).

228.    Bienz never testified in any criminal matter against Thomas Moroughan (Bienz Decl. ¶¶61-64).

229.    Bienz cooperated fully with all investigations into this incident conducted by SCPD, Suffolk County District Attorney's Office and the NCPD IAB (see Bienz Decl. ¶62, see DE 177, Exh. "H", *et seq*.).

---

[4] In 2018 Edward Bienz was promoted to the rank of Sergeant.  At the time of these events he held the rank of Police Officer and is thus identified in all pleadings before this Court.

**Undisputed Facts Supporting Dismissal of All Claims Asserted Against Defendant Timothy Marinace**

230.   Sergeant Timothy Marinace has submitted a Declaration in support of his motion to dismiss Plaintiff's Complaint.  All undisputed facts recited therein are incorporated here by reference.

231.   At the time of the shooting Sergeant Timothy Marinace ("Marinace") was a sergeant assigned to the NCPD Third Precinct (see Exhibit "Q", page 19, the deposition of NCPD Sergeant Timothy Marinace conducted on March 8, 2013; Marinace Decl. ¶¶2-3)

232.   On February 27, 2011, Marinace was on duty as patrol supervisor (see Exhibit "Q", page 63, see Marinace Decl. ¶4).

233.   After the desk sergeant at the NCPD Third Precinct was notified of the shooting in Huntington, he directed Marinace to report to Huntington Hospital to serve as the caretaker supervisor (see Exhibit "Q", pages 62-68, 141, Marinace Decl. ¶4).

234.   Marinace was not a member of the DFR Team (see Exhibit "Q" page 41-43, Marinace Decl. ¶18 ).

235.   Marinace reported to Huntington Hospital.  The SCPD Scene Log reflects his presence there at 2:11 a.m. (see DE 177, Exh. "H", Bates page 178).

236.   While present at the hospital Marinace checked on Bienz and DiLeonardo as to their physical wellbeing; he did not discuss the underlying event with either of them (see Exhibit "Q", page 86-87; 135-138, see Marinace Decl. ¶¶6-7).

237.   While at the hospital, Marinace spoke briefly with DiLeonardo and his PBA attorney to secure information for the firearms discharge report (see Exhibit "Q", page 186; see Marinace Decl. ¶12).

238.     Subsequent to these events Marinace prepared documentation for the Worker Compensation Board based upon information he received from the SCPD that DiLeonardo had been allegedly attempting to effectuate an arrest at the time (see Exhibit "Q", page 190-191; 200-204; see Exhibit "R" deposition of Timothy Marinace conducted on June 17, 2014, at page 46). These documents were prepared after Plaintiff had already been arrested by SCPD.  The SCPD was the only source of this information (see Exhibit "FF" page 46, Marinace Decl. ¶¶15-16; Bienz Decl. ¶54)

239.     Marinace never met or communicated with Thomas Moroughan (Marinace Decl. ¶21).

240.     Marinace did not arrest or detain Thomas Moroughan (Marinace Decl. ¶22).

241.     Marinace did not provide any statements or other information which served as a basis for the SCPD's arrest of Thomas Moroughan (Marinace Decl. ¶23; see DE 177, Exh. "H", Bates pages 181-182).

242.     Marinace never testified in any criminal matter against Thomas Moroughan (Marinace Decl. ¶24).

243.     Marinace was not consulted in any capacity with respect to the basis for any charges to be brought against Thomas Moroughan (Marinace Decl. ¶23).

244.     Marinace was never interviewed by any member of the SCPD with respect to their investigation into the subject incident (Marinace Decl. ¶26).

**Undisputed Facts Supporting Dismissal of All Cross-Claims for Indemnification and Vicarious Liability Raised by DiLeonardo**

245.    On June 6, 2011, the Nassau County Police Commissioner directed that the Nassau County Police Department's IAB open an investigation into these events (see the NCPD Internal Investigative Summary dated June 6, 2011 annexed as an Exhibit to Plaintiff's Second Amended Complaint, DE 177, Exhibit "H", Bate page 106-107).

246.    Notwithstanding the initial impressions reported to the NCPD Police Commissioner by NCPD's DFR Team, on June 6, 2011, the Commissioner summarized his understanding of the underlying events, and reported that there are allegations that officers Bienz and DiLeonardo may have been intoxicated at the time of the shooting which should be investigated (see DE 177, Exhibit "H", Bate page 106-107).

247.    NCPD's IAB conducted an investigation as directed by the Commissioner resulting in an extensive report totaling more than 1,000 pages in length. (see DE 177, Exh. "H").

248    At the conclusion of the NCPD IAB investigation certain findings and recommendations were reviewed and fully approved, which involved NCPD Officers Bienz and DiLeonardo (see DE 177, Exhibit "H", pages 57-96; see Bienz Decl. ¶55).

249.    The DFR Team Report did not dissuade NCPD from investigating these events or from disciplining its officers.

250.    As a result of NCPD's IAB investigation and its findings and specifications as to DiLeonardo, the NCPD conducted a departmental trial before Hearing Officer NCPD Inspector Michael G. Studdert which resulted in certain findings dated March 30, 2014, including the recommendation that DiLeonardo's employment as an NCPD Officer be terminated.  These

findings and the recommended disciplinary action was endorsed by the NCPD Commissioner on or about May 5, 2014 (see Exhibit "S").

251.     On September 5, 2014, DiLeonardo challenged these findings by bringing a special proceeding pursuant to C.P.L.R. Art. 78 in Supreme Court, Nassau County, in which he sought to annul the determinations and recommendations which resulted in his termination (see Exhibit "T", a copy of DiLeonardo's Article 78 Petition)

252.     By Order of New York State Supreme Court Justice Anthony Parga dated October 16, 2014, and entered on October 22, 2014, that action was transferred to the Appellate Division, Second Department.  See Exhibit "U", Justice Parga's Short Form Order dated October 16, 2014.

253.     On April 11, 2016, the Appellate Division, Second Department, denied DiLeonardo's motion to enlarge time to perfect his proceeding, and dismissed the action on its own motion. See Exhibit "V", a copy of the Appellate Division, Second Department's April 11, 2016 Decision and Order on Motion.

254.     Following the commencement of Plaintiff's lawsuit the NCPD's Police Officer Indemnification Board conducted extensive hearings and concluded on March 6, 2012, that the acts alleged in Moroughan's Complaint filed in this Court as against DiLeonardo were not committed while in the proper discharge of DiLeonardo's duties and were not within the scope of his employment.  As a result of that determination the County of Nassau is not indemnifying DiLeonardo in this action.   See Exhibit "W", the March 6, 2012 Indemnification Board's Determination.

255.     A second indemnification hearing was conducted in April 2013 and reached the same conclusion.  See Exhibit "X", the April 15, 2013 Indemnification Board's Determination

that the acts of DiLeonardo were not committed while in the proper discharge of his duties and were not within the scope of his employment.

256. On August 13, 2013 DiLeonardo challenged these findings by bringing a special proceeding pursuant to C.P.L.R. Art. 78 in Supreme Court, Nassau County in which he sought to annul the determination of the NCPD Officer Indemnification Review Board which concluded that he was not entitled to a defense and indemnification in this matter. See Exhibit "Y", a copy of DiLeonardo's Article 78 Petition).

257. On May 1, 2014, New York State Supreme Court Justice R. Bruce Cozzens. Jr., denied Plaintiff's Petition. See Exhibit "Z", the Short Form Order from Justice Cozzens, dated May 1, 2014 and entered on May 2, 2014.

258. DiLeonardo brought an appeal of Justice Cozzens' Order before the Appellate Division, Second Department. On March 1, 2017, the Appellate Division, Second Department, affirmed the lower court in a unanimous decision (see Exhibit "AA", <u>Matter of DiLeonardo v. Nassau County Police Officer Indem. Bd.</u>, 148 A.D.3d 701, 49 N.Y.S.3d 466 (2d Dep't 2017).

259. In its decision the Appellate Division ruled that the record supports the Board's determination that DiLeonardo was not acting while in the proper discharge of his duties or within the scope of his employment and that there was a factual basis to conclude that the misconduct alleged in the Moroughan Complaint arose from an altercation that was personal in nature and was not undertaken in the exercise of his public responsibilities as a police officer. (See Exhibit "AA").

260. DiLeonardo did not move against, or otherwise attempt to appeal the decision of the Appellate Division.

**Undisputed Miscellaneous Facts**

261.    On the date of the incident, the NCPD had written procedures for the administrative investigation of officer involved shootings. The NCPD DFRT is created by NCPD Department Procedure ADM 1221. See DE 177, Exhibit H bate stamp 207-210.

262.    The reports generated by the DFRT must be sent to the Police Commissioner and only the Commissioner before the end of the next business day after the shoot. See DE 177, Exhibit H bate stamp 207-210.

263.    DiLeonardo's employment was terminated because Nassau County determined his conduct was outside the scope of his employment and violated the policies and procedures of the NCPD.  See Exhibits "U" and "V".


Executed on July 27, 2018.


LEAHEY & JOHNSON, P.C.
Attorneys for Defendants
THE COUNTY OF NASSAU, NASSAU
COUNTY POLICE DEPARTMENT, SGT.
TIMOTHY MARINACI, INSPECTOR EDMUND
HORACE, COMMANDING OFFICER DANIEL
FLANAGAN, DETECTIVE SGT. JOHN
DEMARTINIS AND POLICE OFFICER
EDWARD BIENZ
120 Wall Street, Suite 2220
New York, New York 10005
(212) 269-7308


BY:_____*Joanne Filiberti*_____
          JOANNE FILIBERTI