UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 12-CV-0512 (JFB) (AKT)

THOMAS M. MOROUGHAN,

Plaintiff,

VERSUS

THE COUNTY OF SUFFOLK, ET AL.,

Defendants.

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JAN 20 2021  ★

LONG ISLAND OFFICE

MEMORANDUM AND ORDER
January 20, 2021

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

Plaintiff Thomas M. Moroughan ("plaintiff") brings this civil rights action pursuant to 42 U.S.C. § 1983 ("§ 1983") and the laws of the State of New York against: the County of Suffolk ("Suffolk County" or "Suffolk"), the Suffolk County Police Department (the "SCPD"), Suffolk Detectives Ronald Tavares, Charles Leser, Eugene Geissinger, Nicholas Favata, and Alfred Ciccotto, Detective/Sergeant William J. Lamb, Sergeant Jack Smithers, Suffolk Police Officers William Meaney, and Jesus Faya, and Suffolk John Does 1-10 (collectively, the "Suffolk County defendants"); the County of Nassau ("Nassau County" or "Nassau"), the Nassau County Police Department (the "NCPD"), Sergeant Timothy Marinace, Inspector Edmund Horace, Commanding Officer

Daniel Flanagan, Detective/Sergeant John DeMartinis, Officer Edward Bienz, NCPD Chief of Patrol John Hunter,[1] and Nassau John Does 1-10 (collectively, the "Nassau County defendants") (collectively, with the Suffolk County defendants, the "moving defendants"); and Nassau County Police Officer Anthony D. DiLeonardo[2] (collectively, the "defendants").

Plaintiff's claims arise from an incident on February 27, 2011, at approximately 1:17 a.m., on Oakwood Road in Huntington, New York, where plaintiff alleges DiLeonardo unlawfully shot and beat him while DiLeonardo was off-duty and intoxicated, and plaintiff was then falsely arrested and

---

[1] Hunter is represented by separate counsel in this case.

[2] DiLeonardo's employment with the NCPD has been terminated, and he is represented by separate counsel in this case.

1

prosecuted to cover-up DiLeonardo's unconstitutional use of excessive force. In particular, plaintiff summarizes the allegations as follows:

> On February 26 into February 27, 2011, Defendants Nassau County Police Officer Anthony DiLeonardo and Nassau County Police Officer Edward Bienz, who were off-duty at the time, were out in Huntington Village with their respective girlfriend and wife, and consumed alcohol to the point of intoxication. While on their way home, they were driving erratically and almost ran Plaintiff, Thomas Moroughan, who was driving a taxi, off the road. His girlfriend, Kristie Mondo, was in the taxi with him. The officers got lost on the way, and shortly thereafter Moroughan happened upon them while they were stopped on the side of Oakwood Road, in Huntington, New York. Moroughan yelled at DiLeonardo regarding the dangerous manner in which DiLeonardo was driving. Bienz started [exiting] his vehicle, at which point Moroughan decided to leave the area. Thereafter, at approximately 1:17 AM, DiLeonardo took out . . . his gun and fired all five rounds at the taxi, while walking toward it. Three bullets struck the taxi, two of which hit Moroughan—one in the chest and one in the arm. DiLeonardo then ran up to the driver's side door, smashed the window with the butt of his gun, and assaulted Moroughan. While the two struggled, Moroughan managed to put the car in reverse, and fled to Huntington Hospital. Eventually DiLeonardo and Bienz, who were struck by Moroughan's open car door as he backed up and fled, were also transported to the hospital. Over two dozen police personnel, from both [the SCPD] and [the NCPD], responded to the hospital, and numerous others responded to the scene. Among them, was the SCPD Homicide Squad, the NCPD Deadly Force Response Team ("DFRT") which is a group of four high-ranking members of the NCPD that responds to incidences where officers use deadly physical force. Despite DiLeonardo's obvious signs of intoxication, and his commission of several crimes, and despite the fact that probable cause did not exist to arrest or charge Moroughan with any crimes, the NCPD[,] DFRT[,] and the SCPD[,] particularly (but not exclusively) its Homicide Squad, agreed to arrest and charge Moroughan with Assault in the Second Degree, a class D felony, and Reckless Endangerment in the Second Degree, a class B misdemeanor. Several days later, the Suffolk County District Attorney's Office pulled the investigation from the SCPD Homicide Squad, and several months after that, dismissed both charges against Moroughan.

(Pl.'s Opp'n to Hunter's Br. at 1-2.)

Based upon these allegations, plaintiff asserts that the individual defendants violated his constitutional rights by subjecting him to a false arrest, malicious prosecution, and/or due process violations (involving the fabrication of evidence against him) to conceal DiLeonardo's unconstitutional conduct. Plaintiff further asserts that these defendants conspired to violate his constitutional rights by falsely arresting, prosecuting, and imprisoning plaintiff while shielding DiLeonardo and Bienz from investigation or prosecution for their criminal acts. Plaintiff also brings a municipal liability claim under § 1983 against Nassau County. Finally, plaintiff

alleges a number of state law claims against the defendants arising from this incident.

The defendants deny these factual allegations and defend against the various claims on multiple grounds. For example, DiLeonardo contends that his use of force was lawful because plaintiff attempted to run him over with his car when DiLeonardo got out of his own car, and thus he fired his gun at plaintiff because he feared for his life. The moving defendants assert that the arrest and prosecution of plaintiff was supported by probable cause because it was based upon DiLeonardo's sworn statement regarding the incident, and there was no reason to question the veracity or reliability of that statement. The defendants also deny any alleged fabrication of evidence or conspiracy. In short, the defendants deny that they were involved in the violation of plaintiff's constitutional rights in any way.

Presently before the Court are motions for summary judgment filed by all defendants, except DiLeonardo. For the reasons set forth in detail below, the motions are granted in part and denied in part.

First, the Court concludes that the claims brought against the members of the NCPD Deadly Force Response Team ("DFRT") (Hunter, Horace, Flanagan, and DeMartinis), as well as the claims against Marinace, cannot survive summary judgment. The DFRT is an administrative team that responds to incidents involving the use of deadly physical force by NCPD officers, conducts an investigation, and provides a written report the following day to the NCPD Commissioner. Plaintiff points to no evidence or information obtained by the DFRT, or given to the DFRT, that was inconsistent with the statements in the DFRT report. Moreover, it is uncontroverted that (1) the DFRT did not conduct an independent investigation of the incident; (2) the DFRT did not participate in any interview of plaintiff during which plaintiff claims Suffolk County officers fabricated a confession; and (3) the DFRT report was never given to the SCPD, or the Suffolk County District Attorney's Office, or relied upon in any way in connection with plaintiff's arrest and prosecution. The same is true for Marinace. His role in the aftermath of the incident was simply to be the caretaker supervisor at the hospital to check on the well-being of Bienz and DiLeonardo. He conducted no independent investigation, and none of his paperwork (such as the Firearm Discharge Report or the Workers' Compensation forms for DiLeonardo's injuries) was used in connection with plaintiff's arrest or prosecution. Plaintiff seeks to draw an inference of their knowledge of the fabrication of evidence, as well as their involvement in decisions regarding charges to be brought against plaintiff, from their mere presence at the hospital and Second Precinct during which they had communications with Suffolk County police officials. Participation in a conspiracy or the fabrication of evidence, however, cannot be based upon unsubstantiated speculation and conjecture about what could have been said at a certain meeting or in a particular discussion. More is necessary under the law to overcome a summary judgment motion and require a defendant to proceed to trial for a violation of a plaintiff's civil rights. Even construing the evidence most favorably to him, plaintiff has failed to set forth sufficient evidence to create a material issue of disputed fact on the claims against the DFRT members and Marinace. In short, given the uncontroverted facts, no rational juror could find that any DFRT member or Marinace violated plaintiff's constitutional rights, or conspired to do so. Accordingly, summary judgment is granted as to these

3

defendants on all federal and state claims.[3] Because the federal claim against Nassau County is based upon this alleged unconstitutional conduct of the DFRT members, and the underlying claim against the DFRT members does not survive summary judgment, Nassau County's motion for summary judgment on plaintiff's municipal liability claim is also granted.

Second, with respect to the remaining individual defendants, the summary judgment motions are denied in their entirety. As to these defendants, unlike the DFRT members and Marinace, plaintiff has put forth evidence of their involvement in some aspect of the substantive investigation, arrest, and initiation of charges against plaintiff. Moreover, the record is replete with evidence that creates material factual disputes in connection with the claims against them (and DiLeonardo) including, among others, the following: (1) whether plaintiff attempted to run DiLeonardo over with his car before DiLeonardo fired multiple shots at plaintiff, or whether DiLeonardo fired at plaintiff and assaulted him solely because of a verbal dispute; (2) whether DiLeonardo identified himself as a police officer and/or was wearing his police shield during the incident; (3) DiLeonardo's level of intoxication (if any) at the time of the incident; (4) whether DiLeonardo's demeanor and statements in the presence of Suffolk County police officers at the scene in the immediate aftermath of the incident (as well as later on at the hospital and Second Precinct) gave substantial reason to question his veracity and reliability as it related to his account of the incident; (5) whether plaintiff was placed under arrest by DiLeonardo and Bienz at the time of the incident or whether he was

arrested later by Suffolk County officers; (6) whether Tavares and Leser fabricated a "confession" while interviewing plaintiff at the hospital, which plaintiff contends falsely stated that plaintiff drove towards DiLeonardo and that DiLeonardo fired at plaintiff to protect himself; and (7) whether various defendants knowingly created and submitted documentation of other interviews containing DiLeonardo's false version of the incident in an effort to create a consistent narrative to support the arrest and prosecution, or otherwise concealed investigatory information that undermined DiLeonardo's veracity and any probable cause for plaintiff's arrest and prosecution.

These factual disputes preclude summary judgment because their resolution is critical to a determination on various elements of plaintiff's claims including, among others, the following: (1) whether DiLeonardo and/or Bienz were acting under color of state law during the incident; (2) whether DiLeonardo was acting within the scope of his authority as a police officer during the incident; (3) whether there was probable cause to arrest or prosecute plaintiff for assault or reckless endangerment; (4) whether there was a conspiracy to violate plaintiff's civil rights, including through the fabrication of evidence; and (5) whether there was a failure to intervene by one or more defendants in the alleged unconstitutional conduct of fellow law enforcement officers.

In other words, construing the facts most favorably to plaintiff and drawing all reasonable inferences in plaintiff's favor (as is required at the summary judgment stage), a rational jury could find that a highly-intoxicated DiLeonardo shot at plaintiff multiple times without justification during an off-duty verbal dispute and that plaintiff was falsely arrested and prosecuted, as part of an effort to cover-up DiLeonardo's

---

[3] The Court also grants summary judgment on the cross-claims brought by Suffolk County against Hunter, as well as DiLeonardo's cross-claims against Nassau County.

criminal conduct.   A rational jury could further find that the individual defendants participated in one or more aspects of the alleged false arrest and prosecution of plaintiff, or in the concealment of the alleged unconstitutional conduct during the investigation of the incident, including through the alleged fabrication of a false confession by plaintiff, as well as by making false statements during interviews or in police documentation of the incident.

Although these defendants point to evidence in the record that they argue contradicts plaintiff's version of the events and undermines his claims of unconstitutional conduct, it is the role of a jury from the community, not the Court, to resolve these factual disputes and to make the credibility determinations that are inherent in the resolution of such disputes of material fact.  Similarly, to the extent one or more of these defendants argue that they played no part in the alleged false arrest and prosecution or alleged cover-up, and were simply conveying information regarding the incident that they believed to be truthful based upon interviews of DiLeonardo and others, the Court concludes that there is sufficient evidence in this case (when the evidence is construed most favorably to plaintiff, including all reasonable inferences from the evidence) to require a jury to decide whether each of these defendants participated in the alleged unconstitutional conduct in some way or, at the very least, knowingly failed to fulfill their duty to intervene to prevent such conduct.

Accordingly, given these factual disputes in the record, the Court denies the defendants' motions for summary judgment as to the claims (as asserted by plaintiff) for false arrest, malicious prosecution claims, conspiracy, and violations of due process under federal law as to Bienz and the individual Suffolk County defendants.

These same factual disputes also preclude summary judgment on the issue of qualified immunity at this juncture because, construing the evidence most favorably to plaintiff, no reasonable officer would believe that these alleged actions were lawful, and the constitutional rights at issue were clearly established at the time of the incident.  Thus, the following federal claims under § 1983 shall proceed to trial: (1) excessive force (DiLeonardo); (2) false arrest (DiLeonardo, Bienz, Lamb, Tavares, and Leser); (3) malicious prosecution (DiLeonardo, Bienz, Lamb, Tavares, Leser, and Ciccotto); (5) conspiracy (DiLeonardo, Bienz, Lamb, Tavares, Leser, Meaney, Ciccotto, Geissinger, Favata, Smithers, and Faya); and (6) due process (DiLeonardo, Bienz, Lamb, Tavares, Leser, Meaney, Ciccotto, Geissinger, Favata, Smithers, and Faya).

The motions for summary judgment on the state law claims are also denied as to Suffolk County, Nassau County, Bienz, and the individual Suffolk County defendants.

## I. BACKGROUND

### A.    Factual Background

The following facts are taken from the parties' depositions, affidavits, and exhibits, and the parties' respective Rule 56.1 statements of fact.  Unless otherwise noted, the facts are uncontroverted.  Upon consideration of the motions for summary judgment, the Court shall construe the facts in the light most favorable to plaintiff as the nonmoving party and will resolve all factual ambiguities in his favor.  *See Capobianco v. New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).  Thus, this summary of the evidence does not constitute any findings of fact by the Court, but rather describes the evidence in the light most favorable to plaintiff, while noting material factual disputes in the record between the parties.

### 1. The Oakwood Road Incident

On February 26, 2011, DiLeonardo and his girlfriend, Sophia Cornia, went out to dinner with Bienz and his wife, Jillian Bienz, in Farmingdale, New York. (Nassau's 56.1 ¶ 10.)   At the time, DiLeonardo and Bienz were Nassau County police officers and were both off duty that night.  (Nassau's 56.1 ¶ 11.)  At dinner, according to Bienz, he consumed three beers and DiLeonardo had "at least" two vodka mixed drinks.  (Pl.'s Ex. 1 ¶ 3 (Bienz Internal Affairs Unit ("IAU") Statement).) After dinner, at around 9:30-10:30 p.m., the couples headed to Huntington Village, New York, where they visited various establishments.  (Nassau's 56.1 ¶ 14; Pl.'s Ex. 1 ¶ 3 (Bienz IAU Statement).)  At these establishments, Bienz said he drank five more beers and DiLeonardo had five additional vodka mixed drinks. [4] (Pl.'s Ex. 1 ¶ 3 (Bienz IAU Statement).)  Based on that estimation of drinks, plaintiff's expert submitted a report in which he determined that DiLeonardo's blood alcohol content at 1:16 a.m. (around the time of the incident) was between approximately .076% to .113%. [5] (Pl.'s Ex. 28 at 5-7 (Dr. Dominick A. Labianca Expert Report).)

At around 1:00 a.m., on February 27, 2011, the couples decided to go home. (Nassau's 56.1 ¶ 15.)  DiLeonardo followed Bienz in his car as Bienz drove south, departing out of Huntington Village.

(Nassau's 56.1 ¶ 16.)  DiLeonardo drove a white Infiniti and Bienz drove a blue Acura. (Nassau's 56.1 ¶ 17.)

At the time the couples were leaving Huntington Village, plaintiff was driving his taxi cab on West Hills Road in Huntington and was cut off by a blue Acura (Bienz's vehicle) followed by a white Infiniti (DiLeonardo's vehicle).   (Nassau's 56.1 ¶ 18.)    When DiLeonardo's car passed plaintiff, plaintiff testified that he felt "upset" and "angry."   (Defs.' Ex. C at 348:17-22 (Moroughan Dep.).)

On his way home, Bienz got lost in Huntington and pulled over on Oakwood Road.    (Bienz Decl. ¶ 12.)    Because DiLeonardo was following Bienz, he also pulled over.  (Bienz Decl. ¶ 14.)  While on the side of Oakwood Road, plaintiff stopped his cab next to DiLeonardo's vehicle. (Nassau's 56.1 ¶ 25; Bienz Decl. ¶¶ 14-15.)  Plaintiff's girlfriend, Kristie Mondo, was seated in the front passenger seat of plaintiff's cab.    (Nassau's 56.1 ¶ 26.) Plaintiff stopped next to DiLeonardo's vehicle with his front passenger door parallel to DiLeonardo's driver's side front door.  (Nassau's 56.1 ¶ 27.)  Plaintiff rolled down his passenger window and yelled at DiLeonardo for his driving.  (Nassau's 56.1 ¶ 28.)  Plaintiff made comments to the effect of: "Where did you guys learn how to drive" and    "You're   going   to   f**king   kill somebody."  (Defs.' Ex. C at 67:18-68:7 (Moroughan Dep.).)  According to plaintiff, DiLeonardo   responded:   "Learn   how   to f**king drive a taxi, f*ggot."  (See Defs.' Ex. D  at 105:2-106:7 (Moroughan 50-h Hearing Testimony ("Moroughan 50-h")).)

Plaintiff testified that, after the verbal exchange with DiLeonardo, plaintiff put his car into reverse and backed up.  (See Defs.' Ex.  C  at  88:20-25  (Moroughan  Dep.).) DiLeonardo and plaintiff continued to yell at

---

[4] When Tavares and Leser interviewed DiLeonardo and Bienz about alcohol consumption on the night of the incident, DiLeonardo and Bienz each said they consumed a couple of drinks and DiLeonardo noted that he "wasn't drunk." (See Defs.' Ex. K at 355:21-25; Defs.' Ex. J at 282:18-23; Pl.'s Ex. 2 at 1.)

[5] The legal limit for blood alcohol content for operating a motor vehicle in New York is .08%. See New York State Department of Motor Vehicles, *Chapter 9: Alcohol and Other Drugs*, https://dmv.ny.gov/about-dmv/chapter-9-alcohol-and-other-drugs (last visited Dec. 8, 2020).

each other.  (*See* Defs.' Ex. D at 109:2-13 (Moroughan 50-h).)  Although it is disputed in what sequence the parties exited their vehicles, the parties agree that, at some point, both plaintiff and DiLeonardo exited their vehicles and continued to yell at each other.  (Nassau's 56.1 ¶¶ 36-37.)  During the verbal exchange, Bienz also exited his vehicle to see what was going on with DiLeonardo and plaintiff.  (Nassau's 56.1 ¶ 43.)  When plaintiff witnessed Bienz exit his vehicle, plaintiff got back into his cab.  (Nassau's 56.1 ¶ 44.)

While plaintiff was back in his car, DiLeonardo fired shots at him.  (Nassau's 56.1 ¶¶ 46, 51.)  It is highly contested as to whether plaintiff drove his car forward at DiLeonardo before the shots were fired.  The Nassau County defendants point to plaintiff's 50-h Hearing testimony, in which he states that he put his car in reverse, backed up two to three car lengths, then put his car into drive to make a U-turn to leave, and drove forward.  (Nassau's 56.1 ¶¶ 44-46.)  Plaintiff testified that he put the car in "drive," but rather than driving forward towards DiLeonardo, he turned the wheel to the left to make a U-turn to go south on Oakwood Road and leave the scene.  (Defs.' Ex. D at 112:9-12 (Moroughan 50-h); Defs.' Ex. C at 91:10-18 (Moroughan Dep.).)  In particular, plaintiff noted that (1) when he put the car in drive, he possibly moved forward, but no more than one or two feet; (2) the shots were fired when he put the car in drive to make the U-turn; and (3) as he put the car into drive to make a U-turn to the left, DiLeonardo was standing to the right side of plaintiff's car on the shoulder two to three car lengths in front.  (Defs.' Ex. D at 110:16-117:18,   118:10-121:21,   123:15-124:21 (Moroughan 50-h).)

When firing his gun at plaintiff, DiLeonardo shot all five rounds from his gun.  (*See* Pl.'s Ex. 13 ¶ 34 (DiLeonardo

IAU Statement).)    Once DiLeonardo finished shooting, DiLeonardo ran to the driver's side door of plaintiff's car.  (Nassau's 56.1 ¶ 53.)  DiLeonardo smashed the driver's window of the cab with the butt of his gun, opened the door, and punched plaintiff in the face at least 10 times.  (Nassau's 56.1 ¶ 54.)  While struggling with DiLeonardo, plaintiff put the cab in reverse and backed away.  (Nassau's 56.1 ¶ 55.)  As his car reversed, it hit Bienz, who was—at that time—running towards plaintiff's car.  (Nassau's 56.1 ¶ 64.)  After he pulled away from the area, plaintiff drove himself to Huntington Hospital with his girlfriend in the passenger seat who called 911 on their way.  (Nassau's 56.1 ¶¶ 55, 65.)[6]

### 2.  Identification of DiLeonardo as a Police Officer

It is in dispute whether DiLeonardo identified himself as a police officer to plaintiff during the incident.  (Nassau's 56.1 ¶¶ 57-58.)  According to one post-incident interview, Bienz stated that, during the incident, DiLeonardo identified himself as "Nassau Police."  (Pl.'s Ex. 6 (Palumbo Notes of Bienz Interview, dated Apr. 29, 2011); Pl.'s Ex. 5 at 147:4-8 (Palumbo Dep.).)  There is also evidence that Bienz told another officer that he saw DiLeonardo go to plaintiff's cab door and tell him that "he was a cop."  (Pl.'s Ex. 2 at 1 (Leser

---

[6] The record also includes statements from people who lived in the neighborhood where the incident took place.  For example, according to a woman who lived down the block from where the incident occurred, she heard a man yell, "what the f**k did you do[?]" (Pl.'s Ex. 71 (Statement of Ruti Besares, dated July 20, 2011).)  Another witness, Eric Klug, stated that he observed part of the incident in question, and saw "a man with a gun walking towards a white car which was stopped in the middle of the road.  The man with the gun was shooting his gun at the windshield of the car. . . . The white car was stopped in the travel lane of Oakwood Dr."  (Pl.'s Ex. 18 at 1 (Klug IAU Statement).)

Notes of Bienz Interview).) However, in a declaration, Bienz states that, "[a]t some point during their altercation I heard DiLeonardo say 'you're under arrest'" but that "[h]e did not identify himself as a police officer and he was not in uniform." (Bienz Decl. ¶ 34.)

Jillian Bienz, who was present at the incident, testified that DiLeonardo said "[s]top, police" to plaintiff. (Pl.'s Ex. 7 at 262:16-21 (Jillian Bienz Dep.).) DiLeonardo said that, before he fired the first shot, he "turned toward [plaintiff's] car and shouted, 'stop police, don't move'" and pointed his gun at plaintiff's car as it "headed straight for [him]." (Pl.'s Ex. 13 ¶ 31 (DiLeonardo IAU Statement).) According to DiLeonardo, plaintiff continued to drive towards him and he then fired his gun because he "feared for [his] life." (Pl.'s Ex. 13 ¶¶ 32-33 (DiLeonardo IAU Statement.).) According to DiLeonardo, once plaintiff's vehicle stopped moving after he had finished shooting, he "went to [plaintiff's] door, identified [himself] as a police officer, and told [plaintiff] he was under arrest." (Pl.'s Ex. 22 at 3 (Felony and Misd. Compl. with DiLeonardo Dep.).)

Plaintiff testified that, during the incident, he did not hear DiLeonardo indicate that he was a police officer. (Defs.' Ex. D at 133:15-25; 167:6-13 (Moroughan Dep.).) However, plaintiff noted that, while fleeing the scene, plaintiff testified he heard what sounded like "stop, cop, stop, stop," but did not believe the shooter was a cop at that point. (Defs.' Ex. C at 111:8-112:9 (Moroughan Dep.).) Plaintiff's girlfriend Kristie Mondo told a 911 operator that "I think that kid said that he was a cop," in reference to DiLeonardo. (Defs.' Ex. E, Mondo 911 Call.)

It is further in dispute whether DiLeonardo was wearing a badge or a shield around his neck that identified him as a police officer. (*See* Pl.'s Resp. to Nassau's 56.1 ¶ 72.) The Nassau County defendants highlight the testimony of Nieves, an officer on the scene, who testified in his deposition that DiLeonardo was not wearing a badge when the SCPD arrived at the scene of the incident. (Nassau's 56.1 ¶ 72.) Plaintiff also did not see DiLeonardo wearing anything that indicated he was a police officer. (Defs.' Ex. D at 133:22-25 (Moroughan Dep.).) But, according to DiLeonardo, he "immediately pulled out [his] shield" and approached the driver's side of the taxi "with his shield out." (Pl.'s Ex. 13 ¶¶ 38-39 (DiLeonardo IAU Statement).) Jillian Bienz, Sophia Cornia, and eyewitness Eric Klug gave statements that support DiLeonardo's assertion that he was wearing and displaying his police shield to plaintiff. (Pl.'s Ex. 7 at 262:16-263:25 (Jillian Bienz Dep.); Pl.'s Ex. 23 at 4 (Cornia Statement dated Feb. 27, 2011).); Pl.'s Ex. 18 at 3 (Klug IAU Statement) (stating DiLeonardo had "something large around his neck"); Pl.'s Ex. 25 at 303:7-12 (Palumbo Dep.).)

### 3. Arrival of SCPD Officers

DiLeonardo called 911 to report the incident. (Nassau's 56.1 ¶ 67.) During that 911 call, DiLeonardo told the operator that he had been shot. On the 911 call, DiLeonardo said, "I'm bleeding, I need an ambulance . . . I don't know if I'm shot." (Defs.' Ex. E, DiLeonardo 911 Call.) Moments later, on the same call, DiLeonardo stated again that he was shot and bleeding. (Defs.' Ex. E, 911 Call; *see* Nassau's 56.1 ¶ 67.) DiLeonardo requested immediate assistance and repeatedly stated that his gun had been stolen by plaintiff. (Nassau's 56.1 ¶ 68.) SCPD Officers Channon Rocchio and Enid Nieves were the

first to arrive on the scene at Oakwood Road. (Nassau's 56.1 ¶ 70.) Rocchio testified that, when she spoke with DiLeonardo, she smelled a slight odor of alcohol. (*See* Defs.' Ex. F at 29:6-13 (Rocchio Dep.).) In speaking with DiLeonardo at the scene, DiLeonardo could not tell Rocchio whether he broke the window of plaintiff's car or where his gun was located. (*See* Defs.' Ex. F at 22:17-22 (Rocchio Dep.).) The Suffolk County defendants point to the additional testimony of Rocchio, who stated that she did not believe DiLeonardo was intoxicated. (Defs.' Ex. F at 30:5-13 (Rocchio Dep.).) The Suffolk County defendants further note that Rocchio testified that she had observed that DiLeonardo's speech was not slurred, he was not unsteady on his feet, and he gave her cognitive details of what had happened. (Defs.' Ex. F at 30:14-21 (Rocchio Dep.).) Plaintiff disputes that DiLeonardo was not intoxicated and not mentally impaired based on, among other things, DiLeonardo's subsequent admission to the number of alcohol drinks he consumed that night, the smell of alcohol, and his behavior on the 911 call, at the scene, and at the hospital later that morning. (Suffolk 56.1 ¶ 5; Pl.'s Resp. to Suffolk's 56.1 ¶ 5.) Ultimately, DiLeonardo's gun was found inside plaintiff's cab. (Nassau's 56.1 ¶ 93.)

When Rocchio and Nieves arrived at the scene of the incident, DiLeonardo identified himself as a Nassau County police officer. (Nassau 56.1 ¶ 72.) Suffolk Sergeant Jack Smithers, as well as Suffolk Detectives Nicholas Favata and Eugene Geissinger, also responded to the scene.[7] (Nassau's 56.1 ¶ 78; Pl.'s Ex. 29 (Oakwood Road Scene Log.).) DiLeonardo told Smithers that he believed that he shot himself and

physically demonstrated how he might have done so. (Defs.' Ex. H at 19:5-18 (Smithers Dep.).) Smithers described DiLeonardo immediately after the incident as "distraught, bordering on tears" and that DiLeonardo said to him, "Sarge, can you help me[?]" (Defs.' Ex. H at 15:4-6 (Smithers Dep.).) Geissinger observed DiLeonardo "walking in circles" and holding his arm because "[DiLeonardo] thought he was shot." (Pl.'s Ex. 34 at 27:17-28:22 (Geissinger Dep.).) Favata testified that "DiLeonardo, didn't even know if he was shot or not . . . he didn't really know what was going on." (Pl.'s Ex. 3, at 03:51-04:07 (Recording of Favata Internal Affairs Bureau ("IAB") Interview).) Despite DiLeonardo's representations regarding his injuries, Rocchio clarified to the responding officers on radio that DiLeonardo was not shot and said, "he's not hurt," and the dispatcher responded, "Correction, Nassau PD not injured." (Defs.' Ex. E, Rocchio Radio Transmission.) Rescue personnel tended to DiLeonardo and Bienz at the scene, and both were placed in an ambulance and transported to Huntington Hospital. Rocchio and Geissinger went in the ambulance with DiLeonardo and Bienz. (Nassau 56.1 ¶ 84.) On the way to the hospital, Geissinger smelled a "moderate" odor of alcohol in the ambulance. (Pl.'s Ex. 34 at 69:6-70:9 (Geissinger Dep.).) Both Bienz's and DiLeonardo's medical records note that the smell of alcohol was on their breath. (Pl.'s Ex. 40 at 2 (Bienz Medical Records); Pl.'s Ex. 24 at 6 (DiLeonardo Medical Records).)

#### 4.  Circumstances of Plaintiff's Arrest

It is disputed as to when and who arrested plaintiff in connection with the Oakwood Road incident. According to plaintiff, he did not hear DiLeonardo identify himself as a police officer or indicate that plaintiff was under arrest

---

[7] No NCPD personnel were at the scene of the incident at any time prior to 4:39 a.m. (Nassau's 56.1 ¶ 87.)

during the incident on Oakwood Road. (*See* Pl.'s. Resp. to Nassau's 56.1 ¶ 59; Defs.' Ex. D at 167:6-9 (Moroughan 50-h).) According to the Nassau County defendants, Bienz also never told plaintiff he was under arrest during the incident. (Nassau's 56.1 ¶¶ 61-63.) Bienz testified that, at some point during the incident, he heard DiLeonardo say "[y]ou're under arrest" to plaintiff. (*See* Pl.'s. Resp. to Nassau's 56.1 ¶ 56; Defs.' Ex. B at 320:14-19 (Bienz Dep.).) On the same day of the incident, Bienz wrote in an Incident/Accident Statement that "[w]hile acting in the scope of [his] official duties, [he] was injured in the process of assisting Police Officer DiLeonardo effect a lawful arrest." (Pl.'s Ex. 19 at 186:12-187:11 (Bienz Dep. (quotation marks omitted)); Pl.'s Ex. 20 at 1 (Bienz Incident/Accident Statement, dated Feb. 27, 2011).) Similarly, the day of the incident, DiLeonardo wrote in a report that "[w]hile acting in the scope of [his] official duties, [he] was injured when [he] attempted to place [plaintiff] under arrest." (Pl.'s Ex. 21 at 1 (DiLeonardo Incident/Accident Statement, dated Feb. 27, 2011).) In a later declaration, Bienz stated that his description of "assisting DiLeonardo effect a lawful arrest" was a "poor choice of words" as he was "not attempting to assist in effecting an arrest but intended to intervene between two individuals who were fighting over a loaded handgun." (Bienz Decl. ¶ 54.) Bienz later denied seeing plaintiff commit any crime warranting an arrest. (*See* Defs.' Ex. B at 323:5-324:10 (Bienz Dep.).) Plaintiff's arrest paperwork states that he was arrested at 1:15 a.m. by DiLeonardo, who is listed as the "Arresting Officer." (Pl.'s Ex. 49 at 1, 4 (Arrest Report and Worksheets).) And, as previously noted, DiLeonardo's and Bienz's original accounts mirror each other in stating that DiLeonardo arrested plaintiff at the scene of the incident, and they were acting in the scope of their official duties. (*See* Pl.'s Ex. 20 at 1 (Bienz

Incident/Accident Statement, dated Feb. 27, 2011); Pl.'s Ex. 21 at 1 (DiLeonardo Incident/Accident Statement, dated Feb. 27, 2011).)

Some Suffolk County defendants also corroborate that plaintiff was arrested by DiLeonardo at the scene. Suffolk Detective/Sergeant William Lamb testified that, when he arrived at the hospital at 4:15 a.m., he was advised that plaintiff was under arrest, and that "the Nassau cop arrested him." (Pl.'s Ex. 43 at 64:11-15, 67:11-25 (Lamb Dep.).) Suffolk Detectives Ronald Tavares and Charles Leser, who arrived at the hospital around 4:00 a.m., were told by Lamb that plaintiff was under arrest by Nassau. (Pl.'s Ex. 43 at 41:9-22 (Lamb Dep.); Defs.' Ex. K at 70:25-71:18, 186:8-14 (Tavares Dep.); Defs.' Ex. J at 78:6-80:22, 96:13-16 (testifying that Lamb and Tavares wanted to speak to DiLeonardo at the hospital because "he is the one that took police action, he is the one that arrested Moroughan"), 128:12-16 (Leser Dep.).)

Tavares and Leser testified that they entered plaintiff's hospital room at approximately 6:30 a.m. because they wanted to speak to him about the incident; they also testified that they told plaintiff at that time that he had been arrested already by Nassau. (*See* Defs.' Ex. K at 210:7-25 ("[I] [t]old him he was under arrest by Nassau . . . . Nassau arrested you.") (Tavares Dep.); Defs.' Ex. J at 189:19-190:6 (noting that they informed plaintiff that "[Nassau County] place[d] [him] under arrest.") (Leser Dep.).) Nassau, in contrast, points to plaintiff's deposition testimony in which he states that the first time he was told he was under arrest was at the SCPD Second Precinct. (Nassau's 56.1 ¶ 118.)

Plaintiff likewise notes that there is conflicting evidence in the record regarding when he was arrested and by whom. For

example, although plaintiff testified that he did not hear DiLeonardo tell him he was under arrest at the scene of the incident, Bienz and DiLeonardo both testified that DiLeonardo did make such a pronouncement. (*See* Pl.'s. Resp. to Nassau's 56.1 ¶¶ 98, 117.) Moreover, plaintiff points out, as discussed above, Tavares and Leser testified that they told plaintiff he was already under arrest, specifically by Nassau, when they interviewed him about the incident in his hospital room at around 6:30 a.m. (*See* Pl.'s. Resp. to Nassau's 56.1 ¶¶ 98, 117-18.) Plaintiff further notes that there is evidence that Suffolk waited to process plaintiff's arrest only after SCPD interviewed DiLeonardo, Bienz, Cornia, and Jillian Bienz. (*See* Defs.' Ex. K at 368:8-24 (Tavares Dep.).)

The Suffolk County defendants maintain that Lamb was informed by Suffolk Detective Lieutenant Gerard Pelkofsky that plaintiff was under arrest by Nassau. (Suffolk's 56.1 ¶¶ 18-19.) Plaintiff highlights that this assertion is disputed, and contends that there is no evidence that Pelkofsky was at Huntington Hospital at the same time as Lamb. (*See* Pl.'s Ex. 38 at 1 (Huntington Hosp. Scene Log).) Plaintiff further notes the dispute regarding Tavares and Leser's accounts of plaintiff's arrest being made by Nassau. Plaintiff points to Tavares and Leser's deposition testimony in which both admitted that at 6:30 a.m., prior to entering plaintiff's hospital room to interview him, they knew they would be filing "some type of assault charge" against plaintiff. (Pl.'s to Nassau's 56.1 ¶ 122; *see* Defs.' Ex. K at 183:19-184:8 (Tavares Dep.); Defs.' Ex. J at 128:22-129:13 (Leser Dep.) ("[Q.] Was [plaintiff], when you went into speak to him, under arrest for Assault 2nd degree? [A.] I would say assaulting a police officer, yes. [Q.] I[s] that Assault 2nd degree? [A.] Correct.").)

Once Tavares and Leser provided handwritten statements regarding the incident, assault and reckless endangerment charges were entered into a Suffolk computer and the formal Felony and Misdemeanor Complaint was generated against plaintiff. (Defs.' Ex. K at 198:3-200:12 (Tavares Dep.); Defs.' Ex. J at 139:13-140:18, 142:12-144:10 (Leser Dep.); Pl.'s Ex. 49 at 9-10 (Arrest Report and Worksheets); Pl.'s Ex. 22 at 1-2 (Felony and Misd. Compl.).) Plaintiff asserts that Bienz allowed the processing of plaintiff's arrest even though he did not witness plaintiff drive his cab at DiLeonardo or witness plaintiff commit any act which warranted arrest. (*See* Defs.' Ex. B at 323:19-324:10 (Bienz Dep.).)

### 5. Time at Huntington Hospital

Plaintiff's medical record reflects that he was admitted to the emergency room at Huntington Hospital at 1:30 a.m. (Nassau's 56.1 ¶ 113.) The SCPD created a Scene Log for the Huntington Hospital and SCPD Officer William Meaney was the first to arrive at 1:22 a.m. (Nassau's 56.1 ¶ 89.) Meaney spoke to plaintiff and sought to locate DiLeonardo's missing gun.[8] Plaintiff told Meaney that DiLeonardo may have dropped his gun inside his cab. (Nassau's 56.1 ¶ 92.) Meaney then went outside to check and found DiLeonardo's gun inside plaintiff's cab. (Nassau's 56.1 ¶ 93.) Once the gun was secured, Meaney returned to the emergency room where he remained with plaintiff, sometimes in his room, but mostly outside his room for plaintiff's entire hospital stay. (Nassau's 56.1 ¶¶ 95, 99.) Meaney questioned plaintiff about what

---

[8] Suffolk asserts that plaintiff "spontaneously" spoke to Meaney and their conversation was not in response to questions from Meaney. Plaintiff disputes these assertions. (Suffolk's 56.1 ¶ 14; Pl.'s Resp. to Suffolk's 56.1 ¶ 14.)

happened. Plaintiff testified that he told Meaney the following:

> I got into an argument on the road and this f**king psycho just jumped out of his car and started shooting at me for no reason and that he came up to -- you know, he came up and broke my window and started hitting me in my face and that I managed to drive away and drove myself [to the hospital].

(Defs.' Ex. C at 122:7-123:3 (Moroughan Dep.).) Suffolk points to Meaney's Supplementary Report about the incident that states that plaintiff told him that he "put his car in reverse and floored it" but that the vehicle "was mistakenly in drive and it did move forward toward one of the men." (Suffolk's 56.1 ¶ 15.) Plaintiff disputes this and points to a Suffolk County investigator's notes regarding the morning of the incident, which states that Moroughan told his treating physician "[w]hen [the] guy got out of the car with a gun [I] thought [I] was going to die" and that he had been beat up and shot for no reason. (Pl.'s Resp. to Suffolk's 56.1 ¶ 15.)

It is in dispute whether plaintiff was handcuffed at the hospital. The Nassau County defendants assert that plaintiff was never handcuffed the entire time Meaney was with him at the hospital. (Nassau's 56.1 ¶ 96.) Plaintiff, on the other hand, notes that Tavares testified that plaintiff was handcuffed to the hospital bed at about 5:30 a.m., when Tavares first entered his room, and was still handcuffed at 6:30 a.m. when Tavares reentered. (Defs.' Ex. K at 128:5-13, 216:7-24 (Tavares Dep.).) In addition, Risco Mention-Lewis, plaintiff's godmother, who at the time was also a Nassau County Assistant District Attorney, testified lthat she arrived at the hospital at approximately 2:00 a.m. and that she "believe[d] . . . he

was handcuffed the whole time" he was in the hospital. (Pl.'s Ex. 42 at 158:18-159:3 (Mention-Lewis Dep.); *see also* Pl.'s Ex. 41 at 38:3-6 (Mention-Lewis Dep.); Pl.'s Ex. 42 at 73:14-17 (Mention-Lewis Dep.).) Meaney, who was outside of plaintiff's room, stated conversely that plaintiff was "[n]ever handcuffed" and "never under arrest." (Pl.'s Ex. 3 at 00:09-00:33 (Meaney IAB Interview).) Plaintiff testified that he did not remember ever being handcuffed while at the hospital. (*See* Pl.'s Ex. 16 at 158:22-159:2 (Moroughan Dep.).)

As noted above, Tavares and Leser testified that, at approximately 6:30 a.m., they entered plaintiff's hospital room and said they wanted to speak with plaintiff regarding the incident and told plaintiff that he had been placed under arrest by Nassau County. (*See* Defs.' Ex. K at 210:7-25.) It is in dispute whether Tavares and Leser advised plaintiff of his *Miranda* rights. According to Tavares and Leser, prior to discussing the incident with plaintiff, Tavares and Leser read him his *Miranda* rights and had him execute the waiver on the Advice of Rights form. (*See* Pl.'s Ex. 44 (SCPD Advice of Rights); Defs.' Ex. K at 210:7-213:9 (Tavares Dep.); Defs.' Ex. J at 178:6-13, 186:15-190:21 (Leser Dep.).) However, plaintiff stated that he was not orally advised of his *Miranda* rights, and that he initialed where he was directed to sign without reading what the Advice of Rights form stated. (*See* Pl.'s Ex. 16 at 178:6-23, 214:9-215:12, 335:3-338:18 (Moroughan Dep.).)

Plaintiff also points out that, though Tavares and Leser claim that plaintiff signed his Advice of Rights at 7:00 a.m., his medical records indicate that he was undergoing a CT scan at 6:34 a.m. and provided a urine sample at 7:00 a.m. (Pl.'s Ex. 57 at 20, 32 (Moroughan Medical Records).) Therefore, plaintiff argues that

Tavares and Leser did not speak with plaintiff until, at the earliest, after 7:00 a.m. Meanwhile, at 6:48 a.m., NCPD Deputy Chief of Patrol John Hunter emailed NCPD Chief of Support Lorraine Hannon, while at the hospital and expressed that "[e]verything is going very well. Both Police Officers have been released and transported to SCPD 2nd Precinct where they will begin processing the arrest of the taxicab driver for Assault 2 and menacing." (*See* Pl.'s Ex. 46 (Email from Dep. Chief Hunter to Chief Hannon, dated Feb. 27, 2011 at 6:48 a.m.).)

### a. Plaintiff's Requests for a Lawyer

Tavares testified that plaintiff was not allowed to have visitors at the hospital because "he was under arrest." (Defs.' Ex. K at 94:9-95:20 (Tavares Dep.).) Tavares told Mention-Lewis that "Nassau is making the arrest, and Suffolk is processing the paperwork." (Pl.'s Ex. 42 at 159:4-16 (Mention-Lewis Dep.).) It is disputed as to who entered plaintiff's hospital room that morning. The Nassau County defendants note that Meaney (who was with plaintiff throughout his hospital stay) said he saw only SCPD personnel and medical staff enter plaintiff's room. (Nassau's 56.1 ¶ 100.) However, plaintiff contends that two men entered his hospital room and identified themselves as NCPD detectives. (Defs.' Ex. C at 136:3-138:22, 147:9-148:25 (Moroughan Dep.).) According to plaintiff, he asked repeatedly to speak to his lawyer, but the two Nassau detectives in the room "tr[ied] to convince [plaintiff] that [he] didn't need a lawyer, [because] only suspects need lawyers." (*See* Defs.' Ex. C at 114:13-117:2, 138:14-20 (Moroughan Dep.).) Plaintiff testified that he was "screaming for . . . [his] lawyer the whole night." (Pl.'s Ex. 16 at 178:9-23 (Moroughan Dep.).) More specifically, plaintiff testified that he said, "I want my lawyer" multiple times, and was ignored.

(Pl.'s Ex. 16 at 138:14-22 (Moroughan Dep.).)

### b. Injuries from the Incident and Treatment

In terms of injuries from the incident, plaintiff sustained two bullet wounds from the shooting, one in the arm and one in the chest. (Pl.'s Ex. 16 at 117:18-22.) DiLeonardo also fractured plaintiff's nose. (*See* Defs.' Ex. J at 154:17-155:19 (Leser Dep.); Defs.' Ex. K at 159:16-20, 346:25-347:10 (Tavares Dep.).) At the hospital, plaintiff received 0.5 milligrams of Ativan at around 1:45 a.m., four milligrams of morphine at approximately 2:00 a.m., a tetanus, diphtheria, and pertussis (Tdap) injection, one milligram of Dilaudid at about 2:45 a.m., one gram of Ancef, and another milligram of Dilaudid, as well as two tablets of Percocet at approximately 6:00 a.m. (*See* Pl.'s Ex. 32 at 195:20-202:7 (Dr. Kraszewski Dep.); Pl.'s Ex. 57 at 7-8 (Moroughan Medical Records).)

DiLeonardo bruised his shoulder, received a 0.25-centimeter puncture wound, and a 0.5-centimeter superficial laceration. (Pl.'s Ex. 24 at 7 (DiLeonardo Medical Records).) One of the treating physicians in the emergency room, Dr. Beverly Kraszewski, said in reference to DiLeonardo, "[G]reat[,] you can get drunk shoot someone and walk out the same day." (Pl.'s Ex. 84 (Geissinger Notes).) According to Geissinger, an unidentified physician also said she "want[ed] [DiLeonardo's] blood."[9] (*See* Pl.'s Ex. 34 at

---

[9] Geissinger attributes this statement to a "nasty lady" who was a doctor at Huntington Hospital, but could not identify who specifically made that remark. (*See* Pl.'s Ex. 34 at 162:9-164:4 (Geissinger Dep.).) In her deposition, Dr. Kraszewski expressed that she wanted to draw DiLeonardo's blood for medical treatment purposes. (Pl.'s Ex. 32 at 57:4-20 (Dr. Kraszewski Dep.).) However, it is unclear from the record if she

162:9-165:7 (Geissinger Dep.).) Dr. Kraszewski testified that DiLeonardo had an "altered mental status," was "slurring his speech," and had an "odor of alcohol on his breath." (*See* Pl.'s Ex. 32 at 56:18-57:20 (Dr. Kraszewski Dep.).) Dr. Kraszewski indicated that DiLeonardo said he had been shot and run over by a car. (*See* Pl.'s Ex. 32 at 57:4-57:20 (Dr. Kraszewski Dep.).) DiLeonardo's medical records include the following notations: "Insight & Judgement . . . impaired," "Memory . . . impaired," "Affect . . . hostile." (*See also* Pl.'s Ex. 24 at 6-7 (DiLeonardo Medical Records).) As part of her treatment plan, Dr. Kraszewski wanted to perform blood work because DiLeonardo was a trauma patient and doing so was standard care protocol. (*See* Pl.'s Ex. 32 at 84:17-85:10 (Dr. Kraszewski Dep.).) Dr. Kraszewski testified that a nurse started an IV for DiLeonardo which was to be used to simultaneously draw his blood. (Pl.'s Ex. 32 at 89:18-90:8 (Dr. Kraszewski Dep.).) Once the IV was in place, Dr. Kraszewski said that DiLeonardo exclaimed, "I don't want any blood." (Pl.'s Ex. 32 at 89:22-90:4 (Kraszewski Dep.).) As a result, according to Dr. Kraszewski, DiLeonardo pulled away and she and the nurse had to "calm [DiLeonardo] down and he agreed to keep the IV." (Pl.'s Ex. 32 at 89:22-90:4 (Kraszewski Dep.).) But DiLeonardo ultimately refused blood work. (Pl.'s Ex. 24 at 5 (DiLeonardo Medical Records).) In terms of injuries, Bienz sustained an elbow contusion and leg abrasion. (Pl.'s Ex. 40 at 6 (Bienz Medical Records).) According to DiLeonardo, "[plaintiff] backed up his car causing the driver's door to hit [DiLeonardo] knocking [him] to the ground causing [him] multiple contusions and lacerations for which [he] was treated at Huntington Hospital." (Defs.' Ex H at 3 (DiLeonardo's Supporting Deposition).)

### c. Plaintiff's Statement at the Hospital and Other Investigation

According to plaintiff, later that morning, plaintiff was interviewed by Tavares and Leser, though he requested repeatedly to speak to his lawyer. Tavares and Leser told plaintiff he was the "victim" and that they needed a statement from him in order to arrest DiLeonardo and Bienz; otherwise, the two would be released. (Pl.'s Ex. 16 at 136:3-138:22, 147:9-148:25, 168:9-171:20, 172:25-173:5, 174:14-175:16, 271:4-14 (Moroughan Dep.).) Plaintiff eventually told Tavares and Leser his version of what had happened on Oakwood Road. Tavares took notes during the interview and then drafted a written statement from plaintiff. Tavares and Leser then asked plaintiff to sign the statement. (*See* Pl.'s Resp. to Suffolk's 56.1 ¶23; Defs.' Ex. K at 229:13-231:24 (Tavares Dep.); Defs.' Ex. J at 192:24-193:7 (Leser Dep.); Pl.'s Ex. 16 at 176:8-21, 178:6-8 (Moroughan Dep.).) Though plaintiff admits to signing the statement taken by Tavares and Leser, he maintains that he did not read it nor was it read to him prior to signing it. (*See* Defs.' Ex. D at 152:2-10, 167:23-168:3 (Moroughan 50-h); Pl.'s Ex. 16 at 337:20-339:2 (Moroughan Dep.).) Plaintiff initialed changes to the statement, but plaintiff said Tavares told him to initial the document because "he made some mistakes," but plaintiff claims he did not know what Tavares changed in the statement. (Pl.'s Ex. 16 192:18-197:6, 215:11-217:11 (Moroughan Dep.).) According to plaintiff, the first time he read this statement was when his defense attorney showed it to him during his criminal proceeding. (*See* Pl.'s Ex. 16 at 553:5-19 (Moroughan Dep).) Plaintiff maintains that the majority of the statement taken by Tavares and Leser is not true and is contradictory to what plaintiff told the two detectives about the incident in his hospital

---

was the same woman who made the comment reflected in Geissinger's notes.

room. (*See* Pl.'s Ex. 16 at 189:23-191:24, 197:19-214:16, 555:3-15 (Moroughan Dep.).) For example, plaintiff testified that, contrary to what the written statement indicates, plaintiff did not drive forward toward DiLeonardo. Instead, plaintiff explained that he put the car in drive and turned left to leave the area. (*See* Pl.'s Ex. 16 at 206:5-20 (Moroughan Dep.).) Plaintiff also stated that he never told Tavares and Leser that "[DiLeonardo] fired at [him] to protect himself because [plaintiff] drove at him." (Pl.'s Ex. 44 at 2-3 (Advice of Rights); Pl.'s Ex. 16 at 205:19-207:19, 212:25-213:8 (Moroughan Dep.).) Once Lamb reviewed the statement from plaintiff, he told the other officers to go to Suffolk's Second Precinct. (*See* Pl.'s Ex. 43 at 148:2-149:6 (Lamb Dep.).)[10]

Bienz and DiLeonardo were discharged from the hospital at 5:50 a.m. and 6:30 a.m., respectively. (Pl.'s Ex. 40 at 6 (Bienz Medical Records); Pl.'s Ex. 24 at 8 (DiLeonardo Medical Records).) DiLeonardo and Bienz were interviewed about the incident later that morning at 10:00 a.m. at the Suffolk Second Precinct.[11] (Defs.' Ex. J at 90:13-91:4 (Leser Dep.).) Plaintiff's hospital record reflects that he was discharged at 8:00 a.m. (Nassau's 56.1

¶ 113.) At the time of his discharge, Huntington Hospital's medical staff determined that plaintiff was "fit for confinement." (Nassau's 56.1 ¶ 115.) Plaintiff was then transferred in an SCPD patrol car to the Suffolk Second Precinct. (*See* Defs.' Ex. C at 539:15-540:2 (Moroughan Dep.).) When plaintiff was transferred to the Suffolk Second Precinct, his Prisoner Activity Log was created at 8:48 a.m., which plaintiff points out was about two hours before DiLeonardo completed his supporting deposition, which is discussed further below. (Pl.'s Ex. 61 at 1 (Prisoner Activity Log).)

### 6. Criminal Charges Against Plaintiff

At the Second Precinct, DiLeonardo drafted a supporting deposition in order to bring charges against plaintiff. DiLeonardo's deposition stated that plaintiff "backed up his vehicle and then accelerated toward me. I thought he was going to hit me with the car and I was in fear of my life." (Pl.'s Ex. 22 at 3 (Felony and Misd. Compl. with DiLeonardo Dep.).) DiLeonardo said at this point he shot plaintiff to "stop him from hitting me." (Pl.'s Ex. 22 at 3 (Felony and Misd. Compl. with DiLeonardo Dep.).) DiLeonardo explained that he "identified [himself] as a police officer, and told [plaintiff] he was under arrest." (Pl.'s Ex. 22 at 3 (Felony and Misd. Compl. with DiLeonardo Dep.).) DiLeonardo concluded in his statement that, as he was "trying to arrest" plaintiff, plaintiff "backed up his car causing the driver's door to hit me knocking me to the ground." (Pl.'s Ex. 22 at 3 (Felony and Misd. Compl. with DiLeonardo Dep.).)

With this supporting deposition, a complaint was filed against plaintiff. The complaint lists the arrest date and time for

---

[10] Plaintiff also asserts that other defendants prepared other documentation that was falsified in that the reports contained statements attributed to him that he has testified that he did not make, or summarized another witness's statement that the witness (such as Mondo) has denied ever making in the interview, including reports prepared by Meaney, Ciccotto, and Faya. Plaintiff also points to Supplementary Reports by, among others, Meaney and Faya that plaintiff contends omitted material information, such as alcohol consumption by DiLeonardo. (*See* Pl.'s Resp. to Suffolk 56.1 ¶¶ 19-26.)

[11] Plaintiff also indicates that Tavares, Leser, and Lamb testified that the three of them attempted to speak with DiLeonardo and Bienz twice between 4:20 and 4:45 a.m. (*See* Defs.' Ex. K at 75:8-77:20, 89:11-18 (Tavares Dep.); Pl.'s Ex. 43 at 64:11-20, 90:16-23 (Lamb Dep.).)

plaintiff as February 27, 2011, at 1:15 a.m.[12] (Pl.'s Ex. 22 at 1 (Felony and Misd. Compl.).) The complaint charged plaintiff with Assault in the Second Degree and Reckless Endangerment in the Second Degree. (Pl.'s Ex. 22 at 1 (Felony and Misd. Compl.).) The complainant listed on the complaint is Sergeant Lamb.[13] (Nassau's 56.1 ¶ 120.) The Nassau County defendants contend, and plaintiff disputes, that the charges brought against plaintiff were based solely on the statement from DiLeonardo about the Oakwood Road incident. (Nassau's 56.1 ¶ 122; Pl.'s Resp. to Nassau's 56.1 ¶ 122.) Plaintiff notes that there is evidence that he was arrested at about 1:15 a.m., and detained at the hospital until his discharge, which was hours before DiLeonardo provided his statement. (Pl.'s Resp. to Nassau's 56.1 ¶ 122.)

### 7. The DFRT Report and Firearms Discharge Report

The DFRT is a team within the NCPD that responds to incidents involving the use of deadly force by members of the NCPD. (Nassau's 56.1 ¶ 129.) With respect to this incident, the DFRT was made up of Deputy Chief of Patrol John Hunter, the Duty Inspector Edmund Horace, Captain Daniel Flanagan, and Detective Sergeant John DeMartinis, a Supervisor from NCPD Homicide. (Nassau's 56.1 ¶ 132.) Hunter served as the "team coordinator" for the DFRT on the morning at issue. (Nassau's 56.1 ¶ 144.) On that morning, Hunter

arrived at the hospital at around 6:00 to 6:30 a.m. (Defs.' Ex. L at 139:7-8 (Hunter Dep.).) Hunter asked DiLeonardo and Bienz how they were doing, but did not question them about the shooting incident. (Pl.'s Ex. 47 at 146:13-147:11 (Hunter Dep).) Hunter then directed Flanagan to leave the hospital to begin drafting a report[14] for the DFRT regarding the incident. (Nassau's 56.1 ¶ 148.) Flanagan wrote in the DFRT draft report:

> [Police Officer] DiLeonardo, fearing for his life, fired at least three rounds from his off-duty .38 caliber revolver at [plaintiff], striking him through the windshield an unknown number of times. The subject vehicle now came to a stop and officer DiLeonardo approached the subject vehicle from the driver's side and officer Bienz approached from the passenger side. [Police Officer] DiLeonardo broke the driver's side window in an attempt to apprehend and arrest [plaintiff]. [Plaintiff] once again put the vehicle in reverse and backed up the subject vehicle, this time striking and dragging officer Bienz. [Plaintiff] then drove off and fled the scene.

(See Pl.'s Ex. 50 at 3 ¶ 6 (Emails from Capt. Flanagan to Chief Hunter, dated Feb. 27, 2011 at 11:35 a.m.).) Flanagan, the author of this report, did not communicate with DiLeonardo, Bienz or plaintiff the night of the incident. (Nassau's 56.1 ¶¶ 150-51.) Hunter testified that all the information in the DFRT report was obtained "either from Suffolk County Police Department or via Sergeant DeMartin[is] from Suffolk County

---

[12] As previously mentioned, it is disputed between the parties as to which officer and which county (Nassau or Suffolk) arrested plaintiff, as well as the timing of that arrest, as evidenced by, among other things, conflicting documents and deposition testimony.

[13] Plaintiff asserts that the only reason Lamb is listed as the complainant is because the SCPD computer would not allow DiLeonardo's name to be entered because he is not a member of the SCPD. (See Defs.' Ex. J at 137:7-138:24 (Leser Dep.).)

[14] Plaintiff disputes that the DFRT report is a "preliminary report," as argued by the Nassau County defendants. (Nassau's 56.1 ¶¶ 149, 154; Pl.'s Resp. to Nassau's 56.1 ¶¶ 149, 154.)

Police Department." (*See* Pl.'s Resp. to Suffolk's 56.1 ¶ 35 (alteration in original).)

The final DFRT report was submitted by Hunter to the Suffolk Commissioner of Police. (Nassau's 56.1 ¶ 156.) Plaintiff contests that the DFRT report was based solely on information provided by the SCPD and, instead, asserts that it was drafted based on facts agreed upon together by SCPD and NCPD, which forms the basis of plaintiff's conspiracy claims discussed below. (Pl.'s Resp. to Nassau's 56.1 ¶¶ 122, 154.) The final DFRT report states:

> [I]t is the opinion of the Deadly Force Response Team that the actions of all officers involved, with regard to Use of Force issues, were within Departmental guidelines pertaining to the Use of Deadly Physical Force as well as those of Article 35 of the Penal Law of New York State. All officers involved were found fit for duty.

(Pl.'s Ex. 51 ¶ 3 (Final DFRT Report).)

As to the basis for the information in the DFRT report, there is evidence that DeMartinis emailed Flanagan with information he received from Suffolk regarding the incident. (Nassau's 56.1 ¶¶ 147, 155.) Emails were exchanged also between Flanagan and Hunter during the drafting process of the DFRT report. (*See* Pl.'s Ex. 50 (Emails of Flanagan to Hunter on February 27, 2011, at 11:35 a.m., 11:57 a.m., and 1:53 p.m., with attachments).) The two spoke after each of the first two drafts of the report were sent, speaking most extensively after the second draft in which the two spoke for about 28 minutes. (*See* Pl.'s Ex. 50 (Emails of Flanagan to Hunter on February 27, 2011, at 11:35 a.m., 11:57 a.m., and 1:53 p.m., with attachments); Pl.'s

Resp. to Nassau's 56.1 ¶ 153.) Nassau maintains that, at the time the DFRT report was submitted to the NCPD Commissioner, Flanagan believed the report was a fair and accurate assessment of the Oakwood Road incident based on information received from the SCPD. (Nassau's 56.1 ¶ 160.)

Marinace filled out the Firearms Discharge Report. On the morning of the incident, Marinace was assigned to be the "caretaker supervisor" who, when an officer uses deadly physical force, "is assigned to ensure that he is cared for, emotionally, physically, medically." (Defs.' Ex. Q at 141:10-15 (Marinace Dep.).) In that role, Marinace was assigned to stay with DiLeonardo and Bienz while they were at Huntington Hospital, and arrived there at 2:11 a.m. According to Marinace, he filled out the Firearms Discharge Report based upon the limited information that was conveyed to him and did not conduct an independent investigation. In particular, Marinace did not question DiLeonardo or Bienz about the underlying events because he had no investigative responsibility as the caretaker supervisor. Marinace also filled out the "206 package" of the officers' injuries, including the Workers' Compensation Forms.

### 8. The Suffolk County District Attorney's Office

On the morning of February 27, 2011, Suffolk County Assistant District Attorney Raphael Pearl ("ADA Pearl") was notified of the Oakwood Road incident. (*See* Pl.'s Ex. 74 at 61:3-62:4 (ADA Pearl Dep.).) ADA Pearl had multiple conversations with Lamb regarding the incident. (*See* Pl.'s Ex. 74 at 62:15-67:10 (ADA Pearl Dep.).) Plaintiff argues that fabricated interviews and statements were forwarded by SCPD to ADA Pearl, and that this information formed the basis of the prosecution of plaintiff.

(Pl.'s Resp. to Nassau's 56.1 ¶ 122, 196; *see* Hunter Ex. 6 at 226:10-23 (ADA Pearl Dep.) (ADA Pearl noting that he discussed plaintiff's statement with Detectives Tavares and Leser and "consider[ed] the substance of [it] in assessing what occurred that night").) Charges were brought, and plaintiff was arraigned the following day. (Pl.'s Ex. 59 (Arraignment Minutes, dated Feb. 28, 2011).) Special Investigator Anthony Palumbo, who was an employee of the Suffolk County District Attorney's Office, was assigned to assist ADA Pearl in the prosecution of plaintiff. (*See* Pl.'s Ex. 74 at 106:13-17 (ADA Pearl Dep.).) Palumbo interviewed witnesses and relayed information to ADA Pearl as part of the prosecution of plaintiff. (Pl.'s Ex. 25 at 6:15-21, 84:12-85:4, 94:12-16 (Palumbo Dep.).) Two months after the incident, in April, Palumbo interviewed Bienz. (Pl.'s Ex. 6 at 3 (Palumbo Notes of Bienz Interview).) In that interview, according to Palumbo, Bienz told Palumbo that plaintiff drove his cab toward DiLeonardo and that DiLeonardo identified himself as a police officer to plaintiff. (Pl.'s Ex. 6 at 3-10 (Palumbo Notes of Bienz Interview).) Bienz also said he heard DiLeonardo tell plaintiff he was under arrest. (Pl.'s Ex. 6 at 10 (Palumbo Notes of Bienz Interview).) Bienz told Palumbo that based on his observations, plaintiff had committed a crime warranting arrest. (Pl.'s Ex. 5 at 154:14-155:25 (Palumbo Dep.).) Plaintiff points out that this information from Bienz supported the criminal charges against plaintiff. (Pl.'s Resp. to Nassau's 56.1 ¶ 229.) ADA Pearl testified that the interviews with Bienz corroborated what Bienz and DiLeonardo had stated regarding the Oakwood Road incident. (*See* Pl.'s Ex. 75 at 279:5-280:12 (Pearl Dep.).) The next month, on May 26, 2011, plaintiff served his notice of claim on Nassau County. (*See* Defs.' Ex. A at 1 (Notice of Claim on Nassau County).)

On June 6, 2011, more than three months after the arrest, the criminal charges against plaintiff were dismissed. (*See* Pl.'s Ex. 31 (Dismissal Minutes, dated June 6, 2011).) ADA Pearl explained to the court that there was a "significant deficiency in the proof" that would "impact [the state's] ability to prove beyond a reasonable doubt the elements of the charges . . . pending against [Moroughan]." (Pl.'s Ex. 31 at 3 (Dismissal Minutes, dated June 6, 2011).) ADA Pearl further stated that there was "conflicting evidence surrounding the facts and circumstances which led to the discharge of a firearm by off duty Police Officer Anthony DiLeonardo." (*See* Pl.'s Ex. 31 at 3 (Dismissal Minutes, dated June 6, 2011).) In addition, ADA Pearl told the court that DiLeonardo "suffered minor injury, the most serious being a cut to his finger" which DiLeonardo caused himself when he broke plaintiff's car window. (*See* Pl.'s Ex. 31 at 5:14-19 (Dismissal Minutes, dated June 6, 2011).)

9. **Additional Investigation into the Oakwood Road Incident and State Court Proceedings Against DiLeonardo**

The same day the charges were dismissed, the NCPD Commissioner directed the NCPD Internal Affairs Unit ("IAU") to open an investigation into the Oakwood Road incident. (Nassau's 56.1 ¶¶ 245-46.) The NCPD IAU investigation made findings and recommendations; particularly, it found that both DiLeonardo and Bienz committed unlawful conduct and violated department rules during the Oakwood Road incident. (Pl.'s Ex. 87 at 1-2 (NCPD IAU Report).) Plaintiff asserts that, if the DFRT report had arrived at a similar conclusion, then DiLeonardo would have been subject to discipline, including termination, and plaintiff would not have been charged. (*See* Defs.' Ex. N at 153:5-

154:18 (Flanagan Dep.).) Plaintiff further posits that, because the DFRT report concluded that DiLeonardo's force was justified under New York state law and in compliance with NCPD procedures, DiLeonardo and Bienz were deemed "fit for duty." (Pl.'s Ex. 51 ¶ 3 (Final DFRT Report).) As a result, plaintiff believes that an NCPD IAU investigation into the incident was not opened when the incident occurred, and was only investigated after the matter was referred to the NCPD IAU by the Suffolk County District Attorney's Office. (See Pl.'s 56.1 Nassau Resp. ¶ 246.)

As a result of the NCPD IAU investigation, a disciplinary hearing was held and DiLeonardo's employment was terminated. (See Def.'s Ex. U (Short Form Order, Index No. 8686-14, dated Oct. 22, 2014).) The NCPD Indemnification Board conducted hearings and concluded that DiLeonardo's acts were not committed while in the proper discharge of his duties and DiLeonardo was not acting within the scope of his employment. (Defs.' Exhibit W (Indemnification Board's Determination, dated March 6, 2012).) Accordingly, the NCPD Indemnification Board determined that Nassau County would not indemnify DiLeonardo. (See Exhibit W, (Indemnification Board's Determination dated March 6, 2012).) DiLeonardo unsuccessfully challenged these findings and the termination of his employment in state court proceedings under New York's C.P.L.R. Article 78. (Nassau's 56.1 ¶¶ 251-253, 256-259.) Ultimately, the New York Appellate Division, Second Department, affirmed the lower court's decision that DiLeonardo is not entitled to defense or indemnification in this present action. See generally In re DiLeonardo v. Nassau Cnty. Police Officer Indemnification Bd., 49 N.Y.S.3d 466 (App. Div. 2017).

## B.     Procedural History

Plaintiff filed the complaint on February 3, 2012. (ECF No. 1.) Plaintiff filed the first amended complaint on December 17, 2012. (ECF No. 54.) Later, plaintiff filed the second amended complaint on April 14, 2015.[15] (ECF No. 177.) Over the past several years, the parties have conducted extensive discovery, and related motions practice, regarding the claims set forth in the second amended complaint.[16] The Nassau County defendants (except Hunter) moved

[15] Plaintiff concedes that the NCPD is an administrative arm of Nassau County, which cannot be sued individually. See Aguilera v. County of Nassau, 425 F. Supp. 2d 320, 323 (E.D.N.Y. 2006) ("Under New York law, the Nassau County Police Department is considered an administrative arm of the County, without a legal identity separate and apart from the municipality and, therefore, without the capacity to sue or be sued."). Accordingly, all claims against NCPD are withdrawn. Plaintiff also concedes that where a municipal entity is named, official capacity claims against its officials are routinely dismissed as duplicative. See Phillips v. County of Orange, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) ("Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant."). Therefore, plaintiff withdraws his official capacity claims against the individual Nassau County defendants in their official capacities as duplicative. Plaintiff also withdraws his Fifth Amendment claim against the Nassau County defendants. (See Pl.'s Opp'n to Nassau Br. at 1 n.2.)

In addition, plaintiff withdraws his fourteenth and fifteenth causes of action—alleging violations of his Fifth and Sixth Amendment rights—against the Suffolk County defendants (see Pl.'s Opp'n to Suffolk Br. at 31 n.20), as well as his eleventh cause of action for malicious prosecution as to defendants Meaney and Faya, (see Pl.'s Opp'n to Suffolk Br. at 11 n.6.)

[16] The parties agreed to the bifurcation of discovery as to plaintiff's Monell claim against Nassau County. Magistrate Judge Tomlinson granted this request and ordered that all discovery related to plaintiff's Monell claim be stayed until further notice. (ECF No. 184.)

for summary judgement on July 27, 2018. (ECF No. 264.) Hunter moved for summary judgment on July 30, 2018. (ECF No. 266.) The Suffolk County defendants moved for summary judgment on July 31, 2018. (ECF No. 271.) The parties subsequently submitted additional written submissions in connection with these motions in July 2019. The Court heard oral argument on the summary judgment motions on October 28, 2019. (ECF No. 299.) The Court has fully considered all of the parties' submissions and arguments.

## II. STANDARD OF REVIEW

The standard for a motion for summary judgment is well-settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013).

The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). Rule 56(c)(1) explains that:

> [A] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party meets its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart*

*Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Rsch. Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Rsch. Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

To prevail on a claim under § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983. Section 1983 does not itself create substantive rights; it offers "a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quotation marks omitted). The Court first addresses the Nassau County defendants' argument that they are entitled to summary judgment on the § 1983 claims because neither DiLeonardo nor Bienz were acting under color of state law in connection with their interactions with plaintiff, and then the Court proceeds to analyze the moving defendants' arguments as to each of the substantive constitutional claims under § 1983, as well as the state law claims.

### A. "State Action" Requirement

The Nassau County defendants argue that Bienz and DiLeonardo were not acting under color of state law at the time of the incident, and DiLeonardo was not acting within the scope of his employment. Thus, according to the Nassau County defendants, any § 1983 claim against them cannot prevail. As set forth below, the Court concludes that material disputes of fact preclude summary judgment on these issues.

#### 1. Applicable Law

The central question in examining the "under color of state law" requirement is whether the alleged infringement of federal rights is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."); *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action.").

It is axiomatic that private citizens and entities are not generally subject to § 1983 liability. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002); *Reaves v. Dep't of Veterans Affairs*, No. 08-CV-1624 (RJD), 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) ("Purely private conduct is not actionable under § 1983, 'no matter how discriminatory or wrongful.'" (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999))). The Second Circuit has held that "under 'color' of law means under 'pretense of law'" for purposes of § 1983 actions and that "acts of officers in the ambit

of their personal pursuits are plainly excluded." *Screws v. United States*, 325 U.S. 91, 111 (1945). However, although "personal pursuits" of police officers do not give rise to § 1983 liability, the Second Circuit has explained that there is no bright line test for distinguishing "personal pursuits" from activities taken under color of law. *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994). More is required than a simple determination as to whether an officer was on or off duty when the challenged incident occurred. *See Rivera v. La Porte*, 896 F.2d 691, 695-96 (2d Cir. 1990). A police officer may be found liable under § 1983, where the officer was off duty but invoked the real or apparent power of the police department. *See id.*; *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991); *Traver v. Meshriy*, 627 F.2d 934, 938 (9th Cir. 1980). Courts look to the nature of the officer's act, not simply his duty status. *See Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989). Factors courts consider when determining whether an off-duty police officer acted under color of law include "whether defendants identified themselves as police officers at any time during the incident; if plaintiff was aware that the defendants were police officers; whether defendants detained or questioned the plaintiff in the line of duty or scope of employment as police officers; if defendants drew a firearm or arrested the plaintiff; [and] whether defendants were engaged in any investigation or any aspect of the traditional public safety functions of police work." *Claudio v. Sawyer*, 675 F. Supp. 2d 403, 408 (S.D.N.Y. 2009) (quotation marks omitted), *aff'd*, 409 F. App'x 464 (2d Cir. 2011). Liability may exist where off-duty police officers perform duties prescribed generally to police officers. *See Stengel v. Belcher*, 522 F.2d 438, 441 (6th Cir. 1975).

For example, the district court in *Mosca* found that the plaintiff plausibly alleged that the defendant acted under color of law because the defendant "(1) identified himself as an officer of the law; (2) flashed his badge; and (3) detained Plaintiff when he stated that 'I'm with the NYPD, you're not going anywhere.'" *Mosca v. City of New York*, No. 17-CV-4327, 2018 WL 3151704, at *4 (E.D.N.Y. Apr. 24, 2018), *report and recommendation adopted*, 2018 WL 2277837 (E.D.N.Y. May 18, 2018). The Second Circuit has stated that there is "no doubt that when an officer identifies himself as a police officer and uses his service pistol, he acts under color of law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).

In *Davis*, which is a case with allegations similar to those asserted here, the district court found that, in viewing all the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in plaintiff's favor, a jury could rationally conclude that the police officer was acting under color of state law. *See Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 475-76 (E.D.N.Y. 2002). Specifically, the district court noted that the officer began initially acting "in the ambit of his personal pursuit" because the officer was "dressed in civilian clothes and went to a local bar where he played darts and drank alcohol for approximately four hours." *Id.* The district court explained, however, that the nature of the officer's conduct changed when he encountered the plaintiff because he informed the plaintiff that he was a police officer and flashed his badge invoking the real or apparent authority of the police department. *Id.*

## 2. Analysis

As a threshold matter, the Nassau County defendants request that this Court take judicial notice of the New York

Appellate Division's decision affirming the denial of DiLeonardo's request for defense or indemnification in the instant case. In that case, the state court concluded that "[t]he record supports the Board's determination that the petitioner was not acting while in the proper discharge of his duties or within the scope of his employment, since there is a factual basis for the conclusion that the alleged misconduct arose from an altercation that was personal in nature and was not undertaken in the exercise of his public responsibility as a police officer." *DiLeonardo*, 49 N.Y.S.3d at 468 (quotation marks and citations omitted). Thus, the Nassau County defendants argue that this Court, taking judicial notice of that ruling, should similarly conclude here, on summary judgment, that DiLeonardo was not acting as a state actor during this incident, but rather as a private citizen in a personal dispute. However, as discussed below, the Court concludes that the Appellate Division's ruling has no preclusive effect in this case and does not impact this Court's determination that there is sufficient evidence to create a material issue of fact on the issue of state action.

Federal Rule of Evidence 201 states that a court may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A court must take judicial notice if a party requests it and the court is supplied with the necessary information. Fed. R. Evid. 201(c). However, "[b]ecause the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond

controversy under Rule 201(b)." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998). More specifically, "[a] court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'" *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992) (quoting *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

Moreover, in light of the longstanding doctrines of *res judicata* and collateral estoppel, if a party was not in privity with any party to such earlier proceeding and did not have a fair and full opportunity to litigate, the party is not precluded from bringing the claim in another court. Under the doctrine of *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *See Leather v. Eyck*, 180 F.3d 420, 424 (2d Cir. 1999). For collateral estoppel, once an issue of fact has been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in any future lawsuit. *Id.* (quoting *Schiro v. Farley*, 510 U.S. 222, 232 (1994)).

In a federal § 1983 suit, the same preclusive effect is given to a previous state court proceeding as would be given to that proceeding in the courts of the state in which the judgment was rendered. *See* 28 U.S.C § 1738; *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82-84 (1984); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 476 (1982); *Allen v. McCurry*, 449 U.S. 90, 101 (1980). This Court concludes New York State courts would not bar plaintiff's suit on either *res judicata* or collateral estoppel grounds, given that plaintiff was not in

privity with the parties in that action and because the issues litigated in the New York state courts are not the same as those here. In fact, the Appellate Division itself did not even make factual findings on this legal issue, but rather was reviewing the Nassau County Police Indemnification Board's determination under a deferential standard of review, namely, whether the determination "was made in violation of lawful procedure, was affected by an error of law, or was arbitrary and capricious or an abuse of discretion." *DiLeonardo*, 49 N.Y.S.3d at 468 (citations omitted). In short, neither the Appellate Division's decision nor the Indemnification Board's determination have any preclusive effect on the issue of state action in this litigation.

Turning to the evidence in this record, the Court concludes that genuine disputes of material fact preclude summary judgment on the issue of whether DiLeonardo and Bienz acted under color of law. In other words, viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the Court concludes that a reasonable jury could find that DiLeonardo and Bienz asserted their authority as police officers during the Oakwood Road incident to arrest plaintiff and ultimately bring criminal charges against him, and were therefore acting under color of law for purposes of § 1983 liability. Although Nassau notes the officers' off-duty status at the time of the incident, which is a relevant factor, more is required under the analysis than simply looking to an officer's on- or off-duty status at the time of an alleged incident. *Rivera*, 896 F.2d at 695-96. As set forth below, given that there is evidence in the record to suggest that DiLeonardo (1) identified himself as a Nassau police officer; (2) flashed his shield; and (3) arrested plaintiff at the scene of the Oakwood Road incident, there exists genuine issues of material fact that preclude

summary judgment as to whether he acted under color of law, and thereby implicated § 1983 liability. Moreover, these and other factual disputes also preclude summary judgment on the issue of whether DiLeonardo acted beyond the scope of his authority as a police officer.

First, there is evidence in the record that, both during and after the Oakwood Road incident, DiLeonardo identified himself as a police officer to plaintiff and others. For example, there is evidence that DiLeonardo identified himself as "Nassau Police," and told plaintiff "[y]ou're under arrest," as the argument escalated and DiLeonardo pulled out his gun. (Pl.'s Ex. 6 (Palumbo Notes of Bienz Interview, dated Apr. 29, 2011); Pl.'s Ex. 5 at 147:4-8 (Palumbo Dep.); Defs.' Ex. B at 320:14-19 (Bienz Dep.).) According to DiLeonardo, Sophia Cornia, and Jillian Bienz, DiLeonardo identified himself as a police officer before he shot plaintiff. For example, DiLeonardo's own statement recounts that he said to plaintiff with his gun drawn "police, don't move, you are under arrest" and that he "identified [himself] as a police officer." Pl.'s Ex. 13 ¶¶ 31, 52 (DiLeonardo IAU Statement).) In addition, on her 911 call, plaintiff's girlfriend, Kristie Mondo, said to the operator, "I think that kid said that he was a cop." (Defs.' Ex. E, Mondo 911 Call.) Plaintiff testified that, when fleeing from the scene, he heard DiLeonardo say what sounded like "stop, cop." (Defs.' Ex. C at 111:8-112:9 (Moroughan Dep.).) DiLeonardo also placed a 911 call following the incident, in which he exclaimed, "Nassau County police officer, officer involved shooting!" (Defs.' Ex. E, DiLeonardo 911 Call.) DiLeonardo said that plaintiff "tried to run [him] over" and requested assistance, saying "I need some officers forthwith to this location" for this "f**king perp!" (Defs.' Ex. E, DiLeonardo 911 Call.) DiLeonardo also repeatedly said plaintiff stole his gun on his

911 call. On that same call, DiLeonardo identified himself as a "Nassau County [Member of Service]." (Defs.' Ex. E, DiLeonardo 911 Call.) In addition, at Oakwood Road, DiLeonardo also identified himself as an NCPD officer to Rocchio and Nieves, who first responded to the scene.

Second, aside from the evidence that DiLeonardo verbally alerted plaintiff and others that he was a police officer, Sophia Cornia, Jillian Bienz, and eyewitness Eric Klug made statements that support the contention that DiLeonardo had his shield out to identify himself as a police officer when confronting plaintiff during the incident on Oakwood Road. Additionally, in DiLeonardo's statement, he represented that, during the incident, he "immediately pulled out [his police] shield" to show plaintiff. (Pl.'s Ex. 13 ¶¶ 38-39 (DiLeonardo IAU Statement).) Such evidence in the record demonstrates a genuine dispute of material fact as to whether DiLeonardo was acting under color of state law because he identified himself as, and invoked the authority of, a Nassau police officer to plaintiff and others.

Further, as discussed in detail *supra*, there is evidence in the record that, if credited, supports a finding that DiLeonardo, in addition to identifying himself as a police officer, arrested plaintiff. That evidence also raises a genuine dispute of material fact as to whether Bienz also was acting under color of state law during the Oakwood Road incident. Bienz stated that he ran over to help DiLeonardo get Moroughan out of the taxi, and "assist[ed] Police Officer DiLeonardo effect a lawful arrest." (Pl.'s Ex. 19 at 186:12-187:11, 258:24-259:11 (Bienz Dep.); Pl.'s Ex. 20 at 1 (Bienz Incident/Accident Statements, dated Feb. 27, 2011).) As plaintiff also points out, Bienz testified that (in general) he and DiLeonardo were assigned to the

same patrol, and together made arrests, prepared paperwork, and went to court. Based upon this evidence, a reasonable jury could conclude that the assistance Bienz provided to arrest plaintiff was in his capacity as a police officer—as he had many times before with DiLeonardo—and accordingly, could find that Bienz too was acting under color of state law.[17]

Notwithstanding this evidence, the Nassau County defendants argue that this incident arose from a "purely personal dispute" between DiLeonardo and plaintiff about driving. (Nassau Br. at 12-13.) However, a rational jury could reach a finding of state action even though DiLeonardo may have begun the incident acting "in the ambit of [his] personal pursuits" which typically do not trigger § 1983 liability. *Pitchell*, 13 F.3d at 548 (quoting *Screws*, 325 U.S. at 111). In other words, even if DiLeonardo initially engaged in a verbal confrontation with plaintiff regarding driving in a purely "personal pursuit," a reasonable jury could still conclude, based upon the evidence discussed *supra*, that the nature of the interaction changed when DiLeonardo invoked his

---

[17] Plaintiff also points out that Bienz later received Workers' Compensation for the injuries he sustained while acting in the "Scope of His[] Official Duties." (*See* Pl.'s Ex. 54 at 2 (Nassau Member's Injury/Accident Report).) Bienz's Workers' Compensation paperwork notes that, as a police officer, Bienz "attempt[ed] to effect a lawful arrest." (*See* Pl.'s Ex. 54 at 2 (Nassau Member's Injury/Accident Report).) The NCPD Indemnification Board determined that Bienz had acted in the scope of his employment during the Oakwood Road incident, and consequently Nassau agreed to defend and indemnify Bienz in this action. As noted above, such findings in the administrative context are not dispositive in this case. However, to the extent Bienz made statements in the administrative proceedings supporting plaintiff's position on this issue, plaintiff may seek to introduce such evidence at trial.

authority as a police officer. *See Mosca,* 2018 WL 3151704, at *4 ("[C]ourts have found that an off-duty officer who engaged in a private altercation but also invoked the real or apparent power of the police department acted under the color of state law." (citing *Davis,* 224 F. Supp. 2d at 475)).

Finally, the Nassau County defendants further argue that "[p]laintiff was not aware that Bienz or DiLeonardo were police officers." (Nassau Br. at 12). But a person's subjective reaction to the conduct at issue is not relevant to determining whether an officer acted under color of state law. *Davis,* 224 F. Supp. 2d at 476 (holding plaintiff's subjective reaction to defendant's conduct is not the subject of the inquiry to determine whether the officer acted under color of state law).

In sum, a rational jury could conclude that DiLeonardo and Bienz were acting under color of state law (and within the scope of their authority as police officers) and, thus, the Nassau County defendants' summary judgment motion on those grounds is denied.[18]

---

[18] Plaintiff also argues, in the alternative, that Bienz and DiLeonardo may be subject to § 1983 liability even as private actors under the facts of this case. Private individuals are liable under § 1983 "where the private actor operates as a willful participant in joint activity with the State or its agents." *Jouthe v. City of New York,* No. 05-CV-1374, 2009 WL 701110, at *18 (E.D.N.Y. Mar. 10, 2009) (quoting *Tancredi v. Metro. Life Ins. Co.,* 316 F.3d 308, 312 (2d Cir. 2003)). Plaintiff contends that, even if the Court determined DiLeonardo and Bienz were acting as private actors, there would still be triable issues of material fact as to whether both joined in a common goal with the NCPD and SCPD in depriving plaintiff of his rights in the wrongful arrest, imprisonment, and subsequent prosecution of plaintiff, thus triggering joint activity liability under § 1983. However, given that the Court has already found summary judgment unwarranted on the state action

## B. False Arrest Claims

Plaintiff asserts false arrest/false imprisonment claims under federal and state law against Bienz, Lamb, Tavares, Leser and non-moving defendant DiLeonardo. As set forth below, the summary judgment motions on these claims are denied.

### 1. Applicable Law

To prevail on a false arrest claim, a plaintiff must prove four elements: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. New York,* 335 N.E.2d 310, 314 (N.Y. 1975). Under § 1983, a claim for false arrest is substantially the same as a claim for false imprisonment under New York law. *Ackerson v. City of White Plains,* 702 F.3d 15, 19 (2d Cir. 2012) (citing *Weyant,* 101 F.3d at 852). The first prong of a false arrest claim, intent to confine, may be shown by evidence that a defendant either (a) actually confined or intended to confine a plaintiff himself, or (b) "affirmatively procured or instigated the plaintiff's arrest." *King v. Crossland Sav. Bank,* 111 F.3d 251, 256 (2d Cir. 1997). To show instigation, a plaintiff must demonstrate that a defendant did more than simply provide information to the police. *Id.* at 257. "Under New York law, '[o]ne who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest.'" *Croft v. Greenhope Servs. for Women, Inc.,* No. 13-CV-2996, 2013 WL 6642677, at *5 (S.D.N.Y. Dec. 17, 2013) (alterations in original) (quoting *Dunn v. City of Syracuse,* 443 N.Y.S.2d 463, 464

---

question, the Court need not address this alternative argument.

(App. Div. 1981)) (citing *Vernes v. Phillips*, 266 N.Y. 298, 194 N.E. 762 (N.Y. 1935)); *see also Hill v. Melvin*, No. 05-CV-6645, 2006 WL 1749520, at *11 (S.D.N.Y. June 27, 2006), *aff'd*, 323 F. App'x 61 (2d Cir. 2009) (summary order).

It is well settled that "[a]n officer need not necessarily have directly seized and handcuffed an individual to be liable for false arrest." *Bryant v. Serebrenik*, No. 15-CV-3762, 2016 WL 6426372, at *3 (E.D.N.Y. Oct. 28, 2016) (quotation marks omitted); *see also Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986) ("[Section] 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.' Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link." (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961))); *Goode v. Newton*, No. 12-CV-754, 2013 WL 1087549, at *5 (D. Conn. Mar. 14, 2013) ("[A]s long as the causal link is strong enough, '[a]s a general rule, a government official's liability for causing an arrest is the same as for carrying it out.'" (alteration in original) (quoting *Berg v. County of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000)). Instead, an officer may be held liable for false arrest where he caused the arrest, *see Goode*, 2013 WL 1087549, at *5, or was "involved in the decision to arrest [the] plaintiff," *Wong v. Yoo*, 649 F. Supp. 2d 34, 61 (E.D.N.Y. 2009) (rejecting argument that defendants "cannot be held liable for false arrest because they were not personally involved in plaintiff's arrest"). Where an individual instigates an arrest and does so based on knowingly false information, that individual may be held liable for false arrest. *Weintraub v. Bd. of Educ.*, 423 F. Supp. 2d 38, 56 (E.D.N.Y. 2006) ("Contrary to defendants' argument, even where there is no claim that a

defendant actually restrained or confined a plaintiff, a claim of false arrest or false imprisonment may lie where a plaintiff can 'show that . . . defendants instigated his arrest, thereby making the police . . . agents in accomplishing their intent to confine the plaintiff.'" (alterations in original) (quoting *Carrington v. City of New York*, 607 N.Y.S.2d 721, 722 (App. Div. 1994))). The Supreme Court has held that where an officer restrains the freedom of a person to walk away, he has seized that person. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)). For purposes of the Fourth Amendment, a suspect is seized when he is shot in an effort to bring him under police control. *Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *8 (S.D.N.Y. Nov. 29, 2004) (citing *Garner*, 471 U.S. at 7), *aff'd*, 173 F. App'x 893 (2d Cir. 2006) (summary order). For example, in *Crockett*, the district court denied a motion for summary judgment on a false arrest claim because the plaintiff was "effectively seized when he was shot by [an officer]." *Crockett v. City of New York*, No. 11-CV-4378, 2015 WL 5719737, at *5 (E.D.N.Y. Sept. 29, 2015).

On the issue of probable cause, the Second Circuit has made clear that "[t]he existence of probable cause to arrest . . . is a complete defense to an action for false arrest." *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852). At the summary judgment stage, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citation omitted).

Moreover, the Second Circuit has held that, "[i]n general, probable cause to arrest

exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* at 852. With respect to an officer's basis for probable cause, it is well-established that "[w]hen information [regarding an alleged crime] is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citation omitted) (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)). The reliability or veracity of a person and the basis of that person's knowledge regarding what happened are two important factors to consider when evaluating veracity. *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). The "validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. County of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)). "Rather, the court looks only to the information that the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Where probable cause does not otherwise exist, however, it cannot be manufactured by an officer's knowingly false statements. *See Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (holding that a magistrate judge's finding of probable cause will not immunize an arresting officer if the plaintiff shows that the officer "knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause" (quotation marks omitted)); *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 247 (D. Conn. 2003) ("A plaintiff can overcome this heavy, but not

insurmountable burden by demonstrating that his right not to be arrested without probable cause was violated when the officer submitting the probable cause affidavit knowingly or intentionally, or with reckless disregard for the truth, made a false statement in his affidavit, or omitted material information, and that such false information was necessary to the finding of probable cause." (quotation marks omitted)); *Hibbard v. Gallivan*, No. 99-CV-145, 1999 WL 782174, at *1 (W.D.N.Y. Sept. 15, 1999) ("[A]n officer may not insulate himself from liability by procuring an arrest warrant based on false statements." (quotation marks omitted)).

### 2. Analysis

The two counties, Nassau and Suffolk, sharply contest who was responsible for plaintiff's arrest. On the one hand, the Nassau County defendants argue that plaintiff's claims for false arrest fail because DiLeonardo and Bienz did not detain or confine plaintiff and did not cause the arrest. Instead, the Nassau County defendants argues that Suffolk officials detained and arrested plaintiff based solely on a statement from DiLeonardo. On the other hand, the Suffolk County defendants maintain that plaintiff's arrest was effectuated by DiLeonardo when he approached plaintiff's vehicle immediately after shooting plaintiff. In particular, the Suffolk County defendants point to DiLeonardo's and Bienz's sworn statements wherein they asserted that DiLeonardo approached the vehicle and told plaintiff he was under arrest. Thus, the Suffolk County defendants contend that DiLeonardo arrested plaintiff and, in any event, the arrest was supported by probable cause because Suffolk did not learn of any reasons why they could not rely on DiLeonardo's representations about what had happened that night. As set forth below, there are numerous disputes of material fact

that preclude summary judgment on the false arrest and false imprisonment claims against the moving defendants, including on the issues of who was responsible for plaintiff's arrest and whether that arrest was supported by probable cause.[19]

With respect to who was responsible for the arrest, there is conflicting evidence that the jury will need to weigh to resolve the many factual disputes.[20] First, there is evidence in the record that would support the Suffolk County defendants' position that DiLeonardo (a Nassau officer) was responsible for the initial arrest of plaintiff. For example, the Suffolk County defendants rely on DiLeonardo's written statement, made roughly nine or ten hours after the shooting, as well as Bienz's deposition testimony, which both reflect that DiLeonardo arrested plaintiff at the scene. Moreover, there is paperwork which lists DiLeonardo as the "Arresting Officer" and indicates that the arrest took place at 1:15 a.m. (Pl.'s Ex. 49 at 1 (Arrest Report and Worksheets).) In addition, several Suffolk officers (Lamb, Tavares, and Leser, for example) testified that they were advised at Huntington Hospital that "Nassau" had arrested plaintiff. The Suffolk County defendants also note that, according to Mention-Lewis, Tavares and Leser told her that Nassau arrested plaintiff and that

Suffolk would be processing the arrest. In short, if certain evidence is credited, a rational jury could find that DiLeonardo arrested plaintiff and Suffolk processed the paperwork for his arrest based on DiLeonardo's and Bienz's actions as police officers.

As to Bienz, the Nassau County defendants contend that Bienz never spoke to plaintiff, let alone detained or confined him. However, putting aside whether Bienz assisted in any arrest by DiLeonardo, the evidence, at a minimum, would support liability on a failure-to-intervene theory. In particular, a defendant police officer can be liable for false arrest if he was aware "a constitutional violation was being committed by a law enforcement official" and failed to intervene to prevent the harm from occurring. *Wong*, 649 F. Supp. 2d. at 61. For liability to attach on a failure to intervene theory, there must have been a realistic opportunity to intervene to prevent the harm from occurring. *Id.* (quoting *Anderson v. Branen*, 17 F.3d 522, 557 (2d Cir. 1994)). As plaintiff points out, there is evidence that would support a rational finding by a jury that Bienz knew DiLeonardo was intoxicated when he shot plaintiff and that plaintiff did not drive toward DiLeonardo and try to run him over before DiLeonardo shot him.[21] A reasonable jury could thus conclude that Bienz knew, prior to plaintiff's arrest being formally processed (whether by Nassau or Suffolk), that there was no probable cause

---

[19] Given that under § 1983 a claim for false arrest is substantially the same as a claim for false imprisonment under New York law, for purposes of the motions for summary judgment, the Court treats the two together. *Ackerson*, 702 F.3d at 19 (citing *Weyant*, 101 F.3d at 852).

[20] The Court notes that, to the extent that the theories of which county was responsible for the arrest (Nassau or Suffolk) may be inconsistent with one another, the law allows a plaintiff in a summary judgment motion to rely on a favorable fact as to one claim, while also disputing that fact as it relates to another claim. *See Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 94-95 (2d Cir. 1994).

[21] Among the evidence that creates a factual dispute on this issue, independent of plaintiff's testimony, is the statement of Eric Klug. Klug stated that he witnessed part of the incident in question, and that he saw "a man with a gun walking towards a white car which was stopped in the middle of the road. The man with the gun was shooting his gun at the windshield of the car. . . . The white car was *stopped in the travel lane of Oakwood Dr.*" (Pl.'s Ex. 18 at 1 (Klug IAU Statement) (emphasis added).)

and plaintiff was being charged with crimes he did not commit based on DiLeonardo's false arrest and inaccurate account of the Oakwood Road incident, and that he nevertheless failed to intervene. Similarly, a reasonable jury could find an arrest took place on Oakwood Road even though plaintiff fled following the encounter with DiLeonardo. *See California v. Hodari D.*, 499 U.S. 621, 624 (1991) ("To constitute an arrest, however—the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient."). Thus, if certain evidence is credited, the jury could rationally find that DiLeonardo falsely arrested plaintiff, and Bienz, at a minimum, failed to intervene to prevent that false arrest at the scene or thereafter.

However, there is also evidence that could rationally support a finding that Suffolk was responsible for the decision to arrest plaintiff. First, plaintiff disputes that DiLeonardo announced that he was under arrest at the scene and, instead, testified in his deposition that the first-time he was told he was under arrest was at the SCPD Second Precinct. Second, plaintiff notes that "[o]ther than Det. Tavares, Det. Leser, and D/Sgt. Lamb, everyone else from the SCPD testified that at the hospital, [plaintiff] was never under arrest or handcuffed." (Pl.'s Opp'n to Suffolk Br. at 5.) In addition, plaintiff points to evidence that Lamb, who was in charge of the investigation into the shooting, directed that plaintiff be transferred to the Suffolk Second Precinct where his Prisoner Activity Log was started at 8:48 a.m. Plaintiff further notes that Tavares and Leser admitted that they did not speak with DiLeonardo, his girlfriend, Bienz, or his wife, prior to the interviews of DiLeonardo and Bienz at the Second Precinct at around 10:00 a.m. or 11:00 a.m.

Thus, plaintiff contends that "no one from the SCPD who was either present at Oakwood Road and communicated with DiLeonardo and/or Bienz, or present at the hospital as of 4:15 AM, was ever advised that DiLeonardo had arrested or attempted to arrest the taxi driver, and there is no source for that information." (Pl.'s Opp'n to Suffolk Br. at 4.) In sum, if certain evidence is credited and construed most favorably to plaintiff, a rational jury could find that no arrest was made at Oakwood Road and, instead, Tavares, Leser, and/or Lamb made the decision to arrest plaintiff in the hospital.

Finally, there is an alternative theory of liability that survives summary judgment as to these individual Suffolk County defendants even if they were not directly involved in the decision to arrest and charge plaintiff—namely, failure to intervene. As to the ability to void the arrest (even if the arrest was made by DiLeonardo), plaintiff cites to the sworn testimony from Leser in which he stated that authority existed for Suffolk County to void the arrest if their investigation determined that DiLeonardo's arrest was not supported by probable cause. (*See* Defs.' Ex. J, at 153:14-154:16 (Leser Dep.).) In short, even if not involved in the decision to arrest or charge plaintiff, there is evidence that would allow a rational jury to infer that one or more of these individual Suffolk County defendants (Tavares, Leser, and Lamb) were aware that DiLeonardo's version of events was highly questionable based upon information they acquired from their own investigation and observations and/or what they learned from fellow officers. In other words, construing the evidence most favorably to plaintiff, there are material questions of fact that preclude summary judgment on the issue of whether these officers had the opportunity to intervene in an arrest they knew was not supported by probable cause, and failed to

take any action to prevent such an arrest prior to the initiation of the charges.[22]

The Court similarly concludes that the issue of probable cause to arrest cannot be decided on summary judgment because of the existence of numerous factual disputes that impact that analysis. Most fundamentally, as noted above, there is a factual dispute about whether DiLeonardo was so obviously intoxicated and in an altered mental state that morning such that the police should not have relied on the veracity of any of his (or Bienz's) statements, in order to arrest plaintiff. For example, with respect to intoxication, one of the first officers to arrive on the scene, Rocchio, testified that, when she spoke to DiLeonardo she smelled a slight odor of alcohol. Geissinger, who rode in the ambulance with DiLeonardo stated that he definitely smelled a "moderate" odor of

alcohol from him. (Pl.'s Ex. 34 at 69:6-70:9 (Geissinger Dep.).)[23]

With respect to this and other evidence of intoxication, the Suffolk County defendants argue that "the mere consumption of alcohol alone, does not serve to defeat probable cause, and there is no evidence in the available admissible record that DiLeonardo's cognitive abilities were affected, or that he was unable to recall the event in a consistent manner." (Suffolk Reply at 5 (internal citation omitted).) That contention regarding the record, however, is inaccurate. There is substantial evidence in the record, beyond alcohol consumption itself by DiLeonardo, from which a rational jury could find that officers at the scene knew that DiLeonardo's cognitive abilities were severely impaired at the time of the incident and that his account of the events was unreliable. For example, there was evidence that DiLeonardo was extremely disoriented when the officers arrived at the scene, in that he could not recall whether he broke the window of plaintiff's car or where his gun was located. Several other officers testified to DiLeonardo's mental state, such as Smithers describing DiLeonardo as "distraught, bordering on tears." (Defs.' Ex. H at 15:4-6 (Smithers Dep.).) Smithers said that DiLeonardo believed that he shot himself and physically reenacted how he may have done so. Geissinger observed DiLeonardo walk in circles and hold his arm because he thought he was shot, even though he had not actually been shot. Favata described DiLeonardo as not "know[ing] if he was shot or not" and that he "didn't really

---

[22] To the extent the Suffolk County defendants argue that a claim for failure to intervene was not sufficiently pled, the Court disagrees. First, "[a] 'failure to intervene' cause of action does not itself state a separate constitutional violation." *Hickey v. City of New York*, No. 01-cv-6506 (GEL), 2004 WL 2724079, at *16 (S.D.N.Y. Nov. 29, 2004), *aff'd*, 173 F. App'x 893 (2d Cir. 2006). Instead, it is an alternative theory of liability for certain constitutional violations, such as a false arrest. *See Blake v. Race*, 487 F. Supp. 2d 187, 208 n.14 (E.D.N.Y. 2007) (distinguishing between a plaintiff's "primary theory of liability" that "the defendants were directly involved in the unconstitutional acts" and the plaintiff's "failure to intercede theory" and rejecting argument that plaintiff had abandoned any failure to intercede liability). As the Second Circuit has made clear, "[l]iability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted). In the instant case, the Second Amended Complaint makes clear that plaintiff was alleging not only affirmative conduct, but also silence and tacit collaboration with respect to violations of plaintiff's constitutional rights of which they were aware. *See, e.g.*, Second Am. Compl., at ¶¶ 2, 215-32. These allegations incorporate not only a conspiracy claim, but also liability under a failure to intervene theory.

[23] Plaintiff also contends that an inference can be drawn that, because of the intoxication, the interview of DiLeonardo and Bienz was intentionally delayed until 10:00 a.m., despite the two being discharged from the hospital at 5:50 a.m. and 6:30 a.m. However, plaintiff need not rely upon any such inference to create a genuine issue of material fact on the probable cause element.

know what was going on." (Pl.'s Ex. 3, at 03:51-04:07 (Recording of Favata IAB Interview).)

In addition to the proof regarding DiLeonardo's demeanor and conduct at the scene, plaintiff offers further evidence in the record as to DiLeonardo's mental state witnessed by Nassau and Suffolk personnel later at Huntington Hospital to call into question the foundation of probable cause to arrest or charge plaintiff. For example, Geissinger admitted to hearing an unidentified physician raise her voice stating that she wanted to take a sample of DiLeonardo's blood. Geissinger's own notes memorialized that Dr. Kraszewski said, "[t]his is great you can get drunk [and] shoot someone and walk out the same day." (Pl.'s Ex. 84 (Geissinger Notes).) DiLeonardo's medical records include the following notations: "Insight & Judgement . . . impaired," "Memory . . . impaired," "Affect . . . hostile." (*See also* Pl.'s Ex. 24 at 6-7 (DiLeonardo Medical Records).)

On this issue of whether officers had reason to question DiLeonardo's veracity regarding his verbal account or written statement as to what transpired on Oakwood Road, plaintiff also highlights that DiLeonardo's version of events was false on its face in several material respects, whether due to intoxication or otherwise. For example, on the 911 call, DiLeonardo represented that he had been shot when he had actually only sustained minor scrapes and cuts. He also made no mention on the 911 call of shooting plaintiff.

In sum, when the evidence is viewed collectively and construed most favorably to plaintiff as each individual issue is examined, there are factual issues regarding whether the officers involved in the arrest of plaintiff would, through their own observations and/or information provided to

them, have had a basis to question the veracity of DiLeonardo's claim that plaintiff tried to run him over or assault him in any way. Put differently, a rational jury could find that DiLeonardo's intoxication and/or altered mental state rendered his account so unreliable that it could not provide a basis for probable cause to arrest plaintiff. Accordingly, summary judgment on the false arrest claims under § 1983 is denied.[24]

## C. Malicious Prosecution Claims

Plaintiff asserts malicious prosecution claims under federal and state law against Bienz, Lamb, Tavares, Leser, and Ciccotto, and non-moving defendant DiLeonardo. As set forth below, the summary judgment motions on these claims are denied.

### 1. Applicable Law

Claims for malicious prosecution brought under § 1983 are substantially the same as claims for malicious prosecution under state law. *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018); *Jocks*, 316 F.3d at 134. "A malicious prosecution claim under New York law requires the plaintiff to prove: '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Blake v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (quoting *Jocks*, 316 F.3d at 136). For a § 1983 claim for malicious prosecution, plaintiff also must demonstrate a "sufficient post-arraignment liberty restraint." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000).

---

[24] To the extent summary judgment is sought on the state false arrest/false imprisonment claims, these same issues of fact discussed above preclude summary judgment on those claims.

Because the second element is not in dispute, nor is there a dispute about the existence of a sufficient post-arraignment liberty restraint, the Court briefly outlines the applicable law as it relates to the remaining three elements.

### a.   Initiating a Proceeding

The initiation or continuation of a criminal proceeding can be satisfied by, *inter alia*, showing that the defendant filed formal charges and caused the plaintiff to be arraigned. *Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 353-54 (N.D.N.Y. 2008). It is well settled that "[i]n order for a civilian complainant to be considered to have initiated a criminal proceeding, 'it must be shown that [the complainant] played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Barrett v. Watkins*, 919 N.Y.S.2d 569, 572 (App. Div. 2011) (second alteration in original) (quoting *Viza v. Town of Greece*, 463 N.Y.S.2d 970, 971 (App. Div. 1983)). Importantly, "[m]erely furnishing information to law enforcement authorities, who are then free to exercise their own judgment as to whether criminal charges should be filed, and giving testimony at a subsequent trial are insufficient to establish liability." *Id.*

### b.   Probable Cause

"[P]robable cause" for malicious prosecution purposes is assessed "in light of facts known or reasonably believed at the time the prosecution was initiated" and not at the time of arrest. *Drummond v. Castro*, 522 F. Supp. 2d 667, 678-79 (S.D.N.Y. 2007) (quoting *Carson v. Lewis*, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999)); *see also Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) ("[T]he existence, or lack, of probable cause is measured as of the time the judicial proceeding is

commenced (e.g., the time of the arraignment) . . . ."). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution." *Stansbury v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010)).

For malicious prosecution claims, probable cause "has . . . been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Id.* at 95 (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)). In cases where the police had probable cause to arrest, in order to succeed on a malicious prosecution claim, a plaintiff must show that "authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest." *Nzegwu v. Friedman*, No. 10-CV-2994, 2014 WL 1311428, at *11 (E.D.N.Y. March 31, 2014) (quoting *Johnson v. City of Mount Vernon*, No. 10-CV-70006, 2012 WL 4466618, at *5 (S.D.N.Y. Sept. 18, 2012)).

Probable cause to prosecute not only dissipates when police officers uncover new evidence after an arrest, but in certain cases, can also dissipate when police officers fail to examine evidence already available to them. As one district court explained, "[p]olice officers may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause." *Korthas v. City of Auburn*, No. 04-CV-537, 2006 WL 1650709, at *15 (N.D.N.Y. June 9, 2006) (quotation marks omitted); *see also Leogrande v. State of New York*, No. 08-CV-3088, 2013 WL 1283392, at *8 (E.D.N.Y. Mar. 29, 2013). The Second Circuit also has emphasized that "the failure to make a further inquiry when a reasonable person would have done so may

be evidence of lack of probable cause." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1250 (1983)).

### c.   Malice

Concerning the fourth element, malice, "[i]n most cases, the lack of probable cause—while not dispositive—'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.'" *Id.* at 573 (quoting *Conkey v. New York*, 427 N.Y.S.2d 330 (App. Div. 1980)); *see Cunninham v. New York City*, No. 04-CV-10232, 2007 WL 2743580, at *6 (S.D.N.Y. Sept. 18, 2007) (same); *Mesiti v. Wegman*, 763 N.Y.S.2d 67, 70 (App. Div. 2003) ("[T]he jury was able to 'infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding.'" (quoting *Martin v. City of Albany*, 364 N.E.2d 1304, 1307 (1977))).

### 2.   Analysis

Here, although it was Lamb who initiated the criminal proceedings against plaintiff—evidenced by him being listed as the "Complainant" and having signed both the Felony and Misdemeanor complaints—plaintiff has created a material issue of fact as to whether other Suffolk County defendants (namely, Tavares and Ciccotto), as well as Bienz, played a role in the initiation of the charges and alleged malicious prosecution of plaintiff.

The Nassau County defendants argue that Nassau officers did not commence or continue criminal proceedings against plaintiff. Instead, the Nassau County defendants state that it was Suffolk that commenced, conducted, and controlled the entire investigation into the Oakwood Road

incident. However, the Second Circuit has held that where officers are jointly involved in a scheme to ensure that a plaintiff was detained on false charges, the officer may be held liable for malicious prosecution even though he did not personally prepare documents to initiate the prosecution. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (finding summary judgment improper where a reasonable jury could find that officers violated the plaintiffs' constitutional rights by, *inter alia*, fabricating a false confession and forwarding it on to prosecutors, and by maliciously prosecuting plaintiffs for second degree assault without probable cause); *see also Mejia*, 119 F. Supp. 2d at 272-73 ("[P]ersons who conspire with a complaining witness to manufacture evidence that is likely to influence the prosecutor's decision to commence proceedings and the jury's verdict are jointly liable for malicious prosecution.").

Here, plaintiff has demonstrated issues of fact as to the roles of DiLeonardo and Bienz in the initiation and continuation of the prosecution of plaintiff. A reasonable jury could conclude that DiLeonardo and Bienz, (both NCPD police officers) helped to initiate the prosecution of plaintiff and supported its continuation by supplying false information regarding the incident. Although Bienz did not personally prepare the documents at the Suffolk Second Precinct, a jury could rationally find that he knew that DiLeonardo was intoxicated at the time of the shooting, that plaintiff had not driven toward DiLeonardo, and that the verbal and written statements recounting otherwise used to form the bases of the arrest and subsequent charges were false. A rational jury could further find that Bienz's corroboration of DiLeonardo's account of what transpired on Oakwood Road is a critical reason why the criminal prosecution was able to proceed for several months. As

noted *supra*, there is also some evidence that formal charges against plaintiff were not filed until *after* DiLeonardo and Bienz were interviewed by Tavares and Leser, and therefore, that the charges were drafted based on information Bienz and DiLeonardo allegedly knew to be false.

In addition to speaking with Tavares and Leser about the Oakwood Road incident, there is evidence that Bienz also corroborated DiLeonardo's story to Palumbo, an investigator with the Suffolk County District Attorney's Office, who ADA Pearl had assigned to the case. According to Palumbo, Bienz told Palumbo that he saw plaintiff drive at DiLeonardo, heard DiLeonardo identify himself as a police officer to plaintiff, and that plaintiff knocked him and DiLeonardo to the ground causing them injury. Also, as plaintiff highlights, Bienz said that he ran up to plaintiff's taxi to assist DiLeonardo in arresting plaintiff. However, Bienz later recanted this account and denied ever seeing plaintiff drive at DiLeonardo, denied hearing DiLeonardo identify himself as a police officer, and denied seeing plaintiff commit any crime warranting arrest. Plaintiff has provided sufficient evidence in the record to create triable issues of material fact as to whether DiLeonardo and Bienz provided fabricated evidence to both Nassau and Suffolk officials to secure and continue charges against plaintiff.

Similarly, as mentioned above, Bienz may be held liable for the malicious prosecution of plaintiff, just as he may be for the false arrest claim, based upon his alleged failure to intervene in connection with the charges being filed against plaintiff. *Branen*, 17 F.3d at 557 ("An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." (citations omitted)).[25] Plaintiff has provided evidence from which a rational jury could find that Bienz could have intervened in the alleged malicious prosecution of plaintiff and failed to do so.

As is the case with Bienz, there exist genuine issues of material fact as to the culpability of Tavares and Leser for malicious prosecution beyond Lamb's initiation of the charges. In particular, plaintiff argues that, taken together, the evidence would allow a jury to rationally find the following: "Det. Tavares and Det. Leser initiated the criminal proceedings against [plaintiff] given that, among other things, they determined which charges should be filed against him, prepared the charging documents, fabricated documents to . . . support the charges, misrepresented the true facts to the prosecutor, and otherwise acted in bad faith, and Det. Ciccotto did so by knowingly eliciting and fabricating inculpatory statements." (Pl.'s Opp'n to Suffolk Br. at 11). To support his theory, plaintiff points to several different pieces of evidence, and notes reasonable inferences that could be drawn from such evidence. First, based upon plaintiff's own testimony, plaintiff asserts that Tavares and Leser fabricated his "confession" (which the two detectives used to corroborate DiLeonardo's account that he believed that he was in danger when he shot plaintiff) and had DiLeonardo prepare a false statement,

---

[25] *See also Coggins v. County of Nassau*, 988 F. Supp. 2d 231, 245 (E.D.N.Y. 2013) ("It is well settled that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (quotation marks omitted)).

which were relied upon to justify the charges brought against plaintiff. Further, plaintiff contends that, together with Ciccotto, Tavares and Leser agreed to tailor DiLeonardo's, Sophia Cornia's, Jillian Bienz's, and Edward Bienz's accounts to falsely incriminate plaintiff and maliciously prosecute him. Plaintiff also argues that it was Tavares and Leser who determined the charges against him, facilitated DiLeonardo's supporting deposition, and ultimately signed the charging paperwork. In particular, Tavares and Leser took DiLeonardo's deposition to Lamb, and thereafter processed plaintiff's paperwork, themselves writing out the to-wit clauses for the two charges to generate the Felony and Misdemeanor Complaint that Lamb ultimately approved and signed. Plaintiff also points to evidence that Tavares and Leser spoke directly to ADA Pearl, who was assigned to prosecute the case against plaintiff, from the date he was arraigned throughout the time period the prosecution was pending. ADA Pearl asked Tavares and Leser to give her "[e]verything you know about the case. Everything you know specifically. Tell me about alcohol consumption," (Pl.'s Ex. 74 at 163:10-17 (Pearl Dep.)), and inquired about "what [they] kn[ew] about who was drinking alcohol that night," (Pl.'s Ex. 74 at 151:14-152:2 (Pearl Dep)). ADA Pearl discussed Tavares and Leser's interviews with DiLeonardo and Bienz and their admissions to consuming alcohol the night of the Oakwood Road incident. Tavares and Leser told ADA Pearl that the two had consumed "a couple" of drinks. (See Pl.'s Ex. 74 at 147:16-149:5, 170:25-177:17 (Pearl Dep.).) As plaintiff points out, DiLeonardo's and Bienz's alcohol consumption was important to ADA Pearl in his evaluation of the case given that he did not himself interview DiLeonardo and Bienz, and thus, he was relying on information gathered from Tavares and Leser to support the charges brought against plaintiff.

In short, having reviewed the record, the Court concludes that there is sufficient evidence in the record to create a disputed factual issue as to the roles in the initiation and continuation of charges against plaintiff of not only Lamb, but also Tavares, Leser, and Ciccotto from Suffolk County, as well as Bienz and DiLeonardo from Nassau County. As with the false arrest claim, these defendants also may alternatively be liable on a failure to intervene theory, when all the evidence is construed most favorably to plaintiff.

In addition, there are many disputed material facts as to the issue of probable cause as it relates to the malicious prosecution claim. As discussed above in connection with the false arrest claims, there is sufficient evidence that there was knowledge of the levels of intoxication of both DiLeonardo and Bienz that evening, as well as inconsistencies in DiLeonardo's account of the events and his altered mental state at the time of the incident, such that a rational jury could conclude that those involved in the initiation and continuation of the charges against plaintiff were aware of information that should have caused them to doubt the veracity of DiLeonardo's account, and that they should not have relied on such statements to prosecute plaintiff.

Finally, with respect to malice, it is well settled that a jury may infer actual malice from the absence of probable cause. See, e.g., Maxwell v. City of New York, 554 N.Y.S.2d 502, 505 (App. Div. 1990). Thus, given the factual disputes about probable cause (as well as the other evidence in the record discussed supra, including the alleged fabrication of evidence), summary judgment on the malice requirement is unwarranted.

36

Accordingly, summary judgment on the malicious prosecution claims under § 1983 is denied.[26]

## D. Excessive Force Claim

### 1. Applicable Law

A police officer's use of force is excessive and in violation of the Fourth Amendment, "if it is objectively unreasonable 'in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). More specifically, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quotation marks omitted). Physical force is often necessary, and thus, "not every push or shove" is unconstitutionally excessive, "even if it may later seem unnecessary in the peace of a judge's chambers." *Maxwell*, 380 F.3d at 108 (alteration and quotation marks omitted).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *accord Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). The court must inquire about the totality of the circumstances, "including the severity of the crime at issue, whether the suspect posed

an immediate threat to the safety of others and whether he is actively resisting arrest." *Sullivan v. Gagnier*, 225 F.3d 161, 165 (2d Cir. 2000). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

With respect to deadly force, "an officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003) (quotation marks omitted); *see also Garner*, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").

### 2. Analysis

DiLeonardo has not moved for summary judgment, including as to the excessive force claim against him. As discussed in detail *supra* with respect to the analysis of the other claims against the moving defendants, there is sufficient evidence submitted by plaintiff to raise a genuine dispute of material fact as to whether DiLeonardo's use of force against plaintiff was reasonable. In particular, although DiLeonardo asserts that his use of force was justified because plaintiff drove towards him with his car and he feared for his safety, plaintiff has testified that DiLeonardo's version of the events is false and that the force was used without justification. Plaintiff's testimony alone, if credited, would support a rational jury finding in

---

[26] To the extent summary judgment is sought on the state malicious prosecution claims, the same issues of fact discussed above preclude summary judgment on those claims.

plaintiff's favor on this claim, and is therefore sufficient to preclude summary judgment on this issue. In any event, the jury will need to consider all the evidence with respect to the incident and the surrounding circumstances to resolve this issue, including testimony from law enforcement officers, medical personnel, and other third parties. In sum, in light of these disputed factual issues on the various elements of the excessive force claim, that claim against DiLeonardo shall proceed to trial.

### E. Conspiracy

Plaintiff has asserted conspiracy claims under § 1983 against all of the individual Nassau County defendants and Suffolk County defendants, as well as non-moving defendant DiLeonardo. As set forth below, summary judgment on the conspiracy claims against members of the DFRT (Hunter, Horace, Flanagan, and DeMartinis) and Marinace is granted. However, summary judgment on the conspiracy claims as to Bienz and the individual Suffolk County defendants is denied.

#### 1. Applicable Law

To prove a § 1983 conspiracy, a plaintiff must show "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). While "conclusory allegations" of a § 1983 conspiracy are insufficient, *Dwares v. City of New York*, 985 F.2d 94, 99-100 (2d Cir. 1993) (collecting cases), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993), the Second Circuit has recognized that such

"conspiracies are by their very nature secretive operations," and may have to be proven by circumstantial, rather than direct, evidence, *Pangburn*, 200 F.3d at 72 (quoting *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir. 1994)). A plaintiff should make an effort to provide some details of time and place and the alleged effect of the conspiracy. "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; [d]iffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Dwares*, 985 F.2d at 99-100 (quotation marks omitted); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (reiterating that "conclusory allegations" or "unsubstantiated speculation" will not defeat summary judgment on § 1983 conspiracy claim). To survive a motion for summary judgment, "a plaintiff's evidence of a § 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Randle v. Alexander*, 170 F. Supp. 3d 580, 591 (S.D.N.Y. 2016) (brackets omitted) (quoting *Stein v. Janos*, 269 F. Supp. 2d 256, 261-62 (S.D.N.Y. 2003)).

#### 2. Analysis

##### a. The DFRT and Marinace

Plaintiff alleges that the DFRT members and Marinace were involved in a conspiracy with Suffolk County police officials with the "goal of falsely arresting and maliciously prosecuting MOROUGHAN to avoid criminal and administrative sanctions against DILEONARDO and BIENZ," as well as the goals of "fabricating evidence against MOROUGHAN" and "inflicting unconstitutional injury upon

MOROUGHAN." (Second Amended Compl. ¶¶ 125, 149, 152.) As noted *supra*, the DFRT is a NCPD administrative team that (1) responds to incidents involving the use of deadly force by a member of the NCPD, and (2) conducts an administrative investigation and prepares a written report of the initial account of the incident, which then must be provided to the NCPD Commissioner by the end of the next business day after the deadly force incident occurred. The DFRT members—namely, Horace, Flanagan, and DeMartinis—were coordinated by Hunter.

In the instant case, Chief of Patrol Hunter reported to the NCPD Commissioner both verbally and via the DFRT Report that DiLeonardo's and Bienz's use of force was within departmental guidelines and that the officers were fit for duty. More specifically, the DFRT report stated:

> The investigation consisted of an on scene evaluation and a review of the investigation by the Suffolk County Police Department's Homicide Squad and Second Squad. All preliminary information was received from SCPD investigators. Interviews with police officers DiLeonardo and Bienz have not yet been conducted. As a result of this preliminary investigation, it is the opinion of the Deadly Force Response Team that the actions of all officers involved, with regard to Use of Force issues, were within Departmental guidelines pertaining to the Use of Deadly Physical Force as well as those of Article 35 of the Penal Law of New York State. All officers involved were found fit for duty.

(Pl.'s Ex. 51 ¶ 3 (Final DFRT Report).)

As set forth below, plaintiff has failed to point to evidence in the record from which a rational jury could conclude that the DFRT was involved in any conspiracy to violate his constitutional rights. Instead, the claims are based upon speculation and conjecture that cannot overcome a summary judgment motion.

First, there is no evidence that the DFRT members learned of any information during their brief and limited investigation of the incident in the hours following the incident that would place them on notice that DiLeonardo and/or Bienz were involved in an unconstitutional use of deadly force against plaintiff. For example, there is no specific evidence in the record that, when they arrived at Oakwood Road several hours after the incident, the DFRT members learned any information that would make them aware of DiLeonardo's and/or Bienz's levels of intoxication at the time of the shooting, or any similar information that would suggest that the use of deadly force was unjustified. Moreover, there is no evidence that DiLeonardo or Bienz appeared intoxicated to Hunter at the time he spoke with them at Huntington Hospital sometime after 6:30 a.m. on February 27, 2011, which was more than five hours after the incident occurred. Similarly, there is no evidence that anyone at Huntington Hospital advised any member of the DFRT that either DiLeonardo or Bienz was intoxicated at the time of the shooting. In short, plaintiff cannot point to any evidence in the record that establishes that any DFRT member personally received any information that was inconsistent with the statements contained in the DFRT report.

Second, there is no evidence that any DFRT member participated in plaintiff's arrest or in any of the investigative acts performed by the Suffolk County officers in the aftermath of the incident. For example,

there is no evidence that any DFRT member was present when plaintiff allegedly requested an attorney, was questioned by Suffolk County officers, and allegedly was directed to sign a false statement about the incident. There is also no evidence that any DFRT member spoke to plaintiff at any time about the incident, or even learned plaintiff's version of the events prior to submission of the DFRT report. In addition, with regard to Hunter's brief meeting with DiLeonardo and Bienz in the hospital, the uncontroverted evidence is that Hunter asked them how they were doing and did not question them about the shooting incident, which was under investigation by Suffolk County.

Third, there is no evidence that the DFRT report was ever given to the SCPD or the Suffolk County District Attorney's Office, or even viewed or considered by them. Instead, the uncontroverted evidence is that the DFRT report was provided to the NCPD Commissioner the day after the incident, and the DFRT's involvement with this incident then ended. In short, there is no evidence that the DFRT report played any role whatsoever in plaintiff's arrest or prosecution.

Given the lack of any evidence that any DFRT member had any knowledge of facts inconsistent with the statements in the DFRT report or had any involvement in the arrest, investigation, or prosecution, plaintiff seeks to establish such knowledge and participation by pointing to the DFRT members' mere presence at the scene after the shooting, in Huntington Hospital, and at the Second Precinct in the hours following the incident, as well as communication with Suffolk County officers at those locations. For instance, plaintiff points to a meeting in the Second Precinct detectives' squad room between DFRT members and various SCPD police officers "where the Homicide Squad

discussed the status of the case." (Pl.'s Opp'n to Hunter Br. at 15.) However, it is well settled that generalized allegations that a meeting took place, without details regarding the substance of the meeting that can establish—either directly or circumstantially—an unlawful scheme, are not sufficient to support a conspiracy claim. *See, e.g.*, *Scotto v. Almenas*, 143 F.3d 105, 114-15 (2d Cir. 1998) (holding that "several telephone calls and other communications" did not establish a conspiratorial agreement); *San Filippo v. U.S. Trust Co. of N.Y., Inc.*, 737 F.2d 246, 256 (2d Cir. 1984) (holding that conspiracy claims failed to survive summary judgment because "at no point in the proceedings ha[d] [plaintiff] alleged one shred of evidence in support of his conclusory assertion of conspiracy, beyond the fact that [the prosecutor] and [the detective] met with [the private] defendants prior to their grand jury testimony," "which [is] routine and necessary in the preparation of evidence"); *see also McGuire v. Village of Tarrytown*, No. 08-CV-2049, 2011 WL 2623466, at *5 (S.D.N.Y. June 22, 2011) ("At best, Plaintiff appears to argue that solidarity among police officers led the responding officers to protect a fellow officer's employee, but this speculation is insufficient to overcome a motion for summary judgment.").

In other words, here, plaintiff has produced no evidence that DFRT members were given information in any meeting or communication that demonstrated that the use of force was unjustified, or that they gave direction or advice to SCPD regarding whether or not plaintiff should be charged with any crimes and, if so, which crimes. Instead, plaintiff seeks to draw such inferences simply from the fact of the meetings themselves. Conspiracy claims under § 1983 cannot be based on that type of

speculation and conjecture.[27]  The Court recognizes that "an agreement may be inferred from the relationship of the parties, their overt acts and concert of action, and the totality of their conduct." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1192 (11th Cir. 2011) (quotation marks omitted).  However, even construing all of the evidence together in the light most favorable to plaintiff, no rational jury could find on this record that any DFRT member was involved in a conspiracy to falsely arrest, maliciously prosecute, and/or otherwise violate plaintiff's constitutional rights in any way.

Finally, the Court reaches the same conclusion as to Marinace.  Marinace was not a member of the DFRT; rather, he was assigned to be the caretaker supervisor for DiLeonardo and Bienz while they were at Huntington Hospital, and arrived there at 2:11 a.m.  Again, by his general presence in the hospital, plaintiff speculates that Marinace must have heard alleged comments that indicated DiLeonardo's intoxication level, and thus, he was part of a conspiracy with Suffolk County officials to violate plaintiff's constitutional rights.  For the same reasons discussed *supra* as to the DFRT members, in the absence of any evidence suggesting participation in any

conversation about DiLeonardo's consumption of alcohol, his general presence in the hospital does not establish, or even provide a rational inference, that he overheard such comments.  Moreover, there is no evidence in the record that Marinace performed any investigative function in the hospital as to the incident (or at any other time), nor is there evidence that he participated in any discussions with Suffolk County officials or anyone else regarding whether plaintiff should be charged with any crimes.  Moreover, none of the documents he prepared were provided to prosecutors.  In short, even construing the evidence most favorably to plaintiff, there is insufficient evidence from which a rational jury could find that Marinace was part of a conspiracy to violate plaintiff's constitutional rights.

Accordingly, summary judgment in favor of defendants Hunter, Horace, Flanagan, DeMartinis, and Marinace on these conspiracy claims is granted.

### b. Bienz and the Suffolk County Defendants

With respect to DiLeonardo, Bienz, and the individual Suffolk County defendants, the Court concludes that material issues of fact preclude summary judgment on these conspiracy claims.  In essence, plaintiff's conspiracy claims as to these defendants are that: (1) DiLeonardo and Bienz provided a false narrative to Suffolk County regarding the circumstances surrounding DiLeonardo's use of force on plaintiff, including fabricating that plaintiff attempted to run over DiLeonardo with his car before DiLeonardo shot him; (2) the Suffolk County defendants had substantial reasons to believe that DiLeonardo was highly intoxicated and in an altered mental state at the time of the incident, such that there was no factual basis to conclude that plaintiff had done anything warranting DiLeonardo's

---

[27] Plaintiff's attempt to infer a conspiracy from an email between Hunter and NCPD Chief Hannon is similarly flawed.  In particular, in the email from 6:48 a.m. on February 27, 2011, Hunter advises Hannon that "they will begin processing the arrest of the taxicab driver for Assault 2 and menacing." (Pl. Ex. 46 (Email from Dep. Chief Hunter to Chief Hannon, dated Feb. 27, 2011 at 6:48 a.m.).)  However, the mere conveyance of the proposed charges between law enforcement officials at that juncture does not allow a rational inference that the DRFT members conspired with the SCPD officials to have those charges brought against plaintiff.  Indeed, the actual charges by SCPD against plaintiff differed in part from the email—namely, the menacing charge was replaced by a charge for Reckless Endangerment in the Second Degree.

deadly use of force, and that DiLeonardo's narrative, as well as the statement by Bienz, were false; (3) the Suffolk County defendants, at a minimum, tacitly agreed with DiLeonardo and Bienz to support this false narrative in the investigation, arrest, and prosecution of plaintiff; and (4) various Suffolk County defendants committed one or more overt acts in furtherance of this conspiracy by, *inter alia*, denying plaintiff's request for an attorney, fabricating evidence against him, falsely arresting plaintiff, and providing false or incomplete evidence to the District Attorney's Office as part of a malicious prosecution of plaintiff.

Unlike the DFRT members and Marinace, plaintiff does not simply rely upon the Suffolk County defendants' mere presence at Huntington Hospital and/or the Second Precinct, or at meetings, to support these conspiracy claims. Instead, for each of these defendants, plaintiff has pointed to specific evidence in the record that, if credited, could prove that they were aware of information that undermined any purported probable cause to arrest and prosecute plaintiff and then took some overt act—such as fabricating evidence, participating in plaintiff's arrest, or supplying fabricated evidence to others—or, at a minimum, concealed material exculpatory evidence from those involved in the investigation, arrest, and/or prosecution of plaintiff as part of the conspiracy.

For example, Geissinger, Smithers, and Favata responded to the scene at Oakwood Road shortly after the shooting and there was evidence that DiLeonardo was highly intoxicated and in an altered mental state at that time, such that he could not recall whether he broke the window of plaintiff's car or where his gun was located, and erroneously believed he had been shot. For example, Favata described DiLeonardo as not "know[ing] if he was shot or not" and

that he "didn't really know what was going on." (Pl.'s Ex. 3, at 03:51-04:07 (Recording of Favata IAB Interview).) Geissinger, who rode in the ambulance with DiLeonardo stated that he definitely smelled a "moderate" odor of alcohol from him. (Pl.'s Ex. 34 at 69:6-70:9 (Geissinger Dep.).) Geissinger also admitted to hearing an unidentified physician stating that she wanted to take a sample of DiLeonardo's blood. Geissinger's own notes memorialized that Dr. Kraszewski said, "[t]his is great you can get drunk [and] shoot someone and walk out the same day." (Pl.'s Ex. 84 (Geissinger Notes).) As noted earlier, DiLeonardo's medical records conclude the following notations: "Insight & Judgement ... impaired," "Memory ... impaired," "Affect ... hostile." (*See also* Pl.'s Ex. 24 at 6-7 (DiLeonardo Medical Records).) Those records (and the other evidence about what transpired in interactions with DiLeonardo at the scene) allow plaintiff to argue that it is rational to infer that those who interacted with him at the scene, and heard his version of events, would have had substantial reason to question his veracity. Thus, plaintiff contends that these defendants who responded to the scene were all aware of DiLeonardo's intoxication and unstable mental state but, as part of the conspiracy, made no effort to confirm such intoxication through a field sobriety test or otherwise, and concealed such information to allow for plaintiff's false arrest and prosecution.

With respect to the fabrication of evidence, plaintiff asserts that Tavares, Leser, and Meaney falsely attributed certain statements to plaintiff during the interview in the hospital, including falsely indicating that plaintiff admitted that he drove his car towards DiLeonardo.[28] Plaintiff asserts that

---

[28] Plaintiff also points out that Bienz has denied ever telling Tavares during an interview that plaintiff's car

these statements were fabricated as part of the conspiracy to conceal DiLeonardo's unconstitutional use of force and justify plaintiff's arrest and prosecution. Plaintiff also asserts that Faya prepared a Supplementary Report of plaintiff's statements containing the same false information (about perhaps mistakenly putting the car in drive and hitting DiLeonardo), which plaintiff denies ever stating. (*See* Pl.'s Ex. 65 (Faya Supp. Report).) With respect to Ciccotto, plaintiff points to, among other things, the fact that Mondo denies making many of the statements that Ciccotto attributed to her in the statement he drafted of her interview. (*See* Pl.'s Ex. 9 at 252:2-261:10 (Mondo Dep.); Pl.'s Ex. 67 (Mondo Statement).) Plaintiff further highlights that many of the witness statements prepared by Ciccotto contain very similar language that suggests an attempt to make the statements consistent.

Plaintiff also contends, as part of the conspiracy, various Suffolk County defendants concealed critical facts in preparing documentation. For example, plaintiff points to Supplementary Reports prepared by Meaney and Faya which contain no reference to what plaintiff contends Rocchio learned at the scene, including the odor of alcohol, the frazzled demeanor of DiLeonardo and Bienz, or that DiLeonardo thought he had been shot.

In short, when all the evidence is taken together and is construed most favorably to plaintiff, a rational jury could conclude, as to each of the individual Suffolk County defendants, based upon their own personal observations during the investigation and/or what was conveyed to them by other officers, as well as their alleged conduct or inaction in connection with the fabrication of evidence and/or plaintiff's arrest and prosecution, that they conspired with DiLeonardo and Bienz to violate plaintiff's constitutional rights in an effort to cover-up DiLeonardo's unconstitutional use of force against plaintiff. *See, e.g.*, *Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) ("If a jury finds in favor of Plaintiff on his excessive force claim, then a reasonable juror could also find that the Medical Treatment of Prisoner document shows an agreement to falsify testimony and cover up an unconstitutional use of force."); *Hill v. City of New York*, No. 03-CV-1283, 2005 WL 3591719, at *5 (E.D.N.Y. Dec. 30, 2005) ("Given that a jury may rationally infer that the defendant officers participated in a conspiracy to cover-up unconstitutional acts, summary judgment is not appropriate on plaintiff's conspiracy claim.").

The Court emphasizes that this claim cannot be defeated by arguing that each piece of evidence, such as knowledge of DiLeonardo's intoxication, alone would be insufficient to establish that conspiracy. That is not how a court or a jury is to evaluate the evidence under the law. In other words, although no single piece of evidence might be sufficient to support the claim, all of the evidence must be examined in totality, not in isolation. When that approach is taken as to the evidence in this case, and all reasonable inferences from the evidence are drawn in plaintiff's favor (as required on a summary judgment motion), the collective evidence is more than sufficient to create genuine issues of material fact as to whether such a conspiracy existed in this case as to these defendants.

Finally, to the extent any of the moving defendants attempt to rely upon the intracorporate conspiracy doctrine to defeat this claim on summary judgment, the Court

---

was driven at DiLeonardo, even though Tavares attributed that statement to Bienz in his notes of the interview. (*See* Pl.'s 56.1 Suffolk Resp. ¶ 68.)

finds that argument unpersuasive. The intracorporate conspiracy doctrine posits that the officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other. *See, e.g.*, *Farbstein v. Hicksville Pub. Library*, 254 F. App'x 50, 51 (2d Cir.2007) (summary order) (affirming dismissal of conspiracy complaint "at the first step of analysis" because complaint made reference only to employees of same corporation); *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy [under Section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own . . . officers[ ] and employees, each acting within the scope of his employment."); *Cameron v. Church*, 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2003); *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359–60 (E.D.N.Y. 1999); *Rini v. Zwirn*, 886 F. Supp. 270, 292 (E.D.N.Y. 1995) ("Intracorporate immunity has also been extended to the context of conspiracies between a public entity and its employees."). Here, because there is sufficient evidence to preclude summary judgment on the conspiracy claims as to DiLeonardo, Bienz, and the individual Suffolk County defendants, the alleged conspiracy does not involve one single municipal entity; rather, it allegedly involves police officials from both Nassau County and Suffolk County. Thus, the intracorporate conspiracy doctrine does not preclude this claim from proceeding to trial. *See, e.g.*, *Vlahadamis v. Kiernan*, 837 F. Supp. 2d 131, 157 (E.D.N.Y. 2011) (intracorporate conspiracy doctrine did not apply to alleged conspiracy between Town of Southampton employees and member of the New York State Division of Alcohol Beverage Control).

Accordingly, summary judgment is denied as to the conspiracy claims against Bienz and the Suffolk County defendants.

**F. Due Process Claims**

Plaintiff has asserted due process claims under § 1983 against all of the individual Nassau County defendants and Suffolk County defendants, as well as non-moving defendant DiLeonardo. As set forth below, summary judgment on the due process claims against the DFRT members and Marinace is granted. However, summary judgment on the due process claims as to Bienz and the individual Suffolk County defendants is denied.

**1. Applicable Law**

When a police officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors," the police officer "violates the accused's constitutional right to a fair trial" and such "unconscionable action" may be redressed through damages under § 1983. *Ricciuti*, 124 F.3d at 130. Moreover, "a Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277-78 (2d Cir. 2016).

The Second Circuit has held that the fabricated evidence must cause the deprivation of liberty. *See Zahrey v. Coffey*, 221 F.3d 342, 350-351 (2d Cir. 2000); *see also Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order) ("A person suffers a constitutional violation if an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the

plaintiff suffers a deprivation of liberty as a result."). The inquiry as to causation is "whether the liberty deprivations that occurred are legally traceable back even further to [the] earlier investigatory act of fabrication." *Zahrey*, 221 F.3d at 352. However, in a recent decision, the Second Circuit made clear that the right to a fair trial can be violated even if the fabricated evidence that was supplied to the prosecutor was not ultimately used at trial. *See Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 250 (2d Cir. 2020). Moreover, it is important to note that, although the officer need not directly provide the fabricated evidence to the prosecutor, no causation for this claim would exist if such evidence was never brought to the prosecutor's attention. In other words, the claim only accrues "when fabricated information is forwarded to a prosecutor and results in the deprivation of a defendant's liberty." *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016).

Finally, in addition to the fabrication of evidence, "[p]olice officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors." *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015); *see also Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019) ("When police officers withhold exculpatory or impeaching evidence from prosecutors, they may be held liable under § 1983 for violating the disclosure requirements of *Brady v. Maryland* . . . ."); *Poventud v. City of New York*, 750 F.3d 121, 132 n.12 (2d Cir. 2014) (en banc) ("We reject out of hand defendants' contention that *Brady* violations cannot provide a basis for a § 1983 claim."). Moreover, as with the fabrication of evidence, the *Brady* violation must have caused a deprivation of liberty.

### 2. Analysis

#### a. The DFRT and Marinace

With respect to the DFRT members and Marinace, the due process claims cannot proceed for reasons substantially similar to the conspiracy claims. In particular, plaintiff has failed to provide evidence from which a rational jury could find that these defendants were aware that any statement contained in the DFRT report (or other Nassau County documentation) was false based upon the information available to them at the time the documents were created. More importantly, it is uncontroverted that these documents were not supplied to the prosecutor and, thus, could not have possibly caused any deprivation of liberty even if such documents contained fabricated information.

Moreover, to the extent plaintiff suggests that the DFRT members and Marinace were negligent in failing to uncover exculpatory information regarding the incident, this argument fails because only the intentional suppression of exculpatory evidence by the police gives rise to a fair trial claim under § 1983. *See, e.g., Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) (summary order) ("Our limited precedent addressing fair trial claims sounding in a *Brady* violation confirms our understanding that police officers may be held liable for *Brady* violations when they intentionally suppress exculpatory evidence." (collecting cases)).

Therefore, summary judgment is warranted as to the due process claims against the DFRT members (Hunter, Horace, Flanagan, and DeMartinis) and Marinace.[29]

---

[29] Plaintiff has withdrawn the separate Fifth Amendment and pendent state law right-to-counsel

### b. Bienz

As a threshold matter, the Nassau County defendants argue Bienz did not violate plaintiff's due process rights because Bienz did not arrest, detain, or prosecute him. However, as noted above, involvement in the arrest or initiation of charges is not an element for a due process claim; rather, liability can be triggered by, among other things, intentionally supplying fabricated evidence to the prosecutor. *Ricciuti*, 124 F.3d at 130.

With respect to Bienz, plaintiff has put forth evidence that Bienz initially fabricated false information regarding the incident, including that plaintiff attempted to run over DiLeonardo, and that such fabricated evidence was provided to prosecutors. Moreover, there is evidence that, approximately two months after the incident, Special Investigator Palumbo (from the Suffolk County District Attorney's Office), interviewed Bienz. According to Palumbo, Bienz told Palumbo that plaintiff drove his cab toward DiLeonardo and that DiLeonardo identified himself as a police officer to plaintiff. Bienz also said he heard DiLeonardo tell plaintiff he was under arrest. Bienz further told Palumbo that based on his observations, plaintiff had committed a crime warranting arrest. ADA Pearl testified that the interviews with Bienz corroborated what Bienz and DiLeonardo had stated regarding the Oakwood Road

---

claims against Hunter. Moreover, although plaintiff also has withdrawn the Fifth Amendment claims against the other DFRT members and Marinace, it is unclear whether plaintiff is still seeking to pursue the state law right-to-counsel claims against them. In any event, to the extent that plaintiff has not withdrawn the state claims against the other DFRT members, summary judgment also is granted on those claims because there is no evidence that any DFRT member or Marinace were personally involved in any alleged deprivation of plaintiff's right to counsel under the New York State Constitution.

incident. Accordingly, this testimony raises a genuine dispute of material fact in light of the entire record as to whether Bienz supplied fabricated evidence to the prosecutor (or withheld *Brady* material from the prosecutor), and thus precludes summary judgment as to Bienz on the due process claims.

### c. Suffolk County Defendants

The sole argument made by the individual Suffolk County defendants for summary judgment with respect to plaintiff's due process claims relates to plaintiff's allegedly fabricated confession. More specifically, the Suffolk County defendants argue that "[t]here is no evidence in the available record, that the alleged fabricated statement taken from the plaintiff ever resulted in a deprivation of his liberty and therefore he has no claim for a violation of his right to a fair trial." (Suffolk Br. at 23.) Thus, because it is uncontroverted that "the plaintiff's statement was never used, or even considered during his brief pending criminal prosecution," (*id.*), they argue that his due process claims must be dismissed.

The Court finds this argument unpersuasive. As noted above, the Second Circuit recently rejected this precise argument. More specifically, in *Frost*, the Second Circuit held that the "fair trial right protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury.*" *Frost*, 980 F.3d at 250. The Court emphasized that "we have expressly distinguished this right from the separate, although related, right not to be convicted based on the use of false evidence *at trial.*" *Id.* Thus, the fair trial claim survived summary judgment in *Frost* even though the

allegedly fabricated evidence was presented to the prosecutor, but never used at any trial.

In the instant case, ADA Pearl testified that he considered the interviews of DiLeonardo and Bienz, and that plaintiff's allegedly fabricated confession corroborated their accounts as evidence against plaintiff. Thus, as in *Frost*, the due process claims survive summary judgment even though the charges against plaintiff were dismissed before trial. Moreover, as the Second Circuit reiterated in *Frost*, "probable cause is not a defense to a fair trial claim based on the fabrication of evidence," *id.* at 248, and thus, plaintiff may prevail on this claim even if probable cause existed for his arrest and prosecution.

Although the Suffolk County defendants' motion focused only on plaintiff's allegation that his statement to the Suffolk County defendants was fabricated, plaintiff notes that his due process claims also include an allegation that the Suffolk County defendants fabricated other evidence in connection with the investigation and prosecution of plaintiff, which was supplied to the prosecutor. (*See* Pl.'s Opp'n to Suffolk Br. at 32 (noting that, in addition to allegedly fabricated confession, "there are sufficient facts in the record to demonstrate, that the Suffolk County defendants fabricated other evidence as well[]—all witness statements, the police officers' Supplementary Reports, DiLeonardo's Deposition and the Felony and Misdemeanor Complaints.").)

In addition, aside from the allegations regarding affirmative conduct by the Suffolk County defendants in creating and forwarding fabricated evidence to ADA Pearl, plaintiff correctly notes that this claim also includes allegations that the Suffolk County defendants intentionally withheld exculpatory evidence related to plaintiff's criminal case from the prosecutors. Such omissions are part of a due process analysis. *See Morse v. Fusto*, 804 F.3d 538, 547-48 (2d Cir. 2015) ("We conclude that the omissions in this case were properly considered under the rubric of *Zahrey*, under which government officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly."); *see also Bermudez*, 790 F.3d at 376 (concluding that "a jury could find that [the defendant police officers'] alleged failure to inform [the prosecutor] about problems in the initial questioning of these witnesses could have prevented [the prosecutor] from making an informed decision about the reliability of that evidence. And this would mean that a jury could find that [the defendant officers] remained a proximate cause of the deprivation of [plaintiff's] due process rights" (footnote omitted)). Specifically, as discussed above, police officers are "under a constitutional obligation to disclose exculpatory evidence," which requires disclosure to the prosecutor. *See Collins v. City of New York*, 923 F. Supp. 2d 462, 476 n.6 (E.D.N.Y. 2013); *see also Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992). The prosecutor is the "final arbiter[]" of the "government's obligation to ensure fair trials." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

In short, plaintiff argues, based upon the record in this case, that "[a] reasonable jury can certainly find that if the fabricated evidence was not submitted to the Suffolk County District Attorney's Office, including ADA Pearl, and that if the Suffolk Defendants did not withhold all the evidence undermining the charges, including the legality of the statements they procured, which all, 'conveniently,' corroborated each other, tha[n] Moroughan would not have been arraigned, given, as this Court will surely find, that there was no probable cause

47

to prosecute." (Pl.'s Opp'n to Suffolk Br. at 35.) Construing the evidence most favorably to plaintiff, the Court concludes that there are genuinely disputed issues of material fact that preclude summary judgment on the due process claims against the individual Suffolk County defendants due to the varied allegations—and evidence supporting these allegations—of the fabrication of evidence and the withholding of material evidence as it relates to plaintiff's prosecution.

Accordingly, summary judgment as to the Suffolk County defendants on the due process claims is denied.

### G. Qualified Immunity

The Nassau County defendants (with the exception of Bienz) and Suffolk County defendants argue that they are entitled to qualified immunity. As a threshold matter, the Court has concluded that the DFRT members and Marinace are entitled to summary judgment on all claims on other grounds. Thus, the Court need not (and does not) address the qualified immunity issue as it relates to those defendants. Because the only remaining Nassau County individual defendant is Bienz—who does not assert qualified immunity in the summary judgment motion—the qualified immunity issue need only be analyzed as to the individual Suffolk County defendants. With respect to those defendants, the Court concludes that summary judgment on qualified immunity grounds is unwarranted given the disputed issues of fact in this case.

#### 1. Applicable Law

According to the Second Circuit, qualified immunity shields a government official from liability for civil damages if the official's "conduct did not violate plaintiff's clearly established rights or if it would have

been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) (summary order). Qualified immunity shields an official even if his conduct resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). As the Second Circuit has noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)). Thus, qualified immunity is not merely a defense, but is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, a court should determine the availability of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . . The unlawfulness must be apparent." *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998) (quotation marks and brackets omitted). Even where the plaintiff's rights are clearly established, however, the qualified immunity defense protects the government actor if it was objectively reasonable for him to believe his actions were lawful at the time of the challenged

act. *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). "The objective element of this test requires the court to look beyond the generalized constitutional protection, such as the right to be free of unreasonable searches and seizures, and to determine whether the law is clearly established in a more particularized sense," given the specific factual situation with which the officer is confronted. *Kerman v. City of New York*, 261 F.3d 229, 236 (2d Cir. 2001).

With respect to summary judgment, the Second Circuit has held that a court should cloak a defendant with qualified immunity at this juncture "only . . . when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)); *see also Ford v. McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (holding that finding qualified immunity at summary judgment stage is appropriate "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff . . . and with all permissible inferences drawn in [the plaintiff's] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right'" (second alteration added) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)))); *see also Stancuna v. Sherman*, 563 F. Supp. 2d 349, 356 (D. Conn. 2008) ("Here, the court finds that summary judgment on qualified immunity grounds is

inappropriate. As the Second Circuit has held, [w]hen a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical." (alteration in original) (quotation marks omitted)). Though qualified immunity is ordinarily decided by the court, "that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required" to resolve the factual disputes before the court makes its legal determinations. *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994).

## 2. Analysis

As an initial matter, all the rights that are the subject of plaintiff's claims in the instant case—namely, the right to be free from unlawful arrest, malicious prosecution, excessive force, and violations of the fair trial right (including the fabrication of evidence or suppression of exculpatory information by the police)—were all clearly established at the time of the alleged unconstitutional conduct in this case, as set forth in Second Circuit precedent developed long before the incident here. *See, e.g.*, *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995) ("There is no question that the rights at issue in this case—to be free from false arrest, malicious prosecution, and excessive force—were clearly established at the time of the incident."); *Zahrey*, 221 F.3d at 355 ("It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a government officer."); *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) (noting that "the police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors" and allowing plaintiff on remand to re-plead allegations that the

police suppressed evidence from the prosecution). Moreover, the constitutional requirement that police officers intervene to prevent a false arrest, malicious prosecution, or the fabrication of evidence, if they have the reasonable opportunity to do so, also was clearly established decades prior to the incident on Oakwood Road. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (a police officer "has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers").

The Suffolk County defendants principally argue that, based upon the facts in this case, no reasonable officer would have understood that he was violating those clearly established rights as it related to plaintiff. In particular, they contend that, even if probable cause was lacking for the arrest and prosecution of plaintiff, they are entitled to qualified immunity based upon the existence of arguable probable cause. However, the disputed issues of material fact in this case (discussed in detail *supra*) preclude summary judgment on the issue of qualified immunity. In other words, as set forth below, if the facts are construed most favorably to plaintiff, no reasonable officer would believe there was probable cause, or that his conduct did not violate plaintiff's clearly established rights.

The Court recognizes that, even without probable cause, a police officer is entitled to qualified immunity "so long as 'arguable probable cause' was present when the arrest was made." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)). "A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could

disagree on whether the probable cause test was met.'" *Id.*

The Second Circuit has affirmed that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause. . . . If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). Under this standard, an arresting officer is entitled to qualified immunity, as a matter of law, only "if the *undisputed facts* and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan v. Smith*, 439 F.3d 137, 147-48 (2d Cir. 2006) (alteration in original) (quotation marks omitted).

As discussed in detail *supra*, viewing the evidence most favorably to plaintiff, including drawing all reasonable inferences in his favor, plaintiff has shown that there is a material issue of fact as to whether the Suffolk County defendants participated in the fabrication of evidence to establish probable cause to arrest and prosecute plaintiff, as well as whether they concealed exculpatory evidence. If all of the evidence in plaintiff's favor is credited by the jury, the jury could also rationally find that one or more Suffolk County defendants knew that DiLeonardo was highly intoxicated at the time of the incident and after the time at which he made statements—to the point that he was describing critical information about the incident that officers instantly knew to be false (such as claiming to have been shot)—and thus that DiLeonardo's version of the events was completely lacking in credibility and probable cause was absent.

50

Under the circumstances of this case, these disputed issues of fact also preclude summary judgment on the issue of qualified immunity. In particular, if the Suffolk County defendants knew that the version of the events provided by DiLeonardo and Bienz was completely lacking in credibility, and that they then fabricated evidence and/or withheld exculpatory evidence to conceal DiLeonardo's unjustified use of force, there would be a lack of even arguable probable cause for plaintiff's arrest and prosecution, and no reasonable officers would disagree on the unconstitutionality of such conduct.[30]

This conclusion is consistent with well-settled Second Circuit precedent. For example, in *Ricciuti v. New York City Transit Authority*, the Second Circuit held that the district court erred in granting summary judgment in favor of the police officers on qualified immunity grounds with respect to the alleged fabrication of evidence. 124 F.3d 123, 130 (2d Cir. 1997). The Court found qualified immunity unavailable because conspiring to fabricate and forward to prosecutors a known false

confession "violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise." *Id.* Moreover, the Court held that the disputed factual issues regarding fabrication precluded summary judgment on that issue. *Id.* ("[A] reasonable jury could find, based on the evidence, that defendants . . . violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict. These defendant police officers are not entitled to summary judgment on the ground of qualified immunity."); *see also McSherry v. City of Long Beach*, 423 F.3d 1015, 1022 (9th Cir. 2005) (reversing grant of judgment as a matter of law on qualified immunity grounds where plaintiff "raised a disputed issue of fact as to whether defendants fabricated some of the evidence used to obtain [plaintiff's] conviction"); *Kingsland v. City of Miami*, 382 F.3d 1220, 1233 (11th Cir. 2004) (reversing summary judgment on qualified immunity grounds and noting that "because a jury question exists as to whether the defendants constructed evidence upon which to base [plaintiff's] arrest, the question whether arguable probable cause for the arrest existed is aptly suited for a jury"); *Scotto v. Almenas*, 143 F.3d 105, 113 (2d Cir. 1998) ("[I]t would be objectively unreasonable for [the defendant officer] to believe he had probable cause to arrest [plaintiff] if [the defendant] himself fabricated the grounds for arrest.").

Similarly, in *Jenkins*, the Second Circuit found that some of the facts alleged to provide a basis for probable cause were "vigorously disputed," including facts that were "clearly material" to the district court's finding of arguable probable cause. 478 F.3d at 89. The Second Circuit, therefore, found that the district court had erred in part in granting summary judgment on qualified

---

[30] The Suffolk County defendants, citing *Mullenix v. Luna*, 136 S. Ct. 305 (2015), argue that it was not clearly established that charging plaintiff under these specific circumstances violated his constitutional rights. *See id.* at 308-09. The Court finds this argument and reliance on *Mullenix* unpersuasive. In *Mullenix*, the Supreme Court emphasized that, when determining whether an officer's conduct violated clearly established law, the inquiry "must be undertaken in light of the specific context of the case." *Id.* at 308 (citation omitted). Thus, with respect to qualified immunity, the "relevant inquiry is whether existing precedent placed the conclusion that [the officer] acted unreasonably in these circumstances beyond debate." *Id.* at 309 (internal citation and quotation marks omitted). Here, if a rational jury finds that officers arrested and charged plaintiff knowing that probable cause for plaintiff's arrest was lacking because of the unreliable nature of DiLeonardo's statement and/or fabricated evidence to support the charges, existing precedent at the time placed it well beyond debate that such conduct violated plaintiff's constitutional rights.

immunity grounds. *Id.* at 91; *see also McGee v. Doe*, 568 F. App'x 32, 37-38 (2d Cir. July 2, 2014) (summary order) ("[Plaintiff] has alleged facts that, if true, indicate that any reasonably competent officer should have known that [the complainant] was an unreliable victim-informant whose statement, under the circumstances, could not form the sole basis for an arrest.").

Other courts have denied qualified immunity at summary judgment where the facts (if taken as true) raised doubt as to the complainant's veracity and vitiated probable cause to the point that no reasonable officer could conclude that an arrest was constitutional. *See Allen v. Leonard*, 18-CV-7163, 2020 WL 4587752, at *12 (E.D.N.Y. March 3, 2020) ("[T]here were reasons to doubt the Complainants' veracity in this situation, and, as a consequence, the validity of the Supporting Depositions. Therefore, it may not have been 'objectively reasonable' for Defendants to believe probable cause existed solely from the Supporting Depositions without having conducted a further investigation. Under these circumstances, absent reliable Supporting Depositions, no 'officers of reasonable competence could disagree' that the arresting officers did not have probable cause to arrest and charge Plaintiff."), *report and recommendation adopted*, 2020 WL 2537280 (E.D.N.Y. May 19, 2020); *Jovanovic v. City of New York*, No. 04-CV-8437, 2006 WL 2411541, at *8 (E.D.N.Y. Aug. 17, 2006) ("[T]here were reasons to doubt [the victim's] veracity, and therefore the validity of her statement, so that it may not have been 'objectively reasonable' for [the officer] to believe he had probable cause based solely upon this statement. Removing the alleged victim's statement from the equation, no officer of reasonable competence could believe that [the officer]

had probable cause to arrest [the plaintiff].").

Accordingly, given the disputed issues of fact in the record regarding the alleged fabrication of evidence by various Suffolk County defendants and/or their knowledge regarding information that substantially undermined DiLeonardo's version of the events and vitiated any arguable probable cause for plaintiff's arrest and prosecution, the individual Suffolk County defendants' motion for summary judgment on qualified immunity grounds is denied.[31]

## H. *Monell* Claim against Nassau County

Plaintiff also asserts a § 1983 claim against Nassau County in connection with the DFRT members. In short, plaintiff alleges that there was a policy and custom of

---

[31] Although summary judgment has been denied on qualified immunity grounds, the individual defendants may raise the issue again with the Court at trial. In order to determine the availability of the qualified immunity defense in this case at trial, the Court is prepared to follow the procedures set forth by the Second Circuit in *Zellner v. Summerlin*, 494 F.3d 344, 367-68 (2d Cir. 2007). Specifically, although "the ultimate question of whether it was objectively reasonable for [defendants] to believe that [their] conduct did not violate a clearly established right, *i.e.*, whether officers of reasonable competence could disagree as to the lawfulness of such conduct, is to be decided by the court," *id.* at 367, the jury must first "resolve[ ] any disputed facts that are material to the qualified immunity issue," *id.* at 368. Further, "[t]o the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question." *Id.* (noting that "if the defendant does not make such a request, he is not entitled to have the court, in lieu of the jury, make the needed factual finding"). In particular, "the jury should decide these issues on special interrogatories." *Id.* (quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990)). Once the jury has determined these factual issues, the Court will—if necessary—afford defendants an additional opportunity to renew their motion with respect to qualified immunity.

utilizing the DFRT to conceal the unconstitutional use of deadly physical force by NCPD personnel. As set forth below, Nassau County is entitled to summary judgment on this claim.[32]

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipal entity may be held liable under § 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell*, 436 U.S. at 694-95; *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989) and *Monell*, 436 U.S. at 692-94). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y.C.Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). A policy, custom, or practice of the municipal entity may be inferred where "the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Patterson*, 375 F.3d at 226 (quoting *Kern*, 93 F.3d at 44). However, a municipal entity may only be held liable where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

Here, because the Court has concluded that there is insufficient evidence for the underlying constitutional claims against the DFRT members to survive summary judgment, no *Monell* claim can lie against Nassau County based upon that alleged conduct. *See, e.g., Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("A plaintiff who seeks to hold a municipality liable in damages under section

1983 must prove that the municipality was, in the language of the statute, the 'person who . . . subject[ed], or cause[d] [him] to be subjected,' to the deprivation of his constitutional rights." (quoting 42 U.S.C. § 1983)); *Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007) (granting summary judgment to city on *Monell* claim because police officer's conduct did not deprive plaintiff of his constitutional rights); *Torraco v. Port Auth. of N.Y. and N.J.*, 539 F. Supp. 2d 632, 652 (E.D.N.Y. 2008) ("[S]ince the individual defendants did not violate plaintiffs' rights, there can be no liability against the Port Authority."). Therefore, the Court grants the Nassau County defendants' motion for summary judgment as to plaintiff's *Monell* claim against Nassau County.[33]

## I. State Law Claims

### 1. Nassau County

The Nassau County defendants argue that, for all the reasons summary judgment is warranted on the federal claims, summary judgment should be granted on the state law claims. Among other things, Nassau County contends that it cannot be liable under a *respondeat superior* theory of liability under state law for the intentional conduct of DiLeonardo or Bienz because they were not acting under color of state law at the time of the shooting incident.

---

[32] No *Monell* claim has been asserted against Suffolk County.

[33] Although plaintiff argues that the Court should defer consideration of the summary judgment motion on this claim until the *Monell* discovery (which had been bifurcated) is complete, such deferral of the motion is unwarranted because the claim must be dismissed as a matter of law independent of such discovery. In other words, discovery regarding any policy or custom by Nassau County regarding the DRFT would be futile given the absence of any underlying constitutional violation by the DRFT members in this case.

As a threshold matter, to the extent that plaintiff asserts any state law claims against the DFRT members and Marinace, summary judgment is granted on those claims for the same reason that summary judgment is granted on the federal claims against those defendants.

With respect to Bienz, the disputed issues of fact that preclude summary judgment on the federal claims against him also preclude summary judgment on the corresponding state law claims. Accordingly, summary judgment is denied as to Bienz on the state law claims.

Finally, as to Nassau County, it is well established that the doctrine of *respondeat superior* renders an employer vicariously liable for torts committed by an employee acting within the scope of his or her employment. *Beauchamp v. City of New York*, 771 N.Y.S.2d 129, 131 (App. Div. 2004). Thus, although a municipality cannot be held vicariously liable on a § 1983 claim, under New York state law, a municipality may be held vicariously liable on state law claims asserted against individual officers under a theory of *respondeat superior*. *Scott v. City of New Rochelle*, 986 N.Y.S. 2d 819, 836 (Sup. Ct. 2014). "An employee's actions fall within the scope of employment where the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business." *Beauchamp*, 771 N.Y.S.2d at 131 (quotation marks omitted).

In the instant case, because the Court has already determined that disputed factual issues preclude summary judgment on whether DiLeonardo and/or Bienz acted under color of state law at the time of the shooting (or thereafter in connection with the investigation, arrest, and prosecution), summary judgment on the state law claims

against Nassau County on that ground is similarly denied. *See id.* ("Since the determination of whether an employee's actions fall within the scope of employment depends heavily on the facts and circumstances of the particular case, the question is ordinarily for the jury."). If the jury determines that DiLeonardo and/or Bienz were acting under color of state law and finds liability against them on one or more of the state law claims, Nassau County also would be liable under the doctrine of *respondeat superior*.

Accordingly, summary judgment as to Nassau County on the state law claims, as it relates to the corresponding claims against Bienz and DiLeonardo, is denied.

## 2. Suffolk County

The Suffolk County defendants assert one ground for summary judgment on the state law claims—namely, they assert the claims for libel and slander should be dismissed because there was probable cause for plaintiff's arrest. In the alternative, the Suffolk County defendants request that, in the absence of viable federal claims, the Court should decline to exercise supplemental jurisdiction over the state law claims.

Given that the Court has already determined that factual disputes preclude summary judgment on the probable cause issue, summary judgment on the libel and slander claims on that ground is denied. Moreover, because federal claims against the Suffolk County defendants have survived summary judgment, the Court, in its discretion, will exercise supplemental jurisdiction over the state law claims against the Suffolk County defendants.

## J. Cross-Claims

The Nassau County defendants have moved for summary judgment on DiLeonardo's cross-claims against them. Defendant Hunter has likewise moved for summary judgment on the cross-claim brought against him by the Suffolk County defendants.

To the extent these cross-claims seek indemnification and contribution on plaintiff's § 1983 claims, they cannot do so as a matter of law. No right to contribution exists under § 1983. *See Crews v. County of Nassau*, 612 F. Supp. 2d 199, 208 (E.D.N.Y. 2009) (collecting cases). Nor is there a federal right of indemnification under the statute.[34] *See Hayden v. Hevesi*, No. 05–CV–0294E(SR), 2007 WL 496369, at *4 (W.D.N.Y. Feb. 12, 2007). Accordingly, summary judgment is granted on these cross-claims, and the cross-claims against these defendants are dismissed.

## K. Punitive Damages

The Nassau County defendants seeks dismissal of the claim for punitive damages. Bienz is the only remaining individual defendant, among the individual Nassau County defendants, who remains in this case. Viewing the record in the light most favorable to plaintiff, a reasonable trier of fact could find that Bienz acted with "reckless or callous indifference" to plaintiff's rights. *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir.1996) (citation omitted). Accordingly, the Nassau County defendants' motion for summary judgment as to

plaintiff's punitive damages claim is denied.[35]

## CONCLUSION[36]

For the reasons set forth above, the Court grants the motions for summary judgment as to all of plaintiff's claims against defendants Hunter, Horace, Flanagan, DeMartinis, and Marinace.[37] The cross-claims against defendant Hunter also are dismissed. The cross-claims brought by DiLeonardo against Nassau County are also dismissed.

The Court also grants summary judgment as to the federal § 1983 claim under *Monell* against Nassau County.

The summary judgment motions are denied in all other respects.

The federal and state claims shall proceed to trial against the remaining individual defendants (DiLeonardo, Bienz, Lamb, Tavares, Leser, Meaney, Ciccotto, Geissinger, Favata, Smithers, and Faya), as

---

[34] Moreover, given that summary judgment has been granted on the § 1983 claims against Hunter, no liability exists for any cross-claims. *See Keller v. Village of Hempstead*, No. CV 13-3670, 2014 WL 2718573, at *6 (E.D.N.Y. June 12, 2014).

[35] The request for punitive damage also remains against DiLeonardo and the individual Suffolk County defendants.

[36] To the extent that the moving defendants have incorporated by reference the arguments set forth by their moving co-defendants, those arguments are also rejected for the same reasons set forth *supra*.

[37] Hunter's request for attorney's fees is denied. When the prevailing party in a § 1983 action is the defendant, attorney's fees will only be awarded if the plaintiff's underlying "'claim was frivolous, unreasonable, or groundless, or . . . the plaintiff continued to litigate after it clearly became so.'" *Rounseville v. Zahl*, 13 F.3d 625, 632 (2d Cir.1994) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986) (additional internal quotations omitted)). Here, although the Court has granted summary judgment on the claims against Hunter, it does not believe that the claims brought were frivolous, or that any grounds exist for awarding fees. Accordingly, Hunter's request for attorney's fees is denied.

well as the state claims against Nassau County and Suffolk County.

SO ORDERED.

s/ Joseph F. Bianco

_____

JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Date:    January 20, 2021
Central Islip, NY

\*\*\*

Plaintiff Thomas M. Moroughan is represented by Mirel Fisch and Anthony M. Grandinette of the Law Office of Anthony M. Grandinette, 114 Old Country Road, Suite 420, Mineola, New York 11501.

The Nassau County defendants are represented by Peter James Johnson, Jr., Joanne Filiberti, and Christopher D. Clarke of Leahey & Johnson, P.C., 120 Wall Street, Suite 2220, New York, New York 10005.

The Suffolk County defendants are represented by Suffolk County Attorney Dennis M. Brown and Assistant County Attorney Brian C. Mitchell, H. Lee Dennison Building, 100 Veterans Memorial Highway, Hauppauge, New York 11788.

Defendant John Hunter is represented by Annemarie S. Jones of Lewis Johs Avallone Aviles, LLP, One CA Plaza, Suite 225, Islandia, New York 11749.